UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                             :

In re                                         :

                                             :     Chapter 11

**BREITBURN ENERGY**               :
**PARTNERS LP,** *et al.*,          :    Case No. 16-_____ (___)

                                             :

                Debtors.[1]        :    **(Joint Administration Pending)**

                                             :
------------------------------------------------------------x

## DECLARATION OF TIMOTHY R. POHL IN SUPPORT OF DEBTORS' MOTION FOR APPROVAL OF AND AUTHORITY TO ENTER INTO POSTPETITION FINANCING AND USE CASH COLLATERAL

I, Timothy Pohl, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am a Managing Director of the firm Lazard Frères & Co. LLC ("**Lazard**"), which has its principal office at 30 Rockefeller Plaza, New York, New York 10020. I am authorized to make this declaration (the "**Declaration**") in support of the *Motion of Debtors pursuant to 11 U.S.C. §§ 105, 361, 362, 363, AND 364 and Fed. R. Bankr. P. 4001, and Local Rules 4001-1 and 4001-2 for Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Related Relief* (the "**Motion**").[2] The Debtors engaged Lazard in March 2016 to serve as their investment banker to provide restructuring advice.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Breitburn Energy Partners LP (9953); Breitburn GP LLC (9948); Breitburn Operating LP (5529); Breitburn Operating GP LLC (5525); Breitburn Management Company LLC (2858); Breitburn Finance Corporation (2548); Alamitos Company (9156); Beaver Creek Pipeline, L.L.C. (7887); Breitburn Florida LLC (7424); Breitburn Oklahoma LLC (4714); Breitburn Sawtelle LLC (7661); Breitburn Transpetco GP LLC (7222); Breitburn Transpetco LP LLC (7188); GTG Pipeline LLC (3760); Mercury Michigan Company, LLC (3380); Phoenix Production Company (1427); QR Energy, LP (3069); QRE GP, LLC (2855); QRE Operating, LLC (9097); Terra Energy Company LLC (9616); Terra Pipeline Company LLC (3146); and Transpetco Pipeline Company, L.P. (2620). The Debtors' mailing address is 707 Wilshire Boulevard, Suite 4600, Los Angeles, California 90017.

[2] Capitalized terms use but not defined herein shall have the meanings ascribed to such terms in the Motion.

2. Lazard is the primary U.S. operating subsidiary of a preeminent international financial advisory and asset management firm. Lazard, together with its predecessors and affiliates, has been advising clients around the world for over 150 years. Lazard has dedicated professionals who provide restructuring services to its clients.

3. The current vice chairmen, managing directors, directors, vice presidents and associates of Lazard have extensive experience working with financially troubled companies in complex financial restructurings, both out-of-court and in Chapter 11 proceedings. Lazard and its professionals have been involved as advisor to debtors, creditors and equity constituencies and government agencies in many reorganization cases. Since 1990, Lazard's professionals have been involved in over 250 restructurings, representing over $1 trillion in debtor assets.

4. At Lazard, I have advised on numerous complex restructurings including HOVENSA, Boomerang Tube, Target Canada, United States Enrichment Corp., Longview Power, A123 Systems, Energy Future Holdings (Creditors Committee), Midwest Generation (bondholders), GMAC/Residential Capital, Capital Source, Highland Hotels, Opti Canada, Westgate Resorts, Clear Channel Outdoor, and Xerium Technologies, among others.

5. Prior to joining Lazard, I was co-leader of Skadden, Arps, Meagher & Flom's worldwide corporate restructuring practice where I was involved in a variety of in-court and out-of-court restructurings. I led the chapter 11 cases of a number of major corporations, including National Steel, ICG Communications, McLeod USA, Radnor Holdings, VeraSun Energy and Diamond Brands. I also led successful out-of-court restructurings for companies across many industries, including Meridian Technologies, Reliant Resources, ITC^DeltaCom, Rural Cellular Communications, American National Power, InterGen, and Krispy Kreme in the

restructuring of its troubled franchisees. I have also advised on numerous M&A transactions, including acting as lead counsel in the merger of America West and US Airways, the acquisition by OAO Severstal of Rouge Industries, the sale of National Steel to U.S. Steel, the acquisitions by Transworld Entertainment of multiple industry competitors, and acquisitions by private equity firms of companies such as Smart Carte Corp, Werner Ladder Company and Bayou Steel.

6. I submit this declaration ("**Declaration**") in support of the Debtors' Motion for approval of and authority to enter into a $150 million first-lien secured debtor-in-possession financing facility (the "**DIP Facility**") and to use cash collateral filed contemporaneously herewith. In particular, I submit this Declaration as evidence that the proposed DIP Facility is (a) the best postpetition financing alternative available to the Debtors under the circumstances, (b) in the best interests of the Debtors, their estates, and all parties in interest in these chapter 11 cases, and (c) the product of an arms' length negotiation process.

7. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, my experience, my review of relevant documents, information provided to me by Lazard employees working under my supervision or information provided to me by members of the Debtors' management or their other advisors. If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

### The Debtors' Capital Structure and the Need for DIP Financing

8. The Debtors' prepetition capital structure is explained in detail in the *Declaration of James G. Jackson Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York and in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, which has been filed with the Court contemporaneously herewith. In short, substantially all of the Debtors' assets are subject to the prepetition security interests and liens of

3

the RBL Agent, the RBL Lenders, the Second Lien Trustee, and the Second Lien Noteholders. The interests of the Second Lien Trustee and the Second Lien Noteholders in the Debtors' assets are subject to the Prepetition Intercreditor Agreement, which generally prohibits such parties from objecting to the DIP Facility.

9. As a result of the ongoing crisis in the oil and gas industry, the Debtors' operating revenues have significantly declined. The Debtors have determined that a balance sheet restructuring is necessary and in the best interest of the Debtors and all stakeholders, and that chapter 11 is necessary to effectuate that restructuring. A significant source of liquidity for the Debtors outside of chapter 11 is Hedging Proceeds. Many hedge agreement counterparties are revolving lenders, and the hedges are collateral under the RBL Facility.

10. As a result of the chapter 11 filing, hedge counterparties may terminate the hedges, and there is disagreement between the Debtors and the RBL Agent regarding the Debtors' right to use Hedging Proceeds as cash collateral. The Debtors and the RBL Agent have agreed that the ultimate disposition of the Hedging Proceeds, which are estimated to be up to $500 million, should be the subject of further negotiation with the goal of reaching a consensual resolution to avoid litigation. During such negotiations, the Debtors and the RBL Agent have agreed that all parties' rights with respect to the Hedging Proceeds should be fully reserved. As a result, pending further agreement or court order resolving the issue, the Debtors' estimated sources of liquidity exclude use of Hedging Proceeds, and the latest 13-week cash forecast prepared by the Debtors' advisors excludes such revenue, resulting in insufficient liquidity for the Debtors in the first 60 days of these chapter 11 cases and thereafter. The DIP Facility, together with the use of cash collateral contemplated thereby, will satisfy the Debtors' needs for

4

additional liquidity in the absence of the use of Hedging Proceeds, preserving the value of the estates for all stakeholders.

### The DIP Facility Is the Best Postpetition Financing Available to the Debtors

11. In my role as investment banker, I was actively involved in the Debtors' analysis of their postpetition financing options. Based on my experience and involvement in the consideration and negotiation of the DIP Facility, including engaging in good-faith, arms' length negotiations with the DIP Agent (on behalf of the DIP Lenders), I believe that the DIP Facility should be approved.

12. Lazard, together with the Debtors' other advisors, began considering potential postpetition financing shortly after being engaged by the Debtors. The Debtors and their advisors determined that, in light of the Debtors' prepetition capital structure and the existing liens on substantially all of the Debtors' assets, the only practical and reasonable sources of financing would be available from either the RBL Lenders or the Second Lien Noteholders. In the prepetition period, no third-party lender was likely to be able to reach consensus with all of the Debtors, the RBL Lenders, and the Second Lien Noteholders on both the value of the Debtors' assets and the validity and perfection of the prepetition liens thereon. Absent such consensus: (i) no third-party lenders were likely to lend on an unsecured or junior-lien basis, and (ii) if the Debtors proposed a third-party priming DIP Loan, the Debtors would face a significant risk of costly and destabilizing litigation at the outset of these cases regarding valuation, adequate protection, lien perfection, and the use of Hedging Proceeds.

13. The Debtors approached both the RBL Agent and the Second Lien Noteholders to discuss potential terms for a postpetition loan facility. Based on their initial discussions, it became clear that the RBL Lenders were willing and able to provide financing on materially more favorable terms (including more attractive rates) than the Second Lien

5

Noteholders would provide. Any financing provided by the Second Lien Noteholders would be subject to the restrictions imposed by the Prepetition Intercreditor Agreement, which was likely to make a Second Lien Noteholder-provided facility riskier and more expensive than one provided by the RBL Lenders. Moreover, the Debtors could not have entered into a Second Lien Noteholder-provided facility without also requiring the use of the RBL Lenders' cash collateral, potentially on a non-consensual basis. In addition, as noted above, the Debtors believe that it is in the estates' best interest to continue to negotiate over the application of the Hedging Proceeds rather than litigating these issues at this time. As a result, the RBL Lenders were, overall, the parties best suited to provide postpetition financing in these chapter 11 cases.

14. The RBL Lenders ultimately agreed to provide the DIP Facility, which is on terms that I believe to be fair, reasonable, and advantageous to the Debtors. First, the DIP Facility provides significant flexibility to the Debtors. It contains no milestones or overly burdensome consent rights. The Budget provides for variance testing on an aggregate, rather than line-item, basis. The Budget excludes professional fees paid by the Debtors. The Budget also permits cash payments of Adequate Protection to the advisors to the Second Lien Noteholders, who are actively engaged in the Debtors' restructuring discussions and whose involvement will be critical to the chapter 11 plan process in these cases. Under the Prepetition Intercreditor Agreement, the RBL Agent and RBL Lenders are not required to permit such payments but have consented to such payments under the terms of the DIP Facility. I believe that, altogether, these features of the DIP Facility provide substantial benefits to the Debtors that would not be available from any other party.

15. Second, the DIP Facility preserves the status quo with respect to the Debtors' prepetition Derivative Contracts, which are among their most valuable assets. The

Debtors, the Derivative Counterparties, and the Debtors' other stakeholders intend to use the Interim Period to negotiate a consensual disposition of the Hedging Proceeds. During that period, all rights of the parties will be reserved and to the extent any Hedging Proceeds are payable in cash to the Debtors, such Hedging Proceeds will be held by the Derivative Counterparties.

16. Third, in my opinion, the rate proposed under the DIP Facility is below the existing market rates for postpetition financing in this industry. From the outset of negotiations, the RBL Lenders touted this benefit of the DIP Facility (among other benefits). Based on my extensive experience negotiating postpetition financings, I am confident that the Debtors would be unable to obtain credit on similar terms at lower cost than those of the DIP Facility from an alternative lender, especially when taking into account the significant favorable non-financial terms of the DIP Facility, including the avoidance of litigation.

17. Finally, the DIP Facility addresses the Debtors' need for certainty and stability during the Interim Period. By avoiding litigation at the outset of these chapter 11 cases and demonstrating ongoing capability to meet ordinary course obligations, the Debtors will be able to ensure the confidence of their employees, customers, and vendors, which chapter 11 otherwise threatens to disrupt. In short, the DIP Facility is the best postpetition financing alternative available to the Debtors under the circumstances. Approving and authorizing the Debtors' entry into the DIP Facility would benefit all parties in interest in these cases by preserving the status quo, providing the Debtors flexibility in operating their business and negotiating the terms of a chapter 11 plan, avoiding litigation, and bringing certainty and stability to this restructuring.

**The DIP Facility Was Negotiated in Good Faith and at Arms' Length**

18. Together with the Debtors and their other advisors, I took an active role in the negotiation of the DIP Facility. The process can be accurately characterized as "hard bargaining."

19. Initially, the Debtors sent the RBL Agent a term sheet proposing a consensual use of cash collateral in these cases. The RBL Agent responded with a term sheet for a postpetition loan facility. The parties exchanged term sheets every several days thereafter and negotiated telephonically or by e-mail nearly every day. Every term sheet contained significant changes to multiple material terms of the loan facility.

20. The negotiation process included as a key component the disposition of the Hedging Proceeds. Specifically, the Debtors sought the ability to use all Hedging Proceeds as cash collateral and to require Derivative Contract counterparties to pay Hedging Proceeds to them as such Hedging Proceeds came due in accordance with the terms of the Derivative Contracts. The RBL Agent, however, pressed for the RBL Lenders to have the ability to offset Hedging Proceeds against amounts due under the RBL Credit Agreement. Ultimately, the DIP Facility reflects a compromise, preserving the issue for future consensual negotiation (and if not, litigation later in these cases). This is one of numerous material issues that remained unresolved until the parties reached agreement on all unresolved terms.

21. Accordingly, I believe that the DIP Facility was negotiated in good faith and at arms' length. It represents the best possible postpetition financing alternative available to the Debtors under the circumstances. As a result, I believe that the Court should approve and authorize the Debtors' entry into the DIP Facility and use of cash collateral contemplated thereby.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: May 15, 2016
      Chicago, IL

/s/ Timothy R. Pohl
Timothy R. Pohl
Managing Director
Lazard Frères & Co. LLC

WEIL:\95714642\3\29979.0003