Thomas R. Slome
Michael Kwiatkowski
MEYER, SUOZZI, ENGLISH & KLEIN, P.C.
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York 11530-9194
Telephone: (516) 741-6565
Facsimile: (516) 741-6706

    and

Russell R. Johnson III
John M. Craig
LAW FIRM OF RUSSELL R. JOHNSON III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia 23103
Telephone: (804) 749-8861
Facsimile: (804) 749-8862

*Co-Counsel for Southwestern Electric Power Company d/b/a
American Electric Power, Southern California Edison Company and
Southern California Gas Company*

Hearing Date and Time: June 14, 2016 at 2:00 p.m.
Objection Deadline: June 7, 2016 at 4:00 p.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| **BREITBURN ENERGY PARTNERS,** *et al.*, | ) Case No. 16-11390 (SMB) |
| Debtors. | ) **(Jointly Administered)** |

**OBJECTION OF CERTAIN UTILITY COMPANIES
TO THE MOTION OF DEBTORS PURSUANT TO 11 U.S.C.
§§ 105(a) AND 366 REQUESTING ENTRY OF AN ORDER (I)
APPROVING DEBTORS' PROPOSED FORM OF ADEQUATE ASSURANCE OF
PAYMENT TO UTILITY PROVIDERS, (II) ESTABLISHING PROCEDURES
PROVIDING ADEQUATE ASSURANCE AND RESOLVING OBJECTIONS BY
UTILITY PROVIDERS, AND (III) PROHIBITING UTILITY PROVIDERS FROM
<u>ALTERING, REFUSING, OR DISCONTINUING UTILITY SERVICE</u>**

Southwestern Electric Power Company d/b/a American Electric Power ("AEP"), Southern California Edison Company ("SCE") and Southern California Gas Company ("SoCalGas") (collectively, the "Utilities"), by counsel, hereby object to the *Motion of Debtors Pursuant To 11 U.S.C. §§ 105(a) and 366 Requesting Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment To Utility Providers, (II) Establishing Procedures Providing Adequate Assurance and Resolving Objections By Utility Providers, and (III) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Service* (the "Utility Motion"), and set forth the following:

### Introduction

The Debtors' Utility Motion improperly seeks to shift the Debtors' obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested by the Utilities under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. This Court should not permit the Debtors to shift their statutory burden.

The Debtors seek to have this Court approve their form of adequate assurance of payment, which is a bank account containing $1.4 million that supposedly reflects two weeks of the Debtors' averages utility charges for the fiscal year ending 2015 (the "Bank Account"). As set forth herein, both the amount and the form of the Debtors' proposed adequate assurance of payment is unsatisfactory. With respect to the amount, the Debtors' claim that they spend approximately $5.3 million each month on utility costs. Accordingly, the proposed Bank Account in the amount of $1.4 million would only contain approximately eight (8) days of the

Debtors' estimated utility charges. As to the form, Section 366(c) of the Bankruptcy Code specifically defines the forms of adequate assurance of payment in Section 366(c)(1), none of which include a segregated bank account. The Utilities recognize that some courts have held that a segregated bank account somehow equals a cash deposit, but in order to reach such holdings those courts have had to ignore the plain language of Section 366 and industry custom on what constitutes a cash deposit.

Even if this Court were to improperly consider the Bank Account as a form of adequate assurance of payment for the Utilities, the Court should reject it as an insufficient form of adequate assurance of payment for the following reasons:

1. Unlike all of the identified and permissible forms of adequate assurance of payment listed in Section 366(c)(1)(A), the Bank Account is not something held by the Utilities, so the Utilities do not have any control over when the Bank Account will be terminated;

2. All funds contained in the Bank Account may remain subject to prepetition liens in favor of the Debtors' secured lenders (this is in complete contrast to the $5 million Carve-Out received by the Debtors' professionals in the Financing pleadings, which remains in place even if there is an event of default);

3. In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a disbursement request;

4. It is underfunded from the outset because the Utilities issue monthly bills; and

5. The Bank Account could be closed prior to the payment of all post-petition utility charges.

The Utilities are seeking the following cash deposits from the Debtors that they are authorized to obtain pursuant to applicable state law or contracts: (a) AEP - $649,571 (2-month); (b) SCE - $1,024,073 (2-month); and (c) SoCalGas – (i) $99,300 as to the Breitburn Contracts (defined below) and (ii) $218,900 as to the Alamitos Contracts (defined below). Based on all the foregoing, this Court should deny the Utility Motion as to the Utilities because the amounts of the Utilities' post-petition deposit requests are reasonable under the circumstances and should not be modified.

## Facts

### Procedural Facts

1. On May 15, 2016 (the "Petition Date"), the Debtors commenced their cases under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") that are now pending with this Court. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

2. The Debtors' chapter 11 bankruptcy cases are being jointly administered.

### The Utility Motion

3. On May 16, 2016, the Debtors filed the Utility Motion.

4. In the Utility Motion, the Debtors seek to avoid the applicable legal standards under Sections 366(c)(2) and (3) by seeking Court approval for their own form of adequate assurance of payment, which is a bank account containing $1.4 million that supposedly

4

reflects two weeks of the Debtors' estimated utility charges, based on the Debtors' average usage for the fiscal year ending 2015 (the "Bank Account").  Utility Motion at ¶ 11.  The foregoing proposal is unacceptable to the Utilities and should not be considered relevant by this Court because Sections 366(c)(2) and (3) do not allow the Debtors to establish the form or amount of adequate assurance of payment. Under Sections 366(c)(2) and (3), this Court and the Debtors are limited to modifying, if at all, the amount of the security sought by the Utilities under Section 366(c)(2).

5.      The Debtors' claim that they spend approximately $5.3 million each month on utility costs.  Utility Motion at ¶ 8.  As such, the Debtors proposed Bank Account would only contain approximately eight days' of utility charges.

6.      Although not requested in the Utility Motion, the proposed Final Utility Order provides that any monies contained in the Bank Account shall be returned to the Debtors on the earlier of (i) the date on which the Debtors have satisfied in full all postpetition obligations due and owing to a particular utility and (ii) the effective date of a plan of reorganization, if not applied earlier.  Proposed Final Utility Order at page 3.  As the Utilities bill the Debtors in arrears and the proposed two-week Bank Account is insufficient to cover their monthly billing charges, the Bank Account, if approved, should not be released until the Debtors confirm payment in full of their post-petition utility expenses.

7.      The Debtors claim that they have a good payment history with their utility providers, and to the best of their knowledge, there and no defaults or material arrearages with respect to the Debtors' undisputed invoices for prepetition utility services.  Utility Motion at ¶

8. However, Section 366(c)(3)(B)(ii) expressly provides that in making an adequate assurance of payment determination, a court may not consider a debtor's timely payment of prepetition utility charges.

8. On May 18, 2016, the Debtors filed the *Notice of Hearing On June 14, 2016* on the Utility Motion (the "Notice of Hearing"), which set a June 7, 2016 deadline for filing objections to the Utility Motion and set a hearing date on the Utility Motion for June 14, 2016 at 2:00 p.m. Local Rule 9014-2, however, provides that the initial hearing on a motion, such as the Utility Motion, is non-evidentiary. As the facts that the Debtors intend to introduce to support their burden of proof and the Utilities' contrary evidence will need to be considered by the Court, a subsequent evidentiary hearing will need to be scheduled by this Court.

9. The Utility Motion does not address why the Bank Account would be undercapitalized at only a supposed two-week deposit amount when the Debtors know that the Utilities are required by applicable state laws, regulations, tariffs or contract to bill the Debtors monthly. Moreover, presumably the Debtors want the Utilities to continue to bill them monthly and provide them with the same generous payment terms that they received prepetition. Accordingly, if the Bank Account is relevant, which the Utilities dispute, the Debtors need to explain: (A) why they are only proposing to establish a two week Bank Account (actually only about eight days of utility charges); and (B) how such an insufficient amount could even begin to constitute adequate assurance of payment for the Utilities' monthly bills.

10. Furthermore, the Utility Motion does not address why this Court should consider modifying, if at all, the amounts of the Utilities' adequate assurance requests

pursuant to Section 366(c)(2). Rather, without providing any specifics, the Utility Motion merely states that the Bank Account "in conjunction with the Debtors' ability to timely pay for future Utility Services in the ordinary course of business . . . constitute sufficient adequate assurance to the Utility Providers." Utility Motion at ¶ 13.

### Facts Regarding the Debtors

11. The Debtors are an independent oil and gas partnership engaged in the acquisition, exploitation and development of oil and natural gas properties. *Declaration of James G. Jackson Pursuant To Local Bankruptcy Rule 1007-2 and In Support of the Debtors' Chapter 11 Petitions and First Day Relief* ("First Day Declaration") at ¶ 5.

12. For the fiscal year ended December 31, 2015, the Debtors' total operating revenues were approximately $1.1 billion, representing a 22% decrease in operating revenues year over year, which was driven by the decline in the prices of crude oil and natural gas in 2015. First Day Declaration at ¶ 15.

13. As of March 31, 2016, the Debtors had consolidated reported assets and liabilities of approximately $4.71 billion and $3.41 billion, respectively. The Debtors recorded a consolidated net loss after taxes of $2.6 billion for fiscal 2015 and a consolidated net loss of $115 million in the first quarter of 2016. First Day Declaration at ¶ 18.

14. As of the Petition Date, the Debtors have approximately $3 billion in total funded debt outstanding. The Debtors' prepetition funded indebtedness consist primarily of the following: (i) Revolving Credit Facility - $1.242 billion; (ii) 9.25% Senior Secured Second Lien Notes due 2020 - $650 million; (iii) 7.875% Senior Unsecured Notes due 2022 -

$850 million; and (iv) 8.625% Senior Unsecured Notes due 2020 - $305 million.  First Day Declaration at ¶ 19.

15. The Debtors estimated that as of the Petition Date, their outstanding trade payables were approximately $50 million.  First Day Declaration at ¶ 25.

### The Debtors' Post-Petition Financing

16. On May 16, 2016, the Debtors filed the *Motion of Debtors Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Fed. R. Bankr. P. 4001, and Local Rules 4001-1 and 4001-2 For Authority To (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections To Prepetition Secured Parties, and (D) Related Relief* (the "Financing Motion").

17. Through the Financing Motion, the Debtors are seeking authority to enter into a DIP credit facility of up to $150 million, with a $75 million borrowing limit upon entry of the Interim Financing Order, and an additional $75 million following entry of the Final Financing Order.  Financing Motion at page 3.

18. The Debtors also seek a $5 million carve-out for the payment of fees and expenses of the Debtors' professionals after a Carve-Out Trigger Date, in addition to a provision that guarantees payment of their fees up to a Carve-Out Trigger Date.  Financing Motion at page 5.

19. On May 23 2016, the Court entered the *Interim Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rule 4001-2 (I) Authorizing the Debtors To Obtain Postpetition Senior Secured*

*Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection To the Prepetition Secured Parties, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "Interim Financing Order").

20. The Interim Financing Order authorized the Debtors to borrow up to $75 million on an interim basis. Interim Financing Order at page 15.

21. Attached as Exhibit "B" to the Interim Financing Order is a 13-week cash flow forecast through August 12, 2016. It is unclear from the Budget whether the Debtors have budgeted sufficient sums for the payment of their post-petition utility expenses.

22. The Interim Financing Order also approved the $5 million Carve-Out. Interim Financing Order at pages 23-24.

## Facts Concerning SoCalGas

23. SoCalGas and Debtor Breitburn Operating LP ("Breitburn") are parties to the following producer interconnection and operational balancing contracts:

  A. California Producer Interconnection Agreement dated January 1, 2016 [11100 Constitution Avenue, Brentwood, California Facility] (the "Breitburn CPIA");

  B. California Producer Operational Balancing Agreement dated January 1, 2016 [Breitburn Operating, LP/OM5719] (the "Breitburn CPOBA");

  C. Collectible Work Authorization prepared July 15, 2015 (the "Breitburn CWA").

(the Breitburn CPIA, Breitburn CPOBA and Breitburn CWA, collectively, the "Breitburn Contracts").

9

24. SoCalGas and Debtor Alamitos Company are parties to the following producer interconnection and operational balancing contracts:

    A. California Producer Interconnection Agreement dated January 1, 2016 [Seal Beach Blvd. and Anchors Way, Seal Beach, California Facility] (the "Alamitos CPIA");

    B. California Producer Operational Balancing Agreement dated January 1, 2016 [Alamitos Company/OM6115] (the "Alamitos CPOBA");

    C. Collectible Work Authorization prepared July 15, 2015 (the "Alamitos CWA").

(the Alamitos CPIA, Alamitos CPOBA and Alamitos CWA, collectively, the "Alamitos Contracts").

25. Pursuant to the terms of the Breitburn Contracts, SoCalGas is entitled to, and seeking a deposit of $99,300.

26. Pursuant to the terms of the Alamitos Contracts, SoCalGas in entitled to, and seeking a deposit of $218,900.

27. As of May 5, 2016, the past-due amounts under the Breitburn and Alamitos Contracts was $11,460.

28. Prior to the Petition Date and since that time, SoCalGas and the Debtors were negotiating the terms of a letter of credit in the amount of $142,000 (the "Alamitos LOC") to secure the Alamitos Contracts.

29. From the Petition Date forward SoCalGas and the Debtors were also negotiating a cash deposit in the amount of $75,000 to secure the Breitburn contracts.

30. Although SoCalGas believes that those negotiations are near completion and will result in the payment of the security set forth above, it is filing this Objection to preserve its rights with respect to the amount and form of adequate assurance of payment it is entitled to receive from the Debtors.

### Facts Concerning the Utilities Other Than SoCalGas

31. Each of the Utilities provided the Debtors with prepetition utility goods and/or services and have continued to provide the Debtors with utility goods and/or services since the Petition Date.

32. Under the Utilities' billing cycles, the Debtors receive approximately one month of utility goods and/or services before the Utility issues a bill for such charges. Once a bill is issued, the Debtors have approximately 20 to 30 days to pay the applicable bill. If the Debtors fail to timely pay the bill, a past due notice is issued and, in most instances, a late fee may be subsequently imposed on the account. If the Debtors fail to pay the bill after the issuance of the past due notice, the Utilities issue a notice that informs the Debtors that they must cure the arrearage within a certain period of time or its service will be disconnected. Accordingly, under the Utilities' billing cycles, the Debtors could receive at least two months of unpaid charges before the utility could cease the supply of goods and/or services for a post-petition payment default.

33. In order to avoid the need to bring witnesses and have lengthy testimony regarding the Utilities regulated billing cycles, the Utilities request that this Court, pursuant to Rule 201 of the Federal Rules of Evidence, take judicial notice of the Utilities' billing cycles.

11

Pursuant to the foregoing request and based on the voluminous size of the applicable documents, the Utilities' web site links to the tariffs and/or state laws, regulations and/or ordinances are as follows:

AEP:   https://www.aeptexas.com/account/bills/rates/

SCE:   http://www.sce.com/AboutSCE/Regulatory/tariffbooks/rules.htm

34. Subject to a reservation of the Utilities' right to supplement their post-petition deposit requests if additional accounts belonging to the Debtors are subsequently identified, the Utilities' post-petition deposit requests are as follows:

| **Utility** | **No. of Accts.** | **Est. Prepet. Debt** | **Dep. Request** |
| --- | --- | --- | --- |
| AEP | 674 | $237,000 | $649,571 (2-month) |
| SCE | 10 | $643,000 | $1,024,073 (2-month) |

35. AEP holds a surety bond in the amount of $855,000 that it will make a claim upon for payment of the prepetition debt that the Debtors owe to AEP.

36. SCE holds a surety bond in the amount of $866,000 that it will make a claim upon for payment of the prepetition debt that the Debtors owe to SCE.

**Discussion**

**A.   THE UTILITY MOTION SHOULD BE DENIED AS TO THE UTILITIES.**

Sections 366(c)(2) and (3) of the Bankruptcy Code provide:

> (2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility;

> (3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

As set forth by the United States Supreme Court, "[i]t is well-established that 'when the statute's language is plain, the sole function of the courts--at least where the disposition required by the text is not absurd--is to enforce it according to its terms.'" *Lamie v. United States Trustee*, 540 U.S. 526, 534, 124 S. Ct. 1023, 157 L. Ed. 2d 1024 (2004) (*quoting Hartford Underwriters Ins. Co.* v. *Union Planters Bank, N. A.,* 530 U.S. 1, 6, 120 S. Ct., 1942, 147 L. Ed. 2d 1 (2000)). *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir. 1997) ("Statutes . . . must be read in a 'straightforward' and 'commonsense' manner."). A plain reading of Section 366(c)(2) makes clear that a debtor is required to provide adequate assurance of payment satisfactory to its utilities on or within thirty (30) days of the filing of the petition. If a debtor believes the **amount** of the utility's request needs to be modified, then the debtor can file a motion under Section 366(c)(3) requesting the court to modify the **amount** of the utility's request under Section 366(c)(2).

In this case, the Debtors filed the Utility Motion to improperly shift the focus of their obligations under Section 366(c)(3) from modifying the amount of the adequate assurance of payment requested under Section 366(c)(2) to setting the form and amount of the adequate assurance of payment acceptable to the Debtors. Accordingly, this Court should not reward the Debtors for their failure to comply with the requirements of Section 366(c) and deny the Utility Motion as to the Utilities.

1. **The Debtors' Proposed Bank Account Is Not Relevant And Even If It Is Considered, It Is Unsatisfactory Because It Does Not Provide the Utilities With Adequate Assurance of Payment.**

This Court should not even consider the Bank Account as a form of adequate assurance of payment because: (1) It is not relevant because Section 366(c)(3) provides that a debtor can only modify "the amount of an assurance of payment under paragraph (2)"; and (2) The Bank Account is not a form of adequate assurance of payment recognized by Section 366(c)(1)(A). Moreover, even if the Court were to consider the Bank Account, the Bank Account is an improper and otherwise unreliable form of adequate assurance of future payment for the following reasons:

(i) Unlike the statutory approved forms of adequate assurance of payment, the Bank Account is not something held by the Utilities. Accordingly, the Utilities have no control over how long the Bank Account will remain in place.

(ii) In order to access the Bank Account, the Utilities may have to incur the expense to draft, file and serve a default pleading with the Court and possibly litigate the demand if the Debtors refuse to honor a Disbursement Request.

(iii) It is underfunded from the outset because the Utilities issue monthly bills and by the time a default notice is issued the Debtors will have used at least 45 to 60 days of commodity or service.

(iv) The Bank Account, unlike the $5 million Professionals Carve-Out, may be subject to the DIP lender's liens.

(v) The monies contained in the Bank Account would be returned to the Debtors before all post-petition utility charges are paid in full.

Accordingly, the Court should not approve the Bank Account as adequate assurance to the Utilities because the Bank Account is: (a) not the **form** of adequate assurance requested by the Utilities; (b) not a form recognized by Section 366(c)(1)(A); and (c) an otherwise unreliable form of adequate assurance.

    **2.**    **The Utility Motion Should Be Denied As To the Utilities Because**

### the Debtors Have Not Set Forth Any Basis For Modifying the Utilities' Requested Deposits.

In the Utility Motion, the Debtors fail to address why this Court should modify the amount of the Utilities' requests for adequate assurance of payment. Under Section 366(c)(3), the Debtors have the burden of proof as to whether the amounts of the Utilities' adequate assurance of payment requests should be modified. *See In re Stagecoach Enterprises, Inc.*, 1 B.R. 732, 734 (Bankr. M.D. Fla. 1979) (holding that the debtor, as the petitioning party at a Section 366 hearing, bears the burden of proof). However, the Debtors do not provide the Court with any evidence or factually supported documentation to explain why the amount of the Utilities' adequate assurance requests should be modified. Accordingly, the Court should deny the relief requested by Debtors in the Utility Motion and require the Debtors to comply with the requirements of Section 366(c) with respect to the Utilities.

**B.    THE COURT SHOULD ORDER THE DEBTORS TO PROVIDE THE ADEQUATE ASSURANCE OF PAYMENT REQUESTED BY THE UTILITIES PURSUANT TO SECTION 366 OF THE BANKRUPTCY CODE.**

Section 366(c) was amended to overturn decisions such as *Virginia Electric and Power Company v. Caldor, Inc.*, 117 F.3d 646 (2d Cir. 1997), that held that an administrative expense, without more, could constitute adequate assurance of payment in certain cases. Section 366(c)(1)(A) specifically defines the forms that assurance of payment may take as follows:

>  (i) a cash deposit;
>  (ii) a letter of credit;

>   (iii) a certificate of deposit;
>   (iv) a surety bond;
>   (v) a prepayment of utility consumption; or
>   (vi) another form of security that is mutually agreed upon between the utility and the debtor or the trustee.

Section 366 of the Bankruptcy Code was enacted to balance a debtor's need for utility services from a provider that holds a monopoly on such services, with the need of the utility to ensure for itself and its rate payers that it receives payment for providing these essential services. *See In re Hanratty*, 907 F.2d 1418, 1424 (3d Cir. 1990). The deposit or other security "should bear a reasonable relationship to expected or anticipated utility consumption by a debtor." *In re Coastal Dry Dock & Repair Corp.*, 62 B.R. 879, 883 (Bankr. E.D.N.Y. 1986). In making such a determination, it is appropriate for the Court to consider "the length of time necessary for the utility to effect termination once one billing cycle is missed." *In re Begley*, 760 F.2d 46, 49 (3d Cir. 1985).

Although the billing cycles for each of the Utilities are slightly different, they all bill the Debtors on a monthly basis for the charges already incurred by the Debtors in the prior month. Each Utility then provides the Debtors with a certain period of time to pay the bill, the timing of which is set forth in applicable state laws, tariffs, regulations and/or contracts. Based on the foregoing state or contract-mandated billing cycles, the minimum period of time the Debtors could receive service from the Utilities before termination of service for non-payment of post-petition bills is approximately two (2) months. Moreover, even if the Debtors timely pay their post-petition utility bills, the Utilities still have potential exposure of 45 to 60 days based on their billing cycles. Furthermore, the amounts of the Utilities' deposit requests

are the amounts that the applicable public service commission, which is a neutral third-party entity, or applicable contract, permits the Utilities to request from their customers. The Utilities are not taking the position that the deposits that they are entitled to obtain under applicable state law or contract are binding on this Court, but, instead are introducing those amounts as evidence of amounts that their regulatory entities or contracts permit them to request from their customers.

Finally, in contrast to the improper treatment proposed to the Debtors' Utilities, the Debtors have made certain that post-petition professionals are favored creditors over the Utilities by ensuring that the post-petition bills/expenses of Debtors' counsel are paid, even in the event of a post-petition DIP Financing default, by seeking a $5 million professionals carve-out for the payment of their fees/expenses after a default and a guarantee of payment for fees incurred up to a default. Therefore, despite the fact that the Utilities continue to provide the Debtors with crucial post-petition utility services on the same generous terms that were provided prepetition, with the possibility of non-payment, the Debtors are seeking to deprive the Utilities of any adequate assurance of payment for which it is entitled to for continuing to provide the Debtors with post-petition utility goods/services. Against this factual background, it is reasonable for the Utilities to seek and be awarded the full security they have requested herein.

WHEREFORE, the Utilities respectfully request that this Court enter an order:

1. Denying the Utility Motion as to the Utilities;

2. Awarding the Utilities the post-petition adequate assurance of payment pursuant to Section 366 in the amount and form satisfactory to the Utilities, which are the form and amounts requested herein; and

3.  Providing such other and further relief as the Court deems just and appropriate.

Dated: Garden City, New York
    June 6, 2016

MEYER, SUOZZI, ENGLISH & KLEIN, P.C.

By:   /s/ Michael Kwiatkowski
     Thomas R. Slome
     Michael Kwiatkowski
990 Stewart Avenue, Suite 300
P.O. Box 9194
Garden City, New York 11530-9194
(516) 741-6565

and

Russell R. Johnson III
John M. Craig
Law Firm of Russell R. Johnson III, PLC
2258 Wheatlands Drive
Manakin-Sabot, Virginia 23103
(804) 749-8861

*Co-Counsel for Southwestern Electric Power Company d/b/a American Electric Power, Southern California Edison Company and Southern California Gas Company*

1122531