Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 16-11390-smb

4   - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6   BREITBURN ENERGY PARTNERS LP

7

8           Debtor.

9   - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11                 U.S. Bankruptcy Court

12                 One Bowling Green

13                 New York, NY  10004

14

15                 August 18, 2016

16                 11:00 AM - 12:39 PM

17

18

19

20

21

22

23   B E F O R E :

24   HON STUART M. BERNSTEIN

25   U.S. BANKRUPTCY JUDGE

Page 2

1    Hearing re: Case Conference

2

3    Hearing re: Debtors' Motion to Seal Exhibits to Declaration

4    of James Jackson Supporting Motion Approving Retention and

5    Incentive Programs.

6

7    Hearing re: Application of Official Committee of Unsecured

8    Creditors under 11 U.S.C. 1103 and Fed. R. Bankr. P. 2014

9    and 5002, for Order Authorization Retention and Employment

10   of Quinn Emanuel Urquhart & Sullivan, LLP as Conflicts

11   Counsel.

12

13   Hearing re: Application of the Official Committee of

14   Unsecured Creditors of Breitburn Energy Partners LP, et al.,

15   for Entry of an Order Authorizing the Employment and

16   Retention of Porter Hedges LLP as Special Counsel.

17

18   Hearing re: Motion of Debtors Pursuant to 11 U.S.C. §§

19   105(a) and 363 and Fed. R. Bankr. P. 2002 for Entry of an

20   Order Authorizing Debtors to Sell Certain Non-essential

21   Assets.

22

23   Hearing re: Motion of Debtors Pursuant to 11 U.S.C. §§ 105

24   and 365 and Fed. R. Bankr. P. 6006 and 9019(a) for Entry of

25   an Order Approving (I) Assumption of Executory Contract and

1    (II) Settlement Between Debtors and GEXA Energy LP.

2

3    Hearing re: Motion of Debtors Pursuant to 11 U.S.C. § 365

4    and Fed. R. Bankr. P. 6006 to Assume and Assign Enterprise

5    Fleet Lease, as Amended.

6

7    Hearing re: Application of Debtors Pursuant to 11 U.S.C. §

8    327(e), Fed. R. Bankr. P. 2014(a) and 2016, and Local Rules

9    2014-1 and 2016-1 for Authorization to Employ and Retain

10   Coghlan Crowson, LLP as Litigation Counsel for the Debtors

11   Nunc Pro Tunc to the Petition Date

12

13   Hearing re: Application of Debtors Pursuant to 11 U.S.C. §§

14   327(a) and 328(a) and Fed. R. Bankr. P. 2016(a), Authorizing

15   Debtors to Employ and Retain PricewaterhouseCoopers LLP as

16   Auditor and Tax Advisor Nunc Pro Tunc to the Petition Date.

17

18   Hearing re: Motion of LL&E Royalty Trust for Relief from the

19   Automatic Stay.

20

21   Hearing re: . Motion of Debtors Pursuant to 11 U.S.C. §§

22   105, 361, 362, 363, and 364 and Fed. R. Bankr. P. 4001 and

23   Local Rules 4001- and 4001-2 for Authority to (A) Obtain

24   Postpetition Financing, (B) Use Cash Collateral, (C) Grant

25   Certain Protections to Prepetition Secured Parties, and (D)

Page 4

1    Related Relief

2

3    Hearing re: Motion of Debtors Pursuant to 11 U.S.C. §§ 105,

4    363(b), and 503(c)(3) for Entry of an Order Approving

5    Debtors' Retention and Incentive Programs for Certain Key

6    Employees

7

8    Hearing re: Motion for Preliminary Injunction filed by

9    Felicia Pierce.

10

11   Hearing re: Order to Show Cause Why an Official Committee of

12   Equity Security Holders Should Not Be Appointed.

13

14   Hearing re: Motion of Debtors Pursuant to 11 U.S.C. § 365

15   Approving Rejection of an Unexpired Non-residential Real

16   Property Lease and the Related Subleases for the Premises

17   Located at 600 Travis Street, Houston, Texas, Effective as

18   of May 31, 2016

19

20   Hearing re: Texas Tower Limited's Motion for Payment of

21   Administrative Expense Claim.

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 5

1   A P P E A R A N C E S :

2

3   MOSES & SINGER, LLP

4         Counsel to Secured Equity Holders

5         405 Lexington Avenue

6         New York, NY 10174

7

8   BY:  ALAN E. GAMZA

9         JESSICA K. BONTEQUE

10

11  PORTER HEDGES LLP

12        1000 Main Street, 36th Floor

13        Houston, Texas 77002

14

15  BY:  PETER ERIC M. ENGLISH

16

17  U.S. DEPARTMENT OF JUSTICE

18  OFFICE OF THE U.S. TRUSTEE

19        Attorney for Trustee

20        33 Whitehall Street, 21st Floor

21        New York, NY 10004

22

23  BY:  RICHARD C. MORRISSEY

24        SUSAN D. GOLDEN

25

1   WEIL, GOTCHAL & MANGES LLP

2       Attorney for Debtors

3       767 Fifth Avenue

4       New York, NY 10153

5

6   BY:  STEPHEN KAROTKIN

7

8   MCELROY, DEUTSCH, MULVANEY & CARPENTER, LLP

9       1 Penn Center, Suburban Station

10      1617 JFK Blvd., Suite 1500

11      Philadelphia, PA 19103

12

13  BY:  GARY D. BRESSLER

14

15  DICKINSON WRIGHT PLLC

16      Attorney for LL&E Royalty Trust

17      350 S. Main Street, Suite 300

18      Ann Arbor, MI 48104

19

20  BY:  MICHAEL C. HAMMER

21

22

23

24

25

```
 1   WINSTON & STRAWN
 2         Attorneys for Wells Fargo
 3         200 Park Avenue
 4         New York, NY 10166
 5
 6   BY:  DAVID NEIER
 7         CARIE V. HARDMAN
 8
 9   KILPATRICK TOWNSEND
10         Attorneys for Wilmington Trust
11         1114 Avenue of the Americas
12         New York, NY 10036
13
14   BY:  DAVID M. POSNER
15
16   KIRKLAND & ELLIS LLP
17         Attorneys for 2nd Lien Ad Hoc Committee
18         601 Lexington Avenue
19         New York, NY 10022
20
21   BY:  CHRISTOPHER MARCUS, P.C.
22
23
24
25
```

Pg 8 of 92

```
 1   PROSKAUER

 2        Eleven Times Square

 3        New York, NY 10036

 4

 5   BY:  MARTIN J. BIENENSTOCK

 6        VINCENT INDELICATO

 7

 8   SIDLEY AUSTIN LLP

 9        787 Seventh Avenue

10        New York, NY 10019

11

12   BY:  BRIAN J. LOHAN

13

14   MILBANK, TWEED, HADLEY & MCCLOY LLP

15        Attorneys for Ad Hoc Group of Unsecured Creditors

16        601 South Figueroa Street, 30th Floor

17        Los Angeles, CA 90017

18

19   BY:  ANDREW LEBLANC

20        ALEXANDER B. LEES

21

22

23

24

25
```

212-267-6868                www.veritext.com                516-608-2400

Page 9

1   SUSMAN GODREY LLP

2         1301 Avenue of the Americas, 32nd Floor

3         New York, NY 10019

4

5   BY:  SETH ARD

6

7   APPEARING TELEPHONICALLY:

8   KHALIL ABUMANNEH

9   DAVID J. ADLER

10  CANDACE ARTHUR

11  THOMAS BOYD

12  PEG A. BRICKLEY

13  KATE R. BUCK

14  SARAH L. FOWLER

15  GENE GOLDMINTZ

16  MARK F. HEBBEIN

17  WILLIAM JUNG

18  HAIG MAGHAKIAN

19  SHERRY MILIMAN

20  ARSALAN MUHAAMAD

21  JAMES F . MURPHY

22  JOHN MYRICK

23  JEFF PIES

24  RACHAEL RINGER

25  JASON B. SANJANA

Page 10

1    ANDREW M. SIMON

2    RICHARD A. SMIKLE

3    MATTHEW D. TANNER

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                P R O C E E D I N G S

2            CLERK:  Breitburn.

3            MR. KAROTKIN:  Good morning, Your Honor.  Stephen

4    Karotkin, Weil, Gotshal & Manges, for the Debtors.  I'm here

5    with my colleague, Mr. Schrock.

6            MR. SCHROCK:  Good morning, Judge.

7            THE COURT:  Good morning.

8            MR. KAROTKIN:  Unless Your Honor has some other

9    scheduling in mind, I would suggest we proceed with the

10   agenda.

11           THE COURT:  Well, let's take Miss Pierce's case.

12           MR. KAROTKIN:  Okay.

13           THE COURT:  Ms. Pierce?  You can step up.  Someone

14   give her a seat, please.  Let me start with your payment of

15   your fee.

16           MS. PIERCE:  Okay.

17           THE COURT:  I've entered an Order.  You can have a

18   copy.  To refund the money, you have to fill out an ROS form

19   for it.  So if you go down to Room 534 after the hearing,

20   they'll start the paperwork.  I don't know how long it'll

21   take.

22           MS. PIERCE:  Okay.

23           THE COURT:  All right?  You're trying to get money

24   from the government, so good luck.  As I understand it,

25   you're seeking to enjoin drilling on your land pending a

1   determination of the ownership issue.

2           MS. PIERCE:  Yes.  Right now, I'm in a Trespass to

3   Try Title suit in Texas, and I was here about a month ago to

4   get the stay listed, which was modified.  But the thing is I

5   tried to send in a motion for injunction with the court in

6   Texas, and they said I'm violating the stay, so that's the

7   reason why I sent the motion here.

8           THE COURT:  And so tell me how long has this

9   drilling been going on?

10          MS. PIERCE:  For 80 something years, about 85

11  years.

12          THE COURT:  Well, it hasn't -- Breitburn hasn't

13  been doing the drilling.

14          MS. PIERCE:  Oh, Breitburn, about since 2012.

15          THE COURT:  All right.  So it's about four years

16  of drilling.

17          MS. PIERCE:  Yes, sir.

18          THE COURT:  And that's every day?

19          MS. PIERCE:  Every day, yes, sir.

20          THE COURT:  Okay.  And tell me why, if you thought

21  about it --

22          MS. PIERCE:  I'm sorry, sir.

23          THE COURT:  If you're right in the end, they must

24  keep records about what they take out of the ground, why

25  they couldn't simply give you a check at the end of the day

1   with the terms that you really owned the property.

2          MS. PIERCE:  Oh, well, one of the things, we did

3   go to Breitburn about a year ago actually.  It was about a

4   year ago, and we did speak to them about what the issue was,

5   and that, you know, let them know that they were

6   trespassing.  But the thing is that they're claiming it's

7   under adverse position.

8          THE COURT:  No, I understand there's a dispute

9   about who owns the land.

10          MS. PIERCE:  Yes, sir.

11          THE COURT:  And that's what's supposed to be

12   resolved in Texas.  And my only point really is, doesn't it

13   make sense to have that issue resolved in Texas -- and I

14   don't know what's going on there at this point on this issue

15   -- and then it turns out that you own the land and you're

16   entitled to money from them to taking the minerals, you send

17   them a bill.

18          MS. PIERCE:  Well, one of the issues is that, like

19   I said, they're going to continue to accumulate damages that

20   will be accumulated on our side.  And I do understand what

21   you're saying as far as what they're trying to do right now,

22   I'm having issues in Texas, just to be honest with you.  I

23   had a summary judgment that was actually set for hearing on

24   the 2nd of September, which now has been pushed out, and

25   they allowed the Defendant to come in for a dismissal on my

```
 1    case.  And my thing is, the issue here is, there's no way

 2    that, under adverse possession, like I said, there's no way

 3    for anyone to own property or for them to claim an ownership

 4    on my property under adverse position if -- I mean, you can

 5    take into --

 6              THE COURT:  But that's an issue for the Texas

 7    Court.

 8              MS. PIERCE:  Yes, sir.

 9              THE COURT:  That's what Texas Court is going to --

10    so if I do hear an injunction motion -- and I'm not hearing

11    it today, I'm hearing theirs today.

12              MS. PIERCE:  Yes.

13              THE COURT:  I'm going to have to make the same

14    determination, or at least figure out whether you're likely

15    to succeed on that determination, so you wind up trying the

16    same case twice essentially.  And that doesn't sound like it

17    makes a lot of sense.

18              MS. PIERCE:  Yeah.  That's the reason why I put

19    the lis pendens back on the -- in Texas.  I put the lis

20    pendens on there.  The lis pendens sat out there for five

21    months and nobody could dispute it.  Now there was an ad put

22    in the newspaper that I was unlawfully clouding the

23    property, but no one brought a motion to expunge it, no one

24    -- because they can't.  And that's the reason why I reported

25    bankruptcy fraud because they're bringing this property to
```

1    be taken by the Court.

2            And it's putting me in a situation and my family

3    in a situation where I'm having to come here because six

4    days later after I filed this lawsuit and, like I said, it's

5    been going on for years, so a lot of money been made --

6    we're talking about millions of dollars been made out there

7    -- and that's the reason why I followed them here.  I

8    followed him because I knew I had the evidence, and that's

9    what's been avoided in Texas and that's been avoided right

10   now.

11           THE COURT:  But isn't it coming to a head in

12   Texas.  In other words, you've moved for summary judgment,

13   and as I understand it, the Defendants have moved to

14   dismiss.

15           MS. PIERCE:  Yeah, they moved for a dismiss.  They

16   pushed my date back so they can move for a dismiss on the

17   2nd and push mine back to October 7th.

18           THE COURT:  But, okay, all right.  Let me hear

19   from the Debtor.

20           MS. PIERCE:  Okay.

21           THE COURT:  In terms of what's going on in Texas

22   and what the schedule is.

23           MR. KAROTKIN:  I don't exactly know what's going

24   on in Texas, but what Miss Pierce says sounds correct.  We

25   can certainly get more details on that.  We did, Your Honor,

1    as you know, agree to accommodate Miss Pierce, agree to a

2    limited modification of the estate, elect the litigation to

3    proceed in Texas.  Despite that, she's now seeking this

4    injunctive relief down here.

5              THE COURT:  Well, she's seeking additional relief.

6    She's seeking what's based on the assumption or the belief

7    that she owns the property.

8              MR. KAROTKIN:  I understand that.

9              THE COURT:  As opposed to just determining the

10   dispute.

11             MR. KAROTKIN:  I understand that.  She's also sent

12   letters to the Department of Justice asserting bankruptcy

13   fraud and other things.

14             THE COURT:  That's her right as a citizen.

15             MR. KAROTKIN:  I think that borders on continuing

16   violations of the stay, Your Honor, seeking to enforce her

17   claim, but we can leave that for another day.

18             As you said before, we're happy to go forward in

19   Texas to adjudicate the primary issue.  And as you said, if

20   she wins, she has a claim like everybody else.  But beyond

21   that, we're not prepared to agree to anything.  If she

22   commences an adversary proceeding, we'll address the

23   allegations at the appropriate time.

24             THE COURT:  All right.  Miss Pierce, it doesn't

25   look like there's a meeting of the minds in terms of how to

Page 17

1    proceed.  So what you're going to have to do is file an

2    adversary proceeding --

3              MS. PIERCE:  I did that.

4              THE COURT:  -- and identify who it is you're

5    suing, because I'm looking at what you filed, the motion,

6    and you have listed the United States Trustee Susan Golden,

7    Richard Morris.  You're not suing those people; they have

8    nothing to do with the drilling.  It's the entity that has

9    the rights and/or is actually doing the drilling that you're

10   looking to stop.  So if you file an adversary proceeding,

11   then I'll treat this motion as a motion for a preliminary

12   injunction and I'll schedule an evidentiary hearing.

13             MS. PIERCE:  You said if I do the adversary?

14             THE COURT:  You got to file an adversary

15   proceeding.

16             MS. PIERCE:  I did that this morning.  I filed an

17   adversary this morning.

18             THE COURT:  Okay.  Who's the Defendant in the

19   adversary?

20             MS. PIERCE:  I have Breitburn, but I also have the

21   Trustees on there as well, but I have Breitburn down as the

22   Defendant.

23             THE COURT:  All right.  I'll schedule a hearing on

24   the motion for preliminary injunction.

25             MS. PIERCE:  Okay.  And, Your Honor, before we end

1    this, I want to say one other reasons why I wanted to go

2    ahead and get this done because they often reconstructuring,

3    and this is done too.  I don't know what's going to happen

4    as far as the monetary gain from these, and it may -- you

5    know, we may not come out with the same amount of damages

6    because of that.  And that's the reason why I'm asking that

7    you go ahead and order that Breitburn --

8            THE COURT:  The damages may not be the same, but -

9    - well, your damages will be the same, but the amount that

10   it's worth may not be the same.

11           MS. PIERCE:  Exactly.  So I would just ask let you

12   go ahead and order, I mean, at least until we can resolve

13   this in Texas and that's up until October.

14           THE COURT:  When is the motion for, when is the

15   motion to dismiss scheduled for in Texas?

16           MS. PIERCE:  It's on the 2nd of September.

17           THE COURT:  The 2nd of September.

18           MS. PIERCE:  Yes, sir.  And then my motion for

19   summary judgment is on October 7th, so I'm just kind of --

20   I'm asking that you do it at least up until October 7th.

21           THE COURT:  Well, I'll certainly wait because, you

22   know, if the Texas Court resolves the issue, that'll make it

23   simpler.  Why don't we do this; why don't we have another

24   conference sometime around the middle of October.  You can

25   appear by telephone if you want; you don't necessarily have

1   to come out.

2          MS. PIERCE:  Is there any way that you could do up

3   until the 2nd at least of September?

4          THE COURT:  Let's see what the Texas Court does.

5   It may not decide the matter anyway; it may reserve decision

6   to review the papers, or it may simply decide the matter.

7   But, and independent of what it decides, may have or may not

8   have relevance in terms of the argument you're making.

9          MS. PIERCE:  Your Honor, I mean, I don't want to

10  be a -- I really need for you to do this.  I really do.  I

11  need for you to do this so that we can move because they are

12  continuing damages.  They are still -- it is what it is

13  itself, and they are stealing for us, and the came to the

14  bankruptcy court to get away from this case is what it is.

15  We're just asking that you go ahead and grant the injunction

16  so we could move for -- because going to continue to do

17  this.

18          THE COURT:  I'm not going to grant the injunction

19  today.  And I will tell you two things, I don't want to

20  argue with you today.  One, I don't think you're irreparably

21  harmed.  The law means you don't have an adequate remedy at

22  law, and damages are an adequate remedy at law.  And even if

23  I grant the injunction, it's going to be conditioned on your

24  posting a bond.

25          MS. PIERCE:  Okay.

Page 20

1          THE COURT:  So depending on the amount of money

2    that they could lose during the duration of the injunction,

3    that bond may be very, very large because they don't have to

4    bear the risk necessarily that they're right and you're

5    wrong.  You're the person seeking the injunction.  I just

6    want you to bear that in mind that you could win the battle

7    and lose the war on this one at the end of the day.

8          But what I will is I will schedule another

9    conference for October 18th.  As I say, you could appear

10    telephonically if you want.  You're welcome to come up --

11    the weather is still nice -- and do your thing.  It'll be at

12    10:00.  If you do want to appear telephonically, you have to

13    look at our website.  We use something called Court Cal, and

14    it'll tell you how to dial in and arrange to use it.  Okay?

15    But if you can't figure it out, just call my chambers.

16          MS. PIERCE:  Can I ask you as far as with the lis

17    pendens be out there.

18          THE COURT:  I don't understand what that means;

19    lis pendens usually just means that if you transfer

20    property, you transfer it subject to whatever interest is

21    listed.  So if they're going to transfer the property, I

22    guess there's a lis pendens.  Whether or not the filing of

23    that lis pendens violated the automatic stay, I don't know.

24    Because if it interferes with their possession or control of

25    the property, it might, but that's for another day.

1           I think that what you want is the Texas Court to

2    decide whether you own the land or not, and that's what you

3    should be focused on.  And I appreciate the fact that you're

4    losing money, or you feel you're losing money, because

5    they're withdrawing the valuable minerals or oil and gas

6    from the property, but it's been going on for four years

7    already.

8           MS. PIERCE:  Yeah.

9           THE COURT:  And that's another thing that cuts

10   against your argument that you've been irreparably harmed.

11   But why don't we have another conference on October 18th.

12   You can report back in terms of what's happening.  And if

13   nothing's resolved, I'll just schedule a hearing on the

14   motion for a preliminary injunction.

15           MS. PIERCE:  Okay.  Will we doing a -- do I need

16   to schedule a hearing for the adversary?

17           THE COURT:  The adversary, they'll issue a

18   summons, which will schedule a hearing.  Do you have a

19   summons yet?

20           MS. PIERCE:  I'll have to get the summons.

21           THE COURT:  When you get the summons, it will

22   schedule a hearing date.

23           MS. PIERCE:  Okay.

24           THE COURT:  You'll see it one of the boxes there,

25   a pretrial conference date, but that's just a pretrial

Page 22

1   conference.  Okay?

2           MS. PIERCE:  Okay.

3           THE COURT:  All right, good luck.  You want to be

4   heard on this matter, Mr. Morrissey.

5           MR. MORRISSEY:  If I may, yes.  For the record,

6   Richard Morrissey for the U.S. Trustee.  As Your Honor has

7   noted, both Susan Golden and I have been named as party

8   Defendants in this adversary proceeding.  And just to inform

9   Your Honor, there is an adversary proceeding number, so

10  there was a Complaint filed.

11          THE COURT:  What's the adversary proceeding?

12          MR. MORRISSEY:  The number is 16-01198.

13          THE COURT:  01198, okay.

14          MR. MORRISSEY:  And I'm sure Your Honor will not

15  be surprised to hear that we would like to have ourselves

16  dismissed as party Defendants, especially in light of the

17  fact that no summons has yet been issued.  We'd like to do

18  that, if possible, before that if Miss Pierce is amenable to

19  that.

20          THE COURT:  I don't think you have a claim against

21  the Department of Justice; they're not drilling.

22          MS. PIERCE:  No, I didn't.

23          THE COURT:  And they'd rather not be included as

24  parties in the lawsuit because then they have to turn it

25  over to the Department of Justice to defend them and make a

1   motion to dismiss and then you'll have to come up, and I'll

2   probably dismiss them from the case anyway.

3           MR. MORRISSEY:  So I think the simplest thing,

4   Your Honor, would be simply if we could submit an Order to

5   the Court dismissing the two of us as party Defendants.

6           THE COURT:  You know, you're named and there's a

7   procedure for that.  Why don't you talk to Ms. Pierce about

8   asking her if she would agree to dismiss you and Ms. Golden.

9   If not, you can make a motion to dismiss.  It doesn't have

10  to be extensive.

11          MR. MORRISSEY:  If Ms. Pierce does agree, perhaps

12  a Stipulation.

13          THE COURT:  A Stipulation is fine.

14          MR. MORRISSEY:  Thank you, Your Honor.

15          THE COURT:  Okay.  I don't think you want to sue

16  them.  Okay, back to the calendar.  Thank you very much.

17          MS. PIERCE:  Thank you.

18          THE COURT:  If you go down -- Miss Pierce, if you

19  go down to Room 534, they should give you the IRS W-9 form

20  if they have it.  It's in the Order, it'll tell you exactly

21  what you need to do.  Good luck.

22          MS. PIERCE:  Thank you.

23          THE COURT:  By the way, you know, you have to pay

24  a filing fee for the adversary.  Did you do that?

25          MS. PIERCE:  I did.

1           THE COURT:  Okay.  All right, let's go back to the

2     beginning of the calendar now.

3           CLERK:  Start with #1, sir?

4           THE COURT:  All right, numbers -- we're actually

5     doing to do 1 and 2 together.  Numbers 1 and 2 are

6     applications by the creditor's committee to retain conflicts

7     counsel and special counsel on behalf of the --

8           MR. KAROTKIN:  (indiscernible) yesterday, we have

9     certificates of no objection.

10          MR. LEBLANC:  Numbers 3 is signed, Your Honor, but

11    not items #1 and 2.  We may have missed it, but either way,

12    we just ask the Court to enter them this morning.

13          THE COURT:  All right, I thought I had signed it.

14    But is there any objection to the retention of -- what it is

15    -- committee counsel and special counsel?

16          MR. LEBLANC:  It's a conflict, yes -- co-counsel

17    for the committee and special counsel to do certain

18    investigations.

19          THE COURT:  Okay.  Does anybody object?  The

20    record should reflect there's no response.  Those

21    applications are granted.  As I say, I thought I signed the

22    Orders, but if I didn't, just submit Orders.

23          MR. KAROTKIN:  Number 3, Your Honor, you did sign

24    it.

25          THE COURT:  So it is signed.

1              MR. KAROTKIN:  Number 4, another uncontested

2       motion requesting authority to sell certain nonessential

3       assets.  I will point out, Your Honor, that there are three

4       transactions in there.  We are not seeking approval at this

5       time of the transaction with GEXA; that will be adjourned to

6       another date.  The other two are relatively minor

7       transactions: one for certain oil and gas leases and related

8       assets for $150,000; and the other with respect to certain

9       non-core surface rights for $75,000.

10             Your Honor, these really are in the ordinary

11      course of business.  But out of an abundance of caution, we

12      are asking the Court for approval.  The only objection that

13      was filed, Your Honor, was by U.S. Specialty Insurance.

14      We've had conversations with them; that objection has been

15      resolved by me making a representation that no U.S.

16      Specialty bond is affected by the relief sought in the

17      motion, and we so represent that.

18             The U.S. Attorney's Office also requested that we

19      include certain language in the proposed Order, some

20      customary language with respect to environmental matters,

21      which we have agreed to include.  I can hand up the revised

22      Order if you'd like.

23             THE COURT:  Why don't you just drop it off in

24      chambers.  Let me ask, does anybody want to be heard in

25      connection with the motion?  The record should reflect

Page 26

1    there's no response.  I will grant the applications.

2              MR. KAROTKIN:  Thank you, sir.

3              THE COURT:  Next is the Enterprise contract.

4              MR. KAROTKIN:  Again, no objections were filed to

5    that.  The motion is self-explanatory.  It's really no

6    economic impact on the Debtors, but to recognize the fact

7    that certain vehicles will be kept by the Debtors, certain

8    will be kept by Pacific Coast Energy as the Debtors will no

9    longer have any interest to them.  All of the parties have

10   agreed and no objections were filed.

11             THE COURT:  Does anybody want to be heard in

12   connection with that application?  The record should reflect

13   there's no response.  It's granted.

14             MR. KAROTKIN:  I think we skipped #5.

15             THE COURT:  Is that the one we just did, or is

16   that GEXA?

17             MR. KAROTKIN:  Yeah.

18             THE COURT:  Okay, go ahead.

19             MR. KAROTKIN:  That's an Order approving

20   essentially a settlement in GEXA Energy, which is a utility

21   supplier, that resolves any concerns that GEXA had with

22   respect to the 366 Order entered earlier in the case.

23   Again, the motion is self-explanatory and no objections were

24   filed.

25             THE COURT:  Does anybody want to be heard in

1    connection with that motion?  The record should reflect

2    there's no response.  It's granted.

3            MR. KAROTKIN:  Numbers 7 and 8, perhaps we could

4    take together.  Number 7 is an application for the Debtors

5    to retain Coghlan Crowson, LLP as litigation counsel for the

6    Debtors and nunc pro tunc to the petition date.  As I

7    recall, Your Honor, this is the law firm that is involved

8    with the Piece action in Texas.  Again, no objections filed;

9    we would ask that that be granted.  And Number 7 is the

10   application for the Debtors to employ and retain Price

11   Waterhouse as their auditors and tax advisors.  Again, both

12   of these objections have -- both of these applications have

13   been reviewed with the Office of the United States Trustee.

14   To their requested any modifications, those were made, and I

15   believe the U.S. Trustee has signed off on them.

16           THE COURT:  Does anybody object to the retention

17   of Coghlan Crowson as special counsel in the Texas

18   litigations?  The record should reflect there's no response.

19   That's approved.  Does anybody want to be heard on Price

20   Waterhouse retentions?  The record should reflect there's no

21   response.  I just have a couple of comments: one, there's a

22   dispute resolution provision.

23           MR. KAROTKIN:  This is in Price Waterhouse, sir?

24           THE COURT:  Yeah.  If you're looking at the top,

25   you know, with the ECF numbers, it's page 34 of 73.

1           MR. KAROTKIN:  Can you give me one moment?

2           THE COURT:  Sure.

3           MR. KAROTKIN:  In the Order, sir?

4           THE COURT:  No, it's in the -- it's actually one

5    of the letters that contain the term.  Across the top, it's

6    page 34 of 73, document 340.

7           MR. KAROTKIN:  Yes.

8           THE COURT:  It's got a dispute resolution

9    procedure, which I assume is a usual non-bankruptcy

10   provision that's put in there.  But any disputes relating to

11   the fees with the retention have to be resolved here.

12          MR. KAROTKIN:  I think we addressed that, Your

13   Honor, in the proposed Order.

14          THE COURT:  You have the revised Order?

15          MR. KAROTKIN:  Yes.

16          THE COURT:  May I see the revised Order?

17          MR. KAROTKIN:  May I approach?

18          THE COURT:  Yeah.  Okay, you resolved the other

19   issue as to the exoneration and limitation of

20   (indiscernible).  So I will approve the retention of Price

21   Waterhouse.  You can submit an Order.

22          MR. KAROTKIN:  Thank you.  We go now to the

23   contested matters, Your Honor.  The first item is the motion

24   for relief of the stay, #9, filed by LL&E Royalty Trust.

25          THE COURT:  Okay.

1           MR. HAMMER:  Your Honor, Michael Hammer appearing

2     on behalf of LL&E Royalty Trust.  I'm from the law firm of

3     Dickinson Wright.  This is our motion for relief from the

4     automatic stay to allow pending Texas State Court litigation

5     to proceed.  That litigation was filed by the Debtor in 2015

6     to resolve continuing disputes regarding 1983 conveyance of

7     an overriding royalty interest in certain leases of oil and

8     gas wells located in Florida and Alabama.  Under that,

9     conveyance of trust was conveyed 50 percent of the generated

10    net proceeds; the working interest holders control the other

11    50 percent.

12          We believe this motion should be viewed in the

13    context of the Debtor's prior motion to authorize to pay

14    ongoing royalty interest at Docket #16, which was granted by

15    this Court on June 15, 2016, pursuant to Docket 135.  The

16    Debtor made statements in that motion that are relevant to

17    this dispute.  They said proceeds from royalty interest are

18    not property under the estate under 541(e)(6).

19          THE COURT:  Does the conveyance say that they'll

20    hold the special escrow fund in trust?

21          MR. HAMMER:  The conveyance says you could earmark

22    certain funds for special future costs, and that you either

23    put it in an escrow or you treat it as if it were put into

24    escrow, and they chose the latter and they put it in account

25    called special costs escrow account.

```
 1              THE COURT:  Where was that in the conveyance?
 2              MR. HAMMER:  It is -- the conveyance is a little
 3    confusing on these points because it speaks of a special
 4    escrow, a special cost escrow.  So I tabbed those pages --
 5    they are -- the one that talks about putting it in escrow as
 6    -- treating it as if it were put in escrow is Paragraph
 7    8(h).
 8              THE COURT:  Is there a number, a Bates number, on
 9    the bottom?
10              MR. HAMMER:  Yeah.  It is Bates 31 and it is of
11    our 17 of 37.
12              THE COURT:  I got it, okay.
13              MR. HAMMER:  So in that motion there said it holds
14    no legal title to the percent of production attributable to
15    the royalty trust and holds any such funds solely for the
16    benefit of the holder.  And they did state as unclear if the
17    automatic stay applies to an action to obtain possession or
18    control over the royalty payments.  In its response to this
19    motion --
20              THE COURT:  Even if your ownership is disputed?
21              MR. HAMMER:  Well, correct, it's if -- we're
22    entitled to 50 percent of the net proceeds.  Instead of
23    paying that, they're holding the funds.  We say they have
24    grossly estimated the cost that those relate to, and those
25    are our property in payable to us.
```

1            THE COURT:  But you said the automatic stay

2    doesn't decline.  And this sounds like it's essentially a

3    contractual dispute in which if you're right, then the

4    result might be that some portion of money that they're

5    holding is your property or that they owe you a debt because

6    they used some portion of your money under some other

7    purpose.

8            MR. HAMMER:  Well, but it's exactly the type of

9    conveyance that the Debtor spoke of in its motion to approve

10   royalty interest.

11           THE COURT:  No, I don't understand the Debtor to

12   be saying that if you're right, this isn't your property

13   necessarily, but it still has to -- it's still essentially a

14   contractual disagreement.  In other words, you don't know if

15   it's your property until you prevail on your contract claim.

16           MR. HAMMER:  Right.  Well, I'd say it's more than

17   that.  If we prove that we're right under the conveyance and

18   those funds were always our property, so there's an escrowed

19   set of funds, approximately $18.3 million, and there's

20   current net proceeds that are being generated is unclear

21   what's going on.  So when the Debtor claims in its response

22   that the Trust is simply an unsecured creditor, it should

23   just file a proof of claim, it has no interest in property

24   and has no right to litigate its entitlement to these

25   royalty proceeds.  We disagree.  We think that's what the

1    Debtor completely overlooks his royalty motion and --

2              THE COURT:  But that's the only authority you've

3    cited.  In other words, that's why I asked you about the

4    conveyance.  Is there anything in the conveyance that

5    requires them to hold the money in trust or makes it to a

6    property or something like that, all you're citing is the

7    royal motion.  And my response is that your rights are still

8    essentially based on a contract, and in order to prove the

9    ownership, you would have to successfully litigate the

10   contract claim.  That's what I'm saying.

11             MR. HAMMER:  Well, litigate semantics, but to us,

12   it's more than a contract.  It's a conveyance of real

13   property and they are withholding it and holding the funds.

14   So if we're right, then that's our property in that fund.

15   But, go ahead.

16             THE COURT:  No, they were speaking.  I asked them

17   to hold it down.

18             MR. HAMMER:  If we're right, those are our funds

19   and they're being held and there's additional funds being

20   generated, and we claim an interest in that property.  And

21   to do nothing, to just say file a proof of claim, will not

22   resolve the $18 million that's being held in this special

23   cost escrow account and that is being additionally

24   generated.  So it is different than just filing a proof of

25   claim; it would not resolve the issue if we just filed a

1     proof of claim.

2              THE COURT:  Tell me about the other claims you're

3     seeking to pursue -- the tort claims, the conspiracy claims,

4     and all those other things.

5              MR. HAMMER:  There's a history here that's even

6     beyond this Debtor where various parties were involved in

7     various capacities.  Some of them were prior working

8     interest holders; some of them are a general partner of

9     what's called a royalty partnership that's involved in this

10    primarily for tax --

11             THE COURT:  You could pursue those claims without

12    the Debtor.  Why would I grant your relief from the stay to

13    pursue a tort claim against the Debtor?

14             MR. HAMMER:  Because the primary claim is the

15    money that is held by the Debtor that, if we're right, is

16    our property.

17             THE COURT:  Okay.  But if you're telling me that

18    the Debtor tortuously breached its contract, that's just a

19    breach of contract claim, and I understand that claim.  If

20    you're telling me that the Debtor was involved in a

21    conspiracy with prior working interest holders, that goes

22    well beyond the contract that we're talking about.

23             MR. HAMMER:  It is true in pleading this case in

24    Texas, the State Court litigators did throw in a bunch of

25    claims.  But the primary claim that's driving this is to try

Page 34

1    to get possession and control over what we view as our

2    property that's being held in the special cost escrow, that

3    is continuing to be generated today, and it is unclear what

4    happened.  So if we did nothing, just file a proof of claim,

5    and we are right that they have and continue to this day

6    every month generate these net proceeds without paying to

7    us, there's $18.3 million that suddenly isn't there, then

8    they've converted our property, and the problem post-

9    petition becomes, you know, a much more magnified to them.

10           We're just asking to have this dispute, allow it

11   to be resolved because it's more than just a claim; there's

12   actually money there that we claim entitlement to.  And, you

13   know, if you were to say, okay, I'm going to lift the stay,

14   but I'm going to let you focus on control or interest in the

15   property and any other damages, you know, were they awarded

16   had to be dealt with in a plan or something like that,

17   that's fine.  But I do think the primary purpose of this is

18   we've been -- in every year until they took over, we were

19   getting multi-regular royalty events.  We got $300 million

20   over 23 years.  Once they took over, we never got another

21   nickel.  And so, you know, we do have to show that those net

22   proceeds are properly payable for us that they've included

23   improper costs in trying to calculate those.

24           I do believe, as the working interest holders,

25   there's another 50 percent that they continue to receive.

Page 35

```
 1   We don't know that for sure, but it's not put in the escrow.

 2   So they're, in effect, being paid for their working

 3   interests, which includes managing these fields.  This is,

 4   in a sense, a cost of their doing business.  I mean, they're

 5   getting the other half of the 50 percent.  We want our

 6   proceeds dealt with.  And we think it's important and it

 7   certainly fits under the Sonnax factors that there's cause

 8   to do that.

 9           You know, this litigation -- you're right, there's

10   claims against -- the Debtor started this litigation.  We

11   filed counterclaims against the Debtor Plaintiff.  We filed

12   third-party claims against other Debtor entities that were

13   involved in various capacities in this, as either prior

14   working interest holders or operators.  And we do have

15   claims against six non-Debtors who were involved in various

16   interest -- ConocoPhillips was prior, a working interest

17   holder, is also general partner under -- and actually, they

18   have three Counterclaims back.

19           We faced a situation where the Debtor says, well,

20   it will just stay its action, but its action is not stayed

21   right now.  And our claims against the third-party entities

22   and their claims back against us certainly are not stayed.

23           THE COURT:  Debtor, okay.

24           MR. HAMMER:  So the Debtor commenced this action.

25   They just say, never mind.  Well, I can see why they want to
```

Page 36

1    say never mind, because they're holding our money.  And, you

2    know, why have it resolved and just leave it hanging out

3    there.  I don't see how -- it has to be resolved.  And so,

4    if we end up filing an adversary proceeding in front of this

5    Court to say we need to resolve our interest in that

6    property, then you would still have the Texas State Court

7    proceeding with all the other claims without the party

8    that's currently controlling the funds.

9           So just let me briefly put it into the Sonnax

10   factors, if that's okay.

11          THE COURT:  Sure, that's what we're here for, you

12   know.

13          MR. HAMMER:  I know, I know.  Sonnax factors 1 and

14   10, we believe, go hand in hand because stay relief would

15   result in a full resolution of the issues, it would serve

16   judicial economy.  Only the Texas State Court can give the

17   complete relief because this Court can't resolve the state

18   law claims between the six non-Debtors.  The Debtor's really

19   only response to that is in our prayer for relief, we seek

20   punitive damages, and the Texas State Court couldn't resolve

21   the punitive damage issue.  That, instead, should be

22   reserved for the Bankruptcy Court.

23          We do think that is sort of the tail wagging the

24   dog, and this case is about us getting possession and

25   control over our royalty payments.  And to the extent we get

1   an award greater than our property for royalties that were

2   payable to us, I suppose if it was important to this Court,

3   we could just come back and they could be identified if

4   they're punitive damages in this award and the Debtor could

5   deal with it in a plan as it wants to; but, ultimately, what

6   we want is the money in escrow and the current money being

7   generated subject to our interest.

8            So, otherwise, and there's a (indiscernible), we

9   face an adversary proceeding and multiple lawsuits.  They

10  would, even if we brought the adversary proceeding here,

11  they would have to monitor what's going on in the Texas

12  Court.

13           So as to Sonnax factors 2 and 7, lack of any

14  connection or interference with a case and no creditors to

15  creditors.  I mean, this is -- I refer to what the Debtor

16  said in its royalty motion at Paragraph 28, "No creditors

17  should be prejudiced by the requested relief as royalty

18  payments are not property of the state and the Debtors have

19  no right to distribute royalty interest to creditors."

20           So there's really two choices -- they can hold the

21  funds or they pay us.  But there's not a third choice where

22  the Debtor just gets to keep the money.  And as I indicated,

23  there's probably a greater impact it'll do nothing and find

24  out this is continuing on all during the case.  The Debtor

25  says, well, we're missing the point.  There is an impact;

1    it's their cost to defend.  But as I pointed out, we do

2    believe this type of dispute, since they are getting

3    compensated for the working interest, is inherent to the

4    business.  It's a cost of their doing business.  Part of

5    their working interest, they have to assume responsibility

6    under these conveyances.

7            And to the extent we're dealing with post-petition

8    action, the Sonnax says those do not implicate the purpose

9    of the stay.  As to the Sonnax factor 3, whether the other

10   proceeding involves the Debtors of fiduciary, the Debtor

11   says it doesn't.  But it does, in its royalty motion,

12   acknowledges when it holds funds attributable to the

13   conveyance holder, it holds them for the benefit of another,

14   and that is the primary kind of rationale behind is this

15   factor met.  It's not their money; they're saying, well,

16   geez, it should be held for something else, but there's no

17   circumstances where it really is theirs.

18           As a Sonnax factor 4, we know it's a Harris

19   County, Texas State Court located in Houston.

20           THE COURT:  Isn't it theirs to the extent that

21   they can use it to pay these costs?  In other words, when

22   does it -- is it your money that they can use to pay costs;

23   is that what you're saying?

24           MR. HAMMER:  What they're saying is when we

25   calculate to the net proceeds, there should be a deduction.

1    We can hold money for future costs.  And so, these aren't

2    really your net proceeds, but they're earmarked for these

3    special costs.  And just to put in a little bit of

4    historical context, I mean, this conveyance was done in

5    1983.  Over a long period of time -- so you can -- I didn't

6    put this in our papers.  I just want to give a history and

7    you can take it as that.

8           But there's only $4 million over a long period of

9    time that was ever escrowed, and half of it was half --

10          THE COURT:  I've seen your papers.

11          MR. HAMMER:  -- and half of it was funded by the

12   working interest and half by us.  And suddenly when they

13   take over, it's a gigantic increase in these funds.  So we

14   think, and there was also prior litigation in which the

15   whole overriding royalty interest -- not by this Debtor --

16   but previously, was attempted to be terminated.  So we're on

17   edge about this and our money is sitting in the account.

18          So while the Harris County, Texas Court,

19   technically not a specialized tribunal, certainly State

20   Court in Texas sitting in Houston has experience in oil and

21   gas issues.

22          Sonnax factor 6, does the action primarily involve

23   third parties.  We know the Debtor is very important, but a

24   simple math of 6 of 10 are non-Debtor parties.  Sonnax

25   factor 8 is satisfied because any judgment claim would not

Page 40

1    be subject to equitable subordination.  Sonnax factor 9 is

2    satisfied because the trust success in the underlying

3    proceeding were not resolved and are avoidable judicial

4    lien.

5              Then you get to Sonnax factor 12, the impact on

6    the stay on the parties and the balances of harm.  The

7    Debtor chose this forum.  It is the Plaintiff in the

8    litigation.  They acknowledge in a royalty motion that

9    there's really no harm to the estate as these are not its

10   funds.  We're, in effect, litigating our money.

11             THE COURT:  Yeah, but that's what you say.  They

12   say it's not your money, I guess.

13             MR. HAMMER:  I don't think they say they could

14   keep the --

15             THE COURT:  Or they say they don't have to pay it

16   to you.  They can escrow it, use it for special other costs.

17             MR. HAMMER:  Right, but it's not going to be.  I

18   don't understand them to say that it's going to be funds

19   distributable in this bankruptcy case.  It's either going to

20   be used for costs related to those working interests or not.

21   They've already filed an application to employ special

22   counsel in this matter at Docket 357.  And we believe -- and

23   I'm wrapping up -- without stay relief, there would be

24   continuing harm to us.  We don't have the mechanism to deal

25   with the recovery of the funds in the account or have those

1    issues resolved.  This continues to go on every month post-

2    petition without resolution.

3            And while they say they won't, they could continue

4    the litigation, but we can't fully assert counterclaims and

5    third-party claims against the Debtor parties, but just to

6    say, oh, great, we'll stay as to everyone.  It can't be

7    stayed because there's the six non-Debtor parties, and we

8    believe it'll be harmful to all the parties to have to deal

9    with multiple avenues for this.

10           So at least two factors, Sonnax factor 5, whether

11   the insurer assumes responsibility.

12           THE COURT:  The litigation against the tort claims

13   are very different.  You're not litigating over your own

14   money then.  Those are money damage claims that you happen

15   to join six or 10 parties in.  But that's very different

16   from the first claim you're describing, which is a claim

17   where you say this is our property and you have to pay us.

18           MR. HAMMER:  And I understand that.  I understand

19   the lawyers in the State Court in Texas would seek some type

20   of injunctive relief to at least make sure the funds are

21   held while the issue is being resolved.  And if there's a

22   way to carve that out that we deal with, you know, what are

23   we entitled to as royalty payments, that would be something

24   that is workable to us.

25           And then the last factor, 11, whether the parties

1    are ready for trial, that is not met.  We are through the

2    initial pleadings stage, all the claims, crossclaims, third-

3    party claims, counterclaims have been filed, all the Answers

4    have been filed in the cases ready to go.  So we do believe,

5    and we understand your concerns though that we have

6    satisfied 10 to 12 Sonnax factors and we believe this issue

7    needs to be resolved.  And while it will take effort by the

8    Debtor to do it in the context of this case since it won't

9    resolve in distributable proceeds, the relief should be

10   granted.  Thank you.

11            THE COURT:  Thank you.

12            MR. KAROTKIN:  Stephen Karotkin, Weil, Gotshal &

13   Manges for the Debtors.  I think, Your Honor, you put your

14   finger on it.  This is a simple contract dispute.

15            THE COURT:  It's not quite simple, I was just

16   asking questions.

17            MR. KAROTKIN:  Well, I think it is important.

18   Who's entitled to money, it's a contract dispute.  He

19   admitted it was a contract dispute, he's cutting through it

20   all.  All they're seeking is money damages, and that is the

21   primary claim.

22            THE COURT:  See, that's what I'm trying to figure

23   out, whether the dispute will result in a determination that

24   that's their property, or the dispute will result in a

25   determination that they have a claim against you like every

1    other prepetition creditor, at least to the extent that the

2    prepetition (crosstalk).

3              MR. KAROTKIN:  I think it's the latter.  The claim

4    is are they entitled to this money, who is entitled to the

5    proceeds, are we obligated to pay them under the conveyance

6    agreement.  I think it's really that.

7              THE COURT:  So you brought a claim in Texas, which

8    would basically resolve that issue for a breach of contract.

9              MR. KAROTKIN:  It's a declaratory judgment to

10   resolve that issue.

11             THE COURT:  So why not just go forward with it and

12   decide that, which is obviously, they could assert a claim.

13   They could say that it's our money, not yours.  It's the

14   same claim.

15             MR. KAROTKIN:  Again, the normal procedure -- this

16   is no different than any other type of claim.

17             THE COURT:  Except you brought, you brought -- let

18   me just finish.  You brought a declaratory judgment

19   proceeding, which if it's stayed, would resolve the same

20   issue that the Defendant is raising, at least with respect

21   to the contract rights -- put aside the tort claims for a

22   minute.

23             MR. KAROTKIN:  Prepetition, yes.  Prepetition, we

24   brought a declaratory judgment, and because this dispute was

25   going on, it could have been -- it was a similar dispute was

1    brought by them previous to that time.  It's no different

2    than any other general unsecured prepetition claim.  As

3    you've noted -- actually, as you noted in the SunEdison case

4    about an hour ago, and the appropriate procedure is not to

5    have this management devote its resources to litigating

6    simple prepetition contract rights in another forum.

7            THE COURT:  How did you deal with your pending

8    claim though in Texas?  It's not stayed.

9            MR. KAROTKIN:  We've agree to stay it.  We agreed

10   not to proceed.

11           THE COURT:  Not if that judge says no, I'm not

12   going to stay on; you filed it; or the other side objects

13   and says, no, you shouldn't stay it, this should be

14   resolved, basically making the same argument that was just

15   made.

16           MR. KAROTKIN:  First of all, I've never seen that

17   happen.  I can't imagine the Judge in Texas would entertain

18   that type of a thing.  It doesn't make any sense.  The

19   appropriate procedure --

20           THE COURT:  When's the next hearing in Texas on

21   this issue, do you know?

22           MR. KAROTKIN:  No, I don't know.  I mean, this

23   litigation in Texas, despite what counsel said, this is in

24   its infancy.  This case was commenced in February -- in

25   October of last year, I'm sorry.  Discovery hasn't even

Page 45

1    started.  The case hasn't moved forward at all.  There is no

2    interest in judicial economy in having that case proceed in

3    the State of Texas.  The most efficient way, Your Honor, is

4    the claims resolution process in this Court, and that you

5    noted in the cases that they cited in (indiscernible).  I

6    mean, as I think you noted earlier, they haven't cited one

7    case that supports what they are saying.

8            They cite your decision in New York Medical.  And,

9    as I'm sure you may recall, that case, you say, "A creditor

10   holding a general unsecured claim files their claim in the

11   Bankruptcy Court and the claim is deemed allowed, unless a

12   party with standing objects."  Objections are resolved in

13   the Bankruptcy Court, and the claims objection process

14   usually results in a liquidation of the allowed amount of

15   the claim.  As Judge Gerber noted, that's the most efficient

16   way to do things.  That doesn't distract the Debtor in its

17   management to go pursue what may be, the way he describes

18   it, complicated litigation in Texas, devoting their

19   resources to that.

20           It's totally contrary to what Section 362 is

21   designed to protect from the Debtor's perspective.  There's

22   no unfairness here.  We've agreed not to pursue our claims.

23   Our claims are simply the converse of their claims.  It's

24   exactly the same thing -- who is entitled to the money and,

25   you know, they haven't satisfied their burden under the

Page 46

1    Sonnax factors.  As I said, they cases they cite, you know,

2    either with cases that are ready for trial, cases where the

3    Court lets summary judgment motion go forward.  There's not

4    one case that they cite which allows the stay to be modified

5    in a situation like this, where the case is in its infancy.

6    It's totally contrary to the statutory provisions.

7            And the fact that they say they'll commence an

8    adversary proceeding in this Court, that's inappropriate.

9    The process is file a claim like every other prepetition

10   creditor.  That's the appropriate procedure, that's the way

11   the resolution process is efficiently administered.  And

12   there is nothing unique here about what they are seeking.

13           THE COURT:  Okay, thank you.  What I'd like to

14   hear from the parties -- not today, I'll give you a chance

15   to brief it -- is, and it's really directly in the first

16   instance, I guess, at the movant, whether this is a case

17   where you have a property interest in the funds that are

18   being withheld or they're held in trust on some theory like

19   that, or whether at the end of the day, all you have is a

20   claim against the Debtor and this is just a prepetition

21   breach of contract claim.

22           All right, I'll give you two weeks, and I want to

23   hear more than the Debtors took a position of a royalty

24   position.  They have to refer to the documents themselves

25   and any applicable law.  I don't know if this is a common

1    way that these types of projects are wrong and as law in

2    Texas, in terms of what your interest is in that escrow

3    funds under the contract.  I'll give you two weeks to submit

4    simultaneous briefs.

5              I mean, in the interim, if the Texas Court

6    decides, yeah, I'll just stay everything, I'd certainly like

7    to know that also.  Whether the Texas Court is going to

8    forward at least on the contract claim, which the Debtor

9    brought, I'd like to know that also.

10             MR. HAMMER:  Thanks.

11             THE COURT:  Next?  Financing, I think?

12             MR. KAROTKIN:  Yes, the next item, Your Honor, is

13   #10 on the agenda, which is the final hearing on the Debtor-

14   in-possession financing.  And let me just give you, if I

15   may, some quick background.

16             THE COURT:  Okay.

17             MR. KAROTKIN:  The only objection that was filed

18   to the approval of the Debtor-in-possession on a final basis

19   was by the creditor's committee.  That was several weeks

20   ago, prior to the last hearing we held that was basic --

21   where another interim Order was entered.  As you may recall,

22   responses to that objection were filed by both the Debtors

23   and the DIP lenders, and I think, as set forth in the

24   response that we filed a day or two ago.  And we're pleased

25   to report, and I think that counsel for both the committee

1  and the DIP lenders can confirm that all but one of the

2  issues raised in the objection filed by the creditor's

3  committee have been resolved.

4           Yesterday, we filed with the Court a form of

5  proposed final revised DIP Order that reflects the

6  resolution of those issues, together with a blackline

7  against the amended interim DIP Order that was entered by

8  the Court.  I believe you should have copies, but we can

9  hand it up to the Court.

10           THE COURT:  Maybe on the next.

11           MR. KAROTKIN:  You have both?

12           THE COURT:  Let me just see if I have it.  Which

13  tab was it in your book, do you know?

14           MR. KAROTKIN:  Ten, and then there are letter tabs

15  with the various pleadings.

16           THE COURT:  Do you know what binder it is?

17           MR. KAROTKIN:  Is it L?

18           THE COURT:  All right, I know what the --

19           MR. KAROTKIN:  Yes, it's L.

20           THE COURT:  Okay.

21           MR. KAROTKIN:  Would you like a --

22           THE COURT:  I have it.

23           MR. KAROTKIN:  -- color copy?

24           THE COURT:  I got it.  And the unresolved issues

25  are the committee standing and their right to -- its right

1    to take 2000 toward discovery.

2           MR. KAROTKIN:  Yes.  We can leave that, or we can

3    address that now if you would like.  Mr. Neier representing

4    the DIP lenders can take you through the changes, and if you

5    have any questions.

6           THE COURT:  I believe leave the changes; I don't

7    have a problem with the changes, so let me just hear on

8    those two unresolved issues.

9           MR. KAROTKIN:  As we've set forth in our

10   responsive pleading, Your Honor, we see no reason why the

11   committee should not be put to its burden to demonstrate

12   cause for derivative standing or for the taking of 2004

13   examination.

14          THE COURT:  So they're a party in interest taking

15   from 2004 exams, so just have to make an application.

16          MR. KAROTKIN:  To make an application.  They're

17   seeking authority to do that without making an application.

18   And in order to, you know, as I'm sure you're aware, there

19   are certain requirements, as we've set forth in our

20   pleadings, as to the cause.  It has to be demonstrated in

21   connection with both derivative standing and authority to

22   take 2004 examinations.  We don't think that that should be

23   automatically dispensed with here.  I think that following

24   those procedures enables Your Honor to be a gatekeeper to

25   determine whether assets of the estate should be utilized to

1    pursue those types of claims or discovery.

2              THE COURT:  Can I ask a question?

3              MR. KAROTKIN:  Yes.

4              THE COURT:  If you didn't have the Stipulations in

5    the paper and the Debtor would do the -- who could bring the

6    claims that the committee is start to bring.  I wouldn't be

7    acting as a gatekeeper.  You wouldn't have to ask me for

8    permission to do it, would you?

9              MR. KAROTKIN:  The Debtor wouldn't no.  The Debtor

10   would have to ask permission for the 2004 examinations.

11             THE COURT:  Okay.  But let's talk about the

12   standing to assert claims.  But isn't the Debtor really

13   giving up that ability in this Order by stipulating to these

14   issues?

15             MR. KAROTKIN:  Two things, Your Honor.  First, the

16   Debtor didn't --

17             THE COURT:  And if the answer is yes, so who's the

18   estate representative?

19             MR. KAROTKIN:  Let me address that, two answers.

20   Number one, the Debtor didn't entirely give up the right to

21   challenge the liens; in certain areas, they have full rights

22   with respect to the hedge proceeds.  Second --

23             THE COURT:  Yeah, but that's -- you know, I looked

24   at your -- in Paragraph 16, where you basically admit to the

25   extent and validity of the liens.

1         MR. KAROTKIN:  Yes, Your Honor, after we did due

2    diligence and reviewed all of the papers, did a thorough

3    examination of perfection issues.  We just didn't do it

4    willy nilly because they asked us to do this.  And I think

5    that in view of those circumstances, the Debtor has a

6    fiduciary.  The Debtor didn't do this lightly.

7         THE COURT:  We're not far away from the GM case,

8    mistakes were made.

9         MR. KAROTKIN:  Mistake, yes.

10         THE COURT:  And it happens.

11         MR. KAROTKIN:  And they can come into Court and

12    they can simply demonstrate why they think it's appropriate

13    to move forward before they embark on a course of action

14    that will obviously incur substantial costs and expenses.

15    All we're asking is, like in any other case, they come

16    before you and say this is the reason they want to do this.

17    And if they have cause, it ought to be easy.  But to

18    automatically grant them standing just doesn't seem

19    appropriate.

20         THE COURT:  Okay, thank you.

21         MR. LEBLANC:  Good morning, Your Honor.  Andrew

22    Leblanc, Milbank, Tweet, Hadley & McCloy, on behalf of the

23    committee.  Your Honor, we, I think, followed Your Honor's

24    lead in both AOG and SunEdison, SunEdison where Weil,

25    Gotshal represents the committee.  Your Honor, I think in

1    both of those cases, sua sponte required that the committee

2    be granted standing as part of the cash collateral Orders or

3    the DIP Orders there.  And we do think it's appropriate, and

4    Your Honor is a gatekeeper as a trial judge in any event.

5    To the extent that we bring claims, there will --

6               THE COURT:  I'm also passing on fees.

7               MR. LEBLANC:  I'm sorry?  And you're also passing

8    on fees.  You're a gatekeeper in both of those

9    circumstances.  So you will decide whether the claims are

10   colorable, as required under default, and Your Honor will

11   also decide on whether or not we're entitled to be paid

12   administrative expenses for having brought those claims.

13              So we don't think anything more is necessary with

14   respect to the standing, and Your Honor I think has done

15   this twice in the very recent past, which was why we thought

16   it was appropriate here.  And it is, there's a timing

17   element, although what they've drafted does hold the

18   investigation period if we file a motion for standing.  But

19   we think it's an unnecessary administrative expense to

20   burden the estate with the process, given the fact that

21   Paragraph 16 waivers that the Debtors give, from A through

22   D, are as extensive a waiver -- they carve out one

23   particular set of collateral.

24              But with the exception of that, with any other

25   claims, they've completely waived them.  They've released

1    them, they've waived them, they've stipulated to them, so

2    they've done everything you could possibly do.  So we think

3    it's an appropriate exercise of the Court's discretion to

4    allow us standing to the extent that we believe there's a

5    claim to bring.

6            With respect to the Rule 2004, Your Honor also did

7    that in SunEdison.  And, Your Honor, we think that's

8    appropriate for an even more important reason, which is that

9    doesn't toll the time for us to conduct our investigation.

10   So to the extent that we have to take Rule 2004 and we have

11   to first come to the Court and ask for permission, then that

12   consumes a period of time.  Now let me be clear, and I think

13   Your Honor can take note of this, we have not filed the Rule

14   2004 motion yet.  We expect and hope that we won't have to

15   ever do that.  We have been getting cooperation at the very

16   -- within days of us being retained.

17           THE COURT:  So you're saying that you recognize

18   you're going to have to file a motion to take a 2004 exam,

19   which is apparently, the Debtor interprets the Order to say

20   you can just simply start serving exams.  What are your

21   requests?

22           MR. LEBLANC:  Well, this is what I -- the point

23   I'm trying to make, Your Honor, is we're not going to

24   unnecessarily seek formal 2004 discovery if we don't have

25   to.  We have, from the beginning of the case, we served the

1    Debtors with an informal document request.  After some time,

2    we got better information flow from them.  We've been able

3    to do our investigation on a cooperative basis.  We've had

4    the same cooperation from the lenders.

5           And so we aren't going to seek formal 2004

6    discovery, service subpoenas, and things like that, unless

7    we believe we have to.  We could have because we, today,

8    don't have an Order that allows us to come in -- or we don't

9    have an Order that says we don't have to seek authority to

10   bring a 2004 motion.  But the point I'm making, Your Honor,

11   is that we're not going to do that unless -- we're not going

12   to seek formal discovery unless we conclude that we really

13   need it.

14           THE COURT:  But Mr. Karotkin said that even if the

15   Debtor was the appropriate party, you would still have to

16   seek authority pursuant to Rule 2004, I guess, every time

17   you wanted to take a 2004 exam.

18           MR. LEBLANC:  In the absence -- well --

19           THE COURT:  Which is what a Trustee normally does.

20           MR. LEBLANC:  No, I understand, in this

21   jurisdiction, Your Honor.  In the Third Circuit, as example,

22   there's a standing Order that says you -- that dispenses

23   with the requirement to seek authority.

24           THE COURT:  Ah, but we're not in the Third

25   Circuit.

1          MR. LEBLANC:  I understand, Your Honor, I

2      understand.  And, importantly, we're not asking for this

3      relief from the requirement to seek authority to serve 2004

4      discoveries for everybody, but rather just for us.  We're

5      working within a limited period of time.  We don't want that

6      period of time to be consumed by the need to come to Court

7      on what -- if and when we choose that we have to do it

8      because there isn't cooperation forthcoming and there has

9      been to date.  But to the extent that that changes and we

10     need to come, we just don't want to burden the Court and the

11     estate with the administrative expense of coming and seeking

12     authority from the Court do so solely with respect to an

13     investigation that, as Your Honor has noted, we're the only

14     ones who are conducting it at this point, the Debtor isn't.

15          So we'd ask, Your Honor, that you make those two

16     modifications to the Order.  And I will say that we thank

17     the parties for working with us to resolve all the other

18     objections and leaving just this issue to be resolved with

19     the Court.  Thank you, Your Honor.

20          MR. NEIER:  David Neier on behalf of Wells Fargo.

21     Good morning, Your Honor.  A couple of things; first of all,

22     we're cooperating with both the Debtors and the committee in

23     their separate investigations.  The Debtors have made

24     document requests of us and information requests of us in

25     lieu of 2004.  With respect to the committee, I think we've

1    turned well over 5000 pages of document so far, even prior

2    to the entry of this Order, and we've been doing that on a

3    rolling basis and we're going to continue to roll it.  They

4    haven't given us a request; we just started producing all

5    the lien and security and what-have-you documents.  As we

6    get them, they're getting them.

7              And with respect to standing, the Debtors have

8    really reserved on two issues.  As you may recall, Mr.

9    Schrock in his first day said that there are certain

10   unencumbered assets; he estimated approximately $50 million

11   worth of unencumbered assets.  The DIP Order actually says

12   that the liens are substantially valid, but it doesn't say

13   they're all valid because the Debtor said they could not

14   attest to that.  So they are following up on two issues,

15   that and the hedge proceeds.

16             So if Your Honor is going to do anything on

17   standing, I don't think you should divest the Debtors of

18   their standing, as is typical in a standing motion, because

19   they are following up with things and they feel very

20   strongly about it.  And the hedge proceeds, which are, what,

21   approximately $450 million?

22             THE COURT:  That's correct.

23             MR. NEIER:  The $450 million, which Wells Fargo

24   assets is its collateral and should be paid down on the

25   first lien debt, is a critical, critical factor in this

Page 57

1   case; in fact, probably one of the most important factors in

2   terms of any reorganization efforts that are going to take

3   place in this Court and are the subject of intense

4   negotiations.  It would be highly inappropriate for the

5   Court to divest the Debtors of the standing with respect to

6   that.

7              THE COURT:  What was the other issue that you said

8   is --?

9              MR. NEIER:  They have asserted that certain assets

10  are unencumbered.  They have asserted that certain property

11  is unencumbered, and the DIP Order reflects that.

12             THE COURT:  Okay.

13             MR. NEIER:  Thank you, Your Honor.

14             THE COURT:  Thank you.  Does anyone else want to

15  be heard?

16             MR. MARCUS:  Thank you, Your Honor.  Christopher

17  Marcus from Kirkland & Ellis on behalf of the ad hoc second

18  lien committee.  Two brief points, first is the gatekeeper

19  function.  The standard here is that the Debtors are

20  unjustifiably failing to prosecute.  I'm not aware of the

21  reason for the sua sponte grant of standing in the SunEdison

22  case, but all I've heard from the creditor's committee is

23  that the Debtors have stipulated, which is a fact that is

24  consistent with virtually every Chapter 11 case.

25             THE COURT:  That's right, that I take it that way.

1     It's what they have to do to get the money.

2             MR. MARCUS:  Well, the Debtors did an

3     investigation.  The standard is not that the Debtors are

4     failing to prosecute; it's that they're unjustifiably

5     failing to prosecute.  The creditor's committee has to

6     demonstrate colorability, and they have to demonstrate from

7     a cost benefit perspective that it makes sense to grant them

8     standing to allow them to pursue the claims and causes of

9     action.

10             And it's not just, counsel mentioned that this was

11    just sort of they don't want to go through the

12    administrative burden of filing that motion.  I just spent

13    15 or 17 days in front of Judge Chapman on a standing motion

14    in the Sabine case that cost tens of millions of dollars,

15    went up to the District Court.  The District Court affirmed

16    that was a real material factor in the case, that was a real

17    issue in the case.  And the inability of the creditor's

18    committee to get standing because they couldn't satisfy that

19    burden was very important for the Debtors.  I don't see this

20    as just an administrative step.

21             So unless there's some other reason for what Your

22    Honor might conclude that the Debtors have unjustifiably

23    failed to prosecute, I think the creditor's committee needs

24    to be put to their burden under STN, have to demonstrate

25    colorability, and they have to demonstrate cross-benefit.

1                THE COURT:  Okay, thank you.

2                MR. MARCUS:  Thank you, Judge.

3                THE COURT:  Anyone else before I hear from the

4    Debtor?

5                MR. KAROTKIN:  Just briefly, Your Honor.  First of

6    all, this is not the SunEdison case, as I'm sure you know

7    better than anyone.  In SunEdison, there were allegations of

8    fraud, there was a rollup of the DIP, there were many

9    allegations.

10               THE COURT:  Well, there's (indiscernible)in this

11   case, and I'm not sure that is really part of your

12   admission, that insider's traded on, or essentially traded

13   on inside information.

14               MR. KAROTKIN:  Putting aside the fact there's no

15   basis for those allegations.

16               THE COURT:  Well, that's not what the --

17               MR. KAROTKIN:  That's not --

18               THE COURT:  It's a very limited stipulation.  It's

19   limited to really what the first lien lenders -- or what the

20   prepetition lenders did or didn't do.

21               MR. KAROTKIN:  I agree with that.  But there's no

22   reason why --

23               THE COURT:  So why shouldn't the committee if it

24   discovers that somebody didn't file a UCC or terminated a

25   security interest, as we know, happens, be in a position to

1    bring that lawsuit; why do they have to come to me?

2            MR. KAROTKIN:  Because maybe they're wrong, and

3    maybe, like every other party, they should be subject to the

4    same burdens that every other party in a Chapter 11 case is

5    subject to.  And if they're right, it's pretty easy to file

6    a motion and get a hearing before the Court so that the

7    Court and other parties' interests can weigh in on whether

8    that's an appropriate expenditure of the estate's funds and

9    resources.

10           The other factor to be considered, Your Honor, is

11   that if they are granted automatic standing to do what they

12   -- any type of lawsuit related to the challenge period,

13   deprives the Debtor the right to settle that type of

14   lawsuit.  And I think that would be totally inappropriate,

15   and those are the types of factors that have to be

16   considered before a unilateral standing is granted.

17           THE COURT:  I would say that an estate

18   representative of the committee would have the authority on

19   any claim that it asserted within that representation of the

20   settlement.

21           MR. KAROTKIN:  Again, but does that deprive the

22   Debtor of the ability to settle it, and shouldn't those

23   issues come before the Court at the appropriate time so the

24   Court can decide on what basis will standing be granted or

25   not be granted.  It's very simple.  You're available, you

1       file a motion like everybody else.

2               THE COURT:  But you've already settled, as far as

3       the Debtor's concerned, you settled the claims against the

4       prepetition members, other than the couple of issues that

5       you have yet to, subject to a 90-day lookback period for

6       other parties and interests.  You've made your settlement.

7               MR. KAROTKIN:  Okay.  So what is the burden on

8       them to come forward with something to demonstrate why the

9       assets of this estate should be devoted to a lawsuit?  Let

10      them come in and show why.  It's very simple.  If there's a

11      legitimate basis to do so, you'll grand them standing.

12              THE COURT:  Anything else?

13              MR. NEIER:  One very minor point, Your Honor,

14      David Neier.

15              THE COURT:  What is this, (indiscernible)?

16              MR. NEIER:  No, just one very minor point.  You

17      say it's subject to a 90-day lookback period, but we're not

18      fussy about the time.  And we've said that if they file a

19      standing motion, the time would automatically be tolled from

20      that day forward.  So it's really, there is no time limit.

21              THE COURT:  Is that what the Order provides, that

22      you have to file a standing motion with 90 days?

23              MR. NEIER:  Correct.

24              THE COURT:  Or you have to file a Complaint within

25      90 days?

1              MR. KAROTKIN:  No, just the motion for standing.

2              MR. NEIER:  Just a motion for standing, so that

3      they can file a motion for standing tomorrow and the 90-day

4      limit is gone.  And that was a negotiated part of the Stip

5      Order.

6              THE COURT:  I don't need to hear anymore, okay.

7      One of the reasons I usually require, before I grant the

8      committee the status of an estate representative and

9      standing in these Orders, is that the action usually has to

10     be commenced under these Orders within the period.  And you

11     can say you can file a standing motion and you can get

12     before the Court, there's inevitable delay depending on the

13     Court's calendar and availability.  But as long as all you

14     have to do is file the motion within the period and not

15     close the period, you know, I think that is satisfactory.

16             You're certainly entitled -- I wouldn't, by the

17     way, I wouldn't grant you standing necessarily or it's a

18     different situation with respect to issues on which the

19     Debtor did not.  But, I mean, the Debtor has really only

20     waived the claims against the prepetition lenders.  And from

21     what I've been reading in the various papers and other

22     matters, there may be other claims that the Debtor hasn't

23     counted on.  But how do they investigate?  There's this 90-

24     day investigation period.  If they can't serve 2004 Orders,

25     how do they investigate?

```
 1              MR. NEIER:  First of all --

 2              THE COURT:  (indiscernible) the committee in a

 3    separate position than somebody who comes in and wants to

 4    bring a lawsuit, this committee's got statutory and

 5    fiduciary duties.

 6              MR. NEIER:  First of all, as they acknowledge,

 7    they are investigating, they're getting cooperation.  And,

 8    again, if they need to take a 2004 examination, they can

 9    come to the Court.  And we will represent to the Court that

10    from the Debtor's perspective, we're more than happy to

11    waive the 90-day period or whatever it is pending the

12    resolution of the 2004 examination.

13              THE COURT:  It's not your period to waive.  You're

14    not the object to these claims.

15              MR. NEIER:  In terms of timing?

16              THE COURT:  It's not yours to waive.  They're not

17    going to sue you; they're going to sue the banks or whoever.

18              MR. NEIER:  But it's our DIP Order as well.

19              THE COURT:  And by the way, one point to consider

20    this for the future.  I was told that you did all these

21    investigations, there's no allegations in your application

22    relating to the examinations you've conducted or what you

23    did.  And as we all know, mistakes are made.

24              MR. NEIER:  They are, Your Honor, but as a matter

25    of professionalism, that's what we do at our law firm.
```

1          THE COURT:  I know what I read and I don't know

2     what I don't read.  So I will -- I'll sign the Order as

3     proposed, as long as anything you stayed should the

4     committee file a claim or an application for STN, which I

5     guess can go beyond the waivers that are in the Order.

6          MR. NEIER:  Thank you, sir.

7          MR. KAROTKIN:  Your Honor, with respect to the

8     2004, though.

9          THE COURT:  You're going to have to submit an

10     application if you tell me you're looking at a lien, and you

11     can accompany that with a motion to extend the term if

12     you're looking at certain information and somebody's not

13     giving it to you, although it sounds like the prepetition

14     lenders are giving you the information, and I don't know

15     what other claims you're going to examine into.

16          MR. LEBLANC:  I wouldn't expect that we would be

17     filing a 2004.  If Your Honor does agree, we're not likely

18     to do it unless we have to; we're not going to do it unless

19     we have to, and I hope we get cooperation.  And, obviously,

20     Your Honor, the investigation period only applies to the

21     prepetition lenders.  So to the extent that we're

22     investigating other claims, that period of time is

23     inapplicable to those claims.

24          THE COURT:  Okay, thank you.  Yes, sir.

25          MR. MORRISSEY:  Your Honor, once again, Richard

1    Morrissey.  I just wanted to correct the record and provide

2    the Court with an update regarding the Felicia Pierce

3    matter.  The Summons actually --

4              THE COURT:  Is she dismissing here?

5              MR. MORRISSEY:  Yes, she has agreed to sign the

6    Stipulation, which we will present to the Court to be so

7    ordered.  But I just wanted to correct the record.  The

8    Summons in that adversary proceeding has been issued.

9              THE COURT:  It has been issued.  What's the

10   pretrial conference date we have, do you know?  We can just,

11   we'll just, we'll move the pretrial conference up today.

12             MR. MORRISSEY:  Set for September 29th.

13             THE COURT:  Okay, we can go back to

14   (indiscernible).

15             MR. MORRISSEY:  Thank you, Your Honor.

16             THE COURT:  Just remember, I have to write her a

17   letter.  Let me deal with the sealing motion that I

18   received.  I got the sealing motion, and I looked at the

19   list.  And none of the reasons for the sealing motion was

20   that it would disclose the names of employees.  There are no

21   names.

22             MR. KAROTKIN:  I realize that, sir, but you can

23   tell -- it's easy to extrapolate, for other employees to

24   extrapolate from the titles who they would be.

25             THE COURT:  Even if you remove the locations, they

1    can still tell?

2              MR. KAROTKIN:  Yes, that's what we're told, yes.

3    And that would not be good information to have available to

4    the employees.

5              THE COURT:  Tell me why it's bad to have that

6    information public.

7              MR. KAROTKIN:  Because generally, the employees

8    don't like their salary information public.  And for other

9    employees to see what others in the firm are making causes a

10   lot of consternation.

11             THE COURT:  All right, counselor, I'll grant the

12   motion.

13             MR. KAROTKIN:  Thank you, sir.

14             THE COURT:  Even though you hadn't (indiscernible)

15   it.  Go ahead.

16             MR. KAROTKIN:  By way of background, the motion

17   was filed on July 27th, and the motion seeks approval of

18   three employee programs, the first being a KERP program

19   covering --

20             THE COURT:  Excuse me.  Go ahead.

21             MR. KAROTKIN:  Yes, the first program, Your Honor,

22   is what we call the KERP program covering approximately 580

23   essentially rank-and-file-type employees.  The second

24   element is what we call the KEP, K-E-P, program covering 111

25   employees.  Those employees are the more administrative, had

1   functions such as accounting, marketing, human resources,

2   environmental compliance, engineering.  And the last program

3   the KEIP, K-E-I-P program, which covers the Debtors for

4   senior executives.  Each of those programs is described in

5   quite detail in the motion.

6          As we noted in the responsive pleading, Your

7   Honor, that we filed yesterday, the Debtor's first and

8   second lienholders have no objection to the relief requested

9   in the motion.  Also, as noted in that reply, Your Honor,

10  after consultation with the creditor's committee and in

11  order to provide the creditor's committee with additional

12  time to discuss certain aspects of both the KEP program and

13  the KEIP program, the Debtors and the committee have agreed

14  to the terms of a proposed revised Order, which would

15  approve the KERP program, would approve the second quarterly

16  payment only under the KEP program, which would be for the

17  period ending June 30th, would adjourn consideration of the

18  relief requested with respect to the balance of the KEP

19  program and would adjourn consideration of the entire KEIP

20  program.

21         We did submit a proposed revised Order to the

22  Court and filed it on the docket, and I could hand it up to

23  Your Honor.

24         THE COURT:  What's the letter tab after this?  I

25  have it back here --

1            MR. KAROTKIN:  12, I think, or 11(b).

2            THE COURT:  I'll check if I have it.  Has the U.S.

3    Trustee seen the revised Order?

4            MR. KAROTKIN:  Yes.

5            THE COURT:  And basically the proposal is to

6    adjourn the KEIP for the day, to approve the KERP, and to

7    approve the KEP, but only up to the second quarterly

8    payment.  So why don't we focus on those.  Let me start with

9    the KERP.  Is there any objection from the U.S. Trustee to

10   the KERP?  I don't know if you've seen the --

11           MS. GOLDEN:  Yes, Your Honor.  For the record,

12   Susan Golden from the U.S. Trustee's Office.  Yes, Your

13   Honor, we've seen all the information that the Court has

14   received in its unredacted form.  We have no objection to

15   the, I think it's for the general rank-and-file KERP program

16   and we have received the information on the rank-and-file

17   incentive program.  And I think that our objection was

18   really an information to objection overall.  So if the Court

19   is satisfied that Your Honor has received the information

20   necessary in order to make a determination as to whether the

21   participants are not insiders and whether the plan is truly

22   incentive, then the U.S. Trustee defers to the Court.

23           THE COURT:  Which is the plan that implicates the

24   relative?

25           MR. KAROTKIN:  The KEP.

```
 1              THE COURT:  The KEP, all right.  Let me start with

 2    the KERP then.  I've reviewed the KERP.  It does not appear

 3    to have any insiders involved in it.  It's consistent with

 4    the Debtor's prepetition practices.  It was then and is now

 5    and is now an appropriate exercise of business judgment and

 6    justified by the facts and circumstances of the case, so

 7    I'll approve the KERP.

 8              MR. KAROTKIN:  Thank you, sir.

 9              THE COURT:  The two plans.  Now let's get onto the

10    KEP.

11              MR. KAROTKIN:  We can actually --

12              THE COURT:  Let me just hear from the U.S. Trustee

13    before we --

14              MS. GOLDEN:  Thank you, Your Honor.  You know, as

15    I said a moment ago, our objection was really informational.

16    And we felt that it was important for the Court to see the

17    information that the U.S. Trustee had received.  The Debtor

18    has actually added additional information and an additional

19    declaration from the Debtor's CFO.  But, you know, it was

20    important that Your Honor, who was an independent duty under

21    Section 503, received the information to make a

22    determination as to whether there are insiders and whether

23    the KEP is truly an incentive plan.

24              THE COURT:  What if there are no insiders; what

25    difference does it make?
```

1          MS. GOLDEN:  Well, the issue really is whether or
2     not it's an incentive plan.
3          THE COURT:  So could it be a mixed retention, and
4     I don't even have to be facetious because part of it is a
5     retention plan.
6          MS. GOLDEN:  No question.
7          THE COURT:  And part of it is an incentive plan.
8          MS. GOLDEN:  No question.
9          THE COURT:  Even the Debtor says it's largely --
10    three times -- largely an incentive plan, which means more -
11    -
12         MS. GOLDEN:  I mean, Debtors often say that.  You
13    know, Debtors often say that.  So, you know, that's neither
14    here nor there.  That's what Debtors, you know, that's what
15    Debtors often say.  One of the issues that came up in the
16    reply that was not in the motion was the standard of review
17    of who the possible insiders could be.  The U.S. Trustee
18    still takes the position that the corporate definition is
19    the appropriate one because the Debtor's general partner is
20    a corporation.
21         THE COURT:  Well, the lender is a separation of
22    the Board of Directors.
23         MS. GOLDEN:  Board of Directors, which are
24    corporate concepts, not partnership concepts.
25         THE COURT:  I agree you can --

```
 1              MS. GOLDEN:  You know, the compensation committee

 2    was appointed to the board.

 3              THE COURT:  So do you object to the KEP

 4    (indiscernible)?

 5              MS. GOLDEN:  It's not an objection to the KEP in

 6    concept.  It really was informational so that the Court

 7    could make the determination as to what standard applies and

 8    whether or not there are insiders.  I do also note for the

 9    record that aside from the gentleman who is the CEO's

10    brother, there are, I think, four or five other KEP

11    participants who were appointed directly by the Board of

12    Directors.  Your Honor did say in SunEdison that that is a

13    factor that Your Honor would consider.

14              Also, we just want to note that while the amounts

15    -- the average amounts per employee in connection with the

16    KEP are set out in the motion.  Obviously because something

17    is an average, mathematically some people are earning less,

18    some people are earning significantly more.  But, in

19    essence, you know, that's really where we are, that Your

20    Honor had all the information that was necessary to make a

21    determination as to the standard and the attribute of the

22    participants.

23              THE COURT:  By the way, you didn't mention Mr.

24    Karotkin, but I think the discretionary fund issue is also

25    being moved over to a later date?
```

Page 72

1            MR. KAROTKIN:  No, that is not.

2            MS. GOLDEN:  We also have an issue on the

3    discretionary fund because they standards and criteria have

4    not been set forth, and it's a million dollars and that's a

5    lot of money.

6            THE COURT:  This is for the KEP?

7            MS. GOLDEN:  It's for the KEP and the KERP.  It's

8    just for those employees.

9            THE COURT:  So what are the standards for the

10   discretionary fund, other than discretion, which I know is a

11   very loose standard.

12           MR. KAROTKIN:  Your Honor, the discretionary fund,

13   as we've indicated, is merely a way to address promotions

14   within the KERP and the KEP.  It's not for the KEIP, it's

15   very clear, promotions for new hires so that they can be

16   treated in the same fashion.  It's not to provide --

17           THE COURT:  To new hires, you mean not the people

18   on the list?

19           MR. KAROTKIN:  If we hire someone tomorrow, a new

20   hire, so that they can be appropriately compensated as well

21   in the same basis that the other employees are compensated.

22   That's all, I mean, it's a fairly common practice.  As we've

23   noted in our reply, it's generally assumed in many, many

24   other cases so that management has the discretion and

25   ability to compensate people appropriately, you know, within

1    the confines of the general compensation practices of the

2    company.

3              THE COURT:  Let me raise an issue, two issues I

4    have with the KEP.  It looks to me like it's partially

5    retentive and partially incentive, because -- I'm looking at

6    Page 12, I guess, in the motion.  And it'd be beneficiary to

7    the program, earn 60 percent of the award for missing all

8    the partners.

9              MR. KAROTKIN:  That's correct.

10             THE COURT:  And that sounds like a retentive only.

11             MR. KAROTKIN:  Although there were other -- there

12   were incentive elements in terms of personal performance

13   metrics and things like that.  But, yes, if we're on target,

14   they still would get something.

15             THE COURT:  And assuming at least that portion is

16   retentive, you have the brother of an insider.  And I've

17   heard Ms. Golden that the way you sent to partnership.

18             MR. KAROTKIN:  It still applies in a partnership

19   anyway.

20             THE COURT:  I know, but for governance purposes,

21   it looks like a corporation.  It's got a Board of Directors.

22             MR. KAROTKIN:  Again, that would apply in either

23   case, so we're not trying to abruptly --

24             THE COURT:  And I have an issue because I don't

25   know enough about these four or five employees that are

Page 74

1    appointed by the board, which start to sound like an

2    officers, regardless of what their title is and I don't know

3    anything about their duties.

4              MR. KAROTKIN:  Well, I think, Your Honor, that we

5    did file --

6              THE COURT:  Well, did you file --

7              MR. KAROTKIN:  We did file the file of Mr.

8    Jackson, which addresses all of the participants in the KEP.

9              THE COURT:  I think I'd like a little more -- I

10   mean, the insider issue is not going to go away in terms of

11   the brother.  The brother is clearly an insider, so he's an

12   insider under the code.  It doesn't matter what his duties

13   are because his status is not based on what he does; it's

14   based on what the brother does.

15             MR. KAROTKIN:  Well, again, yeah, Mr. Jackson's

16   declaration did address the insider status of every person

17   included in the KEP.

18             THE COURT:  Is this #4 -- Document 414?

19             MR. KAROTKIN:  Yup, 412.

20             THE COURT:  Is that in your book?

21             MR. KAROTKIN:  Should be.  I can hand you up

22   another copy.

23             THE COURT:  What's the number on top?  I just have

24   one document, an 84-page document, and I have --

25             MR. KAROTKIN:  The document is 412.  I could hand

1    you up a copy.

2              THE COURT:  Okay, all right.

3              MR. KAROTKIN:  In Paragraph 7 and 8, I think

4    address the issue that your concerned with as to all the

5    participants, which would include the ones you mentioned.

6              THE COURT:  Yeah, but, you know, these are just

7    conclusory statements.  If you go back and look at what I

8    was given in SunEdison, it was a confidential affidavit and

9    declaration, but it really told me who the people were, what

10   they did, and who they reported to.

11             MR. KAROTKIN:  Well, we can certainly supplement

12   the record with that as to those five individuals.

13             THE COURT:  Well, what I was going to suggest is

14   the following.  I don't have a problem with the incentive

15   portion of the KEP, and maybe it makes sense to divide it

16   into two, which is the 100 percent.  And what's the third

17   category, the stretch?

18             MR. KAROTKIN:  Can I have one minute?

19             THE COURT:  Sure.

20             MR. KAROTKIN:  May I make a suggestion?

21             THE COURT:  Sure.

22             MR. KAROTKIN:  With respect to the relief we are

23   seeking today, which is only the second quarter payment, I'm

24   advised that those targets which would enable the full

25   payment of that amount were achieved.  So the incentive

Page 76

1    amount was achieved.  There's not an issue of people

2    receiving --

3                THE COURT:  Well, what I was going to say is that

4    I would approve the incentive portion, which is the 100

5    percent in stretch.  Because based upon the facts which are

6    set forth in the declarations, they've been developed

7    consistently with the past -- and maybe mis-consistently in

8    the past, apparently they have been reached, which is good.

9    With respect to the retention portion, I would approve it,

10   except for the four or five individuals and the relative.

11   I'm don't know how you're going to solve the relative

12   problem, maybe the -- but the other people who were

13   appointed by the board can be resolved with a little more

14   disclosure and just kick that over to the next hearing.

15               MR. KAROTKIN:  That's fine.  But I think what I'm

16   saying is kick it over to the next hearing because every

17   individual has met the incentive portion.

18               THE COURT:  Maybe the incentive is too low?

19               MR. KAROTKIN:  No, it's actually not too low.

20               THE COURT:  Everybody (indiscernible).

21               MR. KAROTKIN:  Well, they're terrific operators,

22   Your Honor.

23               THE COURT:  But this is a continuing process.

24               MR. KAROTKIN:  Again, and the next two payments

25   have been reserved for future hiring.

1              THE COURT:  I hear what you're saying, but I still

2      --

3              MR. KAROTKIN:  But we'll give you additional

4      information on the other folks.

5              THE COURT:  All right.  Is that an acceptable

6      resolution of this issue; does anybody want to be heard?

7              MR. LEES:  Your Honor, Alex Lees of Milbank for

8      the committee.  As counsel has represented, we are

9      adjourning a number of issues.  I just want to make very

10     clear that we have raised some issues with the Debtors.  We

11     have real substantive issues.  Unlike the U.S. Trustee,

12     these are not procedural issues.  It's got what targets are

13     appropriate, whether incentives are properly aligned, and

14     we're trying to work that out.  We've tried to take a very

15     targeted approach, which is why we're not objecting to the

16     rank-and-file and to the second quarter payment for the

17     midlevel.  But we hope to work that out with them.  And if

18     they don't, we will be back before Your Honor.

19             THE COURT:  What's the adjourn date of this?

20             MR. KAROTKIN:  September 15th.

21             THE COURT:  All right.  As I said, I'll approve

22     the KERP.  I don't hear an objection to the KERP.

23             MR. LEES:  No, Your Honor.  I just wanted to make

24     clear that we're reserving our rights on the remainder.

25             THE COURT:  All right.

1          MR. KAROTKIN:  The only other item, I think, is

2    the discretionary fund.

3          THE COURT:  Well, the discretionary is apparently

4    kind of a true offer where if you hire somebody else, you

5    can put them in the same position, as I assume, a person of

6    comparable -- a person in a comparable position would earn

7    that person (indiscernible).

8          MR. KAROTKIN:  Yes, they would.

9          MS. GOLDEN:  I apologize, Your Honor.  We would

10   also like a copy of whatever is submitted to the Court.

11         THE COURT:  Of course, of course.

12         MS. GOLDEN:  We have the right to review as well.

13         THE COURT:  Of course.  So I'm approving the KERP.

14   The KEIP, K-E-I-P, is being adjourned the September 15th,

15   and I'll approve to the KEP to the extent they're paying the

16   second quarterly payment based upon the representation that

17   the targets, the 100 percent target at least, has been

18   reached.

19         MR. KAROTKIN:  Yes, sir.

20         THE COURT:  So, I don't have a problem with that

21   portion of it as an incentive program.  Subject to hearing

22   from the committee, all this is without prejudice to a

23   challenge to the KEP.

24         MR. KAROTKIN:  And I think that the Order we

25   provided you accurately reflects what you just said.

Page 79

1          THE COURT:  Does it?

2          MR. KAROTKIN:  I think the revised Order

3    accurately reflects what you just said.

4          THE COURT:  If you will just submit an Order.  If

5    there are any further changes off of the revised Order, and

6    then just submit a blackline copy of the Order.

7          MR. KAROTKIN:  We will do so.  Thank you, sir.

8          THE COURT:  Last, I think we have the equity

9    committee motion.  It's my motion, but I'll give up the

10   floor.  Didn't stop him from sitting there for two hours,

11   he's jumped up.

12         MR. KAROTKIN:  Yeah, I seen him already.

13         THE COURT:  I'll hear everybody, but we're not

14   trying this issue today.  I just want to hear about the

15   scope of hearing and set the schedule.

16         MR. KAROTKIN:  Yeah, as we indicated in our

17   omnibus response, in addition to addressing why an equity

18   committee is not appropriate here, we intend to take

19   discovery.  We've asked for a status conference for Your

20   Honor to set an appropriate schedule, recognizing that, I

21   think you said yourself in the SunEdison decision that it's

22   not a valuation hearing.

23         THE COURT:  No, it's not.  But on the other hand,

24   if people are going to give me valuation evidence, which

25   apparently most singulars are going to do, I'll consider it.

1              MR. KAROTKIN:  Okay.  And as a consequence of

2      that, we're going to want to take the deposition of the

3      (indiscernible).

4              THE COURT:  It sounds like a valuation hearing.

5              MR. KAROTKIN:  And have the opportunity to present

6      appropriate evidence.

7              THE COURT:  How long do you need to discovery,

8      besides taking the deposition of their -- who is it, Mr.

9      Lewis?

10             MR. KAROTKIN:  Mr. Lewis.  I think that if we were

11     to schedule the hearing sometime mid --

12             THE COURT:  Just don't have a discovery --

13             MR. KAROTKIN:  By now, we're just talking about

14     the deposition of Mr. Lewis.

15             THE COURT:  Okay.  And notwithstanding that it's

16     Labor Day coming up, I assume you could accomplish that in

17     30 days?

18             MR. KAROTKIN:  Yes, sir.

19             THE COURT:  All right.  Anybody else feel they

20     need discovery in this, on this matter?

21             MR. NEIER:  Your Honor, David Neier on behalf of

22     Wells Fargo.  Both of the prepetition secured parties, as

23     the first lien and the second liens, filed joinders, and we

24     --

25             THE COURT:  Joinders in the motion or the

1   opposition?

2           MR. NEIER:  Joinders in the opposition.

3           THE COURT:  Okay.

4           MR. NEIER:  So we want to be active participants

5   both in the discovery and in the deposition.  And while it's

6   really great that the seconds believe they're the fulcrum

7   and the unsecured creditors have put in pleadings that

8   they're the fulcrum, and now the equity has come in and said

9   they're the fulcrum.

10          THE COURT:  Maybe everybody will get their

11  (crosstalk).

12          MR. NEIER:  Nobody's demonstrated that we're not

13  the fulcrum, and we don't want to be the fulcrum.  But our

14  debt is already trading at a discount and the unit holder is

15  trading about half of what SunEdison is trading.

16          THE COURT:  Well, SunEdison's a different case.  I

17  do have a question for the people who have put in papers on

18  behalf of Equity.  I notice that there are preferred unit

19  holders and common unit holders.  Are they in the same

20  position, or do you really need to committees?

21          MR. BIENENSTOCK:  Well, they're not in the same --

22  Martin Bienenstock with Proskaur Rose.

23          THE COURT:  And do they have the same cancellation

24  of debt issues?

25          MR. BIENENSTOCK:  I'm always worried as a

1    bankruptcy lawyer to ask questions.

2              MR. KAROTKIN:  I could answer to that.

3              THE COURT:  No, I think that's an important issue

4    in the case --

5              MR. KAROTKIN:  They do not.

6              THE COURT:  -- to differentiate it.,

7              MR. KAROTKIN:  The preferred B, the unit Bs do not

8    have --

9              THE COURT:  These are the preferred stockholders?

10             MR. KAROTKIN:  Neither of the preferred

11   stockholders have the (indiscernible)issue.

12             THE COURT:  Okay.

13             MR. BIENENSTOCK:  Your Honor, speaking for the

14   clients on whose behalf we filed the motion that's been

15   about the prefer, the preferred and common unit holders are

16   asking for one committee; some of them have both preferred.

17   I had actually stood up for a different purpose, Your Honor.

18             THE COURT:  Okay.

19             MR. BIENENSTOCK:  Going back to the Court's

20   initial inquiry on discovery.  If the Debtor or the

21   statutory credit's committee is going to put on any type of

22   valuation witness or proffer some type of report, within

23   that same 30 days, we would like the opportunity to take

24   their deposition.  So we'd like them to designate that

25   person or entity in the next seven days, and then we'll

Page 83

1    schedule a deposition so we can get this done within the 30

2    days.

3              THE COURT:  Well, I don't know if they have to --

4    if they do intend to do it and they have such a report

5    ready, Mr. Lewis has already committed.

6              MR. BIENENSTOCK:  Right, but I'm saying -- I'm not

7    asking for the report in seven days.  I'm saying tell us

8    within the next seven days if you're going to do it, so that

9    we can take that person or entity's deposition within the

10   same 30 days.  Otherwise, this is going to stretch out far

11   too long.

12             THE COURT:  Well, it may, and that may be a result

13   of a -- it sounds like it's turning into a valuation

14   hearing.

15             MR. BIENENSTOCK:  Which we don't want.

16             THE COURT:  I understand that, but somebody's put

17   in, you know, an expert valuation report.  And I have to

18   consider it, I can't not consider it.

19             MR. BIENENSTOCK:  Especially when one of the

20   Court's considerations in SunEdison and every other equity

21   committee motion goes to the issue of is there some

22   plausibility of equity value.  We understand that.  We,

23   frankly, think it's enough for people just to submit their

24   reports.  But now that they're taking discovery, we want to

25   try to keep a level playing field.

1              THE COURT:  Well, I had an evidentiary hearing in

2     SunEdison, and I can have an evidentiary hearing on a

3     competing arguments regarding whether or not Debtor is

4     hopefully insolvent.  It could be interpreted the Debtor is

5     hopelessly insolvent, but because they concealed the D

6     issue, concealed the I issue, I would think that a committee

7     is appropriate only just on that issue.

8              MR. BIENENSTOCK:  We agree.

9              THE COURT:  But, you know, that doesn't -- okay.

10    Why don't we do this?  Any other reports have to be filed

11    within 30 days.  In the meantime, you can take Mr. Lewis's

12    deposition within the 30 days.  We'll have another

13    conference third week in September, and then we'll decide

14    whether you need any further discovery or we can just go

15    straight to a hearing on this.  How does that sound?

16             MR. BIENENSTOCK:  That'd be great.

17             MR. KAROTKIN:  That's fine.

18             MR. LEES:  Your Honor, Alex Lees for the

19    committee.  As has been recognized, valuation is an issue

20    that's coming to the fore.  We filed a brief statement

21    yesterday.  The committee obviously has strong views on

22    valuation and the increasing value of the Midland basin

23    assets, as well as the reduction in costs that has led to

24    the improvement in value across the Debtor's portfolio.  So

25    we also intend to be active participants in discussions

Page 85

1    about value and also discussions about the appropriate

2    disposition of the Debtor's assets.

3                THE COURT:  Do you intend to file an expert report

4    on valuation?

5                MR. BIENENSTOCK:  At this time, I can't say one

6    way or another.

7                THE COURT:  Okay.  Actually, I have a question,

8    it's a practical question.  If I appoint a committee, how do

9    you get paid in this case?

10               MR. BIENENSTOCK:  Your Honor --

11               THE COURT:  There's no carve out for an equity

12   committee.

13               MR. BIENENSTOCK:  I understand.  That is not a

14   problem for the following simple reason.  If they're going

15   to confirm a plan, one requirement is that all allowed admin

16   expenses have to be paid.

17               THE COURT:  Okay, all right.

18               MR. NEIER:  Your Honor, David Neier, on behalf of

19   Wells Fargo.

20               THE COURT:  I remember you from the other

21   (indiscernible).

22               MR. NEIER:  I just want to say one thing, okay.

23   On payment, there had been equity committees appointed where

24   they're only paid as any recovery to --

25               THE COURT:  I know.

Page 86

```
 1              MR. NEIER:  -- as opposed to being paid from the

 2     lender --

 3              THE COURT:  I suggested that in SunEdison, but

 4     they didn't like that.

 5              MR. NEIER:  Well, we make the same suggestion

 6     here, Your Honor, especially if it's just about the

 7     purviews.

 8              MR. BIENENSTOCK:  To Mr. Neier's point, I think

 9     Mr. Neier's clients overlooks, as certain other parties

10     overlook, the fact that Congress put an examiner into the

11     Code on a mandatory basis in this case, if anyone moves for

12     it, and there's no cost benefit test.  The difference

13     between an examiner --

14              THE COURT:  That can fix the budget.  If you're

15     taking about the second subsection, I'll fix the budget.

16              MR. BIENENSTOCK:  You couldn't but it's going to

17     be based on an appropriate investigation, so it still could

18     be a significant number.  The only difference --

19              THE COURT:  You see, what you said concerns me.

20     When you start to talk about an appropriate investigation

21     and you go beyond the value and you're talking about your

22     CODI claims, which you alluded to, that means I got the

23     Debtor doing it, maybe a credit's committee doing it, and

24     now you're implying that you want to do it.  And that sounds

25     like it starts to get expensive.
```

```
 1              MR. BIENENSTOCK:  Well, Your Honor --

 2              THE COURT:  Could I appoint an equity committee

 3    solely on the CODI issue so that you can ensure that, to the

 4    extent the Debtor is proposing a plan or is contemplating

 5    something preplan that will protect, I guess, it's the

 6    common unit holders.  Yeah, you're authorized to act as a

 7    committee for that.  But whatever else you do, you're doing

 8    it on your own dime.

 9              MR. BIENENSTOCK:  Well, two things, Your Honor.

10    First, please do not assume that the committee we're asking

11    for would do a duplicate or a triplicate investigation.  I

12    can imagine reasons why we would look a stance at a Debtor's

13    investigation of its own people, but the statutory

14    creditor's committee is another story.

15              On Your Honor's question as to a committee solely

16    for the cancellation of indebtedness issue, my preliminary

17    reaction to that is that would be insufficient.  It's got to

18    include both that and valuation because the bottom line is,

19    each constituency of creditors are going to look for enough

20    value for themselves.  And we've seen in enough cases in

21    this circuit and other circuits that constituencies of

22    creditors love it when they find more than enough value, but

23    can tell the Court, well, it's just enough for us, and then

24    they get a windfall.  So there's no way we believe an equity

25    committee should be prevented from valuation.
```

1          THE COURT:  I guess I didn't phrase the question

2     properly.  If I determine that the Debtor is hopefully

3     insolvent -- I should have said that -- could I then appoint

4     an equity committee for the purpose of, for lack of a better

5     phrase, the CODI issue.

6          MR. BIENENSTOCK:  I think the answer is yes, of

7     course.  But perhaps I'm guilty of being biased here, but I

8     don't think the Court can remotely on these facts find

9     hopeless insolvency.

10          THE COURT:  That brings me to my -- actually, I

11     had a question for Mr. Karotkin, if I could ask it.  One of

12     the arguments you make in the KEIP is that these people are

13     very important and they're administering $4 billion worth of

14     assets.  If I grant the motion on that basis, are you

15     judicially estopped from arguing that the Debtor's assets

16     are not worth at least $4 billion.

17          MR. KAROTKIN:  I think that was an erroneous

18     reflection of the party, Your Honor.

19          THE COURT:  Well, but that's what you say.

20          MR. KAROTKIN:  It was really take the book value.

21          THE COURT:  Well, are you telling me that they're

22     not administering $4 billion worth of assets?

23          MR. KAROTKIN:  Pardon me?

24          THE COURT:  Are you telling --

25          MR. KAROTKIN:  I'm telling you there is no $4

1    billion worth of Enterprise value.

2            THE COURT:  Notwithstanding what the motion says.

3            MR. KAROTKIN:  Notwithstanding what the motion

4    says.

5            THE COURT:  Okay.  All right, so let's do this to

6    save time.  Oh, Mr. Gamza, come up.  Come on, we'll share.

7            MR. GAMZA:  Very briefly, Your Honor.  First of

8    all, I'd like to introduce Mr. Lewis who's here.

9            MR. LEWIS:  How do you do?

10           THE COURT:  You've become a popular guy in these

11   proceedings.

12           MR. GAMZA:  Also, in response to Your Honor's

13   question, we also represent both preferred and common.  We

14   think that one committee would certainly be sufficient.

15           THE COURT:  Certainly, on a valuation basis, it's

16   one committee, although does one have a preference over the

17   other in distribution?  I'm sure they do.

18           MR. GAMZA:  But it's not uncommon, Your Honor, for

19   different interests to be represented on a single committee.

20   It happens quite commonly.

21           THE COURT:  I understand.  But if the argument is,

22   you know, when you get to the level, if they're satisfied,

23   they're not going to worry about the next level and you have

24   two levels, it's always an issue.

25           MR. BIENENSTOCK:  Committees with senior and

1    junior debt exist all the time.

2              MR. GAMZA:  The last point, Your Honor, that I

3    make is the CODI and the valuation are almost flip sides of

4    the same coin because of the risk value for equity, which,

5    you know, we believe there is, then you don't have a CODI

6    issue.  And if you have a CODI issue, it's because there's

7    no sufficient value for equity.  So it seems like one way or

8    another, there are interests here of equity that will need

9    to be represented in the case.

10             THE COURT:  We have someone else here.  Yes, sir.

11             MR. LOHAN:  Good afternoon, Your Honor.  Brian

12   Lohan on behalf of Equity First Holdings.  We have 10

13   million common units; we're only in the common.  And I agree

14   with what Mr. Hammer has said, if (indiscernible)goes beyond

15   the debt, then the CODI issue is resolved.  The only other

16   point I'd like to make is we did not file expert valuation

17   because we didn't think this was going to turn into a

18   valuation.

19             THE COURT:  Well, that's what it looks like.

20             MR. LOHAN:  And I don't know that we will, but we

21   will make a decision quickly.

22             THE COURT:  Well, let's just say that any expert

23   report, any reports on value, have to be filed within 30

24   days.  I'll schedule another conference for Thursday,

25   September 22nd, which is just beyond the 30 days, and then

1    you'll decide how to proceed at that point.  And in the

2    meantime, Mr. Karotkin, you can take Mr. Lewis's deposition

3    within the 30 days.

4              MR. KAROTKIN:  Thank you, sir.

5              THE COURT:  All right.

6              MR. KAROTKIN:  I think that concludes the agenda.

7              THE COURT:  All right, thank you very much.

8              ALL:  Thank you, Your Honor.

9

10

11   (Whereupon these proceedings were concluded at 12:39 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 92

1            C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   Sonya                Digitally signed by Sonya Ledanski
                          Hyde
                          DN: cn=Sonya Ledanski Hyde, o, ou,
7   Ledanski Hyde         email=digital1@veritext.com, c=US
                          Date: 2016.08.22 16:59:30 -04'00'

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  August 22, 2016