Ray C. Schrock, P.C.
Stephen Karotkin
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------x
:
**In re**                                         :
:                **Chapter 11**
**BREITBURN ENERGY**                              :
**PARTNERS LP**, *et al.*,                        :    **Case No. 16-11390 (SMB)**
:
**Debtors.**[1]                                   :    **(Jointly Administered)**
:
------------------------------------------------------x

## NOTICE OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363(b), AND 503(c)(3) FOR ENTRY OF AN ORDER APPROVING DEBTORS' 2017 RETENTION AND INCENTIVE PROGRAMS FOR CERTAIN KEY EMPLOYEES

**PLEASE TAKE NOTICE** that a hearing on the annexed Motion, dated February

1, 2017 (the "**Motion**"), of Breitburn Energy Partners LP and its affiliated debtors in the above-

captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"),

for entry of an order pursuant to sections 105(a), 363(b), and 503(c)(3) of title 11 of the United

States Code approving the Debtors' 2017 retention and incentive programs for certain key

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Breitburn Energy Partners LP (9953); Breitburn GP LLC (9948); Breitburn Operating LP (5529); Breitburn Operating GP LLC (5525); Breitburn Management Company LLC (2858); Breitburn Finance Corporation (2548); Alamitos Company (9156); Beaver Creek Pipeline, L.L.C. (7887); Breitburn Florida LLC (7424); Breitburn Oklahoma LLC (4714); Breitburn Sawtelle LLC (7661); Breitburn Transpetco GP LLC (7222); Breitburn Transpetco LP LLC (7188); GTG Pipeline LLC (3760); Mercury Michigan Company, LLC (3380); Phoenix Production Company (1427); QR Energy, LP (3069); QRE GP, LLC (2855); QRE Operating, LLC (9097); Terra Energy Company LLC (9616); Terra Pipeline Company LLC (3146); and Transpetco Pipeline Company, L.P. (2620). The Debtors' mailing address is 707 Wilshire Boulevard, Suite 4600, Los Angeles, California 90017.

employees, all as more fully set forth in the Motion, will be held before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 723, One Bowling Green, New York, NY 10004 (the "**Bankruptcy Court**"), on **February 23, 2017 at 10:00 a.m. (Eastern Time)** (the "**Hearing**").

PLEASE TAKE FURTHER NOTICE that any responses or objections ("**Objections**") to the Motion must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York, and shall be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M–399 (which can be found at http://www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M–399, to the extent applicable, and served on:

<div style="margin-left:2em">

(a)    Weil, Gotshal & Manges LLP, attorneys for the Debtors, 767 Fifth Avenue, New York, NY 10153 (Attn: Ray C. Schrock, P.C. and Stephen Karotkin, Esq.);

(b)    Milbank, Tweed, Hadley & McCloy LLP, attorneys for the Official Committee of Unsecured Creditors, 2029 Century Park East, 33rd Floor, Los Angeles, CA 90067 (Attn: Gregory Bray, Esq. and Paul Aronzon, Esq.);

(c)    Proskauer Rose LLP, attorneys for the Official Committee of Equity Security Holders, Eleven Times Square, New York, NY 10036 (Attn: Martin J. Bienenstock, Esq., Vincent Indelicato, Esq., and Philip M. Abelson, Esq.);

(d)    the United States Trustee for Region 2, 201 Varick Street, Suite 1006, New York, NY 10014 (Attn: Susan D. Golden, Esq. and Richard C. Morrissey, Esq.); and

(e)    all other parties required to be served pursuant to and in accordance with General Order M–399 and the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and*

</div>

2

*9007 Implementing Certain Notice and Case Management Procedures* (ECF No. 146)

so as to be filed and received no later than **February 16, 2017 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

      **PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Motion, which order may be entered with no further notice or opportunity to be heard.

      **PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted or denied upon default.

Dated: February 1, 2017
      New York, New York

            /s/ Stephen Karotkin
            Ray C. Schrock, P.C.
            Stephen Karotkin
            **WEIL, GOTSHAL & MANGES LLP**
            767 Fifth Avenue
            New York, New York  10153
            Telephone:  (212) 310-8000
            Facsimile:   (212) 310-8007

            *Attorneys for Debtors*
            *and Debtors in Possession*

WEIL:\95934381\9\29979.0004

Ray C. Schrock, P.C.
Stephen Karotkin
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                 :

**In re**                     :

                  :     **Chapter 11**

**BREITBURN ENERGY**    :

**PARTNERS LP,** *et al.*,    :     **Case No. 16-11390 (SMB)**

                  :

        **Debtors.**[1]     :     **(Jointly Administered)**

                  :

---------------------------------------------------------x

## MOTION OF DEBTORS PURSUANT TO
## 11 U.S.C. §§ 105, 363(b), AND 503(c)(3) FOR ENTRY OF
## AN ORDER APPROVING DEBTORS' 2017 RETENTION
## AND INCENTIVE PROGRAMS FOR CERTAIN KEY EMPLOYEES

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

        Breitburn Energy Partners LP and its affiliated debtors in the above-captioned

chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully

represent as follows in support of this motion (the "**Motion**"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Breitburn Energy Partners LP (9953); Breitburn GP LLC (9948); Breitburn Operating LP (5529); Breitburn Operating GP LLC (5525); Breitburn Management Company LLC (2858); Breitburn Finance Corporation (2548); Alamitos Company (9156); Beaver Creek Pipeline, L.L.C. (7887); Breitburn Florida LLC (7424); Breitburn Oklahoma LLC (4714); Breitburn Sawtelle LLC (7661); Breitburn Transpetco GP LLC (7222); Breitburn Transpetco LP LLC (7188); GTG Pipeline LLC (3760); Mercury Michigan Company, LLC (3380); Phoenix Production Company (1427); QR Energy, LP (3069); QRE GP, LLC (2855); QRE Operating, LLC (9097); Terra Energy Company LLC (9616); Terra Pipeline Company LLC (3146); and Transpetco Pipeline Company, L.P. (2620). The Debtors' mailing address is 707 Wilshire Boulevard, Suite 4600, Los Angeles, California 90017.

## **Preliminary Statement**

1.      The Debtors' employees are critical to the Debtors' business enterprise, revenue generating capacity, and, of course, to a successful reorganization.  Faced with a challenging environment in the oil and gas industry and the impact the chapter 11 cases have had on the Debtors' ability to provide meaningful equity-based compensation, the Debtors obtained Court approval to implement the 2016 Key Employee Retention Program (the "**2016 KERP**"), 2016 Key Employee Program (the "**2016 KEP**"), and 2016 Key Employee Incentive Program ("**2016 KEIP**" and together with the 2016 KERP and 2016 KEP, the "**2016 Employee Programs**").  Implementing the 2016 Employee Programs was essential to maintaining market-based compensation, employee morale, avoiding high volume attrition, and appropriately incentivizing the Debtors' workforce to maximize value.  The Debtors' 2016 performance achieved the 2016 "target" for production of oil and gas and for reduction of lease operating expenses, and the Debtors successfully retained most of their employees who were key to attaining these levels of performance.

2.      As evidenced by the record of these chapter 11 cases, the Debtors implemented the 2016 Employee Programs after undertaking a deliberative process to design market-comparable programs with the assistance of their independent compensation consultants, Meridian Compensation Partners LLP and Willis Towers Watson ("**WTW**"), engaging in extensive negotiations with the Official Committee of Unsecured Creditors (the "**Creditors' Committee**"), and addressing the concerns and diligence questions raised by the United States Trustee for Region 2 (the "**U.S. Trustee**").  The 2016 KERP and 2016 KEP were approved by the Court on August 19, 2016 (ECF No. 427), and the 2016 KEIP was approved by the Court on September 16, 2016 (ECF No. 548).  The Debtors believe approval and implementation of the

2

2016 Employee Programs was critical to the achievement of 2016 performance and served to promote and accomplish the other goals for which they were designed.

3.       By this Motion, the Debtors seek approval of their 2017 employee compensation programs (the "**2017 Employee Programs**") that are substantially identical to the 2016 Employee Programs, except with respect to modifications necessary to reflect a slight decrease in the number of program participants, appropriate changes to performance metrics to reflect the operational goals for fiscal year 2017, and adjustments for equity-related discounts imposed on the 2016 KERP participants.

4.       It is clear that the administration of these large and complex chapter 11 cases will continue well into 2017.   Under these circumstances, it is essential to value maximization and to the success of these cases that appropriate incentive and retention programs continue as provided in the 2017 Employee Programs.   As demonstrated below, the 2017 Employee Programs are appropriate, reasonable, and consistent with the 2016 Employee Programs, well within the Debtors' business judgment, and, most importantly, are critical to preserving and maximizing enterprise value for the benefit of the Debtors' economic stakeholders.

### Background

5.       As noted in the Motion seeking approval of the 2016 Employee Programs (the "**2016 Employee Programs Motion**, ECF No. 309), through a combination of  workforce reduction plans, resignations, and early retirements in 2015 and 2016, the Debtors already are operating with a lean labor force.   The Debtors believe that any additional material attrition among their employees will adversely affect their operations, revenue generation, and ability to successfully reorganize.   Additionally, it is imperative that the Debtors' executives, who are responsible for managing and operating the Debtors' business enterprise on a day-to-day basis,

3

and who have the additional responsibilities attendant to the chapter 11 process, are appropriately incentivized to drive performance for the benefit of all parties in interest.

6.     Notably, due to the efforts of the Debtors' senior management and other key employees, the administration of these cases has proceeded on a constructive and inclusive basis as contemplated by chapter 11 of the Bankruptcy Code.  Indeed, in addition to focusing on operations, revenue generation and the well-being of the business enterprise, senior management is spearheading the plan formulation and negotiation process that will assure that value is maximized for all of the Debtors' economic stakeholders.  This effort has encompassed, among other things, numerous meetings with various key stakeholders and their advisors, responding expeditiously to a multitude of due diligence requests made by the parties, addressing tax issues to assure that any plan mitigates to the maximum extent possible any cancellation of indebtedness income risks, and interfacing on a regular basis with the statutory Creditors' Committee and Equity Security Holders' Committee.

7.     Under the circumstances of these chapter 11 cases, the costs associated with the 2017 Employee Programs are significantly outweighed by the economic and non-economic benefits that will be realized therefrom.

### A.    General Background

8.     On May 15, 2016 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.

4

9.      These chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

10.     On May 26, 2016, the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code.  On November 15, 2016, the U.S. Trustee appointed the Official Committee of Equity Security Holders pursuant to section 1102 of the Bankruptcy Code.

11.     Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of James G. Jackson Pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York and in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (ECF No. 13).

### B.      The Debtors' Retention and Incentive Programs

12.     On July 27, 2016, the Debtors filed the 2016 Employee Programs Motion. In support of the 2016 Employee Programs Motion, the Debtors submitted two declarations from James G. Jackson, the Debtors' Chief Financial Officer.[2]  As described in further detail in the 2016 Employee Programs Motion, the Debtors historically paid their employees with a combination of "short term" cash awards ("**STIP**") and "long term" equity awards ("**LTIP**"). *See* 2016 Employee Programs Motion ¶ 12.  Given, among other things, the adverse impact of the chapter 11 cases on the value of the equity granted to LTIP-eligible employees, the Debtors recognized that there was an acute need to account for the significant decrease (if not

---

[2] *See Declaration of James G. Jackson in Support of Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363(b), and 503(c)(3) for Entry of an Order Approving Debtors' Retention and Incentive Programs for Certain Key Employees* (ECF No. 412) and *Supplemental Declaration of James G. Jackson in Support of Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363(b), and 503(c)(3) for Entry of an Order Approving Debtors' Retention and Incentive Programs for Certain Key Employees* (ECF No. 492).

elimination) of value of the equity granted to such employees to maintain market-based compensation. The 2016 Employee Programs were expressly formulated to account for the economic impact the chapter 11 cases would have on the total compensation that could be realized by key employees, to ensure the continuation of market-based compensation and, when applicable, to provide incentive-based compensation (similar to that provided prepetition) only if challenging operational goals were obtained. *Id.* ¶ 2, 13.

13.    After the 2016 Employee Programs Motion was filed, the Debtors and the Creditors' Committee engaged in various discussions resulting in certain amendments to the programs, and, as stated, on August 19, 2016, the Court entered an order approving the 2016 KERP and part of the 2016 KEP, and on September 16, 2016 entered an order approving the 2016 KEIP and modifications to the 2016 KEP (ECF No. 548, and collectively, the "**2016 Employee Programs Orders**").

14.    Notably, in connection with the approval of the 2016 Employee Programs, the Court observed that the 2016 Employee Programs (a) compared favorably to comparable target plans in similar types of cases (Hr'g Tr. 26:13–18, Sept. 15, 2016), and (b) used a reasonable collection of metrics – mainly, the saving of expenses and increasing of revenues (Hr'g Tr. 25:15-18, Sept. 15, 2016). Furthermore, as the Court noted, the 2016 KEP and 2016 KEIP, as to which the 2017 KEP and 2017 KEIP are substantially identical, only rewarded the participants for prospective achievement, which was appropriate for an operating business enterprise like the Debtors. *See* Hr'g Tr. 27:10-18, Sept. 15, 2016.

15.    The Debtors are administering these cases efficiently and economically, and are engaging with their constituencies in a manner that will optimize the ability to achieve a plan acceptable to all of their economic stakeholders, the Debtors' successful emergence from

6

chapter 11, and long-term viability. However, as noted above, the chapter 11 cases will continue

to be administered in 2017 and the same circumstances warranting approval and implementation

of the 2016 Employee Programs remain present for the 2017 fiscal year and plainly justify the

relief requested in this Motion.

### Jurisdiction

16.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C.

§§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper

before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

17.    By this Motion, pursuant to sections 105(a), 363(b), and 503(c)(3) of the

Bankruptcy Code, the Debtors request entry of an order approving the 2017 Employee Programs.

A proposed order granting the relief requested herein is annexed hereto as **Exhibit A** (the

"**Proposed Order**"). In support of this Motion, the Debtors submit the declaration of James G.

Jackson, the Debtors' Chief Financial Officer, a copy of which is annexed hereto as **Exhibit B**

(the "**Jackson Declaration**"), and the declaration of Douglas Friske, Managing Director at

Willis Towers Watson ("**WTW**"), a copy of which is annexed hereto as **Exhibit C** (the "**Friske**

**Declaration**").

### The 2017 Employee Programs

18.    Like the 2016 Employee Programs, the 2017 Employee Programs consist

of three separate elements covering three distinct groups of employees. Substantially similar to

its predecessor programs, the 2017 Employee Programs provide for the Debtors to (a) make

quarterly cash payments (subject to continued employment) to (i) 2017 STIP eligible non-insider

rank-and-file employees (the "**2017 General Rank-and-File Program**") and (ii) 2017 non-

insider rank-and-file employees that were STIP and LTIP eligible prepetition (the "**2017 Rank-**

7

**and-File Incentive Program**" and, together with the General Rank-and-File Program, the "**2017 KERP**"), (b) make quarterly cash payments to designated key employees based upon the individual and the Debtors meeting quarterly performance metrics for the 2017 fiscal year (the "**2017 KEP**"), and (c) make quarterly cash payments to four key executives solely if the Debtors meet incentive-based performance metrics for the 2017 fiscal year (the "**2017 KEIP**"). Notably, as was the case with the 2016 Employee Programs, the 2017 Employee Programs were formulated and developed by the Debtors and their four-director compensation and governance committee (the "**Compensation Committee**" – the members of which are outside directors and none of whom are beneficiaries of any of the 2017 Employee Programs), with the assistance of their counsel and independent compensation consultant, WTW.

### A.    Description of the 2017 KERP for Rank-and-File Employees

19.    The 2017 KERP has substantially identical terms and conditions, types of participants, and payout levels as those established in the 2016 KERP, except will include fifteen fewer non-insider rank and file participants. Like the 2016 KERP, the 2017 KERP is composed of two programs – the 2017 General Rank and File Program and the 2017 Rank and File Incentive Program. The 2017 KERP is consistent with the Debtors' prepetition and customary compensation program with the only difference being quarterly payments instead of annual payments to reduce the uncertainties created by the pendency of these chapter 11 cases. Any 2017 KERP participant who voluntarily terminates employment with the Debtors before the vesting of any award will forfeit receipt of such award for the applicable period and for any subsequent periods.

20.    The 2017 General Rank-and-File Program includes approximately 390 formerly STIP-only eligible, non-insider, rank-and-file employees. Pursuant to the program,

8

participants will receive a quarterly cash "stay bonus" if they are employed by the Debtors at the end of each calendar quarter in 2017. The program provides for quarterly payments to be made as soon as practicable after the end of March 31, June 30, September 30, and December 31, 2017. The Debtors estimate that the maximum amount payable to the eligible employees under the 2017 General Rank-and-File Program is approximately $2.95 million.[3] The average potential aggregate postpetition payout of the 2017 General Rank-and-File Program is approximately $7,500 per participant. This program keeps aggregate compensation equal to or less than what the eligible 2017 General Rank-and-File Program participants received in 2016.

21.    The other component of the 2017 KERP is the 2017 Rank-and-File Incentive Program for approximately 180 formerly STIP- (and formerly LTIP) eligible employees. 2017 Rank-and-File Incentive Program participants will be eligible for a cash award equal to 100% of their legacy STIP amounts plus 70% of their legacy target LTIP awards, in each case subject to adjustment based on the individual employee's performance. For 2017, cash payments will be made as soon as practicable after the end of each performance period, marked by each quarter ending March 31, June 30, September 30, and December 31, 2017. The 2017 Rank-and-File Incentive Program participants will be eligible for award payments if they remain employed by the Debtors at the end of each performance period (*i.e.*, the end of each quarter). The Debtors' estimate the total cost of the 2017 Rank-and-File Incentive Program will be approximately $8.11 million. The average potential payout of the 2017 Rank-and-File Incentive Program is approximately $45,000 per employee. This program keeps aggregate compensation equal to or less than what the eligible 2017 Rank-and-File Incentive Program participants received in 2016, except for elimination of certain prepetition discounts on account of historical

---

[3] The total payments under the 2017 General Rank-and-File Program include prospective amounts attributable to potential overtime payments due to program participants.

WEIL:\95934381\9\29979.0004

equity awards.[4]  The 2017 Rank-and-File Incentive Program form of award agreement is substantially in the form annexed hereto as **Exhibit D**.

22.     As was the case with the 2016 KERP, none of the participants in the 2017 KERP constitute "insiders" as such term is defined in section 101(31) of the Bankruptcy Code. As reflected in the Jackson Declaration, the 2017 KERP participants do not include any employees who (a) report directly to the Debtors' board of directors, (b) are appointed directly by the Board of Directors, (c) direct the Debtors' overall corporate governance, (d) control the Debtors' company policy, or (e) exercise managerial control over the Debtors' operations as a whole.  None of the 2017 KERP participants is among the Debtors' named executive officers in their filings with the Securities and Exchange Commission.  *See* Jackson Decl. ¶ 5.  Thus, even though certain of the 2017 KERP Employees may have the words "director" or "manager" in their titles, they are not "insiders" within the purview of section 503(b) of the Bankruptcy Code.

23.     A summary table of the 2017 KERP is set forth below:

| 2017 KERP | |
|---|---|
| Number of Participants (approx.) | 570 Employees |
| Aggregate Maximum 2017 Amount | $11.06 million |
| Average per Employee | $19,400 |

**B.     Description of the 2017 KEP**

24.     The 2017 KEP also has the same terms, conditions and participants, as those established under the 2016 KEP, except for certain adjustments on account of a slight decrease in the number of participants, the corresponding decrease in aggregate payout amounts and, of course, the adoption of revised metrics for fiscal year 2017.  Of the 111 key employees the Debtors and the Compensation Committee identified under the 2016 KEP, 109 remain

---

[4] The participants in the 2016 Rank-and-File Incentive Program received prepetition equity awards in January 2016 which were discounted when converted into the postpetition cash award approved by the 2016 Employee Programs Orders.  No such conversion is applicable in 2017, and the discount will be eliminated to calculate the 2017 Rank-and-File Incentive Program participants' awards in the same manner as the other participants in the 2017 Employee Programs.

10

employed by the Debtors and compose the 2017 KEP participant pool. The 2017 KEP participants continue to perform duties that are integral to the Debtors' operations and vital to the Debtors' ability to maintain operational stability and preserve and enhance enterprise value – including accounting, asset management, land, environmental, business administration, engineering, geosciences, information technology, marketing, human resources, operational safety, and regulatory work.

25.    As was the case with the 2016 KEP, the 2017 KEP provides for quarterly cash awards during 2017. The salient provisions of the 2017 KEP are as follows:

(a)    <u>Minimum Award</u>:  Subject to the performance metrics set forth below, 2017 KEP participants will receive a cash award equal to 100% of their 2017 STIP target amounts plus 70% of their legacy LTIP amounts, in each case subject to adjustment based on the individual employee's performance.

(b)    <u>Form of Payout</u>:  Quarterly cash payments.

(c)    <u>Performance Period</u>:  Calendar year 2017 with payments made for the quarters ending March 31, June 30, September 30, and December 31, 2017.

(d)    <u>Performance Metrics</u>:  The 2017 KEP is based on the achievement of customary industry performance metrics measured 50% by oil and gas production (the "**Production Metric**") and 50% by lease operating expenses (the "**LOE Metric**"). As with the 2016 KEP, each of the metrics is considered independently. The annual metrics and payouts are set forth below. The Production Metric will be measured by million barrels of oil equivalents ("**MMBoe**"), performance and the LOE Metric will be measured by lease operating expense ("**LOE**") performance, determined for the Debtors' 2017 full year in accordance with the following table:

| | Minimum | Target | Stretch |
|---|---|---|---|
| **2017 Production Metric (MMBoe)** | Less than 14.68 | 16.31 | Greater than or equal to 17.94 |
| **2017 LOE Metric (in millions)** | Greater than $337.2 | $306.5 | Less than $275.9 |
| **Total 2017 Award (in millions)** | $13.955 | $16.945 | $19.936 |

11

(e)     Timing of Payout:  Payments under the 2017 KEP will be paid as soon as practicable after the applicable quarter.

(f)     Computing Payout Levels:  Payout levels will be interpolated based on the payout curve between "minimum" and "target" for the applicable metric or between "target" and "stretch" for the applicable metric.

(g)     Termination of Employment:

(i)     A 2017 KEP participant who (a) is terminated for "Cause", or (b) who terminates employment by retirement or by resignation other than for "Good Reason," in the case of (a) or (b), either before the earlier of (x) the effective date of the Company's plan of reorganization and (y) April 15, 2018, shall not be eligible to receive a 2017 KEP award for that performance period and shall be required to repay all previous awards paid under the 2017 KEP, net of taxes paid by the participant.

(ii)    A 2017 KEP participant terminated without "Cause" or who resigns for "Good Reason" or upon the occurrence of a "Change of Control" during a performance period shall be entitled to receive the pro rata share of any 2017 KEP award earned based on performance through the date of the cessation of employment.

(iii)   If a chapter 11 plan becomes effective before December 31, 2017, the 2017 KEP participants shall be entitled to retain any earned awards and shall receive a pro rata portion of the award for the performance period in which the chapter 11 plan becomes effective.

(h)     Total Cost:  The maximum cost of the 2017 KEP will not exceed $19.94 million, and only if stretch level of performance is achieved. The maximum cost at target is approximately $17 million.

26.     The 2017 KEP is designed at "stretch" performance to maintain the aggregate compensation levels of the participants at amounts no greater than the levels established for the 2016 KEP.  The documentation with respect to the 2017 KEP is substantially in the form annexed hereto as **Exhibit E**.

27.     In addition to the foregoing, and as was provided under the 2016 KERP and 2016 KEP, the Debtors propose to establish an additional discretionary fund in the aggregate amount of $1,000,000 (the "**Discretionary Fund**") in connection with the 2017 KERP and 2017

12

KEP.  Subject to the discretion of the Debtors' Chief Executive Officer and oversight by the Compensation Committee, the Discretionary Fund is to be used (a) to increase by no more than 10% individual 2017 KERP or 2017 KEP awards to address special circumstances; (b) to address promotions; and (c) to provide awards to new net participants.  The Discretionary Fund will not be available for the 2017 KEIP.

### C.    Description of the 2017 KEIP

28.    The 2017 KEIP, similarly has substantially identical terms and conditions, the same four participants, and similar payout levels as the 2016 KEIP approved by the 2016 Employee Programs Orders, except for adopting revised Performance Metrics for fiscal year 2017 and the modification of the timing of award payments so that they are quarterly and on the same schedule as the 2017 KERP and 2017 KEP payouts.  Notably, payouts under the 2017 KEIP incorporate the same ten percent reduction negotiated with the Creditors' Committee in connection with the 2016 Employee Programs.  *See* 2016 Employee Programs Order at 2 (ECF No. 548).  Specifically, the Performance Metrics for the 2017 KEIP will be as follows:

|  | Threshold | Target | Stretch |
|---|---|---|---|
| **2017 Production Metric (MMBoe)** | Less than 14.68 | 16.31 | Greater than or equal to 17.94 |
| **2017 LOE Metric (in millions)** | Greater than $337.20 | $306.5 | Less than $275.9 |
| **Total 2017 KEIP Awards (in millions)** | $4.345 | $7.242 | $9.657 |

29.    The KEIP is purely incentive based and the Performance Metrics for the 2017 KEIP are identical to the metrics for the 2017 KEP.  Namely, the Debtors, together with the Compensation Committee and WTW, developed and formulated the 2017 KEIP for the Debtors' four most senior executives (the "**KEIP Executives**") to appropriately incentivize and motivate their performance during these chapter 11 cases, and to align their interests with the Debtors' economic stakeholders so as to maximize value.  Notably, absent approval of the 2017 KEIP,

13

total direct compensation for the KEIP Executives will only consist of base salary, resulting in their compensation being substantially less than the market.  *See* Friske Decl. ¶¶ 19–20.  A summary of the key terms of the 2017 KEIP are as follows:

(a)    <u>KEIP Executives</u>:  Halbert S. Washburn (Chief Executive Officer), Mark Pease (President and Chief Operating Officer), James G. Jackson (Executive Vice President and Chief Financial Officer), and Gregory Brown (Executive Vice President, General Counsel, and Chief Administrative Officer).

(b)    <u>Form of Payout</u>:  Quarterly cash payments.

(c)    <u>Performance Period</u>:  Calendar year 2017 with payments made for the quarters ending March 31, June 30, September 30, and December 31, 2017.

(d)    <u>Performance Metrics</u>:  The 2017 KEIP is based 50% on the Production Metrics and 50% on the LOE Metrics.  If threshold levels are not met, KEIP Executives will not be entitled to 2017 KEIP payments for the underperformed metric.

(e)    <u>Payout Levels</u>:  The 2017 KEIP payments are based on the legacy target award amounts for the covered individuals.

- *Below Threshold Awards*:  If threshold performance is not achieved, there is no payout.

- *Threshold Awards*:  54% of legacy STIP amounts and 38% of legacy target LTIP amounts.

- *Target Awards*:  90% of legacy STIP amounts and 63% of legacy target LTIP amounts.

- *Stretch Awards*:  90% of legacy STIP amounts and 90% of legacy target LTIP amounts.

14

(f)    The foregoing metrics result in the following potential total award amounts:

|  | Below Threshold Award | Total Threshold Award | Total Target Award | Total Stretch Award |
|---|---|---|---|---|
| **Chief Executive Officer (Washburn)** | $0 | $1,898,208 | $3,163,680 | $4,258,800 |
| **Chief Operating Officer (Pease)** | $0 | $987,012 | $1,645,020 | $2,178,540 |
| **Chief Financial Officer (Jackson)** | $0 | $730,080 | $1,216,800 | $1,609,920 |
| **Chief Administrative Officer and General Counsel (Brown)** | $0 | $730,080 | $1,216,800 | $1,609,920 |
| **Total** | $0 | $4,345,380 | $7,242,300 | $9,657,180 |

(g)    Computing Payout Levels:  Payout levels will be interpolated based on the payout curve between "threshold" and "target" for the applicable metric or between "target" and "stretch" for the applicable metric.

(h)    Performance Measurement and True-Up:  The Production Metrics and LOE Metrics will be measured each performance period, but trued-up relative to cumulative performance at the end of the year.  This enables under performance in one performance period to be made up by outperformance in the other performance period if cumulative performance targets for the entire twelve months are achieved.  At the end of 2017, KEIP Executives will be entitled to the greater of (i) the sum of payments actually earned, and (ii) the outcome if measured on a cumulative basis.  An award is not subject to "clawback" if the cumulative targets are not reached.

(i)    Timing of Payout:  Payments under the 2017 KEIP will be paid as soon as practicable after the applicable quarterly performance period.

(j)    Termination of Employment and Plan of Reorganization:

(i)    A KEIP Executive who (a) is terminated for "Cause", or (b) who terminates employment by retirement or by resignation other than for "Good Reason," in the case of (a) or (b), either before  the earlier of (x) the effective date of the Company's plan of reorganization and (y) April 15, 2018, shall not be eligible to receive a 2017 KEIP award for that performance period and shall be required to repay all previous awards paid under the 2017 KEIP, net of taxes paid by the participant.

(ii)    If a KEIP Executive is terminated without "Cause" or resigns for "Good Reason" or upon the occurrence of a "Change of Control" during a performance period he shall be entitled to receive his pro

15

rata share of any 2017 KEIP award earned based on performance through the date of the cessation of employment.

(iii)    If a chapter 11 plan becomes effective before December 31, 2017, the KEIP Executives shall be entitled to retain any earned awards and shall receive a pro rata portion of the award for the performance period in which the chapter 11 plan becomes effective.

(k)    <u>Total Cost</u>:  The total maximum cost of the 2017 KEIP at stretch levels will not exceed $9,657,180 million.

30.    As stated in the Friske Declaration, the 2017 KEIP is appropriately designed to provide market-based compensation and provide for incentive compensation in amounts and based on metrics that are consistent with industry practice.  *See* Friske Decl. ¶¶ 21–26.  The documentation with respect to the 2017 KEIP is substantially in the form annexed hereto as **<u>Exhibit E</u>**.

<div align="center"><u>**Basis for Relief Requested**</u></div>

31.    The relief requested in this Motion should be approved for several reasons.  First, as with the 2016 Employee Programs, the 2017 Employee Programs represent the continuation of prepetition compensation practices that constitute a sound exercise of the Debtors' business judgment and are in the best interests of the Debtors' estates.  The awards under the 2017 Employee Programs are reasonable in light of market practice, and the circumstances of these chapter 11 cases further buttress the Debtors' valid business purpose in implementing the programs and the need to maintain normal and customary compensation practices and programs.  Indeed, as with the 2016 KERP, the Debtors believe that the 2017 KERP constitutes an ordinary course business transaction that does not require Court approval.  Nevertheless, out of the abundance of caution and to avoid any unnecessary dispute, authority to continue such program is included in the Motion.  Additionally, the awards under the 2017 Employee Programs are no higher than the awards under the 2016 Employee Programs, except

<div align="center">16</div>

for the slight increase with respect to the 2017 Rank-and-File Incentive Program.[5]  Second, the

2017 Employee Programs fully comply with the requirements of section 503(b) and 503(c) of the

Bankruptcy Code.  As an initial matter, the 2017 KERP does not involve any "insiders" and

represents a sound exercise of the Debtors' business judgment.  Furthermore, although the 2017

KEP encompasses one insider, the Court should find (as it did in connection with the 2016 KEP)

that the 2017 KEP is nevertheless primarily incentive based and tied to appropriate industry

operating metrics.  Similarly, the 2017 KEIP is incentive-based consistent with the requirements

of section 503(c)(3) of the Bankruptcy Code, and completely aligns executive compensation with

performance based on metrics used in the industry to drive performance.  In view of the

substantial similarities between the 2016 Employee Programs and the 2017 Employee Programs

and the goals they are designed to achieve, approval of the relief requested herein is warranted

for the same reasons expressed by the Court in connection with the approval of the 2016

Employee Programs.

> **A.**    **The 2017 Employee Programs Satisfy the Requirements of Section 363(b) of the Bankruptcy Code**

32.    The 2017 Employee Programs should be authorized under section 363(b)

of the Bankruptcy Code.  Section 363(b) of the Bankruptcy Code provides, in relevant part, that

"[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary

course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Under section 363 of the

Bankruptcy Code, a court may authorize a debtor to use estate property if a sound business

purpose exists for doing so.  *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr.

S.D.N.Y. 1989) (internal citations omitted).  The business judgment rule is satisfied if "'the

---

[5] As noted in footnote 4 above, the participants in the 2016 Rank-and-File Program received a discounted award upon conversion of the equity award to cash.  Because the 2017 Rank-and-File Program will be cash based from the outset, no such discount will apply to the program.

directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *See, e.g.*, *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

33.    Under the circumstances that exist in these chapter 11 cases, implementation of the 2017 Employee Programs constitutes an exercise of the Debtors' sound business judgment.  The 2016 Employee Programs continued the Debtors' historical prepetition retention and incentive programs, and the 2017 Employee Programs mirror the 2016 Employee Programs approved by the Court, with only the minor modifications described herein.  Moreover, as demonstrated in the Friske Declaration and as was the case with respect to the 2016 Employee Programs, the payments under the 2017 KEP and 2017 KEIP are reasonable in light of competitive market practices, industry norms, and programs offered by similarly situated companies.  *See* Friske Decl. ¶¶ 20, 28–29.  Accordingly, the Debtors submit that implementation of the 2017 Employee Programs constitutes an ordinary course transaction that satisfies the requirements for approval under section 363(b) of the Bankruptcy Code.

**B.    The 2017 Employee Programs Satisfy the Requirements of Section 503(c) of the Bankruptcy Code**

1.    Sections 503(c)(1) and 503(c)(2) Are Inapplicable to the 2017 Employee Programs

34.    Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code do not apply to the 2017 KERP.  Section 503(c)(1) of the Bankruptcy Code restricts the ability of "insiders" to receive payments as part of retention plans and, as stated above, none of the 2017 KERP

18

participants are "insiders" (as such term is defined in section 101(31) of the Bankruptcy Code). The participants in the 2017 KERP handle the same types of duties as the participants in the 2016 KERP, which the Court found did "not appear to have any insiders involved in it." Hr'g Tr. 69:2–3, Aug. 18, 2016.

35.    As set forth in the Jackson Declaration, none of the employees participating in the 2017 KERP have the type of authority or responsibility in the Debtors' business to dictate corporate policy or make strategic decisions. *See* Jackson Decl. ¶ 6. Accordingly, based on the foregoing, none of the 2017 KERP employees constitute "insiders" of the Debtors, and the restrictions of section 503(c)(1) of the Bankruptcy Code are inapplicable to the 2017 KERP.    Section 503(c)(2) of the Bankruptcy Code also does not apply to the 2017 KERP because the 2017 KERP is not a severance program.    In fact, the 2017 KERP participants must remain employed by the Debtors to receive any payments under the program.

36.    Sections 503(c)(1) and 503(c)(2) of the Bankruptcy Code also do not apply to the 2017 KEP or 2017 KEIP.    Neither statutory provision applies to performance-based incentive plans. *See, e.g., In re Musicland Holding Corp.*, No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 1, 2006) (debtor continuing to provide incentive-based compensation under management incentive plan did not violate section 503(c) of the Bankruptcy Code).    As with the 2016 Employee Programs and as described herein, the primary characteristics of the 2017 KEP and 2017 KEIP are to incentivize performance[6] to maximize the value of the Debtors' estates, and the applicable Performance Metrics establish ambitious goals.    Furthermore, as the Court

---

[6] As set forth in the 2016 Employee Programs Motion, any retentive characteristic is an incidental byproduct. *See Dana*, 358 B.R. at 576 (noting that "some components that arguably have a retentive effect do not necessarily violate section 503(c)"); *In re Global Home Prods., LLC*, 369 B.R. 778, 786 (Bankr. D. Del. 2007) (noting that, "the fact that . . . all compensation has a retention element [did] not reduce the Court's conviction [that the debtor's primary goal in approving the incentive plans] was to create value by motivating performance").

WEIL:\95934381\9\29979.0004

noted in approving the 2016 KEIP, the Performance Metrics used therein were "incentivizing" and "selected to measure performance[.]"  Hr'g Tr. 29:10–11, Sept. 15, 2016.  The 2017 KEP and 2017 KEIP use the same metrics, subject to appropriate adjustments to reflect fiscal year 2017.

37.    As set forth in the Jackson Declaration, the 2017 KEP and 2017 KEIP Performance Metrics are difficult to reach and not "layups."  Jackson Decl. ¶¶ 9-13.  *Cf. In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012).  The 2017 KEP and 2017 KEIP Performance Metrics closely mirror the 2016 KEP and 2016 KEIP Performance Metrics which were heavily negotiated with the Creditors' Committee and are comparable to programs offered by similarly situated companies in the Debtors' industry.  The 2017 KEP and 2017 KEIP Performance Metrics were developed to appropriately and similarly challenge and incentivize the participants.  As was the case with the 2016 Employee Programs, the performance metrics are based directly upon the Debtor's 2017 operating budget.  Consistent with past practice, the 2017 operating budget was developed over several months and is based on detailed input from all of the Debtors' five operating divisions.  Each year's budget is developed by the divisions' asset teams, including the field staff who manage the Debtors' assets on a daily basis.  Only after all applicable budgets are rolled up from the divisions, is the total budget presented to the Board of Directors for review.  Historically, the Debtors' operating budget—like the 2017 budget—has required the meeting of challenging goals that often have neither been met nor exceeded.  In reviewing the last five years before the commencement of the chapter 11 cases, the budget production target was missed in 70% of the quarters (14 of 20) and the budget lease operating expense target was missed in 55% of the quarters (11 of 20).

20

38.     The target levels for the performance metrics in the 2017 KEP and 2017 KEIP are taken directly from the 2017 operating budget and, accordingly, hardly are easily achievable. The "stretch" goals are far more challenging. Similar to the metrics for the 2016 KEP and 2016 KEIP, the "stretch" Performance Metrics in the 2017 KEP and 2017 KEIP are set at the "P25" level, or the level which management only expects to achieve 1 in 4 times. *See* Jackson Decl. ¶ 11. Notably, none of the 2016 KEP or KEIP participants received stretch awards under the 2016 KEP or KEIP. Similarly, the threshold level of performance in the 2017 KEP and 2017 KEIP are also tied directly to the 2017 operating budget. Unless the Debtors achieve at least 90% of the budget for the Production Metric and no more than 110% of the budget for the LOE Metric, 2017 KEIP participants will not earn any incentive payment based on that metric. If only one of the stretch goals is met, then the stretch portion of the award is reduced by half.

39.     The production goals are particularly challenging because of additional operational factors outside of the participants' control. For example, over 30% of the Debtors' oil and gas wells and nearly 10% of the Debtors' proved reserves are dependent on operations by other companies whose businesses have been stressed and who may curtail production on their own. Additionally, "downtime" at gathering and processing facilities operated by third parties may exceed forecasts or arise as a result of unexpected financial distress or maintenance. Further, the Debtors operate a number of large, complex facilities, and a single significant interruption or a one-time significant amount of mechanical "downtime" with one of these assets alone could result in the inability to achieve targeted production levels. Lastly, as drilling and completion activity has increased, the availability of services is and will become more uncertain and costs will increase.

WEIL:\95934381\9\29979.0004

40.     In light of the foregoing, the Debtors submit that sections 503(c)(1) and

503(c)(2) of the Bankruptcy Code also do not apply to the 2017 KEP or 2017 KEIP.

> 2.    <u>The 2017 Employee Programs Satisfy the Requirements of Section 503(c)(3) of the Bankruptcy Code</u>

41.     The appropriate standard under section 503 of the Bankruptcy Code for

evaluating the Employee Programs is under subsection (c)(3), which permits payments to a

debtor's employees outside the ordinary course of business if such payments are justified by "the

facts and circumstances of the case."  11 U.S.C. § 503(c)(3).  Bankruptcy Courts in this and other

Districts have generally utilized the factors identified in *Dana* when determining if the structure

of a compensation proposal and the process for its development meet the business judgment test.

*See, e.g.*, *In re Residential Capital, LLC*, 491 B.R. 73, 85–86 (Bankr. S.D.N.Y. 2013) (applying

the *Dana* factors to the debtors' retention plan for non-insiders, and approving the plan as an

exercise of sound business judgment); *Borders*, 453 B.R. at 473–74 (same).  In *Dana*, the

Bankruptcy Court set forth the following six factors for evaluating whether a debtor has satisfied

the "sound business judgment" test for purposes of the approval of a compensation plan under

section 503(c)(3) of the Bankruptcy Code:

> (a) Is there a reasonable relationship between the plan proposed and the results to be obtained, *i.e.*, will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

> (b) Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

> (c) Is the scope of the plan fair and reasonable; does it apply to all employees; does it discriminate unfairly?

> (d) Is the plan or proposal consistent with industry standards?

> (e) What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

22

(f) Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana*, 358 B.R. 567, 576–77 (Bankr. S.D.N.Y. 2006).  As set forth below, each of the 2017 Employee Programs satisfy the *Dana* factors and should be approved.

a.   *The 2017 KERP Is Justified by the Facts and Circumstances of the Cases*

42.    As was the case for the 2016 KERP, the 2017 KERP similarly is justified by the facts and circumstances of these cases.  *See* Hr'g Tr. 69:5–6, Aug. 18, 2016 (Court finding that the 2016 KERP was an appropriate exercise of business judgment "justified by the facts and circumstances of the case").   First, the 2017 KERP is reasonably designed to retain the 2017 KERP participants.  As noted above, the 2017 KERP was implemented to ensure that the 2017 KERP participants remain with the Debtors as they undergo their financial and operational restructuring.  Given the uncertainty attendant to the Debtors' chapter 11 cases and the distressed oil and gas industry, the Debtors reasonably believe that failure to implement the 2017 KERP may result in a loss of 2017 KERP participants.  The 2017 KERP participants play a key role in the Debtors' business operations and have significant industry experience and institutional knowledge – all of which are important to the success of the Debtors' business and the reorganization effort.   Furthermore, the 2017 KERP was designed to maintain appropriate compensation levels, and payments are structured to motivate the participants to remain employed by the Debtors through their restructuring efforts.  A failure to retain the 2017 KERP participants would cause the Debtors to incur significant time and expense to obtain and train replacements, which would in turn hinder and delay their reorganization and distract key management from the operation of the Debtors' businesses and the successful administration of these chapter 11 cases, to the detriment of all parties in interest.

23

43.    Second, the cost of the 2017 KERP is reasonable in light of the Debtors'

assets, liabilities and earning potential.  The maximum postpetition cost of the 2017 KERP is

approximately $11.06 million, or approximately $19,400 per employee.  The 2017 KERP also

maintains target compensation at prepetition target compensation levels and represents a

reasonable expenditure to preserve and enhance morale and to minimize uncertainty and

potential loss of employees as a consequence of the pendency of these cases.

44.    Third, the scope of the 2017 KERP is fair and reasonable.  In identifying

2017 KERP participants, the Debtors' senior management and human resources department

undertook a careful process to address a particular need among their rank-and-file employees.

Accordingly, the 2017 KERP is broad-based to avoid any unfair discrimination and is designed

to provide essentially the same relative benefits to all participants.

45.    Fourth, the 2017 KERP comports with industry standards.  Programs

similar to the 2017 KERP have been implemented by other companies in the oil and gas industry

undergoing restructurings.  Additionally, payments under the 2017 KERP largely enable the

participants to maintain compensation levels competitive with the industry.

b.  *The 2017 KEP is Justified by the Facts and Circumstances of the Cases*

46.    The *Dana* factors also strongly weigh in favor of approving the 2017 KEP.

47.    First, the 2017 KEP participants receive payments that are substantially

tied to the Debtors' ability to successfully produce oil and gas (as measured by the Production

Metric) or to reduce lease operating expenses (as measured by the LOE Metric), normal and

customary operating metrics in the industry.

48.    Second, the cost of the 2017 KEP is reasonable in light of the Debtors'

assets, liabilities and earning potential.  The maximum postpetition target cost of the 2017 KEP

which covers 109 employees is approximately $16.95 million, or an average of approximately

24

$155,500 per employee.  Additionally, the potential payments under the 2017 KEP are designed to maintain historic compensation levels and not to increase them.

49.    Third, the scope of the 2017 KEP is fair and reasonable.  The Debtors have not added any new participants to the 2017 KEP and in reviewing the participants of the 2017 KEP the Debtors and the Compensation Committee ensured that the program continued to essentially include employees based on prepetition compensation policies to make sure the program was implemented fairly and consistent with past practice.

50.    Fourth, the 2017 KEP comports with industry standards.  As stated in the Friske Declaration, the 2017 KEP opportunities are reasonable and appropriate in light of competitive market practice. *See* Friske Declaration ¶¶ 28–29.  Moreover, the structure of the 2017 KEP is also consistent with key design elements (such as the frequency of payments, participation levels, and use of cash) of similar award plans approved on a post-petition basis, including the 2016 KEP.  The 2017 KEP also contains performance metrics, which are not always included in non-insider compensation plans, and therefore, the program aligns well with creditor interests. *See* Friske Decl. ¶ 29.  As stated, WTW compared the 2017 KEP opportunities (expressed as a percentage of base salary) to 16 comparable programs selected from companies that operate in the oil and gas industry.  On average, the 2017 KEP target award opportunities (as a percentage of base salary) generally were positioned at or between the 25th and 50th percentile of the market. *See* Friske Decl. ¶ 28.

51.    Lastly, as with the 2016 KEP, the Debtors received input from their professional advisors with respect to the formulation of the 2017 KEP. *See, e.g.*, *Residential Capital*, 491 B.R. at 87 (finding that debtor satisfied *Dana* diligence prong by consulting experts, compensation committee, and counsel); *Velo Holdings, Inc.*, 472 B.R. at 208 (finding that debtor

25

satisfied *Dana* diligence prong by utilizing financial advisor).    Indeed, an independent

compensation consultant as well as outside legal counsel advised the Debtors as to the design

and implementation of the 2017 KEP.  Specifically, WTW played a key role in confirming for

the Debtors that the design of the 2017 KEP and the type of metrics to be utilized were

reasonable and appropriate to provide market-based compensation.

> 52.    Accordingly, the Debtors submit that the 2017 KEP satisfies section

503(c)(3) of the Bankruptcy Code as it is justified by the facts and circumstances of these chapter

11 cases, and should be approved.

c.    *The 2017 KEIP is Justified by the Facts and Circumstances of the Cases*

> 53.    The 2017 KEIP also is justified by the facts and circumstances of these

cases.  Indeed, the fundamental purpose of the 2017 KEIP is to maximize enterprise value for the

Debtors' economic stakeholders and to promote the Debtors' expeditious and successful

reorganization.  The 2017 KEIP easily satisfies each of the *Dana* factors.

> 54.    First, as with the 2016 KEIP, the 2017 KEIP is reasonably calculated to

preserve and enhance the Debtors' enterprise value through incentivizing exceptional operational

management and performance by the Debtors' executives.  The 2017 KEIP has been crafted to

incentivize the executives to achieve specific goals that will drive value.  The Production Metrics

and LOE Metrics were established as appropriate industry metrics that would focus efforts on the

key items that are critical to performance in these uncertain times.  As stated, if the Debtors fail

to meet the performance goals under the 2017 KEIP, the participants will not be entitled to

receive any payments.

> 55.    Second, the cost of the 2017 KEIP is exactly the same as the 2016 KEIP

and is reasonable in light of the Debtors' assets, liabilities, and earning potential.  The maximum

cost of the 2017 KEIP at stretch levels is approximately $9.657 million.  As indicated in the

WEIL:\95934381\9\29979.0004

Friske Declaration, these costs are well within market parameters, as WTW reviewed the proposed target and stretch cost of the 2017 KEIP expressed as a percentage of the Debtors' debt and assets relative to the maximum costs of 12 approved post-petition incentive plans for similar type companies. *See* Friske Declaration ¶ 22. In doing so, WTW observed that the target cost of the 2017 KEIP, as a percentage of debt and assets, were within the range of observed market practice and approximated the 50th percentile, while the stretch cost was positioned between the 50th and 75th percentiles. *See* Friske Decl. ¶ 25.

56.     Third, the 2017 KEIP is consistent with, and within the range of reasonableness of, industry standards. WTW analyzed executive incentive compensation plans offered by the Debtor's peer companies, in keeping with the Debtors' and the Compensation Committee's historical focus on exploration and production or energy industry practices. Additionally, WTW reviewed approved post-petition incentive plans offered by 12 companies that operate in the oil and gas industry, energy industry, or more broadly in other commodity driven industries. As described more fully in the Friske Declaration, WTW determined that the 2017 KEIP is within the range of reasonableness when compared to similar plans implemented by other companies in the energy industry. *See* Friske Declaration ¶ 20. Specifically, when compared to plans of similar companies, WTW found that total direct compensation for the KEIP Executives under the 2017 KEIP is overall 27% below the 25th percentile at threshold payouts, 11% below the 50th percentile at target payouts, and if the Debtors significantly outperform the target levels, 17% below the 75th percentile at stretch payouts. *See* Friske Declaration ¶ 19. As further noted in the Friske Declaration, without implementation of the 2017 KEIP, the competitiveness of the Debtors' compensation structure would be undermined. *See* Friske Declaration ¶ 20.

57.     Fourth, the scope of the 2017 KEIP is fair and reasonable.  The 2017 KEIP is limited to four participants.  The four identified participants have the most control over the Debtors, and therefore will be the persons not only driving performance but also effectively guiding the Debtors through the chapter 11 process.  Indeed, the KEIP Executives comprise the "Executive Leadership Team" and all significant company-wide decisions are made or approved at this level.  *See Borders Grp., Inc.*, 453 B.R. at 476.  Furthermore, the structure and potential payments under the 2017 KEIP are identical to or no greater than the Debtors' prepetition incentive programs with refinements to address the unique circumstances attendant to chapter 11.  *See Velo Holdings, Inc.*, 472 B.R. 201 at 213 (finding that a KEIP "nearly identical" to prepetition KEIP favored approval under *Dana*).

58.     Fifth, as discussed at length above, the 2017 KEIP was designed with the advice and consultation of a compensation consultant after analyzing and taking into account the Debtors' circumstances and compensation arrangements provided by other oil and gas exploration and production companies.

59.     Accordingly, the Debtors submit that the 2017 KEIP satisfies the requirements of section 503(c)(3) of the Bankruptcy Code and should be approved

## Conclusion

60.     The 2017 Employee Programs continue the 2016 Employee Programs with minor adjustments to address the 2017 Performance Metrics and to eliminate the discount that was applied to the 2016 Rank-and-File Incentive Program.  The 2017 Employee Programs will continue assuring that the Debtors' management and workforce are compensated at appropriate market levels and incentivize them to achieve optimum performance levels that will maximize value and promote a successful reorganization.  The 2017 Employee Programs

28

represent a sound exercise of the Debtors' business judgment, comply with all of the provisions of the Bankruptcy Code, and should be approved.

**Notice**

61.     Notice of this Motion has been provided to all parties in interest in accordance with the procedures set forth in the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(c), 2002(m), and 9007 Implementing Certain Notice and Case Management Procedures* (ECF No. 146).  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

62.     Other than the 2016 Employee Programs Motion, no previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as is just.

Dated: February 1, 2017
      New York, New York

          /s/ Stephen Karotkin
          Ray C. Schrock, P.C.
          Stephen Karotkin
          **WEIL, GOTSHAL & MANGES LLP**
          767 Fifth Avenue
          New York, New York  10153
          Telephone:  (212) 310-8000
          Facsimile:   (212) 310-8007

          *Attorneys for Debtors*
          *and Debtors in Possession*

WEIL:\95934381\9\29979.0004

## Exhibit A

**Proposed Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                        :

In re                       :

                       :       **Chapter 11**

**BREITBURN ENERGY**     :

**PARTNERS LP,** *et al.,*   :       **Case No. 16-11390 (SMB)**

                       :

         **Debtors.**[1]    :       **(Jointly Administered)**

                       :

-------------------------------------------------------x

### ORDER PURSUANT TO 11 U.S.C. §§ 105, 363(b), AND 503(c)(3) APPROVING DEBTORS' 2017 KEY EMPLOYEE RETENTION PROGRAM AND KEY EMPLOYEE INCENTIVE PROGRAM

Upon the Motion, dated February 1, 2017 (the "**Motion**"),[2] of Breitburn Energy

Partners LP and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and

debtors in possession (collectively, the "**Debtors**"), pursuant to sections 105, 363(b), and

503(c)(3) of the Bankruptcy Code, for an order approving the 2017 Employee Programs, all as

more fully set forth in the Motion; and the Court having jurisdiction to consider the Motion and

the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the Amended

Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

due and proper notice of the Motion having been provided, and it appearing that no other or

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Breitburn Energy Partners LP (9953); Breitburn GP LLC (9948); Breitburn Operating LP (5529); Breitburn Operating GP LLC (5525); Breitburn Management Company LLC (2858); Breitburn Finance Corporation (2548); Alamitos Company (9156); Beaver Creek Pipeline, L.L.C. (7887); Breitburn Florida LLC (7424); Breitburn Oklahoma LLC (4714); Breitburn Sawtelle LLC (7661); Breitburn Transpetco GP LLC (7222); Breitburn Transpetco LP LLC (7188); GTG Pipeline LLC (3760); Mercury Michigan Company, LLC (3380); Phoenix Production Company (1427); QR Energy, LP (3069); QRE GP, LLC (2855); QRE Operating, LLC (9097); Terra Energy Company LLC (9616); Terra Pipeline Company LLC (3146); and Transpetco Pipeline Company, L.P. (2620).  The Debtors' mailing address is 707 Wilshire Boulevard, Suite 4600, Los Angeles, California 90017.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

further notice need be provided; and a hearing having been held to consider the relief requested in the Motion (the "**Hearing**"); and upon the Jackson Declaration and the Friske Declaration, filed contemporaneously with the Motion; and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors, their estates, creditors, and all parties in interest, and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is

ORDERED that the Motion is granted as provided herein; and it is further

ORDERED that each of the 2017 Employee Programs is hereby approved; and it is further

ORDERED that the Debtors are authorized to take any and all actions necessary or appropriate to implement the 2017 Employee Programs and to perform any and all obligations contemplated thereby; and it is further

ORDERED that notwithstanding any applicability of Bankruptcy Rule 6004(h), the terms and provisions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation and/or enforcement of this Order.

Dated: _____, 2017
       New York, New York

_____
HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

2

**Exhibit B**

**Jackson Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x
                         :

In re                         :

                         :     **Chapter 11**

**BREITBURN ENERGY**      :

**PARTNERS LP**, *et al.*,     :     **Case No. 16-11390 (SMB)**

                         :

           **Debtors.**[1]      :     **(Jointly Administered)**

                         :

-----------------------------------------------------------x

### DECLARATION OF JAMES G. JACKSON IN SUPPORT
### OF MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 363(b),
### AND 503(c)(3) FOR ENTRY OF AN ORDER APPROVING DEBTORS' 2017
### RETENTION AND INCENTIVE PROGRAMS FOR CERTAIN KEY EMPLOYEES

I, James G. Jackson, make this declaration ("**Declaration**") under 28 U.S.C. § 1746:

        1.      I am the Chief Financial Officer and Executive Vice President of Breitburn GP LLC, a wholly-owned subsidiary of Breitburn Energy Partners LP ("**Breitburn Parent**"). On May 15, 2016 (the "**Petition Date**"), Breitburn Parent and certain of its subsidiaries (collectively, the "**Debtors**") each commenced in this Court a case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I am knowledgeable and familiar with the business and financial affairs of the Debtors. I submit this Declaration in support of the *Motion of Debtors pursuant to 11 U.S.C. §§ 105, 363(b), and 503(c)(3) for Entry of an Order Approving Debtors' 2017 Retention and Incentive Programs for Certain Key*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Breitburn Energy Partners LP (9953); Breitburn GP LLC (9948); Breitburn Operating LP (5529); Breitburn Operating GP LLC (5525); Breitburn Management Company LLC (2858); Breitburn Finance Corporation (2548); Alamitos Company (9156); Beaver Creek Pipeline, L.L.C. (7887); Breitburn Florida LLC (7424); Breitburn Oklahoma LLC (4714); Breitburn Sawtelle LLC (7661); Breitburn Transpetco GP LLC (7222); Breitburn Transpetco LP LLC (7188); GTG Pipeline LLC (3760); Mercury Michigan Company, LLC (3380); Phoenix Production Company (1427); QR Energy, LP (3069); QRE GP, LLC (2855); QRE Operating, LLC (9097); Terra Energy Company LLC (9616); Terra Pipeline Company LLC (3146); and Transpetco Pipeline Company, L.P. (2620). The Debtors' mailing address is 707 Wilshire Boulevard, Suite 4600, Los Angeles, California 90017.

*Employees* (the "**Motion**").[2]  I previously submitted (a) a declaration in support of the Debtors' chapter 11 petitions and first day relief (ECF No. 13), and (b) two declarations in support of the Debtors' motion to approve the 2016 Employee Programs (ECF Nos. 412, 492), each of which I incorporate into this Declaration by reference.

2.    Except as otherwise indicated, all statements in this Declaration are based on a combination of my personal experience and knowledge, my opinion, my discussions with the Debtors' employees, and my review of relevant documents.  If called to testify, I would testify to each of the facts and opinions set forth herein.

### The Debtors' Employees

3.    The Debtors' management personnel and other employees are critical to their operations, revenue generating capacity, and the success of these chapter 11 cases.  In my opinion, the 2016 Employee Programs were essential to motivating a lean workforce, particularly in the very challenging environment facing the Debtors and the industry in which they operate and achieving the levels of performance in 2016.  Because it is clear that the administration of these chapter 11 cases will continue well into 2017 and there is the need to continue providing market based compensation to, as applicable, retain and incentivize key employees, the same reasons that justified and warranted implementation of the 2016 Employee Programs also apply to the 2017 Employee Programs.  The Debtors, with the assistance of their advisors, designed the 2017 Employee Programs to provide compensation levels consistent with historical and industry standards, to provide market-based compensation to essential employees, and to account for the impact the chapter 11 cases have on the ability of the Debtors to provide meaningful equity-based compensation as they did historically.

---

[2] Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

WEIL:\96001462\4\29979.0004

4.       The Debtors are a master limited partnership and all significant company-wide decisions are made or approved by me, Halbert S. Washburn, Mark Pease, and Gregory Brown (the "**Executive Leadership Team**").  The Executive Leadership Team together with the Board of Directors of Breitburn Parent (the "**Board**"), have authority and responsibility for the Debtors' businesses and operations.  All other employees of the Debtors, regardless of whether appointed by the Board or designated as officers in their titles or otherwise, report to one or more members of the Executive Leadership Team and no such employees have control over the Debtors' operations as a whole.

5.       **The 2017 KERP Participants**:  In my view, the 2017 KERP continues the Debtors' ordinary course compensation practices embodied in the 2016 KERP, with certain modifications necessary to accommodate a change in the number of participants and adjustments for equity-related discounts.  The participants in the 2017 KERP include approximately 570 employees that are substantially the same group of support staff, lease, field and plant operators, engineers, experienced technicians, and professionals that participated in the 2016 KERP. Annexed hereto as **Exhibit 1** is a confidential schedule identifying the participants in the 2017 KERP (the "**2017 KERP Schedule**"),[3] along with such participants' title, department, and their potential award payments under the 2017 KERP.  To the best of my knowledge, no participant identified in the 2017 KERP Schedule (a) is a member of the Board, (b) was appointed by the Board, (c) reports directly to the Board, (d) participates in company governance of the Debtors, or exercises managerial control over the Debtors' overall operations, (e) is authorized to take any material action affecting the Debtors' company policy or asset dispositions without prior authorization from a member of the Executive Leadership Team or the Board, (f) participates in

---

[3]  I understand that the 2017 KERP Schedule is filed under seal pursuant to a separate motion filed contemporaneously herewith.

Board meetings, (g) qualifies as an "officer" of the Debtors, or (h) is party to an employment agreement. Furthermore, all participants in the 2017 KERP have duties limited to particular departments, further constricting their scope of authority.

6. **The 2017 KEP Participants**: As with the 2017 KERP described above, in my view, the 2017 KEP also serves to continue the Debtors' ordinary course compensation practices, with certain modifications necessary to accommodate a change in the number of participants and appropriate changes to performance metrics to reflect the operational goals for fiscal year 2017. The participants in the 2017 KEP are identical to the participants in the 2016 KEP, except for two participants who departed the company. To the best of my knowledge, none of the 2017 KEP participants direct the Debtors' overall company governance, control the Debtors' company policy, exercise managerial control over the Debtors' operations as a whole, or control decision-making with respect to any asset dispositions or acquisitions. As stated above, all significant company-wide decisions are made by the Executive Leadership Team. The 2017 KEP includes the following five (5) participants who were appointed by the Board and are the same five (5) Board-appointed participants in the 2016 KEP:

- **Thomas E. Thurmond** holds the title of Senior Vice President and was appointed by the Board in 2015. Mr. Thurmond oversees the Debtors' oil and gas operations and reports to Mark Pease, the Debtors' President and Chief Operating Officer. Any significant decision pertaining to the Debtors' oil and gas operations must be approved by Mr. Pease and/or other members of the Executive Leadership Team. Mr. Thurmond does not have authority to make company-wide decisions or set company policy. Further, Mr. Thurmond's authority is limited to operations. He does not have any authority to make decisions or commitments for the Debtors' other business functions, including with respect to the areas of finance, human resources, accounting, treasury, business development, corporate governance or legal. Mr. Thurmond has attended Board meetings in the past to assist Mr. Pease in presenting reports on the Debtors' oil and gas operations but he does not report directly to the Board.

4

- **Lawrence C. Smith** holds the titles of Vice President, Controller, and Chief Accounting Officer. The Board appointed Mr. Smith Controller in 2006, Vice President in 2009, and Chief Accounting Officer in 2014. Mr. Smith manages the Debtors' accounting and tax functions and reports directly to me. Mr. Smith is generally responsible for overseeing the implementation of the accounting and tax policies adopted by the Executive Leadership Team, as well as responding to taxing authorities under my direction. I and/or other members of the Executive Leadership Team must approve any significant decision in the accounting department and with respect to tax matters. Mr. Smith does not have authority to make company-wide decisions or set policy and does not have the authority to make decisions or commitments in any areas of the Debtors' operations other than with respect to accounting and tax functions, and, as stated above, major decisions in those areas are subject to the approval of the Executive Leadership Team. Mr. Smith has attended Board meetings in the past to assist me in presenting reports on the Debtors' financial condition. Mr. Smith, however, does not report to the Board in the ordinary course of his duties.

- **Bruce D. McFarland** holds the titles of Treasurer and Vice President. The Board appointed Mr. McFarland Treasurer in 2006 and Vice President in 2009. Mr. McFarland also reports directly to me. Mr. McFarland manages the Debtors' treasury, cash management system and risk management (insurance, bonding and derivatives) functions. I and/or other members of the Executive Leadership Team must approve any significant decision of the treasury or risk management department and any significant decision relating to cash management. Mr. McFarland does not determine corporate financial strategies and does not develop the Debtors' annual financial plan. Furthermore, Mr. McFarland does not have authority to make company-wide decisions or set policy and does not have the authority to make any decisions or commitments in any of the Debtors' business functions other than those directly related to treasury and risk management functions. Mr. McFarland generally does not attend Board meetings and does not report directly to the Board.

- **Roberta Kass** holds the titles of Associate General Counsel, Vice President and Corporate Secretary. Ms. Kass' only appointment by the Board is in her capacity as Corporate Secretary. As Corporate Secretary, Ms. Kass is tasked with keeping the minutes of meetings of the Board and its committees. Ms. Kass only attends Board meetings in her capacity as Corporate Secretary and does not report to the Board in the ordinary course. Ms. Kass' primary role is an attorney in the Debtors' legal department. In her capacity as Associate General Counsel, Ms. Kass is involved in addressing the Debtors' legal matters pertaining to financing, securities, corporate governance and human resources. Ms. Kass reports to Gregory C. Brown, the Debtors' Executive Vice President, General Counsel and Chief Administrative Officer. Mr. Brown and/or other members of the Executive Leadership Team must approve any significant decision of the legal department. Ms. Kass does not have

WEIL:\96001462\4\29979.0004

authority to make company-wide decisions or set policy and her role is limited primarily to legal matters involving the Debtors.

- **W. Jackson Washburn** was appointed by the Board of Directors as a Senior Vice President in 2009.  Mr. Washburn is the brother of the Debtors' Chief Executive Officer.   Mr. Washburn's current area of responsibility is Acquisition Integration and Real Estate.  He manages the Debtors' business integration of new assets and entities and real estate matters, including entry into certain office leases.  Mr. Washburn does not have authority to make company-wide decisions or set policy and does not have the authority to make decisions or commitments in any of the Debtors' business areas other than as set forth above.  Furthermore, any significant decision in the business integration or real estate area must be approved by the Debtors' Chief Executive Officer and/or other members of the Executive Leadership Team. Although Mr. Jackson has attended Board meetings in the past, he does not report directly to the Board but to the Debtors' Chief Executive Officer.  It is my understanding from legal counsel that despite Mr. Jackson's lack of control over the Debtors and their operations as a whole, the Bankruptcy Code provides that a relative of a person in control of a debtor is an "insider."  Thus, given Mr. Jackson's familial ties to the Debtors' Chief Executive Officer I understand that he is technically an "insider" for purposes of the relief requested in the Motion.

7.     As to the other participants in the 2017 KEP who have a title of either Vice-President or Director, these titles are departmental in scope, were awarded to convey credibility externally, and do not signify or encompass any company-wide decision making authority or control of the Debtors' operations.

8.     **The 2017 KEIP Participants**:  The members of the 2017 KEIP are identical to the members of the 2016 KEIP and include the four-member Executive Leadership Team who have the most control over the Debtors and are responsible for driving these chapter 11 cases.

## 2017 Performance Metrics

9.     I believe, after consultation with the other members of the Executive Leadership Team, the Compensation Committee, and WTW, that the performance metrics relevant to the 2017 KEP and 2017 KEIP are not easily achievable or "lay-ups."

6

10.     The performance metrics are based directly on the Debtor's 2017 operating budget which was formulated in connection with the Debtors' development of a business plan which also is being utilized in connection with the plan of reorganization negotiation process.   Consistent with past practice, the 2017 operating budget was developed over several months and is based on detailed input from all of the Debtors' five operating divisions.  Each year's budget is developed by the divisions' asset teams, including the field staff that manage the Debtors' assets on a daily basis.   Only after all applicable budgets are rolled up from the divisions, is the total budget presented to the Board for review.   Historically the Debtors' operating budget—like the 2016 and other past budgets —has required the meeting of challenging goals that often have neither been met nor exceeded.   For example, it is my understanding that in the past five years before the commencement of the chapter 11 cases, the budget production target was missed in 70% of the quarters (14 of 20) and the budget lease operating expense target was missed in 55% of the quarters (11 of 20).

11.     The target levels for the performance metrics in the 2017 KEP and 2017 KEIP are taken directly from the 2017 operating budget and, I believe they are not easily achievable.   Furthermore, I believe the stretch goals are far more challenging.   Consistent with the 2016 KEP and 2016 KEIP, the "stretch" performance metrics in the 2017 KEP and 2017 KEIP are set at the "P25" level, or the level which management only expects to achieve 1 in 4 times (given that the target goals were actually missed 55% and 70% of the time in the five years before the Petition Date).   The Debtors did not achieve the stretch goals set forth in the 2016 KEP or 2016 KEIP, which I believe further evidences the challenges in satisfying such goals.

12.     The production goals are particularly challenging because of additional operational factors outside of the participants' control.   For example, I am aware that

WEIL:\96001462\4\29979.0004

"downtime" at gathering and processing facilities operated by third parties may exceed forecasts or arise as a result of unexpected financial distress or maintenance.  Furthermore, the Debtors operate a number of large, complex facilities, and a single significant interruption or a one-time significant amount of mechanical "downtime" with one of these assets alone could result in the inability to achieve targeted production levels.  Lastly, as drilling and completion activity has increased, the availability of services is and will become more uncertain and costs will increase.  Additionally, factors outside the participants' control also impact the ability to achieve production goals.  Consequently, I believe that the performance metrics in the 2017 KEP and 2017 KEIP are as difficult, if not more difficult, than the metrics consensually agreed between the Debtors and the Creditors' Committee in connection with the 2016 KEP and 2016 KEIP.

13.    For the reasons set forth above and in the Motion, among others, I believe that the performance metrics relevant to the 2017 KEP and 2017 KEIP are challenging and appropriately designed to incentivize the participants to increase enterprise value.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: February 1, 2017
       New York, New York

                              /s/ James G. Jackson
                              James G. Jackson
                              Executive Vice President and Chief Financial
                              Officer of Breitburn GP LLC

8

**Exhibit 1**

**2017 KERP Schedule**

**Filed Under Seal**

## Exhibit C

**Friske Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x
                                  :

In re                              :

                                :      **Chapter 11**

BREITBURN ENERGY         :

PARTNERS LP, *et al.*,      :      **Case No. 16-11390 (SMB)**

                                :

         Debtors.[1]       :      **(Jointly Administered)**

                                :

---------------------------------------------------------x

## DECLARATION OF DOUGLAS FRISKE
### IN SUPPORT OF THE DEBTORS' MOTION FOR
### ENTRY OF AN ORDER APPROVING DEBTORS' 2017 RETENTION
### AND INCENTIVE PROGRAMS FOR CERTAIN KEY EMPLOYEES

I, Douglas J. Friske, hereby declare under penalty of perjury:

1.      I am a Managing Director at Willis Towers Watson PLC ("Willis Towers Watson"). In May 2016, Breitburn Energy Partners LP ("Breitburn"), one of the above captioned debtors and debtors in possession (the "Debtors") engaged Willis Towers Watson to provide compensation consulting services following the commencement of these chapter 11 cases. I am familiar with the pre- and postpetition structure of the Debtors' compensation plans as well as the structure of the Debtors' proposed 2017 employment incentive programs—the 2017 Key Employee Incentive Plan (the "2017 KEIP") and the 2017 Key Employee Plan (the "2017 KEP" — together, the "2017 Incentive Programs")—as they are set forth in the *Debtors' Motion*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Breitburn Energy Partners LP (9953); Breitburn GP LLC (9948); Breitburn Operating LP (5529); Breitburn Operating GP LLC (5525); Breitburn Management Company LLC (2858); Breitburn Finance Corporation (2548); Alamitos Company (9156); Beaver Creek Pipeline, L.L.C. (7887); Breitburn Florida LLC (7424); Breitburn Oklahoma LLC (4714); Breitburn Sawtelle LLC (7661); Breitburn Transpetco GP LLC (7222); Breitburn Transpetco LP LLC (7188); GTG Pipeline LLC (3760); Mercury Michigan Company, LLC (3380); Phoenix Production Company (1427); QR Energy, LP (3069); QRE GP, LLC (2855); QRE Operating, LLC (9097); Terra Energy Company LLC (9616); Terra Pipeline Company LLC (3146); and Transpetco Pipeline Company, L.P. (2620). The Debtors' mailing address is 707 Wilshire Boulevard, Suite 4600, Los Angeles, California 90017.

*Pursuant to 11 U.S.C. § 105, 363(b), and 503(c)(3) for Entry of an Order Approving Debtors'*
*2017 Retention and Incentive Programs for Certain Key Employees* (the "Motion").[2]

2.        I submit this declaration (the "Declaration") on behalf of Willis Towers Watson in support of the Motion.  Except as otherwise indicated, I have personal knowledge of all facts in this Declaration, based on my review of the Debtors' operations and finances, my research into compensation practices for companies in the energy industry and those that have filed for chapter 11 protection, and information supplied to me by members of the Debtors' management team and the Debtors' other advisors.  For the reasons described below, it is my opinion that the Debtors' 2017 Incentive Programs are reasonable and consistent with market practice both for companies in the exploration and production industry and those in chapter 11.  If called upon to testify, I could and would testify competently to the facts and opinions set forth herein.

## Background and Qualifications

3.        I received my Bachelor's degree in Finance from the University of Illinois in 1986.  After working at Allstate and Chubb Insurance Companies, I returned to school at Northwestern University.  I received a Master's degree in Management from Northwestern University's J.L. Kellogg Graduate School of Management in 1990.  Since that time, I have been employed by Willis Towers Watson (effective January 5, 2016, Willis and Towers Watson have formally merged to form Willis Towers Watson).

4.        Willis Towers Watson is an international professional services firm that offers a wide variety of services to public and private clients, including expert analysis of executive and management compensation.  Willis Towers Watson designs and delivers solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Motion.

2

institutions and individuals. Willis Towers Watson focuses on four key business segments: corporate risk and broking, human capital and benefits, exchange solutions, and investment, risk and reinsurance.

5.      My responsibilities at Willis Towers Watson have primarily involved consulting to large companies, specifically with regard to executive compensation.  I have worked with numerous Fortune 1000 companies, and have participated in the development and design of hundreds of management and employee incentive plans for companies inside and outside of bankruptcy.

6.      I am frequently retained by large companies to advise them on their employee compensation strategies, programs, and pay levels.  I am also retained by companies performing specific searches for management personnel, for which I provide guidelines on general market practice and the level and form of current market compensation for those positions.

7.      I am highly experienced in executive, management, and employee compensation matters with over 26 years of experience in the field.  During this time, I have been the lead or supporting employee compensation expert in more than 40 bankruptcy cases, and have frequently testified as to the reasonableness of a variety of postpetition compensation arrangements. Specifically, I have been involved in the review and design of key employee incentive plans, management incentive plans, and other similar-type plans in the chapter 11 cases of, among others, American Airlines, AMF, ATA Airlines, Calpine, Chemtura, Collins & Aikman, Conexant, Delta Airlines, Dura Automotive, Energy Future Holdings, Frontier Airlines, The Great Atlantic & Pacific Tea Company, Hayes Lemmerz, Keystone Automotive, Kimball Hill Homes, Lear, Leiner Health Products, Longview Power, Mark IV, Midstates, Muzak, Neff, Northwest Airlines, Orchard Brands, Penn Virginia, RadioShack, Reader's Digest Association, Round Table Pizza, Sabine Oil

3

& Gas, Samson Resources, Sbarro, School Specialty, TOUSA, United Airlines, Visteon, and Xerium.

### Willis Towers Watson's Involvement with the Debtors

8.        Since Willis Towers Watson was retained by Breitburn in May 2016, I have familiarized myself with the Debtors' operations and unique business and restructuring challenges. At the start of our engagement, Willis Towers Watson discussed with the Debtors and their advisors the Debtors' operational history, financial performance, restructuring process, and various issues regarding the Debtors' workforce and employee programs.  Willis Towers Watson reviewed the structure of the Debtors' existing base salary and primary incentive programs, paying specific attention to the various incentive plans' performance metrics, participating employees, payout frequency, and target payout levels.

9.        As previously described in my July 27, 2016 declaration, during the course of Willis Towers Watson's engagement, my team and I provided relevant market data and advice to the Breitburn's management team and the compensation and governance committee of its Board of Directors (the "**Compensation Committee**") with respect to the design and target award levels of the Court-approved 2016 Key Employee Program and 2016 Key Employee Incentive Program (together, the "**2016 Incentive Programs**"), and the Debtors performed significant due diligence in developing the Court-approved 2016 Incentive Programs.  As the design and the manner in which the target awards levels were determined under the 2017 Incentive Programs are generally consistent with the program approved by the Court for 2016, the basis for my analysis has remained similar.

10.        My primary goal in the course of these interactions with the Debtors was to provide an independent assessment of the proposed incentive plans that drew directly upon relevant market data as well as my experience in designing comparable programs for similarly-

4

situated companies.   Specifically as it relates to the 2017 Incentive Programs, my team and I (a) provided input and advice on the design and structure of the 2017 KEIP, and reviewed the approved award opportunities for reasonableness, and (b) reviewed the design, structure and award opportunities of the 2017 KEP for reasonableness.   The primary goal in the course of these interactions with the Debtors was to provide an independent assessment of the Debtors' 2017 Incentive Programs that drew directly upon relevant market data as well as my experience in designing comparable programs for similarly-situated companies.

## 2017 Incentive Programs Background

11.     The Debtors initiated their chapter 11 cases in May 2016, and received Court approval of quarterly insider and non-insider incentive programs for the remainder of calendar year 2016, as previously described in my July 27, 2016 declaration.   Since this time, I have learned that the Debtors find themselves in a position of uncertainty as to when they will emerge from Chapter 11.   The Debtors now seek to implement their 2017 Incentive Programs—that are substantially identical to the 2016 Incentive Programs—in order to continue to motivate key employees to achieve desired business objectives during 2017.

12.     The 2017 KEIP provides four members of the Debtors' executive leadership team—all considered insiders under the Bankruptcy Code—with the opportunity to earn four periodic incentive-based cash awards if the Debtors achieve pre-established production and lease operating expense performance goals.   The 109 participants in the 2017 KEP are to receive quarterly payments based upon the achievement of quarterly production and lease operating performance goals.   Both the 2017 KEIP and the 2017 KEP contain post-petition performance metrics and incentive compensation related to each quarter of 2017.

5

## Overview of the 2017 KEIP

13.　　The participants in the 2017 KEIP include the four senior-most officers of the Debtors—the chief executive officer, chief operating officer, chief financial officer, and the general counsel.  It is my understanding that these officers are generally responsible for the overall strategy and direction of the Debtors' enterprise as a whole.

14.　　The 2017 KEIP contains the following primary design features:

(a)　　<u>KEIP Executives</u>:  Halbert S. Washburn (Chief Executive Officer), Mark Pease (President and Chief Operating Officer), James G. Jackson (Executive Vice President and Chief Financial Officer), and Gregory Brown (Executive Vice President, General Counsel, and Chief Administrative Officer).

(b)　　<u>Form of Payout</u>:  Quarterly cash payments.

(c)　　<u>Performance Period</u>:  Calendar year 2017 with payments made for the quarters ending March 31, June 30, September 30, and December 31, 2017.

(d)　　<u>Performance Metrics</u>:  The 2017 KEIP is based 50% on the Production Metrics and 50% on the LOE Metrics.  If threshold levels are not met, KEIP Executives will not be entitled to 2017 KEIP payments for the underperformed metric.

(e)　　<u>Payout Levels</u>:  The 2017 KEIP payments are based on the legacy target award amounts for the covered individuals.

- *Below Threshold Awards*:  If threshold performance is not achieved, there is no payout.

- *Threshold Awards*:  54% of legacy STIP amounts and 38% of legacy target LTIP amounts.

- *Target Awards*:  90% of legacy STIP amounts and 63% of legacy target LTIP amounts.

- *Stretch Awards*:  90% of legacy STIP amounts and 90% of legacy target LTIP amounts.

6

(f)     The foregoing metrics result in the following potential total award amounts:

|  | Below Threshold Award | Total Threshold Award | Total Target Award | Total Stretch Award |
|---|---|---|---|---|
| **Chief Executive Officer (Washburn)** | $0 | $1,898,208 | $3,163,680 | $4,258,800 |
| **Chief Operating Officer (Pease)** | $0 | $987,012 | $1,645,020 | $2,178,540 |
| **Chief Financial Officer (Jackson)** | $0 | $730,080 | $1,216,800 | $1,609,920 |
| **Chief Administrative Officer and General Counsel (Brown)** | $0 | $730,080 | $1,216,800 | $1,609,920 |
| **Total** | $0 | $4,345,380 | $7,242,300 | $9,657,180 |

(g)     Computing Payout Levels:  Payout levels will be interpolated based on the payout curve between "threshold" and "target" for the applicable metric or between "target" and "stretch" for the applicable metric.

(h)     Performance Measurement and True-Up:  The Production Metrics and LOE Metrics will be measured each performance period, but trued-up relative to cumulative performance at the end of the year.  This enables under performance in one performance period to be made up by outperformance in the other performance period if cumulative performance targets for the entire twelve months are achieved.  At the end of 2017, KEIP Executives will be entitled to the greater of (i) the sum of payments actually earned, and (ii) the outcome if measured on a cumulative basis.  An award is not subject to "clawback" if the cumulative targets are not reached.

(i)     Timing of Payout:  Payments under the 2017 KEIP will be paid as soon as practicable after the applicable quarterly performance period.

(j)     Termination of Employment and Plan of Reorganization:

(i)     A KEIP Executive who (a) is terminated for "Cause", or (b) who terminates employment by retirement or by resignation other than for "Good Reason," in the case of (a) or (b), either before  the earlier of (x) the effective date of the Company's plan of reorganization and (y) April 15, 2018, shall not be eligible to receive a 2017 KEIP award for that performance period and shall be required to repay all previous awards paid under the 2017 KEIP, net of taxes paid by the participant.

(ii)     If a KEIP Executive is terminated without "Cause" or resigns for "Good Reason" or upon the occurrence of a "Change of Control" during a performance period he shall be entitled to receive his pro

7

rata share of any 2017 KEIP award earned based on performance through the date of the cessation of employment.

(iii)    If a chapter 11 plan becomes effective before December 31, 2017, the KEIP Executives shall be entitled to retain any earned awards and shall receive a pro rata portion of the award for the performance period in which the chapter 11 plan becomes effective.

15.    If approved, the 2017 KEIP would provide aggregate (for all participants) threshold, target, and stretch opportunities of approximately $4.35 million, $7.24 million, and $9.66 million respectively, to be earned for performance through the end of December 2017. These amounts are the same as provided under the Court-approved 2016 KEIP.

**Analysis of Total Direct Compensation for 2017 KEIP Participants**

16.    In assessing the reasonableness of the 2017 KEIP, I worked with my team to analyze competitive target total direct compensation—an industry-standard benchmark that includes the sum of base salary, target annual bonus awards and long-term incentive grant values—for all participants in the 2017 KEIP (the "2017 KEIP Executives").

17.    A critical initial step in this analysis was to define the relevant market for talent. Before Willis Towers Watson was engaged, the Debtors had developed, and the Compensation Committee had approved, a set of peer companies operating in the oil and gas exploration and production industry for use in determining market rates of pay. It is my understanding that the Debtors selected this group in light of a number of factors, including scope of operations and industry relevance with a priority on master limited partnerships. Importantly, I understand these companies are reasonably likely to compete with the Debtors for executive talent. Of the original 18 companies in the approved peer group, 12 currently remain publicly-traded or disclose recent public compensation data in proxies (the "Peer Companies"), and the balance having been acquired or filed for chapter 11 protection and did not disclose compensation data. The Peer

8

Companies include:  Cabot Oil & Gas Corp., Comstock Resources Inc., EXCO Resources Inc., Laredo Petroleum, Inc., Legacy Reserves LP, PDC Energy, Inc., Range Resources Corp., SM Energy Co., Stone Energy Corp., Vanguard Natural Resources, LLC, and W&T Offshore Inc.  My team and I reviewed the Peer Companies and believe them to be reasonable comparators for executive compensation analytical purposes.  Consistent with the Debtors' historical practice and my approach to analyzing 2016 KEIP opportunities, my team and I matched each of the Debtors' four insiders to proxy-disclosed executives at the Peer Companies with similar positions and comparable roles and responsibilities.  My team and I then developed competitive total direct compensation benchmarks based on the most recent proxy disclosures from each Peer Company.

18.    I compared the Debtors' target and stretch total direct compensation (reflecting base salary and the target and stretch 2017 KEIP opportunities) for the 2017 KEIP Executives to target total direct compensation data for equivalent positions from the Peer Companies.

19.    If the Debtors do not receive approval from the Court for the 2017 KEIP, total direct compensation for the 2017 KEIP Executives will only reflect current base salaries, and thus total direct compensation would fall 77 percent below the 25th percentile of the Peer Companies, on average.  This outcome could significantly undermine the Debtors' ability to motivate their senior management to achieve desired business objectives.  Assuming the 2017 KEIP is approved, aggregate 2017 target total direct compensation for all 2017 KEIP Executives would be approximately 11 percent below the 50th percentile of the Peer Companies.  The Debtors' maximum total direct compensation, reflecting the sum of current base salaries and stretch 2017 KEIP opportunities would be positioned 12 percent above the market 50th percentile and 17 percent below Peer Company 75th percentile target total direct compensation levels, on average.  To be clear, this stretch level outcome reflects a scenario where the Debtors significantly

9

outperform the target Production Metrics and LOE Metrics and thereby earn the maximum amount of potential incentive compensation provided for in the 2017 KEIP, and nevertheless, the total direct compensation for 2017 KEIP Executives still would be below the 75th percentile of the Peer Companies. These outcomes are summarized in the table below:

**Total Direct Compensation for 2017 KEIP Executives**

| 2017 Total Direct Compensation (TDC) for 2017 KEIP Executives | | | |
| --- | --- | --- | --- |
| TDC Outcome | Relation to 25th Percentile of Market TDC | Relation to 50th Percentile of Market TDC | Relation to 75th Percentile of Market TDC |
| Base Salaries Only (No 2017 KEIP Payments) | 77% below | 81% below | 86% below |
| Base Salaries Plus Threshold Payout | 27% below | 39% below | 55% below |
| Base Salaries Plus Target Payout | 6% above | 11% below | 34% below |
| Base Salaries Plus Stretch Payout | 34% above | 12% above | 17% below |

20.    Based on the results of these benchmarking analyses, and my experience in other incentive compensation arrangements implemented in chapter 11 cases, I believe the 2017 KEIP and the threshold, target, and stretch 2017 total direct compensation levels are reasonable in light of competitive market practice for companies, like the Debtors, that operate in the E&P and energy industries. Critically, in my opinion, the absence of an incentive opportunity for the 2017 KEIP Executives as provided in the 2017 KEIP would significantly undermine the current competitiveness of the Debtors' compensation structure (as it would be composed of just base salary), which in turn could negatively impact the Debtors' ability to motivate senior management to achieve desired business objectives, as well as the Debtors' ability to attract other skilled senior executives.

10

### Analysis of the 2017 KEIP Structure

21.     When reviewing the Debtors' various compensation plans, I recommended linking incentives to financial and operational metrics that would serve the interests of the Debtors' key stakeholders.   To that end, the 2017 KEIP relies exclusively on achieving total production and lease operating expense performance goals.

22.     To assess the reasonableness of the design of the 2017 KEIP, I analyzed the incentive plans of two groups of companies that are similarly situated to the Debtors.  *First*, I analyzed executive incentive compensation plans offered by the Peer Companies, in keeping with the Debtors' and the Compensation Committee's historical focus on E&P and energy industry practices.  *Second*, I reviewed incentive plans authorized and approved in chapter 11 cases involving the following 12 companies (the "Chapter 11 Peers") that operate in the oil and gas industry, energy industry, or more broadly in other commodity driven industries: Apex Silver Mines, Aventine Renewable Energy Holdings, BPZ Resources, Inc., Chemtura, Global Geophysical Services, James River Coal, Longview Power, MolyCorp, Parallel Energy, Patriot Coal, Sabine Oil & Gas Corporation and Samson Resources.  In conducting this analysis, I also relied upon my significant consulting experience in the analysis and design of post-petition incentive plans generally at dozens of other companies.

23.     The general structure of the 2017 KEIP comports with the findings of my review of annual incentive plans of the Debtors' Peer Companies.  I would note the following key design features:

     a.  nearly every Peer Company used some form of non-financial metric in the plan, with production (75 percent of Peer Companies) most commonly cited;

     b.  most of the Peer Companies (75 percent) utilize some form of expense or cost containment metric, similar to the LOE Metric in the 2017 KEIP;

11

      c.      each Peer Company uses multiple metrics within its annual incentive plans; and

      d.      the median range of payouts relative to target was 50 percent for threshold performance and 200 percent for maximum performance, which provides for greater upside opportunity than contemplated under the Debtors' 2017 KEIP.

24.      The general structure of the 2017 KEIP also aligns with incentive-based plans approved in chapter 11 cases involving companies, like the Debtors, that are in the oil and gas industry, energy industry, or more broadly in other commodity driven industries. Based on my review of incentive plans approved in cases involving the Chapter 11 Peers, it is common for such plans to implement a blend of various financial and operating performance metrics. More specifically, like the Debtor's proposed 2017 KEIP, each of the post-petition incentive plans approved in the chapter 11 cases of the Chapter 11 Peers included some form of non-financial metric. Further, the use of performance metrics tested more frequently than annually is a majority practice from a post-petition incentive perspective.

25.      Lastly, my team and I also reviewed the proposed target and stretch cost of the 2017 KEIP expressed as a percentage of the Debtors' debt and book assets relative to the maximum costs with respect to the approved post-petition incentive plans of the Chapter 11 Peers. In doing so, I observed that the target cost of the 2017 KEIP as a percentage of debt and book assets approximated the 50th percentile of such companies, while the stretch cost was positioned between the 50th and 75th percentiles of such companies.

26.      For these reasons, and based on my experience with incentive-based compensation programs implemented by companies in chapter 11, I believe the structure of the Debtors' 2017 KEIP is reasonable and consistent with market practice.

WEIL:\95794038\3\29979.0004

## **Analysis of the 2017 KEP**

27.     Based on the terms as described in the Motion, in evaluating the reasonableness of the 2017 KEP, my team and I analyzed incentive compensation award opportunities (expressed as a percentage of base salary) from a proprietary Willis Towers Watson survey that focuses on 16 companies that operate in the oil and gas industry.  These incentive award opportunities are similar to those approved by this Court for the 2016 calendar year.  I took the following steps to review the proposed award opportunities, consistent with the approach as described in my July 27, 2016 declaration:

    a.    program participants were segmented into base salary tiers, with an average fixed award opportunity calculated by tier;

    b.    for each tier, competitive 25th, 50th and 75th percentile incentive compensation opportunities (as a percentage of base salary) were developed based on similarly paid (on the basis of salary) employees in the proprietary oil and gas survey;

    c.    the Debtors' average annualized fixed award opportunities by tier were compared to market 25th, 50th and 75th percentile incentive opportunities from the Willis Towers Watson oil and gas survey; and

    d.    the relationship between the Debtors' proposed award opportunities and the competitive oil and gas industry benchmarks noted above was determined.

28.     Based on this analysis, I observed that on average the Debtors' minimum award opportunities (as a percentage of base salary) generally were positioned at or between the 25th and 50th percentiles of the market, target opportunities generally were positioned at or between the 50th and 75th percentiles of the market, and stretch opportunities generally were positioned at or above the 75th percentile of the market.

29.     Given this relationship, I believe the 2017 KEP opportunities are reasonable and appropriate in light of competitive market practice.  Moreover, based on my experience, the structure of the 2017 KEP is also generally consistent with key design elements (such as the

13

frequency of payments, participation levels, and use of cash) of similar award plans approved on a post-petition basis. I would also note that the proposed 2017 KEP contains performance metrics, which are not always included in non-insider compensation plans, and hence, the program can be viewed as an incentive plan (as opposed to a pure retention plan) which aligns well with stakeholder interests.

## Conclusion

30.    Based on my education, experience, and the work I have done in these cases and in similar cases, I believe that the design, structure, and award opportunities available under the 2017 KEIP and 2017 KEP are reasonable given the facts and circumstances of these chapter 11 cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  February 1, 2017

/s/ Douglas J. Friske
Douglas J. Friske
Managing Director
Willis Towers Watson PLC

14

## **Exhibit D**

**Rank-and-File Incentive Program Award Agreement**

# BREITBURN ENERGY PARTNERS LP
# INCENTIVE BONUS AWARD AGREEMENT

Pursuant to this Incentive Bonus Award Agreement, dated as of [_____], 2017 (the "**Agreement**"), Breitburn GP LLC (the "**Company**"), as the general partner of Breitburn Energy Partners LP, a Delaware limited partnership (the "**Partnership**"), hereby grants to the individual set forth on <u>Exhibit A</u> hereto (the "**Participant**") the following award of an incentive bonus (the "**Award**"), pursuant and subject to the terms and conditions of this Agreement. Except as otherwise expressly provided herein, all capitalized terms used in this Agreement, but not defined, shall have the meanings provided in the Partnership's First Amended and Restated 2006 Long-Term Incentive Plan (the "**Plan**"). Certain other capitalized terms used herein are defined in Section 12 below. For the avoidance of doubt, the Award is neither granted under, nor subject to the terms of, the Plan.

## GRANT NOTICE

Subject to the terms and conditions of this Agreement, the principal features of this Award are as follows:

**Award; Grant Date**: The amount of the Award and Grant Date of the Award are set forth on <u>Exhibit A</u> hereto; *provided*, that the Company may, in its sole and absolute discretion, increase or decrease the amount of the Award by up to ten percent (10%) of the Award and may make such other adjustments to the amount of the Award as the Company determines, in its sole discretion, are necessary or desirable to reflect events in 2017 related to the Participant's service with the Company and its Affiliates (including, but not limited to, promotions and leaves-of-absence).

**Vesting of Award**: The Award shall become fully vested and non-forfeitable as of December 31, 2017 (the "**Vesting Date**"), subject to the Participant's continued service as an Employee through such date. In addition, the Award shall be subject to accelerated vesting as set forth in Section 2 of the Terms and Conditions of Incentive Bonus below.

**Payment**: The Award shall be paid to the Participant in cash, less any applicable tax withholdings, within forty-five (45) days following the December 31, 2017 Vesting Date (with the exact date of payment determined by the Company in its sole discretion). Notwithstanding the foregoing, for each of the first three calendar quarters of 2017, subject to the Participant's continued service as an Employee through the last day of each such quarter, the Company shall pay to the Participant, as an advance against the Award, a lump-sum cash amount equal to twenty-five percent (25%) of the Award set forth on <u>Exhibit A</u>, as may be adjusted (each such quarterly advance, an "**Advance Payment**"); *provided*, that the Company may, in its sole and absolute discretion, increase or decrease the amount of any Advance Payment by up to ten percent (10%) of the Advance Payment. The final day of each of the first three calendar quarters of 2017 shall be deemed the "Vesting Date" for any Advance Payment of the Award. Any Advance Payment (as so increased or decreased) shall be paid to the Participant in cash, less any applicable tax withholdings, within forty-five (45) days following the applicable quarterly Vesting Date (with the exact date of payment determined by the Company in its

sole discretion), and shall reduce, on a dollar-for-dollar basis, the amount of the Award ultimately paid to the Participant (but not below zero).

**Termination of Award**:  Except as set forth in Section 2 of the Terms and Conditions of Incentive Bonus below, if the applicable Vesting Date has not occurred with respect to any portion of the Award or any Advance Payment of the Award prior to or in connection with the Participant's Termination of Service for any reason, such portion of the Award shall automatically be forfeited by the Participant upon such Termination of Service without further action and without payment of consideration therefor.  In the event of the Participant's Termination of Service due to the Participant's retirement or voluntary resignation other than for Good Reason prior to the effective date of a plan of reorganization of the Company, the Partnership or the Employer in a case under Chapter 11 of the Bankruptcy Code (a "**Qualifying Reorganization**"), any portion of the Award that is vested but unpaid hereunder (including any unpaid Advance Payment for any prior fiscal quarter), shall thereupon automatically be forfeited by the Participant without further action and without payment of consideration therefor.

US-DOCS\79728123.5

## TERMS AND CONDITIONS OF INCENTIVE BONUS

1.     <u>Grant</u>.  The Company hereby grants to the Participant, as of the Grant Date, an incentive bonus Award in the amount set forth in the Grant Notice above, subject to all of the terms and conditions contained in this Agreement.

2.     <u>Vesting and Termination</u>.  The Award shall vest and be paid to the Participant in accordance with the Grant Notice above, *provided*, that, upon (i) the Participant's Termination of Service due to the Participant's death or Disability, any portion of the Award set forth on <u>Exhibit A</u> that is then unpaid and outstanding shall vest in full, and (ii) the first to occur of (a) the Participant's Termination of Service by the Employer without Cause or by the Participant for Good Reason, (b) a Change of Control or (c) a Qualifying Reorganization, in each case prior to December 31, 2017  (each of (a), (b), and (c), a "**Qualifying Event**"), a portion of the Award set forth on <u>Exhibit A</u>, pro-rated based on the number of days elapsed during calendar year 2017 through the effective date of such Qualifying Event shall become vested and payable.  For the avoidance of doubt, any portion of the Award that vests pursuant to this Section 2 shall be reduced on a dollar-for-dollar basis (but not below zero) by any Advance Payment previously received by the Participant hereunder. The date of any event described in clause (i) or (ii) of this Section 2 shall be deemed the "Vesting Date" for any portion of the Award that vests in connection therewith as provided in this Section 2.  Except as set forth in this Section 2, no portion of the Award that has not become vested at the date of the Participant's Termination of Service or other Qualifying Event (as applicable) shall thereafter become vested and/or payable, and any such portion of the Award shall thereupon automatically be cancelled without further action and without payment of consideration therefor.

3.     <u>Non-Transferability</u>.   The Award may not be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution.  Neither the Award nor any interest or right therein shall be liable for the debts, contracts or engagements of the Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence.

4.     <u>No Effect on Employment</u>.  Nothing in this Agreement shall confer upon the Participant any right to serve or continue to serve as an Employee, Director or Consultant.

5.     <u>Withholding; Tax Consultation</u>.  The Employer or the Company may withhold from any amount payable under this Agreement or otherwise with respect to the Award such federal, state, or local taxes as shall be required to be withheld pursuant to any applicable law or regulation.  None of the Company or its Affiliates has made any warranty or representation to the Participant with respect to the income tax consequences of the issuance of the Award or the transactions contemplated by this Agreement, and the Participant is in no manner relying on such entities or their representatives for an assessment of such tax consequences.  The Participant understands that the Participant may suffer adverse tax consequences in connection with the Award granted pursuant to this Agreement.  The Participant represents that the Participant has consulted with any tax consultants that the Participant deems advisable in connection with the

- 3 -

Award and that the Participant is not relying on the Company or any of its Affiliates for tax advice.

6.   Severability.  If any provision in this Agreement is held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Agreement, which shall remain in full force and effect.

7.   Amendments, Suspension and Termination.  This Agreement may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Company, provided that no change shall materially reduce the rights or benefits of the Participant with respect to the Award without the consent of the Participant.  Except as provided in the preceding sentence, this Agreement cannot be modified, altered or amended, except by an agreement, in writing, signed by both the Company and the Participant.

8.   Determinations Binding.  All determinations, interpretations, and other decisions under or with respect to this Award shall be within the sole discretion of the Company, may be made at any time and shall be final, conclusive, and binding upon all Persons, including the Company, the Partnership, any Affiliate, the Participant, and any beneficiary of the Award.

9.   Successors and Assigns.  The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement shall inure to the benefit of the successors and assigns of the Company.  Subject to the restrictions on transfer contained herein, this Agreement shall be binding upon the Participant and his or her heirs, executors, administrators, successors and assigns.

10.  Governing Law.   The laws of the State of Delaware shall govern the interpretation, validity, administration, enforcement and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

11.  Captions.  Captions provided herein are for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

12.  Code Section 409A.  To the extent applicable, this Agreement shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the effective date of this Agreement ("**Section 409A**"). To the extent that the Company determines that any portion of the Award may be or become subject to Section 409A, the Company may amend this Agreement in a manner intended to comply with the requirements of Section 409A or an exemption therefrom (including amendments with retroactive effect), or take any other actions as it deems necessary or appropriate to (a) exempt the Award from Section 409A and/or preserve the intended tax treatment of the benefits provided with respect to the Award, or (b) comply with the requirements of Section 409A; *provided, however*, that nothing in this Agreement shall create any obligation on the part of the Company to adopt any such amendment or take any such other action or any liability for doing so or failure to do so. Notwithstanding anything to the contrary in this Agreement, no amounts payable under this Agreement shall be paid to the Participant prior to the expiration of the six-month period following the Participant's "separation from

- 4 -

US-DOCS\79728123.5

service" (within the meaning of Code Section 409A(a)(2)(A)(i)) to the extent that the Company determines that paying such amounts prior to the expiration of such six-month period would result in a prohibited distribution under Code Section 409A(a)(2)(B)(i). If the payment of any such amounts is delayed as a result of the previous sentence, then on the first business day following the end of the applicable six-month period (or such earlier date upon which such amounts can be paid under Section 409A without resulting in a prohibited distribution, including as a result of the Participant's death), such amounts shall be paid to the Participant.

13.    <u>Definitions</u>.  For purposes of this Agreement, when capitalized herein, the terms below shall have the following meanings:

"**Cause**" means (i) any material failure or neglect by the Participant to perform his or her duties or responsibilities to the Employer; (ii) any act of fraud, embezzlement, theft, misappropriation or dishonesty by the Participant relating to the Employer or its business or assets; (iii) the Participant's commission of a felony or other crime involving moral turpitude; (iv) any gross negligence or intentional misconduct on the part of the Participant in the conduct of his duties and responsibilities with the Employer or which adversely affects the image, reputation or business of the Employer or its affiliates; or (v) any material breach by the Participant of any written agreement between the Employer and the Participant.

"**Change of Control**" means, and shall be deemed to have occurred upon one or more of the following events:

(i)    any "person" or "group" within the meaning of those terms as used in Sections 13(d) and 14(d)(2) of the Exchange Act, other than an Affiliate of the Company, shall become the beneficial owner, directly or indirectly, by way of merger, consolidation, recapitalization, reorganization or otherwise, of 50% or more of the combined voting power of the equity interests or of a controlling interest in Breitburn Management Company LLC, the Company or the Partnership;

(ii)    the limited partners of the Partnership approve, in one or a series of transactions, a plan of complete liquidation of the Partnership;

(iii)    the sale or other disposition by either the Company or the Partnership of all or substantially all of its assets in one or more transactions to any Person other than the Company or an Affiliate of the Company;

(iv)    a transaction resulting in a Person other than the Company or an Affiliate of the Company being the general partner of the Partnership; or

(v)    any time at which individuals who, as of the Grant Date, constitute the board of directors of the Company (the "**Incumbent Board**") cease for any reason to constitute at least a majority of the Board; *provided*, *however*, that any individual becoming a director subsequent to the Grant Date whose election, or nomination for election by the Partnership's unitholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board will be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as the result of an actual or threatened election

US-DOCS\79728123.5

contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Incumbent Board.

"**Disability**" means a condition that entitles the Participant to receive benefits under an applicable Employer long-term disability insurance plan, or, if the Participant is not covered by such a plan, a condition that would entitle the Participant to such benefits had the Participant been covered under such a plan.

"**Employer**" means Breitburn Management Company LLC or a successor employer.

"**Good Reason**" means a relocation by the Employer of the Participant's principal place of employment, without the Participant's consent, in excess of 50 miles from the Participant's principal place of employment as of the Grant Date. Notwithstanding the foregoing, the Participant shall not have Good Reason to terminate the Participant's employment on such basis unless the event giving rise to Good Reason is not fully remedied within 30 days after receipt by the Company of a written notice from the Participant of such event, which written notice must be provided within 90 days of the initial occurrence of such event, and the Participant must resign from employment, if at all, no later than 90 days following the Company's failure to remedy such event.

"**Termination of Service**" means a termination of the Participant's service as an Employee.

*[Signature Page Follows]*

- 6 -

The Participant's signature below indicates the Participant's agreement with and understanding that this Award is subject to all of the terms and conditions contained in this Agreement. The Participant further acknowledges that the Participant has read and understands this Agreement, which contains the specific terms and conditions of this Award. The Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Company upon any questions arising under this Agreement or with respect to this Award.

PARTICIPANT

By: _____

Print Name: _____

BREITBURN GP LLC

_____

Name:  Halbert S. Washburn
Title:  Chief Executive Officer

## <u>EXHIBIT A</u>

## <u>INCENTIVE BONUS AWARD</u>

**Participant:**  _____

**Award Amount:**                **$** _____

**Grant Date:** _____ ___, 2017

## **Exhibit E**

**KEP Award Agreement**

# BREITBURN ENERGY PARTNERS LP
# INCENTIVE BONUS AWARD AGREEMENT

Pursuant to this Incentive Bonus Award Agreement, dated as of ● ●, 2017 (the "**Agreement**"), Breitburn GP LLC (the "**Company**"), as the general partner of Breitburn Energy Partners LP, a Delaware limited partnership (the "**Partnership**"), hereby grants to the individual set forth on <u>Exhibit A</u> hereto (the "**Participant**") the following award of an incentive bonus (the "**Award**"), pursuant and subject to the terms and conditions of this Agreement. Except as otherwise expressly provided herein, all capitalized terms used in this Agreement, but not defined, shall have the meanings provided in the Partnership's First Amended and Restated 2006 Long-Term Incentive Plan (the "**Plan**"). Certain other capitalized terms used herein are defined in Section 12 below. For the avoidance of doubt, the Award is neither granted under, nor subject to the terms of, the Plan.

## GRANT NOTICE

Subject to the terms and conditions of this Agreement, the principal features of this Award are as follows:

**Minimum, Target, Maximum Annual Cash Award; Grant Date**:  Each of the Minimum Annual Cash Award, Target Annual Cash Award, Maximum Annual Cash Award and Grant Date of the Award are set forth on <u>Exhibit A</u> hereto.

**Earned Award; Vesting of Award**:  The portion of the Award earned (if any) shall be determined in accordance with <u>Exhibit A</u> hereto (the portion of the Award so earned, if any, the "**Earned Award**"). The Earned Award (if any) shall become vested and non-forfeitable as of December 31, 2017 (the "**Vesting Date**"), subject to the Participant's continued service as an Employee through such date. In addition, the Award shall be subject to accelerated vesting as set forth in Section 2 of the Terms and Conditions of Incentive Bonus below and to the "Repayment" provision set forth below in the Grant Notice.

**Payment**:  Any Earned Award shall be paid to the Participant in cash, less any applicable tax withholdings, within forty-five (45) days following the Vesting Date (with the exact date of payment determined by the Company in its sole discretion). Notwithstanding the foregoing, and without regard to whether any such portion of the Award has become an Earned Award, for each of the first three calendar quarters of 2017, subject to the Participant's continued service as an Employee through the last day of each such quarter, the Company shall pay to the Participant, as an advance against the Earned Award, a lump-sum cash amount equal to twenty-five percent (25%) of the Target Annual Cash Award set forth on <u>Exhibit A</u> to this Grant Notice  (each such quarterly advance, an "**Advance Payment**"); *provided*, that the Company may, in its sole and absolute discretion, increase or decrease the amount of any Advance Payment by up to ten percent (10%) of the Advance Payment. The final day of each of the first three calendar quarters of 2017 shall be deemed the "Vesting Date" for any Advance Payment of the Award. Each Advance Payment (as so increased or decreased) shall be paid to the Participant in cash, less any applicable tax withholdings, within forty-five (45) days following the

applicable quarterly Vesting Date (with the exact date of payment determined by the Company in its sole discretion). Each Advance Payment shall reduce, on a dollar-for-dollar basis, the amount of the Earned Award ultimately paid to the Participant (but not below zero).

**Termination of Award**: Except as set forth in Section 2 of the Terms and Conditions of Incentive Bonus below, if the applicable Vesting Date has not occurred with respect to any portion of the Award prior to or in connection with the Participant's Termination of Service for any reason, such portion of the Award shall automatically be forfeited by the Participant upon such Termination of Service without further action and without payment of consideration therefor. In addition, in the event that any portion of the Award fails to become an Earned Award by reason of the failure to satisfy the applicable performance metric(s) set forth on Exhibit A hereto, such portion of the Award that fails to become an Earned Award (other than any Advance Payments previously made to the Participant) shall thereupon automatically be forfeited by the Participant without further action and without payment of consideration therefor. In the event of the Participant's Termination of Service due to the Participant's retirement or voluntary resignation other than for Good Reason prior to the effective date of a plan of reorganization of the Company, the Partnership or the Employer in a case under Chapter 11 of the Bankruptcy Code (a "**Qualifying Reorganization**"), any portion of the Award that is vested but unpaid hereunder (including any unpaid Advance Payment for any prior fiscal quarter), shall thereupon automatically be forfeited by the Participant without further action and without payment of consideration therefor.

**Repayment**: In the event of the Participant's Termination of Service (i) due to the Participant's retirement or voluntary resignation other than for Good Reason or (ii) by the Employer for Cause, in each case, prior to the earlier of (a) a Qualifying Reorganization or (b) April 15, 2018, the Participant shall, within ten business days following the Termination of Service, repay to the Company any portion of the Award (including any Advance Payment(s)) that had been paid to the Participant prior to such Termination of Service, net of any taxes paid by the Participant in respect of such portion of the Award (for the avoidance of doubt, such payment shall be required notwithstanding the occurrence of a Vesting Date with respect to any such portion of the Award).

**Adjustment**: Notwithstanding anything herein to the contrary, in the event that the Company determines, in its sole discretion, that an adjustment to any of the terms or conditions set forth on Exhibit A hereto is appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended by the Company to be made available pursuant to this Agreement, the Company may make equitable adjustments, if any, to any of the terms or conditions set forth on Exhibit A hereto. The Company may make such adjustments at any time, and all such adjustments shall be final, conclusive and binding upon all persons, including, but not limited to, the Company, the Employer, any of their respective Affiliates, the Participant and any beneficiary of the Participant.

US-DOCS\79723407.6

## TERMS AND CONDITIONS OF INCENTIVE BONUS

1.    <u>Grant</u>.  The Company hereby grants to the Participant, as of the Grant Date, an incentive bonus Award in the amounts set forth on <u>Exhibit A</u> hereto, subject to all of the terms and conditions contained in this Agreement.

2.    <u>Vesting and Termination</u>.  The Earned Award shall vest and be paid to the Participant in accordance with the Grant Notice above, *provided*, that, upon (i) the Participant's Termination of Service due to the Participant's death or Disability, any portion of the Target Cash Award set forth on <u>Exhibit A</u> that is then unpaid and outstanding shall become an Earned Award and vest in full (and, for the avoidance of doubt, no portion of the Maximum Award set forth on <u>Exhibit A</u> shall be deemed earned or vested), and (ii) the first to occur of (a) the Participant's Termination of Service by the Employer without Cause or by the Participant for Good Reason, (b) a Change of Control or (c) a Qualifying Reorganization, in each case prior to December 31, 2017,  (each of (a), (b), and (c), a "**Qualifying Event**"), a portion of the Award, determined based on actual performance through the date of such Qualifying Event (calculated based on the Quarterly Performance Metric schedule set forth on <u>Exhibit B</u> attached hereto) and pro-rated based on the number of days elapsed during calendar year 2017 through the effective date of such Qualifying Event, shall immediately become an Earned Award and become vested and payable.  For the avoidance of doubt, any portion of the Award that becomes vested pursuant to this Section 2, shall be reduced on a dollar-for-dollar basis (but not below zero) by any Advance Payment previously received by the Participant hereunder. The date of any event described in clause (i) or (ii) of this Section 2 shall be deemed the "Vesting Date" for any portion of the Award that becomes an Earned Award and vests in connection therewith as provided in this Section 2.  Except as set forth in this Section 2, no portion of the Award that has not become earned and vested at the date of the Participant's Termination of Service or other Qualifying Event (as applicable) shall thereafter become earned, vested and/or payable, and any such portion of the Award shall thereupon automatically be cancelled without further action and without payment of consideration therefor.

3.    <u>Non-Transferability</u>.  The Award may not be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution.  Neither the Award nor any interest or right therein shall be liable for the debts, contracts or engagements of the Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence.

4.    <u>No Effect on Employment</u>.  Nothing in this Agreement shall confer upon the Participant any right to serve or continue to serve as an Employee, Director or Consultant.

5.    <u>Withholding; Tax Consultation</u>.  The Employer or the Company may withhold from any amount payable under this Agreement or otherwise with respect to the Award such federal, state, or local taxes as shall be required to be withheld pursuant to any applicable law or regulation.  None of the Company or its Affiliates has made any warranty or representation to the Participant with respect to the income tax consequences of the issuance of the Award or the

- 3 -

transactions contemplated by this Agreement, and the Participant is in no manner relying on such entities or their representatives for an assessment of such tax consequences. The Participant understands that the Participant may suffer adverse tax consequences in connection with the Award granted pursuant to this Agreement. The Participant represents that the Participant has consulted with any tax consultants that the Participant deems advisable in connection with the Award and that the Participant is not relying on the Company or any of its Affiliates for tax advice.

6.      Severability. If any provision in this Agreement is held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be construed to have any effect on, the remaining provisions of this Agreement, which shall remain in full force and effect.

7.      Amendments, Suspension and Termination. This Agreement may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Company, provided that no change shall materially reduce the rights or benefits of the Participant with respect to the Award without the consent of the Participant. Except as provided in the preceding sentence, this Agreement cannot be modified, altered or amended, except by an agreement, in writing, signed by both the Company and the Participant.

8.      Determinations Binding. All determinations, interpretations, and other decisions under or with respect to this Award shall be within the sole discretion of the Company, may be made at any time and shall be final, conclusive, and binding upon all Persons, including the Company, the Partnership, any Affiliate, the Participant, and any beneficiary of the Award.

9.      Successors and Assigns. The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement shall inure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer contained herein, this Agreement shall be binding upon the Participant and his or her heirs, executors, administrators, successors and assigns.

10.      Governing Law. The laws of the State of Delaware shall govern the interpretation, validity, administration, enforcement and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

11.      Captions. Captions provided herein are for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

12.      Code Section 409A. To the extent applicable, this Agreement shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the effective date of this Agreement ("**Section 409A**"). To the extent that the Company determines that any portion of the Award may be or become subject to Section 409A, the Company may amend this Agreement in a manner intended to comply with the requirements of Section 409A or an exemption therefrom (including amendments with retroactive effect), or take any other actions as it deems necessary or appropriate to (a) exempt the Award from Section 409A and/or preserve the intended tax treatment of the benefits provided with respect to the Award, or (b) comply with the

- 4 -

requirements of Section 409A; *provided, however*, that nothing in this Agreement shall create any obligation on the part of the Company to adopt any such amendment or take any such other action or any liability for doing so or failure to do so. Notwithstanding anything to the contrary in this Agreement, no amounts payable under this Agreement shall be paid to the Participant prior to the expiration of the six-month period following the Participant's "separation from service" (within the meaning of Code Section 409A(a)(2)(A)(i)) to the extent that the Company determines that paying such amounts prior to the expiration of such six-month period would result in a prohibited distribution under Code Section 409A(a)(2)(B)(i). If the payment of any such amounts is delayed as a result of the previous sentence, then on the first business day following the end of the applicable six-month period (or such earlier date upon which such amounts can be paid under Section 409A without resulting in a prohibited distribution, including as a result of the Participant's death), such amounts shall be paid to the Participant.

13.    Entire Agreement. The Participant and the Company agree that this Agreement sets forth the entire agreement between the Participant and the Company regarding the subject matter referenced herein and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matters.

14.    Definitions. For purposes of this Agreement, when capitalized herein, the terms below shall have the following meanings:

"**Cause**" means (i) any material failure or neglect by the Participant to perform his or her duties or responsibilities to the Employer; (ii) any act of fraud, embezzlement, theft, misappropriation or dishonesty by the Participant relating to the Employer or its business or assets; (iii) the Participant's commission of a felony or other crime involving moral turpitude; (iv) any gross negligence or intentional misconduct on the part of the Participant in the conduct of his duties and responsibilities with the Employer or which adversely affects the image, reputation or business of the Employer or its affiliates; or (v) any material breach by the Participant of any written agreement between the Employer and the Participant.

"**Change of Control**" means, and shall be deemed to have occurred upon one or more of the following events:

(i)    any "person" or "group" within the meaning of those terms as used in Sections 13(d) and 14(d)(2) of the Exchange Act, other than an Affiliate of the Company, shall become the beneficial owner, directly or indirectly, by way of merger, consolidation, recapitalization, reorganization or otherwise, of 50% or more of the combined voting power of the equity interests or of a controlling interest in Breitburn Management Company LLC, the Company or the Partnership;

(ii)    the limited partners of the Partnership approve, in one or a series of transactions, a plan of complete liquidation of the Partnership;

(iii)    the sale or other disposition by either the Company or the Partnership of all or substantially all of its assets in one or more transactions to any Person other than the Company or an Affiliate of the Company;

(iv)      a transaction resulting in a Person other than the Company or an Affiliate of the Company being the general partner of the Partnership; or

(v)      any time at which individuals who, as of the Grant Date, constitute the board of directors of the Company (the "**Incumbent Board**") cease for any reason to constitute at least a majority of the Board; *provided*, *however*, that any individual becoming a director subsequent to the Grant Date whose election, or nomination for election by the Partnership's unitholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board will be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as the result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Incumbent Board.

 "**Disability**" means a condition that entitles the Participant to receive benefits under an applicable Employer long-term disability insurance plan, or, if the Participant is not covered by such a plan, a condition that would entitle the Participant to such benefits had the Participant been covered under such a plan.

"**Employer**" means Breitburn Management Company LLC or a successor employer.

"**Good Reason**" means a relocation by the Employer of the Participant's principal place of employment, without the Participant's consent, in excess of 50 miles from the Participant's principal place of employment as of the Grant Date. Notwithstanding the foregoing, the Participant shall not have Good Reason to terminate the Participant's employment on such basis unless the event giving rise to Good Reason is not fully remedied within 30 days after receipt by the Company of a written notice from the Participant of such event, which written notice must be provided within 90 days of the initial occurrence of such event, and the Participant must resign from employment, if at all, no later than 90 days following the Company's failure to remedy such event.

"**Termination of Service**" means a termination of the Participant's service as an Employee.

*[Signature Page Follows]*

- 6 -

The Participant's signature below indicates the Participant's agreement with and understanding that this Award is subject to all of the terms and conditions contained in this Agreement.  The Participant further acknowledges that the Participant has read and understands this Agreement, which contains the specific terms and conditions of this Award.  The Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Company upon any questions arising under this Agreement or with respect to this Award.


PARTICIPANT


By: _____


Print Name: _____



BREITBURN GP LLC


_____

Name:  Halbert S. Washburn
Title:  Chief Executive Officer

## EXHIBIT A

## INCENTIVE BONUS AWARD

**Participant:** _____

**Minimum Annual Cash Award:**    $ _____

**Target Annual Cash Award:**    $ _____

**Maximum Annual Cash Award:**    $ _____

**Grant Date: ● ●, 2017**

Calculating Award Payments:  The Award will be earned 50% based on achievement of the 2017 Production Performance and 50% based on Lease Operating Expense ("**LOE**") Performance metrics set forth below, as determined by the Company. For performance between the "Minimum" and "Target" levels and the "Target" and "Maximum" levels, the Earned Award in respect of each applicable performance metric will be determined using linear interpolation.

| | Minimum | Target | Maximum |
|---|---|---|---|
| **Performance Metrics** | | | |
| **2017 Production Performance (MMBoe)** | Less than 14.68 | 16.31 | Greater than or equal to 17.94 |
| **2017 LOE Performance ($ in millions)** | Greater than $337.2 | $306.5 | Less than $275.9 |

With respect to the Company's 2017 fiscal year, the Company may, in its sole and absolute discretion, increase or decrease the amount of the "**Earned Award**" by up to ten percent (10%) of the Earned Award.  Payment of the Earned Award shall be reduced (but not below zero) by the sum of all Advance Payments paid to the Participant with respect to the Company's 2017 fiscal year, as set forth in the Grant Notice.

<u>**EXHIBIT B**</u>

<u>**QUARTERLY PERFORMANCE METRIC SCHEDULE**</u>

If a Qualifying Event occurs during calendar year 2017, for purposes of Section 2 of the Agreement of which this <u>Exhibit B</u> forms a part, actual performance through the date of such Qualifying Event shall be determined based on the adjusted performance metrics set forth in the following matrix.

For any complete quarter in calendar year 2017 through the date of such Qualifying Event, the quarterly performance metrics below will be added to each other. For any incomplete quarter in calendar year 2017 through the date of such Qualifying Event, the quarterly performance metrics for such quarter will be pro-rated based on the number of days elapsed during the applicable quarter through the date of the Qualifying Event.

|  | Q1 Performance Period | | | Q2 Performance Period | | | Q3 Performance Period | | | Q4 Performance Period | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | **Minimum** | **Target** | **Maximum** | **Minimum** | **Target** | **Maximum** | **Minimum** | **Target** | **Maximum** | **Minimum** | **Target** | **Maximum** |
| **Production Performance (MMBoe)** | Less than 3.68 | 4.09 | Greater than or equal to 4.49 | Less than 3.68 | 4.09 | Greater than or equal to 4.49 | Less than 3.66 | 4.07 | Greater than or equal to 4.48 | Less than 3.66 | 4.06 | Greater than or equal to 4.48 |
| **LOE Performance ($MM)** | Greater than 85.1 | 77.4 | Less than 69.7 | Greater than 84.1 | 76.4 | Less than 68.8 | Greater than 84.4 | 76.7 | Less than 69.0 | Greater than 83.6 | 76 | Less than 68.4 |

For example, if a Qualifying Event were to occur on September 10, 2017, the performance metrics to be applied in determining whether any portion of the Award is an Earned Award shall be as follows:

- Production Performance:
  - Minimum: $3.68 + 3.68 + (3.66 * (72/92)) = $ Less than 10.22
  - Target: $4.09 + 4.09 + (4.07 * (72/92)) = 11.37$
  - Maximum: $4.49 + 4.49 + (4.48 * (72/92)) = $ Greater than or equal to 12.48
- LOE Performance
  - Minimum: $85.1 + 84.1 + (84.4 * (72/92)) = $ Greater than 235.1
  - Target: $77.4 + 76.4 + (76.7 * (72/92)) = 213.8$
  - Maximum: $69.7 + 68.8 + (69.0 * (72/92)) = $ Less than 192.5

## **Exhibit F**

**KEIP Award Agreement**

# BREITBURN ENERGY PARTNERS LP
# INCENTIVE BONUS AWARD AGREEMENT

Pursuant to this Incentive Bonus Award Agreement, dated as of ●●, **2017** (the "**Agreement**"), Breitburn GP LLC (the "**Company**"), as the general partner of Breitburn Energy Partners LP, a Delaware limited partnership (the "**Partnership**"), hereby grants to the individual set forth on <u>Exhibit A</u> hereto (the "**Participant**") the following award of an incentive bonus (the "**Award**"), pursuant and subject to the terms and conditions of this Agreement. Except as otherwise expressly provided herein, all capitalized terms used in this Agreement, but not defined, shall have the meanings provided in the Partnership's First Amended and Restated 2006 Long-Term Incentive Plan (the "**Plan**"). Certain other capitalized terms used herein are defined in Section 12 below and on <u>Exhibit A</u> hereto. For the avoidance of doubt, the Award is neither granted under, nor subject to the terms of, the Plan.

## GRANT NOTICE

Subject to the terms and conditions of this Agreement, the principal features of this Award are as follows:

**Target, Maximum 2017 Cash Award; Grant Date**: Each of the Target 2017 Cash Award, Maximum 2017 Cash Award and Grant Date of the Award are set forth on <u>Exhibit A</u> hereto.

**Earned Award; Vesting of Award**: The Committee shall determine and certify the Earned Award (if any) with respect to each applicable performance period set forth on <u>Exhibit A</u> hereto in accordance with <u>Exhibit A</u> hereto, and any such Earned Award shall become immediately vested and non-forfeitable as of the applicable Periodic Determination Date or 2017 Determination Date (each such date, a "**Vesting Date**"). In addition, the Award shall be subject to accelerated vesting as set forth in Section 2 of the Terms and Conditions of Incentive Bonus below and to the "Repayment" provision set forth below in the Grant Notice.

**Payment**: Earned Awards in respect of each of the Quarterly Performance Periods set forth on <u>Exhibit A</u> hereto (in each case, if any) shall be paid to the Participant in cash, less any applicable tax withholdings, within thirty (30) days following the applicable Vesting Date (with the exact date of payment determined by the Company in its sole discretion). The Earned Award in respect of the 2017 Performance Period (if any) shall be paid to the Participant in cash, less any applicable tax withholdings, within fifteen (15) days following the applicable Vesting Date (with the exact date of payment determined by the Company in its sole discretion). In no event shall any Earned Award be paid later than March 15th of the calendar year following the calendar year to which such Earned Award relates.

**Termination of Award**: Except as set forth in Section 2 of the Terms and Conditions of Incentive Bonus below, if the applicable Vesting Date has not occurred with respect to any portion of the Award prior to or in connection with the Participant's Termination of Service for any reason, such portion of the Award shall automatically be forfeited by the Participant upon such Termination of Service without further action and without payment

of consideration therefor. In addition, in the event that any portion of the Award fails to become an Earned Award in accordance with the provisions (including the applicable performance metric(s)) set forth on <u>Exhibit A</u> hereto, such portion of the Award that fails to become an Earned Award shall thereupon automatically be forfeited by the Participant without further action and without payment of consideration therefor. In the event of the Participant's Termination of Service due to the Participant's retirement (including a Qualifying Retirement) or voluntary resignation other than for Good Reason prior to the effective date of a plan of reorganization of the Company, the Partnership or the Employer in a case under Chapter 11 of the Bankruptcy Code (a "**Qualifying Reorganization**"), any portion of the Award that is vested but unpaid hereunder (including any unpaid Advance Payment for any prior fiscal quarter), shall thereupon automatically be forfeited by the Participant without further action and without payment of consideration therefor.

**Repayment**: In the event of the Participant's Termination of Service (i) due to the Participant's retirement (including a Qualifying Retirement) or voluntary resignation other than for Good Reason or (ii) by the Employer for Cause, in each case, prior to the earlier of (a) a Qualifying Reorganization or (b) April 15, 2018, the Participant shall, within ten business days following the Termination of Service, repay to the Company any portion of the Award that had been paid to the Participant prior to such Termination of Service, net of any taxes paid by the Participant in respect of such portion of the Award (for the avoidance of doubt, such payment shall be required notwithstanding the occurrence of a Vesting Date with respect to any such portion of the Award).

**Adjustment**: Notwithstanding anything herein to the contrary, in the event that the Committee determines, in its sole discretion, that an adjustment to any of the terms or conditions set forth on <u>Exhibit A</u> hereto is appropriate in order to prevent dilution or enlargement of the benefits or potential benefits intended by the Company to be made available pursuant to this Agreement, the Committee may make equitable adjustments, if any, to any of the terms or conditions set forth on <u>Exhibit A</u> hereto. The Committee may make such adjustments at any time, and all such adjustments shall be final, conclusive and binding upon all persons, including, but not limited to, the Company, the Employer, any of their respective Affiliates, the Participant and any beneficiary of the Participant.

## TERMS AND CONDITIONS OF INCENTIVE BONUS

1.    <u>Grant</u>.  The Company hereby grants to the Participant, as of the Grant Date, an incentive bonus Award in the amounts set forth in the Grant Notice above, subject to all of the terms and conditions contained in this Agreement.

2.    <u>Vesting and Termination</u>.

(a)    Except as expressly set forth in this Section 2, the Earned Award shall vest and be paid to the Participant in accordance with the Grant Notice above.

(b)    Notwithstanding anything herein to the contrary, in the event of a Qualifying Reorganization on or prior to December 31, 2017, (i) the Participant shall retain any portion of the Earned Award previously paid to the Participant hereunder and (ii) for the applicable Quarterly Performance Period during which such Qualifying Reorganization occurs, a portion of the Award in respect of such Quarterly Performance Period, determined based on actual performance through the date of such Qualifying Reorganization and pro-rated based on the number of days elapsed during the applicable Quarterly Performance Period through the effective date of such Qualifying Reorganization, shall immediately become an Earned Award and shall vest in full.

(c)    Notwithstanding anything herein to the contrary, upon the first to occur of

(i) the Participant's Termination of Service by the Employer due to the Participant's death or Disability prior to the 2017 Determination Date, a portion of the Award equal to the positive difference, if any, between (x) the Target 2017 Cash Award (or such other amount as the Committee may, in its sole discretion, determine based on Production Performance and LOE Performance data available as of the date of the Participant's Termination of Service), and (y) the Earned Award (if any) previously paid or payable to the Participant shall immediately become an Earned Award and shall vest in full;

(ii) (A) the Participant's Termination of Service by the Employer without Cause or by the Participant for Good Reason, or (B) a Change of Control, in each case, on or prior to December 31, 2017, then, for the applicable Quarterly Performance Period during which such event occurs, a portion of the Award in respect of such Quarterly Performance Period, determined based on actual performance through the date of such event and pro-rated based on the number of days elapsed during the applicable Quarterly Performance Period through the date of such event, shall immediately become an Earned Award and shall vest in full; or

(iii) (A) the Participant's Termination of Service by the Employer without Cause or by the Participant for Good Reason, (B) a Change of Control, or (C) a Qualifying Reorganization, in each case, on or after January 1, 2018 and prior to the 2017 Determination Date, then

(1)  with respect to the Q4 Performance Period, a portion of the Award equal to the amount of the Award determined based on actual performance

through the Q4 Performance Period shall immediately become an Earned Award and shall vest in full, and

(2) a portion of the Award equal to the positive difference, if any, between (x) the amount of the Award determined based on actual performance through the 2017 Performance Period, and (y) the Earned Award (if any) previously paid or payable to the Participant (including, for the avoidance of doubt, the Earned Award, if any, that becomes payable pursuant to Section 2(c)(iii)(1) above), shall immediately become an Earned Award and shall vest in full.

(d) The date of any event described in Section 2(b) or Section 2(c) hereof shall be deemed the "Vesting Date" for any portion of the Award that becomes an Earned Award and vests in connection therewith as provided in this Section 2. Except as set forth in this Section 2, no portion of the Award that has not become earned and vested at the date of a Qualifying Reorganization, the Participant's Termination of Service or a Change of Control (as applicable) shall thereafter become earned, vested and/or payable, and any such portion of the Award shall thereupon automatically be cancelled without further action and without payment of consideration therefor.

3. <u>Non-Transferability</u>. The Award may not be sold, pledged, assigned or transferred in any manner other than by will or the laws of descent and distribution. Neither the Award nor any interest or right therein shall be liable for the debts, contracts or engagements of the Participant or his or her successors in interest or shall be subject to disposition by transfer, alienation, anticipation, pledge, encumbrance, assignment or any other means whether such disposition be voluntary or involuntary or by operation of law by judgment, levy, attachment, garnishment or any other legal or equitable proceedings (including bankruptcy), and any attempted disposition thereof shall be null and void and of no effect, except to the extent that such disposition is permitted by the preceding sentence.

4. <u>No Effect on Employment</u>. Nothing in this Agreement shall confer upon the Participant any right to serve or continue to serve as an Employee, Director or Consultant.

5. <u>Withholding; Tax Consultation</u>. The Employer or the Company may withhold from any amount payable under this Agreement or otherwise with respect to the Award such federal, state, or local taxes as shall be required to be withheld pursuant to any applicable law or regulation. None of the Company or its Affiliates has made any warranty or representation to the Participant with respect to the income tax consequences of the issuance of the Award or the transactions contemplated by this Agreement, and the Participant is in no manner relying on such entities or their representatives for an assessment of such tax consequences. The Participant understands that the Participant may suffer adverse tax consequences in connection with the Award granted pursuant to this Agreement. The Participant represents that the Participant has consulted with any tax consultants that the Participant deems advisable in connection with the Award and that the Participant is not relying on the Company or any of its Affiliates for tax advice.

6. <u>Severability</u>. If any provision in this Agreement is held invalid or unenforceable, such provision will be severable from, and such invalidity or unenforceability will not be

- 4 -

construed to have any effect on, the remaining provisions of this Agreement, which shall remain in full force and effect.

7.    <u>Amendments, Suspension and Termination</u>.  This Agreement may be wholly or partially amended or otherwise modified, suspended or terminated at any time or from time to time by the Committee, provided that no change shall materially reduce the rights or benefits of the Participant with respect to the Award without the consent of the Participant.  Except as provided in the preceding sentence, this Agreement cannot be modified, altered or amended, except by an agreement, in writing, signed by both the Company and the Participant.

8.    <u>Determinations Binding</u>.  All determinations, interpretations, and other decisions under or with respect to this Award shall be within the sole discretion of the Committee, may be made at any time and shall be final, conclusive, and binding upon all Persons, including the Company, the Partnership, any Affiliate, the Participant, and any beneficiary of the Award.

9.    <u>Successors</u>.  This Agreement shall inure to the benefit of the successors of the Company.  Subject to the restrictions on transfer contained herein, this Agreement shall be binding upon the Participant and his or her heirs, executors, administrators, successors and assigns.

10.    <u>Governing Law</u>.    The laws of the State of Delaware shall govern the interpretation, validity, administration, enforcement and performance of the terms of this Agreement regardless of the law that might be applied under principles of conflicts of laws.

11.    <u>Captions</u>.  Captions provided herein are for convenience only and are not to serve as a basis for interpretation or construction of this Agreement.

12.    <u>Code Section 409A</u>.  To the extent applicable, this Agreement shall be interpreted in accordance with Section 409A of the Code and Department of Treasury regulations and other interpretive guidance issued thereunder, including without limitation any such regulations or other guidance that may be issued after the effective date of this Agreement ("**Section 409A**").  To the extent that the Committee determines that any portion of the Award may be or become subject to Section 409A, the Company may amend this Agreement in a manner intended to comply with the requirements of Section 409A or an exemption therefrom (including amendments with retroactive effect), or take any other actions as it deems necessary or appropriate to (a) exempt the Award from Section 409A and/or preserve the intended tax treatment of the benefits provided with respect to the Award, or (b) comply with the requirements of Section 409A; *provided, however*, that nothing in this Agreement shall create any obligation on the part of the Company to adopt any such amendment or take any such other action or any liability for doing so or failure to do so.  Notwithstanding anything to the contrary in this Agreement, no amounts payable under this Agreement shall be paid to the Participant prior to the expiration of the six-month period following the Participant's "separation from service" (within the meaning of Code Section 409A(a)(2)(A)(i)) to the extent that the Company determines that paying such amounts prior to the expiration of such six-month period would result in a prohibited distribution under Code Section 409A(a)(2)(B)(i).  If the payment of any such amounts is delayed as a result of the previous sentence, then on the first business day following the end of the applicable six-month period (or such earlier date upon which such amounts can be paid under Section 409A without resulting in a prohibited distribution,

- 5 -

including as a result of the Participant's death), such amounts shall be paid to the Participant.

13.     Definitions.  For purposes of this Agreement, when capitalized herein, the terms below shall have the following meanings:

"**Cause**" means "Cause" as defined in the Participant's employment agreement with the Employer if such an agreement exists and contains a definition of Cause, or, if no such agreement exists or such agreement does not contain a definition of Cause, then Cause means (i) any material failure or neglect by the Participant to perform his or her duties or responsibilities to the Employer; (ii) any act of fraud, embezzlement, theft, misappropriation or dishonesty by the Participant relating to the Employer or its business or assets; (iii) the Participant's commission of a felony or other crime involving moral turpitude; (iv) any gross negligence or intentional misconduct on the part of the Participant in the conduct of his duties and responsibilities with the Employer or which adversely affects the image, reputation or business of the Employer or its affiliates; or (v) any material breach by the Participant of any written agreement between the Employer and the Participant.

"**Change of Control**" means, and shall be deemed to have occurred upon one or more of the following events:

(i)     any "person" or "group" within the meaning of those terms as used in Sections 13(d) and 14(d)(2) of the Exchange Act, other than an Affiliate of the Company, shall become the beneficial owner, directly or indirectly, by way of merger, consolidation, recapitalization, reorganization or otherwise, of 50% or more of the combined voting power of the equity interests or of a controlling interest in Breitburn Management Company LLC, the Company or the Partnership;

(ii)     the limited partners of the Partnership approve, in one or a series of transactions, a plan of complete liquidation of the Partnership;

(iii)     the sale or other disposition by either the Company or the Partnership of all or substantially all of its assets in one or more transactions to any Person other than the Company or an Affiliate of the Company;

(iv)     a transaction resulting in a Person other than the Company or an Affiliate of the Company being the general partner of the Partnership; or

(v)     any time at which individuals who, as of the Grant Date, constitute the board of directors of the Company (the "**Incumbent Board**") cease for any reason to constitute at least a majority of the Board; *provided*, *however*, *that* any individual becoming a director subsequent to the Grant Date whose election, or nomination for election by the Partnership's unitholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board will be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as the result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Incumbent Board.

- 6 -

"**Committee**" means the Board of Directors of the Company (the "**Board**"), the Compensation and Governance Committee of the Board or such other committee as may be appointed by the Board.

"**Disability**" means a condition that entitles the Participant to receive benefits under an applicable Employer long-term disability insurance plan, or, if the Participant is not covered by such a plan, a condition that would entitle the Participant to such benefits had the Participant been covered under such a plan.

"**Employer**" means Breitburn Management Company LLC or a successor employer.

"**Good Reason**" means the occurrence of any of the following without the Participant's written consent: (i) a material diminution in the Participant's annual base salary; (ii) a material diminution in the Participant's authority, duties, or responsibilities; (iii) a material diminution in the authority, duties, or responsibilities of the supervisor to whom the Participant is required to report; (iv) a material diminution in the budget over which the Participant retains authority; (v) a material change in the geographic location at which the Participant must perform services to the Employer; or (vi) any other action or inaction that constitutes a material breach by the Employer of the Participant's employment agreement with the Employer; *provided*, that the Participant's resignation shall only constitute a resignation for "Good Reason" hereunder if (a) the Participant provides the Employer with written notice setting forth the specific facts or circumstances constituting Good Reason within 30 days after the initial existence of such facts or circumstances, (b) the Employer has failed to cure such facts or circumstances within thirty days after receipt of such written notice, and (c) the date of the Participant's Termination of Service occurs no later than seventy-five days after the later of (x) the initial occurrence of the event constituting Good Reason or (ii) the date the Participant learns or reasonably should have learned of such event and with all time periods measured from the last event that makes an event become material for purposes of this Good Reason definition.

"**Qualifying Retirement**" means the Participant's voluntary retirement from his or her service as an Employee at a time when the Participant has (i) attained at least sixty-five (65) years of age, and (ii) completed at least five (5) years of service with the Employer.

"**Termination of Service**" means a termination of the Participant's service as an Employee.

[*Signature Page Follows*]

US-DOCS\79728299.7

The Participant's signature below indicates the Participant's agreement with and understanding that this Award is subject to all of the terms and conditions contained in this Agreement. The Participant further acknowledges that the Participant has read and understands this Agreement, which contains the specific terms and conditions of this Award. The Participant hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Committee upon any questions arising under this Agreement or with respect to this Award.

PARTICIPANT: _____

Print Name: _____

BREITBURN GP LLC

_____
Name: Halbert S. Washburn
Title: Chief Executive Officer

**EXHIBIT A**

**INCENTIVE BONUS AWARD**

**Participant:**  [Halbert Washburn] [Mark Pease] [James Jackson] [Gregory Brown]

**Target 2017 Cash Award:**        $ _____

**Maximum 2017 Cash Award:**    $ _____

**Grant Date: _____ ___, 2017**

**Performance Periods**. For purposes of this Exhibit A, the "**Q1 Performance Period**" shall consist of the first fiscal quarter during the Company's 2017 fiscal year, the "**Q2 Performance Period**" shall consist of the second fiscal quarter during the Company's 2017 fiscal year, the "**Q3 Performance Period**" shall consist of the third fiscal quarter during the Company's 2017 fiscal year, the "**Q4 Performance Period**" shall consist of the fourth fiscal quarter during the Company's 2017 fiscal year and the "**2017 Performance Period**" shall consist of the sum of the four quarterly Performance Periods. The four quarterly Performance Periods shall be referred to collectively as the "**Quarterly Performance Periods**."

**Award**. For purposes of this Exhibit A, the Award shall be divided into tranches as follows:

|  | Q1 Performance Period | Q2 Performance Period | Q3 Performance Period | Q4 Performance Period | 2017 Performance Period |
|---|---|---|---|---|---|
| **Tranche 1 Award** | $ _____ | $ _____ | $ _____ | $ _____ | $ _____ |
| **Tranche 2 Award** | $ _____ | $ _____ | $ _____ | $ _____ | $ _____ |

**Earned Award Determination; 2017 Earned Award Adjustment**.

**(a)**    With respect to each of the Quarterly Performance Periods, the "**Earned Award**" for each such performance period shall equal the sum of the Earned Tranche 1 Award and the Earned Tranche 2 Award in respect of the applicable performance period, determined as set forth below. The Committee shall determine and certify the Earned Award (if any) for each of the Quarterly Performance Periods as soon as reasonably practicable following the end of the applicable performance period (and in no event later than forty-five (45) days following the end of the applicable performance period) (each such date, a "**Periodic Determination Date**").

**(b)**    As soon as reasonably practicable following the end of the Company's 2017 fiscal year (and in no event later than sixty (60) days following the end of the Company's 2017 fiscal year) (the "**2017 Determination Date**"), the Committee shall determine and certify the Earned Tranche 1 Award and the Earned Tranche 2 Award (in each case, if any) in respect of the 2017 Performance Period (the sum of such Earned Tranche 1 Award and Earned Tranche 2 Award (if any), the "**2017 Award**"). As of the 2017 Determination Date, the positive difference (if any) between (i) the 2017 Award and (ii) the sum of all Earned Awards previously paid or payable to the Participant shall become an "**Earned Award.**"

**(c)**    For purposes of this Exhibit A, the Earned Tranche 1 Award and Earned Tranche 2 Award for each of the Quarterly Performance Periods and the 2017 Performance Period shall be determined, in each case, as follows:

| |
|---|
| **Earned Tranche 1 Award** = |
| Tranche 1 Award * Tranche 1 Performance Factor |
| **Earned Tranche 2 Award** = |
| Tranche 2 Award * Tranche 2 Performance Factor |

For purposes of this <u>Exhibit A</u>, the terms "**Tranche 1 Performance Factor**" and "**Tranche 2 Performance Factor**" shall have the following meanings.

"**Tranche 1 Performance Factor**" means a percentage equal to the average of the Applicable Performance Factor for each of Production Performance and Lease Operating Expense ("**LOE**") Performance, determined for the each of the Quarterly Performance Periods or the 2017 Performance Period (as applicable) in accordance with the following table; *provided* that for performance between Threshold and Target levels the Applicable Performance Factor shall be determined by linear interpolation between the Threshold and Target Applicable Performance Factor percentages set forth below. For performance below Threshold level, the Applicable Performance Factor shall be zero.

| | Q1 Performance Period | | Q2 Performance Period | | Q3 Performance Period | |
|---|---|---|---|---|---|---|
| | Threshold | Target | Threshold | Target | Threshold | Target |
| **Production Performance (MMBoe)** | 3.68 | 4.09 | 3.68 | 4.09 | 3.66 | 4.07 |
| **LOE Performance ($MM)** | 85.1 | 77.4 | 84.1 | 76.4 | 84.4 | 76.7 |
| **Applicable Performance Factor** | 54% | 90% | 54% | 90% | 54% | 90% |

| | Q4 Performance Period | | 2017 Performance Period | |
|---|---|---|---|---|
| | Threshold | Target | Threshold | Target |
| **Production Performance (MMBoe)** | 3.66 | 4.06 | 14.68 | 16.31 |
| **LOE Performance ($MM)** | 83.6 | 76.0 | 337.2 | 306.5 |
| **Applicable Performance Factor** | 54% | 90% | 54% | 90% |

"**Tranche 2 Performance Factor**" means a percentage equal to the average of the Applicable Performance Factor for each of Production Performance and LOE Performance, determined for each of the Quarterly Performance Periods or the 2017 Performance Period (as applicable) in accordance with the following table; *provided* that for performance between Threshold, Target, or Stretch levels the Applicable Performance Factor shall be determined by linear interpolation between the Threshold, Target, or Stretch Applicable Performance Factor percentages set forth below (as applicable). For performance below Threshold level, the Applicable Performance Factor shall be zero.

| | Q1 Performance Period | | | Q2 Performance Period | | | Q3 Performance Period | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Threshold** | **Target** | **Stretch** | **Threshold** | **Target** | **Stretch** | **Threshold** | **Target** | **Stretch** |
| **Production Performance (MMBoe)** | 3.68 | 4.09 | 4.49 or greater | 3.68 | 4.09 | 4.49 or greater | 3.66 | 4.07 | 4.48 or greater |
| **LOE Performance ($MM)** | 85.1 | 77.4 | 69.7 or less | 84.1 | 76.4 | 68.8 or less | 84.4 | 76.7 | 69.0 or less |
| **Applicable Performance Factor** | 37.8% | 63% | 90% | 37.8% | 63% | 90% | 37.8% | 63% | 90% |

| | Q4 Performance Period | | | 2017 Performance Period | | |
|---|---|---|---|---|---|---|
| | **Threshold** | **Target** | **Stretch** | **Threshold** | **Target** | **Stretch** |
| **Production Performance (MMBoe)** | 3.66 | 4.06 | 4.48 or greater | 14.68 | 16.31 | 17.94 or greater |
| **LOE Performance ($MM)** | 83.6 | 76.0 | 68.4 or less | 337.2 | 306.5 | 275.9 or less |
| **Applicable Performance Factor** | 37.8% | 63% | 90% | 37.8% | 63% | 90% |