**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------x
                                  :

In re                            :           **Chapter 11**
                                    :

**BREITBURN ENERGY**        :           **Case No. 16-11390 (SMB)**
**PARTNERS LP,** *et al.*,         :
                                    :

           **Debtors.**[1]        :          **(Jointly Administered)**
                                    :

-------------------------------------------------------x

## DISCLOSURE STATEMENT FOR
## DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN


**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock, P.C.
Stephen Karotkin
767 Fifth Avenue
New York, New York  10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors and*
*Debtors in Possession*

Dated: December 1, 2017
        New York, New York

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Breitburn Energy Partners LP (9953); Breitburn GP LLC (9948); Breitburn Operating LP (5529); Breitburn Operating GP LLC (5525); Breitburn Management Company LLC (2858); Breitburn Finance Corporation (2548); Alamitos Company (9156); Beaver Creek Pipeline, L.L.C. (7887); Breitburn Florida LLC (7424); Breitburn Oklahoma LLC (4714); Breitburn Sawtelle LLC (7661); Breitburn Transpetco GP LLC (7222); Breitburn Transpetco LP LLC (7188); GTG Pipeline LLC (3760); Mercury Michigan Company, LLC (3380); Phoenix Production Company (1427); QR Energy, LP (3069); QRE GP, LLC (2855); QRE Operating, LLC (9097); Terra Energy Company LLC (9616); Terra Pipeline Company LLC (3146); and Transpetco Pipeline Company, L.P. (2620).  The Debtors' mailing address is 707 Wilshire Boulevard, Suite 4600, Los Angeles, California 90017.

Page

I. INTRODUCTION ........................................................................................................... 1
   A.   Definitions and Exhibits ........................................................................... 1
      1.   Definitions ................................................................................... 1
      2.   Exhibits ........................................................................................ 1
   B.   Notice to Creditors .................................................................................. 1
   C.   Background and Overview of the Plan ..................................................... 5
   D.   Restructuring Support Agreement and Backstop Commitment Agreement ...................... 7
      1.   Restructuring Support Agreement ............................................... 7
      2.   Backstop Commitment Agreement .............................................. 8
   E.   Summary of Plan Classification and Treatment of Claims and Interests............ 8
   F.   Disclosure Statement Enclosures ........................................................... 13
   G.   Inquiries ................................................................................................ 14

II. OVERVIEW OF THE DEBTORS' OPERATIONS .................................................... 14
   A.   The Debtors' Corporate Structure .......................................................... 14
   B.   The Debtors' Business Operations .......................................................... 15
   C.   Prepetition Capital Structure .................................................................. 17
      1.   MLP Common and Preferred Units ........................................... 17
      2.   Indebtedness .............................................................................. 17
      3.   Derivative and Hedge Agreements ............................................ 19
      4.   Trade Payables .......................................................................... 19
   D.   Events Leading to Commencement of the Chapter 11 Cases .......................... 20
      1.   The Oil and Gas Industry Experiences Fundamental Changes............ 20
      2.   Stabilization Efforts .................................................................. 20
      3.   Prepetition Restructuring Efforts ............................................... 21

III. OVERVIEW OF THE CHAPTER 11 CASES............................................................ 22
   A.   Commencement of Chapter 11 Cases ..................................................... 22
   B.   First Day Motions .................................................................................. 22
   C.   Procedural Motions ................................................................................ 23
   D.   Appointment of Creditors' Committee .................................................. 23
   E.   Appointment of Equity Committee ........................................................ 23
   F.   Claims Reconciliation Process................................................................ 23
   G.   Exclusivity ............................................................................................ 24
   H.   Employee Compensation Matters .......................................................... 24
   I.   Executory Contracts and Unexpired Leases ........................................... 25
   J.   Second Lien Proof of Claim and Disputes Related Thereto ............................ 25
   K.   Postpetition Plan Negotiations ............................................................... 28

Table of Contents

Page

L.    Certain Recent Postpetition Expressions of  Interest for Certain of the Debtors'
      Assets ........................................................................................................ 29

M.    Postpetition Mediation .................................................................................. 30

IV. SUMMARY OF THE PLAN ................................................................................. 30

A.    General ......................................................................................................... 30

B.    Classification of Claims and Interests ......................................................... 30

      1.    Classification in General ...................................................................... 30

      2.    Formation of Debtor Groups for Convenience Only ........................... 31

      3.    Summary of Classification of Claims and Interests............................. 31

C.    Treatment of Claims and Interests .............................................................. 31

      1.    Class 1 – Priority Non-Tax Claims. ..................................................... 31

      2.    Class 2 – Other Secured Claims. ....................................................... 32

      3.    Class 3 – Revolving Credit Facility Claims.......................................... 32

      4.    Class 4 – Secured Notes Claims. ....................................................... 33

      5.    Class 5A/Class 5B – Unsecured Notes Claims.................................. 33

      6.    Class 6 – General Unsecured Claims. ................................................ 35

      7.    Class 7A – Ongoing Trade Claims of LegacyCo................................. 35

      8.    Class 7B – Ongoing Trade Claims of New Permian Corp. ................. 36

      9.    Class 8 – Intercompany Claims. .......................................................... 36

      10.   Class 9 – Subordinated Claims. .......................................................... 36

      11.   Class 10 – Intercompany Interests. ..................................................... 36

      12.   Class 11 – Existing BBEP Equity Interests. ........................................ 36

D.    Nonconsensual Confirmation....................................................................... 36

E.    Administrative Expenses and Priority Tax Claims ....................................... 37

      1.    Administrative Expenses ...................................................................... 37

      2.    Professional Fee Claims....................................................................... 37

      3.    DIP Facility Claims .............................................................................. 38

      4.    Priority Tax Claims............................................................................... 38

F.    Means for Implementation and Execution of the Plan................................. 38

      1.    General Settlement of Claims and Interests........................................ 38

      2.    Continued Corporate Existence ........................................................... 39

      3.    Authorization, Issuance, and Delivery of LegacyCo Units and New
            Permian Corp. Shares. ........................................................................ 40

      4.    Cancelation of Existing Securities and Agreements ........................... 40

      5.    Cancelation of Certain Existing Security Agreements ........................ 41

      6.    Rights Offering and Minimum Allocation Rights ................................. 41

      7.    New Permian Corp. Certificate of Incorporation................................. 42

      8.    Exit Facility .......................................................................................... 42

      9.    Restructuring Transactions ................................................................. 43

      10.   Board of Directors ............................................................................... 45

11.    Corporate Action ................................................................................... 45
12.    LegacyCo Management Incentive Plan ................................................. 46
13.    New Permian Corp. Management Incentive Plan ................................. 46
14.    Separability ........................................................................................... 46
15.    Director, Officer, Manager, and Employee Liability Insurance ........... 46
16.    Preservation of Royalty and Working Interests .................................... 47
17.    Hart-Scott-Rodino Antitrust Improvements Act ................................... 47
18.    Post-Effective Date Tax Filings and Audits ......................................... 47
19.    AUNC Trust ........................................................................................... 47

G.    Provisions Governing Distributions ................................................................. 48
1.    No Postpetition Interest on Claims ...................................................... 48
2.    Date of Distributions ............................................................................ 48
3.    Distribution Record Date ...................................................................... 49
4.    Delivery of Distributions ...................................................................... 49
5.    Unclaimed Property .............................................................................. 50
6.    Satisfaction of Claims ........................................................................... 50
7.    Fractional Shares and De Minimis Cash Distributions ........................ 50
8.    Allocation of Distributions between Principal and Interest .................. 50
9.    Exemption from Securities Laws .......................................................... 51
10.    Setoffs and Recoupments ...................................................................... 51
11.    Withholding and Reporting Requirements ........................................... 52

H.    Procedures for Disputed Claims ...................................................................... 52
1.    Objections to Claims ............................................................................. 52
2.    Resolution of Disputed Administrative Expenses and Disputed Claims ............ 53
3.    Payments and Distributions with Respect to Disputed Claims ............ 53
4.    Distributions After Allowance .............................................................. 53
5.    Disallowance of Claims ......................................................................... 53
6.    Estimation ............................................................................................. 54
7.    Interest .................................................................................................. 54

I.    Executory Contracts and Unexpired Leases .................................................... 54
1.    General Treatment ................................................................................. 54
2.    Determination of Cure Disputes and Deemed Consent ........................ 55
3.    Rejection Damages Claims .................................................................... 56
4.    Payment of Cure Amounts .................................................................... 56
5.    Survival of the Debtors' Indemnification Obligations .......................... 57
6.    Employee Obligations ........................................................................... 57
7.    Insurance Policies ................................................................................. 57
8.    Reservation of Rights ............................................................................ 58
9.    Modifications, Amendments, Supplements,  Restatements, or Other
Agreements ........................................................................................... 58

J.    Conditions Precedent ...................................................................................... 59

Page

| | | | |
|---|---|---|---|
| | 1. | Conditions Precedent to Confirmation of Plan | 59 |
| | 2. | Conditions Precedent to Effective Date | 59 |
| | 3. | Satisfaction or Waiver of Conditions | 60 |
| | 4. | Effect of Non-Occurrence of Effective Date | 61 |
| K. | | Effect of Confirmation | 61 |
| | 1. | Released and Settled Claims | 61 |
| | 2. | Binding Effect | 61 |
| | 3. | Vesting of Assets | 61 |
| | 4. | Release and Discharge of Debtors | 62 |
| | 5. | Terms of Injunctions or Stays | 62 |
| | 6. | Injunction Against Interference with Plan | 62 |
| | 7. | [Intentionally Omitted] | 62 |
| | 8. | Exculpation | 62 |
| | 9. | Releases | 63 |
| | 10. | Injunction Related to Releases and Exculpation | 65 |
| | 11. | Subordinated Claims | 66 |
| | 12. | Avoidance Actions | 66 |
| | 13. | Retention of Causes of Action and Reservation of Rights | 66 |
| | 14. | Preservation of Causes of Action | 67 |
| | 15. | Special Provisions for Governmental Units | 67 |
| | 16. | Protections Against Discriminatory Treatment | 67 |
| L. | | Retention of Jurisdiction | 68 |
| M. | | Miscellaneous Provisions | 70 |
| | 1. | Dissolution of Statutory Committees | 70 |
| | 2. | Substantial Consummation | 70 |
| | 3. | Exemption from Transfer Taxes | 70 |
| | 4. | Plan Modifications and Amendments | 70 |
| | 5. | Revocation or Withdrawal of Plan | 71 |

V. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ..... 72

| | | |
|---|---|---|
| A. | Continuation of the Chapter 11 Cases | 72 |
| B. | Liquidation under Chapter 7 | 72 |

VI. TRANSFER RESTRICTIONS AND  CONSEQUENCES UNDER FEDERAL SECURITIES
LAW ..... 73

VII. CERTAIN TAX CONSEQUENCES OF THE PLAN ..... 74

| | | | |
|---|---|---|---|
| A. | | Consequences to the Debtors and to BBEP Common Unitholders | 75 |
| | 1. | Taxable Transfer of Assets | 76 |
| | 2. | Cancellation of Debt and other Income from the Plan | 79 |
| B. | | Consequences to Holders of Certain Claims and Interests | 80 |

1.    Holders of Revolving Credit Facility Claims .................................................... 81
2.    Holders of Secured Notes Claims ....................................................................... 84
3.    Holders of Unsecured Notes Claims ................................................................... 85
4.    Holders of General Unsecured Claims ............................................................... 87
5.    Distributions in Discharge of Accrued Interest or OID ..................................... 87
6.    Character of Gain or Loss ................................................................................... 88
7.    Ownership and Disposition of LegacyCo Units ................................................ 88
8.    Information Reporting and Backup Withholding ............................................... 90

VIII. VOTING PROCEDURES AND REQUIREMENTS ..................................................... 91
A.    Voting Deadline ............................................................................................................ 91
B.    Voting Procedures ......................................................................................................... 92
C.    Parties Entitled to Vote ................................................................................................. 92
1.    Beneficial Holders .............................................................................................. 93
2.    Nominees ............................................................................................................. 94
3.    Miscellaneous ..................................................................................................... 95
4.    Fiduciaries and Other Representatives ............................................................... 95
5.    Agreements upon Furnishing Ballots ................................................................. 95
6.    Change of Vote .................................................................................................... 96
D.    Waivers of Defects, Irregularities, etc. ........................................................................ 96
E.    Further Information, Additional Copies ........................................................................ 96

IX. FACTORS TO CONSIDER BEFORE VOTING ............................................................. 96
A.    Risks Relating to the Debtors' Business Operations and Financial Condition ............. 97
1.    Volatile Oil and Gas Prices ................................................................................ 97
2.    High Costs and Risks of Oil and Natural Gas Drilling and Production .............. 98
3.    Depletion of Oil and Gas Reserves .................................................................... 99
4.    Intense Competitive Environment ...................................................................... 99
5.    Substantial Capital Requirements ..................................................................... 100
6.    Hedging and Derivative Risks .......................................................................... 100
7.    Insurance Coverage and Excess Liability Risks ............................................... 101
8.    Extensive Domestic Regulation and Legislation ............................................. 102
9.    New Permian Corp. Will Be a New Company That Has Never Operated
       Independently ..................................................................................................... 102
10.   Future New Permian Corp. Debt or Equity Financings. ................................... 103
11.   Additional Business and Industry Risk Factors ................................................ 103
B.    Certain Bankruptcy Law Considerations .................................................................... 103
1.    Risk of Non-Confirmation of the Plan .............................................................. 103
2.    Non-Consensual Confirmation .......................................................................... 103
3.    Inaccuracy of Projected Financial Results ........................................................ 103
4.    Claims Could Be More than Projected .............................................................. 104

5.  U.S. Federal Income Tax Risks .................................................................. 104
6.  Risk of Non-Occurrence of the Effective Date ................................................ 104
7.  Conversion into Chapter 7 Cases ............................................................... 104
C.  Factors Relating to Securities to Be Issued ..................................................... 105
1.  Market for Securities ........................................................................... 105
2.  Potential Dilution ................................................................................ 105
3.  Significant Holders of LegacyCo Units or New Permian Corp. Shares ........... 105
4.  Interests Subordinated to the Reorganized Debtors' Indebtedness.................... 106
5.  Implied Valuation of LegacyCo Units or New Permian Corp. Shares Not Intended to Represent the Trading Value of the LegacyCo Units or New Permian Corp. Shares ................................................................................. 106
6.  Dividends ........................................................................................... 106
7.  Restrictions on Ability to Resell LegacyCo Units and New Permian Corp. Shares............................................................................................. 106
D.  Factors Relating to Rights Offering ................................................................ 107
1.  Debtors Could Modify the Rights Offering Procedures ..................................... 107
2.  The Backstop Commitment Agreement Could be Terminated............................. 107
E.  Additional Factors .......................................................................................... 107
1.  Debtors Could Withdraw Plan .................................................................. 107
2.  Debtors Have No Duty to Update .............................................................. 107
3.  No Representations Outside this Disclosure Statement Are Authorized ........... 107
4.  No Legal or Tax Advice Is Provided by this Disclosure Statement .................. 108
5.  No Admission Made .............................................................................. 108

X. CONFIRMATION OF THE PLAN........................................................................... 108
A.  Acceptance of the Plan .................................................................................... 108
B.  Best Interest Test ............................................................................................ 109
C.  Feasibility....................................................................................................... 111
D.  Valuation Analysis.......................................................................................... 112
E.  Notices and Confirmation Hearing .................................................................. 116

XI. CONCLUSION AND RECOMMENDATION.............................................................. 117

EXHIBIT A:    Plan
EXHIBIT B:    Liquidation Analysis
EXHIBIT C:    Projected Financial Information
EXHIBIT D:    Backstop Commitment Agreement
EXHIBIT E:    Restructuring Support Agreement
EXHIBIT F:    Rights Offering Procedures

# I.
# INTRODUCTION

This is the disclosure statement (the "**Disclosure Statement**") of Breitburn Energy Partners LP ("**BBEP**"); Breitburn GP LLC; Breitburn Operating LP ("**BOLP**"); Breitburn Operating GP LLC; Breitburn Management Company LLC ("**BMC**"); Breitburn Finance Corporation ("**Breitburn Finance**"); Alamitos Company; Beaver Creek Pipeline, L.L.C.; Breitburn Florida LLC; Breitburn Oklahoma LLC; Breitburn Sawtelle LLC; Breitburn Transpetco GP LLC; Breitburn Transpetco LP LLC; GTG Pipeline LLC; Mercury Michigan Company, LLC; Phoenix Production Company; QR Energy, LP; QRE GP, LLC; QRE Operating, LLC; Terra Energy Company LLC; Terra Pipeline Company LLC; and Transpetco Pipeline Company, L.P. (collectively, the "**Debtors**"), in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**") pending in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), filed pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**") and in connection with the *Debtors' Third Amended Joint Chapter 11 Plan* dated December 1, 2017 (the "**Plan**"), a copy of which is annexed to this Disclosure Statement as **Exhibit A**. The Plan constitutes a separate chapter 11 plan for each Debtor.

## A.    Definitions and Exhibits

### 1.    Definitions

Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall have the meanings ascribed to such terms in the Plan.

### 2.    Exhibits

The following exhibits to this Disclosure Statement are incorporated as if fully set forth herein and part of this Disclosure Statement:

- **Exhibit A** – Plan
- **Exhibit B** – Liquidation Analysis
- **Exhibit C** – Projected Financial Information
- **Exhibit D** – Backstop Commitment Agreement
- **Exhibit E** – Restructuring Support Agreement
- **Exhibit F** – Rights Offering Procedures

## B.    Notice to Creditors

The purpose of this Disclosure Statement is to set forth information that (1) summarizes the Plan and alternatives to the Plan, (2) advises holders of Claims and Interests of their rights under the Plan, (3) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (4) assists the Bankruptcy Court in determining

whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.

By Order dated December 1, 2017 (the "**Disclosure Statement Approval Order**"), the Bankruptcy Court approved this Disclosure Statement, finding that it contains "adequate information," as that term is used in section 1125(a)(1) of the Bankruptcy Code. The Bankruptcy Court's approval of this Disclosure Statement is not an endorsement of the Plan.

**IT IS THE DEBTORS' OPINION THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS, AND EQUITY INTEREST HOLDERS. THEREFORE, THE DEBTORS RECOMMEND THAT CREDITORS VOTE TO ACCEPT THE PLAN.**

**BALLOTS FOR VOTING TO ACCEPT OR REJECT THE PLAN MUST BE RECEIVED BY JANUARY 4, 2018 AT 4:00 P.M. (EASTERN TIME) (THE "<u>VOTING DEADLINE</u>").**

**IF A HOLDER OF AN ALLOWED UNSECURED NOTES CLAIM THAT IS AN ELIGIBLE OFFEREE DOES NOT ELECT TO PARTICIPATE IN THE RIGHTS OFFERING, SUCH HOLDER SHALL NOT RECEIVE ANY DISTRIBUTION UNDER THE PLAN.**

**IF A HOLDER OF AN ALLOWED UNSECURED NOTES CLAIM THAT IS NOT AN ELIGIBLE OFFEREE DOES NOT COMPLY WITH THE REQUIREMENTS SET FORTH IN THE RIGHTS OFFERING PROCEDURES, INCLUDING PROVIDING THE REQUISITE CERTIFICATIONS SET FORTH IN THE RIGHTS OFFERING PROCEDURES, SUCH HOLDER OF AN ALLOWED UNSECURED NOTES CLAIM SHALL BE DEEMED TO HAVE FOREVER AND IRREVOCABLY RELINQUISHED AND WAIVED THE RIGHT TO RECEIVE A DISTRIBUTION UNDER THE PLAN.**

**THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS NOVEMBER 29, 2017 (THE "<u>RECORD DATE</u>"). BECAUSE HOLDERS OF EQUITY INTERESTS IN BBEP WILL NOT RECEIVE ANY DISTRIBUTION OR CONSIDERATION UNDER THE PLAN AND THEIR EQUITY INTERESTS WILL BE CANCELED, THEY ARE DEEMED TO REJECT THE PLAN AND, ACCORDINGLY, WILL NOT VOTE ON THE PLAN.**

**A HEARING TO CONSIDER CONFIRMATION OF THE PLAN (THE "<u>CONFIRMATION HEARING</u>") WILL BE HELD BEFORE THE HONORABLE STUART M. BERNSTEIN, UNITED STATES BANKRUPTCY JUDGE, IN ROOM 723 OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, ONE BOWLING GREEN, NEW YORK, NEW YORK 10004, ON JANUARY 11, 2018 AT 10:00 A.M. (EASTERN TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD. THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE JANUARY 4, 2018 AT 4:00 P.M. (EASTERN TIME).**

**PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. A COPY OF THE PLAN IS ANNEXED HERETO AS <u>EXHIBIT A</u>. THE**

DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT SUCH SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE ACTUAL TERMS AND PROVISIONS OF THE PLAN.    ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL.

SECURITIES LAW NOTICES: THE ISSUANCE OF AND THE DISTRIBUTION UNDER THE PLAN (A) OF THE LEGACYCO UNITS AND (B) OF THE NEW PERMIAN CORP. SHARES COMPRISING THE PUT OPTION PREMIUM OR ISSUED PURSUANT TO SECTIONS 4.5(c) or 4.6 OF THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933 (AS AMENDED, THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS TO THE FULLEST EXTENT PERMITTED BY SECTION 1145 OF THE BANKRUPTCY CODE.

THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(A)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE RIGHTS OFFERING AND THE ISSUANCE AND SALE OF THE NEW PERMIAN CORP. SHARES PURSUANT TO THE RIGHTS OFFERING AND TO THE COMMITMENT PARTIES UNDER THE BACKSTOP COMMITMENT AGREEMENT (INCLUDING THE NEW PERMIAN CORP. SHARES ISSUED PURSUANT TO THE MINIMUM ALLOCATION RIGHTS, BUT NOT INCLUDING THE PUT OPTION PREMIUM) ARE BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER.    SUCH SECURITIES WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS, UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT.

THE LEGACYCO UNITS AND THE NEW PERMIAN CORP. SHARES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND

**NEITHER THE SEC NOR ANY SUCH STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.    ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.    THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.**

**FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.    DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.**

**THE DEBTORS WILL REQUEST AT THE CONFIRMATION HEARING THAT PARTIES ENTITLED TO VOTE FOR OR AGAINST THE PLAN THAT DO NOT VOTE WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE X OF THE PLAN THAT RELEASE THE PARTIES SPECIFIED IN ARTICLE X OF THE PLAN.**

**WHERE TO FIND ADDITIONAL INFORMATION**:  BBEP currently files annual reports with, and furnishes other information to, the SEC.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.  Each of the following filings is incorporated as if fully set forth herein and is a part of this Disclosure Statement (but later information filed with the SEC that updates information in the filings incorporated by reference will update and supersede that information):

- Form 10-K for the fiscal year ended December 31, 2016, filed with the SEC on March 8, 2017 and amended on April 28, 2017

- Form 8-K filed with the SEC on August 10, 2017

- Form 8-K filed with the SEC on August 29, 2017

- Form 10-Q for the quarterly period ended September 30, 2017, filed with the SEC on November 13, 2017

- Form 8-K filed with the SEC on November 16, 2017

### C.    Background and Overview of the Plan[2]

The Plan encompasses a comprehensive restructuring of the Debtors, that is the product of the Debtors' arms-length negotiations and an agreement with (1) holders of claims under the *Third Amended and Restated Credit Agreement* dated November 19, 2014 (the lenders thereunder, the "**Revolving Credit Facility Lenders**"), (2) certain holders of the Debtors' 9.25% Senior Secured Second Lien Notes due 2020 (the "**Second Lien Group**"),[3] (3) certain holders of the Debtors' 7.875% Senior Notes due 2022 and 8.625% Senior Notes due 2020 (the "**Unsecured Senior Notes Group**"),[4] and (4) the Official Committee of Unsecured Creditors (the "**Creditors' Committee**").

The Plan is premised on the division of the Debtors' existing businesses and assets into two separate entities upon the occurrence of the Effective Date under the Plan: (1) a newly-formed limited liability company ("**LegacyCo**") that will own all of the Debtors' assets other than certain assets related to the Permian Basin (such assets, the "**Permian Assets**", that are set forth in Exhibit II of the Plan); and (2) a newly-formed corporation ("**New Permian Corp.**") that will acquire all of the equity of a newly-formed limited liability company ("**New Permian LLC**") that will own the Permian Assets.  New Permian Corp. will also own 7.5% of the equity of LegacyCo.

The Plan provides for the following treatment of claims and equity interests:

- Revolving Credit Facility Lenders, holding claims in the aggregate amount of approximately $747,316,435.62 with respect to principal and two interest rate derivative obligations plus such amounts as may be owing for any other outstanding "Obligations" (as such term is defined in the Revolving Credit Agreement) (collectively, the "**Allowed Revolving Credit Facility Claims**"), will receive (a) Cash in an amount equal to such holder's pro rata share of the Allowed Revolving Credit Facility Claims minus $400 million (*i.e.*, the original principal amount of an amended and restated term loan facility to be entered into on the Effective Date, the "**Exit Facility**") and (b) such holder's Pro Rata share of the Exit Facility.  Each Revolving Credit Facility Lender will also have the right to convert all of its portion of the Exit Facility on a dollar-for-dollar basis to an equal amount of a revolving credit facility.

---

[2] **This overview is qualified in its entirety by reference to the Plan**.  The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise or limit any rights, claims or causes of action if the Plan is not confirmed.  You should read the Plan in its entirety before voting to accept or reject the Plan.

[3] The constitution of the Second Lien Group is set forth in their verified statement pursuant to Bankruptcy Rule 2019 (ECF No. 914).

[4] The constitution of the Unsecured Senior Notes Groups is set forth in their verified statement pursuant to Bankruptcy Rule 2019 (ECF No. 1452).

- Holders of the 9.25% Senior Secured Second Lien Notes due 2020 (the "**Second Lien Noteholders**"), with claims, solely for purposes of the Plan, in the aggregate amount of $793.3 million plus accrued unpaid pre- and postpetition default interest on all obligations, costs, fees, indemnities, and all other obligations payable under the Secured Notes Indenture,[5] will receive a pro rata share of 92.5% of new common units of LegacyCo (the "**LegacyCo Units**"), potentially subject to dilution.

- Holders of Unsecured Notes Claims (the "**Unsecured Noteholders**") that are Eligible Offerees will receive the right to purchase their pro rata share of an aggregate of 60% of the common shares issued by New Permian Corp. (the "**New Permian Corp. Shares**"), subject to certain dilution, pursuant to a $465 million rights offering (the "**Rights Offering**"). Unsecured Noteholders that are Eligible Offerees that do not elect to participate in the Rights Offering will receive no distribution under the Plan.

The Rights Offering will be backstopped by certain Unsecured Noteholders (the "**Backstop Parties**") pursuant to the *Amended and Restated Backstop Commitment Agreement* annexed hereto as **Exhibit D** (as may be amended, restated, or modified, the "**Backstop Commitment Agreement**"). Pursuant to the Backstop Commitment Agreement, the Backstop Parties also have committed to exercise rights to purchase the remaining 40% of the New Permian Corp. Shares (the "**Minimum Allocation Rights**"), subject to certain dilution, for the aggregate amount of $310 million.

Both (a) the Backstop Parties, and (b) all other Unsecured Noteholders that are Eligible Offerees as of November 27, 2017 (the "**Rights Offering Record Date**") that irrevocably elect to participate in the Rights Offering by December 13, 2017, will receive on the Effective Date their pro rata share (based on the respective backstop commitment amounts (which includes the amounts committed in the Minimum Allocation Rights and the Rights Offering) of the Backstop Parties and the respective subscription amounts as to the rights exercised by Eligible Offerees by December 13, 2017) of 10% of the New Permian Corp. Shares, which will dilute the New Permian Corp. Shares issued pursuant to the Minimum Allocation Rights and the Rights Offering.

Unsecured Noteholders that are not Eligible Offerees will receive through a trust New Permian Corp. Shares having a value equal to 4.5% of their claims but have the option to elect to receive instead Cash in the amount of 4.5% of their claims; *provided that* the aggregate amount of the value of the New Permian Corp. Shares and Cash distributed to such Unsecured Noteholders will not exceed $5,422,265. To the extent that the New Permian Corp. Shares and Cash that would otherwise be issued to such holders exceeds $5,422,265, the distribution of such New Permian Corp. Shares and Cash will be reduced ratably to eliminate such excess. Unsecured Noteholders that are not Eligible Offerees, and that fail to comply with the requirements of the Rights Offering Procedures, will receive no distribution under the Plan.

---

[5] If the Plan is not confirmed or the Effective Date does not occur, this amount is not binding and is without prejudice to the rights of all parties as to the allowed amount of the Secured Notes Claims.

- Holders of Allowed General Unsecured Claims will receive their pro rata share of $1.5 million in Cash. Holders of Allowed General Unsecured Claims exceeding $1 million, however, will have the right to elect to receive instead New Permian Corp. Shares having a value equal to 4.5% of their claims; *provided that* the aggregate amount of the distribution to such holders will not exceed New Permian Corp. Shares having a value equal to $817,240, and to the extent that the New Permian Corp. Shares that would otherwise be issued to such holders exceeds $817,240, the distribution of such shares will be reduced ratably to eliminate such excess.

- The holders of Allowed Ongoing Trade Claims of LegacyCo and Allowed Ongoing Trade Claims of New Permian Corp. will be paid in Cash in full.

- All Royalty and Working Interests will be preserved and remain in full force and effect in accordance with the terms of their underlying documents, and no Royalty and Working Interests will be compromised, or obligations with respect thereto discharged, by the Plan.

- BBEP's common and preferred unitholders will receive no distribution or consideration under the Plan on account of their equity interests, and all such units will be canceled on the Effective Date. ***The Plan, however, based on certain assumptions, structures the Debtors' reorganization so as to attempt to mitigate any cancellation of debt ("COD") and other income risk for the Debtors' unitholders. However, that risk still remains. See Section VII of this Disclosure Statement for a discussion of tax consequences.***

Accordingly, upon consummation and implementation of the Plan, 92.5% of the equity of LegacyCo will be distributed to the Second Lien Noteholders. Simultaneously, New Permian Corp. will acquire the equity of New Permian LLC (which will hold the Permian Assets), and New Permian Corp. also will acquire the remaining 7.5% of the equity of LegacyCo. In turn, New Permian Corp. will be owned 40% by the Backstop Parties that exercised the Minimum Allocation Rights, and the remainder by the Unsecured Noteholders that participate in the Rights Offering and holders of Allowed General Unsecured Claims that elect to receive New Permian Corp. Shares in accordance with the Plan.

## D. <u>Restructuring Support Agreement and Backstop Commitment Agreement</u>

### 1. **Restructuring Support Agreement**

In connection with negotiation of the Plan, the Debtors, certain Second Lien Noteholders holding substantially all of the principal amount of the Secured Notes (the "**Consenting Second Lien Creditors**"), and certain Unsecured Noteholders holding approximately 68% in principal amount of the Unsecured Notes (the "**Consenting Senior Unsecured Creditors**" and together with the Consenting Second Lien Creditors, the "**Consenting Creditors**") entered into the *Amended and Restated Restructuring Support Agreement* dated as of October 11, 2017 and amended on November 28, 2017 (as may be further amended, restated, or modified, the "**Restructuring Support Agreement**"), a copy of which is annexed hereto as **<u>Exhibit E</u>**. The Restructuring Support Agreement provides that the Consenting Creditors will support the Plan and the restructuring transactions contemplated thereby, subject to the terms and provisions of the

Restructuring Support Agreement.  In addition, in the Restructuring Support Agreement, the Debtors have agreed to move forward expeditiously with confirmation and consummation of the Plan, and to be subject to certain milestones which, if not achieved, enable the Consenting Creditors to terminate the Restructuring Support Agreement.  The relevant milestones to be achieved include: (a) entry of the Confirmation Order by no later than January 30, 2018 and (b) the occurrence of the Effective Date under the Plan by no later than the 25th day after entry of the Confirmation Order.

### 2.    Backstop Commitment Agreement

Contemporaneously with the execution of the Restructuring Support Agreement, the Debtors, the Consenting Second Lien Creditors, and the Backstop Parties (that are comprised of the Consenting Senior Unsecured Creditors) entered into the Backstop Commitment Agreement.

On December 1, 2017, the Bankruptcy Court entered an Order authorizing and approving the Backstop Commitment Agreement (ECF No. 1886), a copy of which is annexed hereto as **Exhibit D**.  The Backstop Commitment Agreement generally provides as follows:

- The Backstop Parties commit to (a) exercise rights to purchase 40% of the New Permian Corp. Shares to be issued pursuant to the Plan, and (b) backstop the purchase of the remaining 60% of the New Permian Corp. Shares to be issued pursuant to the Plan and the Rights Offering.

- In consideration of the foregoing, the Backstop Parties will receive a share of the Put Option Premium of 10% of the aggregate number of New Permian Corp. Shares issued on the Effective Date, which will be subject to dilution by New Permian Corp. Shares issued pursuant to Section 4.5(c) and 4.6 of the Plan.

- The Backstop Parties will be entitled to have all of their reasonable fees and expenses paid by the Debtors, including the reasonable fees and expenses of their attorneys and advisors.

- The Backstop Parties will be entitled to a break-up premium equal to $38.75 million payable in cash under certain circumstances if the Backstop Commitment Agreement is terminated.  Payment of such break-up premium will only be made after all claims held by the Second Lien Noteholders are paid in full in cash.

The Backstop Parties have the right to terminate the Backstop Commitment Agreement under certain circumstances, including if the Debtors breach the covenants contained therein or fail to meet certain milestones toward confirmation and consummation of the Plan, and including if the Debtors terminate based on the pursuit of an alternative transaction consistent with the exercise of their fiduciary duties.

### E.    Summary of Plan Classification and Treatment of Claims and Interests

The following table provides a summary of the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan.

| Class and Designation | Impairment and Entitlement to Vote | Treatment under the Plan | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| (Administrative Expenses Excluding Professional Fee Claims) | N/A | Paid in full in cash. | Estimated Allowed Amount: $72,500,000[6]<br><br>Estimated Percentage Recovery: 100% |
| (Professional Fee Claims) | N/A | Paid in full in cash. | Estimated Allowed Amount: $41,000,000<br><br>Estimated Percentage Recovery: 100% |
| (DIP Facility Claims) | N/A | Paid in full in cash. | Estimated Allowed Amount: $63,600,000<br><br>Estimated Percentage Recovery: 100% |
| (Priority Tax Claims) | N/A | Paid in full in cash. | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: N/A |
| 1 (Priority Non-Tax Claims) | Unimpaired<br><br>(**Not entitled** to vote because deemed to accept) | Each holder of an Allowed Priority Non-Tax Claim shall receive, in full satisfaction of such Claim, at the option of the Debtors, with the consent of the Requisite Consenting Second Lien Creditors:  (a) Cash in an amount equal to the Allowed amount of such Claim, or (b) other treatment consistent with section 1129(a)(9) of the Bankruptcy Code; *provided*, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business, shall be paid in the ordinary course of business. | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: N/A |
| 2 (Other Secured Claims) | Unimpaired<br><br>(**Not entitled** to vote because deemed to accept) | Each holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors, with the consent of the Requisite Consenting Second Lien Creditors, and, to the extent that such treatment adversely affects the Exit Facility, the Exit Facility Agent, and in full satisfaction of such Claim, either (a) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Other Secured Claim, (b) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Other Secured Claim is entitled, | Estimated Allowed Amount: $700,000<br><br>Estimated Percentage Recovery: 100% |

---

[6] These Administrative Expenses comprise principally liabilities incurred in the ordinary course of business, and such liabilities will be paid in the ordinary course of business in accordance with their terms.  The estimate does not include amounts payable pursuant to the Backstop Commitment Agreement.

| Class and Designation | Impairment and Entitlement to Vote | Treatment under the Plan | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| | | or (c) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code. In the event an Other Secured Claim against any of the Debtors is treated under clause (a), the liens securing such Other Secured Claim shall be deemed released immediately upon payment. | |
| 3 (Revolving Credit Facility Claims) | Impaired (**Entitled** to vote) | The Revolving Credit Facility Claims shall be deemed Allowed in the amount of $747,316,435.62, plus such amounts as may be owing for any other outstanding "Obligations" (as such term is defined in the Revolving Credit Agreement).<br><br>Each holder of an Allowed Revolving Credit Facility Claim shall receive: (a) Cash in an amount equal to such holder's Pro Rata share of the Allowed Revolving Credit Facility Claims minus the original principal amount of the Exit Facility on the Effective Date of $400 million, and (b) such holder's Pro Rata share of the Exit Facility. | Estimated Allowed Amount: $747,316,435.62<br><br>Estimated Percentage Recovery: 100% |
| 4 (Secured Notes Claims) | Impaired (**Entitled** to vote) | The Secured Notes Claims shall be deemed Allowed solely for purposes of the Plan in the amount of $793,300,000 plus accrued unpaid pre and postpetition default interest on all outstanding obligations, costs, fees, indemnities, and all other obligations payable under the Secured Notes Indenture.<br><br>Each holder of an Allowed Secured Notes Claim that is a Certified Holder, shall receive, in accordance with the Restructuring Transactions, its Pro Rata share of 92.5% of the LegacyCo Units, which may be subject to dilution by the LegacyCo Management Incentive Plan. | Estimated Allowed Amount: $838 million to $949 million[7]<br><br>Estimated Percentage Recovery: 84% to 75%% |
| 5A/5B (Unsecured Notes Claims)<br><br>Class 5A (Eligible Offerees) | Impaired (**Entitled** to vote) | The 7.875% Unsecured Notes Claims shall be deemed Allowed in the aggregate principal amount outstanding as of the Petition Date plus all accrued and unpaid interest as of the Petition Date. The 8.625% Unsecured Notes Claims shall be deemed Allowed in the aggregate principal amount outstanding as of the Petition Date plus all accrued and unpaid interest as of the Petition Date.<br><br>Class 5A: Each holder of an Allowed Unsecured Notes Claim that is an Eligible Offeree as of the Rights Offering Record Date shall receive, in accordance with the Rights Offering and the Rights Offering Procedures, the right to participate in the Rights Offering; *provided that*, any Eligible Offeree that is not a Backstop Party and has elected to participate in the Rights Offering on or before December 13, 2017 in accordance with the Early Election Procedures, will receive on the Effective Date their Pro Rata share (based on the respective Backstop Commitment | Estimated Allowed Amount of 7.785% Unsecured Notes Claims: $889,046,875.00<br><br>Estimated Allowed Amount of 8.625% Unsecured Notes Claims: $320,345,312.50<br><br>Recovery for Eligible Offerees: Right to subscribe in Rights Offering |

---

[7] These amounts are estimates with a range based on an unresolved dispute as to the appropriate allowed amount of postpetition interest. If the Plan is not confirmed or the Effective Date does not occur, these amounts are not binding and will be without prejudice to the rights of all parties as to the allowed amount of the Secured Notes Claims.

| Class and Designation | Impairment and Entitlement to Vote | Treatment under the Plan | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| Class 5B (non-Eligible Offerees) | | Amounts (which includes the amounts committed in the Minimum Allocation Rights and the Rights Offering) of the Backstop Parties and the respective subscription amounts as to the rights exercised by Eligible Offerees by December 13, 2017) of the Put Option Premium.  Any holder of an Allowed Unsecured Notes Claim that is an Eligible Offeree and elects not to participate in the Rights Offering shall receive no distribution whatsoever on account of its Allowed Unsecured Notes Claim; *provided, that*, if the Plan is subsequently amended at any time to provide for a consensual distribution to holders of Existing BBEP Equity Interests, then such holders shall receive a distribution in the amount agreed upon among the Debtors, the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties, and the Creditors' Committee that is no less favorable than any distribution to holders of Existing BBEP Equity Interests.<br><br>Class 5B:  Each holder of an Allowed Unsecured Notes Claim as of the Rights Offering Record Date that certifies, to the reasonable satisfaction of the Debtors in consultation with the Requisite Commitment Parties and the Creditors' Committee, and subject to the rights of the Requisite Commitment Parties under Section 7.D of the Rights Offering Procedures, that it is not an Eligible Offeree shall receive through the AUNC Trust a number of shares of New Permian Corp. Shares having a value, based on the Permian Stock Value, equal to 4.5% of its Allowed Unsecured Notes Claim (a "**Receiving AUNC Holder**").  Notwithstanding the foregoing, any Receiving AUNC Holder shall have the option to elect on the Ballot to receive instead Cash in the amount of 4.5% of its Allowed Unsecured Notes Claim with respect to any Senior Unsecured Notes held by it that have been held only by an Entity that is not an Eligible Offeree during the period from and after the Rights Offering Record Date through the Effective Date; *provided, that*, the sum of (a) the aggregate value of New Permian Corp. Shares distributed to the Receiving AUNC Holders and (b) the aggregate amount of Cash distributed to those Receiving AUNC Holders electing to receive Cash as provided here, shall not exceed $5,422,265 (the "**AUNC Cap**"), and to the extent that the AUNC Cap would otherwise be exceeded by the distribution to those receiving New Permian Corp. Shares and Cash, each shall be reduced ratably to eliminate such excess.<br><br>If a holder of an Allowed Unsecured Notes Claim that is not an Eligible Offeree does not comply with the requirements set forth in the Rights Offering Procedures, then such holder of an Allowed Unsecured Notes Claim shall be deemed to have forever and irrevocably relinquished and waived the right to receive a distribution under the Plan.<br><br>* * * * *<br><br>In addition to the foregoing, there shall be a Cash distribution on the Initial Distribution Date to Class 5A and 5B (the "**Additional** | Estimated Percentage Recovery for non-Eligible Offerees: 4.5% |

| Class and Designation | Impairment and Entitlement to Vote | Treatment under the Plan | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| | | **Cash Distribution**") in an amount equal to the Unsecured Notes Indenture Trustee's reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases, not to exceed $1,050,000 as to both Class 5A and 5B, subject to the terms and provisions of Section 4.5(d) of the Plan.

For the avoidance of doubt, holders of Class 5A or Class B Unsecured Notes Claims shall not have any right to receive (or elect to receive) any recovery provided for Class 6 General Unsecured Claims in the Plan. | |
| 6 (General Unsecured Claims) | Impaired (**Entitled** to vote) | Each holder of an Allowed General Unsecured Claim shall receive, on the Initial Distribution Date and Final Distribution Date, in full satisfaction of such Claim, its Pro Rata share of $1.5 million in cash payable from general accounts (the "**GUC Cash Pool**"), with such Pro Rata share to be calculated taking into account any Claims in Class 6 that receive New Permian Corp. Shares as provided below; *provided, that*, any holder of an Allowed General Unsecured Claim in Class 6 with an Allowed Claim equal to or more than $1 million who is able to hold New Permian Corp. Shares through the facilities of DTC shall have the right to elect on its Ballot to receive on the Initial Distribution Date and Final Distribution Date a distribution of New Permian Corp. Shares through DTC having a value, based on the Permian Stock Value, equal to 4.5% of its Allowed General Unsecured Claim (any such electing holder, a "**Receiving GUC Holder**"); *provided, further, that* the aggregate amount of such New Permian Corp. Shares distributed to Receiving GUC Holders shall not exceed in the aggregate New Permian Corp. Shares having a Permian Stock Value of $817,240 (the "**GUC Stock Cap**"). To the extent that the New Permian Corp. Shares that would otherwise be issued to such holders exceeds the GUC Stock Cap, the distribution of such shares shall be reduced ratably to eliminate such excess.

The amount of Cash from the GUC Cash Pool that otherwise would have been distributed to any such holder of an Allowed General Unsecured Claim that elects to receive New Permian Corp. Shares shall be distributed to New Permian Corp. | Estimated Allowed Amount: $21,500,000

Estimated Percentage Recovery:[8] 6.98% |

---

[8] Assumes that the claimant in Class 6 is not a Receiving GUC Holder. The estimated percentage recovery for a Receiving GUC Holder that elects to receive New Permian Corp. Shares, instead of receiving a distribution from the GUC Cash Pool, is 4.5%.

| Class and Designation | Impairment and Entitlement to Vote | Treatment under the Plan | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 7A (Ongoing Trade Claims of LegacyCo) | Unimpaired<br><br>(**Not entitled** to vote because deemed to accept) | Each holder of an Allowed Ongoing Trade Claim of LegacyCo shall receive Cash in an amount equal to such Allowed Ongoing Trade Claim of LegacyCo. | Estimated Allowed Amount: $5,200,000<br><br>Estimated Percentage Recovery: 100% |
| 7B (Ongoing Trade Claims of New Permian Corp.) | Unimpaired<br><br>(**Not entitled** to vote because deemed to accept) | Each holder of an Allowed Ongoing Trade Claim of New Permian Corp. shall receive Cash in an amount equal to such Allowed Ongoing Trade Claim of New Permian Corp. | Estimated Allowed Amount: $150,000<br><br>Estimated Percentage Recovery: 100% |
| 8 (Intercompany Claims) | Unimpaired<br><br>(**Not entitled** to vote because deemed to accept) | All Allowed Intercompany Claims shall either be (a) canceled (or otherwise eliminated) and receive no distribution under the Plan or (b) Reinstated. | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: 0% / 100% |
| 9 (Subordinated Claims) | Impaired<br><br>(**Not entitled** to vote because deemed to reject) | Subordinated Claims are subordinated pursuant to the Plan and section 510 of the Bankruptcy Code. The holders of Subordinated Claims shall not receive or retain any property under the Plan. | Estimated Allowed Amount: $0<br><br>Estimated Percentage Recovery: N/A |
| 10 (Intercompany Interests) | Unimpaired<br><br>(**Not entitled** to vote because deemed to accept) | All Allowed Intercompany Interests shall either be (a) canceled (or otherwise eliminated) and receive no distribution under the Plan or (b) Reinstated. | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% / 100% |
| 11 (Existing BBEP Equity Interests) | Impaired<br><br>(**Not entitled** to vote because deemed to reject) | On the Effective Date, all Existing BBEP Equity Interests shall be canceled and all holders of Existing BBEP Equity Interests shall not receive or retain any property under the Plan. | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: 0% |

## F.    Disclosure Statement Enclosures

The following three enclosures accompany this Disclosure Statement:

13

1. **Disclosure Statement Approval Order**.  A copy of the Disclosure Statement Approval Order, without exhibits which, among other things, approves this Disclosure Statement, establishes procedures for voting on the Plan (the "**Voting Procedures**"), and schedules the Confirmation Hearing and the deadline for objecting to confirmation of the Plan.

2. **Confirmation Hearing Notice**.  A copy of the notice of the Voting Deadline and, among other things, notice of the date, time, and place of the Confirmation Hearing and the deadline for filing objections to confirmation of the Plan (the "**Confirmation Hearing Notice**").

3. **Ballots.**  One or more Ballots (and return envelopes) for voting to accept or reject the Plan unless you are not entitled to vote because you are (a) not impaired under the Plan and are presumed to accept the Plan, (b) deemed to reject the Plan, or (c) a holder of a Claim subject to an objection filed by the Debtors, which Claim is temporarily disallowed for voting purposes.  See Section VIII of this Disclosure Statement for an explanation of which parties are entitled to vote and a description of the Voting Procedures.

### G.    Inquiries

If you have any questions about the packet of materials you have received, please contact Prime Clerk LLC, the Debtors' voting agent (the "**Voting Agent**"), at 1-855-851-7887 (domestic toll-free) or 1-917-258-6103 (international).  Additional copies of this Disclosure Statement, the Plan, or the Plan Supplement are available upon written request made to the Voting Agent at the following address:

<div align="center">

Breitburn Energy Partners LP
c/o Prime Clerk, LLC
830 Third Avenue, 3rd Floor
New York, NY 10022

</div>

Copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed) are also available on the Voting Agent's website, http://cases.primeclerk.com/breitburn. PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

<div align="center">

**II.**
**OVERVIEW OF THE DEBTORS' OPERATIONS**

</div>

### A.    The Debtors' Corporate Structure

BBEP was formed in 2006 after its predecessor, Breitburn Energy Company, determined that a portion of the company would go public as a master limited partnership.  BBEP successfully completed its initial public offering in October 2006, listing as "BBEP" on the NASDAQ exchange.  On May 16, 2016, the Listing Qualifications Department of The Nasdaq Stock Market LLC notified BBEP of its determination to delist BBEP's common units from the NASDAQ exchange.  On June 10, 2016, NASDAQ filed a Form 25-NSE with the SEC to remove BBEP's securities from listing and registration on NASDAQ.

The organizational structure of the Debtors as of the Petition Date is set forth below:

<div align="center">

14

</div>



## B.    The Debtors' Business Operations

The Debtors are an independent oil and gas partnership engaged in the acquisition, exploitation and development in the United States of oil and natural gas properties, midstream assets,[9] and a combination of ethane, propane, butane, and natural gasolines that when removed from natural gas become liquid under various levels of higher pressure and lower temperature ("**NGL**").  The Debtors conduct their operations through BBEP's wholly-owned subsidiary, Breitburn Operating LP (BOLP), and BOLP's general partner, Breitburn Operating GP LLC (BOGP).

The Debtors' assets consist primarily of producing and non-producing oil, NGL, and natural gas reserves located in seven producing areas:

1)  **Midwest (Michigan, Indiana, and Kentucky)**:  As of December 31, 2016, Midwest properties approximated 20% of the Debtors' total estimated proved reserves.  The Antrim Shale underlies the Midwest properties and tends to produce relatively predictable amounts of natural gas, with an average expected life of greater than 14 years.  Growth opportunities for the Antrim Shale include infill drilling and recompletions, horizontal drilling, and bolt-on acquisitions.  Non-Antrim Shale interests include the Prairie du Chien, Richfield, Detroit River Zone III and Niagaran pinnacle reefs.

---

[9] The term "midstream assets" refers to transmission and gathering pipelines, gas processing plants, NGL recovery plants, a controlling interest in a salt water disposal company and the 120-mile Transpecto Pipeline.

2) **Ark-La-Tex (Arkansas, Louisiana, and East Texas):**  As of December 31, 2016, the Ark-La-Tex properties approximated 17% of the Debtors' total estimated proved reserves.   The Ark-La-Tex area includes properties located in southern Arkansas, northern Louisiana and eastern Texas. These properties produce from formations including the Cotton Valley Sand, Haynesville Sand, Woodbine Sand and Smackover Carbonate.

3) **Permian Basin**:  As of December 31, 2016, the Permian Basin properties approximated 22% of the Debtors' total estimated proved reserves.  The Permian Basin properties are primarily located in the southern Midland Basin and Eastern Shelf in Texas and New Mexico.

4) **Other Operating Regions:**   The following table summarizes the Debtors' other operating regions, which as of December 31, 2016 comprise the remaining 41% of the Debtors' total estimated proved reserves.

| Operating Region | Description | Average Daily Production in 2016 (Boe/d) | Percentage of Total Estimated Proved Reserves |
|---|---|---|---|
| Mid-Continent | Properties located in western Oklahoma, southwestern Kansas and the Texas Panhandle.  These properties produce from regionally significant geologic formations such as the Cottage Grove, Morrow, Atoka, Redfork and Lansing. | 5,881 | 15% |
| Rockies | Properties in the Powder River Basin in eastern Wyoming and Wind River and Big Horn Basins in central Wyoming and natural gas properties in the Evanston and Green River Basins in southwestern Wyoming. The Debtors also own non-operated producing assets in Weld County, Colorado. | 5,874 | 12% |
| Southeast | Significant holdings in two major geologic trends, the Sunniland trend in southwest Florida and the Jay trend in the northwest Florida Panhandle.  These properties produce from the Cretaceous formations of the South Florida Basin and the Smackover Carbonate formation, respectively. | 4,769 | 7% |
| California | Several large, complex oil fields within the Los Angeles Basin.   The Debtors also operate oil properties in the San Joaquin Basin in Kern County, California. | 4,149 | 7% |

The Debtors generally do not hold 100% of the interests in any real property in which they have interests.   The Debtors and the other interest holders usually enter into joint operating agreements to govern the parties' responsibilities with respect to the land, including which party will be responsible for the exploration and production of the oil and gas thereon.   As of December 31, 2016, the Debtors operate or have working interests in approximately 11,900 gross operating oil and gas wells, and approximately 8,000 net oil and gas wells.  The Debtors own interests in approximately 623,000 net acres and had estimated proved reserves, as of December 31, 2016, of 205.3 million barrels of oil equivalent of which approximately 55% was oil, 9% was NGLs, and 36% was natural gas.  The Debtors maintain operational control over approximately

89% of their proved reserves.  The Debtors' production in 2016 was 18.3 million barrels of oil equivalent, of which approximately 52% was oil, 11% was NGLs, and 37% was natural gas.

Before the Petition Date, the Debtors' long-term business strategy had consistently been to manage their oil, NGL, and natural gas producing properties for the purpose of generating cash flow and making distributions to their economic stakeholders.  The Debtors' core investment strategy included the following principles:

- Acquire long-lived assets with low-risk exploitation and development opportunities;

- Optimize reserve recovery by using technical expertise and state-of-the-art technologies;

- Reduce cash flow volatility through commodity price and interest rate derivatives; and

- Maximize asset value and distributable cash flow through operating expertise.

In particular, the strategic selection of the right oil and gas acquisitions was a focal point of the Debtors' business strategy before the severe oil and gas price decline that began at the end of 2014 and that adversely affected the entire industry.

The Debtors manage their assets and perform other administrative services, such as accounting, corporate development, finance, land administration, legal, and engineering through BBEP's wholly-owned subsidiary, Breitburn Management Company LLC (BMC).  As the operator, BMC designs and manages the development of wells and supervises operation and maintenance activities on a day-to-day basis.  BMC does not own any drilling rigs or other oil field services equipment used for drilling or maintaining wells on properties that it operates.  Instead, BMC employs independent contractors to provide all the equipment and personnel associated with these activities.  In addition to independent contractors, the Debtors' work force includes, as of December 31, 2016, 671 employees.  All employees are employed by BMC and none of the employees are party to any collective bargaining agreements.

## C.    Prepetition Capital Structure

### 1.    MLP Common and Preferred Units

As of June 30, 2017, BBEP had approximately 213.8 million common units representing limited partnership interests outstanding.  BBEP also had, as of June 30, 2017, 8 million *8.25% Series A Cumulative Redeemable Perpetual Preferred Units* ("**Series A Preferred Units**") outstanding, and 49.6 million *8% Series B Perpetual Convertible Preferred Units* ("**Series B Preferred Units**") outstanding.

### 2.    Indebtedness

The Debtors are composed of entities incorporated or organized in Delaware, Wyoming, California, Michigan, Virginia, and Texas.  All of the Debtors are direct and indirect subsidiaries of BBEP, and together, constitute the issuers or guarantors of the Debtors' funded debt.

As of the Petition Date, the Debtors had approximately $3.1 billion in total outstanding funded debt:

| Debt | Approximate Principal Amount Outstanding ($mm) |
|---|---|
| First Lien Revolving Credit Facility | $1,242[10] |
| 9.25% Senior Secured Second Lien Notes due 2020 | $650 |
| 7.875% Senior Unsecured Notes due 2022 | $850 |
| 8.625% Senior Unsecured Notes due 2020 | $305 |
| **Total Debt** | $3,047 |

The below description of the Debtors' prepetition indebtedness is for informational purposes only and is qualified in its entirety by reference to the specific agreements evidencing the indebtedness.

(a)    Revolving Credit Facility

Prior to the Petition Date, the Debtors were party to the *Third Amended and Restated Credit Agreement*, dated November 19, 2014 (as amended, the "**Revolving Credit Agreement**"), with the Revolving Credit Facility Agent and the Revolving Credit Facility Lenders.  Pursuant to the Revolving Credit Agreement, the Revolving Credit Facility Lenders provided the Debtors with revolving loans and letters of credit (the "**Revolving Credit Facility**").

The obligations under the Revolving Credit Agreement are secured by first priority liens on and security interests in substantially all of the Debtors' property and assets (collectively, the "**Prepetition Collateral**").  As of the Petition Date, approximately $1.25 billion in principal amount was outstanding under the Revolving Credit Facility, including approximately $45.3 million of outstanding but undrawn letters of credit.  As discussed below, the amount outstanding under the Revolving Credit Facility was reduced by the payment of approximately $450 million of hedge proceeds in July 2017, as authorized by an Order of the Bankruptcy Court (ECF No. 1451).

(b)    Secured Notes

On April 8, 2015, the Debtors issued $650 million of 9.25% senior secured second lien notes due 2020 (the "**Secured Notes**") pursuant to an *Indenture* dated April 8, 2015 (as amended, the "**Secured Notes Indenture**"), between BBEP, BOLP, and Breitburn Finance, as issuers, each of the guarantors named therein, and Delaware Trust Company, as successor indenture trustee.  The obligations under the Secured Notes Indenture are secured by liens on the Prepetition Collateral that are junior and subordinate to the liens securing the obligations under the Revolving Credit Agreement.

---

[10] As discussed herein, pursuant to an Order of the Bankruptcy Court (ECF No. 1451), this principal amount has been reduced to approximately $750 million.

(c)    8.625% Unsecured Notes

On October 6, 2010, the Debtors issued 8.625% senior notes due 2020 (the "**8.625% Unsecured Notes**") in an aggregate principal amount of $305 million, pursuant to an *Indenture* dated October 6, 2010 (as amended), between BBEP, Breitburn Finance, each of the other Debtors named therein as guarantors, and Wilmington Trust Company, as successor indenture trustee. As of the Petition Date, the entire principal amount of the 8.625% Unsecured Notes was outstanding. The 8.625% Unsecured Notes are unsecured.

(d)    7.875% Unsecured Notes

On January 13, 2012, the Debtors issued 7.875% senior notes due in 2022 (the "**7.875% Unsecured Notes**" and together with the 8.625% Unsecured Note, the "**Unsecured Notes**") in an aggregate principal amount of $250 million, pursuant to an indenture dated January 13, 2012 (as amended), among BBEP, Breitburn Finance, each of the other Debtors named therein as guarantors, and Wilmington Trust Company, as successor indenture trustee. On September 27, 2012, the Debtors issued an additional $200 million in aggregate principal amount of 7.875% Unsecured Notes. On November 22, 2013, the Debtors issued $400 million in aggregate principal amount of additional 7.875% Unsecured Notes. As of the Petition Date, the entire principal amount of $850 million of the 7.875% Unsecured Notes was outstanding. The 7.875% Unsecured Notes are unsecured and are *pari passu* with the 8.625% Unsecured Notes.

### 3.    Derivative and Hedge Agreements

Because the Debtors' revenues and cash flow are sensitive to oil and natural gas prices, historically and before the Petition Date, BOLP regularly entered into commodity derivative contracts (the "**Hedge Agreements**") intended to achieve more predictable cash flow and to reduce the Debtors' exposure to adverse fluctuations in the price of oil and natural gas. The Debtors maintained the Hedge Agreements for a significant portion of their oil and gas production. Notably, all of the counterparties to the Hedge Agreements were lenders (or affiliates of lenders) under the Revolving Credit Facility. As a consequence of the commencement of the Chapter 11 Cases, all Hedge Agreements were terminated. After such termination, the Debtors were owed approximately $450 million by the applicable Hedge Agreement counterparties. Pursuant to an Order of the Bankruptcy Court dated July 17, 2017 (ECF No. 1451), the Bankruptcy Court authorized the application of such amount to the amounts owed by the Debtors to the hedge counterparties, and thereafter as a dollar-for-dollar reduction of the amounts outstanding under the Revolving Credit Facility. As a result of such application, the outstanding principal amount under the Revolving Credit Facility was reduced to approximately $750 million.

### 4.    Trade Payables

In the ordinary course of their business, the Debtors incur trade debt with numerous vendors in connection with their operations. The Debtors estimate that as of the Petition Date their outstanding trade payables total approximately $50 million.

### D. Events Leading to Commencement of the Chapter 11 Cases

#### 1. The Oil and Gas Industry Experiences Fundamental Changes

Since early 2014, the persistent and severely distressed market conditions in the oil and gas industry have negatively impacted all levels of the industry, with a particularly adverse impact on upstream companies that produce oil and gas. Notably, natural gas prices were depressed for a significant period of time and the precipitous decline in crude oil prices since 2014 was virtually unprecedented, with prices well below what anyone in the business could have reasonably anticipated, and resulted in a substantial decline in revenue, reserves, and asset values across the spectrum.

For example, in 2016, the West Texas Intermediate ("**WTI**") spot price averaged approximately $43 per barrel ("**Bbl**"), compared with approximately $48 per Bbl in 2015 and $93 per Bbl in 2014. During 2016, the WTI monthly average ranged from a monthly average low of $30 per Bbl in January and a monthly average high of $52 per Bbl in December. Historically, there has been a strong relationship between changes in NGL and crude oil prices. NGL prices are correlated to North American supply and petrochemical demands. Lower crude oil prices not only decrease revenues, but may also reduce the amount of crude oil that can be produced economically and therefore lower crude oil reserves.

The following chart sets forth the WTI crude oil spot pricing historical data from January 2014 to October 10, 2017.



#### 2. Stabilization Efforts

The Debtors were not immune to these severely adverse market conditions and its impact on their reserves, cash flow, borrowing capacity, and ability to service their outstanding indebtedness. Consequently, commencing in 2015, the Debtors took significant efforts to respond to this crisis by initiating a series of financial and operational actions set forth below:

- In January 2015, the Debtors reduced distributions to common unitholders by 52% from $2.08 per unit to $1.00 per unit on an annualized basis.

- In April 2015, the Debtors raised approximately $1 billion by issuing the Secured Notes and Series B Preferred Units, the net proceeds of which were used to repay borrowings under the Revolving Credit Facility. The Debtors also further reduced their distributions to common unitholders by another 50%, from $1.00 per unit to $0.50 per unit on an annualized basis.

- In connection with the April 2015 capital raise, the Debtors negotiated a redetermination of their borrowing base to $1.8 billion under the Revolving Credit Facility for one year, which provided stable liquidity in 2015.

- The Debtors reduced their general, administrative, and technical workforce in 2015 by over 60 positions through a combination of a workforce reduction plan, resignations, and early retirements. The Debtors also reduced their general, administrative and technical workforce by an additional 20% in 2016.

- The Debtors significantly reduced their capital spending, focusing primarily on drilling and rate-generating projects and carbon dioxide purchases that are designed to increase either production or reserves.

- In November 2015, the Debtors suspended the payment of distributions on their common units, which preserved approximately $9 million per month in cash expenditures.

### 3.    Prepetition Restructuring Efforts

Despite these efforts, however, and the moderate increase in crude oil prices in the weeks before the Petition Date, the Debtors' revenue and cash flow generating capacity was insufficient to service their outstanding debt on a long-term basis and to maintain the liquidity necessary to operate their business and preserve their long-term viability and enterprise value.

In view of the circumstances and the inevitable reduction of their borrowing base under the Revolving Credit Agreement, the Debtors focused their attention and resources on preserving liquidity and developing a strategy to implement a comprehensive restructuring that would right-size their balance sheet and maximize value for their economic stakeholders. In furtherance of this effort, commencing April 2016, the Debtors initiated preliminary discussions with the Revolving Credit Facility Agent and the Second Lien Noteholders with respect to a significant deleveraging transaction and also started discussions with advisors retained by an ad hoc group of holders of both series of the Unsecured Notes.

On April 15, 2016, an aggregate of approximately $46.7 million in interest payments became due and payable on the Unsecured Notes. Pursuant to the provisions of the indentures governing the Unsecured Notes, there was a 30-day grace period for the payment of interest before an event of default matured thereunder – that grace period expired on May 16, 2016. To preserve their liquidity while pursuing restructuring negotiations, the Debtors elected not to pay the interest on April 15, 2016 and to take advantage of the grace period.

Although the Debtors' discussions and negotiations with their several creditor constituencies were productive, it became clear that the negotiations could not be concluded and an appropriate

restructuring consummated on an out-of-court basis in a timeframe that would assure the Debtors' ongoing access to sufficient liquidity to operate their business. The need for liquidity was particularly urgent because of the imminent expiration of the grace period to pay interest on the Unsecured Notes, the cross-defaults to other indebtedness that would ensue, the resultant inability to borrow under the Revolving Credit Facility, and the risk of precipitous remedial action on the Debtors' hedging assets, among other things, that could have a significant adverse impact on the Debtors' ongoing operations with the attendant severe impairment of value. Under the circumstances, the Debtors had no reasonable alternative but to seek relief under chapter 11.

<div align="center">

**III.**
**OVERVIEW OF THE CHAPTER 11 CASES**

</div>

### A.   Commencement of Chapter 11 Cases

On May 15, 2016, the Debtors commenced the Chapter 11 Cases. The Debtors believed that the chapter 11 process would not only assure the Debtors' continued access to sufficient liquidity necessary to maximize enterprise value but would also provide a forum to continue the restructuring negotiations in an atmosphere most conducive to achieving a successful result. The Debtors continue managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.   First Day Motions

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11 (the "**First Day Motions**"). The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Continue paying employee wages and benefits;

- Continue the use of the Debtors' cash management system, bank accounts, and business forms;

- Continue insurance programs and the processing of workers' compensation Claims;

- Continue the Debtors' surety bond program;

- Pay certain prepetition taxes and assessments;

- Pay certain royalty interests;

- Pay certain joint interest billings, operating expenses, and shipping and delivery charges;

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service; and

<div align="center">22</div>

- Obtain senior secured superpriority financing and use cash collateral.

## C.    Procedural Motions

Throughout the Chapter 11 Cases, the Bankruptcy Court has entered various orders regarding procedural issues common to chapter 11 cases of similar size and complexity, including orders authorizing and establishing procedures for *de minimis* asset transactions (ECF No. 602), authorizing the Debtors to employ professionals used in the ordinary course of business (ECF No. 297), and establishing procedures for the interim compensation and reimbursement of expenses of professionals (ECF No. 132).

## D.    Appointment of Creditors' Committee

On May 26, 2016, the Creditors' Committee was appointed by the Office of the United States Trustee for Region 2 (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases.  The initial members of the Creditors' Committee were Ares Special Situations Fund IV, L.P. ("**Ares**"), BPC UKI LP ("**BPC**"), and Wexford Spectrum Investors, LLC ("**Wexford**").  Ares, Wexford, and BPC have resigned from the Creditors' Committee.  On October 6, 2017, the U.S. Trustee appointed Transpetco Transport Co. and Wilmington Trust Company (which previously served *ex officio*) to the Creditors' Committee.  On October 30, 2017, the U.S. Trustee appointed Ronald Jay Lichtman to the Creditors' Committee.

The Creditors' Committee retained Milbank, Tweed, Hadley & McCloy LLP as its attorneys; Houlihan Lokey Capital, Inc. as its investment banker; Berkeley Research Group, LLC as its financial adviser; Prime Clerk LLC as its information agent; Porter Hedges LLP as special counsel; and Quinn Emanuel Urquhart & Sullivan LLP as conflicts counsel.

## E.    Appointment of Equity Committee

On November 15, 2016, the Official Committee of Equity Security Holders (the "**Equity Committee**") was appointed by the U.S. Trustee pursuant to section 1102 of the Bankruptcy Code to represent the interests of the Debtors' preferred and common interest holders in the Chapter 11 Cases.  The Equity Committee currently consists of Andrew M. Parker, Gerald Epling, Jim Lemezis, Robert Menjivar, Rodger R. Stelter (Beneficiary for Rodger R. Stelter 401k), John Myrick, and Ira Wilsker.  The Equity Committee retained Proskauer Rose LLP as its attorneys; Carl Marks & Co. as its financial advisor; and Barchan Advisory Services Ltd. as its engineering consultant.

## F.    Claims Reconciliation Process

On August 23, 2016, the Bankruptcy Court entered an order (the "**Bar Date Order**"), which, among other things, (1) established October 14, 2016 at 5:00 p.m. (the "**Bar Date**") as the deadline for certain persons and entities to file proofs of Claim in the Chapter 11 Cases and (2) approved the form and manner of the Bar Date notice.  The Debtors provided notice of the Bar Date as required by the Bar Date Order.  As of August 31, 2017, approximately 3,100 proofs of Claim had been filed against the Debtors in the aggregate amount of approximately $3.8 billion.

The Debtors continue to review, analyze, reconcile, and file objections to the filed Claims. The Debtors have identified many Claims they believe should be disallowed because they are, among other things, duplicative, without merit, overstated, or have already been paid pursuant to Orders of the Bankruptcy Court. Accordingly, the Debtors have filed 25 omnibus objections to approximately 2,000 Claims. As of August 31, 2017, the Bankruptcy Court has disallowed approximately $230 million of Claims. Because the process of analyzing and objecting to Claims is ongoing, the amount of disallowed Claims may change significantly in the future.

### G.    Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

The Bankruptcy Court has entered several orders extending the Exclusive Periods. The Exclusive Periods currently remain in effect and may be further extended by the Bankruptcy Court through no later than January 15, 2018.

### H.    Employee Compensation Matters

As of the Petition Date, the Debtors employed approximately 700 employees. The Debtors have historically maintained incentive and compensation programs designed to attract, retain, or incentivize (as appropriate) employees.

On July 27, 2016, the Debtors filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363(b), and 503(c)(3) for Entry of an Order Approving Debtors' Retention and Incentive Programs for Certain Key Employees* (the "**Employee Programs Motion**", ECF No. 309) seeking approval of the Employee Programs (as defined and described in the Employee Programs Motion). In August and September 2016, the Bankruptcy Court entered Orders approving the relief sought in the Employee Programs Motion (ECF Nos. 434 and 548).

On February 1, 2017, the Debtors filed the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363(b), and 503(c)(3) for Entry of an Order Approving Debtors' 2017 Retention and Incentive Programs for Certain Key Employees* (the "**2017 Employee Programs Motion**", ECF No. 992), seeking approval of the 2017 Employee Programs (as defined and described in the 2017 Employee Programs Motion). On March 6, 2017, the Bankruptcy Court entered an Order approving the relief sought in the 2017 Employee Programs Motion (ECF No. 1058).

Both the Employee Programs Motion and the 2017 Employee Programs Motion provided for a retention program for certain key employees, and incentive-based programs for more senior-level employees, including the Debtors' senior management. The incentive payments are tied to customary industry performance metrics measured 50% by oil and gas production and 50% by lease operating expense reductions. All of the programs provide for cash payments.

## I.   Executory Contracts and Unexpired Leases

As of the Petition Date, the Debtors were parties to or held thousands of oil and gas leases and interests in oil and gas leases in numerous forms, including surface leases, subsurface leases, rights of way, easements, real property licenses, royalty interests, net profits interests, overriding royalty interests, and similar agreements (collectively, the "**Oil and Gas Leases**").

By Order dated August 22, 2016, the initial 120-day period for the Debtors to assume, assign, or reject unexpired leases of nonresidential real property was extended through December 12, 2016 (ECF No. 447).  On November 23, 2016, the Debtors filed a motion to assume all unexpired leases of nonresidential real property (including all oil and gas leases) not previously assumed or rejected (ECF No. 765).  On December 13, 2016, the Bankruptcy Court entered an Order granting the Debtors' motion to assume substantially all unexpired nonresidential real property leases not previously assumed or rejected and subject to section 365 of the Bankruptcy Code, including all Oil and Gas Leases (and other than certain federal or tribal oil and gas leases) (ECF No. 838).  Pursuant to a stipulation with the United States government (ECF No. 815), the deadline to assume or reject unexpired leases of nonresidential real property on federal or tribal lands was extended to the date on which the Bankruptcy Court enters an Order confirming the Plan.

During the Chapter 11 Cases, the Debtors have filed motions to reject certain leases of nonresidential real property.  On July 6, 2016, the Debtors filed a motion to reject a certain lease for premises located at 600 Travis Street, Houston Texas, effective as of May 31, 2016 (ECF No. 234).  After the Debtors resolved the landlord's objection (ECF No. 265), the Bankruptcy Court entered an Order approving the rejection on November 30, 2016 (ECF No. 772).  On September 1, 2016, the Debtors filed a motion to, among other things, reject a lease located at 1401 McKinney Street, Houston, Texas (ECF No. 478) and on September 23, 2016, the Bankruptcy Court entered an Order approving, among other things, such rejection (ECF No. 478).

## J.   Second Lien Proof of Claim and Disputes Related Thereto

The Plan incorporates and reflects a global compromise and settlement of issues related to the Debtors' prepetition indebtedness, including certain issues raised in the Chapter 11 Cases as to the aggregate amount of the Allowed Claim held by the Second Lien Noteholders and the enforceability of certain liens securing such claims.

As described in Section II(C)(2)(b), on April 8, 2015, the Debtors closed a private offering of approximately $650 million of Secured Notes.  The Secured Notes are secured by a second priority lien on substantially all of the Debtors' assets, and under the agreements relating to the issuance of the Secured Notes, EIG Redwood Equity Aggregator LP ("**EIG**") was permitted to appoint a seat on the board of Breitburn GP LLC, the general partner of BBEP.  On October 10, 2016, the trustee for the Secured Notes filed proof of claim 1855 (the "**Second Lien Proof of Claim**"), which asserted Secured Notes Claims of approximately $793.3 million, including: (a) $650 million in outstanding principal amount of Secured Notes, (b) unpaid interest on the Secured Notes of approximately $7.5 million, and (c) a make-whole or prepayment premium of approximately $134 million, plus interest on all other Obligations (as defined in the Secured Notes Indenture), fees, costs, and indemnities.

On December 19, 2016, the Creditors' Committee (a) objected to the Second Lien Proof of Claim on the basis that the make-whole claim asserted by the Second Lien Noteholders is not allowable because, among other reasons, the holders of Secured Notes may be reinstated and that it overcompensates the Second Lien Noteholders if they also receive postpetition interest, (b) sought conditional standing to prosecute certain claims relating to certain mortgages securing the Secured Notes on the basis that such mortgages constituted preferential transfers under the Bankruptcy Code or applicable state law, and, therefore, were subject to avoidance; and (c) sought clarification that the stipulations in the final order authorizing the Debtors to obtain postpetition senior secured superpriority financing, authorizing the Debtors' limited use of cash collateral, and granting adequate protection to the prepetition secured parties ("**Final DIP Order**," ECF No. 431) did not apply to estate claims against the Debtors' current or former directors and officers (the "**Standing Motion and Claim Objection**," ECF No. 867).

Various responsive pleadings have been filed to the Standing Motion and Claim Objection by parties in interest, including by the Revolving Credit Facility Agent and the DIP Facility Agent (ECF No. 1082), the Equity Committee (ECF No. 1084), the Secured Notes Indenture Trustee (ECF No. 1085), certain of the Second Lien Noteholders (the "**Second Lien Group's Objection to Standing Motion and Claim Objection**," ECF No. 1083), and the Debtors ("**Debtors' Objections to Standing Motion and Claim Objection**," ECF No. 1086).

In the Second Lien Group's Objection to Standing Motion and Claim Objection, the responding Second Lien Noteholders asserted that the Creditors' Committee claims were meritless, the Creditors' Committee's objection to the Second Lien Proof of Claim was premature, and the Creditors' Committee's request for clarification was untimely.  Specifically, the responding Second Lien Noteholders argued that none of the claims the Creditors' Committee sought conditional standing to pursue had merit: (a) the mortgages the Creditors' Committee sought to avoid as preferential transfers were protected from avoidance under section 546(e) of the Bankruptcy Code as transfers to a financial institution in connection with a securities contract; (b) the transfers were made more than 90 days before the Petition Date; and (c) the Creditors' Committee had offered no basis to support their claim that EIG was an insider of the Debtors at the time of the alleged preference.  The responding Second Lien Noteholders also argued that none of the Creditors' Committee's other claims asserted against the Second Lien Noteholders as a whole had any merit: (a) the Creditors' Committee contended that certain mortgages securing the Second Lien Notes were improperly perfected, but made no effort to identify the allegedly defective mortgages; (b) although the Creditors' Committee had otherwise failed to identify specific liens subject to a defect or what those alleged defects were; and (c) the Creditors' Committee's claim that certain of the Debtors' assets were unencumbered could be resolved by stipulation and not litigation.  Finally, the responding Second Lien Noteholders asserted that the Creditors' Committee's objection to the make-whole claim was premised on contingencies that would be addressed through plan negotiations and confirmation proceedings, and therefore was not ripe for adjudication.

In the Debtors' Objection to Standing Motion and Claim Objection, the Debtors likewise objected to the Standing Motion and Claim Objection, arguing that it was premature. Specifically, the Debtors asserted that the Standing Motion and Claim Objection, by its own admission, was premature because the Creditors' Committee specifically stated that it was not seeking to commence litigation against any defendant at the time.  Even if the Standing Motion

and Claim Objection was not premature, the Debtors argued that the Standing Motion and Claim Objection was meritless: (a) the transactions that the Creditors' Committee sought to unwind were protected under the safe harbor provisions of section 546(e) of the Bankruptcy Code; (b) the mortgages the Creditors' Committee sought to unwind were not granted to "insiders," as that term is defined under section 547 of the Bankruptcy Code; (c) even if EIG could somehow be considered an insider, the mortgages in question constituted a substantially contemporaneous exchange and were therefore not subject to avoidance; (d) the Debtors agreed with the Creditors' Committee that certain of the Debtors' assets were unencumbered, but that the combined value of such unencumbered assets did not exceed $65 million, and litigation was unnecessary to resolve the matters; and (e) the Creditors' Committee's attempt to clarify the scope of the releases provided for in the Final DIP Order was procedurally improper. The Debtors, however, also asserted that certain amounts claimed in the Second Lien Proof of Claim for interest were not allowable.

To date, the Bankruptcy Court has not conducted a hearing on the Standing Motion and Claim Objection, which has been repeatedly adjourned by agreement of the parties, including the Creditors' Committee. No findings of fact or rulings have been issued in connection with the Standing Motion and Claim Objection. After a consideration of the parties' respective positions and arguments, the Debtors continue to believe that the issues and claims raised in the Standing Motion and Claim Objection (other than issues related to postpetition interest) lack merit, which in the Debtors' business judgment would yield no benefit to the estates to pursue.

To avoid the time, expense, and delay associated with the litigation of the claims asserted in the Standing Motion and Claim Objection, the Plan incorporates a compromise and settlement of those matters. More specifically, under the Plan, the Second Lien Noteholders have agreed to accept the distribution of 92.5% of the equity of LegacyCo in full settlement and satisfaction of their claim, which they have asserted, and solely for purposes of the Plan all parties to the Restructuring Support Agreement have agreed, should be allowed in the amount of $793.3 million plus accrued unpaid pre- and postpetition default interest on all outstanding obligations, costs, fees, indemnities, and all other obligations payable under the Secured Notes Indenture.[11] Furthermore, in light of the settlement of disputes among the parties, the Creditors' Committee has agreed that the prosecution of the Standing Motion and Claim Objection will be held in abeyance and that, upon the Effective Date of the Plan, the Standing Motion and Claim Objection will be withdrawn and deemed withdrawn with prejudice.

In view of the cost, expense, and, in particular, the uncertainties attendant to litigation, including evolving applicable law, the Debtors believe that the compromise and settlement embodied in the Plan is reasonable and constitutes a fair, equitable, and appropriate resolution of all claims asserted in the Standing Motion and Claim Objection.

---

[11] If the Plan is not confirmed or the Effective Date does not occur, such allowed amount of the claim asserted by the Second Lien Noteholders will not be binding and will be without prejudice to the rights of all parties as to the allowed amount of the Secured Notes Claims.

### K.    Postpetition Plan Negotiations

During the pendency of the Chapter 11 Cases, the Debtors have engaged in negotiations with a number of parties with respect to a plan of reorganization.

The Debtors initially developed a comprehensive business plan (the "**Original Business Plan**") premised on the ongoing operation and development of all of their assets. However, to fund the Original Business Plan, the Debtors required significant new capital. To that end, commencing in June 2016, the Debtors directly engaged with the Revolving Credit Facility Lenders, the Second Lien Group, and the Creditors' Committee regarding obtaining the financing necessary to fund the Original Business Plan and consummate a plan of reorganization.

Contemporaneously with the negotiations with the Revolving Credit Facility Lenders, the Second Lien Group, and the Creditors' Committee, the Debtors sought financing from alternate sources. In late 2016 and early 2017, the Debtors commenced negotiations with a group of Unsecured Noteholders regarding the potential for a sizeable equity infusion pursuant to a plan of reorganization. These negotiations progressed for a significant period of time and involved substantial due diligence. As a result of, among other things, changes in the composition of the holders of the Unsecured Notes, the commitments to provide the necessary equity capital to pursue this plan formulation did not materialize.

Through mid-2017, the Debtors continued pursuing various options with respect to a plan of reorganization. These pursuits included negotiations with respect to potential plan structures with the Second Lien Group for new capital to be infused by that group. The Debtors also engaged in plan negotiations with the Unsecured Senior Notes Groups that collectively held a majority of the Unsecured Notes, as well as the Creditors' Committee with respect to a plan that contemplated a substantial capital infusion. Those negotiations ended because, among other things, the Unsecured Senior Notes Groups insisted that the plan structure require a "cram up" of the Secured Notes, which the Debtors did not view as confirmable, appropriate, or supportable.

In mid-August 2017, the Unsecured Senior Notes Groups and the Second Lien Group became engaged in direct negotiations regarding a plan of reorganization involving (a) holders of Secured Notes receiving, in satisfaction of their claims, a substantial portion of the equity of LegacyCo that would own the Debtors' assets, other than the Permian Assets, and (b) a new equity infusion through a rights offering, pursuant to which participants would receive 100% of the equity of New Permian Corp. which would own the Permian Assets and the balance of the equity of LegacyCo not distributed to holders of the Secured Notes. The Debtors were advised that the Second Lien Group and the Unsecured Senior Notes Groups were engaged directly and were advised that the groups were working to bridge gaps in their respective positions in an effort to champion a global settlement. The Debtors became directly involved in these negotiations, which resulted in the proposed plans of reorganization previously filed in the Chapter 11 Cases (ECF Nos. 1690 and 1807). After further good faith negotiations and a mediation session, discussed in Section III(M) of this Disclosure Statement, the Debtors and their key creditor constituencies, including the Creditors' Committee, reached an agreement in principle regarding the restructuring embodied in the Plan that is being solicited pursuant to this Disclosure Statement.

**L.    Certain Recent Postpetition Expressions of
Interest for Certain of the Debtors' Assets**

During 2017, certain third parties have submitted the following non-binding expressions of
interest for certain of the Debtors' assets, including certain assets in the Permian Basin that will
be owned by New Permian Corp. pursuant to the Plan.

| Party | Date | Assets Offered to Purchase | Amount of Offer | Material Offer Conditions |
|---|---|---|---|---|
| Diamondback Energy, Inc. | August 29, 2017 | All of Debtors' interests in oil, gas, minerals, and other related assets in Howard, Martin, Midland, and Glasscock Counties, Texas, and all infrastructure relating to or associated with such assets. | $675,000,000 (subject to adjustment based on due diligence) | • Court approval of break-up fee of 2%.<br><br>• Diamondback's obligations subject to its satisfaction, in its sole discretion, as to confirmation of Debtors' title to the Permian Basin assets.<br><br>• Diamondback's obligations subject to various conditions, including the Debtors meeting milestones, the lack of material adverse events before the closing date, negotiation of documentation satisfactory in all respects to Diamondback, and Court approval of stalking horse bid and related protections. |
| Monterey Oil & Gas Corporation | September 5, 2017 | All of the Debtors' assets in California. | $211,032,000 (subject to adjustment based on due diligence) | • Court approval of break-up fee of 5%.<br><br>• If the winning bidder is unable or unwilling to close the transaction, Monterey would receive a right of first refusal to honor its original bid price, or in lieu of honoring its original bid, to receive the 5% breakup fee and reimbursement of expenses.<br><br>• Financial sponsor of Monterey bid to have final approval rights over Monterey's bid. |
| Riverside Energy Michigan LLC | September 19, 2017 | Indicative offer for Michigan Antrim Shale natural gas assets (does not include related oil production properties in Michigan). | $63,500,000 to $70,000,000 (subject to adjustment based on due diligence) | • Riverside will not participate in a competitive bid process, and the offer is automatically withdrawn if the offer is used in any way within a competitive process. |
| Diamondback Energy, Inc. | October 3, 2017 (supersedes prior offer) | All of Debtors' interests in oil, gas, minerals, and other related assets in Howard, Martin, Midland, and Glasscock Counties, Texas, and all infrastructure relating to or associated with such assets. | $725,000,000 (subject to adjustment based on due diligence) | • Court approval of break-up fee of 2%.<br><br>• Offer subject to Diamondback's satisfaction, in its sole discretion, as to confirmation of Debtors' title to the Permian Basin assets.<br><br>• Diamondback's obligations subject to various conditions, including the Debtors meeting milestones, the lack of material adverse events before the closing date, negotiation of documentation satisfactory in all respects to Diamondback, and Court approval of stalking horse bid and related protections. |

### M.    Postpetition Mediation

On November 16, 2017, the Bankruptcy Court entered an order (ECF No. 1830) appointing the Honorable Judge Robert D. Drain to serve as a mediator (the "**Mediator**").  On November 21, 2017, the Debtors, the Revolving First Lien Lenders, the Second Lien Group, the Unsecured Senior Notes Group, the Creditors' Committee, the Unsecured Notes Indenture Trustee, the Equity Committee, and their respective principals and advisors, met in New York for a mediation session with the Mediator.  After good faith negotiations, and with the assistance of the Mediator, the Debtors and their principal creditor constituencies (including the Creditors' Committee) reached an agreement in principle, the terms and provisions of which are embodied in the Plan.  As stated above, the Plan has the support of the Debtors' key creditor constituencies, and the Debtors believe that the Plan is in the best interests of their economic stakeholders.

<div align="center">

IV.
**SUMMARY OF THE PLAN**

</div>

### A.    General

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.  **YOU SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

In general, a chapter 11 plan (1) divides claims and equity interests into separate classes, (2) specifies the consideration that each class is to receive under the plan and (3) contains other provisions necessary to implement the plan.  Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.  Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (1) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in such class or (2) provides, among other things, for the cure of certain existing defaults and reinstatement of the maturity of claims in such class.  Under the Plan, Classes 3, 4, 5A, 5B, 6, 9, and 11, are impaired under the Plan, and holders of Claims or Interests in such Classes are entitled to vote to accept or reject the Plan unless such Classes of Claims or Interests are deemed to reject the Plan or subject to an objection filed by the Debtors.  Ballots are being furnished herewith to all holders of Claims in Classes 3, 4, 5A, 5B, and 6 that are entitled to vote to facilitate their voting to accept or reject the Plan.  Classes 9 and 11 are deemed to reject the Plan and, therefore, Claims or Interests in such Classes will not vote on the Plan.

### B.    Classification of Claims and Interests

### 1.    Classification in General

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, *that* a Claim is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only if such Claim is an Allowed Claim in that Class and such Claim has not been satisfied, released, or otherwise settled before the Effective Date.

<div align="center">

30

</div>

## 2.    Formation of Debtor Groups for Convenience Only

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making distributions in respect of Claims against the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

## 3.    Summary of Classification of Claims and Interests

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (a) Impaired or Unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) deemed to accept or deemed to reject the Plan:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | Revolving Credit Facility Claims | Impaired | Yes |
| 4 | Secured Notes Claims | Impaired | Yes |
| 5A/5B | Unsecured Notes Claims | Impaired | Yes |
| 6 | General Unsecured Claims | Impaired | Yes |
| 7A | Ongoing Trade Claims of LegacyCo | Unimpaired | No (deemed to accept) |
| 7B | Ongoing Trade Claims of New Permian Corp. | Unimpaired | No (deemed to accept) |
| 8 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| 9 | Subordinated Claims | Impaired | No (deemed to reject) |
| 10 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| 11 | Existing BBEP Equity Interests | Impaired | No (deemed to reject) |

## C.    Treatment of Claims and Interests

## 1.    Class 1 – Priority Non-Tax Claims.

Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment of such Claim, which different treatment shall be acceptable to the Requisite

Consenting Second Lien Creditors, on the Effective Date, each holder of an Allowed Priority Non-Tax Claim against any of the Debtors shall receive, in full satisfaction of such Claim, at the option of the Debtors, with the consent of the Requisite Consenting Second Lien Creditors: (a) Cash in an amount equal to the Allowed amount of such Claim, or (b) other treatment consistent with section 1129(a)(9) of the Bankruptcy Code; provided, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business, shall be paid in the ordinary course of business, and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to such transactions without further action by the holders of such Priority Non-Tax Claims or further approval by the Bankruptcy Court.

### 2.    Class 2 – Other Secured Claims.

Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment of such Claim, which different treatment shall be acceptable to the Requisite Consenting Second Lien Creditors and, to the extent that such different treatment adversely affects the Exit Facility, the Exit Facility Agent, each holder of an Allowed Other Secured Claim against any of the Debtors shall receive, at the option of the Debtors, with the consent of the Requisite Consenting Second Lien Creditors and, to the extent that such treatment adversely affects the Exit Facility, the Exit Facility Agent, and in full satisfaction of such Claim, either (a) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Other Secured Claim, (b) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Other Secured Claim is entitled, or (c) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.  In the event an Other Secured Claim against any of the Debtors is treated under clause (a), the liens securing such Other Secured Claim shall be deemed released immediately upon payment.

### 3.    Class 3 – Revolving Credit Facility Claims.

The Revolving Credit Facility Claims shall be deemed Allowed in the amount of $747,316,435.62 with respect to principal and two interest rate derivative obligations plus such amounts as may be owing for any other outstanding "Obligations" (as such term is defined in the Revolving Credit Agreement) thereunder, including any accrued or hereafter accruing and unpaid interest thereon and any additional amounts, charges, fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Revolving Credit Documents) now or hereafter due under the Revolving Credit Documents.

(a)    Each holder of an Allowed Revolving Credit Facility Claim shall receive, on the Effective Date, in full and final satisfaction thereof: (i) Cash in an amount equal to such holder's Pro Rata share of the Allowed Revolving Credit Facility Claims minus the original principal amount of the Exit Facility on the Effective Date of $400 million, and (ii) such holder's Pro Rata share of the Exit Facility; *provided that* all Revolving Credit Facility Claims arising under any "Lender Derivative Contract" (as such term is defined in the Revolving Credit Agreement) shall be indefeasibly paid in full in Cash and shall not be included in the distributions or calculation of Pro Rata share in the immediately preceding clauses (i) and (ii).

(b)      Each holder of an Allowed Revolving Credit Facility Claim shall also have the right pursuant to the Revolver Option and the Revolver Option Procedures to convert all (but not less than all) of its amount of the Exit Facility received pursuant to Section 4.3(a)(ii) of the Plan to an equal amount of a revolving credit facility as provided in the Exit Facility Term Sheet and the Exit Facility Documents.

(c)      LegacyCo shall pay in full in Cash (other than as provided in section (a)(ii) above) all amounts payable with respect to the Revolving Credit Documents as provided in the DIP Facility Order.

### 4.      Class 4 – Secured Notes Claims.

The Secured Notes Claims shall be deemed Allowed solely for purposes of the Plan in the aggregate amount of $793,300,000, plus accrued unpaid pre and postpetition default interest on all outstanding obligations, costs, fees, indemnities, and all other obligations payable under the Secured Notes Indenture.

On the Effective Date, each holder of an Allowed Secured Notes Claim that is a Certified Holder, shall receive, in accordance with the Restructuring Transactions, in full satisfaction of such Claim, its Pro Rata share of 92.5% of the LegacyCo Units, which may be subject to dilution by the LegacyCo Management Incentive Plan.

### 5.      Class 5A/Class 5B – Unsecured Notes Claims.

The 7.875% Unsecured Notes Claims shall be deemed Allowed in the aggregate principal amount outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date.  The 8.625% Unsecured Notes Claims shall be deemed Allowed in the aggregate principal amount outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date.

Class 5A:  Each holder of an Allowed Unsecured Notes Claim that is an Eligible Offeree as of the Rights Offering Record Date, shall receive, in accordance with the Rights Offering and the Rights Offering Procedures, in full satisfaction of such Claim, the right to participate in the Rights Offering; *provided that*, any Eligible Offeree that is not a Backstop Party and has elected to participate in the Rights Offering on or before December 13, 2017 in accordance with the Early Election Procedures, will receive on the Effective Date their Pro Rata share (based on the respective Backstop Commitment Amounts (which includes the amounts committed in the Minimum Allocation Rights and the Rights Offering) of the Backstop Parties and the respective subscription amounts as to the rights exercised by Eligible Offerees by December 13, 2017) of the Put Option Premium.  Any holder of an Allowed Unsecured Notes Claim that is an Eligible Offeree and elects not to participate in the Rights Offering shall receive no distribution whatsoever on account of its Allowed Unsecured Notes Claim; *provided*, *that*, if the Plan is subsequently amended at any time to provide for a consensual distribution to holders of Existing BBEP Equity Interests, then such holders shall receive a distribution in the amount agreed upon among the Debtors, the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties, and the Creditors' Committee that is no less favorable than any distribution to holders of Existing BBEP Equity Interests.

<u>Class 5B</u>:  Each holder of an Allowed Unsecured Notes Claim as of the Rights Offering Record Date that certifies, to the reasonable satisfaction of the Debtors in consultation with the Requisite Commitment Parties and the Creditors' Committee, and subject to the rights of the Requisite Commitment Parties under Section 7.D of the Rights Offering Procedures, that it is not an Eligible Offeree shall receive through the AUNC Trust a number of shares of New Permian Corp. Shares having a value, based on the Permian Stock Value, equal to 4.5% of its Allowed Unsecured Notes Claim.  Notwithstanding the foregoing, any Receiving AUNC Holder shall have the option to elect on the Ballot to receive instead Cash in the amount of 4.5% of its Allowed Unsecured Notes Claim with respect to any Senior Unsecured Notes held by it that have been held only by an Entity that is not an Eligible Offeree during the period from and after the Rights Offering Record Date through the Effective Date; *provided, that*, the sum of (a) the aggregate value of New Permian Corp. Shares distributed to the Receiving AUNC Holders and (b) the aggregate amount of Cash distributed to those Receiving AUNC Holders electing to receive Cash as provided in this paragraph, shall not exceed the AUNC Cap, and to the extent that the AUNC Cap would otherwise be exceeded by the distribution to those receiving New Permian Corp. Shares and Cash, each shall be reduced ratably so as to eliminate such excess.

Any New Permian Corp. Shares issued to a Receiving AUNC Holder shall be issued to the AUNC Trust (as defined in Section 6.20 of the Plan).  New Permian Corp. Shares issued pursuant to Section 4.5(c) of the Plan shall dilute all other New Permian Corp. Shares issued pursuant to the Plan, but are subject to dilution from any New Permian Corp. Shares issued on (other than pursuant to the Plan) or after the Effective Date, including pursuant to the New Permian Corp. Management Incentive Plan or similar arrangement.

If a holder of an Allowed Unsecured Notes Claim that is not an Eligible Offeree does not comply with the requirements set forth in the Rights Offering Procedures, then such holder of an Allowed Unsecured Notes Claim shall be deemed to have forever and irrevocably relinquished and waived the right to receive a distribution under the Plan.

In addition to the foregoing, there shall be the Additional Cash Distribution in an amount equal to the Unsecured Notes Indenture Trustee's reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases, not to exceed $1,050,000 as to both Class 5A and Class 5B; *provided*, *that* (a) the Unsecured Notes Indenture Trustee shall be entitled to exercise its charging lien solely against such Additional Cash Distribution, (b) the Unsecured Notes Indenture Trustee shall, fifteen (15) days prior to the Confirmation Hearing, deliver to the attorneys for the Debtors, the Unsecured Senior Notes Groups, the Second Lien Group, and the Creditors' Committee (the "**Reviewing Parties**") invoices (including an estimate of fees to be incurred thereafter through the Effective Date) which sets forth and documents the reasonable fees and expenses of the Unsecured Notes Indenture Trustee and its counsel and agents, which invoices may be redacted to preserve privilege and/or confidentiality, (c) after delivery of the invoices, the Reviewing Parties shall have five (5) Business Days to review such invoices and raise any objection, in writing, to the reasonableness of the fees and expenses, and (d) if the Unsecured Notes Indenture Trustee and the Reviewing Parties are unable to resolve such an objection on a consensual basis within five (5) Business Days after such written objection has been submitted to the Unsecured Notes Indenture Trustee, then one or more of the Reviewing Parties may file with the Court such objection and the Court shall adjudicate the matter at the Confirmation Hearing; *provided*, *further, that* if the Additional Cash Distribution is less than

$1,050,000 (for any reason), such excess Cash shall be retained by LegacyCo. Under no circumstances shall the aggregate amount of the fees and expenses sought by the Unsecured Notes Indenture Trustee exceed $1,050,000.

For the avoidance of doubt, holders of Class 5A and Class 5B Unsecured Notes Claims shall not have any right to receive (or elect to receive) any recovery provided for Class 6 General Unsecured Claims in the Plan.

### 6.    Class 6 – General Unsecured Claims.

Except to the extent a holder of an Allowed General Unsecured Claim and the Debtors or the Reorganized Debtors, as applicable, agree to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive, on the Initial Distribution Date and Final Distribution Date, as applicable, in full satisfaction of such Claim, its Pro Rata share of the GUC Cash Pool (such Pro Rata share to be calculated taking into account any Claims in Class 6 that receive New Permian Corp. Shares as provided below); *provided*, that, any holder of an Allowed General Unsecured Claim in Class 6 with an Allowed Claim equal to or more than $1 million who is able to hold New Permian Corp. Shares through the facilities of DTC shall have the right to elect on its Ballot to receive on the Initial Distribution Date and Final Distribution Date a distribution of New Permian Corp. Shares through DTC having a value, based on the Permian Stock Value, equal to 4.5% of its Allowed General Unsecured Claim; *provided*, further, that the aggregate amount of such New Permian Corp. Shares distributed to Receiving GUC Holders shall not exceed the GUC Stock Cap. To the extent that the New Permian Corp. Shares that would otherwise be issued under this paragraph exceeds the GUC Stock Cap, the distribution to such holders shall be reduced ratably to eliminate such excess. The amount of Cash from the GUC Cash Pool that otherwise would have been distributed to any such holder of a General Unsecured Claim that elects to receive New Permian Corp. Shares shall be distributed to New Permian Corp.

Any New Permian Corp. Shares issued to holders of Allowed General Unsecured Claims shall be issued through DTC. New Permian Corp. Shares issued pursuant to Section 4.6 of the Plan shall dilute all other New Permian Corp. Shares issued pursuant to the Plan, but are subject to dilution from any New Permian Corp. Shares issued on (other than pursuant to the Plan) or after the Effective Date, including pursuant to the New Permian Corp. Management Incentive Plan or similar arrangement.

### 7.    Class 7A – Ongoing Trade Claims of LegacyCo.

Except to the extent that a holder of an Allowed Ongoing Trade Claim of LegacyCo and the Debtors or Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, with the consent of the Requisite Consenting Second Lien Creditors, agree to less favorable treatment, each holder of an Allowed Ongoing Trade Claim of LegacyCo shall receive Cash from the Rights Offering Proceeds and Minimum Allocation Rights Proceeds in an amount equal to such Allowed Ongoing Trade Claim of LegacyCo on the Effective Date.

To the extent that an Ongoing Trade Claim of LegacyCo: (a) will benefit New Permian Corp. post-Effective Date or benefits Permian Assets (whether before or after the Effective Date) and

(b) will benefit LegacyCo or benefits Legacy Assets (whether before or after the Effective Date), such Ongoing Trade Claim of LegacyCo shall be paid its Cash distribution as a Class 7A Claim and New Permian Corp. shall reimburse LegacyCo for its pro rata share of all such amounts pursuant to the terms of the Transition Services Agreement.

### 8.    Class 7B – Ongoing Trade Claims of New Permian Corp.

Except to the extent that a holder of an Allowed Ongoing Trade Claim of New Permian Corp. and New Permian Corp. with the consent of the Requisite Commitment Parties, agree to less favorable treatment, each holder of an Allowed Ongoing Trade Claim of New Permian Corp. shall receive Cash, payable from the Rights Offering Proceeds and Minimum Allocation Rights Proceeds in an amount equal to such Allowed Ongoing Trade Claim of New Permian Corp. on the Effective Date.

### 9.    Class 8 – Intercompany Claims.

All Allowed Intercompany Claims shall either be (a) canceled (or otherwise eliminated) and receive no distribution under the Plan or (b) Reinstated, in each case as determined by the Debtors or the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, with the consent of the Requisite Consenting Second Lien Creditors.

### 10.    Class 9 – Subordinated Claims.

Subordinated Claims are subordinated pursuant to the Plan and section 510 of the Bankruptcy Code.  The holders of Subordinated Claims shall not receive or retain any property under the Plan on account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

### 11.    Class 10 – Intercompany Interests.

All Allowed Intercompany Interests shall either be (a) canceled (or otherwise eliminated) and receive no distribution under the Plan or (b) Reinstated, in each case as determined by the Debtors or the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, with the consent of the Requisite Consenting Second Lien Creditors.

### 12.    Class 11 – Existing BBEP Equity Interests.

On the Effective Date, all Existing BBEP Equity Interests shall be canceled without further action by or order of the Bankruptcy Court and all holders of Existing BBEP Equity Interests shall not receive or retain any property under the Plan.

### D.    Nonconsensual Confirmation

The Bankruptcy Code permits the Bankruptcy Court to confirm a chapter 11 plan over the dissent of any class of claims or equity interests if the standards in section 1129(b) are met.  This power to confirm a plan over dissenting classes – often referred to as "cram down" – is an important part of the reorganization process.  It assures that no single group (or multiple groups)

36

of Claims or Interests can block a restructuring that otherwise meets the requirements of the Bankruptcy Code and is in the interests of the other constituents in these cases.

As noted above, certain Classes are deemed to reject the Plan and will not vote. Additionally, a voting Class under the Plan may not vote to accept the Plan. The Debtors reserve the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to each dissenting Class.

### E.    Administrative Expenses and Priority Tax Claims

To confirm the Plan, Allowed Administrative Expenses must be paid in full or in a manner otherwise agreeable to the holders of such Claims. Administrative Expenses are the actual and necessary costs and expenses of the Chapter 11 Cases. Those expenses include compensation for individuals working on behalf of the Debtors, amounts owed to vendors providing goods and services during the Chapter 11 Cases, tax obligations incurred after the Petition Date, 503(b)(9) Claims, management costs, and certain statutory fees and expenses. Other Administrative Expenses include the actual, reasonable, necessary, and unpaid fees and expenses of the professionals retained by the Debtors, the Creditors' Committee, and the Equity Committee.

#### 1.    Administrative Expenses

Consistent with the requirements of the Bankruptcy Code, the Plan generally provides for Allowed Administrative Expenses to be paid in full on the Effective Date; *provided however*, Allowed Administrative Expenses against any of the Debtors representing liabilities incurred in the ordinary course by the Debtors, as debtors in possession, or liabilities arising under loans or advances to or other obligations incurred by any of the Debtors, as debtors in possession, regardless of whether incurred in the ordinary course, shall be paid by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) in the ordinary course, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

#### 2.    Professional Fee Claims

Administrative Expenses relating to compensation of the professionals retained by the Debtors, the Creditors' Committee, and the Equity Committee will, unless otherwise agreed by the claimant, be paid after entry of an order allowing such Administrative Expenses from the Professional Fee Escrow Account. Before the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals, and shall be treated as a grantor trust pursuant to Treasury Regulation section 1.671–4(a) for U.S. federal income tax purposes (with the Professionals as the grantors thereof). Such funds shall not be considered property of the estates of the Debtors or the Reorganized Debtors. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order. When all such Allowed amounts owing to Professionals have been paid in full, any remaining amount in the Professional Fee

Escrow Account shall promptly be paid to the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), without any further action or order of the Bankruptcy Court.

### 3.    DIP Facility Claims

In full and final satisfaction, settlement, release, and discharge of, and in exchange for, the Allowed DIP Facility Claims (subject to the last sentence of this paragraph), such Allowed DIP Facility Claims shall be paid in full in Cash by the Debtors on the Effective Date equal to the Allowed amount of such DIP Facility Claims and all commitments under the DIP Facility Documents shall terminate.  Upon the indefeasible payment or satisfaction in full in Cash of the DIP Facility Claims (other than any DIP Facility Claims based on the Debtors' contingent obligations under the DIP Facility Documents for which no claim has been made) in accordance with the terms of the Plan, on the Effective Date, all Liens granted to secure such obligations automatically shall be terminated and of no further force and effect.  The Debtors' contingent or unliquidated obligations under the DIP Facility Documents, to the extent not indefeasibly paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors in a manner acceptable to the DIP Facility Agent, any affected DIP Facility Lender, or any other holder of a DIP Facility Claim, as applicable, shall survive the Effective Date and shall not be released or discharged pursuant to the Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

### 4.    Priority Tax Claims

Except to the extent that LegacyCo and a holder of an Allowed Priority Tax Claim against any of the Debtors agree to a different treatment of such Claim, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, with the consent of the Requisite Consenting Second Lien Creditors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date, or (b) Cash, in equal semi-annual installments commencing on the first (1st) Business Day following the Effective Date (or as soon thereafter as is reasonably practicable after such Claim becomes an Allowed Priority Tax Claim) and continuing over a period not exceeding five (5) years from and after the Petition Date, together with interest accrued thereon at the applicable nonbankruptcy rate, which as to any Allowed Priority Tax Claim of the Internal Revenue Service on behalf of the United States shall be the applicable rate specified by the Tax Code, as of the Confirmation Date, applied pursuant to section 511 of the Bankruptcy Code, subject to the sole option of the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) to prepay the entire amount of the Allowed Priority Tax Claim.  All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on or before the Effective Date shall be paid in the ordinary course as such obligations become due.

### F.    **Means for Implementation and Execution of the Plan**

### 1.    General Settlement of Claims and Interests

The Plan shall be deemed a motion to approve the good-faith compromise and settlement pursuant to which the Debtors, and the holders of Claims against or Interests in the Debtors settle

all Claims, Interests, and Causes of Action pursuant to section 1123 of the Bankruptcy Code and
Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and
other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall
constitute a good faith compromise and settlement of all Claims and Interests and controversies
resolved pursuant to the Plan.  The Confirmation Order shall constitute the Bankruptcy Court's
approval of the compromise, settlement, and release of all such Claims, Interests, and Causes of
Action, as well as a finding by the Bankruptcy Court that all such compromises, settlements, and
releases are mutual and bi-directional and are in the best interests of the Debtors, their estates,
and the holders of Claims, Interests, and Causes of Action, and is fair, equitable, and reasonable.
In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code
and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the
Bankruptcy Court, after the Effective Date, the Reorganized Debtors, as applicable, may
compromise and settle all Claims and Causes of Action against, and Interests in, the Debtors and
their estates.  The compromises, settlements, and releases described herein shall be deemed
nonseverable from each other and from all other terms of the Plan.  Subject to Article V of the
Plan, all distributions made to holders of Allowed Claims in any Class are intended to be and
shall be final.

## 2.    Continued Corporate Existence

Except as otherwise provided in the Plan (including pursuant to the Restructuring Transactions),
the Debtors (other than BBEP) shall continue to exist after the Effective Date as Reorganized
Debtors in accordance with the applicable laws of the respective jurisdictions in which they are
incorporated or organized and pursuant to the New Organizational Documents.  On or after the
Effective Date, without prejudice to the rights of any party to a contract or other agreement with
any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as
permitted by applicable law and such Reorganized Debtor's organizational documents, as such
Reorganized Debtor may determine is reasonable and appropriate, including causing:   (a) a
Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a
Reorganized Debtor; (b) a Reorganized Debtor to be dissolved; (c) the legal name of a
Reorganized Debtor to be changed; or (d) the closure of a Reorganized Debtor's Chapter 11 Case
on the Effective Date or any time thereafter.

On the Effective Date, the Reorganized Debtors may take all actions as may be necessary or
appropriate to effect any transaction described in, approved by, or necessary or appropriate to
effectuate the Plan, including:  (a) the execution and delivery of appropriate agreements or other
documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution,
or liquidation containing terms that are consistent with the terms of the Plan and the Plan
Documents and that satisfy the requirements of applicable law and any other terms to which the
applicable entities may agree; (b) the execution and delivery of appropriate instruments of
transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or
obligation on terms consistent with the terms of the Plan and having other terms to which the
applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation and
amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant
to applicable law; (d) the Restructuring Transactions; and (e) all other actions that the applicable
entities determine to be necessary or appropriate, including making filings or recordings that may
be required by applicable law.

### 3. Authorization, Issuance, and Delivery of LegacyCo Units and New Permian Corp. Shares.

On and after the Effective Date, LegacyCo is authorized to issue, or cause to be issued, and shall issue the LegacyCo Units to BBEP in accordance with the LegacyCo Contribution Agreement for distribution and transfer in accordance with the terms of the Plan, the Exchange Agreement and the Backstop Commitment Agreement without the need for any further corporate, limited liability company, or equity holder action.

On the Effective Date, New Permian LLC is authorized to issue, or cause to be issued, and shall issue the New Permian LLC Equity to BBEP in accordance with the Permian Contribution Agreement, and BBEP is authorized to transfer the New Permian LLC Equity, in accordance with the terms of the Plan, the Exchange Agreement and the Backstop Commitment Agreement without the need for any further corporate, limited liability company, or equity holder action.

On the Effective Date, and in accordance with the Backstop Commitment Agreement, the Rights Offering Procedures, the Restructuring Term Sheet and the Plan, New Permian Corp. shall issue the New Permian Corp. Shares in accordance therewith.

### 4. Cancelation of Existing Securities and Agreements

Except for the purpose of enabling holders of Allowed Claims to receive a distribution under the Plan as provided herein and except as otherwise set forth in the Plan, the Plan Supplement, or the Confirmation Order, on the Effective Date, all 7.875% Unsecured Notes and the 7.875% Unsecured Notes Indenture, all 8.625% Unsecured Notes and the 8.625% Unsecured Notes Indenture, all Secured Notes and the Secured Notes Indenture (in each case, only upon receipt of all the distributions set forth in the Plan on account of Unsecured Notes Claims or Secured Notes Claims, as applicable), and all agreements, instruments, and other documents evidencing any prepetition Claim or Existing BBEP Equity Interest and any rights of any holder in respect thereof shall be deemed canceled, discharged, and of no force or effect. The holders or parties to such canceled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancelation thereof, except the rights provided for pursuant to the Plan.

The Unsecured Notes Indenture Trustee shall be released and discharged from all duties and responsibilities under the respective Unsecured Notes Indentures; *provided*, that notwithstanding the releases at Section 10.9 of the Plan, entry of the Confirmation Order or the occurrence of the Effective Date, each of the Unsecured Notes Indentures and any such Unsecured Notes Indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect to the extent necessary to:  (a) enforce the rights, Claims, and interests of the Unsecured Notes Indenture Trustee thereto vis-a-vis any parties other than the Released Parties; (b) allow the holders of Allowed Unsecured Notes Claims, as applicable, to receive distributions under the Plan, to the extent provided for under the Plan; (c) maintain and exercise the Unsecured Notes Indenture Trustee's respective Charging Liens solely to the extent provided for in Section 4.5(d) of the Plan; (d) appear to be heard in the Chapter 11 Cases or in any proceedings in the Bankruptcy Court or any other court; (e) preserve any rights of the Unsecured Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations from or on any money or

property to be distributed in respect of the Allowed Unsecured Notes Claims; (f) permit the Unsecured Notes Indenture Trustee to seek compensation and reimbursement of any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with the implementation of the Plan; and (g) enforce any obligation owed to the Unsecured Notes Indenture Trustee under the Plan.

The Secured Notes Indenture Trustee shall be released from all duties under the Secured Notes Indenture; *provided*, that notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Secured Notes Indenture shall continue in effect to the extent necessary to:  (a) enforce the rights, Claims, and interests of the Secured Notes Indenture Trustee thereto vis-a-vis any parties other than the Released Parties; (b) allow the holders of Allowed Secured Notes Claims, as applicable, to receive distributions under the Plan from the Secured Notes Indenture Trustee or from any other source, to the extent provided for under the Plan; (c) preserve any rights of the Secured Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations from or on any money or property to be distributed in respect of the Allowed Secured Notes Claims; and (d) enforce any obligation owed to the Secured Notes Indenture Trustee under the Plan.

## 5.    Cancelation of Certain Existing Security Agreements

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

## 6.    Rights Offering and Minimum Allocation Rights

The Debtors on behalf of New Permian Corp. shall commence and consummate the Rights Offering in accordance with the procedures governing the Rights Offering (the "**Rights Offering Procedure**"), annexed hereto as <u>**Exhibit F**</u>.  The New Permian Corp. Shares shall be issued to the Eligible Offerees that exercise their respective Subscription Rights, pursuant to the Rights Offering Procedures and the Plan.  The consummation of the Rights Offering is conditioned on the occurrence of the Effective Date, and any other condition specified in the Backstop Commitment Agreement.  Amounts held by the Rights Offering Subscription Agent (as defined in the Backstop Commitment Agreement) with respect to the Rights Offering prior to the Effective Date shall not be entitled to any interest on account of such amounts and no Eligible Offeree participating in the Rights Offering shall have any rights in the New Permian Corp. Shares until the Rights Offering is consummated.

In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to (a) exercise its Minimum Allocation Rights, and (b) purchase, on or prior to the Effective Date,

its respective Final BCA Percentage (as defined in the Backstop Commitment Agreement) of the Unsubscribed Securities (as defined in the Backstop Commitment Agreement).

In exchange for providing the commitment to exercise the Minimum Allocation Rights and the backstop commitment for the Rights Offering, the Backstop Parties will receive the Put Option Premium in accordance with the terms of the Backstop Commitment Agreement, the Backstop Approval Order, and the Plan.

The Debtors shall offer the Minimum Allocation Rights to the Backstop Parties in accordance with the Backstop Commitment Agreement, pursuant to documentation acceptable to the Debtors, the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors.

The New Permian Corp. Shares issuable to Eligible Offerees are expected to be issued in book entry form through the facilities of the DTC to the account of their respective Subscription Nominees in which their Unsecured Notes were held, to the extent practicable and if so permitted or otherwise registered form on the books and records of New Permian Corp. or its designee.

## 7.    New Permian Corp. Certificate of Incorporation

On or prior to the Effective Date, and in accordance with the Backstop Commitment Agreement, New Permian Corp. will file the New Permian Corp. Certificate of Incorporation with the Secretary of State of the State of Delaware.  The New Permian Corp. Certificate of Incorporation shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Permian Corp. Certificate of Incorporation will prohibit the issuance of non-voting equity securities.  The New Permian Corp. Certificate of Incorporation shall be deemed adopted by the New Permian Corp. Board as of the Effective Date.  After the Effective Date, New Permian Corp. may amend and restate the New Permian Corp. Certificate of Incorporation and other constituent documents as permitted by the laws of the State of Delaware and the New Permian Corp. Certificate of Incorporation.  If approved by the Requisite Commitment Parties, New Permian Corp. shall adopt a registration rights agreement to be effective on the Effective Date.  The New Permian Corp. Certificate of Incorporation, the New Permian Corp. Bylaws and such registration rights agreement shall be binding on New Permian Corp. and all parties receiving, and all holders of, New Permian Corp. Common Shares.  The New Permian Corp. Certificate of Incorporation shall provide that preemptive rights shall be granted to all holders of New Permian Corp. Shares that are accredited investors, including the AUNC Trust (if accredited), and that the tag-along rights set forth in the Restructuring Term Sheet shall be made available to all holders of New Permian Corp. Shares.

## 8.    Exit Facility

On the Effective Date, the Exit Facility Documents shall be executed and delivered by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), and the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) shall be authorized to execute, deliver, and enter into such documents without the need for any further action.

### 9.    Restructuring Transactions

On or prior to the Effective Date (or as soon as practicable thereafter), the following transactions shall occur in the following order, and the Debtors or Reorganized Debtors (as applicable) may take all actions necessary or appropriate to effectuate such transactions:

(a)    After entry of the Confirmation Order but prior to the Effective Date, and in anticipation of the Permian Corp. Asset Acquisition, the Backstop Parties pursuant to the Backstop Commitment Agreement shall (i) form New Permian Corp., (ii) cause New Permian Corp. to conduct the Rights Offering, and (iii) cause New Permian Corp. to enter into the Exchange Agreement with BBEP pursuant to which New Permian Corp. shall agree to acquire all of the New Permian LLC Equity on and subject to the occurrence of the Effective Date in consideration for conducting the Rights Offering, $775 million (less the amount of the Minimum Cash Balance), an amount of New Permian Corp. Shares necessary to satisfy distributions pursuant to Sections 4.5(c) and 4.6 with respect to Allowed Claims as of the Effective Date, and the assumption of the obligation to issue New Permian Corp. Shares with respect to, or on account of, Disputed General Unsecured Claims as to which the holder elected to receive New Permian Corp. Shares.

(b)    On the Effective Date and in accordance with the provisions hereof, the Backstop Commitment Agreement and the Rights Offering, New Permian Corp. shall close the Rights Offering.  Immediately thereafter, the Rights Offering and Minimum Allocation Rights Proceeds shall be released to New Permian Corp. and New Permian Corp. shall issue New Permian Corp. Shares to those Eligible Offerees that have validly exercised the Subscription Rights and to the Backstop Parties, as applicable, including in respect of the Minimum Allocation Rights and the Put Option Premium. Concurrent therewith (but not prior to), New Permian Corp. shall also issue, and on behalf of BBEP distribute, New Permian Corp. Shares pursuant to Sections 4.5(c) and 4.6, as applicable, with respect to Allowed Claims as of the Effective Date (other than any shares to be held back in respect of Disputed General Unsecured Claims in accordance with Article VII of the Plan).

(c)    On the Effective Date, (i) BBEP shall contribute the Legacy Contributed Assets to LegacyCo in exchange for LegacyCo Units representing all of the equity capital of LegacyCo pursuant to the LegacyCo Contribution Agreement (the "**Legacy Asset Transfer**"), and (ii) BBEP shall contribute the Permian Assets to New Permian LLC in exchange for all of the New Permian LLC Equity pursuant to in the Permian Contribution Agreement (the "**Permian Asset Transfer**").  Such transfers shall be accompanied by the assumption by LegacyCo or New Permian LLC, as applicable, of certain liabilities and obligations as provided in the LegacyCo Contribution Agreement or Permian Contribution Agreement, as

applicable, the Plan or the Confirmation Order, or as otherwise agreed between BBEP and LegacyCo or New Permian LLC, as applicable. Immediately after the Legacy Asset Transfer and the Permian Asset Transfer, BBEP shall be the sole member of LegacyCo and New Permian LLC. Each of LegacyCo and New Permian LLC shall be disregarded as an entity separate from BBEP for U.S. federal income tax purposes at all times on or before the Effective Date (including immediately after the Legacy Asset Transfer and the Permian Asset Transfer), unless, as to LegacyCo, the Requisite Consenting Second Lien Creditors determine (in their sole discretion) that LegacyCo elect to be treated as a corporation for U.S. federal income tax purposes (the "**Corporation Election**").

(d)    On the Effective Date, BBEP shall simultaneously (i)(A) distribute 92.5% of the LegacyCo Units received in consideration for the Legacy Asset Transfer to holders of Allowed Secured Notes Claims in satisfaction and discharge of their Claims as provided in Section 4.4(b) of the Plan, and (B) transfer 7.5% of the LegacyCo Units received in consideration for the Legacy Asset Transfer to New Permian Corp. pursuant to the Exchange Agreement (the "**LegacyCo Distribution and Transfer**"), and (ii) transfer to New Permian Corp. pursuant to the Exchange Agreement all of the New Permian LLC Equity received in consideration for the Permian Asset Transfer. Pursuant to the Exchange Agreement, and in consideration for the foregoing transfers to New Permian Corp., New Permian Corp. shall pay to BBEP $775 million (less the amount of the Minimum Cash Balance) an amount of New Permian Corp. Shares necessary to satisfy distributions pursuant to Sections 4.5(c) and 4.6 with respect to Allowed Claims as of the Effective Date, and the assumption of the obligation to issue New Permian Corp. Shares with respect to, or on account of, Disputed General Unsecured Claims as to which the holder elected to receive New Permian Corp. Shares (the "**Permian Corp. Asset Acquisition**"). Upon formation, and at the time of the Legacy Asset Transfer, LegacyCo shall be treated as a disregarded entity for U.S. federal income tax purposes, such that BBEP will still be regarded prior to the LegacyCo Distribution and Transfer as owning the LegacyCo Contributed Assets, unless the Requisite Consenting Second Lien Creditors effect the Corporation Election. Accordingly, for U.S. federal income tax purposes, the Debtors, LegacyCo, all holders of Allowed Secured Notes Claims and New Permian Corp. shall (absent the Corporation Election) treat the LegacyCo Distribution and Transfer as (i) a distribution and transfer of the Legacy Contributed Assets, subject to certain liabilities and obligations, in a taxable exchange to the holders of Allowed Secured Notes Claims and New Permian Corp., followed by (ii) the contribution of the Legacy Contributed Assets, subject to such liabilities and obligations, by the holders of Allowed Secured Notes Claims and New Permian Corp. to LegacyCo with LegacyCo being treated as a newly formed partnership for U.S. federal income tax purposes, unless otherwise required pursuant to a "final determination" to the contrary within the meaning of section

1313(a) of the Tax Code.  Upon formation, and at the time of the Permian Corp. Asset Acquisition, New Permian LLC shall be treated as a disregarded entity for U.S. federal income tax purposes, such that BBEP will still be regarded prior to the Permian Corp. Asset Acquisition as owning the Permian Assets (which will be transferred to New Permian LLC pursuant to the Permian Contribution Agreement).  Accordingly, for U.S. federal income tax purposes, the Debtors, New Permian LLC and New Permian Corp. shall treat the Permian Corp. Asset Acquisition as a taxable purchase of the underlying Permian Assets unless otherwise required pursuant to a "final determination" to the contrary within the meaning of section 1313(a) of the Tax Code.

(e)   BBEP shall use the Cash consideration received pursuant to the Exchange Agreement (together with any Cash otherwise available) to satisfy any Cash distributions and other payments to be made on the Effective Date pursuant to or in connection with the Plan and Confirmation Order.

Notwithstanding anything in the Plan to the contrary, the Restructuring Transactions may be modified or revised by the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties and the Debtors in their reasonable discretion to ensure a more tax efficient structure for holders of Secured Notes Claims and the Debtors.  On or after the Effective Date, the Reorganized Debtors may take all actions consistent with the Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan with the consent of the Requisite Consenting Second Lien Creditors and Requisite Commitment Parties.

## 10.   Board of Directors

The LegacyCo Board shall be composed of the chief executive officer of the Debtors as of the date immediately preceding the Effective Date and such other members selected by the Requisite Consenting Second Lien Creditors in their sole discretion; *provided*, that New Permian Corp. shall have the right to appoint an observer to the LegacyCo Board subject to the conditions in the Restructuring Term Sheet.  The identities of the members of the LegacyCo Board and the initial Boards of Directors of the Reorganized Debtors shall be disclosed at or prior to the Confirmation Hearing.

The New Permian Corp. Board shall be selected in accordance with the terms of the Restructuring Term Sheet.

## 11.   Corporate Action

On the Effective Date, each of the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) will file their respective charters that are part of their New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation.  The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code.  Pursuant to section 1123(a)(6) of the

Bankruptcy Code the New Organizational Documents will prohibit the issuance of non-voting equity securities. The LegacyCo Organizational Documents shall be deemed adopted by the LegacyCo Board as of the Effective Date. After the Effective Date, the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents.

On the Effective Date, the adoption, filing, approval, and ratification, as necessary, of all corporate or related actions contemplated herein with respect to each of the Reorganized Debtors shall be deemed authorized and approved by each of the Reorganized Debtors, their respective boards of directors, managers, equity holders, members, or partners, as applicable, in all respects, in each case to the extent required by applicable nonbankruptcy law. Without limiting the foregoing, such actions include (a) the adoption and filing of the New Organizational Documents for each of the Reorganized Debtors, (b) the adoption and approval of the LegacyCo LLC Agreement and the LegacyCo Organizational Documents, which shall be adopted and affirmed by the board of LegacyCo Board, (c) the election or appointment, as applicable, of directors and officers for the Reorganized Debtors, and (d) the issuance of the LegacyCo Units.

All matters provided for in this Section involving the corporate structure of any Debtor or Reorganized Debtor, or any corporate or related action required by any Debtor or Reorganized Debtor in connection herewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders or directors of such Debtor or Reorganized Debtor or by any other stakeholder, and with like effect as though such action had been taken unanimously by the Security holders and directors, managers, members, or partners, of each Debtor or Reorganized Debtor, as applicable.

## 12.    LegacyCo Management Incentive Plan

The LegacyCo Board may adopt the LegacyCo Management Incentive Plan on or after the Effective Date.

## 13.    New Permian Corp. Management Incentive Plan

New Permian Corp. may adopt the New Permian Corp. Management Incentive Plan, which shall be in form and substance acceptable to the New Permian Corp. Board in its sole discretion.

## 14.    Separability

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

## 15.    Director, Officer, Manager, and Employee Liability Insurance

Prior to and after the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' liability insurance

policies (including any "tail policy") with respect to conduct occurring on or prior to the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time after May 15, 2015 shall be entitled to the full benefits of such policies for the full six-year term of such policies regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

### 16. Preservation of Royalty and Working Interests

Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests, and no Royalty and Working Interests shall be compromised or discharged by the Plan.  For the avoidance of doubt and notwithstanding anything to the contrary in the preceding sentence, any right to payment arising from a Royalty and Working Interest, if any, shall (to the extent not otherwise paid pursuant to a Final Order of the Bankruptcy Court) be treated as an Ongoing Trade Claim of LegacyCo or an Ongoing Trade Claim of New Permian Corp., as applicable, under the Plan and shall not be subject to any discharge and/or release provided under the Plan.

### 17. Hart-Scott-Rodino Antitrust Improvements Act

Any LegacyCo Units or New Permian Corp. Shares to be distributed under the Plan to an entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, will not be distributed until the notification and waiting periods applicable under such Act to such entity have expired or been terminated.

### 18. Post-Effective Date Tax Filings and Audits

Following the Effective Date, LegacyCo shall have full and exclusive authority and responsibility in respect of all taxes and tax filings of BBEP (including any audits or other proceedings) and any other liquidating Debtors, to the same extent as if LegacyCo were the Debtors.  Without limiting the foregoing, on the Effective Date, a power of attorney authorizing LegacyCo to correspond with any tax authority on behalf of such Debtors and to sign, negotiate, settle, and administer any tax returns or other tax filings, and collect any tax refunds, shall be provided to LegacyCo.  LegacyCo shall use commercially reasonable efforts to (a) file all tax returns and related filings consistent with the intended tax treatment of the Restructuring Transactions, (b) not take any tax position inconsistent therewith, and (c) if any such tax returns or related filings or tax position is challenged, diligently defend such matters.

### 19. AUNC Trust

The New Permian Corp. Shares to be issued to Receiving AUNC Holders pursuant to Section 4.5(c) of the Plan shall be issued to a trust that shall engage in no business other than holding such shares and engaging in the activities incidental thereto (the "**AUNC Trust**").  The AUNC Trust shall be structured so as not to be subject to the Securities Act of 1933, the Securities Exchange Act of 1934, or the Investment Company Act of 1940.

The interests in the AUNC Trust shall be held by the Receiving AUNC Holders and on a Pro Rata basis based on their respective holdings of the New Permian Corp. Shares.

The interests in the AUNC Trust may not be transferred at any time and shall be totally passive. The trustee of the AUNC Trust, the terms of the trustee's engagement, and the documents governing the AUNC Trust, shall be reasonably acceptable to the Requisite Commitment Parties, the Creditors' Committee, and, after the Effective Date, New Permian Corp.  On the seventh anniversary of the AUNC Trust, the trust shall terminate and the shares of New Permian Corp. held by the AUNC Trust shall be distributed to the beneficiaries of the AUNC Trust.

From and after the Effective Date, New Permian Corp. shall be responsible for up to $300,000 of fees and expenses of the AUNC Trust in the aggregate as and when incurred.  New Permian Corp. shall otherwise not be responsible for any fees, expenses or other liabilities or monetary obligations arising under the AUNC Trust.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by trustee of the AUNC Trust), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, LegacyCo, New Permian Corp. and all holders of Allowed Claims) shall treat the AUNC Trust as a "trust" within the meaning of Treas. Reg. § 301.7701-4(c), and shall treat the transfer of New Permian Corp. Shares to the AUNC Trust as (a) a direct transfer to Receiving AUNC Holders for whose benefit such shares were issued, followed by (b) the transfer by such persons to the AUNC Trust in exchange for their beneficial interest therein.  Accordingly, except in the event of contrary definitive guidance, AUNC Trust beneficiaries shall generally be treated for United States federal income tax purposes as the grantors and owners of their respective portions of the underlying assets of the AUNC Trust. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes, and for purposes of securities laws.

### G.    Provisions Governing Distributions

#### 1.    No Postpetition Interest on Claims

Except as otherwise specifically provided for in the Plan, or the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, postpetition or default interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date; *provided that* this provision shall not apply to the Secured Notes Claims.

#### 2.    Date of Distributions

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date; *provided*, *that* the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) may implement periodic distribution dates to the extent they determine them to be appropriate.

### 3.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  None of the Debtors, the Reorganized Debtors, or the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, none of the Debtors, the Reorganized Debtors, or the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

### 4.    Delivery of Distributions

The Disbursing Agent will make the applicable distribution under the Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any holder of an Allowed Claim as and when required by the Plan at:  (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.  Neither the Unsecured Notes Indenture Trustee nor the Secured Notes Indenture Trustee shall incur any liability on account of the making of any distribution under the Plan except for gross negligence or willful misconduct.

Except as otherwise provided in the Plan, all distributions to Holders of Secured Notes Claims shall be made by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) to the Holders of Secured Notes Claims of record as of the Distribution Record Date.

The Disbursing Agent, with the Unsecured Notes Indenture Trustee's cooperation, shall make the distributions, if any, on account of the Class 5A and Class B Claims, provided that the Unsecured Notes Indenture Trustee's Charging Lien shall not attach to any property to be distributed by the Unsecured Notes Indenture Trustee or in respect of the Unsecured Notes Claims, except as expressly provided in Section 4.5(d) of the Plan.  The Unsecured Notes Indenture Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Disbursing Agent, the Debtors, or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed Unsecured Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.  The Reorganized Debtors (other than New Permian Corp. and New Permian LLC) shall reimburse the Unsecured Notes Indenture Trustee for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with actions explicitly requested by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) necessary for implementation

of the Plan; *provided, that*, for the avoidance of doubt, nothing in the Plan or Confirmation Order shall be considered or construed as an explicit request by the Reorganized Debtors authorizing the incurrence of fees and expenses by the Unsecured Notes Indenture Trustee.

### 5.    Unclaimed Property

One year from the later of (a) the Effective Date and (b) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions payable on account of Claims that are not deliverable, or have not responded to a request for information to make such delivery, and remain unclaimed shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) or their successors or assigns, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

### 6.    Satisfaction of Claims

Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 7.    Fractional Shares and De Minimis Cash Distributions

No fractional New Permian Corp. Shares or LegacyCo Units shall be distributed.  When any distribution would otherwise result in the issuance of a number of New Permian Corp. Shares or LegacyCo Units that is not a whole number, the New Permian Corp. Shares or LegacyCo Units subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number; and (b) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of New Permian Corp. Shares or LegacyCo Units to be distributed will be adjusted as necessary to account for the rounding provided for herein.  No consideration will be provided in lieu of New Permian Corp. Shares or LegacyCo Units that are rounded down.

None of the Reorganized Debtors or the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Permian Corp. Share or LegacyCo Unit, or fifty dollars ($50.00) in Cash.

### 8.    Allocation of Distributions between Principal and Interest

Except as otherwise required by law, consideration received in respect of an Allowed Claim shall be allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 9.    Exemption from Securities Laws

The issuance of and the distribution under the Plan of (a) the LegacyCo Units issued pursuant to Sections 4.4(b) of the Plan, and (b) the issuance of the New Permian Corp. Shares (i) comprising the Put Option Premium or (ii) pursuant to Sections 4.5(c) or 4.6 of the Plan, shall be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  These Securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

The issuance and sale, as applicable, of the New Permian Corp. Shares pursuant to the Rights Offering and to the Backstop Parties under the Backstop Commitment Agreement (including the New Permian Corp. Shares issued pursuant to the Minimum Allocation Rights) are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder.  Such Securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

Should New Permian Corp. elect, on or after the Effective Date, for any portion of the ownership of the New Permian Corp. Shares to be held through the facilities of the DTC, New Permian Corp. shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of the New Permian Corp. Shares, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Permian Corp. Shares are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Permian Corp. Shares are exempt from registration and/or eligible for DTC book entry delivery, settlement, and depository services.

### 10.    Setoffs and Recoupments

Each Debtor or Reorganized Debtor, as applicable, or such Entity's designee, may, in consultation with the Second Lien Group, pursuant to section 553 of the Bankruptcy Code or

applicable nonbankruptcy law, offset or recoup against any Allowed Claim (other than any Allowed Revolving Facility Claims, DIP Facility Claims, Allowed Secured Notes Claims, or Allowed Unsecured Notes Claims) and the distributions to be made pursuant to the Plan on account of such Allowed Claim (other than any Allowed Revolving Facility Claims, DIP Facility Claims, Allowed Secured Notes Claims, or Allowed Unsecured Notes Claims) any and all Claims, rights, and Causes of Action that such Debtor or Reorganized Debtor or its successors may hold against the holder of such Allowed Claim; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any Claims, rights, or Causes of Action that any such entity or it successor or assign may possess against such holder.

### 11.    Withholding and Reporting Requirements

In connection with the Plan and all distributions made hereunder, the Reorganized Debtors and the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any federal, state, local, or foreign taxing authority, including income, withholding, and other tax obligations, on account of such distribution. The Reorganized Debtors and the Disbursing Agent have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations.

The Reorganized Debtors and the Disbursing Agent may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim provide any information necessary to allow the distributing party to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority. If the Reorganized Debtors or the Disbursing Agent make such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

### H.    Procedures for Disputed Claims

### 1.    Objections to Claims

The Reorganized Debtors (other than New Permian Corp. and New Permian LLC) shall be entitled to object to Claims. Any objections to Claims shall be served and filed on or before the later of (a) one hundred and eighty (180) days after the Effective Date and (b) such later date as

may be fixed by the Bankruptcy Court (as the same may be extended by the Bankruptcy Court for cause shown).

### 2.     Resolution of Disputed Administrative Expenses and Disputed Claims

On and after the Effective Date, the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), in consultation with the Second Lien Group, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expenses or Claims and to compromise, settle, or otherwise resolve any disputed Administrative Expenses and Disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Expenses relating to compensation of professionals.

### 3.     Payments and Distributions with Respect to Disputed Claims

Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim, and in the case of a Disputed Claim as to which the holder elected to receive a distribution of New Permian Corp. Shares, such shares shall not be issued by New Permian Corp. until such Claim has been resolved.

### 4.     Distributions After Allowance

After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in the Plan.  Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.  To the extent a Disputed Claim as to which the holder elected to receive a distribution of New Permian Corp. Shares is disallowed, the shares that would otherwise have been distributed in respect of such Claim shall be reallocated as if such Claim had been disallowed as of the Effective Date and, in accordance with the Restructuring Transactions, distributed by New Permian Corp. as soon as practicable after the date that the order or judgment of the Bankruptcy Court disallowing such Disputed Claim (or portion thereof) becomes a Final Order.

### 5.     Disallowance of Claims

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All proofs of claim filed on account of an indemnification obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy

Court. Except as otherwise provided herein, all proofs of claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.

### 6. Estimation

The Debtors or Reorganized Debtors (other than New Permian Corp. and New Permian LLC), in consultation with the Second Lien Group, may determine, resolve and otherwise adjudicate all contingent Claims, unliquidated Claims and Disputed Claims in the Bankruptcy Court or such other court of the Debtors' or Reorganized Debtors' choice having jurisdiction over the validity, nature or amount thereof. The Debtors or the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), in consultation with the Second Lien Group, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether any of the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent Claim, unliquidated Claim or Disputed Claim, that estimated amount shall constitute the maximum limitation on such Claim, and the Debtors or the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) may pursue supplementary proceedings to object to the ultimate allowance of such Claim; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Claim unless the holder of such Claim has filed a motion requesting the right to seek such reconsideration on or before twenty (20) calendar days after the date such Claim is estimated by the Bankruptcy Court.

### 7. Interest

To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date.

## I. <u>Executory Contracts and Unexpired Leases</u>

### 1. General Treatment

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Reorganized Debtors that do not relate to Employee Obligations shall be deemed assumed, unless such contract or lease (a) was

previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (b) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (c) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (d) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts.

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts of BBEP shall be deemed assumed and assigned to LegacyCo or New Permian LLC, as applicable, or otherwise rejected pursuant to the terms of the Plan.

As of and subject to the occurrence of the Effective Date, all executory contracts related to Employee Obligations shall be deemed rejected, unless such contract (a) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (b) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (c) is specifically designated as a contract to be assumed on the Schedule of Assumed Employee Obligations.

Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

### 2.    Determination of Cure Disputes and Deemed Consent

(a)    Any monetary defaults under an assumed or assumed and assigned executory contract or unexpired lease, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)    At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, cure notices to the applicable third parties.  **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors at least seven (7) days before the Confirmation Hearing.**  Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Amount will be deemed to have assented to such assumption, assumption and assignment, or Cure Amount. Notwithstanding anything herein to the contrary, in the event that any executory contract or unexpired lease is removed from the Schedule of Rejected Contracts after such 14-day deadline, a cure notice with respect to such executory contract or unexpired lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such executory contract or unexpired lease can be assumed or assumed and assigned, as applicable.

(c)    In the event of an unresolved dispute regarding (i) any Cure Amount, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or (iii) any other matter pertaining to assumption, assignment, or the Cure Amounts required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order).

(d)    If the Bankruptcy Court determines that the Cure Amount with respect to any executory contract or unexpired lease is greater than the amount set forth in the applicable cure notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such executory contract or unexpired lease to the Schedule of Rejected Contracts, in which case such executory contract or unexpired lease will be deemed rejected as of the Effective Date.

(e)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired Lease.  Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## 3.    Rejection Damages Claims

If the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective estates, properties or interests in property, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtors or the Reorganized Debtors, as applicable, no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of the rejection of such executory contract or unexpired lease, as set forth on the Schedule of Rejected Contracts or order of the Bankruptcy Court.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts.

## 4.    Payment of Cure Amounts

To the extent that a Cure Amount relates to a contract or lease that (a) solely benefits Legacy Assets (whether before or after the Effective Date) or will solely benefit LegacyCo, or (b) solely benefits Permian Assets (whether before or after the Effective Date) or will solely benefit New Permian Corp., such Cure Amount shall be paid its Cash distribution from the Rights Offering Proceeds and Minimum Allocation Rights.  To the extent that a Cure Amount relates to a contract that (x) will benefit New Permian Corp post-Effective Date or benefits Permian Assets (whether before or after the Effective Date) and (y) will benefit LegacyCo post-Effective Date or

benefits Legacy Assets (whether before or after the Effective Date), such Cure Amount shall also be paid its Cash distribution from the Rights Offering Proceeds and Minimum Allocation Rights; *provided that* New Permian Corp. shall reimburse LegacyCo for its pro rata share of all such amounts pursuant to the terms of the Transition Services Agreement.

### 5.    Survival of the Debtors' Indemnification Obligations

Any and all obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, memorandum and articles of association, or other organizational documents (including all Indemnification Obligations) to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; *provided*, that the Reorganized Debtors shall not indemnify any persons for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes fraud, gross negligence, or willful misconduct.  All such obligations shall be deemed and treated as executory contracts that are assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors (other than New Permian Corp. and New Permian LLC).  Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.  None of the Reorganized Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or adversely affect any obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights and New Permian Corp. shall reimburse LegacyCo for such amounts to the extent set forth in the Transition Services Agreement.

### 6.    Employee Obligations

The Reorganized Debtors (other than New Permian Corp. and New Permian LLC) shall honor all of the Employee Obligations in accordance with the Schedule of Assumed Employee Obligations; *provided*, that (a) the consummation of the transactions contemplated by the Plan shall not, in and of themselves, constitute a "change in control" with respect to any of the Employee Obligations and (b) subject to and in accordance with the Employee Programs Order, the KEIP (as defined in the Employee Programs Order) shall terminate on the Effective Date and the participants in such program shall vest in and be entitled to the payments and compensation as expressly provided under the KEIP.  Notwithstanding anything in the Employee Programs Order to the contrary, the KERP and the KEP (as such terms are defined in the Employee Programs Order), shall continue in full force and effect through December 31, 2017.  Subject to clause (b) above, to the extent that any of the Employee Obligations constitute executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, each of them will be deemed rejected as of the Effective Date unless identified in the Schedule of Assumed Employee Obligations and shall be treated in accordance with Article 8 of the Plan.

### 7.    Insurance Policies

All insurance policies (including all D&O Liability Insurance Policies and tail coverage liability insurance) to which any Debtor is a party as of the Effective Date shall be deemed to be and

treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

### 8.    Reservation of Rights

(a)    The Debtors, with the consent of the Requisite Consenting Second Lien Creditors may amend the Schedule of Assumed Employee Obligations and the Schedule of Rejected Contracts (with the consent of the Requisite Commitment Parties only to the extent that a contract relates to New Permian Corp. or the Permian Assets) and any cure notice through 4:00 p.m. (Eastern Time) on the Business Day immediately prior to the commencement of the Confirmation Hearing to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assignment or (ii) amend the proposed Cure Amount; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to 4:00 p.m. (Eastern Time) on the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.

(b)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(c)    Except as explicitly provided in the Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(d)    Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(e)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 9.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and executory contracts and unexpired leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any

of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

### J.    Conditions Precedent

#### 1.    Conditions Precedent to Confirmation of Plan

The following are conditions precedent to confirmation of the Plan:

(a)    An order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Bankruptcy Court;

(b)    The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, the Requisite Commitment Parties, the Requisite Consenting Second Lien Creditors, the Revolving Credit Facility Agent, the DIP Facility Agent, the Exit Facility Agent, and to the extent that any provisions of the Confirmation Order affect Classes 5A, 5B, 6, 7A, or 7B, they shall be acceptable to the Creditors' Committee and all other provisions of the Confirmation Order shall be reasonably acceptable to the Creditors' Committee; and

(c)    The Backstop Commitment Agreement and Restructuring Support Agreement shall be in full force and effect and binding on all parties thereto, and shall not have been terminated by the parties thereto.

#### 2.    Conditions Precedent to Effective Date

The following are conditions precedent to the Effective Date of the Plan:

(a)    The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

(b)    The Backstop Commitment Agreement shall be in full force and effect and binding on the parties thereto and any conditions precedent to the respective obligations of the parties thereto shall have been satisfied or waived in accordance with the terms thereof, and New Permian Corp. shall have received proceeds of at least $775 million pursuant to the Rights Offering and the Minimum Allocation Rights;

(c)    The Put Option Premium shall have been paid to the parties entitled thereto;

(d)    The Restructuring Support Agreement shall not have been terminated by the parties thereto;

(e)    The Debtors shall have implemented the Restructuring Transactions and all transactions contemplated by the Plan and the Restructuring Support Agreement, in a manner materially consistent in all respects with the Restructuring Support Agreement and the Plan and in accordance with Section 6.9 of the Plan;

(f)    The Plan Supplement, including the Plan Documents, shall have been filed in form and substance as provided in the Restructuring Support Agreement;

(g)    The conditions to effectiveness of the Exit Facility Credit Agreement shall have been satisfied or waived in accordance with the terms thereof, and such agreement shall be in full force and effect and binding on all parties thereto;

(h)    The Debtors shall have received any authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Plan (including, but not limited to, to implement or effectuate any of the Restructuring Transactions) and are required by law, regulation, or order;

(i)    The LegacyCo Organizational Documents shall be in full force and effect;

(j)    Each of the New Permian Corp. Certificate of Incorporation and New Permian Corp. Bylaws shall be in full force and effect;

(k)    The AUNC Trust shall have been created and the trust agreement for the AUNC Trust and any related documents necessary for the administration of the AUNC Trust shall have been executed and be in full force and effect;

(l)    Any other documents, instruments, and agreements necessary to effectuate the Plan shall have been effected or executed; and

(m)    The Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section 12.6 of the Plan.

### 3.    Satisfaction or Waiver of Conditions

Except as otherwise provided in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors determine that any of the conditions precedent set forth in Sections 9.1 or 9.2 of the Plan cannot be satisfied and the occurrence of such conditions is not waived pursuant to Section 9.4 of the Plan, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court.

The conditions set forth in Sections 9.1 or 9.2 of the Plan may be waived or modified only by the Debtors with the prior written consent of the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties, to the extent that any such waiver or modification adversely affects the treatment or rights of holders of Claims in Classes 5A, 5B, 6, 7A, or 7B, the Creditors' Committee, and, to the extent such waiver or modification adversely affects the Revolving Credit Facility Claims, the DIP Facility Claims or the Exit Facility, the Revolving Credit Facility Agent, the DIP Agent or the Exit Facility Agent, as applicable, without notice, leave, or order of the Bankruptcy Court, or any formal action other than proceedings to confirm or consummate the Plan.

### 4.    Effect of Non-Occurrence of Effective Date

If the Effective Date does not occur on or before the Outside Date (as defined in the Restructuring Support Agreement), then:  (a) the Plan will be null and void in all respects; (b) nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims, Interests, or Causes of Action by an Entity; (ii) prejudice in any manner the rights of any Debtor or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity; *provided*, that all provisions of the Backstop Commitment Agreement (including the obligation to pay the "Breakup Premium," as that term is defined in the Backstop Commitment Agreement in accordance with the terms and conditions of the Backstop Commitment Agreement) that survive termination of that agreement shall remain in effect in accordance with the terms thereof.

### K.    **Effect of Confirmation**

### 1.    Released and Settled Claims

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates an integrated compromise, settlement and release of the Released and Settled Claims, to achieve a beneficial and efficient resolution of these Chapter 11 Cases for all parties in interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Released and Settled Claims and the Bankruptcy Court's determination that such compromises and settlements are in the best interests of the Debtors, their estates, the Reorganized Debtors, creditors and all other parties in interest, and are fair, equitable and within the range of reasonableness.  The compromises, settlements and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.  On the Effective Date, the Standing Motion and Claim Objection shall be and shall be deemed to be dismissed with prejudice.

### 2.    Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder has accepted the Plan.

### 3.    Vesting of Assets

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all of the Permian Assets of the Debtors shall vest in New Permian LLC and all other assets and property of the Debtors shall vest in the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, free and clear of all Claims, Liens, charges, and other interests, except as otherwise provided herein.  The Reorganized Debtors may operate their businesses and use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as otherwise provided herein.

### 4.    Release and Discharge of Debtors

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided in the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Existing BBEP Equity Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Existing BBEP Equity Interests, rights, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Existing BBEP Equity Interest in the Debtors.

### 5.    Terms of Injunctions or Stays

Unless otherwise provided in the Plan or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 6.    Injunction Against Interference with Plan

Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided*, that nothing herein, in the Plan, or in the Confirmation Order shall preclude, limit, restrict or prohibit any party in interest from seeking to enforce the terms of the Plan, the Confirmation Order, or any other agreement or instrument entered into or effectuated in connection with the consummation of the Plan.

### 7.    [Intentionally Omitted]

### 8.    Exculpation

**Subject to section 1125(e) of the Bankruptcy Code, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, Released and Settled Claim, loss, remedy, or liability for any claim (including, but not limited to, any claim for breach of any fiduciary duty or any similar duty) in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Exit Facility Documents, the Backstop Commitment Agreement, the DIP Facility, the LegacyCo Management Incentive Plan, the New Permian Corp. Management Incentive Plan, the Disclosure Statement, the Plan, the Restructuring Transactions, the Rights Offering, the LegacyCo Contribution Agreement, the Exchange Agreement, the Permian Contribution Agreement, the creation of New Permian Corp., Legacy Co., or the AUNC Trust (including the Plan Documents, the Restructuring Support Agreement, and the trust agreement creating the AUNC Trust), or any agreement, transaction, or document related to any of the foregoing, or the solicitation of votes for, or confirmation of,**

the Plan; funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; any membership in (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Creditors' Committee; the structuring, negotiation, performance, or conducting of, participation in, or entry into, the Rights Offering and/or the Backstop Commitment Agreement (including, but not limited to, payment or receipt of the Put Option Premium), including by any member of the Creditors' Committee; the issuance of Securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted breach of fiduciary duty, actual fraud, or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

9.      **Releases**

(a)     **Releases by the Debtors**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including the service of the Released Parties to facilitate the reorganization of the Debtors, the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Debtors' estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Entities who may purport to assert any Cause of Action or Released and Settled Claim derivatively, by or through the foregoing Entities, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Released and Settled Claim, losses, remedies, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Debtors' estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or the Debtors' estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (including the Revolving Credit Documents and the Indentures), the DIP Facility, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Rights Offering, the Exchange Agreement, the LegacyCo Contribution Agreement, the Permian Contribution Agreement, the creation of New Permian Corp., Legacy Co., or the AUNC Trust, the negotiation, formulation, or preparation of the

Disclosure Statement, and the Plan and related agreements, instruments, and other documents (including the Plan Documents, the Restructuring Support Agreement, and the trust agreement creating the AUNC Trust), the solicitation of votes with respect to the Plan, the Backstop Commitment Agreement, or the Rights Offering, any membership (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Creditors' Committee, the structuring, negotiation, performance, or conducting of, participation in, or entry into, the Rights Offering and/or the Backstop Commitment Agreement (including, but not limited to, payment or receipt of the Put Option Premium), including by any member of the Creditors' Committee, or any other act or omission, transaction, agreement, event, or other occurrence, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

      (b)      **Releases by Holders of Claims and Interests.**

As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties, are deemed forever released and discharged by (i) subject to the penultimate sentence of this paragraph, holders of all Claims who vote to either accept or reject the Plan but do not opt out of granting the releases set forth herein (a "<u>Release Opt-Out</u>"), (ii) the Revolving Credit Facility Agent, (iii) the Unsecured Notes Indenture Trustee, (iv) the DIP Facility Agent, and (v) the Statutory Committees from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Released and Settled Claims, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, and any claims for breach of any fiduciary duty (or any similar duty), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates (to the extent such affiliates can be bound) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (including the Revolving Credit Documents and the Indentures), the DIP Facility, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Rights Offering, the Exchange Agreement, the LegacyCo Contribution Agreement, the Permian Contribution Agreement, the creation of New Permian Corp., LegacyCo, or the AUNC Trust, the negotiation, formulation, or preparation of the Disclosure Statement, the Plan and related agreements, instruments, and other documents (including the Plan Documents, the Restructuring Support Agreement and the trust agreement creating the AUNC Trust),

the solicitation of votes with respect to the Plan, the Backstop Commitment Agreement, or the Rights Offering, any membership in (including, but not limited to, on an ex officio basis), participation in, or involvement with the Creditors' Committee, the structuring, negotiation, performance, or conducting of, participation in, or entry into, the Rights Offering and/or the Backstop Commitment Agreement (including, but not limited to, payment or receipt of the Put Option Premium), including by any member of the Creditors' Committee, or any other act or omission, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. For the avoidance of doubt, notwithstanding the foregoing, a Release Opt-Out solely means that such holder (i) is electing to not release the Released Parties other than the Debtors, and (ii) shall not impair, limit or effect in any way the exculpation of the Exculpated Parties as set forth in Section 10.8 of the Plan. For the avoidance of doubt, the foregoing releases shall not release the indemnification rights of the (i) Secured Notes Indenture Trustee under the Secured Notes Indentures and any related documentation, and (ii) the Unsecured Notes Indenture Trustee under the Unsecured Notes Indentures and any related documentation.

(c)    **Release of Liens**

Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the Exit Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the secured claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.

(d)    **Waiver of Statutory Limitations on Releases**

The releases contained in Article X of the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

## 10.    Injunction Related to Releases and Exculpation

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan.

### 11.    Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interest in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim (other than any Allowed Revolving Facility Claims, DIP Facility Claims, Allowed Secured Notes Claims, or Allowed Unsecured Notes Claims) or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 12.    Avoidance Actions

From and after the Effective Date, the Reorganized Debtors shall waive the right to prosecute any avoidance, equitable subordination, or recovery actions that belong to the Debtors under chapter 5 of the Bankruptcy Code, including sections 105, 502(d), 510, 542 through 551, and 553.  The Debtors do not believe that actions being released pursuant to Section 10.12 of the Plan are material.

### 13.    Retention of Causes of Action and Reservation of Rights

Except as otherwise provided in Section 10.9 of the Plan, nothing herein or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including (a) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, or their officers, directors, or representatives and (b) for the turnover of any property of the Debtors' estates; *provided*, that neither the Debtors nor the Reorganized Debtors shall preserve, retain, commence, prosecute or otherwise reserve any Claims or Cause of Action against (i) any Second Lien Noteholder, (ii) any Series B Interest Holder, (iii) the Secured Indenture Trustee, (iv) the Unsecured Senior Notes Groups (or any member thereof), (v) the Backstop Parties, or (vi) any of the forgoing Entities' respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees, including the Released and Settled Claims.

Nothing herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left unimpaired by the Plan.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

The Reorganized Debtors reserve (or receive) and shall retain the applicable Causes of Action notwithstanding the rejection of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors in accordance with the terms of the Plan.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### 14.    Preservation of Causes of Action

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.

### 15.    Special Provisions for Governmental Units

Solely with respect to Governmental Units, nothing herein shall limit or expand the scope of discharge, release, or injunction to which the Debtors or the Reorganized Debtors are entitled under the Bankruptcy Code.  Furthermore, nothing herein, including Sections 10.8 and 10.9 of the Plan, shall discharge, release, enjoin, or otherwise bar (a) any liability of the Debtors or the Reorganized Debtors to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring on or after the Confirmation Date, (b) any liability to a Governmental Unit that is not a Claim, (c) any valid right of setoff or recoupment of a Governmental Unit, (d) any police or regulatory action by a Governmental Unit, (e) any environmental liability to a Governmental Unit that the Debtors, the Reorganized Debtors, any successors thereto, or any other Person or Entity may have as an owner or operator of real property after the Effective Date, and (f) any liability to a Governmental Unit on the part of any Persons or Entities other than the Debtors or the Reorganized Debtors, *provided*, that nothing in Section 10.15 of the Plan shall affect the Debtors' releases in Section 10.9 of the Plan, nor shall anything herein or the Plan enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any of the matters described in clauses (a) through (f) above.

### 16.    Protections Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### L.    Retention of Jurisdiction

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before or after the Confirmation Date, including any proceeding with respect to a Cause of Action or Avoidance Action;

(c)    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expenses;

(e)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code and to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)    To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    To hear and determine disputes arising in connection with Disputed Claims;

(k)    To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(l)    To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(m)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(o)    To enforce all orders previously entered by the Bankruptcy Court;

(p)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)    To resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(r)    To determine any other matters or adjudicate any disputes that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any document related to the foregoing; *provided* that the Bankruptcy Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court;

(s)    To hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(t)    To hear and determine any rights, claims, or causes of action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code or any federal or state statute or legal theory;

(u)    To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(v)    To hear any other matter not inconsistent with the Bankruptcy Code; and

(w)    To enter a final decree closing the Chapter 11 Cases.

69

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" above shall be deemed to be replaced by the "District Court." Nothing above or in Article XI of the Plan shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

### M.    Miscellaneous Provisions

#### 1.    Dissolution of Statutory Committees

On the Effective Date, the Statutory Committees shall dissolve, the current and former members of the Statutory Committees, including any *ex officio* members, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, except for the limited purpose of prosecuting (a) requests for allowances of compensation and reimbursement of expenses incurred prior to the Effective Date or (b) any appeals of the Confirmation Order.

#### 2.    Substantial Consummation

The Plan provides that on the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

#### 3.    Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any Security or property under the Plan or in connection with the transactions contemplated thereby, the creation, filing, or recording of any mortgage, deed of trust, or other security interest, the making, assignment, filing, or recording of any lease or sublease, or the making or delivery of any deed, bill of sale, or other instrument of transfer under, in furtherance of, or in connection with the Plan, including the distribution of the LegacyCo Units or any agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated herein, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing a stamp tax or similar tax to the maximum extent provided by section 1146(a) of the Bankruptcy Code and applicable nonbankruptcy law.

To the maximum extent provided by section 1146(a) of the Bankruptcy Code and applicable nonbankruptcy law, the Restructuring Transactions shall not be taxed under any law imposing a stamp tax or similar tax.

#### 4.    Plan Modifications and Amendments

The Plan may be amended, modified, or supplemented by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties, to the extent that it adversely affects the treatment or rights of holders of Claims in Classes 5A, 5B, 6, 7A, or 7B, the Creditors' Committee, and, to the extent it adversely affects the Revolving Credit Facility Claims, the DIP Facility Claims or the Exit Facility, the Revolving Credit Facility Agent, the DIP Facility Agent or the Exit Facility Agent,

as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct; *provided* that any such alteration, amendment or modification is consistent with the Restructuring Support Agreement. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Claims hereunder, the Debtors may, with the consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, and to the extent such action adversely affects the Revolving Credit Facility Claims, the DIP Facility Claims or the Exit Facility, the Revolving Credit Facility Agent, the DIP Facility Agent or the Exit Facility Agent, as applicable, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan and any holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as so amended, modified, or supplemented.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not materially and adversely affect the treatment of holders of Claims and that any such technical adjustment or modification is consistent with the Restructuring Support Agreement. Notwithstanding any provision of the Plan to the contrary or that is silent on the issue of consent rights, all documents, exhibits, and schedules related the Plan or Restructuring Transactions including, the Plan, Disclosure Statement, Confirmation Order, the Plan Documents, the Plan Supplement, and the Exit Facility Documents must be acceptable to the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties.

### 5.    Revocation or Withdrawal of Plan

The Debtors may revoke, withdraw, or delay consideration of the Plan prior to the Confirmation Date, either entirely or with respect to one or more of the Debtors, and to file subsequent amended plans of reorganization.  If the Plan is revoked, withdrawn, or delayed with respect to fewer than all of the Debtors, such revocation, withdrawal, or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn, or delayed.  If the Debtors revoke the Plan in its entirety, the Plan shall be deemed null and void.  In such event, nothing herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

Notwithstanding the foregoing paragraph, if the Debtors take any action to attempt to withdraw the Plan from the docket of the Bankruptcy Court or the Debtors refuse, for any reason, to take any and all commercial reasonable actions to implement and support the Restructuring Transactions, then:  (a) immediately, at such time and without any further order of the Court, the Debtors will no longer be proponents of the Plan and the Second Lien Group and the Unsecured Senior Notes Groups will become proponents of the Plan; *provided*, that if the exclusive periods of the Debtors have not been terminated as of such time, the Debtors shall remain nominal proponents of the Plan solely for the purposes of section 1121 until the expiration or termination of such exclusive periods; and (b) any and all provisions and consent rights or requirement that any document or transaction be "acceptable" or other terms under the Plan referencing "Weil," the "Debtor," or the "Debtors" are, and shall continue to be, in full force and effect with respect

to the Consenting Creditors (as defined under the Restructuring Support Agreement) as if such provisions were written without reference to "Weil," the "Debtor," or the "Debtors."

## V.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan reflects a consensus among the Debtors, the Revolving Credit Facility Lenders, the Second Lien Group, certain Unsecured Noteholders, and the Creditors' Committee. The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11. If the Plan is not confirmed and consummated, the alternatives to the Plan are (A) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan of reorganization, or a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (B) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Continuation of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of their assets.

Alternatively, if the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell all of their assets under section 363 of the Bankruptcy Code. Holders of Claims in Classes 2, 3, and 4 would be entitled to credit bid on any property to which their security interest attaches to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by holders of Secured Claims would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein. Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than what they would receive under the Plan.

### B.    Liquidation under Chapter 7

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit B**.

As demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

# VI.
# TRANSFER RESTRICTIONS AND
# CONSEQUENCES UNDER FEDERAL SECURITIES LAW

The issuance of and the distribution under the Plan of (a) the LegacyCo Units issued pursuant to Sections 4.4(b) of the Plan, and (b) the issuance of the New Permian Corp. Shares comprising (i) the Put Option Premium and (ii) pursuant to Sections 4.5(c) or 4.6 of the Plan, shall be exempt from registration under the Securities Act and any other applicable securities laws to the maximum extent permitted by section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of a debtor, of an affiliate participating in a joint plan with a debtor, or of a successor to a debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, a debtor or such affiliate, or principally in such exchange and partly for cash.  In reliance upon this exemption, the LegacyCo Units issued to holders of Allowed Secured Notes Claims, the New Permian Corp. Shares comprising the Put Option Premium, and the New Permian Corp. Shares that may be issued pursuant to Sections 4.5(c) or 4.6 of the Plan will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by Section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (1) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (2) offers to sell securities issued under a plan for the holders of such securities, (3) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (4) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permits the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to current information regarding the issuer being publicly available, applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code

are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

The issuance and sale of the New Permian Corp. Shares pursuant to the Rights Offering and to the Backstop Parties under the Backstop Commitment Agreement (including the New Permian Corp. Shares issued pursuant to the Minimum Allocation Rights) are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder.  Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, including the required holding period, the resale provisions of Rule 144 of the Securities Act.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

If certificated, certificates evidencing the LegacyCo Units held by holders of 10% or more of the outstanding LegacyCo Units or that are otherwise held by underwriters (as defined in section 1145(b) of the Bankruptcy Code) with respect to LegacyCo and certificates evidencing the New Permian Corp. Shares that are "restricted securities", as applicable, will bear (or if uncertificated, shall be deemed to bear) a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS THE DEBTORS RECEIVE AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## VII.
## CERTAIN TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of BBEP common units (the "**BBEP Common Unitholders**") and to holders of certain Claims.  This discussion does not address the U.S. federal income tax consequences to holders of Claims that are unimpaired or who are deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or

differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction).  In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes, nor does it apply to any person that acquires LegacyCo Units, New Permian Corp. Shares, or New Loan Obligations (as defined below) in the secondary market.

This discussion assumes that the Claims, Interests, New Permian Corp. Shares and LegacyCo Units are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code and, unless otherwise indicated below, that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

This discussion is based on the Restructuring Transactions described herein. *See* A.1—"Consequences to the Debtors and to BBEP Common Unitholders—Taxable Transfer of Assets," below. Pursuant to the Plan, the Restructuring Transactions may be modified or revised by the Requisite Consenting Second Lien Creditors and the Debtors (in their reasonable discretion) to ensure a more tax efficient structure for holders of Secured Notes Claims and the Debtors. In the event of any revision, the U.S. federal income tax consequences described herein to the respective parties could materially differ.

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances.  All holders of Claims and Interests are urged to consult their tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan.***

## A.   Consequences to the Debtors and to BBEP Common Unitholders

BBEP is treated as a partnership for U.S. federal income tax purposes and each of the other Debtors (all of whom are subsidiaries of BBEP) are treated as disregarded entities for U.S. federal income tax purposes, with the exception of Breitburn Finance Corporation, Phoenix Production Company and Alamitos Company.  As a partnership or disregarded entity, BBEP and the other Debtors (other than Breitburn Finance Corporation, Phoenix Production Company and Alamitos Company) are not themselves subject to U.S. federal income tax.  Instead, each BBEP

unitholder is required to report on its U.S. federal income tax return, and is subject to tax in respect of, its distributive share of each item of income, gain, loss, deduction and credit of such Debtors. Accordingly, the U.S. federal income tax consequences of the Restructuring Transactions under the Plan generally will not be borne by the Debtors, but instead will be borne by BBEP unitholders. If you are a BBEP unitholder, you are urged to consult your tax advisor.

### 1.    Taxable Transfer of Assets

Pursuant to the Restructuring Transactions, the following transactions will occur in order on or prior to the Effective Date (or as soon as practicable thereafter):

(i)    Prior to the Effective Date, and in anticipation of the Permian Asset Acquisition, the Backstop Parties pursuant to the Backstop Commitment Agreement will (i) form New Permian Corp., (ii) cause New Permian Corp. to conduct the Rights Offering, and (iii) cause New Permian Corp. to enter into an Exchange Agreement with BBEP pursuant to which New Permian Corp. will agree to acquire all of the New Permian LLC Equity on and subject to the occurrence of the Effective Date in consideration for conducting the Rights Offering, Cash, an amount of New Permian Corp. Shares necessary to satisfy distributions pursuant to Sections 4.5(c) and 4.6 of the Plan with respect to Allowed Claims as of the Effective Date, and the assumption of the obligation to issue New Permian Corp. Shares with respect to, or on account of, Disputed General Unsecured Claims as to which the holder elected to receive New Permian Corp. Shares.

(ii)    On the Effective Date and in accordance with the provisions of the Plan, the Backstop Commitment Agreement and the Rights Offering, New Permian Corp. will close the Rights Offering. Immediately thereafter, the Rights Offering and Minimum Allocation Rights Proceeds will be released to New Permian Corp. and New Permian Corp. will issue the New Permian Corp. Shares to those Eligible Offerees that have validly exercised the Subscription Rights and to the Backstop Parties, as applicable. Concurrent therewith (but not prior to), New Permian Corp. shall also issue, and on behalf of BBEP distribute, New Permian Corp. Shares pursuant to Sections 4.5(c) and 4.6 of the Plan, as applicable, with respect to Allowed Claims as of the Effective Date (other than any shares to be held back in respect of Disputed General Unsecured Claims in accordance with Article VII of the Plan).

(iii)    On the Effective Date, (i) BBEP will contribute the Legacy Contributed Assets to LegacyCo in exchange for LegacyCo Units representing all of the equity capital of LegacyCo (the "**Legacy Asset Transfer**"), and (ii) BBEP will contribute the Permian Assets to New Permian LLC in exchange for all of the New Permian LLC Equity (the "**Permian Asset Transfer**"). Such transfers will be subject to certain liabilities and obligations as provided in the Plan or Confirmation Order, or as otherwise agreed between BBEP and LegacyCo or New Permian LLC, as applicable. Immediately after the Legacy Asset Transfer and the Permian Asset Transfer, BBEP will be the sole member of LegacyCo and New Permian LLC. Each of LegacyCo and New Permian LLC will be disregarded as an entity separate from BBEP for U.S. federal income tax purposes at all times on or before the Effective Date (including immediately

after the Legacy Asset Transfer and the Permian Asset Transfer), unless as to LegacyCo, the Requisite Consenting Second Lien Creditors determine in their sole discretion that LegacyCo elect to be treated as a corporation for U.S. federal income tax purposes (the "**Corporation Election**").

(iv)    Simultaneously on the Effective Date, and in accordance with the Exchange Agreement and Article IV of the Plan, (A) BBEP will distribute 92.5% of the LegacyCo Units received in consideration for the Legacy Asset Transfer to holders of Allowed Secured Notes Claims in satisfaction and discharge of their Claims as provided in Section 4.4(b) of the Plan, and transfer 7.5% of the LegacyCo Units received in consideration for the Legacy Asset Transfer to New Permian Corp. (the "**LegacyCo Distribution and Transfer**"), and (B) BBEP will transfer to New Permian Corp. all of the New Permian LLC Equity received in consideration for conducting the Rights Offering, Cash, an amount of New Permian Corp. Shares necessary to satisfy distributions pursuant to Sections 4.5(c) and 4.6 of the Plan with respect to Allowed Claims as of the Effective Date, and the assumption of the obligation to issue New Permian Corp. Shares with respect to, or on account of, Disputed General Unsecured Claims as to which the holder elected to receive New Permian Corp. Shares (the "**Permian Asset Acquisition**").

Upon formation, and at the time of the Legacy Asset Transfer, LegacyCo will be treated as a disregarded entity for U.S. federal income tax purposes, such that BBEP will still be regarded prior to the LegacyCo Distribution and Transfer as owning the assets transferred to LegacyCo, unless the Corporation Election is made. Accordingly, for U.S. federal income tax purposes, the Debtors, LegacyCo, all holders of Allowed Secured Notes Claims and New Permian Corp. will (absent the Corporation Election) treat the LegacyCo Distribution and Transfer as (i) a distribution and transfer of the Legacy Contributed Assets, subject to certain liabilities and obligations, in a taxable exchange to the holders of Allowed Secured Notes Claims and New Permian Corp., followed by (ii) the contribution of such assets by the holders of Allowed Secured Notes Claims, subject to such liabilities and obligations, by the holders and New Permian Corp. to LegacyCo with LegacyCo being treated as a newly formed partnership for U.S. federal income tax purposes, unless otherwise required pursuant to a "final determination" to the contrary within the meaning of section 1313(a) of the Tax Code. Upon formation, and at the time of the Permian Asset Transfer, New Permian LLC will be treated as a disregarded entity for U.S. federal income tax purposes, such that BBEP will still be regarded prior to the Permian Asset Acquisition as owning the assets transferred to New Permian LLC. Accordingly, for U.S. federal income tax purposes, the Debtors, New Permian LLC and New Permian Corp. will treat the Permian Asset Acquisition as a taxable purchase of the underlying Permian Assets unless otherwise required pursuant to a "final determination" to the contrary within the meaning of section 1313(a) of the Tax Code.

(v)    BBEP will use the Cash consideration received pursuant to the Exchange Agreement (together with any Cash otherwise available) to satisfy any Cash distributions and other payments to be made on the Effective Date pursuant to or in connection with the Plan and Confirmation Order.

As discussed above, the Restructuring Transactions are subject to potential change by the Requisite Consenting Second Lien Creditors and the Debtors (in their reasonable discretion) to ensure a more tax efficient structure for holders of Secured Notes Claims and the Debtors; the discussion herein assumes the implementation of the Restructuring Transactions as described.

For U.S. federal income tax purposes, BBEP may recognize gain upon the LegacyCo Distribution and Transfer and the Permian Asset Acquisition but overall expects to incur a substantial net loss with respect to the transfer of assets that generally would be treated as ordinary loss.  As described above, because BBEP is a partnership for U.S. federal income tax purposes, a significant portion of such gain or loss (subject to potential disallowance, as discussed below) will be allocated to the BBEP Common Unitholders.  The amount of gain or loss allocable to any particular BBEP Common Unitholder depends, in part, on the price that the BBEP Common Unitholder paid for its units and the extent to which it has previously been allocated amortization or depreciation deductions with respect to the transferred assets.

Several provisions of the Tax Code can defer or disallow a loss recognized as a result of a transfer of assets under certain circumstances, such as a transaction between related parties, potentially including a sale or exchange of assets between a partnership and certain partners or between a partnership and a commonly-owned or controlled corporation.  In the present context, the application of such related party rules – and, thus, the potential that all or substantially all of the losses expected to be incurred by the Debtors upon the transfer of their assets pursuant to the Plan may be disallowed, while any gains are required to be recognized – can differ depending on whether the Corporation Election is made (which is in the sole discretion of the Requisite Consenting Second Lien Creditors).  *If the Corporation Election is made, the substantial likelihood is that the loss would be disallowed under the related party rules*, although there are arguments to the contrary.  However, it is the Debtors' understanding that the Requisite Consenting Second Lien Creditors do *not* currently intend to make the Corporation Election.

Assuming no Corporation Election is made, the Debtors expect, based on their understanding as of the date hereof of the ownership of Existing BBEP Equity Interests (including certain representations made by the holders of Secured Notes Claims and Unsecured Notes that are parties to the Restructuring Support Agreement and Backstop Commitment Agreement as to the extent of their ownership of Existing BBEP Equity Interests), that the related party loss disallowance rules generally would not apply to the Restructuring Transactions with respect to any loss allocable to the BBEP Common Unitholders.  *Nevertheless, even if no Corporation Election is made, whether related party loss disallowance provisions apply is dependent in part on facts outside of the Debtors' control and as to which the Debtors may be unaware.*  Significantly, the holders of Secured Note Claims currently own in disproportionate amounts all or substantially all of the Series B Preferred Units, which represent the majority of all the outstanding preferred.  Thus, *for example,* holders of Allowed Secured Note Claims could acquire additional Existing BBEP Equity Interests, which depending on the amount and by whom, could put one or more holders into a related party relationship, or could contribute their combined claims directly or indirectly to a corporation or other entity such that such corporation or entity may be considered a related party.

Accordingly, all or part of the loss the Debtors expect to recognize could be subject to disallowance, depending on the circumstances.  *All BBEP Common and Preferred Unitholders*

*are urged to consult their tax advisors regarding the recognition and allocation of any gain and loss and the deductibility of any losses recognized upon the implementation of the Plan (including any other limitations that may be imposed by the tax law based on a holder's individual circumstances).*

### 2.    Cancellation of Debt and other Income from the Plan

In connection with the implementation of the Plan, BBEP will recognize cancellation of debt ("**COD**") income for U.S. federal income tax purposes, including as a result of the discharge of certain Claims pursuant to the Restructuring Transactions and, potentially, as a result of a deemed exchange of the Revolving Credit Facility Claims (as described below).  COD is the amount by which the indebtedness discharged (reduced by any unamortized discount) exceeds any consideration given in exchange therefor.

As described above, because BBEP is a partnership for U.S. federal income tax purposes, a significant portion (and possibly all or substantially all) of such COD income and any other income recognized by the Debtors upon implementation of the Plan should be allocated to the BBEP Common Unitholders.  Certain statutory or judicial exceptions potentially can apply to limit the amount of COD income required to be included in income by the BBEP Common Unitholders, depending on the holders' circumstances.  In particular, exceptions are available that would allow COD income to be excluded from gross income if the COD income is taken into account by a taxpayer that is insolvent (but only to the extent of insolvency) or in bankruptcy.  These exceptions apply at the "partner" level and thus depend on whether the partner, *i.e.,* the BBEP Common Unitholders to whom the COD income was allocated, is itself insolvent or in bankruptcy.  The fact that the Debtors are insolvent and in bankruptcy is not relevant for that purpose.  For purposes of determining a holder's insolvency (measured immediately prior to the Effective Date), the holder would be treated as if it were individually liable for an amount of partnership debt equal to the allocated amount of the COD income.  To the extent any amount of COD income is excludable by a holder by reason of the insolvency or bankruptcy exception, the holder generally would be required to reduce certain tax attributes (such as net operating losses, tax credits, possibly tax basis in assets and passive losses) after the determination of its tax liability for the taxable year.

As discussed in the preceding section, the Debtors currently expect – based on their understanding of the facts as of the date hereof – to recognize a substantial net loss with respect to the transfer of its assets pursuant to the Plan a significant portion of which will be allocated to the BBEP Common Unitholders.  In such event, the Debtors expect that, in aggregate, the amount of the loss allocable to the BBEP Common Unitholders will equal or exceed any COD and other income allocable to the BBEP Common Unitholders.  The amount of gain or loss allocable to any particular holder, however, depends, in part, on the price the holder originally paid for its units and the extent to which it has previously been allocated amortization or depreciation deductions with respect to the transferred assets.  ***Nevertheless, as discussed in the preceding section, whether related party loss rules would apply to disallow all or part of the loss incurred by the Debtors is dependent in part on facts outside of the Debtors' control (including, but not limited to whether a Corporation Election is made for LegacyCo) and as to which the Debtors may be unaware.***  Were such loss to be disallowed, a BBEP Common Unitholder could be taxable on its allocable share of COD income and any gains recognized

upon the transfer of the Debtors assets *even though* the Debtors otherwise incurred a substantial net loss. **All BBEP Common Unitholders are therefore urged to discuss their individual circumstances and the potential for the recognition of a substantial amount of unsheltered income with their tax advisor.**

A BBEP Common Unitholder's adjusted tax basis in its units will be increased to the extent of any net income or gain allocated to such partner and decreased (but not below zero) to the extent of any net loss allocated to such partner, whether or not such loss is disallowed and thus not deductible.

To the extent a holder was allocated losses in taxable years ending prior to the Effective Date, such losses may have been suspended by reason of certain provisions of the Tax Code (in particular, those relating to so-called "passive losses" or the "at risk" rules). As a result of the transaction, all or part of such losses may become deductible.

For U.S. federal income tax purposes, the discharge of BBEP's indebtedness pursuant to the Plan will result in a deemed cash distribution to each BBEP Common Unitholder based on the amount of the indebtedness allocable to such BBEP Common Unitholder's units. To the extent that any such deemed cash distribution exceeds the BBEP Common Unitholder's adjusted tax basis in its units (after adjustment for net gain or loss allocable to the BBEP Common Unitholder as described above), such holder will recognize capital gain. Any such capital gain generally should be long-term if the BBEP Common Unitholder's holding period in its units is more than one year and otherwise should be short-term. A BBEP Common Unitholder's adjusted tax basis in its units will be decreased (but not below zero) to the extent of any such deemed cash distribution.

**The federal income tax consequences of the Plan are complex, and may be particularly adverse for BBEP Common Unitholders. Accordingly, all BBEP Common Unitholders as well as all Preferred Unitholders are urged to consult their tax advisors regarding the U.S. federal income tax consequences to them (taking into account their personal circumstances), including the potential for substantial unsheltered income.**

### B.    Consequences to Holders of Certain Claims and Interests

Unless otherwise noted, the discussion below applies only to U.S. Holders. As used herein, the term "**U.S. Holder**" means a beneficial owner of Revolving Credit Facility Claims, Secured Notes Claims, New Loan Obligations (as defined below), New Permian Corp. Shares or LegacyCo Units that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Revolving Credit Facility Claims, Unsecured Notes Claims, New Loan Obligations (as defined below), New Permian Corp. Shares or LegacyCo Units, the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any of such instruments, you are urged to consult your tax advisor.

### 1.    Holders of Revolving Credit Facility Claims

Pursuant to the Plan, and in full satisfaction of their Allowed Claims, holders of Revolving Credit Facility Claims will receive (a) a cash payment and (b) either (i) a new term loan under the Exit Facility or (ii) at the holder's election, a new loan under a revolving credit facility (such two types of new loans are each hereafter referred to as a "series" and, collectively, as "**New Loan Obligations**"); *provided*, that all Revolving Credit Facility Claims arising under any "Lender Derivative Contract" (as such term is defined in the Revolving Credit Agreement) shall be indefeasibly paid in full in Cash.  The following discussion does not apply to holders of Revolving Credit Facility Claims arising under any "Lender Derivative Contract" as such holders are being paid in full in Cash.

(a)    <u>Treatment of the Revolving Credit Facility Claims</u>

For U.S. federal income tax purposes, the purported exchange of a new debt instrument for an existing debt instrument will be respected as an exchange, as a result of which (among other things) gain or loss is realized, if the terms of the new debt instrument compared to existing debt instrument constitute a "significant modification."  The applicable U.S. Treasury Regulations concerning modification of debt instruments generally provide that an exchange occurs when, based on all the facts and circumstances and taking into account all changes in the terms of the debt instrument collectively (other than certain specified changes), the legal rights or obligations that are altered, and the degree to which they are altered, are economically significant.  Accordingly, if the holders of Revolving Credit Facility Claims receive New Loan Obligations pursuant to the Plan, then based on the interest rate and other economic terms of the other economic terms of the New Loan Obligations under the Exit Revolving Credit Facility, the Debtors believe that the exchange of Revolving Credit Facility Claims for New Loan Obligations is likely to be treated as a "significant modification" of the Revolving Credit Facility Claims, and the remainder of this discussion so assumes.

Consequently, the Debtors believe that the receipt of cash and New Loan Obligations under the various exit facilities in exchange for Revolving Credit Facility Claims will be a fully taxable transaction to holders.  Accordingly, in general, a U.S. Holder of Revolving Credit Facility Claims should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of (A) the amount of any cash received in satisfaction of its Claims (including any upfront fees received on the Effective Date by the holders pursuant to the exit facilities) and (B) the issue

price (as defined below) of the New Loan Obligations received in satisfaction of its Claims (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued original issue discount ("**OID**")), and (ii) the holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* B.6— "Character of Gain or Loss," below.  A U.S. Holder of Revolving Credit Facility Claims will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income.  *See* B.5— "Distributions in Discharge of Accrued Interest or OID," below.

The "issue price" of any series of New Loan Obligations under the Plan depends on whether, at any time during the 31-day period ending 15 days after the Effective Date, such New Loan Obligations or the Revolving Credit Facility Claims are considered traded on an "established market."  Pursuant to applicable U.S. Treasury regulations, an "established market" need not be a formal market.  It is sufficient if there is a readily available sales price for an executed purchase or sale of New Loan Obligations in such series or the Revolving Credit Facility Claims, or if there is one or more "firm quotes" or "indicative quotes" with respect to a series of New Loan Obligations or for the Revolving Credit Facility Claims, in each case as such terms are defined in applicable U.S. Treasury regulations.  If any of the New Loan Obligations received are considered traded on an established market, the issue price of such series of New Loan Obligations for U.S. federal income tax purposes will equal their fair market value as of the Effective Date.  If any series of New Loan Obligations is not considered traded on an established market but the Revolving Credit Facility Claims are so treated, the issue price of such series of New Loan Obligations for U.S. federal income tax purposes will be based on the fair market value of the Revolving Credit Facility Claims (with appropriate adjustments, such as for the amount of cash received, if any).  Alternatively, if the Revolving Credit Facility Claims are also not considered traded on an established market, the issue price of such series of New Loan Obligations for U.S. federal income tax purposes generally will be their stated principal amount. If BBEP determines that any series of New Loan Obligations or the Revolving Credit Facility Claims are traded on an established market, such determination and the determination of issue price will be binding on a holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the Effective Date that such holder's determination is different from BBEP's determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

Based on recent trade and quote data available to BBEP, the Debtors do not believe that the Revolving Credit Facility Claims would currently be considered traded on an established market, however the relevant determination date for such purpose is the Effective Date and there can be no assurances that a trading market will not arise in respect of the Revolving Credit Facility Claims or the New Loan Obligations between now and 15 days after the Effective Date. Accordingly, each holder of Revolving Credit Facility Claims is urged to consult its tax advisor regarding such determination and the gain or loss that such holder may recognize upon implementation of the Plan.

    (b)   <u>Payments of Stated Interest on the New Loan Obligations</u>

Payments of stated interest on New Loan Obligations generally should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received (in accordance with the holder's regular method of tax accounting).

    (c)   <u>Accrual of Original Issue Discount on the New Loan Obligations</u>

The New Loan Obligations may be treated as issued with OID. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" (as described in (a) above) by more than a *de minimis* amount. A New Loan Obligation's "stated redemption price at maturity" for this purpose would include all principal and interest payable over the term of the New Loan Obligation, other than "qualified stated interest," *i.e.,* stated interest that is unconditionally payable at least annually at a constant rate in cash or property (other than debt of the issuer). The stated interest payable on the New Loan Obligations should be considered qualified stated interest for this purpose.

If the New Loan Obligations are issued with OID, a U.S. Holder of a New Loan Obligation generally will be required to include OID in gross income as it accrues over the term of the loan in accordance with a constant yield-to-maturity method, regardless of whether the U.S. holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on the obligation. Accordingly, a U.S. Holder could be treated as receiving interest income in advance of a corresponding receipt of cash. Any OID that a holder includes in income will increase the holder's adjusted tax basis in the New Loan Obligation. A U.S. Holder generally will not be required to include separately in income cash payments (other than in respect of qualified stated interest) received on the New Loan Obligation; instead, such payments will reduce the holder's adjusted tax basis in the New Loan Obligation by the amount of the payment.

The amount of OID includible in income for a taxable year by a U.S. Holder generally equals the sum of the daily portions of OID that accrue on a New Loan Obligation for each day during the taxable year on which such holder holds the New Loan Obligation, whether reporting on the cash or accrual basis of accounting for U.S. federal income tax purposes. The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the New Loan Obligation at the beginning of the accrual period multiplied by the yield to maturity of the New Loan Obligation less the amount of any qualified stated interest allocable to such accrual period. The "adjusted issue price" of a New Loan Obligation at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the New Loan Obligation in all prior accrual periods, and decreased by any payments made during all prior accrual periods on the New Loan Obligation other than qualified stated interest.

The rules regarding the determination of issue price and OID are complex, and the OID rules described above may not apply in all cases. Accordingly, each holder of Revolving Credit

Facility Claims is urged to consult its tax advisor regarding the possible application of the OID rules to the New Loan Obligations.

## 2.    Holders of Secured Notes Claims

Distributions to holders of Allowed Secured Notes Claims will be made in accordance with the terms of the Plan. Accordingly, in accordance with the Restructuring Transactions, the following transactions will occur in order:

- On the Effective Date, BBEP will contribute the Legacy Assets to LegacyCo in exchange for LegacyCo Units representing all of the equity capital of LegacyCo.

- Immediately thereafter, pursuant to the LegacyCo Distribution and Transfer, BBEP will distribute 92.5% of the LegacyCo Units to holders of Allowed Secured Notes Claims in satisfaction and discharge of their Claims (simultaneously, the remaining 7.5% of the LegacyCo Units will be acquired by New Permian Corp.).

As described above (*see* A.1— "Consequences to the Debtors and to BBEP Common Unitholders—Taxable Transfer of Assets"), the distribution of LegacyCo Units to the holders of Secured Notes Claims is intended to be treated for U.S. federal income tax purposes (unless the Corporation Election is made at the direction of the Requisite Consenting Second Lien Creditors) as (a) a distribution of the Legacy Contributed Assets in a taxable exchange to the holders of Secured Notes Claims and New Permian Corp., followed by (b) the contribution of such assets by the holders and New Permian Corp. to LegacyCo, with LegacyCo being treated as a newly formed partnership for U.S. federal income tax purposes. To this end, the Plan requires that all parties treat the transaction in such manner, otherwise required pursuant to a "final determination" to the contrary within the meaning of section 1313(a) of the Tax Code.

So treated, each U.S. Holder of an Allowed Secured Notes Claim generally should recognize gain or loss in an amount equal to the difference, if any, between (a) the aggregate fair market value of its share of the Legacy Contributed Assets (or if a Corporation Election is made, the LegacyCo Units) received in exchange for its Claim (other than possibly any consideration received in respect of a claim for accrued but unpaid interest and possibly OID), and (b) the holder's adjusted tax basis in its Allowed Secured Notes Claim (other than possibly any tax basis attributable to accrued but unpaid interest and possibly OID). *See* B.6— "Character of Gain or Loss," below. However, the recognition of any loss is subject to complex related-party rules. Accordingly, any U.S. Holder of an Allowed Secured Notes Claim that owns Existing BBEP Equity Interests or that may be related to a person that owns Existing BBEP Equity Interests is urged to consult its tax advisor regarding the potential application of any related-party loss disallowance rules. A U.S. Holder of an Allowed Secured Notes Claim will have interest income to the extent of the value of any LegacyCo Units allocable to accrued but unpaid interest not previously included in income. *See* B.5— "Distributions in Discharge of Accrued Interest or OID," below.

The deemed contribution to LegacyCo of the Legacy Assets treated as received by the U.S. Holders of Allowed Secured Notes Claims should itself be a tax-free contribution.

Thus, a U.S. Holder of an Allowed Secured Notes Claim should have a tax basis in the LegacyCo Units received equal to the amount taken into account in determining gain or loss, and the holder's holding period for the units should begin the day following the Effective Date.

### 3.    Holders of Unsecured Notes Claims

Pursuant to the treatment section of the Plan, each holder of an Allowed Unsecured Notes Claim that is an Eligible Offeree will receive, in full satisfaction of such Claim, the right to participate in the Rights Offering (a "**Subscription Right**").  Each holder of an Allowed Unsecured Notes Claims that is not an Eligible Offeree (a Receiving AUNC Holder) will receive either shares of New Permian Corp. or, at the holder's election, cash in accordance with Section 4.5(c) of the Plan.  Pursuant to the Plan, there will also be a distribution in cash in respect of the Unsecured Notes Indenture Trustee's fees.  In the event of a distribution to holders of Existing BBEP Equity Interest, any holder of an Allowed Unsecured Notes Claim that is an Eligible Offeree and elects not to participate in the Rights Offering will receive a distribution in accordance with Section 4.5(b) of the Plan; the following discussion does not address such distribution.

Pursuant to the Plan, each Receiving AUNC Holder will receive its New Permian Corp. Shares in the form of interests in the AUNC Trust.  For U.S. federal income tax purposes, subject to definitive guidance from the IRS or a court of competent jurisdiction, the Plan provides that a distribution of New Permian Corp. Shares to the AUNC trust shall be treated by all parties as (i) a direct transfer to Receiving AUNC Holders, and (ii) the transfer by such persons to the AUNC Trust in exchange for their beneficial interest therein.   Accordingly, it is intended that each holder be treated for United States federal income tax purposes as the grantors and direct owners of their respective portions of the underlying assets of the AUNC Trust, and the following discussion so assumes.  Receiving AUNC Holders will recognize gain or loss on the deemed receipt of New Permian Corp. Shares as described below, but should not recognize additional gain or loss upon the contribution of New Permian Corp. Shares to or any distribution of the New Permian Corp. Shares from the AUNC Trust.

### (a)    Gain or Loss

In general, a U.S. Holder of an Allowed Unsecured Notes Claim should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the amount of cash and the fair market value of any New Permian Corp. Shares or (as discussed below) any Subscription Rights received in the exchange (other than any exchange consideration received in respect of a claim for accrued but unpaid interest and possibly OID), and (ii) the holder's adjusted tax basis in the Unsecured Notes Claims and any other property exchanged (other than possibly any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  However, the recognition of any loss is subject to complex related-party rules.  Accordingly, any U.S. Holder of an Allowed Unsecured Notes Claim that owns or that may be related to a person that owns Existing BBEP Equity Interests is urged to consult its tax advisor regarding the potential application of any related-party loss disallowance rules.  A U.S. Holder of an Unsecured Notes Claim will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income.  *See* B.5— "Distributions in Discharge of Accrued Interest or OID," below.

Although not free from doubt, the Debtors believe that the better view is that the Subscription Right should be treated as an option and an Eligible Offeree should be treated as receiving the Subscription Rights in exchange for its Allowed Unsecured Notes Claim, with the exercise of the Subscription Rights treated for U.S. federal income tax purposes as the exercise of options to acquire the underlying New Permian Corp. Shares (including any New Permian Corp. Shares received relating to the Put Option Premium).  Alternatively, the receipt and exercise of the Subscription Rights pursuant to the Plan could be viewed as an integrated transaction pursuant to which part of the New Permian Corp. Shares are treated as  acquired directly in satisfaction of a holders Allowed Unsecured Notes Claim and part are treated as acquired for Cash.  Unless otherwise indicated, the discussion herein assumes that the Subscription Rights are viewed as options.   Regardless of the characterization of the Subscription Rights, a U.S. Holder of Subscription Rights generally would not recognize additional gain or loss upon the exercise of such Subscription Rights beyond the gain or loss recognized in respect of the exchange of such holder's claim.  If the Subscription Rights are treated as an option, a U.S. Holder's tax basis in the Subscription Rights should equal their fair market value on the Effective Date.

A U.S. Holder's tax basis in the New Permian Corp. Shares received upon exercise of a Subscription Right (including any New Permian Corp. Shares received relating to the Put Option Premium) should generally be equal to the sum of (i) the amount paid, if any, for the New Permian Corp. Shares and (ii) the holder's tax basis, if any, in the Subscription Rights or, alternatively, under an integrated transaction analysis, in any New Permian Corp. Shares that are treated as acquired directly in full satisfaction of the holder's Unsecured Notes Claim.  A U.S. Holder's holding period in the New Permian Corp. Shares received upon exercise of the Subscription Rights should begin on the day such rights are exercised or, alternatively under an integrated transaction analysis, on the day after such holder is treated as receiving the New Permian Corp. Shares.

Each Receiving AUNC Holder generally will have a tax basis in any shares of New Permian Corp. received equal to their fair market value, and a holding period that begins on the day after the Effective Date.

(b)    Lapse of Subscription Right and Disposition of New Permian Corp. Shares

If a U.S. Holder is treated as receiving a Subscription Right of value that subsequently lapses without being exercised by the holder, such holder would generally recognize a loss to the extent of its tax basis in the Subscription Right.  In general, such gain or loss would be a capital gain or loss, long-term or short-term, depending upon whether the requisite holding period was satisfied.

If a U.S. Holder exercises its Subscription Rights and sells, exchanges or otherwise disposes of the underlying New Permian Corp. Shares (including any New Permian Corp. Shares received relating to the Put Option Premium) it receives upon exercise, such holder generally will recognize gain or loss in an amount equal to the difference, if any, between the amount realized for the New Permian Corp. Shares and the U.S. Holder's adjusted tax basis in the New Permian Corp. Shares.  Capital gains of non-corporate U.S. Holders derived with respect to a sale, exchange or other taxable disposition of the New Permian Corp. Shares held for more than one year may be eligible for reduced rates of taxation.  The deductibility of capital losses is subject to limitation.

*You are urged to consult your tax advisor regarding the receipt of the Subscription Rights, as well as the tax consequences of any disposition of the New Permian Corp. Shares.*

### 4.    Holders of General Unsecured Claims

Pursuant to the treatment section of Plan, each holder of an Allowed General Unsecured Claim will receive its Pro Rata share of either (i) the GUC Cash Pool or (ii) if elected by a holder of an Allowed General Unsecured Claim in an amount equal to or more than $1 million, New Permian Corp. Shares (a Receiving GUC Holder).

In general, a U.S. Holder of an Allowed General Unsecured Claim should recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of cash or the fair market value of New Permian Corp. Shares received in the exchange (other than possibly any exchange consideration received in respect of a claim for accrued but unpaid interest and possibly accrued OID), and (ii) the holder's adjusted tax basis in the General Unsecured Claim exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* B.6— "Character of Gain or Loss," below.  However, the recognition of any loss is subject to complex related-party rules.  Accordingly, any U.S. Holder of an Allowed General Unsecured Claim that owns or may be related to a person that owns Existing BBEP Equity Interests is urged to consult its tax advisor regarding the potential application of any related-party loss disallowance rules.  A U.S. Holder of an Allowed General Unsecured Claim will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest not previously included in income.  *See* B.5— "Distributions in Discharge of Accrued Interest or OID," below.

In the event of the subsequent disallowance of any Disputed General Unsecured Claims, a holder of a previously Allowed Claim may receive additional post-Effective Date distributions. Accordingly, it is possible that any loss, or a portion of any gain, realized by a U.S. Holder may be deferred until all Disputed General Unsecured Claims are Allowed or Disallowed.  In addition, a holder may have imputed interest income with respect to such distribution.  U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such holders in respect of their Claims due to the receipt of cash in a taxable year subsequent to the taxable year in which the Effective Date occurs. The discussion herein assumes that the installment method does not apply.

If a U.S. Holder of an Allowed General Unsecured Claim receives New Permian Corp. Shares in the exchange, such holder generally will have a tax basis in any shares of New Permian Corp. received equal to their fair market value, and a holding period that begins on the day after the Effective Date.

### 5.    Distributions in Discharge of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income).  Conversely, a U.S. Holder generally recognizes a deductible loss to the extent

any accrued interest claimed or accrued OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that, except as otherwise required by law, consideration received in respect of an Allowed Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest (in contrast, for example, to a pro rata allocation of a portion of the exchange consideration received between principal and interest, or an allocation first to accrued but unpaid interest). *See* Section 5.13 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration and the inclusion and deductibility of accrued but unpaid interest for U.S. federal income tax purposes.

### 6.    Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. A holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the holder's adjusted tax basis in its Claim is less than the stated redemption price of such Claim at maturity by at least a *de minimis* amount. Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

### 7.    Ownership and Disposition of LegacyCo Units

In accordance with the LegacyCo Amended and Restated Operating Agreement, LegacyCo will be treated as a partnership for U.S. federal income tax purposes, unless the Corporation Election is made (in which event the LegacyCo Units would be treated as common stock in a corporation for U.S. federal income tax purposes). The following discussion assumes that the Corporation

Election is not made.  As a partnership, LegacyCo itself generally will not be subject to U.S. federal income tax.  Instead, LegacyCo will file an annual partnership information return with the IRS, which form will report the results of LegacyCo's operations.  Each recipient of LegacyCo Units will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of LegacyCo's income, gain, loss, deduction and credit for each taxable year of LegacyCo ending with or within such member's taxable year.  Each item generally will have the same character as if the member of LegacyCo had realized the item directly.  Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from LegacyCo for such taxable year, and thus may incur income tax liabilities in excess of any distributions from LegacyCo. LegacyCo will provide each member with the necessary information to report its allocable share of the LegacyCo's tax items for U.S. federal income tax purposes; however, no assurance can be given that LegacyCo will be able to provide such information prior to the initial due date of the members' U.S. federal income tax returns and the members may therefore be required to apply to the IRS for an extension of time to file their tax returns.

The board of directors of LegacyCo will decide how items will be reported on LegacyCo's U.S. federal income tax returns, and all members will be required under the Tax Code to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency.  In the event that the income tax returns of LegacyCo are audited by the IRS, the tax treatment of LegacyCo's income and deductions generally will be determined at the LegacyCo level in a single proceeding, rather than in individual audits of the members.  The tax matters partner and partnership representative will have considerable authority under the Tax Code and the limited liability company agreement for LegacyCo to make decisions affecting the tax treatment and procedural rights of all members.

LegacyCo will have an initial tax basis in its assets equal to their respective fair market values at the time of the transfer by BBEP (discussed above).  LegacyCo's holding period in its assets will begin on the date of the transfer.

A member generally will not recognize gain or loss on the receipt of a distribution of cash or property from LegacyCo (provided that the member is not treated as exchanging such member's share of LegacyCo's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the IRC, and together "**Ordinary Income Items**") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, in some cases, "marketable securities," from LegacyCo (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of LegacyCo) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such member's adjusted tax basis in its membership interest.  Such distribution would be treated as gain from the sale or exchange of a membership interest, which is described below.

A member will recognize gain on the complete liquidation of its membership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest.  Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain.  Any gain recognized by a member on the receipt of a distribution from LegacyCo generally will be capital gain, but may be taxable as ordinary income under certain other

circumstances.  No loss can be recognized on a distribution in liquidation of a membership interest, unless the member receives no property other than money and Ordinary Income Items.

A member's adjusted tax basis in its interest in LegacyCo generally will be equal to such member's initial tax basis (discussed above), increased by the sum of (a) any additional capital contribution such member makes to LegacyCo, (b) the member's allocable share of the income of LegacyCo, and (c) increases in the member's allocable share of the indebtedness of LegacyCo, and reduced, but not below zero, by the sum of (d) the member's allocable share of the losses of LegacyCo, and (e) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of the indebtedness of LegacyCo.

A sale of all or part of a member's LegacyCo Units will generally result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a member's allocable share of certain Ordinary Income Items of LegacyCo and such proceeds exceed the member's adjusted tax basis attributable to such Ordinary Income Items and (ii) of previously allowed bad debt or ordinary loss deductions.  A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the Tax Code.

***The foregoing summary has been provided for informational purposes only.  Each holder of Claims and LegacyCo Units is urged to consult its tax advisor concerning the U.S. federal, state, local, and other tax consequences applicable under the Plan.***

### 8.    Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the exchange consideration, may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions.  Information may also be required to be provided to the IRS concerning payments, unless an exemption applies.  You are urged to consult your tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

U.S. Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  You are urged to consult your tax advisor regarding these U.S. Treasury regulations and whether the contemplated transactions under the Plan would be subject to these U.S. Treasury regulations and require disclosure on your tax return.

***The foregoing summary has been provided for informational purposes only.  Each holder of Claims and Existing BBEP Equity Interests is urged to consult its tax advisor concerning the U.S. federal, state, local, and other tax consequences applicable under the Plan.***

## VIII.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Claim entitled to vote (an "**Eligible Holder**") should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and provisions of the Plan.

### A.    Voting Deadline

All Eligible Holders have been sent a Ballot together with this Disclosure Statement.  Such holders should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.  Special procedures are set forth below for holders of securities through a broker, dealer, commercial bank, trust company, or other agent or nominee ("**Nominee**").

The Debtors have engaged Prime Clerk LLC as their voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (EASTERN TIME) ON JANUARY 4, 2018, UNLESS EXTENDED BY THE DEBTORS**.

AN ELIGIBLE HOLDER HOLDING THE SECURED NOTES, 7.875% UNSECURED NOTES, OR 8.625% UNSECURED NOTES IN "STREET NAME" THROUGH A NOMINEE MAY VOTE AS FURTHER DESCRIBED BELOW.

IF YOU MUST RETURN YOUR BALLOT TO YOUR NOMINEE, YOU MUST RETURN YOUR BALLOT TO THEM IN SUFFICIENT TIME FOR THEM TO PROCESS IT AND RETURN THE MASTER BALLOT TO THE VOTING AGENT BEFORE THE VOTING DEADLINE.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

<div align="center">

**Prime Clerk LLC**
**Telephone:  855-851-7887 (toll free) or +1 917-258-6103 (international)**
**E-mail:  breitburninfo@primeclerk.com with " BBEP" in the subject line**

</div>

Additional copies of this Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B.    Voting Procedures

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to Eligible Holders.  Record holders of certain Claims may include Nominees.  If such Nominees do not hold Claims for their own account, they must provide copies of the Solicitation Package to their customers that are the Eligible Holders thereof as of the Record Date.  Any Eligible Holder that has not received a Ballot should contact its Nominee, or the Voting Agent.

Eligible Holders should provide all of the information requested by the Ballot and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot either to the Voting Agent or their Nominee, as applicable.

The Record Date for determining which holders are entitled to vote on the Plan is November 29, 2017.  The applicable administrative agent or indenture trustee under any debt documents will not vote on behalf of its respective holders.  Such holders must submit their own Ballot.

### C.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of Claims or Interests in "impaired" classes are entitled to vote on the Plan.  Under section 1124 of the Bankruptcy Code, a class of Claims or Interests is "impaired" under the Plan unless (1) the Plan leaves unaltered the legal, equitable, and contractual rights to which such Claim or Interest entitles the holder thereof or (2) notwithstanding any legal right to an accelerated payment of such Claim or Interest, the Plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired Claim or Interest will not receive or retain any distribution under the Plan on account of such Claim or Interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such Claims and Interests do not actually vote on the Plan and will not receive a Ballot.  If a Claim or Interest is not impaired by the Plan, the Bankruptcy Code presumes the holder of such Claim or Interest to have accepted the Plan and, accordingly, holders of such Claims and Interests are not entitled to vote on the Plan, and also will not receive a Ballot.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan; and (2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The Claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 3 – Revolving Credit Facility Claims

- Class 4 – Secured Notes Claims

- Class 5A/5B – Unsecured Notes Claims

- Class 6 – General Unsecured Claims

### 1.    Beneficial Holders

An Eligible Holder that holds a Claim as a record holder in its own name should vote on the Plan by completing and signing a Ballot (a "**Beneficial Holder Ballot**") and returning it directly to the Voting Agent on or before the Voting Deadline using the enclosed self-addressed, postage-paid envelope.

An Eligible Holder holding a Claim in "street name" through a Nominee may vote on the Plan by one of the following two methods (as selected by such Eligible Holder's Nominee):

- Complete and sign the enclosed Beneficial Holder Ballot.  Return the Beneficial Holder Ballot to your Nominee as promptly as possible and in sufficient time to allow such Nominee to process your instructions and return a completed "master" Ballot (each, a "**Master Ballot**") to the Voting Agent by the Voting Deadline.  If no self-addressed, postage-paid envelope was enclosed for this purpose, contact the Voting Agent for instructions; or

- Complete and sign the pre-validated Beneficial Holder Ballot (as described below) provided to you by your Nominee.  Return the pre-validated Beneficial Holder Ballot to the Voting Agent by the Voting Deadline using the return envelope provided in the Solicitation Package.

Any Beneficial Holder Ballot returned to a Nominee by an Eligible Holder will not be counted for purposes of acceptance or rejection of the Plan until such Nominee properly completes and delivers to the Voting Agent that Beneficial Holder Ballot (properly validated) or a Master Ballot casting the vote of such Eligible Holder.

If any Eligible Holder owns a Claim through more than one Nominee, such Eligible Holder may receive multiple mailings containing the Beneficial Holder Ballots.  The Eligible Holder should execute a separate Beneficial Holder Ballot for each block of a Claim that it holds through any particular Nominee and return each Beneficial Holder Ballot to the respective Nominee in the return envelope provided therewith.  Eligible Holders that execute multiple Beneficial Holder Ballots with respect to a Claim in a single Class held through more than one Nominee must

indicate on each Beneficial Holder Ballot the names of all such other Nominees and the additional amounts of such Claims so held and voted.

### 2.    Nominees

A Nominee that, on the Record Date, is the record holder of Claims for one or more Eligible Holders can obtain the votes of the Eligible Holders of such Claims, consistent with customary practices for obtaining the votes of securities held in "street name," in one of the following two ways:

(a)    <u>Pre-Validated Ballots</u>

The Nominee may "pre-validate" a Beneficial Holder Ballot by (i) signing the Beneficial Holder Ballot and indicating on the Beneficial Holder Ballot the name of the Nominee and DTC Participant Number, (ii) the amount and the account number of the Claims held by the Nominee for the Eligible Holder, and (iii) forwarding such Beneficial Holder Ballot, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, the Voting Agent, and other materials requested to be forwarded, to the Eligible Holder for voting. The Eligible Holder must then complete the information requested in Item 2 and Item 3 of the Beneficial Holder Ballot, and return the Beneficial Holder Ballot directly to the Voting Agent in the pre-addressed, postage-paid return envelope so that it is RECEIVED by the Voting Agent on or before the Voting Deadline. A list of the Eligible Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one year from the Voting Deadline.

(b)    <u>Master Ballots</u>

If the Nominee elects not to prevalidate Beneficial Holder Ballots, the Nominee may obtain the votes of Eligible Holders by forwarding to the Eligible Holders the unsigned Beneficial Holder Ballots, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such Eligible Holder must then indicate his, her, or its vote on the Beneficial Holder Ballot, complete the information requested on the Beneficial Holder Ballot, review the certifications contained on the Beneficial Holder Ballot, execute the Beneficial Holder Ballot, and return the Beneficial Holder Ballot to the Nominee. After collecting the Beneficial Holder Ballots, the Nominee should, in turn, complete a Master Ballot compiling the votes and other information from the Beneficial Holder Ballots, execute the Master Ballot, and deliver the Master Ballot to the Voting Agent so that it is RECEIVED by the Voting Agent on or before the Voting Deadline. All Beneficial Holder Ballots returned by Eligible Holders should either be forwarded to the Voting Agent (along with the Master Ballot) or retained by Nominees for inspection for at least one year from the Voting Deadline. EACH NOMINEE SHOULD ADVISE ITS ELIGIBLE HOLDERS TO RETURN THEIR BENEFICIAL HOLDER BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE MASTER BALLOT TO THE VOTING AGENT SO THAT IT IS RECEIVED BY THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE.

### 3.  Miscellaneous

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Date.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots.  Any Ballot marked to both accept and reject the Plan shall not be counted.  If you return more than one Ballot voting different Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  An otherwise properly executed Ballot (other than a Master Ballot) that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only Eligible Holders that actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent or its Nominee will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 4.  Fiduciaries and Other Representatives

If a Beneficial Holder Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another person acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act.  Authorized signatories should submit the separate Beneficial Holder Ballot of each Eligible Holder for whom they are voting.

UNLESS THE BALLOT OR THE MASTER BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR BEFORE THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; *PROVIDED*, *THAT* THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.

### 5.  Agreements upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the voter with respect to such Ballot to accept (a) all of the terms of,

and conditions to, this solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.7, 10.8, and 10.9 therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### 6.    Change of Vote

Any party that has previously submitted a properly completed Ballot to the Voting Agent before the Voting Deadline may revoke such Ballot and change its vote by submitting to the Voting Agent a subsequent, properly completed Ballot for acceptance or rejection of the Plan before the Voting Deadline.

### D.    **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E.    **Further Information, Additional Copies**

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

<div align="center">

**IX.**
**FACTORS TO CONSIDER BEFORE VOTING**

</div>

Before voting to accept or reject the Plan, holders of Claims entitled to vote should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below should not be regarded as the only risks associated with the Plan or its implementation.  Documents filed with the SEC may contain important risk factors that differ from those discussed below, and such risk factors are incorporated as if fully set forth

herein and are a part of this Disclosure Statement. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

## A. Risks Relating to the Debtors' Business Operations and Financial Condition

### 1. Volatile Oil and Gas Prices

Revenues and profitability of the Debtors (and therefore the Reorganized Debtors) substantially depend on prevailing oil and natural gas prices. Oil and natural gas are commodities subject to significant fluctuations in response to changes in supply and demand. Oil and natural gas prices have historically been volatile and are likely to continue to be volatile in the future, especially given current economic and geopolitical conditions. The prices for oil and natural gas are subject to a variety of factors beyond the Debtors' or Reorganized Debtors' control, including the following:

- domestic and foreign supply of and demand for oil, liquefied natural gases, and natural gas;

- market prices of oil, liquefied natural gases, and natural gas;

- level of consumer product demand;

- overall domestic and global political and economic conditions;

- political and economic conditions in producing countries, including those in the Middle East, Russia, South America and Africa;

- actions of the Organization of Petroleum Exporting Countries and other state-controlled oil companies relating to oil price and production controls;

- weather conditions;

- impact of the United States dollar exchange rates on commodity prices;

- technological advances affecting energy consumption and energy supply;

- domestic and foreign governmental regulations and taxation;

- impact of energy conservation efforts;

- capacity, cost and availability of oil and natural gas pipelines, processing, gathering and other transportation facilities and the proximity of these facilities to wells;

- increase in imports of liquid natural gas in the United States; and

- price and availability of alternative fuel.

Historically, higher oil and natural gas prices generally stimulate increased demand and result in increased prices for drilling equipment, crews and associated supplies, equipment and services. A high cost environment could adversely affect the Reorganized Debtors' operations.

### 2.     High Costs and Risks of Oil and Natural Gas Drilling and Production

The Debtors' operations are (and the Reorganized Debtors' operations will be) subject to many risks, including the risk of not discovering commercially productive reservoirs.  Drilling for oil and natural gas can be unprofitable, not only from dry holes, but from productive wells that do not produce sufficient revenue to return a profit.  The decisions to purchase, explore, develop, or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, as well as production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations.  In addition, the results of any exploratory drilling in new or emerging areas are more uncertain than drilling results in areas that are developed and have established production, and the Debtors' or Reorganized Debtors' operations may involve the use of recently-developed drilling and completion techniques.  The cost of drilling, completing, equipping, and operating wells is often uncertain before drilling commences.  Declines in commodity prices and overruns in budgeted expenditures are common risks that can make a particular project uneconomic or less economic than forecasted.  Furthermore, many factors may curtail, delay, or cancel drilling and completion projects, including the following:

- high costs, shortages or delivery delays of drilling rigs, equipment, labor or other services;

- unexpected operational events and drilling conditions;

- sustained depressed oil and natural gas prices and further reductions in oil and natural gas prices;

- limitations in the market for oil and natural gas;

- problems in the delivery of oil and natural gas to market;

- adverse weather conditions;

- facility or equipment malfunctions;

- equipment failures or accidents;

- title problems;

- pipe or cement failures;

- casing collapses;

- compliance with environmental and other governmental requirements;

- environmental hazards, such as natural gas leaks, oil spills, pipeline ruptures and discharges of toxic gases;

- lost or damaged oilfield drilling and service tools;

- unusual or unexpected geological formations;

- loss of drilling fluid circulation;

- pressure or irregularities in formations;

- fires, blowouts, surface craterings and explosions;

- natural disasters; and

- uncontrollable flows of oil, natural gas or well fluids.

In certain properties, the Debtors use (and the Reorganized Debtors will use) enhanced recovery technologies to produce oil and natural gas on certain properties. For example, the Debtors inject water and $CO_2$ into formations on substantially all of their Oklahoma properties to increase production of oil and natural gas. If the Reorganized Debtors are unable to produce oil and gas by injecting $CO_2$ in the manner or to the extent that they anticipate, any future results of operations and financial condition could be materially adversely affected. The additional production and reserves attributable to the use of enhanced recovery methods are inherently difficult to predict. Additionally, the Reorganized Debtors' ability to utilize $CO_2$ to enhance production will be subject to their ability to obtain sufficient quantities of $CO_2$. The Reorganized Debtors may have inadequate $CO_2$ if their $CO_2$ supplier is unable to deliver contractually required quantities of $CO_2$ or adequate $CO_2$ supplies are impeded, which may, in turn, negatively impact oil and gas production volumes.

In addition, the Reorganized Debtors may have limited control over activities on properties where they do not operate. The Reorganized Debtors may have limited ability to influence or control the operation, future development, or capital expenditures of the non-operated properties where they have interests. The success and timing of drilling development or production activities on properties operated by others depend upon a number of factors that will be outside of the Reorganized Debtors' control, including the timing and amount of capital expenditures, the operator's expertise and financial resources, approval of other participants, and selection of technology. The Reorganized Debtors' dependence on the operator and other working interest owners for these projects coupled with their limited ability to influence or control the operation and future development of these properties could have a material adverse effect on the realization of any targeted returns on capital or lead to unexpected future costs.

### 3. Depletion of Oil and Gas Reserves

Producing oil and natural gas reservoirs are characterized by declining production rates that vary based on reservoir characteristics and other factors. The rate of decline of the Reorganized Debtors' reserves and production could change if production from their wells declines in a different manner than estimated, and may change when the Reorganized Debtors drill additional wells, make acquisitions, and under other circumstances. The Reorganized Debtors' future oil and natural gas reserves and production and cash flow will depend on their success in developing and exploiting certain of the Debtors' current reserves sufficiently. The Reorganized Debtors may not be able to develop, find, or acquire additional reserves to replace their production at acceptable costs, which would adversely affect their business, financial condition and results of operations.

### 4. Intense Competitive Environment

The oil and gas industry is intensely competitive with respect to acquiring prospects and productive properties, marketing oil and natural gas and securing equipment and trained

personnel, and the Reorganized Debtors will compete with other companies that have greater resources. Many of the Reorganized Debtors' competitors will be major independent oil and gas companies that possess and employ substantially greater financial, technical, and personnel resources. Those companies may be able to develop and acquire more prospects and productive properties than the Reorganized Debtors' financial or personnel resources permit. The Reorganized Debtors' ability to acquire additional properties and to discover reserves in the future will depend on their ability to evaluate and select suitable properties and to consummate transactions in a highly competitive environment.

Factors that will affect the Reorganized Debtors' ability to acquire properties include availability of desirable acquisition targets, staff and resources to identify and evaluate properties, and available funds. Many larger competitors will not only drill for and produce oil and gas but will also carry on refining operations and market petroleum and other products on a regional, national, or worldwide basis. In addition, there is substantial competition for investment capital in the oil and gas industry. Other companies may have a greater ability to continue drilling activities during periods of low oil and gas prices and to absorb the burden of present and future federal, state, local, and other laws or regulations. The Reorganized Debtors' inability to compete effectively with other companies could have a material adverse effect on their business activities, financial condition, and results of operations.

### 5.    Substantial Capital Requirements

The Reorganized Debtors' ability to borrow and to access the capital and credit markets may be limited by their financial condition at the time of any such financing or offering and the covenants in their post-Effective Date debt agreements, as well as by oil and natural gas prices, the value and performance of their equity securities, and adverse market conditions resulting from, among other things, general economic conditions and contingencies and uncertainties that are beyond their control. The Reorganized Debtors' failure to obtain the funds for necessary future capital expenditures could have a material adverse effect on their business, results of operations, financial condition.

### 6.    Hedging and Derivative Risks

To achieve predictable cash flow and reduce exposure to adverse fluctuations in the prices of oil and gas prices, the Debtors historically and the Reorganized Debtors may in the future enter into derivative arrangements for a significant portion of their expected oil and natural gas production that could result in both realized and unrealized commodity derivative losses. If the Reorganized Debtors cannot enter into commodity derivatives, they could be more affected by changes in commodity prices than their competitors that engage in hedging arrangements.

The extent of the Reorganized Debtors' commodity price exposure will be related largely to the effectiveness and scope of their derivative activities. The reference prices of the derivative instruments the Reorganized Debtors utilize may differ significantly from the actual oil and natural gas prices they realize in their operations. Furthermore, the Reorganized Debtors may enter into derivative transactions related to only a portion of their expected production volumes and, as a result, continue to have direct commodity price exposure on the portion of their production volumes not covered by derivative transactions.

The Reorganized Debtors' actual future production for any given period may be significantly higher or lower than estimated at the time of entering into derivative transactions for such period. If the actual amount is higher than estimated, the Reorganized Debtors will have greater commodity price exposure than intended. If the actual amount is lower than the nominal amount that is subject to the derivative financial instruments, the Reorganized Debtors might be forced to satisfy all or a portion of their derivative transactions without the benefit of the cash flow from any sale or purchase of the underlying physical commodity, resulting in a substantial diminution in profitability and liquidity. As a result of these factors, the Reorganized Debtors' derivative activities may not be as effective as intended in reducing the cash flow volatility, and in certain circumstances may actually increase cash flow volatility. In addition, the Reorganized Debtors' derivative activities may be subject to the following risks:

- the Reorganized Debtors may be limited in receiving the full benefit of increases in oil and natural gas prices as a result of these transactions;

- a counterparty may not perform its obligation under the applicable derivative instrument or seek bankruptcy protection;

- there may be a change in the expected differential between the underlying commodity price in the derivative instrument and the actual price received; and

- the steps the Reorganized Debtors take to monitor derivative financial instruments may not detect and prevent violations of their risk management policies and procedures, particularly if deception or other intentional misconduct is involved.

### 7.    Insurance Coverage and Excess Liability Risks

Although the Debtors currently possess (and the Reorganized Debtors are expected to possess) property and general liability insurance at levels believed to be appropriate, the Debtors and Reorganized Debtors cannot insure against all operational risks. The Debtors are not (and therefore the Reorganized Debtors will not be) fully insured against all risks, including drilling and completion risks that are generally not recoverable from third parties or insurance. In addition, pollution and environmental risks generally are not fully insurable.

Additionally, the Reorganized Debtors may elect not to obtain insurance if the cost of available insurance is excessive relative to the perceived risks presented. Losses could, therefore, occur for uninsurable or uninsured risks or in amounts exceeding existing insurance coverage. Moreover, insurance may not be available in the future at commercially reasonable costs and on commercially reasonable terms. Changes in the insurance markets after natural disasters and terrorist attacks have made it more difficult for the Reorganized Debtors to obtain certain types of coverage. There can be no assurance that the Reorganized Debtors will be able to obtain the levels or types of insurance obtained before these market changes or that the insurance coverage obtained will not contain large deductibles or fail to cover certain hazards or cover all potential losses. Losses and liabilities from uninsured and underinsured events and delay in the payment of insurance proceeds could have a material adverse effect on the Reorganized Debtors' business, financial condition, and operations.

### 8.    Extensive Domestic Regulation and Legislation

The Reorganized Debtors' oil and natural gas exploration, production, gathering, and transportation operations will be subject to complex and stringent laws and regulations.  To conduct their operations in compliance with these laws and regulations, the Reorganized Debtors must obtain and maintain numerous permits, approvals and certificates from various federal, state and local governmental authorities.  The Reorganized Debtors may incur substantial costs to maintain compliance with these existing laws and regulations.  In addition, the Reorganized Debtors' costs of compliance may increase if existing laws, including tax laws, and regulations are revised or reinterpreted, or if new laws and regulations become applicable to their operations. For example, in California, there have been proposals at the legislative and executive levels in the past for tax increases which have included a severance tax as high as 12.5% on all oil production in California.  Although the proposals have not passed the California legislature, the State of California could impose a severance tax on oil in the future.  The Reorganized Debtors will have significant oil production in California and cannot predict the impact of such a tax, which could have severe negative impacts on their California revenues.

### 9.    New Permian Corp. Will Be a New Company That Has Never Operated Independently

New Permian Corp. will be a newly formed company that has never operated independently.  It will need to develop its own administrative infrastructure, and its ability to do so quickly, efficiently, and cost-effectively, could affect the business, financial condition, and results of operations of New Permian Corp.  Pursuant to the Transition Services Agreement, which has an initial term of eight months, LegacyCo will provide New Permian Corp. with certain transition services while it develops the personnel and systems necessary to provide these services itself.

In addition, to establish itself successfully as an independent company, New Permian Corp. will need to attract and retain highly skilled employees.  Efficient oil and gas production requires a skilled workforce, and the demand for such skilled employees sometimes causes a constriction of the labor supply resulting in higher labor costs.  If a shortage of skilled workers exists and New Permian Corp. is unable to train or retain the necessary number of skilled laborers, or is required to pay higher wages to attract or retain such skilled laborers, it could adversely affect New Permian Corp.'s productivity, costs, ability to expand production and ability to achieve its planned results and business strategy, and ultimately its business, financial condition, and results of operations.

New Permian Corp. must also hire and retain executive officers and other key management personnel with the requisite experience and skills to serve in senior management positions. There can be no assurance that New Permian Corp. will be successful in attracting and retaining a sufficient number of such qualified personnel or that it will be able to do so on acceptable terms.

Finally, the historical performance of the Debtors and their subsidiaries is not representative of New Permian Corp.'s performance as a separate company, and no historical financial information has been prepared upon which New Permian Corp.'s operating performance can be evaluated.

### 10. Future New Permian Corp. Debt or Equity Financings.

New Permian Corp. may need or decide to incur debt, including on or shortly after the Effective Date, or issue additional equity in order to fund working capital and capital expenditures or to make acquisitions and other investments.  There can be no assurance that debt or equity financing will be available to New Permian Corp on acceptable terms, if at all.  In addition, it may be more expensive for New Permian Corp. to raise funds through the issuance of debt as a new, independent company.

### 11. Additional Business and Industry Risk Factors

The risks associated with the Debtors' business and industry are more fully described in the Debtors' SEC filings, including the Annual Report on Form 10-K for the fiscal year ended December 31, 2016, filed with the SEC on March 8, 2017 and amended on April 28, 2017.

### B. Certain Bankruptcy Law Considerations

### 1. Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Voting Classes vote in favor of the Plan or the requirements for "cram down" are met with respect to any Class that rejects or is deemed to reject the Plan, the Bankruptcy Court may exercise discretion as a court of equity and choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests would ultimately receive with respect to their Claims or Interests in a subsequent plan of reorganization or otherwise.

### 2. Non-Consensual Confirmation

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a Bankruptcy Court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the Bankruptcy Court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  If any Classes vote to reject or are deemed to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements.

### 3. Inaccuracy of Projected Financial Results

The Debtors have prepared financial projections on a consolidated basis with respect to LegacyCo based on certain assumptions, as set forth in **Exhibit C** hereto.  The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors

nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors including the timing, confirmation, and consummation of the Plan, demand or price for oil and natural gas, inflation, and other unanticipated market and economic conditions.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved.  Such results may vary significantly from the forecasts and such variations may be material.

### 4.    Claims Could Be More than Projected

There can be no assurance that the Allowed amount of Claims in Class 6 will not be significantly more than projected, which in turn, could cause the value of distributions to holders of such Allowed Claims to be reduced.  In addition, there can be no certainty that the distribution to Receiving AUNC Holders will not otherwise exceed the AUNC Cap, or that the distribution to Receiving GUC Holders will not otherwise exceed the GUC Stock Cap, and therefore, in either case, cause the value of distributions to such holders to be reduced ratably to eliminate such excess in accordance with the Plan.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.

### 5.    U.S. Federal Income Tax Risks

For a discussion of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims and Interests, see Section VII of this Disclosure Statement.

### 6.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 7.    Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be

converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Section X(B) hereof, as well as the Liquidation Analysis attached hereto as **Exhibit B**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

## C.    Factors Relating to Securities to Be Issued

### 1.    Market for Securities

There is currently no market for the LegacyCo Units or the New Permian Corp. Shares, and there can be no assurance as to the development or liquidity of any market for any such securities.

LegacyCo and New Permian Corp., as applicable, are under no obligation to list any of the above securities on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, LegacyCo or New Permian Corp. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

### 2.    Potential Dilution

The ownership percentage represented by the LegacyCo Units or New Permian Corp. Shares distributed under the Plan as of the Closing Date will be subject to dilution from the equity issued in connection with (a) the LegacyCo Management Incentive Plan (in the case of the LegacyCo Units) and (b) the Put Option Premium and the New Permian Corp. Management Incentive Plan (in the case of the New Permian Corp. Shares), (c) any other equity that may be issued post-emergence, and (d) the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other equity issuances by LegacyCo or New Permian Corp. could adversely affect the value of the LegacyCo Units or New Permian Corp. Shares. The amount and dilutive effect of any of the foregoing could be material.

### 3.    Significant Holders of LegacyCo Units or New Permian Corp. Shares

Certain holders of Allowed Secured Notes Claims are expected to acquire a significant ownership interest in the LegacyCo Units issued pursuant to the Plan, and certain holders of Allowed Unsecured Notes Claims are expected to acquire a significant ownership interest in the New Permian Corp. Shares issued pursuant to the Plan or Rights Offering. Such holders could be in a position to control the outcome of all actions of LegacyCo or New Permian Co., as applicable, requiring unitholder or shareholder approval, including the election of directors or managers, without the approval of other unitholders or shareholders. This concentration of

ownership could also facilitate or hinder a negotiated change of control of LegacyCo or New Permian Corp. and, consequently, have an impact upon the value of the LegacyCo Units and New Permian Corp. Shares.

### 4.    Interests Subordinated to the Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of LegacyCo or New Permian Corp., the LegacyCo Units or New Permian Corp. Shares would rank below all debt claims against the LegacyCo or New Permian Corp., as applicable.  As a result, holders of the LegacyCo Units and New Permian Corp. Shares will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of LegacyCo or New Permian Corp. (as applicable) until after all applicable holders of debt have been paid in full.

### 5.    Implied Valuation of LegacyCo Units or New Permian Corp. Shares Not Intended to Represent the Trading Value of the LegacyCo Units or New Permian Corp. Shares

The valuation of LegacyCo or New Permian Corp. is not intended to represent the trading value of LegacyCo Units or New Permian Corp. Shares in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the LegacyCo Units and New Permian Corp. Shares is likely to be volatile. Many factors, including factors unrelated to LegacyCo's or New Permian Corp.'s actual operating performance and other factors not possible to predict, could cause the market price of the LegacyCo Units and New Permian Corp. Shares to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the LegacyCo Units or New Permian Corp. Shares in the public or private markets.

### 6.    Dividends

LegacyCo and New Permian Corp. may not pay any dividends on the LegacyCo Units and New Permian Corp. Shares.  In such circumstances, the success of an investment in the LegacyCo Units or New Permian Corp. Shares will depend entirely upon any future appreciation in the value of the LegacyCo Units or New Permian Corp. Shares.  There is, however, no guarantee that the LegacyCo Units or New Permian Corp. Shares will appreciate in value or even maintain their initial value.

### 7.    Restrictions on Ability to Resell LegacyCo Units and New Permian Corp. Shares

The LegacyCo Units and New Permian Corp. Shares will not be registered under applicable federal or state securities law.  Absent such registration, the LegacyCo Units and New Permian Corp. Shares may be offered and sold only in transactions that are not subject to, or that are exempt from, the registration requirements of applicable securities laws.  These restrictions could

significantly limit holders' ability to resell the LegacyCo Units or New Permian Corp. Shares. For a discussion of transfer restrictions on the LegacyCo Units or New Permian Corp. Shares under applicable federal or state securities law, see Section VI of this Disclosure Statement.

### D.   Factors Relating to Rights Offering

#### 1.   Debtors Could Modify the Rights Offering Procedures

The Debtors may modify the procedures governing the Rights Offering, with the approval of the Requisite Commitment Parties (as defined in the Backstop Commitment Agreement), to, among other things, adopt additional detailed procedures if necessary to administer the distribution and exercise of Subscription Rights or to comply with applicable law.  Such modifications may adversely affect the rights of those participating in the Rights Offering.

#### 2.   The Backstop Commitment Agreement Could be Terminated

The Backstop Commitment Agreement contains certain provisions that give the parties the ability to terminate the Backstop Commitment Agreement if various conditions are not satisfied. Termination of the Backstop Commitment Agreement could prevent the Debtors from consummating the Plan.  Under certain conditions in connection with the termination of the Backstop Commitment Agreement, as more fully described therein, the Backstop Parties may be eligible to be paid the Breakup Premium in cash.

### E.   Additional Factors

#### 1.   Debtors Could Withdraw Plan

Subject to, and without prejudice to, the rights of any party in interest, the Plan may be revoked or withdrawn before the Confirmation Date by the Debtors.

#### 2.   Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Additionally, the Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 3.   No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4.    No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5.    No Admission Made

Nothing contained herein or in the Plan shall constitute an admission of, or shall be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

## X.
## CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (C) feasible.

### A.    <u>Acceptance of the Plan</u>

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (1) holders of two-thirds (2/3) in amount and (2) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan.  Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.  The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than

100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

### B.    Best Interest Test

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (1) accept the Plan or (2) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is customarily referred to as the "best interest" test.

The first step in determining whether the Plan satisfies the best interest test is to determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation. The gross amount of Cash that would be available for satisfaction of Claims and Interests would be the sum consisting of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation, the proceeds received from the disposition of encumbered assets that would be distributed to the holders of the liens on such assets, and by the payment of such additional administrative expenses and priority claims arising from the use of chapter 7 for the purposes of liquidation. Any remaining Cash would be allocated to unsecured creditors and equity interest holders in strict priority in accordance with section 726 of the Bankruptcy Code.

Finally, the present value of such allocations (taking into account the time necessary to accomplish the liquidation) are compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date. The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy as well as those fees that might be payable to attorneys and other professionals that the trustee might engage. Other liquidation costs include the expenses incurred during the Chapter 11 Cases allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and statutory committees appointed in the Chapter 11 Cases, and costs and expenses of members of such committees, as well as other compensation Claims. Furthermore, additional Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of Claims, costs, expenses, fees, and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims, or available for distribution to the holders of Interests.

After consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Claims and Interests in the Chapter 11 Cases, including (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (2) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (3) the substantial increase in Claims that would be satisfied on a priority basis, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Interest with a recovery that is not less than such holder would receive pursuant to liquidation of the Debtors under chapter 7. For purposes of the best interests test, distributions under a chapter 11 plan that substantively consolidates debtors are compared against distributions in a hypothetical chapter 7 that also substantively consolidates the debtors.

The Debtors also believe that the value of any distributions to holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Plan because such distributions in a chapter 7 case would not occur for a substantial period of time. It is likely that distribution of the proceeds of the liquidation could be delayed for at least one year after the completion of such liquidation to resolve Claims and prepare for distributions. In the likely event litigation was necessary to resolve Claims asserted in a chapter 7 case, the delay could be prolonged and Administrative Expenses increased.

The liquidation analysis annexed hereto as **Exhibit B** (the "**Liquidation Analysis**") provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors'

estates and confirms the conclusions set forth above.   Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis. The Liquidation Analysis was prepared by Alvarez & Marsal North America, LLC, with the assistance of the Debtors' management and other advisors.

Underlying the Liquidation Analysis are a number of estimates and assumptions which, although developed and considered reasonable by the Debtors' management and their financial advisors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management.   The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change.   Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation. The chapter 7 liquidation period is assumed to be a period of at least seven (7) months, allowing for, among other things, the discontinuation and wind-down of operations within the first few months, compliance with applicable regulatory requirements, the sale of assets, and the collection of receivables.

### C. **Feasibility**

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor under the Plan.   In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed the ability of the Reorganized Debtors to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.   The Debtors prepared consolidated financial projections for LegacyCo (collectively with the reserve information, development schedules, and financial information, the "**Financial Projections**") for January 1, 2018 through December 31, 2021 (the "**Projection Period**").   The Financial Projections, and the assumptions on which they are based, are annexed hereto as **Exhibit C**.   Based upon such projections, the Debtors believe that all payments required pursuant to the Plan to be made by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) will be made and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.   Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies.   In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan.   The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.   The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, the level of activity of oil and natural gas exploration, development, and production domestically and internationally, demand for drilling services, competition and supply of competing rigs, changes in the political

environment of the countries in which the Debtors operate, regulatory changes, and a variety of other factors.  Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

As to New Permian Corp., because it will not have any funded debt on the Effective Date or any ongoing obligation to make distributions under the Plan, and because its assets will consist primarily of undeveloped acreage, the Debtors do not believe that any issue as to feasibility exists.

### D.    <u>Valuation Analysis</u>

THE INFORMATION CONTAINED HEREIN IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN.  THE INFORMATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION UNDER SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS OR ANY OF THEIR AFFILIATES.

Solely for the purposes of the Plan and the Disclosure Statement, Lazard Frères & Co. LLC ("**Lazard**"), as investment banker to the Debtors, has estimated a range of total enterprise value ("**Enterprise Value**") for the Reorganized Debtors pro forma for the transactions contemplated by the Plan (the "**Valuation Analysis**").   The Valuation Analysis is based on reserve information, development schedules, and financial information provided by the Debtors' management, as well as the Financial Projections attached to the Disclosure Statement as **<u>Exhibit C</u>**, and information provided by other sources.  The Valuation Analysis assumes that the Effective Date will occur on January 1, 2018 and utilizes market data and commodity pricing data as of October 27, 2017.  The valuation estimates set forth herein represent valuation analyses of the Reorganized Debtors generally based on the application of customary valuation techniques deemed appropriate by Lazard.

The Plan provides for the allocation of the Reorganized Debtors' assets between New Permian Corp. and LegacyCo.  The Valuation Analysis for the Reorganized Debtors utilized a sum-of-the-parts approach that considered each of New Permian Corp. and LegacyCo on a standalone basis and estimated a range of enterprise values for each entity.  Collectively, the estimated enterprise value ranges of New Permian Corp. and LegacyCo comprise the Enterprise Value range of the Reorganized Debtors.   The valuation methodologies utilized to perform the

Valuation Analysis of the Reorganized Debtors included risked net asset value analysis and precedent transactions analysis. Lazard applied these methodologies to New Permian Corp. and LegacyCo as it deemed appropriate based on the particular characteristics of those entities.

Lazard utilized the precedent transactions methodology to estimate the enterprise value of New Permian Corp. Lazard did not utilize the risked net asset value analysis or public company comparable analysis to estimate the enterprise value of New Permian Corp. because financial projections for New Permian Corp. would be required to perform such analyses, and such projections were not prepared by the Debtors given the lack of any development plan for New Permian Corp. or capital to fund such a plan, as a result of the restructuring transactions contemplated in the Plan. The estimated range of enterprise value of New Permian Corp. is approximately $650 million to $830 million, with a mid-point of $740 million. New Permian Corp. is projected to have no debt at emergence and approximately $10 million of cash of its balance sheet, resulting in an estimated equity value between $660 million and $840 million, with a mid-point of $750 million.[12] The valuation ranges for New Permian Corp. reflect market data available as of October 27, 2017.

Lazard utilized the risked net asset value analysis and precedent transactions analysis to estimate the enterprise value of LegacyCo. Lazard did not utilize public company comparable analysis because Lazard does not believe there are reasonably comparable companies to LegacyCo. The most closely comparable companies to LegacyCo include growth/development asset positions as a material portion of their overall asset portfolios, making them non-comparable to LegacyCo. The estimated range of enterprise value of LegacyCo is approximately $790 million to $1,000 million, with a mid-point of $895 million. LegacyCo is projected to have a debt balance at emergence of approximately $135 million and a pro forma cash balance of $5 million, resulting in net debt of $130 million and an estimated equity value between $660 million and $870 million, with a mid-point of $765 million. The valuation ranges for LegacyCo reflect market data and commodity pricing data as of October 27, 2017. Commodity prices can have a material impact on operating results and valuation, and as such, the valuation ranges are subject to material change based on commodity price assumptions.

Based on the Financial Projections, the aforementioned valuation methodologies, and other information described herein and solely for purposes of the Plan, the estimated range of Enterprise Value of the Reorganized Debtors, collectively, is approximately $1,440 million to $1,830 million (with a mid-point estimate of approximately $1,635 million) as of an assumed Effective Date of January 1, 2018. For purposes of the Valuation Analysis, Lazard assumed that no material changes that would affect estimated value occur between the date of filing of the Disclosure Statement and the assumed Effective Date. Lazard's Valuation Analysis does not constitute an opinion as to fairness from a financial point of view of the consideration to be received or paid under the Plan, of the terms and provisions of the Plan, or with respect to any other matters.

THE VALUATION ANALYSIS REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESSES AND ASSETS OF THE

---

[12] Estimated enterprise value and equity value for New Permian Corp. as presented herein excludes the value of holdings of LegacyCo Units.

DEBTORS AVAILABLE TO LAZARD AS OF OCTOBER 27, 2017. IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE, OR REAFFIRM ITS VALUATION ANALYSIS AND DOES NOT INTEND TO DO SO.

LAZARD DID NOT INDEPENDENTLY VERIFY THE FINANCIAL PROJECTIONS OR OTHER INFORMATION THAT LAZARD USED IN THE VALUATION ANALYSIS, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION THEREWITH.   THE VALUATION ANALYSIS WAS DEVELOPED SOLELY FOR PURPOSES OF THE PLAN AND THE ANALYSIS OF POTENTIAL RELATIVE RECOVERIES TO CREDITORS THEREUNDER. THE VALUATION ANALYSIS REFLECTS THE APPLICATION OF VARIOUS VALUATION TECHNIQUES, DOES NOT PURPORT TO BE AN OPINION AND DOES NOT PURPORT TO REFLECT OR CONSTITUTE AN APPRAISAL, LIQUIDATION VALUE, OR ESTIMATE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED OR ASSETS TO BE SOLD PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH IN THE VALUATION ANALYSIS.

THE VALUATION ANALYSIS WAS PREPARED BASED ON THE ASSUMPTION THAT THE ASSETS ON THE DEBTORS WOULD BE SEPARATED INTO NEW PERMIAN CORP. AND LEGACYCO ON THE EFFECTIVE DATE.  THE PROPOSED SEPARATION IS BASED ON MANAGEMENT ASSUMPTIONS AND AGREEMENT AMONG THE DEBTORS' VARIOUS CREDITOR CONSTITUENCIES.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES THAT ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS. AS A RESULT, THE VALUATION ANALYSIS IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY.  IN ADDITION, THE POTENTIAL VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL AND COMMODITY MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, THE POTENTIALLY DILUTIVE IMPACT OF CERTAIN EVENTS, INCLUDING THE ISSUANCE OF EQUITY SECURITIES PURSUANT TO ANY MANAGEMENT INCENTIVE COMPENSATION PLAN, AND OTHER FACTORS THAT GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Lazard assumed that the Financial Projections, development plan and management's separation assumptions were reasonably prepared in good faith and on a basis reflecting the Debtors' best estimates and judgments as to the future operating and financial performance of the Reorganized Debtors. The Valuation Analysis assumes that the actual performance of the Reorganized Debtors will correspond to the Financial Projections and development plan in all material respects. If the business performs at levels below or above those set forth in the Financial Projections, such performance may have a materially negative or positive impact, respectively, on the Valuation Analysis and estimated potential ranges of Enterprise Value therein.

In preparing the Valuation Analysis, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain financial and operating data of the Debtors, including the Financial Projections and development plan; (c) discussed the Debtors' operations and future prospects with the Debtors' senior management team and third-party advisors; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) considered certain economic and industry information that Lazard deemed generally relevant to the Reorganized Debtors; and (f) conducted such other studies, analyses, inquiries, and investigations as Lazard deemed appropriate. Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management and other parties as well as publicly available information.

The Valuation Analysis does not constitute a recommendation to any holder of Allowed Claims or any other person as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been requested to, and does not express any view as to, the potential trading value of the Reorganized Debtors' securities on issuance or at any other time.

Based on the Debtors' and their tax professionals' tax analysis, the Reorganized Debtors do not expect to have significant tax attributes following the reorganization. Lazard did not estimate the value of any tax attributes nor did it estimate the impact of any cancellation of indebtedness income on the Reorganized Debtors' projections. Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact Lazard's valuation analysis.

THE SUMMARY SET FORTH ABOVE DOES NOT PURPORT TO BE A COMPLETE DESCRIPTION OF THE VALUATION ANALYSIS PERFORMED BY LAZARD. THE PREPARATION OF A VALUATION ANALYSIS INVOLVES VARIOUS DETERMINATIONS AS TO THE MOST APPROPRIATE AND RELEVANT METHODS OF FINANCIAL ANALYSIS AND THE APPLICATION OF THESE METHODS IN THE PARTICULAR CIRCUMSTANCES AND, THEREFORE, SUCH AN ANALYSIS IS NOT READILY SUITABLE TO SUMMARY DESCRIPTION. THE VALUATION ANALYSIS PERFORMED BY LAZARD IS NOT NECESSARILY INDICATIVE OF ACTUAL VALUES OR FUTURE RESULTS, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE DESCRIBED HEREIN.

LAZARD IS ACTING AS INVESTMENT BANKER TO THE DEBTORS, AND HAS NOT BEEN, WILL NOT BE RESPONSIBLE FOR, AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL, OR OTHER SPECIALIST ADVICE.

### E.    Notices and Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  The Confirmation Hearing is scheduled for January 11, 2018 at 10:00 a.m.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of Judge Stuart M. Bernstein, together with proof of service thereof, and served upon all of the below parties.

| | |
|---|---|
| **If to the Debtors, to:**<br>Breitburn Energy Partners LP<br>707 Wilshire Boulevard<br>Suite 4600<br>Los Angeles, California 90017<br>Attn: Gregory Brown, General Counsel<br>Telephone: (213) 225-5900, Ext. 294<br>Telecopier: (213) 225-5917<br>E-mail:  gbrown@breitburn.com | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York  10153<br>Attn: Ray C. Schrock, P.C., Stephen Karotkin<br>Telephone: (212) 310-8000<br>Telecopier: (212) 310-8007<br>E-mail:  ray.schrock@weil.com<br>                 stephen.karotkin@weil.com |
| **If to the Second Lien Group, to:**<br>Kirkland & Ellis LLP<br>601 Lexington Avenue<br>New York, NY 10022<br>Attn: Christopher Marcus, P.C.<br>Telephone: (212) 446-4800<br>Telecopier: (212) 446-4900<br>E-mail:  christopher.marcus@kirkland.com | Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, IL 60654<br>Attn:  Steven N. Serajeddini<br>Telephone: (312) 862-2000<br>Telecopier: (312) 862-2200<br>E-mail:  steven.serajeddini@kirkland.com |
| **If to the Requisite Commitment Parties, to:**<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, NY 10036<br>Attn: Ira Dizengoff<br>Telephone: (212) 872-1096<br>Telecopier: (212) 872-1002<br>E-mail: idizengoff@akingump.com | Akin Gump Strauss Hauer & Feld LLP<br>1333 New Hampshire Avenue, N.W.<br>Washington, DC 20036<br>Attn: Scott Alberino, Daniel Fisher<br>Telephone: (202) 887-4121<br>Telecopier: (202) 887-4288<br>E-mail:  salberino@akingump.com,<br>                 dfisher@akingump.com<br><br>White & Case LLP<br>1221 Avenue of the Americas<br>New York, NY 10020<br>Attn:     Harrison Denman<br>Telephone: (212) 819-2567<br>Telecopier: (212) 354-8113<br>E-mail:  hdenman@whitecase.com |

| **If to the Creditors' Committee, to:** | **If to the Equity Committee, to:** |
|---|---|
| Milbank, Tweed, Hadley & McCloy LLP | Proskauer Rose LLP |
| 2029 Century Park East, 33rd Floor | Eleven Times Square |
| Los Angeles, CA 90067 | New York, NY 10036 |
| Attn: Gregory Bray, Esq., Paul Aronzon, | Attn: Martin J. Bienenstock, Vincent Indelicato |
| Telephone: (424) 386-4000 | Telephone: (212) 969-3000 |
| Telecopier: (213) 629-5063 | Telecopier: (212) 969-2900 |
| E-mail:  gbray@milbank.com, | E-mail:  mbienenstock@proskauer.com, |
|       paronzon@milbank.com |       vindelicato@proskauer.com |

| **If to the Revolving Credit Facility Agent, to**: | |
|---|---|
| Wells Fargo Bank, N.A. | Winston & Strawn LLP |
| 1000 Louisiana St. | 333 S. Grand Avenue, 38th Floor |
| 9th Floor – Energy Group | Los Angeles, CA 90071 |
| Houston, TX 77002 | Attn: Eric E. Sagerman, Justin E. Rawlins, |
| Telephone: (713) 319-1326 | Telephone: (213) 615-1700 |
| E-mail:  Michael.A.Tribolet@wellsfargo.com | Telecopier: (213) 615-1750 |
| | E-mail:  esagerman@winston.com, |
| |       jrawlins@winston.com |
| and | |
| | and |
| Wells Fargo Bank, National Association | |
| Wells Fargo Law Department | Winston & Strawn LLP |
| 333 S. Grand Avenue, Suite 1040 | 200 Park Avenue |
| Los Angeles, CA 90071 | New York, NY 10166-4193 |
| Attn: David S. Rauch, Esq. | Attn: David Neier, Carey D. Schreiber |
| Telephone: (213) 253-6569 | Telephone:  (212) 294-6700 |
| Telecopier: (213) 628-9918 | Facsimile:  (212) 294-4700 |
| E-mail:  david.s.rauch@wellsfargo.com | Email:   dneier@winston.com, |
| |       cschreiber@winston.com |

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

## XI.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 3, 4, 5A, 5B, and 6 to vote in favor thereof.

Dated: December 1, 2017
        New York, New York

                    Respectfully submitted,

                    BREITBURN ENERGY PARTNERS LP

                    /s/ Halbert S. Washburn
                    Name:  Halbert S. Washburn
                    Title:  Authorized Signatory

                    BREITBURN GP LLC
                    BREITBURN OPERATING LP
                    BREITBURN OPERATING GP LLC
                    BREITBURN MANAGEMENT COMPANY LLC
                    BREITBURN FINANCE CORPORATION
                    ALAMITOS COMPANY
                    BEAVER CREEK PIPELINE, L.L.C.
                    BREITBURN FLORIDA LLC
                    BREITBURN OKLAHOMA LLC
                    BREITBURN SAWTELLE LLC
                    BREITBURN TRANSPETCO GP LLC
                    BREITBURN TRANSPETCO LP LLC
                    GTG PIPELINE LLC
                    MERCURY MICHIGAN COMPANY, LLC
                    PHOENIX PRODUCTION COMPANY
                    QR ENERGY, LP
                    QRE GP, LLC
                    QRE OPERATING, LLC
                    TERRA ENERGY COMPANY LLC
                    TERRA PIPELINE COMPANY LLC
                    TRANSPETCO PIPELINE COMPANY, L.P.

## **Exhibit A**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------x
                                                :
In re                                           :
                                                :         **Chapter 11**
**BREITBURN ENERGY**                            :
**PARTNERS LP,** *et al.*,                      :         **Case No. 16-11390 (SMB)**
                                                :
            **Debtors.**                        :         **(Jointly Administered)**
                                                :
---------------------------------------------------------x


## <u>DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN</u>


WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C.
Stephen Karotkin, Esq.
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

Attorneys for Debtors and
Debtors in Possession

Table of Contents

Page

ARTICLE I.      DEFINITIONS, INTERPRETATION AND CONSENTS ......................1

ARTICLE II.     ADMINISTRATIVE EXPENSES AND PRIORITY TAX
CLAIMS ..........................................................................27

| | | |
|---|---|---|
| 2.1 | Administrative Expenses | 27 |
| 2.2 | Professional Fee Claims | 27 |
| 2.3 | DIP Facility Claims | 28 |
| 2.4 | Priority Tax Claims | 29 |

ARTICLE III.    CLASSIFICATION OF CLAIMS AND INTERESTS ..........................29

| | | |
|---|---|---|
| 3.1 | Formation of Debtor Groups for Convenience Only | 29 |
| 3.2 | Classification of Claims and Interests | 29 |
| 3.3 | Separate Classification of Other Secured Claims | 30 |
| 3.4 | Nonconsensual Confirmation | 30 |
| 3.5 | Debtors' Rights in Respect of Unimpaired Claims | 30 |

ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS ..................................31

| | | |
|---|---|---|
| 4.1 | Class 1 – Priority Non-Tax Claims | 31 |
| 4.2 | Class 2 – Other Secured Claims | 31 |
| 4.3 | Class 3 – Revolving Credit Facility Claims | 31 |
| 4.4 | Class 4 – Secured Notes Claim | 32 |
| 4.5 | Class 5A/Class 5B – Unsecured Notes Claims | 32 |
| 4.6 | Class 6 – General Unsecured Claims | 34 |
| 4.7 | Class 7A – Ongoing Trade Claims of LegacyCo | 35 |
| 4.8 | Class 7B – Ongoing Trade Claims of New Permian Corp | 35 |
| 4.9 | Class 8 – Intercompany Claims | 35 |
| 4.10 | Class 9 – Subordinated Claims | 35 |
| 4.11 | Class 10 – Intercompany Interests | 36 |
| 4.12 | Class 11 – Existing BBEP Equity Interests | 36 |

ARTICLE V.     PROVISIONS GOVERNING DISTRIBUTIONS ................................36

| | | |
|---|---|---|
| 5.1 | Distributions Generally | 36 |
| 5.2 | Plan Funding | 36 |
| 5.3 | No Postpetition or Default Interest on Claims | 36 |
| 5.4 | Date of Distributions | 36 |
| 5.5 | Distribution Record Date | 36 |
| 5.6 | Disbursing Agent | 37 |
| 5.7 | Delivery of Distributions | 37 |
| 5.8 | Unclaimed Property | 38 |
| 5.9 | Satisfaction of Claims | 38 |
| 5.10 | Manner of Payment under Plan | 38 |
| 5.11 | Fractional Shares and De Minimis Cash Distributions | 38 |
| 5.12 | No Distribution in Excess of Amount of Allowed Claim | 39 |
| 5.13 | Allocation of Distributions Between Principal and Interest | 39 |
| 5.14 | Exemption from Securities Laws | 39 |

i

| 5.15 | Setoffs and Recoupments | 40 |
| 5.16 | Rights and Powers of Disbursing Agent | 41 |
| 5.17 | Withholding and Reporting Requirements | 41 |

ARTICLE VI.    MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN ........ 42

| 6.1 | General Settlement of Claims and Interests | 42 |
| 6.2 | Continued Corporate Existence | 42 |
| 6.3 | Authorization, Issuance, and Delivery of LegacyCo Units and New Permian Corp. Shares | 43 |
| 6.4 | Cancelation of Existing Securities and Agreements | 43 |
| 6.5 | Cancelation of Certain Existing Security Agreements | 44 |
| 6.6 | Rights Offering and Minimum Allocation Rights | 45 |
| 6.7 | New Permian Corp. Certificate of Incorporation | 45 |
| 6.8 | Exit Facility | 46 |
| 6.9 | Restructuring Transactions | 46 |
| 6.10 | Board of Directors | 48 |
| 6.11 | Corporate Action | 49 |
| 6.12 | LegacyCo Management Incentive Plan | 49 |
| 6.13 | New Permian Corp. Management Incentive Plan | 50 |
| 6.14 | Effectuating Documents and Further Transactions | 50 |
| 6.15 | Separability | 50 |
| 6.16 | Director, Officer, Manager, and Employee Liability Insurance | 50 |
| 6.17 | Preservation of Royalty and Working Interests | 50 |
| 6.18 | Hart-Scott-Rodino Antitrust Improvements Act | 50 |
| 6.19 | Post-Effective Date Tax Filings and Audits | 51 |
| 6.20 | AUNC Trust | 51 |

ARTICLE VII.    PROCEDURES FOR DISPUTED CLAIMS ........ 52

| 7.1 | Objections to Claims | 52 |
| 7.2 | Resolution of Disputed Administrative Expenses and Disputed Claims | 52 |
| 7.3 | Payments and Distributions with Respect to Disputed Claims | 52 |
| 7.4 | Distributions After Allowance | 52 |
| 7.5 | Disallowance of Claims | 52 |
| 7.6 | Estimation | 53 |
| 7.7 | Interest | 54 |

ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ........ 54

| 8.1 | General Treatment | 54 |
| 8.2 | Determination of Cure Disputes and Deemed Consent | 54 |
| 8.3 | Rejection Damages Claims | 56 |
| 8.4 | Payment of Cure Amounts | 56 |
| 8.5 | Survival of the Debtors' Indemnification Obligations | 56 |
| 8.6 | Employee Obligations | 57 |
| 8.7 | Insurance Policies | 57 |

ii

| | | |
|---|---|---|
| 8.8 | Reservation of Rights | 57 |
| 8.9 | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 58 |
| **ARTICLE IX.** | **EFFECTIVENESS OF THE PLAN** | **58** |
| 9.1 | Conditions Precedent to Confirmation of the Plan | 58 |
| 9.2 | Conditions Precedent to the Effective Date | 59 |
| 9.3 | Satisfaction of Conditions | 60 |
| 9.4 | Waiver of Conditions | 60 |
| 9.5 | Effect of Non-Occurrence of Effective Date | 60 |
| **ARTICLE X.** | **EFFECT OF CONFIRMATION** | **61** |
| 10.1 | Released and Settled Claims | 61 |
| 10.2 | Binding Effect | 61 |
| 10.3 | Vesting of Assets | 61 |
| 10.4 | Release and Discharge of Debtors | 61 |
| 10.5 | Term of Injunctions or Stays | 62 |
| 10.6 | Injunction Against Interference with Plan | 62 |
| 10.7 | Injunction | 62 |
| 10.8 | Exculpation | 62 |
| 10.9 | Releases | 63 |
| 10.10 | Injunction Related to Releases and Exculpation | 65 |
| 10.11 | Subordinated Claims | 66 |
| 10.12 | Avoidance Actions | 66 |
| 10.13 | Retention of Causes of Action/Reservation of Rights | 66 |
| 10.14 | Preservation of Causes of Action | 67 |
| 10.15 | Special Provisions for Governmental Units | 67 |
| 10.16 | Protections Against Discriminatory Treatment | 67 |
| 10.17 | Document Retention | 68 |
| **ARTICLE XI.** | **RETENTION OF JURISDICTION** | **68** |
| 11.1 | Jurisdiction of Bankruptcy Court | 68 |
| **ARTICLE XII.** | **MISCELLANEOUS PROVISIONS** | **70** |
| 12.1 | Dissolution of Statutory Committees | 70 |
| 12.2 | Substantial Consummation | 70 |
| 12.3 | Exemption from Transfer Taxes | 71 |
| 12.4 | Expedited Tax Determination | 71 |
| 12.5 | Payment of Statutory Fees | 71 |
| 12.6 | Plan Modifications and Amendments | 71 |
| 12.7 | Revocation or Withdrawal of Plan | 72 |
| 12.8 | Courts of Competent Jurisdiction | 73 |
| 12.9 | Severability | 73 |
| 12.10 | Governing Law | 73 |
| 12.11 | Schedules | 73 |
| 12.12 | Successors and Assigns | 73 |

12.13    Time ....................................................................................................74
12.14    Notices ................................................................................................74
12.15    Reservation of Rights............................................................................75

**Exhibit I: Exit Facility Term Sheet**
**Exhibit II: Permian Assets**

WEIL:\96366844\1\29979.0004

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x
                                                        :
In re                                                   :
                                                        :        **Chapter 11**
**BREITBURN ENERGY**                                    :
**PARTNERS LP**, *et al.*,                              :        **Case No. 16-11390 (SMB)**
                                                        :
            **Debtors.**                                :        **(Jointly Administered)**
                                                        :
--------------------------------------------------------x

## DEBTORS' JOINT CHAPTER 11 PLAN

Breitburn Energy Partners LP (9953); Breitburn GP LLC (9948); Breitburn Operating LP (5529); Breitburn Operating GP LLC (5525); Breitburn Management Company LLC (2858); Breitburn Finance Corporation (2548); Alamitos Company (9156); Beaver Creek Pipeline, L.L.C. (7887); Breitburn Florida LLC (7424); Breitburn Oklahoma LLC (4714); Breitburn Sawtelle LLC (7661); Breitburn Transpetco GP LLC (7222); Breitburn Transpetco LP LLC (7188); GTG Pipeline LLC (3760); Mercury Michigan Company, LLC (3380); Phoenix Production Company (1427); QR Energy, LP (3069); QRE GP, LLC (2855); QRE Operating, LLC (9097); Terra Energy Company LLC (9616); Terra Pipeline Company LLC (3146); and Transpetco Pipeline Company, L.P. (2620), the above-captioned debtors, as plan proponents, propose the following chapter 11 plan pursuant to section 1121(a) of title 11 of the United States Code.

**ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

### ARTICLE I.

### DEFINITIONS, INTERPRETATION AND CONSENTS

**DEFINITIONS.**   The following terms used herein shall have the respective meanings defined below (such meanings to be equally applicable to both the singular and plural):

**1.1     7.875% Unsecured Notes** means the 7.875% Senior Notes due April 15, 2022, issued pursuant to the 7.875% Unsecured Notes Indenture in the aggregate principal amount of Eight Hundred Fifty Million Dollars ($850,000,000).

**1.2     7.875% Unsecured Notes Claim** means, collectively, all Claims arising under the 7.875% Unsecured Notes, including any guaranty Claims arising

on account of the 7.875% Unsecured Notes and the 7.875% Unsecured Notes Indenture.

1.3     **7.875% Unsecured Notes Indenture** means that certain Indenture, dated as of January 13, 2012, by and among BBEP and Breitburn Finance, as issuers, the guarantors named therein, and the 7.875% Unsecured Notes Indenture Trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

1.4     **7.875% Unsecured Notes Indenture Trustee** means Wilmington Trust Company, solely in its capacity as successor indenture trustee under the 7.875% Unsecured Notes Indenture.

1.5     **8.625% Unsecured Notes** means the 8.625% Senior Notes due October 15, 2020, issued pursuant to the 8.625% Unsecured Notes Indenture in the aggregate principal amount of Three Hundred Five Million Dollars ($305,000,000).

1.6     **8.625% Unsecured Notes Claim** means, collectively, all Claims arising under the 8.625% Unsecured Notes, including any guaranty Claims arising on account of the 8.625% Unsecured Notes and the 8.625% Unsecured Notes Indenture.

1.7     **8.625% Unsecured Notes Indenture** means that certain Indenture, dated as of October 6, 2010, by and among BBEP and Breitburn Finance, as issuers, the guarantors named therein, and the 8.625% Unsecured Notes Indenture Trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

1.8     **8.625% Unsecured Notes Indenture Trustee** means Wilmington Trust Company, solely in its capacity as successor indenture trustee under the 8.625% Unsecured Notes Indenture.

1.9     **Administrative Expenses** means costs or expenses of administration of any of the Chapter 11 Cases arising on or prior to the Effective Date and allowed under section 503(b) of the Bankruptcy Code and entitled to priority pursuant to section 507(a)(2) and 507(b) of the Bankruptcy Code that have not already been paid by the Debtors, including, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases, including, for the acquisition or lease of property or an interest in property or the performance of services, any compensation and reimbursement of expenses to the extent allowed by Final Order under sections

2

330 or 503 of the Bankruptcy Code, any indebtedness or obligations arising under the Backstop Commitment Agreement (including the Put Option Premium, the Breakup Premium (as defined in the Backstop Commitment Agreement), the granting of the Minimum Allocation Rights (and the underlying securities), the indemnification provisions of the Backstop Commitment Agreement, and the Expense Reimbursement (as defined in the Backstop Commitment Agreement), all in accordance with the terms of the Backstop Commitment Agreement) and any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code.

**1.10**    **Allowed** means, (a) with reference to any Claim, (i) any Claim against any Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (ii) any Claim listed on the Schedules or any timely filed proof of Claim, as to which no objection to allowance has been, or subsequently is, interposed in accordance with Section 7.1 hereof or prior to the expiration of such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such Final Order is in favor of the respective holder (but solely in the amount as determined in such Final Order), or (iii) any Claim expressly allowed by the Plan or a Final Order of the Bankruptcy Court; and (b) with reference to any Interest, such Interest is reflected as outstanding (other than any such Interest held by any Debtor or any affiliate of a Debtor) in the stock transfer ledger or similar register of the applicable Debtor on the Distribution Record Date.

**1.11**    **Avoidance Action** means any action commenced, or that may be commenced, before or after the Effective Date pursuant to chapter 5 of the Bankruptcy Code including sections 544, 545, 547, 548, 549, 550, or 551; *provided*, that Avoidance Actions do not include Released and Settled Claims.

**1.12**    **Backstop Approval Order** means the Order of the Bankruptcy Court entered on December 1, 2017 (ECF No. 1886) approving the Backstop Commitment Agreement, which order shall be in form and substance satisfactory to the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties.

**1.13**    **Backstop Commitment Agreement** means that certain Amended and Restated Backstop Commitment Agreement, dated as of October 11, 2017, as may be amended or modified from time to time in accordance with the terms thereof and the Backstop Approval Order, pursuant to which the Backstop Parties have agreed to (a) exercise the Minimum Allocation Rights; and (b) backstop the Rights Offering.

3

**1.14    Backstop Parties** means, the Commitment Parties (as such term is defined in the Backstop Commitment Agreement).

**1.15    Ballot** means the form(s) distributed to holders of impaired Claims on which is to be indicated the acceptance or rejection of the Plan.

**1.16    Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.17    Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of New York, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court having subject matter jurisdiction over the Chapter 11 Cases.

**1.18    Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any Local Rules of the Bankruptcy Court.

**1.19    BBEP** means Breitburn Energy Partners LP, a Delaware limited partnership, as debtor or debtor in possession, as the context requires.

**1.20    BOLP** means Breitburn Operating LP, a Delaware limited partnership, as debtor or debtor in possession, as the context requires.

**1.21    Breitburn Finance** means Breitburn Finance Corporation, a Delaware corporation, as debtor or debtor in possession, as the context requires.

**1.22    Business Day** means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

**1.23    Cash** means legal tender of the United States of America.

**1.24    Cause of Action** means, without limitation, any and all actions, proceedings, causes of action, controversies, liabilities, obligations, rights, rights of setoff, recoupment rights, suits, damages, judgments, accounts, defenses, offsets, powers, privileges, licenses, franchises, Claims, Avoidance Actions, counterclaims, cross-claims, affirmative defenses, and demands of any kind or character whatsoever, whether known or unknown, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law, in equity, or otherwise, whether arising under the Bankruptcy Code or any applicable nonbankruptcy law, based in whole or in part upon any act or omission

4

or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.  Without limiting the generality of the foregoing, when referring to Causes of Action of the Debtors or their estates, Causes of Action shall include (a) all rights of setoff, counterclaim, or recoupment and Claims on contracts or for breaches of duties imposed by law or equity, (b) Claims (including Avoidance Actions) pursuant to section 362, and chapter 5 of the Bankruptcy Code including sections 510, 542, 543, 544 through 550, or 553, and (c) Claims and defenses such as fraud, mistake, duress, usury, and any other defenses set forth in section 558 of the Bankruptcy Code.  A nonexclusive list of Causes of Action shall be set forth in the Plan Supplement.

     **1.25**   **Certified Holder** means any holder of an Allowed Secured Notes Claim that provides a certification to the Debtors or the Disbursing Agent prior to the Distribution Record Date in the form of or substantially in the form of that contained in that certain Noteholder Distribution Certification Form (or as otherwise agreed with the Debtors), which include, without limitation, disclosure of ownership of Existing BBEP Equity Interests by the holder and certain controlling and controlled persons, and verification that such holder (and, in the case such holder is a disregarded entity for U.S. federal income tax purposes, its regarded owner) is and as of the Effective Date will be a "United States person" within the meaning of Section 7701(a)(30) of the Tax Code. For purposes of this definition, (i) a person "controlling or controlled by" a holder includes any individual or entity that controls the holder (such as a general partner, managing member or any other equityholder in a similar managing capacity or that owns controlling voting equity interests or more than 50% of the equity interests in the holder, and in the case of a controlling entity, any person that controls such controlling entity) and any entity controlled (through direct or indirect equity ownership) by the holder, and (ii) the term "Existing BBEP Equity Interests" shall be limited to outstanding Series A Redeemable Preferred Units, Series B Preferred Units and common units of BBEP.

     **1.26**   **Chapter 11 Cases** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently styled *In re Breitburn Energy Partners LP*, Ch. 11 Case No. 16-11390 (SMB) (Jointly Administered).

     **1.27**   **Charging Lien** means any Lien or other priority in payment to which the Unsecured Notes Indenture Trustee is entitled to under and subject to the terms of the Unsecured Notes Indentures to assert against distributions to be made to holders of Claims under such Unsecured Notes Indentures.

     **1.28**   **Claim** has the meaning set forth in section 101(5) of the Bankruptcy Code.

     **1.29**   **Class** means any group of Claims or Interests classified herein pursuant to section 1123(a)(1) of the Bankruptcy Code.

WEIL:\96366844\1\29979.0004

**1.30**   **Collateral** means any property or interest in property of the estate of any Debtor subject to a lien, charge, or other encumbrance to secure the payment or performance of a Claim, which lien, charge, or other encumbrance is not subject to a Final Order ordering the remedy of avoidance on any such lien, charge, or other encumbrance under the Bankruptcy Code.

**1.31**   **Confirmation Date** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

**1.32**   **Confirmation Hearing** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.33**   **Confirmation Order** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the transactions contemplated thereby, which shall be in form and substance acceptable to the Debtors, the Revolving Credit Facility Agent, the Exit Facility Agent, the DIP Facility Agent, the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties, and to the extent that any provisions of such order affect Classes 5A, 5B, 6, 7A or 7B they shall be acceptable to the Creditors' Committee and all other provisions of such order shall be reasonably acceptable to the Creditors' Committee.

**1.34**   **Creditors' Committee** means the statutory committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

**1.35**   **Cure Amount** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (a) cure a monetary default as required by section 365(a) of the Bankruptcy Code by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (b) permit the Debtors to assume or assume and assign such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**1.36**   **Debtors** means BBEP; Breitburn GP LLC; BOLP; Breitburn Operating GP LLC; Breitburn Management Company LLC; Breitburn Finance; Alamitos Company; Beaver Creek Pipeline, L.L.C.; Breitburn Florida LLC; Breitburn Oklahoma LLC; Breitburn Sawtelle LLC; Breitburn Transpetco GP LLC; Breitburn Transpetco LP LLC; GTG Pipeline LLC; Mercury Michigan Company, LLC; Phoenix Production Company; QR Energy, LP; QRE GP, LLC; QRE Operating, LLC; Terra Energy Company LLC; Terra Pipeline Company LLC; and Transpetco Pipeline Company, L.P.

6

**1.37    DIP Facility** means the revolving senior secured postpetition credit facility approved in the DIP Facility Order, as the same may be amended through the Effective Date.

**1.38    DIP Facility Agent** means Wells Fargo Bank, National Association, solely in its capacity as administrative agent under the DIP Facility Documents, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Documents.

**1.39    DIP Facility Claims** means all Claims held by the DIP Facility Lenders or the DIP Facility Agent arising under or relating to the DIP Facility Documents or the DIP Facility Order, including any and all fees, expenses, and accrued but unpaid interest and fees arising under the DIP Facility Documents.

**1.40    DIP Facility Credit Agreement** means the Debtor-In-Possession Credit Agreement, dated as of May 19, 2016, by and among BOLP as borrower, BBEP as parent guarantor, certain other Debtor subsidiaries of BBEP as additional guarantors, the DIP Facility Agent, and the DIP Facility Lenders, as the same has been or may be further amended, modified, or supplemented from time to time including, without limitation, the First Amendment to Debtor-In-Possession Credit Agreement effective as of December 15, 2016, the Second Amendment to Debtor-In-Possession Credit Agreement effective as of December 2016, the Third Amendment to Debtor-In-Possession Credit Agreement effective as of May 11, 2017, the Fourth Amendment to Debtor-In-Possession Credit Agreement effective as of July 17, 2017, and the Fifth Amendment to Debtor-In-Possession Credit Agreement effective of as August 24, 2017.

**1.41    DIP Facility Documents** means, collectively, the DIP Facility Credit Agreement and all other "Loan Documents" (as defined therein), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or entered into in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time).

**1.42    DIP Facility Lenders** means the lenders party to the DIP Facility Credit Agreement, including any swingline lender, any issuing lender) and any "Lender Derivative Provider" under any "Lender Derivative Contract" (as each such term is defined in the DIP Facility Credit Agreement).

**1.43    DIP Facility Order** means collectively, the *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Bankruptcy Rule 4001–2 (I) Authorizing the Debtors to Obtain Postpetition Senior Secured Superpriority Financing, (II) Authorizing the Debtors' Limited Use of Cash Collateral, (III) Granting Adequate Protection to the Prepetition Secured Parties and (IV) Granting Related Relief dated August 19, 2016* (ECF No. 431), as the same has been supplemented from time to time,

WEIL:\96366844\1\29979.0004

including, without limitation, pursuant to those orders of the Bankruptcy Court dated December 13, 2016 (ECF No. 837), May 10, 2017 (ECF No. 1252), August 9. 2017 (ECF No. 1496), and August 24, 2017 (ECF No. 1525).

      **1.44**    **Disallowed** means, with reference to any Claim or a portion of a Claim, any Claim against any Debtor that (a) has been disallowed by a Final Order of the Bankruptcy Court, (b) has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as $0, contingent, disputed, or unliquidated and as to which no proof of Claim has been filed by the applicable deadline or deemed timely filed pursuant to any Final Order of the Bankruptcy Court, (c) has been agreed to by the holder of such Claim and the applicable Debtor to be equal to $0 or to be expunged, or (d) has not been listed by such Debtor on the Schedules and as to which no proof of Claim has been filed by the applicable deadline or deemed timely filed pursuant to any Final Order of the Bankruptcy Court.

      **1.45**    **Disbursing Agent** means LegacyCo (or such Entity designated by BBEP and the Requisite Consenting Second Lien Creditors and without the need for any further order of the Bankruptcy Court) in its capacity as a disbursing agent pursuant to Section 5.6 hereof.

      **1.46**    **Disclosure Statement** means the disclosure statement relating to the Plan, including, all exhibits thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

      **1.47**    **Disputed** means, with respect to a Claim, (a) any Claim, proof of which was timely and properly filed, which is disputed under Section 7.1 of this Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation (pursuant to Section 7.6 of this Plan or otherwise) that has not been determined by a Final Order, (b) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed, (c) any Claim that is listed in the Schedules as unliquidated, contingent, or disputed, or (d) any Claim that is otherwise disputed by any of the Debtors or the Reorganized Debtors, which dispute has not been withdrawn, resolved, or overruled by a Final Order.

      For the avoidance of doubt, if no proof of Claim has been filed by the applicable deadline and the Claim is not listed on the Schedules or has been or hereafter is listed on the Schedules as $0, disputed, contingent, or unliquidated, such Claim shall be Disallowed and shall be disregarded for all purposes.

      **1.48**    **Distribution Record Date** means for Class 6 the record date for purposes of voting on the Plan, and for all other purposes the Effective Date, unless otherwise provided in the Rights Offering Procedures, the Plan or designated by the Bankruptcy Court; *provided*, that no Distribution Record Date

shall apply to distributions to be made through DTC to holders of publicly held securities unless otherwise specified.

1.49    **District Court** means the United States District Court for the Southern District of New York having subject matter jurisdiction over the Chapter 11 Cases.

1.50    **D&O Liability Insurance Policies** means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") of any of the Debtors with respect to directors, managers, officers, and employees of the Debtors.

1.51    **DTC** means The Depository Trust Company.

1.52    **Early Election Procedures** means the Early Election Procedures set forth in the Rights Offering Procedures pursuant to which any holder of Senior Unsecured Notes that is not a Backstop Party and that wishes to participate in the "Early Election" as an Eligible Offeree must by December 13, 2017: (a) commit to participate in the Rights Offering and to accept the Plan; (b) certify that they are an Eligible Offeree, were an Eligible Offeree on the Rights Offering Record Date, and are not a Backstop Party; (c) certify and/or covenant, as applicable, that with respect to any Subscription Right that such Eligible Offeree wishes to participate in the Early Election, that the relevant Senior Unsecured Notes have only been held and shall only be held by an Eligible Offeree from and after the Rights Offering Record Date (November 27, 2017) through December 13, 2017; and (d) provide sufficient evidence in the Debtors' reasonable discretion, in consultation with the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties, and the Creditors' Committee, of such Eligible Offeree's financial wherewithal to consummate its commitment to exercise its Subscription Rights; *provided*, that, the Early Election Procedures shall not modify the obligations of the Backstop Parties under the Backstop Commitment Agreement.

1.53    **Effective Date** means a Business Day on or after the Confirmation Date selected by the Debtors, subject to the consent of the Requisite Commitment Parties, the Requisite Consenting Second Lien Creditors, and the Exit Facility Agent and in compliance with the Restructuring Support Agreement, on which the conditions to the effectiveness of the Plan specified in Section 9.2 hereof have been satisfied or otherwise effectively waived in accordance with the terms hereof.

1.54    **Eligible Offeree** means that such party is an Eligible Offeree as defined under the Rights Offering Procedures; *provided*, that, with regard to any Subscription Right pursuant to which an Eligible Offeree has opted into the Early Election Procedures, such Eligible Offeree must certify as to the statements set forth in the Early Election Procedures to be considered an Eligible Offeree.

WEIL:\96366844\1\29979.0004

**1.55**    **Employee Obligations** means any written contracts, agreements, policies, programs and plans for, among other things, compensation, reimbursement, indemnity, health care benefits, disability benefits, deferred compensation benefits, travel benefits, vacation and sick leave benefits, savings, severance benefits, retirement benefits, welfare benefits, relocation programs, life insurance and accidental death and dismemberment insurance, including written contracts, agreements, policies, programs and plans for bonuses and other incentives or compensation for the directors, officers, and employees of any of the Debtors.

**1.56**    **Employee Programs Order** means the Bankruptcy Court's *Order Pursuant to 11 U.S.C. §§ 105, 363(b), and 503(c)(3) Approving Debtors' 2017 Key Employee Retention Program and Key Employee Incentive Program* entered on March 6, 2017 (ECF No. 1057).

**1.57**    **Entity** shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

**1.58**    **Equity Committee** means the official committee of equity security holders appointed by the U.S. Trustee pursuant to section 1102(a)(2) of the Bankruptcy Code.

**1.59**    **Exchange Agreement** means that certain agreement, by and among New Permian Corp. and BBEP, substantially in the form included in the Plan Supplement, pursuant to which New Permian Corp. agrees to acquire on the Effective Date all of the New Permian LLC Equity and 7.5% of the LegacyCo Units from BBEP, subject to certain liabilities and obligations, which shall be in form and substance acceptable to the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties.

**1.60**    **Exculpated Parties** means collectively, and in each case in their capacities as such:  (a) the Debtors and Reorganized Debtors; (b) the Revolving Credit Facility Agent; (c) the Revolving Credit Facility Lenders; (d) the DIP Facility Agent; (e) the DIP Facility Lenders; (f) the Exit Facility Agent; (g) the Exit Facility Lenders; (h) the Second Lien Noteholders; (i) the Series B Interest Holders; (j) the Secured Notes Indenture Trustee; (k) the Backstop Parties; (l) the Unsecured Notes Indenture Trustee; (m) the Creditors' Committee and its current and former members; (n) the Unsecured Senior Notes Groups; (o) the Second Lien Group; (p) New Permian Corp.; (q) LegacyCo; (r) with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds; and (s) with respect to each of the foregoing entities (a) through (r), such entities' current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and

10

such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

      **1.61**   **Existing BBEP Equity Interests** means all Interests in BBEP immediately prior to the Effective Date.

      **1.62**   **Exit Facility** means that certain amended and restated loan facility provided to LegacyCo, among others, pursuant to the Exit Facility Documents, including the Exit Facility Credit Agreement which, on the Effective Date, shall be in the original principal amount of $400 million, as provided for in and shall be consistent with the Exit Facility Term Sheet.

      **1.63**   **Exit Facility Agent** means Wells Fargo Bank, National Association, solely in its capacity as administrative agent under the Exit Facility Documents, its successors, assigns, or any replacement agent appointed pursuant to the terms of the Exit Facility Documents.

      **1.64**   **Exit Facility Credit Agreement** means that certain Fourth Amended and Restated Credit Agreement, which shall be effective on the Effective Date, by and among LegacyCo, among others, the Exit Facility Agent, and the Exit Facility Lenders, substantially in the form contained in the Plan Supplement, which shall be in form and substance acceptable to the Debtors, the Exit Facility Agent, and the Requisite Consenting Second Lien Creditors.

      **1.65**   **Exit Facility Documents** means, collectively, the Exit Facility Credit Agreement and all other "Loan Documents" (as defined therein), including all other agreements, documents, and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time), each of which shall be, to the extent applicable, consistent with the Exit Facility Term Sheet and substantially in the form contained in the Plan Supplement, and which shall be in form and substance acceptable to the Debtors, the Exit Facility Agent, and the Requisite Consenting Second Lien Creditors.

      **1.66**   **Exit Facility Lenders** means each holder of an Allowed Revolving Credit Facility Claim who on the Effective Date shall become a lender under the Exit Facility Documents, including any swingline lender, any issuing lender and any "Lender Derivative Provider" under any "Lender Derivative Contract" (as each such term is defined in the DIP Facility Credit Agreement).

      **1.67**   **Exit Facility Term Sheet** means that certain term sheet attached hereto as **Exhibit I** that sets forth the principal terms of the Exit Facility.

      **1.68**   **Final Distribution Date** means, with respect to Class 6, a date on or after the Initial Distribution Date and after all Disputed Claims in Class 6 have

WEIL:\96366844\1\29979.0004

become either Allowed Claims or Disallowed Claims that is selected by the Disbursing Agent, in its discretion but, in any event, is no later than thirty (30) days thereafter.

**1.69** **Final Order** means an order or judgment of the Bankruptcy Court entered by the Clerk of the Bankruptcy Court on the docket in the Chapter 11 Cases which has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided*, that no order or judgment shall fail to be a Final Order solely because of the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure has been or may be filed with respect to such order or judgment. The susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code shall not render a Final Order not a Final Order.

**1.70** **General Unsecured Claim** means any Claim against any of the Debtors that is (a) not an Administrative Expense, Priority Tax Claim, Revolving Credit Facility Claim, Secured Notes Claim, Other Secured Claim, Unsecured Notes Claim, Ongoing Trade Claim of LegacyCo, Ongoing Trade Claim of New Permian Corp., or Priority Non-Tax Claim, (b) an Allowed Unsecured Notes Claim that is held by a holder that is not an Eligible Offeree, (c) the Second Lien Deficiency Claim, (d) any Claim for damages resulting from or based on the Debtor's rejection of an executory contract or unexpired lease, or (e) otherwise determined by the Bankruptcy Court to be a General Unsecured Claim.

**1.71** **Governmental Unit** has the meaning set forth in section 101(27) of the Bankruptcy Code.

**1.72** **GUC Cash Pool** means $1.5 million in Cash.

**1.73** **Indemnification Obligation** means each of the Debtors' indemnification obligations in place prior to the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, for their current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals and agents of the Debtors, as applicable.

WEIL:\96366844\1\29979.0004

**1.74**    **Initial Distribution Date** means a date on or after the Effective Date that is selected by LegacyCo in its discretion but, in any event, is not earlier than fifteen (15) days and no more than thirty (30) days after the Effective Date.

**1.75**    **Intercompany Claim** means any Claim against a Debtor held by either another Debtor or by a non-Debtor affiliate of a Debtor (excluding any Claims of an individual).  For the avoidance of doubt, any Claims against a Debtor held by either another Debtor or by a non-Debtor affiliate of a Debtor that has otherwise been assigned by such Debtor or non-Debtor affiliate to a third-party is not an Intercompany Claim.

**1.76**    **Intercompany Interest** means an Interest in a Debtor other than an Existing BBEP Equity Interest held by another Debtor or by a non-Debtor affiliate of a Debtor.

**1.77**    **Interest** means any equity security (as defined in section 101(16) of the Bankruptcy Code) of a Debtor, including all units, shares, common stock, preferred stock, partnership interests, or other instrument evidencing any fixed or contingent ownership interest in any Debtor, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in a Debtor, whether or not transferable and whether fully vested or vesting in the future, that existed immediately before the Effective Date.

**1.78**    **Legacy Assets** means the assets of LegacyCo, which shall be all assets of the Debtors and Reorganized Debtors (other than New Permian Corp. and New Permian LLC) other than the Permian Assets and which may include equity interests of a Debtor or Reorganized Debtor (other than New Permian Corp. and New Permian LLC), with such Debtor or Reorganized Debtor (other than New Permian Corp. and New Permian LLC) retaining its assets.

**1.79**    **Legacy Asset Transfer** has the meaning set forth in Section 6.9 of the Plan.

**1.80**    **LegacyCo Distribution and Transfer** has the meaning set forth in Section 6.9 of the Plan.

**1.81**    **LegacyCo** means the newly formed Delaware limited liability company, treated as a partnership for U.S. federal tax purposes and any applicable state or local tax purposes, that will be, as of the Effective Date, the ultimate parent company of the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), and that, in accordance with the Restructuring Transactions, *inter alia*, will be the issuer of the LegacyCo Units to BBEP pursuant to the Plan and the transferee of the assets of BBEP (including equity interests of subsidiaries); *provided*, that in the sole discretion of the Requisite Consenting Second Lien Creditors, LegacyCo may be treated as a corporation for U.S. federal tax purposes and any applicable state or local tax purposes.

WEIL:\96366844\1\29979.0004

1.82    **LegacyCo Board** means LegacyCo's initial board of managers.

1.83    **Legacy Contributed Assets** means the Legacy Assets excluding any Cash and other assets actually distributed on the Effective Date pursuant to or in connection with the implementation of the Plan.

1.84    **LegacyCo Contribution Agreement** means that certain LegacyCo Contribution Agreement pursuant to which BBEP shall contribute the Legacy Contributed Assets to LegacyCo in exchange for all of the LegacyCo Units and the assumption of certain liabilities and obligations, in form and substance acceptable to the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties consistent with the Restructuring Term Sheet.

1.85    **LegacyCo Interests** means the limited liability company equity interests in LegacyCo.

1.86    **LegacyCo LLC Agreement** means the limited liability company agreement of LegacyCo, substantially in the form included in the Plan Supplement and which shall be in form and substance (i) acceptable to the Debtors and the Requisite Consenting Second Lien Creditors and consistent with the Restructuring Term Sheet and (ii) reasonably acceptable to the Exit Facility Agent.

1.87    **LegacyCo Management Incentive Plan** means the long term management incentive plan to be in effect on or after the Effective Date; *provided*, that the Requisite Consenting Second Lien Creditors and the Debtors shall use reasonable good faith efforts to reach agreement on terms of the LegacyCo Management Incentive Plan and to include any such agreed terms in the Plan Supplement.

1.88    **LegacyCo Organizational Documents** means the LegacyCo LLC Agreement and the certificate of formation and/or other organizational documents of LegacyCo, substantially in the form included in the Plan Supplement and which shall be in form and substance (i) acceptable to the Debtors and the Requisite Consenting Second Lien Creditors and consistent with the Restructuring Term Sheet and (ii) reasonably acceptable to the Exit Facility Agent.

1.89    **LegacyCo Units** means the common units of LegacyCo to be issued pursuant to the Plan and as otherwise permitted pursuant to the LegacyCo LLC Agreement.

1.90    **Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.91    **Minimum Allocation Rights** means 40% of New Permian Corp. Shares at a price per share that will equal aggregate proceeds of $310,000,000,

14

that are allocated to and shall be exercised by the Backstop Parties pursuant to the Backstop Commitment Agreement.

**1.92**    **Minimum Cash Balance** means $10,000,000 minus (i) $500,000, (ii) any amounts to be paid to holders of Allowed Ongoing Trade Claims of New Permian Corp., and (iii) any amounts to be paid to holders of Allowed Cure Amounts pursuant to Section 8.4(ii).

**1.93**    **New Organizational Documents** means the LegacyCo Organizational Documents, and, as applicable, the certificates of incorporation, certificates of formation, bylaws, shareholders' agreement, limited liability company agreement, or functional equivalent thereof with respect to each Reorganized Debtor (other than New Permian Corp. and New Permian LLC), which in each case shall be in form and substance acceptable to the Debtors and the Requisite Consenting Second Lien Creditors and consistent with the Restructuring Term Sheet.

**1.94**    **New Permian Corp.** means a newly formed Delaware corporation that, in accordance with the Restructuring Transactions shall, *inter alia*, be the issuer of the New Permian Corp. Shares pursuant to the Rights Offering and the Plan and shall purchase all of the New Permian LLC Equity from BBEP.

**1.95**    **New Permian Corp. Board** means New Permian Corp.'s initial board of directors.

**1.96**    **New Permian Corp. Bylaws** means the Bylaws for New Permian Corp. substantially in the form contained in the Plan Supplement and which shall be acceptable to the Requisite Commitment Parties and consistent with the Restructuring Term Sheet.

**1.97**    **New Permian Corp. Certificate of Incorporation** means the Certificate of Incorporation of New Permian Corp., substantially in the form contained in the Plan Supplement, and which shall be acceptable to the Requisite Commitment Parties and consistent with the Restructuring Term Sheet and which shall provide that preemptive rights shall be granted to all holders of New Permian Corp. Shares that are accredited investors, including the AUNC Trust (if accredited), and that the tag-along rights set forth in the Restructuring Term Sheet shall be made available to all holders of New Permian Corp. Shares.

**1.98**    **New Permian Corp. Management Incentive Plan** means the long-term management incentive plan that may be adopted by the New Permian Corp. Board following the Effective Date.

**1.99**    **New Permian Corp. Shares** means the shares of common stock of New Permian Corp. (a) to be issued pursuant to the Plan, the Rights Offering, the Put Option Premium, and the Backstop Commitment Agreement and (b) as

otherwise permitted to be issued pursuant to the New Permian Corp. Certificate of Incorporation, subject to dilution by (i) shares, if any, issued under the New Permian Corp. Management Incentive Plan on or subsequent to the Effective Date, and (ii) shares, if any, issued on (other than pursuant to clause (a)) or subsequent to the Effective Date.

**1.100  New Permian LLC** means a newly formed Delaware limited liability company, treated as disregarded as an entity separate from its owner for U.S. federal income tax purposes, that, in accordance with the Restructuring Transactions, *inter alia*, will be the issuer of the New Permian LLC Equity to BBEP pursuant to the Plan and the transferee of the Permian Assets.

**1.101  New Permian LLC Equity** means the common units of New Permian LLC to be issued pursuant to the Plan.

**1.102  Ongoing Trade Claim of LegacyCo** means any prepetition general unsecured Claim against any of the Debtors held by a claimant that provides, or will provide, goods and services necessary to the operation of LegacyCo or whose post-Effective Date services will benefit LegacyCo Assets and which claimant will continue to do business with the LegacyCo after the Effective Date, that is (a) not an Administrative Expense, Priority Tax Claim, Revolving Credit Facility Claim, Secured Notes Claim, Other Secured Claim, General Unsecured Claim, Ongoing Trade Claim of New Permian Corp., Priority Non-Tax Claim, or a Second Lien Deficiency Claim, or (b) otherwise determined by the Bankruptcy Court to be an Ongoing Trade Claim of LegacyCo; *provided*, that to the extent a holder of an Ongoing Trade Claim of LegacyCo has not agreed to provide post-Effective Date trade terms reasonably acceptable to LegacyCo, such Ongoing Trade Claim of LegacyCo shall be classified and treated as a General Unsecured Claim.

**1.103  Ongoing Trade Claim of New Permian Corp.** means any prepetition general unsecured Claim against any of the Debtors held by a claimant that will provide goods and services necessary to the operation of New Permian Corp. or whose post-Effective Date services will benefit Permian Assets and which claimant will continue to do business with New Permian Corp. after the Effective Date, that is (a) not an Administrative Expense, Priority Tax Claim, Revolving Credit Facility Claim, Secured Notes Claim, Other Secured Claim, General Unsecured Claim, Ongoing Trade Claim of LegacyCo, Priority Non-Tax Claim, or a Second Lien Deficiency Claim, or (b) otherwise determined by the Bankruptcy Court to be an Ongoing Trade Claim of New Permian Corp.; *provided*, that to the extent a holder of an Ongoing Trade Claim of New Permian Corp. has not agreed to provide post-Effective Date trade terms reasonably acceptable to New Permian Corp., such Ongoing Trade Claim of New Permian Corp. shall be classified and treated as a General Unsecured Claim.

16

**1.104  Other Secured Claim** means a Claim that is not a Revolving Credit Facility Claim or Secured Notes Claim (a) secured by Collateral, to the extent of the value of such Collateral (i) as set forth in the Plan, (ii) as agreed to by the holder of such Claim and the Debtors, or (iii) as determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code or (b) secured by the amount of any valid rights of setoff of the holder thereof under section 553 of the Bankruptcy Code.

**1.105  Ordinary Course Professional Order** means the *Order Pursuant to 11 U.S.C. §§ 105(a), 327, 328, and 330 Authorizing Debtors to Employ Professionals Used in the Ordinary Course of Business Effective as of the Petition Date* (ECF No. 589).

**1.106  Permian Assets** means those assets set forth on **Exhibit II** annexed hereto and such other assets related thereto that are assigned to New Permian LLC pursuant to the Permian Contribution Agreement.

**1.107  Permian Asset Transfer** has the meaning set forth in Section 6.9 of the Plan.

**1.108  Permian Contribution Agreement** means that certain Permian Contribution Agreement, substantially in the form included in the Plan Supplement, pursuant to which BBEP shall transfer the Permian Assets to New Permian LLC in exchange for all of the New Permian LLC Equity and the assumption of certain liabilities and obligations, which shall be in form and substance acceptable to the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties.

**1.109  Permian Corp. Asset Acquisition** has the meaning set forth in Section 6.9 of the Plan.

**1.110  Permian Stock Value** shall mean the value per share of New Permian Corp. Shares as set forth in the Disclosure Statement based on an aggregate New Permian Corp. Share value of $807 million.

**1.111  Person** has the meaning set forth in section 101(41) of the Bankruptcy Code.

**1.112  Petition Date** means May 15, 2016, the date on which the Debtors commenced the Chapter 11 Cases.

**1.113  Plan** means this chapter 11 plan, as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

WEIL:\96366844\1\29979.0004

**1.114** **Plan Document** means any of the documents, other than this Plan, to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date, including the documents to be included in the Plan Supplement, all of which shall be in form and substance as provided herein and the Restructuring Support Agreement.

**1.115** **Plan Supplement** means the forms of certain documents effectuating the transactions contemplated herein, which documents shall be filed with the Clerk of the Bankruptcy Court no later than December 11, 2017, including, but not limited to, (a) the Schedule of Rejected Contracts, (b) a list of retained Causes of Action, (c) the LegacyCo LLC Agreement, (d) the LegacyCo Organizational Documents, (e) the New Permian Corp. Bylaws, (f) the New Permian Corp. Certificate of Incorporation, (g) the Backstop Commitment Agreement, (h) the Exit Facility Credit Agreement, (i) the Transition Services Agreement, (j) the LegacyCo Management Incentive Plan or certain terms thereof (if applicable), (k) the Exchange Agreement, (l) the LegacyCo Contribution Agreement, (m) the Permian Contribution Agreement (n) the Schedule of Assumed Employee Obligations, and (o) a registration rights agreement with respect to New Permian Corp. Shares.  Such documents shall be consistent with the terms hereof, the Restructuring Support Agreement and the Restructuring Term Sheet, the Backstop Commitment Agreement, and the Exit Facility Term Sheet, as applicable, and shall be in form and substance acceptable to the Requisite Consenting Second Lien Creditors, subject to the consent rights of the Requisite Commitment Parties for any Plan Supplement document or portion thereof that relates to New Permian Corp. or Permian Assets, as provided herein and in the Restructuring Support Agreement; *provided*, that, through the Effective Date, the Debtors shall have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan and the Restructuring Support Agreement; *provided*, further, that any documents or agreements incorporating or addressing the terms and conditions for the treatment of Claims in Classes 5A, 5B, 6, 7A or 7B shall be in form and substance reasonably acceptable to the Creditors' Committee.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected at the Office of the Clerk of the Bankruptcy Court during normal Bankruptcy Court hours.  Holders of Claims and Interests may obtain a copy of the Plan Supplement upon written request to the undersigned counsel.  Copies of the Plan Supplement also will be available on the Voting Agent's website, https://cases.primeclerk.com/Breitburn/. For the avoidance of doubt, any consent rights provided to the Creditors' Committee herein shall be in addition to the general rights and remedies of the Creditors' Committee as a statutory committee appointed in the Chapter 11 Cases.

**1.116** **Priority Non-Tax Claim** means any Claim, other than an Administrative Expense or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

WEIL:\96366844\1\29979.0004

**1.117** **Priority Tax Claim** means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.118** **Pro Rata** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class (except where otherwise described herein).

**1.119** **Professional** means an Entity, excluding those Entities entitled to compensation pursuant to the Ordinary Course Professional Order:  (a) retained pursuant to an Order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code; *provided*, that professionals employed by the Revolving Credit Facility Agent, the DIP Facility Agent, the Second Lien Noteholders, the Unsecured Noteholder Group, or the Unsecured Notes Indenture Trustee in their capacity as such, shall not be "Professionals" for the purposes of the Plan.

**1.120** **Professional Fee Claims** means all Administrative Expenses for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to any Final Order of the Bankruptcy Court (including, but not limited to, any fees of a Professional held back in accordance with the Bankruptcy Court's order establishing interim compensation procedures for the Professionals or otherwise).  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses (whether or not paid pursuant to an Order granting interim allowance), then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

**1.121** **Professional Fee Escrow Account** means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount and funded by the Debtors in Cash on the Effective Date, pursuant to Section 2.2(b) of the Plan.

**1.122** **Professional Fee Reserve Amount** means the total amount of Professional Fee Claims estimated in accordance with Section 2.2(c) of the Plan.

**1.123** **Put Option Premium** means the Put Option Premium (as defined in the Backstop Commitment Agreement) to be paid to the Backstop Parties as provided in the Backstop Commitment Agreement, and to be paid pursuant to the proviso contained in Section 4.5(b) of the Plan to the extent any other Eligible Offeree makes the election provided for therein.

19

**1.124  Reinstatement** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the holder of such Claim or Interest in accordance with section 1124 of the Bankruptcy Code, or (b) if applicable under section 1124 of the Bankruptcy Code:  (i) curing all prepetition and postpetition defaults other than defaults relating to the insolvency or financial condition of the applicable Debtor or its status as a debtor under the Bankruptcy Code;  (ii) reinstating the maturity date of the Claim; (iii) compensating the holder of such Claim for damages incurred as a result of its reasonable reliance on a contractual provision or such applicable law allowing the Claim's acceleration;  and (iv) not otherwise altering the legal, equitable or contractual rights to which the Claim entitles the holder thereof.

**1.125  Released and Settled Claims** means all Claims and Causes of Action made, or which could have been made, on or on behalf of any of the Debtors or non-Debtor subsidiaries against the Second Lien Noteholders, Series B Interest Holders, or the Secured Indenture Trustee, or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees, including the Claims and Causes of Action detailed in the Standing Motion and Claim Objection.

**1.126  Released Parties** means, collectively, and in each case in their capacities as such:  (a) the Debtors and Reorganized Debtors; (b) the Revolving Credit Facility Agent; (c) the Revolving Credit Facility Lenders; (d) the DIP Facility Agent; (e) the DIP Facility Lenders; (f) the Exit Facility Agent; (g) the Exit Facility Lenders; (h) the Second Lien Noteholders; (i) the Series B Interest Holders; (j) the Secured Notes Indenture Trustee; (k) the Backstop Parties; (l) the Unsecured Notes Indenture Trustee; (m) the Creditors' Committee and its current and former members; (n) the Unsecured Senior Notes Groups; (o) the Second Lien Group; (p) LegacyCo; and (q) New Permian Corp.; and with respect to each of the foregoing entities, such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

**1.127  Reorganized Debtors** means LegacyCo, New Permian Corp. and New Permian LLC, and each of the other Debtors (excluding BBEP) or any successor thereto, as reorganized pursuant to and under the Plan.

**1.128  Requisite Commitment Parties** has the meaning ascribed to it in the Backstop Commitment Agreement.

WEIL:\96366844\1\29979.0004

**1.129  Requisite Consenting Second Lien Creditors** has the meaning ascribed to it in the Restructuring Support Agreement.

**1.130  Restructuring** means the restructuring of the Debtors, the principal terms of which are set forth in the Plan and the Plan Supplement and subject to the terms of the Restructuring Support Agreement.

**1.131  Restructuring Support Agreement** means that certain Amended and Restated Restructuring Support Agreement (as amended, supplemented or otherwise modified from time to time) dated as of October 11, 2017, by and among the Debtors and the Consenting Creditors (as defined therein).

**1.132  Restructuring Term Sheet** means the term sheet attached as Exhibit D to the Restructuring Support Agreement.

**1.133  Restructuring Transactions** means, collectively, those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions to implement the Plan, in form and substance acceptable to the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties, and, to the extent such transactions adversely affect the Revolving Credit Facility Claims, the DIP Facility Claims, or the Exit Facility, the Revolving Credit Facility Agent, the DIP Agent, or the Exit Facility Agent, as applicable, including the implementation of the Rights Offering, the implementation of the Minimum Allocation Rights, the distribution of the Subscription Rights to the Rights Offering Participants as of the Rights Offering Record Date, and the issuance of the New Permian Corp. Shares in connection therewith, the Exit Facility, the LegacyCo LLC Agreement, the LegacyCo Organizational Documents, the New Permian Corp. Bylaws, the New Permian Corp. Certificate of Incorporation, and the transactions set forth in Sections 6.9 and 6.14. Notwithstanding anything in this Plan to the contrary, the Restructuring Transactions may be modified or revised by the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties and the Debtors in their reasonable discretion to ensure a more tax efficient structure for holders of Secured Notes Claims and the Debtors.

**1.134  Revolver Option** means the right of each holder of a portion of the Exit Facility to convert its term loans thereunder to revolving loans thereunder pursuant to the Revolver Option Procedures.

**1.135  Revolver Option Procedures** means the procedures governing the exercise of the Revolver Option.

**1.136  Revolving Credit Agreement** means that certain Third Amended and Restated Credit Agreement, dated as of November 19, 2014, by and among BOLP, as borrower, certain subsidiaries named therein, as guarantors, the

21

Revolving Credit Facility Lenders, the Revolving Credit Facility Agent, and Wells Fargo Securities, LLC, as sole lead arranger and sole bookrunner (as amended, restated, modified, or supplemented from time to time).

**1.137    Revolving Credit Documents** means, collectively, the Revolving Credit Agreement and all other "Loan Documents" (as defined therein), including all other agreements, documents and instruments delivered or entered into pursuant thereto or in connection therewith (including any guarantee agreements and collateral documentation) (in each case, as amended, restated, modified, or supplemented from time to time).

**1.138    Revolving Credit Facility Agent** means Wells Fargo Bank, National Association, solely in its capacity as administrative agent under the Revolving Credit Documents and, solely for purposes of release, exculpation and injunction hereunder, shall also include Wells Fargo Securities, LLC, as sole lead arranger and sole bookrunner.

**1.139    Revolving Credit Facility Claims** means all Claims arising under or related to the Revolving Credit Documents, including all "Obligations," including "Obligations" to any "Lender Derivative Provider" under any "Lender Derivative Contract" (as each such term is defined in the Revolving Credit Agreement).

**1.140    Revolving Credit Facility Lenders** means the lenders party to the Revolving Credit Agreement, including any swingline lender, any issuing lender and any "Lender Derivative Provider" under any "Lender Derivative Contract" (as each such term is defined in the Revolving Credit Agreement).

**1.141    Rights Offering** means that certain rights offering pursuant to which each Eligible Offeree is entitled to receive Subscription Rights to acquire 60% of the New Permian Corp. Shares in accordance with the Plan, the Rights Offering Procedures, and the Backstop Commitment Agreement.

**1.142    Rights Offering Participants** means those holders of Unsecured Notes Claims who duly subscribe for New Permian Corp. Shares in accordance with the Rights Offerings Procedures.

**1.143    Rights Offering Aggregate Price** means $465,000,000, representing an aggregate of 60% of New Permian Corp. Shares.

**1.144    Rights Offering Procedures** means the procedures governing and for the implementation of the Rights Offering, as approved by the Bankruptcy Court pursuant to the order approving the Disclosure Statement, substantially in the form attached to the Disclosure Statement, and which otherwise shall be in form and substance acceptable to the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties.

WEIL:\96366844\1\29979.0004

**1.145** **Rights Offering Proceeds and Minimum Allocation Rights Proceeds** means the Cash proceeds from the Rights Offering and Minimum Allocation Rights. The Rights Offering Proceeds and Minimum Allocation Rights will total $775,000,000 comprised of (i) $465,000,000 from the Rights Offering Aggregate Price, and (ii) $310,000,000, from the Minimum Allocation Rights.

**1.146** **Rights Offering Record Date** means the date established in the Rights Offering Procedures as the record date for determining the Eligible Offerees entitled to receive Subscription Rights and participate in the Rights Offering, which shall be November 27, 2017.

**1.147** **Royalty and Working Interests** means the working interests granting the right to exploit oil and gas, and certain other royalty or mineral interests, including but not limited to, landowner's royalty interests, overriding royalty interests, net profit interests, non-participating royalty interests, and production payments.

**1.148** **Schedule of Assumed Employee Obligations** means the schedule of Employee Obligations to be assumed by the Debtors pursuant to the Plan, to be filed as part of the Plan Supplement, which schedule shall be in form and substance acceptable to the Requisite Consenting Second Lien Creditors.

**1.149** **Schedule of Rejected Contracts** means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, to be filed as part of the Plan Supplement, which schedule shall be in form and substance acceptable to the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties (as it relates to New Permian Corp. or Permian Assets).

**1.150** **Schedules** means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules as such schedules and statements have been or may be supplemented or amended from time to time.

**1.151** **Second Lien Deficiency Claim** means any unsecured portion of the Secured Notes Claim.

**1.152** **Second Lien Group** means those entities disclosed in the *Amended Verified Statement Pursuant to Rule 2019 of Federal Rules of Bankruptcy Procedure* (ECF No. 399) filed on August 16, 2016, in their capacity as holders of Secured Notes, as may be amended or supplemented.

**1.153** **Second Lien Noteholders** means the holders of the Secured Notes.

WEIL:\96366844\1\29979.0004

**1.154    Secured Notes** means the 9.25% Senior Secured Second Lien Notes due May 18, 2020, issued pursuant to the Secured Notes Indenture in the aggregate principal amount of Six Hundred Fifty Million Dollars ($650,000,000).

**1.155    Secured Notes Claims** means all Claims arising under or based upon to the Secured Notes and the Secured Notes Indenture including, principal, makewhole, accrued unpaid pre- and post-petition interest on all outstanding obligations, costs, fees, indemnities, and all other obligations payable under the Secured Notes Indenture.

**1.156    Secured Notes Indenture** means that certain Indenture, dated as of April 8, 2015, by and among BBEP, BOLP, and Breitburn Finance, as issuers, the guarantors named therein, and the Secured Notes Indenture Trustee, including all agreements, notes, instruments, and any other documents delivered pursuant thereto or in connection therewith (in each case, as amended, modified, or supplemented from time to time).

**1.157    Secured Notes Indenture Trustee** means Delaware Trust Company, solely in its capacity as successor indenture trustee and noteholder collateral agent under the Secured Notes Indenture.

**1.158    Securities Act** means the Securities Act of 1933, as amended.

**1.159    Security** means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

**1.160    Series B Interest Holders** means those holders of Series B Preferred Units.

**1.161    Series B Preferred Units** means the Series B Perpetual Convertible Preferred Units of Existing BBEP Equity Interests.

**1.162    Statutory Committees** means the Creditors' Committee and the Equity Committee.

**1.163    Standing Motion and Claim Objection** means the *(I) Objection to Proof of Claim filed by Delaware Trust Company as Indenture Trustee for the 9.25% Senior Secured Second Lien Notes Due 2020 and (II) Motion of the Official Committee of Unsecured Creditors for Entry of an Order Conditionally Authorizing the Committee to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates and Granting Related Relief* filed by the Creditors' Committee on December 19, 2016 (ECF No. 867).

**1.164    Subordinated Claim** means a Claim subject to subordination under section 510 of the Bankruptcy Code.

24

**1.165** **Subscription Rights** means the Subscription Rights as defined in the Backstop Commitment Agreement.

**1.166** **Tax Code** means title 26 of the United States Code, as amended from time to time.

**1.167** **Transition Services Agreement** means that certain Transition Services Agreement, to be entered into between LegacyCo and New Permian Corp. on the Effective Date, substantially in the form contained in the Plan Supplement and consistent with the Restructuring Term Sheet, which shall be in form and substance acceptable to the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties.

**1.168** **Unsecured Notes Claim** means, collectively, all Claims, including any guaranty Claims, arising under the 7.875% Unsecured Notes, the 7.875% Unsecured Notes Indenture, the 8.625% Unsecured Notes, and/or the 8.625% Unsecured Notes Indenture.

**1.169** **Unsecured Notes Indentures** means the 7.875% Unsecured Notes Indenture and the 8.625% Unsecured Notes Indenture.

**1.170** **Unsecured Notes Indenture Trustee** means Wilmington Trust Company, solely in its capacity as successor indenture trustee under each of the 7.875% Unsecured Notes Indenture and the 8.625% Unsecured Notes Indenture.

**1.171** **Unsecured Senior Notes Groups** means, collectively (i) the ad hoc group of entities disclosed in the *Amended Verified Statement Pursuant to Bankruptcy Rule 2019* (ECF No. 1452) filed on July 19, 2017, in their capacity as holders of Unsecured Notes Claims, as may be amended or supplemented, and (ii) the ad hoc group of certain other holders of Unsecured Notes Claims represented by White & Case LLP.

**1.172** **U.S. Trustee** means the United States Trustee for the Southern District of New York.

**1.173** **Voting Agent** means Prime Clerk LLC, the Debtors' voting agent.

**1.174** **Voting Deadline** means the date set by the Bankruptcy Court by which all completed Ballots must be received.

### INTERPRETATION; APPLICATION OF DEFINITIONS AND RULES OF CONSTRUCTION.

For purposes herein: (a) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein, (b) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the

25

masculine, feminine, and the neuter gender, (c) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions, (d) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation," (e) a term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code, (f) the rules of construction contained in section 102 of the Bankruptcy Code shall apply to the Plan, (g) the headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof, (h) in the event that a particular term of the Plan (including any exhibits or schedules hereto) conflicts with a particular term of the definitive documentation required to be implemented pursuant to the terms of the Plan or any settlement or other agreement contemplated hereunder, the definitive documentation shall control and shall be binding on the parties thereto, (i) except as otherwise provided, any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan, (j) any effectuating provisions may be interpreted by LegacyCo, New Permian Corp., New Permian LLC or the other Reorganized Debtors in a manner consistent with the overall purpose and intent of the Plan, all without further notice to or action, order, or approval of the court or any other entity, and such interpretation shall control in all respects, (k) except as otherwise provided, any reference to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter, and (l) any docket number references in the Plan shall refer to the docket number of any document filed with the Bankruptcy Court in the Chapter 11 Cases.

## CERTAIN CONSENT RIGHTS.

Notwithstanding anything in the Plan to the contrary, any and all consent rights of the Consenting Creditors (as defined in the Restructuring Support Agreement) set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan, the Plan Supplement, the Plan Documents, and any other Restructuring Document (as defined in the Restructuring Support Agreement), including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I hereof) and fully enforceable as if stated in full herein until such time as the Restructuring Support Agreement is terminated in accordance with its terms.

26

# ARTICLE II.

## ADMINISTRATIVE EXPENSES AND PRIORITY TAX CLAIMS

**2.1    Administrative Expenses.**    Except as specified in Section 2.2, unless LegacyCo and a holder of an Allowed Administrative Expense against any of the Debtors agree to a different treatment of such Administrative Expense, on the Effective Date, each holder of an Allowed Administrative Expense shall receive, in full satisfaction of such Allowed Administrative Expense, an amount in Cash equal to the Allowed amount of such Administrative Expense; *provided*, that Allowed Administrative Expenses against any of the Debtors representing liabilities incurred in the ordinary course by the Debtors, as debtors in possession, or liabilities arising under loans or advances to or other obligations incurred by any of the Debtors, as debtors in possession, whether or not incurred in the ordinary course, shall be paid by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) in the ordinary course, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

## 2.2    Professional Fee Claims.

(a)    All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through the Effective Date, must be filed and served on the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) no later than thirty (30) days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, and once approved by the Bankruptcy Court, promptly paid in full in Cash from the Professional Fee Escrow Account up to its full Allowed amount.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be allocated among and paid in full in Cash directly by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC).

(b)    Prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals, and shall be treated as a grantor trust pursuant to Treasury Regulation section 1.671–4(a) for U.S. federal income tax purposes (with the Professionals as the grantors thereof).  Such funds shall not be considered property of the estates of the Debtors or the Reorganized Debtors.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals have

27

been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be paid to the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), without any further action or order of the Bankruptcy Court.

(c)     Professionals shall estimate their unpaid Professional Fee Claims incurred in rendering services to the Debtors or their estates before and as of the Effective Date and shall deliver such estimate to the attorneys for the Debtors and attorneys for the Second Lien Group no later than ten (10) Business Days before the Effective Date; *provided*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors or Reorganized Debtors (other than New Permian Corp. and New Permian LLC) shall estimate the unpaid and unbilled fees and expenses of such Professional in order for such Professional to be entitled to payment from the Professional Fee Escrow Account. The total amount estimated pursuant to this Section shall comprise the Professional Fee Reserve Amount and such estimate shall be provided to the attorneys for the Debtors and attorneys for the Second Lien Group no later than five (5) Business Days before the Effective Date. The Professional Fee Reserve Amount, as well as the return of any excess funds in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full, shall be allocated to the applicable Debtor for whose benefit such Professional Fees Claims were incurred.

(d)     Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors. Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

**2.3    DIP Facility Claims.** In full and final satisfaction, settlement, release, and discharge of, and in exchange for, the Allowed DIP Facility Claims (subject to the last sentence of this Section 2.3), such Allowed DIP Facility Claims shall be paid in full in Cash by the Debtors on the Effective Date equal to the Allowed amount of such DIP Facility Claims and all commitments under the DIP Facility Documents shall terminate. Upon the indefeasible payment or satisfaction in full in Cash of the DIP Facility Claims (other than any DIP Facility Claims based on the Debtors' contingent obligations under the DIP Facility Documents for which no claim has been made) in accordance with the terms of this Plan, on the Effective Date, all Liens granted to secure such obligations automatically shall be terminated and and of no further force and effect. The Debtors' contingent or unliquidated obligations under the DIP Facility Documents, to the extent not indefeasibly paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors in a manner acceptable to the DIP Facility Agent, any affected DIP Facility

Lender, or any other holder of a DIP Facility Claim, as applicable, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

**2.4** **Priority Tax Claims.** Except to the extent that LegacyCo and a holder of an Allowed Priority Tax Claim against any of the Debtors agree to a different treatment of such Claim, each holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtors or Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, with the consent of the Requisite Consenting Second Lien Creditors, (a) Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date, or (b) Cash, in equal semi-annual installments commencing on the first (1st) Business Day following the Effective Date (or as soon thereafter as is reasonably practicable after such Claim becomes an Allowed Priority Tax Claim) and continuing over a period not exceeding five (5) years from and after the Petition Date, together with interest accrued thereon at the applicable nonbankruptcy rate, which as to any Allowed Priority Tax Claim of the Internal Revenue Service on behalf of the United States shall be the applicable rate specified by the Tax Code, as of the Confirmation Date, applied pursuant to section 511 of the Bankruptcy Code, subject to the sole option of the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) to prepay the entire amount of the Allowed Priority Tax Claim.  All Allowed Priority Tax Claims against any of the Debtors that are not due and payable on or before the Effective Date shall be paid in the ordinary course as such obligations become due.

## ARTICLE III.

### CLASSIFICATION OF CLAIMS AND INTERESTS

**3.1** **Formation of Debtor Groups for Convenience Only.** This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and making distributions under this Plan in respect of Claims against and Interests in the Debtors under this Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal entities.

**3.2** **Classification of Claims and Interests.**

(a) The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor, each of which shall include the classifications set forth below.

(b) A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.

29

(c)     The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (i) impaired or unimpaired by this Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to reject this Plan.  The Debtors reserve the right to assert that the treatment provided to holders of Claims and Interests pursuant to Article III of the Plan renders such holders not "impaired" (within the meaning of such term in section 1124 of the Bankruptcy Code).

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Revolving Credit Facility Claims | Impaired | Yes |
| Class 4 | Secured Notes Claims | Impaired | Yes |
| Class 5A/Class 5B | Unsecured Notes Claims | Impaired | Yes |
| Class 6 | General Unsecured Claims | Impaired | Yes |
| Class 7A | Ongoing Trade Claims of LegacyCo | Unimpaired | No (deemed to accept) |
| Class 7B | Ongoing Trade Claims of New Permian Corp. | Unimpaired | No (deemed to accept) |
| Class 8 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| Class 9 | Subordinated Claims | Impaired | No (deemed to reject) |
| Class 10 | Intercompany Interests | Unimpaired | No (deemed to accept) |
| Class 11 | Existing BBEP Equity Interests | Impaired | No (deemed to reject) |

**3.3     Separate Classification of Other Secured Claims.**  Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within this Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of receiving distributions under this Plan.

**3.4     Nonconsensual Confirmation.**  In the event any impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite statutory majority under section 1126(c) of the Bankruptcy Code, then the Debtors reserve the right to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code.

**3.5     Debtors' Rights in Respect of Unimpaired Claims.**  Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Reorganized Debtors in respect of any Claim that is not "impaired" (within the meaning of such term in section 1124 of the Bankruptcy Code), including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Claim.

30

# ARTICLE IV.

## TREATMENT OF CLAIMS AND INTERESTS

**4.1** **Class 1 – Priority Non-Tax Claims.** Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a different treatment of such Claim, which different treatment shall be acceptable to the Requisite Consenting Second Lien Creditors, on the Effective Date, each holder of an Allowed Priority Non-Tax Claim against any of the Debtors shall receive, in full satisfaction of such Claim, at the option of the Debtors, with the consent of the Requisite Consenting Second Lien Creditors: (a) Cash in an amount equal to the Allowed amount of such Claim, or (b) other treatment consistent with section 1129(a)(9) of the Bankruptcy Code; *provided*, that Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business, shall be paid in the ordinary course of business, and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to such transactions without further action by the holders of such Priority Non-Tax Claims or further approval by the Bankruptcy Court.

**4.2** **Class 2 – Other Secured Claims.** Except to the extent that a holder of an Allowed Other Secured Claim agrees to a different treatment of such Claim, which different treatment shall be acceptable to the Requisite Consenting Second Lien Creditors and, to the extent that such different treatment adversely affects the Exit Facility, the Exit Facility Agent, each holder of an Allowed Other Secured Claim against any of the Debtors shall receive, at the option of the Debtors, with the consent of the Requisite Consenting Second Lien Creditors and, to the extent that such treatment adversely affects the Exit Facility, the Exit Facility Agent, and in full satisfaction of such Claim, either (a) Cash in an amount equal to one hundred percent (100%) of the unpaid amount of such Allowed Other Secured Claim, (b) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of such Allowed Other Secured Claim is entitled, or (c) such other distribution as necessary to satisfy the requirements of section 1124 of the Bankruptcy Code. In the event an Other Secured Claim against any of the Debtors is treated under clause (a) of this Section, the liens securing such Other Secured Claim shall be deemed released immediately upon payment.

**4.3** **Class 3 – Revolving Credit Facility Claims.** The Revolving Credit Facility Claims shall be deemed Allowed in the amount of $747,316,435.62 with respect to principal and two interest rate derivative obligations plus such amounts as may be owing for any other outstanding "Obligations" (as such term is defined in the Revolving Credit Agreement) thereunder, including any accrued or hereafter accruing and unpaid interest thereon and any additional amounts, charges, fees and expenses (including any attorneys', accountants', appraisers' and financial advisors' fees and expenses that are chargeable or reimbursable under the Revolving Credit Documents) now or hereafter due under the Revolving Credit Documents (collectively, the "**Allowed Revolving Credit Facility Claims**").

WEIL:\96366844\1\29979.0004

(a)    Each holder of an Allowed Revolving Credit Facility Claim shall receive, on the Effective Date, in full and final satisfaction thereof:  (i) Cash in an amount equal to such holders' Pro Rata share of the Allowed Revolving Credit Facility Claims minus the original principal amount of the Exit Facility on the Effective Date, $400 million, and (ii) such holder's Pro Rata share of the Exit Facility; *provided*, that all Revolving Credit Facility Claims arising under any "Lender Derivative Contract" (as such term is defined in the Revolving Credit Agreement) shall be indefeasibly paid in full in Cash and shall not be included in the distributions or calculation of Pro Rata share in the immediately preceding clauses (i) and (ii).

(b)    Each holder of an Allowed Revolving Credit Facility Claim shall also have the right pursuant to the Revolver Option and the Revolver Option Procedures to convert all (but not less than all) of its amount of the Exit Facility received pursuant to Section 4.3(a)(ii) to an equal amount of a revolving credit facility as provided in the Exit Facility Term Sheet and the Exit Facility Documents.

(c)    LegacyCo shall pay in full in Cash (other than as provided in Section 4.3(a)(ii) above) all amounts payable with respect to the Revolving Credit Documents as provided in the DIP Facility Order.

### 4.4    Class 4 – Secured Notes Claim.

(a)    The Secured Notes Claims shall be deemed Allowed solely for purposes of this Plan in the aggregate amount of $793,300,000, plus accrued unpaid pre and postpetition default interest on all outstanding obligations, costs, fees, indemnities, and all other obligations payable under the Secured Notes Indenture.

(b)    On the Effective Date, each holder of an Allowed Secured Notes Claim that is a Certified Holder shall receive, in accordance with the Restructuring Transactions, in full satisfaction of such Claim, its Pro Rata share of 92.5% of the LegacyCo Units, which may be subject to dilution by the LegacyCo Management Incentive Plan.

### 4.5    Class 5A/Class 5B – Unsecured Notes Claims.

(a)    The 7.875% Unsecured Notes Claims shall be deemed Allowed in the aggregate principal amount outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date.  The 8.625% Unsecured Notes Claims shall be deemed Allowed in the aggregate principal amount outstanding as of the Petition Date plus all accrued and unpaid interest owed as of the Petition Date.

(b)    Class 5A.  Each holder of an Allowed Unsecured Notes Claim that is an Eligible Offeree as of the Rights Offering Record Date, shall receive, in accordance with the Rights Offering and the Rights Offering Procedures, in full satisfaction of such Claim, the right to participate in the Rights Offering; *provided* that, any Eligible Offeree that is not a Backstop Party and has elected to participate in the Rights Offering on or

32

before December 13, 2017 in accordance with the Early Election Procedures, will receive on the Effective Date their Pro Rata share (based on the respective Backstop Commitment Amounts (which includes the amounts committed in the Minimum Allocation Rights and the Rights Offering) of the Backstop Parties and the respective subscription amounts as to the rights exercised by Eligible Offerees by December 13, 2017) of the Put Option Premium. Any holder of an Allowed Unsecured Notes Claim that is an Eligible Offeree and elects not to participate in the Rights Offering shall receive no distribution whatsoever on account of its Allowed Unsecured Notes Claim; *provided*, that, if the Plan is subsequently amended at any time to provide for a consensual distribution to holders of Existing BBEP Equity Interests, then such holders shall receive a distribution in the amount agreed upon among the Debtors, the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties, and the Creditors' Committee that is no less favorable than any distribution to holders of Existing BBEP Equity Interests.

(c)    Class 5B.  Each holder of an Allowed Unsecured Notes Claim as of the Rights Offering Record Date that certifies, to the reasonable satisfaction of the Debtors in consultation with the Requisite Commitment Parties and the Creditors' Committee, and subject to the rights of the Requisite Commitment Parties under Section 7.D of the Rights Offering Procedures, that it is not an Eligible Offeree shall receive through the AUNC Trust (as defined in Section 6.20) a number of shares of New Permian Corp. Shares having a value, based on the Permian Stock Value, equal to 4.5% of its Allowed Unsecured Notes Claim (a "**Receiving AUNC Holder**").  Notwithstanding the foregoing, any Receiving AUNC Holder shall have the option to elect on the Ballot to receive instead Cash in the amount of 4.5% of its Allowed Unsecured Notes Claim with respect to any Senior Unsecured Notes held by it that have been held only by an Entity that is not an Eligible Offeree during the period from and after the Rights Offering Record Date through the Effective Date; *provided*, that,  the sum of (i) the aggregate value of New Permian Corp. Shares distributed to the Receiving AUNC Holders and (ii) the aggregate amount of Cash distributed to those Receiving AUNC Holders electing to receive Cash as provided in this Section 4.5(c), shall not exceed $5,422,265 (the, "**AUNC Cap**"), and to the extent that the AUNC Cap would otherwise be exceeded by the distribution to those receiving New Permian Corp. Shares and Cash as provided in this Section 4.5(c) each shall be reduced ratably so as to eliminate such excess.

(d)    In addition to the foregoing, there shall be a Cash distribution on the Initial Distribution Date to Class 5A and Class 5B (the "**Additional Cash Distribution**") in an amount equal to the Unsecured Notes Indenture Trustee's reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases, not to exceed $1,050,000 as to both Class 5A and Class 5B; *provided*, further, that (i) the Unsecured Notes Indenture Trustee shall be entitled to exercise its charging lien solely against such Additional Cash Distribution, (ii) the Unsecured Notes Indenture Trustee shall, fifteen (15) days prior to the Confirmation Hearing, deliver to the attorneys for the Debtors, the Unsecured Senior Notes Groups, the Second Lien Group, and the Creditors' Committee (the "**Reviewing Parties**") invoices (including an estimate of fees

33

to be incurred thereafter through the Effective Date) which sets forth and documents the reasonable fees and expenses of the Unsecured Notes Indenture Trustee and its counsel and agents, which invoices may be redacted to preserve privilege and/or confidentiality, (iii) after delivery of the invoices, the Reviewing Parties shall have five (5) Business Days to review such invoices and raise any objection, in writing, to the reasonableness of the fees and expenses, and (iv) if the Unsecured Notes Indenture Trustee and the Reviewing Parties are unable to resolve such an objection on a consensual basis within five (5) Business Days after such written objection has been submitted to the Unsecured Notes Indenture Trustee, then one or more of the Reviewing Parties may file with the Court such objection and the Court shall adjudicate the matter at the Confirmation Hearing; *provided*, further, that if the Additional Cash Distribution is less than $1,050,000 (for any reason), such excess Cash shall be retained by LegacyCo. Under no circumstances shall the aggregate amount of the fees and expenses sought by the Unsecured Notes Indenture Trustee exceed $1,050,000.

(e)     For the avoidance of doubt, holders of Class 5A and Class 5B Unsecured Notes Claims shall not have any right to receive (or elect to receive) any recovery provided for Class 6 General Unsecured Claims in the Plan.

Any New Permian Corp. Shares issued to a Receiving AUNC Holder shall be issued to the AUNC Trust (as defined in Section 6.20 of the Plan). New Permian Corp. Shares issued pursuant to Section 4.5(c) of the Plan shall dilute all other New Permian Corp. Shares issued pursuant to the Plan, but are subject to dilution from any New Permian Corp. Shares issued on (other than pursuant to the Plan) or after the Effective Date, including pursuant to any New Permian Corp. Management Incentive Plan or similar arrangement.

**4.6**     **Class 6 – General Unsecured Claims**.  Except to the extent a holder of an Allowed General Unsecured Claim and the Debtors or the Reorganized Debtors, as applicable, agree to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive, on the Initial Distribution Date and Final Distribution Date, as applicable, in full satisfaction of such Claim, its Pro Rata share of the GUC Cash Pool (such Pro Rata Share to be calculated taking into account any Claims in Class 6 that receive New Permian Corp. Shares as provided below); *provided*, that, any holder of an Allowed General Unsecured Claim in Class 6 with an Allowed Claim equal to or more than $1 million who is able to hold New Permian Corp. Shares through the facilities of DTC shall have the right to elect on its Ballot to receive on the Initial Distribution Date and Final Distribution Date a distribution of New Permian Corp. Shares through DTC having a value, based on the Permian Stock Value, equal to 4.5% of its Allowed General Unsecured Claim (any such electing holder, a "**Receiving GUC Holder**"); *provided*, further, that the aggregate amount of such New Permian Corp. Shares distributed to Receiving GUC Holders shall not exceed in the aggregate New Permian Corp. Shares having a Permian Stock Value of $817,240 (the "**GUC Stock Cap**").  To the extent that the New Permian Corp. Shares that would otherwise be issued under this Section 4.6 of the Plan exceeds the GUC Stock Cap, the distribution to those receiving New Permian Corp. Shares under this Section 4.6 shall be reduced ratably so as

34

to eliminate such excess. The amount of Cash from the GUC Cash Pool that otherwise would have been distributed to any such holder of a General Unsecured Claim that elects to receive New Permian Corp. Shares shall be distributed to New Permian Corp.

Any New Permian Corp. Shares issued to holders of Allowed General Unsecured Claims shall be issued through DTC. New Permian Corp. Shares issued pursuant to Section 4.6 of the Plan shall dilute all other New Permian Corp. Shares issued pursuant to the Plan, but are subject to dilution from any New Permian Corp. Shares issued on (other than pursuant to the Plan) or after the Effective Date, including pursuant to any New Permian Corp. Management Incentive Plan or similar arrangement.

### 4.7 Class 7A – Ongoing Trade Claims of LegacyCo.

(a) Except to the extent that a holder of an Allowed Ongoing Trade Claim of LegacyCo and the Debtors or Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, with the consent of the Requisite Consenting Second Lien Creditors, agree to less favorable treatment, each holder of an Allowed Ongoing Trade Claim of LegacyCo shall receive Cash from the Rights Offering Proceeds and Minimum Allocation Rights Proceeds, in an amount equal to such Allowed Ongoing Trade Claim of LegacyCo on the Effective Date.

(b) To the extent that an Ongoing Trade Claim of LegacyCo: (i) will benefit New Permian Corp. post-Effective Date or benefits Permian Assets (whether before or after the Effective Date) and (ii) will benefit LegacyCo or benefits Legacy Assets (whether before or after the Effective Date), such Ongoing Trade Claim of LegacyCo shall be paid its Cash distribution as a Class 7A Claim and New Permian Corp. shall reimburse LegacyCo for its pro rata share of all such amounts pursuant to the terms of the Transition Services Agreement.

### 4.8 Class 7B – Ongoing Trade Claims of New Permian Corp.
Except to the extent that a holder of an Allowed Ongoing Trade Claim of New Permian Corp. and New Permian Corp. with the consent of the Requisite Commitment Parties, agree to less favorable treatment, each holder of an Allowed Ongoing Trade Claim of New Permian Corp. shall receive Cash, payable from the Rights Offering Proceeds and Minimum Allocation Rights Proceeds in an amount equal to such Allowed Ongoing Trade Claim of New Permian Corp. on the Effective Date.

### 4.9 Class 8 – Intercompany Claims. All Allowed Intercompany Claims shall either be (i) canceled (or otherwise eliminated) and receive no distribution under the Plan or (ii) Reinstated, in each case as determined by the Debtors or the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, with the consent of the Requisite Consenting Second Lien Creditors.

### 4.10 Class 9 – Subordinated Claims. Subordinated Claims are subordinated pursuant to this Plan and section 510 of the Bankruptcy Code. The holders of Subordinated Claims shall not receive or retain any property under this Plan on

account of such Claims, and the obligations of the Debtors and the Reorganized Debtors on account of Subordinated Claims shall be discharged.

      **4.11**    **Class 10 – Intercompany Interests.**  All Allowed Intercompany Interests shall either be (i) canceled (or otherwise eliminated) and receive no distribution under the Plan or (ii) Reinstated, in each case as determined by the Debtors or the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, with the consent of the Requisite Consenting Second Lien Creditors.

      **4.12**    **Class 11 – Existing BBEP Equity Interests.**  On the Effective Date, all Existing BBEP Equity Interests shall be canceled without further action by or order of the Bankruptcy Court and all holders of Existing BBEP Equity Interests shall not receive or retain any property under this Plan.

## ARTICLE V.

### PROVISIONS GOVERNING DISTRIBUTIONS

      **5.1**    **Distributions Generally.**  The Disbursing Agent shall make all distributions to the appropriate holders of Allowed Claims in accordance with the terms of this Plan.

      **5.2**    **Plan Funding.**  Distributions of Cash shall be funded from the Rights Offering Proceeds and Minimum Allocation Rights Proceeds or the Debtors' or the Reorganized Debtors' Cash on hand, as applicable, as of the applicable date of such distribution as set forth herein.

      **5.3**    **No Postpetition or Default Interest on Claims.**  Except as otherwise provided for in this Plan or the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, postpetition and/or default interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date; *provided*, that this Section 5.3 shall not apply to the Secured Notes Claims.

      **5.4**    **Date of Distributions.**  Unless otherwise provided in this Plan, any distributions and deliveries to be made under this Plan shall be made on the Effective Date; *provided*, that the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) may implement periodic distribution dates to the extent they determine them to be appropriate.

      **5.5**    **Distribution Record Date.**  As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date. None of the Debtors, the Reorganized Debtors, or the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on

the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, none of the Debtors, the Reorganized Debtors, or the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

   **5.6** **Disbursing Agent.**  All distributions under this Plan shall be made by the Disbursing Agent, on behalf of the applicable Debtor (unless otherwise provided herein), on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 5.17 of this Plan.

### 5.7 Delivery of Distributions.

   (a) The Disbursing Agent will make the applicable distribution under this Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any holder of an Allowed Claim as and when required by this Plan at:  (i) the address of such holder on the books and records of the Debtors or their agents; or (ii) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then current address of such holder, at which time or as soon thereafter as reasonably practicable, such distribution shall be made to such holder without interest.  Neither the Unsecured Notes Indenture Trustee nor the Secured Notes Indenture Trustee shall incur any liability on account of the making of any distribution under the Plan except for gross negligence or willful misconduct.

   (b) Except as otherwise provided in the Plan, all distributions to Holders of Secured Notes Claims shall be made by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) to the Holders of Secured Notes Claims of record as of the Distribution Record Date.

   (c) The Disbursing Agent, with the Unsecured Notes Indenture Trustee's cooperation, shall make the distributions, if any, on account of the Class 5A and Class 5B Claims, provided that the Unsecured Notes Indenture Trustee's Charging Lien shall not attach to any property to be distributed by the Unsecured Notes Indenture Trustee or in respect of the Unsecured Notes Claims, except as expressly provided in Section 4.5(d) of the Plan.  The Unsecured Notes Indenture Trustee shall have no duties

or responsibility relating to any form of distribution that is not DTC eligible and the Disbursing Agent, the Debtors or the Reorganized Debtors, as applicable, shall seek the cooperation of DTC so that any distribution on account of an Allowed Unsecured Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter.    The Reorganized Debtors (other than New Permian Corp. and New Permian LLC) shall reimburse the Unsecured Notes Indenture Trustee for any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date solely in connection with actions explicitly requested by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) necessary for implementation of the Plan; *provided*, that, for the avoidance of doubt, nothing in the Plan or Confirmation Order shall be considered or construed as an explicit request by the Reorganized Debtors authorizing the incurrence of fees and expenses by the Unsecured Notes Indenture Trustee.

5.8    **Unclaimed Property.**    One year from the later of (a) the Effective Date and (b) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions payable on account of Claims that are not deliverable, or have not responded to a request for information to make such delivery, and remain unclaimed shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) or their successors or assigns, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.    The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

5.9    **Satisfaction of Claims.**    Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

5.10    **Manner of Payment under Plan.**    Except as specifically provided herein, at the option of the Reorganized Debtors, any Cash payment to be made under this Plan may be made by a check or wire transfer.

5.11    **Fractional Shares and De Minimis Cash Distributions.**

(a)    No fractional New Permian Corp. Shares or LegacyCo Units shall be distributed.  When any distribution would otherwise result in the issuance of a number of New Permian Corp. Shares or LegacyCo Units that is not a whole number, the New Permian Corp. Shares or LegacyCo Units subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number; and (b) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of New Permian Corp. Shares or LegacyCo Units to be distributed on account of Allowed Claims will be

38

adjusted as necessary to account for the rounding provided for herein.  No consideration will be provided in lieu of New Permian Corp. Shares or LegacyCo Units that are rounded down.

(b)      None of the Reorganized Debtors or the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Permian Corp. Share, (1) LegacyCo Unit, or Fifty Dollars ($50.00) in Cash.

**5.12    No Distribution in Excess of Amount of Allowed Claim.** Notwithstanding anything to the contrary in this Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim, plus any postpetition interest on such Claim, except to the extent such interest is permitted by Section 5.3 of the Plan.

**5.13    Allocation of Distributions Between Principal and Interest.** Except as otherwise required by law, consideration received in respect of an Allowed Claim shall be allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

**5.14    Exemption from Securities Laws.**    The issuance of and the distribution under this Plan of (a) the LegacyCo Units issued pursuant to Section 4.4(b) of the Plan, and (b) the New Permian Corp. Shares (i) comprising the Put Option Premium and (ii) pursuant to Sections 4.5(c) or 4.6 of the Plan, shall be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  These Securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.   In addition, such section 1145 exempt Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

The issuance and sale, as applicable, of the New Permian Corp. Shares pursuant to the Rights Offering and to the Backstop Parties under the Backstop Commitment Agreement (including the New Permian Corp. Shares issued pursuant to the Minimum Allocation Rights) are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and Regulation D thereunder. Such Securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.

WEIL:\96366844\1\29979.0004

Should New Permian Corp. elect, on or after the Effective Date, for any portion of the ownership of the New Permian Corp. Shares to be held through the facilities of the DTC, New Permian Corp. shall not be required to provide any further evidence other than the Plan or Confirmation Order with respect to the treatment of such applicable portion of the New Permian Corp. Shares, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors in all respects.

The DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Permian Corp. Shares are exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, the DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Permian Corp. Shares are exempt from registration and/or eligible for DTC book entry delivery, settlement, and depository services.

**5.15** **Setoffs and Recoupments.** Each Debtor or Reorganized Debtor, as applicable, or such Entity's designee, may, in consultation with the Second Lien Group, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim (other than any Allowed Revolving Facility Claims, DIP Facility Claims, Allowed Secured Notes Claim or Allowed Unsecured Notes Claim) and the distributions to be made pursuant to this Plan on account of such Allowed Claim (other than distributions to be made to holders of Allowed Revolving Facility Claims, DIP Facility Claims, Allowed Secured Notes Claims, or Allowed Unsecured Notes Claims) any and all Claims, rights, and Causes of Action that such Debtor or Reorganized Debtor or its successors may hold against the holder of such Allowed Claim; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any Claims, rights, or Causes of Action that any such entity or it successor or assign may possess against such holder.

WEIL:\96366844\1\29979.0004

**5.16    Rights and Powers of Disbursing Agent.**

(a)    The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions or payments provided for under this Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date) or pursuant to this Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

(b)    To the extent the Disbursing Agent is an Entity other than a Debtor or Reorganized Debtor, except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of LegacyCo, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by LegacyCo.

**5.17    Withholding and Reporting Requirements.**

(a)    In connection with this Plan and all distributions made hereunder, the Reorganized Debtors and the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under this Plan shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of this Plan.

(b)    Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any federal, state, local, or foreign taxing authority, including income, withholding, and other tax obligations, on account of such distribution.  The Reorganized Debtors and the Disbursing Agent have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations.

(c)    The Reorganized Debtors and the Disbursing Agent may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim provide any information necessary to allow the distributing party to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority.  If the Reorganized Debtors or the Disbursing Agent make such a

41

request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

## ARTICLE VI.

### MEANS FOR IMPLEMENTATION AND EXECUTION OF THE PLAN

**6.1** **General Settlement of Claims and Interests.** The Plan shall be deemed a motion to approve the good-faith compromise and settlement pursuant to which the Debtors and the holders of Claims against and/or Interests in the Debtors settle all Claims, Interests, and Causes of Action pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The Confirmation Order shall constitute the Court's approval of the compromise, settlement, and release of all such Claims, Interests, and Causes of Action, as well as a finding by the Bankruptcy Court that all such compromises, settlements, and releases are mutual and bi-directional and are in the best interests of the Debtors, their estates, and the holders of Claims, Interests, and Causes of Action, and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors, as applicable, may compromise and settle all Claims and Causes of Action against, and Interests in, the Debtors and their estates. The compromises, settlements, and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan. Subject to Article V of the Plan, all distributions made to holders of Allowed Claims in any Class are intended to be and shall be final.

**6.2** **Continued Corporate Existence.**

(a)     Except as otherwise provided in this Plan (including pursuant to the Restructuring Transactions), the Debtors (other than BBEP) shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Organizational Documents. On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

42

(b)      On the Effective Date, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate this Plan, including:   (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of this Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

**6.3      Authorization, Issuance, and Delivery of LegacyCo Units and New Permian Corp. Shares**

(a)      On and after the Effective Date, LegacyCo is authorized to issue, or cause to be issued, and shall issue the LegacyCo Units to BBEP in accordance with the LegacyCo Contribution Agreement for distribution and transfer in accordance with the terms of this Plan, the Exchange Agreement, and the Backstop Commitment Agreement without the need for any further corporate, limited liability company, or equity holder action.

(b)      On the Effective Date, New Permian LLC is authorized to issue, or cause to be issued, and shall issue the New Permian LLC Equity to BBEP in accordance with the Permian Contribution Agreement, and BBEP is authorized to transfer the New Permian LLC Equity, in accordance with the terms of this Plan, the Exchange Agreement and the Backstop Commitment Agreement without the need for any further corporate, limited liability company, or equity holder action.

(c)      On the Effective Date, and in accordance with the Backstop Commitment Agreement, the Rights Offering Procedures, the Restructuring Term Sheet and this Plan, New Permian Corp. shall issue the New Permian Corp. Shares in accordance herewith and therewith.

**6.4      Cancelation of Existing Securities and Agreements.**

(a)      Except for the purpose of enabling holders of Allowed Claims to receive a distribution under the Plan as provided herein and except as otherwise set forth in this Plan, the Plan Supplement or the Confirmation Order, on the Effective Date, all 7.875% Unsecured Notes and the 7.875% Unsecured Notes Indenture, all 8.625% Unsecured Notes and the 8.625% Unsecured Notes Indenture, all Secured Notes and the

43

Secured Notes Indenture (in each case, only upon receipt of all the distributions set forth in this Plan on account of Unsecured Notes Claims or Secured Notes Claims, as applicable), and all agreements, instruments, and other documents evidencing any prepetition Claim or Existing BBEP Equity Interest and any rights of any holder in respect thereof shall be deemed canceled, discharged, and of no force or effect. The holders of or parties to such canceled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the cancelation thereof, except the rights provided for pursuant to this Plan.

(b)    The Unsecured Notes Indenture Trustee shall be released and discharged from all duties and responsibilities under the respective Unsecured Notes Indentures; *provided*, that notwithstanding the releases at Section 10.9 of the Plan, entry of the Confirmation Order or the occurrence of the Effective Date, each of the Unsecured Notes Indentures and any such Unsecured Notes Indenture or agreement that governs the rights of the holder of a Claim or Interest shall continue in effect to the extent necessary to: (i) enforce the rights, Claims, and interests of the Unsecured Notes Indenture Trustee thereto vis-a-vis any parties other than the Released Parties; (ii) allow the holders of Allowed Unsecured Notes Claims, as applicable, to receive distributions under the Plan, to the extent provided for under the Plan; (iii) maintain and exercise the Unsecured Notes Indenture Trustee's respective Charging Liens solely to the extent provided for in Section 4.5(d) of the Plan; (iv) appear to be heard in the Chapter 11 Cases or in any proceedings in this Court or any other court; (v) preserve any rights of the Unsecured Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations from or on any money or property to be distributed in respect of the Allowed Unsecured Notes Claims; (vi) permit the Unsecured Notes Indenture Trustee to seek compensation and reimbursement of any reasonable and documented fees and expenses (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with the implementation of the Plan; and (vii) enforce any obligation owed to the Unsecured Notes Indenture Trustee under the Plan.

(c)    The Secured Notes Indenture Trustee shall be released from all duties under the Secured Notes Indenture; *provided*, that notwithstanding entry of the Confirmation Order or the occurrence of the Effective Date, the Secured Notes Indenture shall continue in effect to the extent necessary to: (i) enforce the rights, Claims, and interests of the Secured Notes Indenture Trustee thereto vis-a-vis any parties other than the Released Parties; (ii) allow the holders of Allowed Secured Notes Claims, as applicable, to receive distributions under the Plan from the Secured Notes Indenture Trustee or from any other source, to the extent provided for under the Plan; (iii) preserve any rights of the Secured Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations from or on any money or property to be distributed in respect of the Allowed Secured Notes Claims; and (iv) enforce any obligation owed to the Secured Notes Indenture Trustee under the Plan.

**6.5    Cancelation of Certain Existing Security Agreements.** Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly

44

thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

### 6.6    Rights Offering and Minimum Allocation Rights.

(a)    Following approval by the Bankruptcy Court of the Rights Offering Procedures, the Debtors on behalf of New Permian Corp. shall commence and consummate the Rights Offering in accordance therewith.   The New Permian Corp. Shares shall be issued to the Eligible Offerees that exercise their respective Subscription Rights pursuant to the Rights Offering Procedures and the Plan.   The consummation of the Rights Offering is conditioned on the occurrence of the Effective Date, and any other condition specified in the Backstop Commitment Agreement.   Amounts held by the Rights Offering Subscription Agent (as defined in the Backstop Commitment Agreement) with respect to the Rights Offering prior to the Effective Date shall not be entitled to any interest on account of such amounts and no Eligible Offeree participating in the Rights Offering shall have any rights in the New Permian Corp. Shares until the Rights Offering is consummated.

(b)    In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to (i) exercise its Minimum Allocation Rights, and (ii) purchase, on or prior to the Effective Date, its respective Final BCA Percentage (as defined in the Backstop Commitment Agreement) of the Unsubscribed Securities (as defined in the Backstop Commitment Agreement).

(c)    In exchange for providing the commitment to exercise the Minimum Allocation Rights and the backstop commitment for the Rights Offering, the Backstop Parties will receive the Put Option Premium in accordance with the terms of the Backstop Commitment Agreement, the Backstop Approval Order and the Plan.

(d)    The Debtors shall offer the Minimum Allocation Rights to the Commitment Parties in accordance with the Backstop Commitment Agreement, pursuant to documentation acceptable to the Debtors, the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors.

### 6.7    New Permian Corp. Certificate of Incorporation.   On or prior to the Effective Date, and in accordance with the Backstop Commitment Agreement, New Permian Corp. will file the New Permian Corp. Certificate of Incorporation with the Secretary of State of the State of Delaware. The New Permian Corp. Certificate of Incorporation shall be consistent with section 1123(a)(6) of the Bankruptcy Code. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Permian Corp.

45

Certificate of Incorporation will prohibit the issuance of non-voting equity securities. The New Permian Corp. Certificate of Incorporation shall be deemed adopted by the New Permian Corp. Board as of the Effective Date. After the Effective Date, New Permian Corp. may amend and restate the New Permian Corp. Certificate of Incorporation and other constituent documents as permitted by the laws of the State of Delaware and the New Permian Corp. Certificate of Incorporation. If approved by the Requisite Commitment Parties, New Permian Corp. shall adopt a registration rights agreement to be effective on the Effective Date. The New Permian Corp. Certificate of Incorporation, the New Permian Corp. Bylaws and such registration rights agreement shall be binding on New Permian Corp. and all parties receiving, and all holders of, New Permian Corp. Common Shares.

**6.8      Exit Facility.**  On the Effective Date, the Exit Facility Documents shall be executed and delivered by the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), and the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), shall be authorized to execute, deliver, and enter into such documents without the need for any further action.

**6.9      Restructuring Transactions.**

(a)      On or prior to the Effective Date (or as soon as practicable thereafter), the following transactions shall occur in the following order, and the Debtors or Reorganized Debtors (as applicable) may take all actions necessary or appropriate to effectuate such transactions:

(i)      After entry of the Confirmation Order but prior to the Effective Date, and in anticipation of the Permian Corp. Asset Acquisition, the Backstop Parties pursuant to the Backstop Commitment Agreement shall (A) form New Permian Corp., (B) cause New Permian Corp. to conduct the Rights Offering, and (C) cause New Permian Corp. to enter into the Exchange Agreement with BBEP pursuant to which New Permian Corp. shall agree to acquire all of the New Permian LLC Equity on and subject to the occurrence of the Effective Date in consideration for conducting the Rights Offering, $775 million (less the amount of the Minimum Cash Balance), an amount of New Permian Corp. Shares necessary to satisfy distributions pursuant to Sections 4.5(c) and 4.6 with respect to Allowed Claims as of the Effective Date, and the assumption of the obligation to issue New Permian Corp. Shares with respect to, or on account of, Disputed General Unsecured Claims as to which the holder elected to receive New Permian Corp. Shares.

(ii)      On the Effective Date and in accordance with the provisions hereof, the Backstop Commitment Agreement and the Rights Offering, New Permian Corp. shall close the Rights Offering. Immediately thereafter, the Rights Offering and Minimum Allocation Rights Proceeds shall be released to New Permian Corp. and New Permian Corp. shall issue New Permian Corp. Shares to those Eligible Offerees that have validly exercised the Subscription

46

Rights and to the Backstop Parties, as applicable, including in respect of the Minimum Allocation Rights and the Put Option Premium.  Concurrent therewith (but not prior to), New Permian Corp. shall also issue, and on behalf of BBEP distribute, New Permian Corp. Shares pursuant to Sections 4.5(c) and 4.6, as applicable, with respect to Allowed Claims as of the Effective Date (other than any shares to be held back in respect of Disputed General Unsecured Claims in accordance with Article VII).

(iii)        On the Effective Date, (A) BBEP shall contribute the Legacy Contributed Assets to LegacyCo in exchange for LegacyCo Units representing all of the equity capital of LegacyCo pursuant to the LegacyCo Contribution Agreement (the "**Legacy Asset Transfer**"), and (B) BBEP shall contribute the Permian Assets to New Permian LLC in exchange for all of the New Permian LLC Equity pursuant to in the Permian Contribution Agreement (the "**Permian Asset Transfer**").  Such transfers shall be accompanied by the assumption by LegacyCo or New Permian LLC, as applicable, of certain liabilities and obligations as provided in the LegacyCo Contribution Agreement or Permian Contribution Agreement, as applicable, this Plan or the Confirmation Order, or as otherwise agreed between BBEP and LegacyCo or New Permian LLC, as applicable.  Immediately after the Legacy Asset Transfer and the Permian Asset Transfer, BBEP shall be the sole member of LegacyCo and New Permian LLC.  Each of LegacyCo and New Permian LLC shall be disregarded as an entity separate from BBEP for U.S. federal income tax purposes at all times on or before the Effective Date (including immediately after the Legacy Asset Transfer and the Permian Asset Transfer), unless, as to LegacyCo, the Requisite Consenting Second Lien Creditors determine (in their sole discretion) that LegacyCo elect to be treated as a corporation for U.S. federal income tax purposes (the "**Corporation Election**").

(iv)        On the Effective Date, BBEP shall simultaneously (A)(i) distribute 92.5% of the LegacyCo Units received in consideration for the Legacy Asset Transfer to holders of Allowed Secured Notes Claims in satisfaction and discharge of their Claims as provided in Section 4.4(b), and (ii) transfer 7.5% of the LegacyCo Units received in consideration for the Legacy Asset Transfer to New Permian Corp. pursuant to the Exchange Agreement (the "**LegacyCo Distribution and Transfer**"), and (B) transfer to New Permian Corp. pursuant to the Exchange Agreement all of the New Permian LLC Equity received in consideration for the Permian Asset Transfer.  Pursuant to the Exchange Agreement, and in consideration for the foregoing transfers to New Permian Corp., New Permian Corp. shall pay to BBEP $775 million (less the amount of the Minimum Cash Balance), an amount of New Permian Corp. Shares necessary to satisfy distributions pursuant to Sections 4.5(c) and 4.6 with respect to Allowed Claims as of the Effective Date, and the assumption of the obligation to issue New Permian Corp. Shares with respect to, or on account of, Disputed General Unsecured Claims as to which the holder elected to receive New Permian Corp.

47

Shares (the "**Permian Corp. Asset Acquisition**").  Upon formation, and at the time of the Legacy Asset Transfer, LegacyCo shall be treated as a disregarded entity for U.S. federal income tax purposes, such that BBEP will still be regarded prior to the LegacyCo Distribution and Transfer as owning the LegacyCo Contributed Assets, unless the Requisite Consenting Second Lien Creditors effect the Corporation Election.  Accordingly, for U.S. federal income tax purposes, the Debtors, LegacyCo, all holders of Allowed Secured Notes Claims and New Permian Corp. shall (absent the Corporation Election) treat the LegacyCo Distribution and Transfer as (i) a distribution and transfer of the Legacy Contributed Assets, subject to certain liabilities and obligations, in a taxable exchange to the holders of Allowed Secured Notes Claims and New Permian Corp., followed by (ii) the contribution of the Legacy Contributed Assets, subject to such liabilities and obligations, by the holders of Allowed Secured Notes Claims and New Permian Corp. to LegacyCo with LegacyCo being treated as a newly formed partnership for U.S. federal income tax purposes, unless otherwise required pursuant to a "final determination" to the contrary within the meaning of section 1313(a) of the Tax Code.  Upon formation, and at the time of the Permian Corp. Asset Acquisition, New Permian LLC shall be treated as a disregarded entity for U.S. federal income tax purposes, such that BBEP will still be regarded prior to the Permian Corp. Asset Acquisition as owning the Permian Assets (which will be transferred to New Permian LLC pursuant to the Permian Contribution Agreement).  Accordingly, for U.S. federal income tax purposes, the Debtors, New Permian LLC and New Permian Corp. shall treat the Permian Corp. Asset Acquisition as a taxable purchase of the underlying Permian Assets unless otherwise required pursuant to a "final determination" to the contrary within the meaning of section 1313(a) of the Tax Code.

(v)    BBEP shall use the Cash consideration received pursuant to the Exchange Agreement (together with any Cash otherwise available) to satisfy any Cash distributions and other payments to be made on the Effective Date pursuant to or in connection with the Plan and Confirmation Order.

(b)    On or after the Effective Date, the Reorganized Debtors may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan with the consent of the Requisite Consenting Second Lien Creditors and Requisite Commitment Parties.

### 6.10   Board of Directors.

(a)    The LegacyCo Board shall be composed of the chief executive officer of the Debtors as of the date immediately preceding the Effective Date and such other members selected by the Requisite Consenting Second Lien Creditors in their sole discretion; *provided*, that New Permian Corp. shall have the right to appoint an observer to the LegacyCo Board subject to the conditions in the Restructuring Term Sheet.  The

WEIL:\96366844\1\29979.0004

identities of the members of the LegacyCo Board and the initial Boards of Directors of the Reorganized Debtors shall be disclosed at or prior to the Confirmation Hearing.

(b)　　The New Permian Corp. Board shall be selected in accordance with the terms of the Restructuring Term Sheet.

### 6.11　Corporate Action.

(a)　　**LegacyCo Organizational Documents.**　On the Effective Date, each of the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) will file their respective charters that are part of their New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in its respective state of incorporation or formation in accordance with the applicable laws of the respective state of incorporation or formation. The New Organizational Documents shall be consistent with section 1123(a)(6) of the Bankruptcy Code.  Pursuant to section 1123(a)(6) of the Bankruptcy Code the New Organizational Documents will prohibit the issuance of non-voting equity securities.  The LegacyCo Organizational Documents shall be deemed adopted by the LegacyCo Board as of the Effective Date.  After the Effective Date, the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Organizational Documents.

(b)　　On the Effective Date, the adoption, filing, approval, and ratification, as necessary, of all corporate or related actions contemplated herein with respect to each of the Reorganized Debtors shall be deemed authorized and approved by each of the Reorganized Debtors, their respective boards of directors, managers, equity holders, members, or partners, as applicable, in all respects, in each case to the extent required by applicable nonbankruptcy law.  Without limiting the foregoing, such actions include (i) the adoption and filing of the New Organizational Documents for each of the Reorganized Debtors, (ii) the adoption and approval of the LegacyCo LLC Agreement and the LegacyCo Organizational Documents, which shall be adopted and affirmed by the board of LegacyCo Board, (iii) the election or appointment, as applicable, of directors and officers for the Reorganized Debtors, and (iv) the issuance of the LegacyCo Units.

(c)　　All matters provided for herein involving the corporate structure of any Debtor or Reorganized Debtor, or any corporate or related action required by any Debtor or Reorganized Debtor in connection herewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders or directors of such Debtor or Reorganized Debtor or by any other stakeholder, and with like effect as though such action had been taken unanimously by the Security holders and directors, managers, members, or partners, of each Debtor or Reorganized Debtor, as applicable.

### 6.12　LegacyCo Management Incentive Plan.　The LegacyCo Board may adopt the LegacyCo Management Incentive Plan on or after the Effective Date.

WEIL:\96366844\1\29979.0004

**6.13** **New Permian Corp. Management Incentive Plan.**  New Permian Corp. may adopt the New Permian Corp. Management Incentive Plan, which shall be in form and substance acceptable to the New Permian Corp. Board in its sole discretion.

**6.14** **Effectuating Documents and Further Transactions.**  Each of the officers of each of the Debtors is (and each of the officers of each of the Reorganized Debtors shall be) authorized and directed to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and provisions hereof, without the need for any approvals, authorizations, or consents.

**6.15** **Separability.**  Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in this Plan for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

**6.16** **Director, Officer, Manager, and Employee Liability Insurance.** Prior to and after the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' liability insurance policies (including any "tail policy") with respect to conduct occurring on or prior to the Effective Date, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time after May 15, 2015 shall be entitled to the full benefits of such policies for the full six-year term of such policies regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date.

**6.17** **Preservation of Royalty and Working Interests.** Notwithstanding any other provision in the Plan, on and after the Effective Date, all Royalty and Working Interests shall be preserved and remain in full force and effect in accordance with the terms of the granting instruments or other governing documents applicable to such Royalty and Working Interests, and no Royalty and Working Interests shall be compromised or discharged by the Plan. For the avoidance of doubt and notwithstanding anything to the contrary in the preceding sentence, any right to payment arising from a Royalty and Working Interest, if any, shall (to the extent not otherwise paid pursuant to a Final Order of the Court) be treated as an Ongoing Trade Claim of LegacyCo or an Ongoing Trade Claim of New Permian Corp., as applicable, under this Plan and shall not be subject to any discharge and/or release provided hereunder.

**6.18** **Hart-Scott-Rodino Antitrust Improvements Act.**  Any LegacyCo Units or New Permian Corp. Shares to be distributed under this Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated.

WEIL:\96366844\1\29979.0004

**6.19    Post-Effective Date Tax Filings and Audits.**    Following the Effective Date, LegacyCo shall have full and exclusive authority and responsibility in respect of all taxes and tax filings of BBEP (including any audits or other proceedings) and any other liquidating Debtors, to the same extent as if LegacyCo were the Debtors. Without limiting the foregoing, on the Effective Date, a power of attorney authorizing LegacyCo to correspond with any tax authority on behalf of such Debtors and to sign, negotiate, settle, and administer any tax returns or other tax filings, and collect any tax refunds, shall be provided to LegacyCo.  LegacyCo shall use commercially reasonable efforts to (i) file all tax returns and related filings consistent with the intended tax treatment of the Restructuring Transactions, and (ii) not take any tax position inconsistent therewith and (iii) if any such tax returns or related filings or tax position is challenged, diligently defend such matters.

**6.20    AUNC Trust.**    The New Permian Corp. Shares to be issued to Receiving AUNC Holders pursuant to Section 4.5(c) of the Plan shall be issued to a trust that shall engage in no business other than holding such shares and engaging in the activities incidental thereto (the "**AUNC Trust**").  The AUNC Trust shall be structured so as not to be subject to the Securities Act of 1933, the Securities Exchange Act of 1934, or the Investment Company Act of 1940.

The interests in the AUNC Trust shall be held by the Receiving AUNC Holders and on a Pro Rata basis based on their respective holdings of the New Permian Corp. Shares.

The interests in the AUNC Trust may not be transferred at any time and shall be totally passive.  The Trustee of the AUNC Trust, the terms of the Trustee's engagement, and the documents governing the AUNC Trust, shall be reasonably acceptable to the Requisite Commitment Parties, the Creditors' Committee, and, after the Effective Date, New Permian Corp.  On the seventh anniversary of the AUNC Trust, the trust shall terminate and the shares of New Permian Corp. held by the AUNC Trust shall be distributed to the beneficiaries of the AUNC Trust.

From and after the Effective Date, New Permian Corp. shall be responsible for up to $300,000 of fees and expenses of the AUNC Trust in the aggregate as and when incurred. New Permian Corp. shall otherwise not be responsible for any fees, expenses or other liabilities or monetary obligations arising under the AUNC Trust.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by trustee of the AUNC Trust), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, LegacyCo, New Permian Corp. and all holders of Allowed Claims) shall treat the AUNC Trust as a "trust" within the meaning of Treas. Reg. § 301.7701-4(c), and shall treat the transfer of New Permian Corp. Shares to the AUNC Trust as (i) a direct transfer to Receiving AUNC Holders for whose benefit such shares were issued, followed by (ii) the transfer by such persons to the AUNC Trust in exchange for their beneficial interest therein.  Accordingly, except in the event of contrary definitive guidance, AUNC Trust beneficiaries shall generally be treated for United States federal income tax purposes as the grantors and owners of their

51

respective portions of the underlying assets of the AUNC Trust. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes, and for purposes of securities laws.

# ARTICLE VII.

## PROCEDURES FOR DISPUTED CLAIMS

**7.1    Objections to Claims.** The Reorganized Debtors (other than New Permian Corp. and New Permian LLC) shall be entitled to object to Claims. Any objections to Claims shall be served and filed on or before the later of (i) one-hundred and eighty (180) days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court (as the same may be extended by the Bankruptcy Court for cause shown).

**7.2    Resolution of Disputed Administrative Expenses and Disputed Claims.** On and after the Effective Date, the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), in consultation with the Second Lien Group, shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Administrative Expenses or Claims and to compromise, settle, or otherwise resolve any disputed Administrative Expenses and Disputed Claims without approval of the Bankruptcy Court, other than with respect to Administrative Expenses relating to compensation of professionals.

**7.3    Payments and Distributions with Respect to Disputed Claims.** Notwithstanding anything herein to the contrary, if any portion of a Claim is a Disputed Claim, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim, and in the case of a Disputed Claim as to which the holder elected to receive a distribution of New Permian Corp. Shares, such shares shall not be issued by New Permian Corp. until such Claim has been resolved.

**7.4    Distributions After Allowance.** After such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, the holder thereof shall be entitled to distributions, if any, to which such holder is then entitled as provided in this Plan. Such distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order. To the extent a Disputed Claim as to which the holder elected to receive a distribution of New Permian Corp. Shares is disallowed, the shares that would otherwise have been distributed in respect of such Claim shall be reallocated as if such Claim had been disallowed as of the Effective Date and, in accordance with the Restructuring Transactions, distributed by New Permian Corp. as soon as practicable after the date that the order or judgment of the Bankruptcy Court disallowing such Disputed Claim (or portion thereof) becomes a Final Order.

**7.5    Disallowance of Claims.** Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or

52

that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, as determined by a Final Order, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Final Order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors. All proofs of claim filed on account of an indemnification obligation to a current or former director, officer, or employee shall be deemed satisfied and expunged from the claims register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.  Except as otherwise provided herein, all proofs of claim filed after the Effective Date shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court.

**7.6    Estimation.**  The Debtors or Reorganized Debtors (other than New Permian Corp. and New Permian LLC), in consultation with the Second Lien Group, may determine, resolve and otherwise adjudicate all contingent Claims, unliquidated Claims and Disputed Claims in the Bankruptcy Court or such other court of the Debtors' or Reorganized Debtors' choice having jurisdiction over the validity, nature or amount thereof.  The Debtors or the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), in consultation with the Second Lien Group, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code for any reason or purpose, regardless of whether any of the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent Claim, unliquidated Claim or Disputed Claim, that estimated amount shall constitute the maximum limitation on such Claim, and the Debtors or the Reorganized Debtors (other than New Permian Corp. and New Permian LLC) may pursue supplementary proceedings to object to the ultimate allowance of such Claim; *provided*, that such limitation shall not apply to Claims requested by the Debtors to be estimated for voting purposes only.  All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such Claim unless the holder of such Claim has filed a motion requesting the right to seek such reconsideration on or before twenty (20) calendar days after the date such Claim is estimated by the Bankruptcy Court.

**7.7    Interest.**  To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date.

# ARTICLE VIII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 8.1    General Treatment.

(a)    As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Reorganized Debtors that do not relate to Employee Obligations shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts.

(b)    As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts of BBEP shall be deemed assumed and assigned to LegacyCo or New Permian LLC, as applicable, or otherwise rejected pursuant to the terms of the Plan.

(c)    As of and subject to the occurrence of the Effective Date, all executory contracts related to Employee Obligations shall be deemed rejected, unless such contract (a) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (b) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (c) is specifically designated as a contract to be assumed on the Schedule of Assumed Employee Obligations.

(d)    Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in this Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to this Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

### 8.2    Determination of Cure Disputes and Deemed Consent.

(a)    Any monetary defaults under an assumed or assumed and assigned executory contract or unexpired lease, shall be satisfied, pursuant to section 365(b)(1) of

the Bankruptcy Code, by payment of the default amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.

(b)    At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, cure notices to the applicable third parties. **Any objection by a counterparty to an executory contract or unexpired lease to the proposed assumption, assumption and assignment, or related Cure Amount must be filed, served, and actually received by the Debtors at least seven (7) days before the Confirmation Hearing.** Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption, assumption and assignment, or Cure Amount will be deemed to have assented to such assumption, assumption and assignment, or Cure Amount. Notwithstanding anything herein to the contrary, in the event that any executory contract or unexpired lease is removed from the Schedule of Rejected Contracts after such 14-day deadline, a cure notice with respect to such executory contract or unexpired lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such executory contract or unexpired lease can be assumed or assumed and assigned, as applicable.

(c)    In the event of an unresolved dispute regarding (i) any Cure Amount, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or (iii) any other matter pertaining to assumption, assignment, or the Cure Amounts required by section 365(b)(1) of the Bankruptcy Code, such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order).

(d)    If the Bankruptcy Court determines that the Cure Amount with respect to any executory contract or unexpired lease is greater than the amount set forth in the applicable cure notice, the Debtors or Reorganized Debtors, as applicable, will have the right to add such executory contract or unexpired lease to the Schedule of Rejected Contracts, in which case such executory contract or unexpired lease will be deemed rejected as of the Effective Date.

(e)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired Lease. Any proofs of claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

WEIL:\96366844\1\29979.0004

**8.3    Rejection Damages Claims.  In the event that the rejection of an executory contract or unexpired lease hereunder results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective estates, properties or interests in property, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtors or the Reorganized Debtors, as applicable, no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of the rejection of such executory contract or unexpired lease, as set forth on the Schedule of Rejected Contracts or order of the Bankruptcy Court.  The Confirmation Order shall constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts.**

**8.4    Payment of Cure Amounts.**  To the extent that a Cure Amount relates to a contract or lease that (i) solely benefits Legacy Assets (whether before or after the Effective Date) or will solely benefit LegacyCo, or (ii) solely benefits Permian Assets (whether before or after the Effective Date) or will solely benefit New Permian Corp., such Cure Amount shall be paid its Cash distribution from the Rights Offering Proceeds and Minimum Allocation Rights.  To the extent that a Cure Amount relates to a contract that (A) will benefit New Permian Corp. post-Effective Date or benefits Permian Assets (whether before or after the Effective Date) and (B) will benefit LegacyCo post-Effective Date or benefits Legacy Assets (whether before or after the Effective Date), such Cure Amount shall also be paid its Cash distribution from the Rights Offering Proceeds and Minimum Allocation Rights; *provided*, that New Permian Corp. shall reimburse LegacyCo for its pro rata share of all such amounts pursuant to the terms of the Transition Services Agreement.

**8.5    Survival of the Debtors' Indemnification Obligations.**  Any and all obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, memorandum and articles of association, or other organizational documents (including all Indemnification Obligations) to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by this Plan; *provided*, that the Reorganized Debtors shall not indemnify any persons for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes fraud, gross negligence or willful misconduct.  All such obligations shall be deemed and treated as executory contracts that are assumed by the Debtors under this Plan and shall continue as obligations of the Reorganized Debtors (other than New Permian Corp. and New Permian LLC).  Any claim based on the Debtors' obligations herein shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.  None of the Reorganized Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or

56

adversely affect any obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights and New Permian Corp. shall reimburse LegacyCo for such amounts to the extent set forth in the Transition Services Agreement.

**8.6    Employee Obligations.**    The Reorganized Debtors (other than New Permian Corp. and New Permian LLC) shall honor all of the Employee Obligations in accordance with the Schedule of Assumed Employee Obligations; *provided*, that (i) the consummation of the transactions contemplated by the Plan shall not, in and of themselves, constitute a "change in control" with respect to any of the Employee Obligations and (ii) subject to and in accordance with the Employee Programs Order, the KEIP (as defined in the Employee Programs Order) shall terminate on the Effective Date and the participants in such program shall vest in and be entitled to the payments and compensation as expressly provided under the KEIP.  Notwithstanding anything in the Employee Programs Order to the contrary, the KERP and the KEP (as such terms are defined in the Employee Programs Order), shall continue in full force and effect through December 31, 2017.  Subject to clause (ii) above, to the extent that any of the Employee Obligations constitute executory contracts, pursuant to sections 365 and 1123 of the Bankruptcy Code, each of them will be deemed rejected as of the Effective Date unless identified in the Schedule of Assumed Employee Obligations and shall be treated in accordance with this Article 8.

**8.7    Insurance Policies.**    All insurance policies (including all D&O Liability Insurance Policies and tail coverage liability insurance) to which any Debtor is a party as of the Effective Date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtor and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.

**8.8    Reservation of Rights.**

(a)    The Debtors, with the consent of the Requisite Consenting Second Lien Creditors, may amend the Schedule of Assumed Employee Obligations and the Schedule of Rejected Contracts (with the consent of the Requisite Commitment Parties only to the extent that a contract relates to New Permian Corp. or the Permian Assets) and any cure notice through 4:00 p.m. (Eastern Time) on the Business Day immediately prior to the commencement of the Confirmation Hearing in order to (i) add, delete, or reclassify any executory contract or unexpired lease or amend a proposed assignment and/or (ii) amend the proposed Cure Amount; *provided*, that if the Confirmation Hearing is adjourned for a period of more than two (2) consecutive calendar days, the Debtors' right to amend such schedules and notices shall be extended to 4:00 p.m. (Eastern Time) on the Business Day immediately prior to the adjourned date of the Confirmation Hearing, with such extension applying in the case of any and all subsequent adjournments of the Confirmation Hearing.

57

(b)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, will constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(c)    Except as explicitly provided in this Plan, nothing herein shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(d)    Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(e)    If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**8.9    Modifications, Amendments, Supplements, Restatements, or Other Agreements.**  Unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and executory contracts and unexpired leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

## ARTICLE IX.

### EFFECTIVENESS OF THE PLAN

**9.1    Conditions Precedent to Confirmation of the Plan.**    The following are conditions precedent to confirmation of the Plan:

(a)    An order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Court;

(b)    The proposed Confirmation Order shall be in form and substance acceptable to the Debtors, the Requisite Commitment Parties, the Requisite Consenting Second Lien Creditors, the Revolving Credit Facility Agent, the DIP Facility Agent, the Exit Facility Agent, and to the extent that any provisions of the Confirmation Order affect

58

Classes 5A, 5B, 6, 7A or 7B they shall be acceptable to the Creditors' Committee and all other provisions of the Confirmation Order shall be reasonably acceptable to the Creditors' Committee; and

(c)    The Backstop Commitment Agreement and Restructuring Support Agreement shall be in full force and effect and binding on all parties thereto, and shall not have been terminated by the parties thereto.

**9.2    Conditions Precedent to the Effective Date.**  The following are conditions precedent to the Effective Date of the Plan:

(a)    The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

(b)    The Backstop Commitment Agreement shall be in full force and effect and binding on the parties thereto and any conditions precedent to the respective obligations of the parties thereto shall have been satisfied or waived in accordance with the terms thereof, and New Permian Corp. shall have received proceeds of at least $775 million pursuant to the Rights Offering and the Minimum Allocation Rights;

(c)    The Put Option Premium shall have been paid to the parties entitled thereto;

(d)    The Restructuring Support Agreement shall not have been terminated by the parties thereto;

(e)    The Debtors shall have implemented the Restructuring Transactions and all transactions contemplated by this Plan and the Restructuring Support Agreement, in a manner materially consistent in all respects with the Restructuring Support Agreement and the Plan and in accordance with Section 6.9 hereto;

(f)    The Plan Supplement, including the Plan Documents, shall have been filed in form and substance as provided in the Restructuring Support Agreement;

(g)    The conditions to effectiveness of the Exit Facility Credit Agreement shall have been satisfied or waived in accordance with the terms thereof, and such agreement shall be in full force and effect and binding on all parties thereto;

(h)    The Debtors shall have received any authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents that are necessary to implement the Plan (including, but not limited to, to implement or effectuate any of the Restructuring Transactions) and are required by law, regulation, or order;

(i)    The LegacyCo Organizational Documents shall be in full force and effect;

(j)      Each of the New Permian Corp. Certificate of Incorporation and New Permian Corp. Bylaws shall be in full force and effect;

(k)      The AUNC Trust shall have been created and the trust agreement for the AUNC Trust and any related documents necessary for the administration of the AUNC Trust shall have been executed and be in full force and effect;

(l)      Any other documents, instruments, and agreements necessary to effectuate the Plan shall have been effected or executed; and

(m)      The Plan shall not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section 12.6 of the Plan.

**9.3      Satisfaction of Conditions.**  Except as otherwise provided herein, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.  If the Debtors determine that any of the conditions precedent set forth in Sections 9.1 or 9.2 hereof cannot be satisfied and the occurrence of such conditions is not waived pursuant to Section 9.4, then the Debtors shall file a notice of the failure of the Effective Date with the Bankruptcy Court.

**9.4      Waiver of Conditions.**  The conditions set forth in Sections 9.1 or 9.2 may be waived or modified only by the Debtors with the prior written consent of the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties, to the extent that any such waiver or modification adversely affects the treatment or rights of holders of Claims in Classes 5A, 5B, 6, 7A or 7B, the Creditors' Committee, and, to the extent such waiver or modification adversely affects the Revolving Credit Facility Claims, the DIP Facility Claims or the Exit Facility, the Revolving Credit Facility Agent, the DIP Agent or the Exit Facility Agent, as applicable, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

**9.5      Effect of Non-Occurrence of Effective Date.**  If the Effective Date does not occur on or before the Outside Date (as defined in the Restructuring Support Agreement), then:  (a) the Plan will be null and void in all respects; (b) nothing contained in the Plan or the Disclosure Statement shall:  (i) constitute a waiver or release of any Claims, Interests, or Causes of Action by an Entity; (ii) prejudice in any manner the rights of any Debtor or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity; *provided*, that all provisions of the Backstop Commitment Agreement (including the obligation to pay the "Breakup Premium," as that term is defined in the Backstop Commitment Agreement, in accordance with the terms and conditions of the Backstop Commitment Agreement) that survive termination of that agreement shall remain in effect in accordance with the terms thereof.

60

# ARTICLE X.

## EFFECT OF CONFIRMATION

**10.1     Released and Settled Claims.**     Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates an integrated compromise, settlement and release of the Released and Settled Claims, to achieve a beneficial and efficient resolution of these Chapter 11 Cases for all parties in interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Released and Settled Claims and the Court's determination that such compromises and settlements are in the best interests of the Debtors, their estates, the Reorganized Debtors, creditors and all other parties in interest, and are fair, equitable and within the range of reasonableness. The compromises, settlements and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.  On the Effective Date, the Standing Motion and Claim Objection shall be and shall be deemed to be dismissed with prejudice.

**10.2     Binding Effect.**     Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of this Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under this Plan and whether such holder has accepted this Plan.

**10.3     Vesting of Assets.**     Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all of the Permian Assets of the Debtors shall vest in New Permian LLC and all other assets and property of the Debtors shall vest in the Reorganized Debtors (other than New Permian Corp. and New Permian LLC), as applicable, free and clear of all Claims, Liens, charges, and other interests, except as otherwise provided herein.  The Reorganized Debtors may operate their businesses and use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as otherwise provided herein.

**10.4     Release and Discharge of Debtors.**     Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Existing BBEP Equity Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Existing BBEP Equity Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting

61

any such discharged Claim against or terminated Existing BBEP Equity Interest in the Debtors.

**10.5    Term of Injunctions or Stays.**  Unless otherwise provided herein or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

**10.6    Injunction Against Interference with Plan.**  Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided*, that nothing herein or in the Confirmation Order shall preclude, limit, restrict or prohibit any party in interest from seeking to enforce the terms of the Plan, the Confirmation Order, or any other agreement or instrument entered into or effectuated in connection with the consummation of the Plan.

**10.7    Injunction.**

**[Intentionally Omitted]**

**10.8    Exculpation.  Subject to section 1125(e) of the Bankruptcy Code, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, Released and Settled Claim, loss, remedy, or liability for any claim (including, but not limited to, any claim for breach of any fiduciary duty or any similar duty) in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Exit Facility Documents, the Backstop Commitment Agreement, the DIP Facility, the LegacyCo Management Incentive Plan, the New Permian Corp. Management Incentive Plan, the Disclosure Statement, the Plan, the Restructuring Transactions, the Rights Offering, the LegacyCo Contribution Agreement, the Exchange Agreement, the Permian Contribution Agreement, the creation of New Permian Corp., Legacy Co. or the AUNC Trust (including the Plan Documents, the Restructuring Support Agreement, and the trust agreement creating the AUNC Trust), or any agreement, transaction, or document related to any of the foregoing, or the solicitation of votes for, or confirmation of, this Plan; the funding of this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; any membership in (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Creditors' Committee; the structuring, negotiation, performance, or conducting of, participation in, or entry into, the Rights Offering and/or the Backstop Commitment Agreement (including, but not limited to, payment or receipt of the**

WEIL:\96366844\1\29979.0004

Put Option Premium), including by any member of the Creditors' Committee; the issuance of Securities under or in connection with this Plan; or the transactions in furtherance of any of the foregoing; except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted breach of fiduciary duty, actual fraud or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.    This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

10.9    Releases.

(a)    ***Releases by the Debtors***.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce this Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors, the implementation of the Restructuring, and except as otherwise provided in this Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Debtors' estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Entities who may purport to assert any Cause of Action or Released and Settled Claim derivatively, by or through the foregoing Entities, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Released and Settled Claim, losses, remedies, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Debtors' estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or the  Debtors' estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements between any Debtor and any Released Party (including, the Revolving Credit Documents and the Indentures), the DIP Facility, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Rights Offering, the Exchange Agreement, the LegacyCo Contribution Agreement, the Permian Contribution Agreement, the creation of New Permian Corp., Legacy Co. or the AUNC Trust, the negotiation, formulation, or preparation of the Disclosure Statement, and this Plan and related agreements, instruments, and other documents (including the Plan Documents, the Restructuring Support Agreement and the trust

63

agreement creating the AUNC Trust), the solicitation of votes with respect to this Plan, the Backstop Commitment Agreement, or the Rights Offering, any membership (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Creditors' Committee, the structuring, negotiation, performance, or conducting of, participation in, or entry into, the Rights Offering and/or the Backstop Commitment Agreement (including, but not limited to, payment or receipt of the Put Option Premium), including by any member of the Creditors' Committee, or any other act or omission, transaction, agreement, event, or other occurrence, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.

(b)     ***Releases by Holders of Claims and Interests***. As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties, are deemed forever released and discharged by (i) subject to the penultimate sentence of this Section 10.9(b) of the Plan, holders of all Claims who vote to either accept or reject the Plan but do not opt out of granting the releases set forth herein (a "Release Opt-Out"), (ii) the Revolving Credit Facility Agent, (iii) the Unsecured Notes Indenture Trustee, (iv) the DIP Facility Agent, and (v) the Statutory Committees from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, Released and Settled Claims, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, and any claims for breach of any fiduciary duty (or any similar duty), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates (to the extent such affiliates can be bound) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (including, the Revolving Credit Documents and the Indentures), the DIP Facility, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Rights Offering, the Exchange Agreement, the LegacyCo Contribution Agreement, the Permian Contribution Agreement, the creation of New Permian Corp., LegacyCo, or the AUNC Trust, the negotiation, formulation, or preparation of the Disclosure

64

Statement, the Plan and related agreements, instruments, and other documents (including the Plan Documents, the Restructuring Support Agreement and the trust agreement creating the AUNC Trust), the solicitation of votes with respect to the Plan, the Backstop Commitment Agreement, or the Rights Offering, any membership in (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Creditors' Committee, the structuring, negotiation, performance, or conducting of, participation in, or entry into, the Rights Offering and/or the Backstop Commitment Agreement (including, but not limited to, payment or receipt of the Put Option Premium), including by any member of the Creditors' Committee, or any other act or omission, except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  For the avoidance of doubt, notwithstanding the foregoing, a Release Opt-Out solely means that such holder (i) is electing to not release the Released Parties other than the Debtors, and (ii) shall not impair, limit or effect in any way the exculpation of the Exculpated Parties as set forth in Section 10.8 of the Plan.  For the avoidance of doubt, the foregoing releases shall not release the indemnification rights of the (i) Secured Notes Indenture Trustee under the Secured Notes Indentures and any related documentation, and (ii) the Unsecured Notes Indenture Trustee under the Unsecured Notes Indentures and any related documentation.

(c)    *Release of Liens*.  Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, including the Exit Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the secured claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.

(d)    *Waiver of Statutory Limitations on Releases*.  The releases contained in Article X of the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

**10.10    Injunction Related to Releases and Exculpation.**    The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including, the claims, obligations, suits, judgments,

65

damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan.

**10.11** **Subordinated Claims.** The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under this Plan take into account and conform to the relative priority and rights of the Claims and Interest in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim (other than any Allowed Revolving Facility Claims, DIP Facility Claims, Allowed Secured Notes Claim or Allowed Unsecured Notes Claim) or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**10.12** **Avoidance Actions.** From and after the Effective Date, the Reorganized Debtors shall waive the right to prosecute any avoidance, equitable subordination, or recovery actions that belong to the Debtors under chapter 5 of the Bankruptcy Code including sections 105, 502(d), 510, 542 through 551, and 553.

### **10.13** **Retention of Causes of Action/Reservation of Rights.**

(a)    Except as otherwise provided in Section 10.9 hereof, nothing herein or in the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, or their officers, directors, or representatives and (ii) for the turnover of any property of the Debtors' estates; *provided*, that neither the Debtors nor the Reorganized Debtors shall preserve, retain, commence, prosecute or otherwise reserve any Claims or Cause of Action against (i) any Second Lien Noteholder, (ii) any Series B Interest Holder, (iii) the Secured Indenture Trustee (iv) the Unsecured Senior Notes Groups (or any member thereof), (v) the Backstop Parties, or (vi) any of the forgoing Entities' respective affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees, including the Released and Settled Claims.

(b)    Nothing herein or in the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and

66

all of the Reorganized Debtors' legal and equitable rights with respect to any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

(c)    The Reorganized Debtors reserve (or receive) and shall retain the applicable Causes of Action notwithstanding the rejection of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors in accordance with the terms hereof.  The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**10.14    Preservation of Causes of Action.    No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided herein.**

**10.15    Special Provisions for Governmental Units.**  Solely with respect to Governmental Units, nothing herein shall limit or expand the scope of discharge, release, or injunction to which the Debtors or the Reorganized Debtors are entitled under the Bankruptcy Code.  Further, nothing herein, including Sections 10.8 and 10.9 hereof, shall discharge, release, enjoin, or otherwise bar (a) any liability of the Debtors or the Reorganized Debtors to a Governmental Unit arising on or after the Confirmation Date with respect to events occurring on or after the Confirmation Date, (b) any liability to a Governmental Unit that is not a Claim, (c) any valid right of setoff or recoupment of a Governmental Unit, (d) any police or regulatory action by a Governmental Unit, (e) any environmental liability to a Governmental Unit that the Debtors, the Reorganized Debtors, any successors thereto, or any other Person or Entity may have as an owner or operator of real property after the Effective Date, and (f) any liability to a Governmental Unit on the part of any Persons or Entities other than the Debtors or the Reorganized Debtors, *provided*, that nothing in this Section 10.15 shall affect the Debtors' releases in Section 10.9 hereof, nor shall anything herein enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any of the matters described in clauses (a) through (f) above.

**10.16    Protections Against Discriminatory Treatment.**  Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a

67

grant against, the Reorganized Debtors, or another Entity with whom the Reorganized Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**10.17 <u>Document Retention</u>.**  On and after the Effective Date, the Reorganized Debtors may maintain documents in accordance with the Debtors' standard document retention policy, as may be altered, amended, modified, or supplemented by the Reorganized Debtors.

<div align="center">

**ARTICLE XI.**

**<u>RETENTION OF JURISDICTION</u>**

</div>

**11.1 <u>Jurisdiction of Bankruptcy Court</u>.**  On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine motions for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b)    To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced before or after the Confirmation Date, including, any proceeding with respect to a Cause of Action or Avoidance Action;

(c)    To ensure that distributions to holders of Allowed Claims are accomplished as provided herein;

(d)    To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expenses;

(e)    To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

<div align="center">68</div>

(g)    To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code and to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    To hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred prior to the Confirmation Date;

(i)    To hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated herein, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)    To hear and determine disputes arising in connection with Disputed Claims;

(k)    To take any action and issue such orders as may be necessary to construe, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following consummation;

(l)    To recover all assets of the Debtors and property of the Debtors' estates, wherever located;

(m)    To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)    To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of taxes under section 505(b) of the Bankruptcy Code);

(o)    To enforce all orders previously entered by the Bankruptcy Court;

(p)    To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(q)    To resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(r)    To determine any other matters or adjudicate any disputes that may arise in connection with or are related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any document related to the foregoing;

69

*provided* that the Court shall not retain jurisdiction over disputes concerning documents contained in the Plan Supplement that have a jurisdictional, forum selection or dispute resolution clause that refers disputes to a different court;

(s)      To hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

(t)      To hear and determine any rights, claims, or causes of action held by or accruing to the Debtors or the Reorganized Debtors pursuant to the Bankruptcy Code or any federal or state statute or legal theory;

(u)      To enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases;

(v)      To hear any other matter not inconsistent with the Bankruptcy Code; and

(w)      To enter a final decree closing the Chapter 11 Cases.

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the forgoing matters, the reference to the "Bankruptcy Court" in this Article XI shall be deemed to be replaced by the "District Court." Nothing in this Article XI shall expand the exclusive jurisdiction of the Bankruptcy Court beyond that provided by applicable law.

## ARTICLE XII.

### MISCELLANEOUS PROVISIONS

**12.1     Dissolution of Statutory Committees.**   On the Effective Date, the Statutory Committees shall dissolve, the current and former members of the Statutory Committees, including any *ex officio* members, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, except for the limited purpose of prosecuting (i) requests for allowances of compensation and reimbursement of expenses incurred prior to the Effective Date or (ii) any appeals of the Confirmation Order.

**12.2     Substantial Consummation.**   On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

WEIL:\96366844\1\29979.0004

**12.3** **Exemption from Transfer Taxes.**

(a)      Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any Security or property hereunder or in connection with the transactions contemplated hereby, the creation, filing, or recording of any mortgage, deed of trust, or other security interest, the making, assignment, filing, or recording of any lease or sublease, or the making or delivery of any deed, bill of sale, or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, the distribution of the LegacyCo Units, or any agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated herein, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing a stamp tax or similar tax, to the maximum extent provided by section 1146(a) of the Bankruptcy Code.  To the maximum extent provided by section 1146(a) of the Bankruptcy Code and applicable nonbankruptcy law, the Restructuring Transactions shall not be taxed under any law imposing a stamp tax or similar tax.

**12.4** **Expedited Tax Determination.**  The Reorganized Debtors may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Debtors or the Reorganized Debtors for all taxable periods of the Debtors through the Effective Date.

**12.5** **Payment of Statutory Fees.**  On the Effective Date, and thereafter as may be required, each of the Debtors shall (a) pay all the respective fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to section 3717 of title 31 of the United States Code, until the earliest to occur of the entry of (i) a final decree closing such Debtor's Chapter 11 Case, (ii) a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (iii) a Final Order dismissing such Debtor's Chapter 11 Case, and (b) be responsible for the filing of consolidated post-confirmation quarterly status reports with the Bankruptcy Court in accordance with Rule 3021–1 of the Southern District of New York Local Bankruptcy Rules, which status reports shall include reports on the disbursements made by each of the Debtors.

**12.6** **Plan Modifications and Amendments.**  The Plan may be amended, modified, or supplemented by the Debtors or the Reorganized Debtors, as applicable, with the consent of the Requisite Consenting Second Lien Creditors, the Requisite Commitment Parties, to the extent that it adversely affects the treatment or rights of holders of Claims in Classes 5A, 5B, 6, 7A or 7B, the Creditors' Committee, and, to the extent it adversely affects the Revolving Credit Facility Claims, the DIP Facility Claims or the Exit Facility, the Revolving Credit Facility Agent, the DIP Facility Agent or the Exit Facility Agent, as applicable, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct;  provided that any such alteration, amendment or modification is consistent with the Restructuring Support Agreement.  In addition, after

71

the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Claims hereunder, the Debtors may, with the consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, and, to the extent such action adversely affects the Revolving Credit Facility Claims, the DIP Facility Claims or the Exit Facility, the Revolving Credit Facility Agent, the DIP Facility Agent or the Exit Facility Agent, as applicable, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan and any holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as so amended, modified, or supplemented. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not materially and adversely affect the treatment of holders of Claims and that any such technical adjustment or modification is consistent with the Restructuring Support Agreement. Notwithstanding any provision of this Plan to the contrary or that is silent on the issue of consent rights, all documents, exhibits, and schedules related the Plan or Restructuring Transactions including, the Plan, Disclosure Statement, Confirmation Order, the Plan Documents, the Plan Supplement, and the Exit Facility Documents must be acceptable to the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties.

## 12.7    Revocation or Withdrawal of Plan.

(a)    The Debtors may revoke, withdraw, or delay consideration of the Plan prior to the Confirmation Date, either entirely or with respect to one or more of the Debtors, and to file subsequent amended plans of reorganization. If the Plan is revoked, withdrawn, or delayed with respect to fewer than all of the Debtors, such revocation, withdrawal, or delay shall not affect the enforceability of the Plan as it relates to the Debtors for which the Plan is not revoked, withdrawn, or delayed. If the Debtors revoke the Plan in its entirety, the Plan shall be deemed null and void. In such event, nothing herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

(b)    Notwithstanding the foregoing Section 12.7(a), if the Debtors take any action to attempt to withdraw such Plan from the docket of the Bankruptcy Court or the Debtors refuse, for any reason, to take any and all commercial reasonable actions to implement or support the Restructuring Transactions, then: (a) immediately, at such time and without any further order of the Court, the Debtors will no longer be proponents of this the Plan and the Second Lien Group and the Unsecured Notes Group will become proponents of this Plan; *provided*, that if the exclusive periods of the Debtors have not been terminated as of such time, the Debtors shall remain nominal proponents of the Plan solely for the purposes of section 1121 until the expiration or termination of such exclusive periods; and (b) any and all provisions and consent rights or requirement that any document or transaction be "acceptable" or other terms under this Plan referencing "Weil," the "Debtor," or the "Debtors" are, and shall continue to be, in full force and

WEIL:\96366844\1\29979.0004

effect with respect to the Consenting Creditors (as defined under the Restructuring Support Agreement) as if such provisions were written without reference to "Weil," the "Debtor," or the "Debtors."

**12.8    Courts of Competent Jurisdiction.**    If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**12.9    Severability.**    If, prior to entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, in each case at the election and request of the Debtors, with the consent of the Requisite Consenting Second Lien Creditors and Requisite Commitment Parties, and, to the extent such term or provision affects the Revolving Credit Facility Claims, the DIP Facility Claims or the Exit Facility, the Revolving Facility Agent, the DIP Facility Agent or the Exit Facility Agent, as applicable, may alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and provide that each term and provision hereof, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified except in accordance with the terms of the Plan; and (c) nonseverable and mutually dependent.

**12.10    Governing Law.**    Except to the extent the Bankruptcy Code or other U.S. federal law is applicable, or to the extent a schedule hereto, or a schedule in the Plan Supplement expressly provides otherwise, the rights, duties, and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of law thereof to the extent they would result in the application of the laws of any other jurisdiction.

**12.11    Schedules.**    The schedules and exhibits to the Plan and the Plan Supplement are incorporated into, and are part of, the Plan as if set forth herein.

**12.12    Successors and Assigns.**    All the rights, benefits, and obligations of any Person named or referred to herein shall be binding on, and inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such Person.

WEIL:\96366844\1\29979.0004

**12.13 <u>Time</u>.** In computing any period of time prescribed or allowed herein, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.14 <u>Notices</u>.** To be effective, all notices, requests, and demands to or upon the Debtors, the Second Lien Group, the Creditors' Committee, the Equity Committee, or the Revolving Credit Facility Agent shall be in writing (including by facsimile or electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered, or in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| | |
|---|---|
| **If to the Debtors, to:** | Weil, Gotshal & Manges LLP |
| Breitburn Energy Partners LP | 767 Fifth Avenue |
| 707 Wilshire Boulevard | New York, New York  10153 |
| Suite 4600 | Attn: Ray C. Schrock, P.C., Stephen Karotkin |
| Los Angeles, California 90017 | Telephone: (212) 310-8000 |
| Attn: Gregory Brown, General Counsel | Telecopier: (212) 310-8007 |
| Telephone: (213) 225-5900, Ext. 294 | E-mail:  ray.schrock@weil.com, stephen.karotkin@weil.com |
| Telecopier: (213) 225-5917 | |
| E-mail:  gbrown@breitburn.com | |
| **If to the Second Lien Group, to:** | Kirkland & Ellis LLP |
| Kirkland & Ellis LLP | 300 North LaSalle |
| 601 Lexington Avenue | Chicago, IL 60654 |
| New York, NY 10022 | Attention:  Steven N. Serajeddini |
| Attn: Christopher Marcus, P.C. | Telephone: (312) 862-2000 |
| Telephone: (212) 446-4800 | Telecopier: (312) 862-2200 |
| Telecopier: (212) 446-4900 | E-mail address: steven.serajeddini@kirkland.com |
| E-mail:  christopher.marcus@kirkland.com | |
| **If to the Requisite Commitment Parties, to:** | Akin Gump Strauss Hauer & Feld LLP |
| Akin Gump Strauss Hauer & Feld LLP | 1333 New Hampshire Avenue, N.W. |
| One Bryant Park | Washington, DC 20036 |
| New York, NY 10036 | Attn: Scott Alberino, Daniel Fisher |
| Attn: Ira Dizengoff | Telephone: (202) 887-4121 |
| Telephone: (212) 872-1096 | Facsimile: (202) 887-4288 |
| Facsimile: (212) 872-1002 | Email: salberino@akingump.com, dfisher@akingump.com |
| Email: idizengoff@akingump.com | |
| | White & Case LLP |
| | 1221 Avenue of the Americas |
| | New York, NY 10020 |
| | Attn:  Harrison Denman |
| | Telephone: (212) 819-2567 |
| | Facsimile:  (212) 354-8113 |
| | Email: hdenman@whitecase.com |
| **If to the Creditors' Committee, to:** | **If to the Equity Committee, to:** |
| Milbank, Tweed, Hadley & McCloy LLP | Proskauer Rose LLP |
| 2029 Century Park East, 33rd Floor | Eleven Times Square |
| Los Angeles, CA 90067 | New York, NY 10036 |
| Attn: Gregory Bray, Esq., Paul Aronzon, | Attn: Martin J. Bienenstock, Vincent Indelicato |
| Telephone: (424) 386-4000 | Telephone: (212) 969-3000 |
| Telecopier: (213) 629-5063 | Telecopier: (212) 969-2900 |
| E-mail: gbray@milbank.com, paronzon@milbank.com | E-mail:  mbienenstock@proskauer.com, vindelicato@proskauer.com |
| **If to the Revolving Credit Facility Agent, to:** | Winston & Strawn LLP |
| Wells Fargo Bank, N.A. | 333 S. Grand Avenue, 38th Floor |
| 1000 Louisiana St. | Los Angeles, CA 90071 |
| 9th Floor – Energy Group | Attn: Eric E. Sagerman, Justin E. Rawlins, |
| Houston, TX 77002 | Telephone: (213) 615-1700 |
| Attn: Michael A. Tribolet | Telecopier: (213) 615-1750 |

74

| | |
|---|---|
| Telephone:  (713) 319-1326 | Email: esagerman@winston.com, jrawlins@winston.com |
| Email:  Michael.A.Tribolet@wellsfargo.com | |
| | and |
| and | |
| | Winston & Strawn LLP |
| Wells Fargo Bank, National Association | 200 Park Avenue |
| Wells Fargo Law Department | New York, NY 10166-4193 |
| 333 S. Grand Avenue, Suite 1040 | Attn: David Neier, Carey D. Schreiber |
| Los Angeles, CA 90071 | Telephone:  (212) 294-6700 |
| Attn: David S. Rauch, Esq. | Facsimile:  (212) 294-4700 |
| Telephone: (213) 253-6569 | Email:  dneier@winston.com, cschreiber@winston.com |
| Facsimile: (213) 628-9918 | |
| Email: david.s.rauch@wellsfargo.com | |

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.   After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

     **12.15**   **Reservation of Rights.**   Except as otherwise provided herein, this Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.   None of the filing of this Plan, any statement or provision of this Plan, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

WEIL:\96366844\1\29979.0004

Dated: New York, New York
December 1, 2017

Respectfully submitted,

BREITBURN ENERGY PARTNERS LP

By: /s/ Halbert S. Washburn
    Name:   Halbert S. Washburn
    Title:    Chief Executive Officer

BREITBURN GP LLC
BREITBURN OPERATING LP
BREITBURN OPERATING GP LLC
BREITBURN MANAGEMENT COMPANY LLC
BREITBURN FINANCE CORPORATION
ALAMITOS COMPANY
BEAVER CREEK PIPELINE, L.L.C.
BREITBURN FLORIDA LLC
BREITBURN OKLAHOMA LLC
BREITBURN SAWTELLE LLC
BREITBURN TRANSPETCO GP LLC
BREITBURN TRANSPETCO LP LLC
GTG PIPELINE LLC
MERCURY MICHIGAN COMPANY, LLC
PHOENIX PRODUCTION COMPANY
QR ENERGY, LP
QRE GP, LLC
QRE OPERATING, LLC
TERRA ENERGY COMPANY LLC
TERRA PIPELINE COMPANY LLC
TRANSPETCO PIPELINE COMPANY, L.P

**EXHIBIT I**

**Subject to FRE 408**
**Confidential**

## BREITBURN ENERGY PARTNERS LP
## SUMMARY OF PROPOSED TERMS AND CONDITIONS

This Summary of Proposed Terms and Conditions (this "Term Sheet") outlines certain key terms to resolve certain matters, including treatment of the Prepetition Lenders under the Debtor's Plan (all capitalized terms not defined, as defined below). This Term Sheet is for discussion purposes only and, notwithstanding any discussion concerning proposed exit facilities by and among the Borrower, the other Loan Parties as Guarantors, the Prepetition Lenders, and the Administrative Agent, is neither a proposal nor a commitment to provide financing. Nothing in this Term Sheet is binding on any party and no party will be bound to any commitment or agreement until such time, if any, as Definitive Documentation shall have been executed and delivered among the parties with express reference to such commitment or agreement and approved by the Bankruptcy Court (as defined below). The outlined offered terms are subject to change, withdrawal or modification in the sole discretion of the Administrative Agent or the Loan Parties, are subject to the Administrative Agent's approval of the form and content of the Definitive Documentation. This Term Sheet does not constitute (nor shall it be construed as) an offer with respect to any securities or a solicitation of acceptances or rejections as to any Chapter 11 plan, it being understood that such solicitation, if any, only will be made in compliance with the applicable provisions of all applicable law. For purposes of this Term Sheet "Definitive Documentation" means all documents related to the Debtors' Plan, including, without limitation, the disclosure statement related to the Plan, Plan, and Confirmation Order. The actual terms and conditions upon which credit, if any, may ultimately be extended are subject to satisfactory completion of due diligence, satisfactory documentation and such other terms and conditions as are determined in the sole discretion of the Administrative Agent. No party shall be entitled to rely on any statement or representation made by any other party or its representatives except as ultimately set forth in final, executed Definitive Documentation, if any. This Term Sheet is confidential, and, except to the extent agreed to by the Administrative Agent and the Borrower, shall not be disclosed to any person other than the Loan Parties, the Prepetition Lenders, potential agents, potential lenders and their attorneys and other advisors, and then only on a confidential basis and in connection with considering whether to agree to the Definitive Documentation. This Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions and is intended to be entitled to the protections of Federal Rule of Evidence 408, Evidence Code section 1152, and any other applicable statutes or doctrines. Capitalized terms used herein, but not otherwise defined herein, shall have the meanings ascribed to such terms in the Prepetition Credit Agreement (as defined below).

| | |
|---|---|
| Prepetition Facility: | The senior secured revolving credit facility (the "Prepetition Facility") provided by Wells Fargo Bank, National Association, as administrative agent (the "Prepetition Agent"), and certain lenders (the "Prepetition Lenders") pursuant to that certain Third Amended and Restated Credit Agreement dated as of November 19, 2014 (as amended, supplemented or otherwise modified, the "Prepetition Credit Agreement") by and among Breitburn Operating LP (together with its affiliated debtors in chapter 11, the "Debtors"), as borrower, Breitburn Energy Partners LP ("BBEP"), as parent guarantor, and the Prepetition Agent and the Prepetition Lenders. |
| Borrower: | Breitburn Operating LP, a Delaware limited partnership (the "Borrower"). |
| Guarantors: | The obligations of (a) the Borrower under the Facilities (as defined below), (b) any Loan Party (as defined below) under any hedging agreements entered into between such Loan Party and any counterparty that is a Lender (as defined below) (or any affiliate |

thereof) and (c) any Loan Party under any treasury management arrangements between such Loan Party and a Lender (or any affiliate thereof) (collectively, the "<u>Obligations</u>") will be unconditionally guaranteed, on a joint and several basis, by (i) each guarantor of the facilities under the Prepetition Facility (other than BBEP), including each person identified on <u>Annex A</u>, (ii) any other entity of which the Borrower is a direct wholly-owned subsidiary, collectively, the "<u>Parent</u>"), (iii) each other entity formed or otherwise continuing through the Plan as a successor to the Debtors (other than the Borrower, Permian Co. and Parent) and (iv) each other wholly-owned, material domestic restricted subsidiary of the Borrower (collectively with the Parent, the "<u>Guarantors</u>" and, collectively with the Borrower, the "<u>Loan Parties</u>"; and such guarantee being referred to as the "<u>Guarantee</u>").    All Guarantees shall be guarantees of payment and not of collection.

| | |
|---|---|
| Chapter 11 Plan: | The chapter 11 plan (the "<u>Plan</u>") of the Debtors pursuant to chapter 11 of title 11 of the United States Code filed in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>"), which is attached to the Plan support agreement. The Plan (a) shall provide for treatment of the Prepetition Lenders consistent with this Term Sheet and (b) shall give effect to the transactions contemplated by the Definitive Documentation and this Term Sheet. |
| Lead Arrangers and Bookrunners: | Wells Fargo Securities, LLC ("<u>Wells Fargo Securities</u>"), Citigroup Global Markets Inc., JP Morgan Chase Bank, N.A., Barclays Bank PLC, BMO Capital Markets Corp. and Capital One, N.A. will act as joint lead arrangers and bookrunners (each in such capacity, including any affiliates acting in such capacity, collectively, the "<u>Lead Arrangers</u>"). |
| Administrative Agent, Issuing Bank and Swingline Lender: | Wells Fargo Bank, National Association (the "<u>Administrative Agent</u>", the "<u>Issuing Bank</u>" or the "<u>Swingline Lender</u>", as the case may be).  Additional Issuing Banks and Swingline Lenders may be added with the consent of the Borrower and the Administrative Agent. |
| Lenders: | Each Prepetition Lender (for purposes of the Facilities, each a "<u>Lender</u>" and, collectively, the "<u>Lenders</u>"). |
| Facilities: | A senior secured amended and restated Term Facility and a senior secured amended and restated Revolving Facility (each as defined below and, collectively, the "<u>Facilities</u>"), that shall become effective on the effective date of the Plan (the "<u>Plan Effective Date</u>"), as follows: |

(a)    <u>Term Facility</u>.  The new term loans shall be non-amortizing, interest-only term loans (the "<u>Term Loans</u>")under a term facility (the "<u>Term Facility</u>" and the lenders under such Term Facility, the "<u>Term Lenders</u>") deemed made by each Prepetition Lender

AmericasActive:9418093.14

to the Borrower on the Closing Date that does not elect to become a Revolving Lender, in a principal amount based upon such Term Lender's pro rata share of the prepetition obligations under the Prepetition Facility (the "<u>Prepetition Obligations</u>"). The Term Facility shall be secured pari passu with the Revolving Facility on a "last out" basis.

(b)    <u>Revolving Facility</u>.    Each Prepetition Lender that elects to become a revolving lender (collectively, the "<u>Revolving Lenders</u>") by agreeing to provide a commitment in respect of a revolving facility (the "<u>Revolving Facility</u>" and the loans under such Revolving Facility, the "<u>Revolving Loans</u>") shall be allocated its pro rata share of revolving commitments such that the total revolving commitment amount shall be in an amount equal to the lesser of (i) (A) the Borrowing Base and (B) an initial aggregate principal amount of $400,000,000, as adjusted from time to time in accordance with the provisions herein, secured pari passu with the Term Facility on a "first-out" basis less (ii) the aggregate principal amount of the Term Facility on the Closing Date.

The Revolving Facility will include a subfacility for (i) standby letters of credit (each, a "<u>Letter of Credit</u>") in the aggregate principal amount not to exceed the lesser of (x) the aggregate principal amount of the Revolving Facility and (y) $100,000,000, and (ii) a subfacility for swingline loans (each, a "<u>Swingline Loan</u>") in the aggregate principal amount not to exceed the lesser of (x) the aggregate principal amount of the Revolving Facility and (y) $50,000,000, each on customary terms and conditions.

|  |  |
|---|---|
| Borrowing Base and Borrowing Base Redetermination: | Availability under the Revolving Facility shall be subject to a borrowing base (the "<u>Borrowing Base</u>"), which shall be initially determined and periodically redetermined (each such redetermination a "<u>Borrowing Base Redetermination</u>") as set forth below and otherwise on terms not less restrictive than the Prepetition Credit Agreement unless consented to by Administrative Agent in its sole discretion. |

On the Closing Date, the initial Borrowing Base, inclusive of the Term Facility, shall be deemed to equal $400,000,000.  Thereafter, a Borrowing Base Redetermination shall occur on October 1, 2018 (the "<u>First Scheduled Redetermination Date</u>"), and thereafter on April 1 and October 1 of each year until the Revolving Facility is indefeasibly repaid or satisfied in full in cash and the commitments thereunder are terminated.

Interim Borrowing Base Redeterminations shall be implemented upon (a) the request of the Administrative Agent or the requisite Lenders (a "<u>Lender Wild Card Redetermination</u>"), or (b) the request of the Borrower; <u>provided</u> that (i) that there shall be no Lender Wild Card Redetermination prior to the First Scheduled Redetermination

3

Date, (ii) there shall be no more than one Lender Wild Card Redetermination in any fiscal year and (iii) there shall be no more than one interim Borrowing Base Redetermination made at the request of the Borrower between each scheduled Borrowing Base Redetermination.

Additionally, the Borrower may elect to cause an interim Borrowing Base Redetermination contemporaneously with the consummation of any acquisitions of oil and gas properties to which associated proven reserves represent at least 5% of the Borrowing Base.

In the event the total outstanding balance of the Revolving Facility is greater than the Borrowing Base (a "<u>Borrowing Base Deficiency</u>") at the time of any Borrowing Base Redetermination, the Borrower shall, within 30 days after notice from Administrative Agent of the new or adjusted Borrowing Base, notify Administrative Agent of the Borrower's election to exercise one, or a combination of, the following options in order to cure such Borrowing Base Deficiency: (a) repay the Borrowing Base Deficiency (after giving effect to any action taken under clause (c) below) in a single lump sum for application to the Revolving Facility (as set forth in the "Mandatory Prepayments" section below); (b) repay the Borrowing Base Deficiency (after giving effect to any action taken under clause (c) below) in five monthly installments equal to one-fifth of such Borrowing Base Deficiency with the first such installment due 30 days after notice from Administrative Agent of the new or adjusted Borrowing Base and each following installment due 30 days after the preceding installment for application to the Revolving Facility (as set forth in the "Mandatory Prepayments" section below); or (c) provide additional collateral acceptable to the Administrative Agent, in the Administrative Agent's sole discretion, to increase the Borrowing Base.

|                                          |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                           |
| ---------------------------------------- | --- |
| Mandatory Borrowing Base Reductions:     | If the sum of (a) the aggregate Borrowing Base value of oil and gas properties disposed of (including through casualty and condemnation but excluding any disposition to a Loan Party) (i) during the period from the Closing Date to the date of the First Scheduled Redetermination Date and (ii) thereafter, during any period between scheduled Borrowing Base Redeterminations *plus* (b) the net effect of hedge modifications and early terminations of the Loan Parties to hedge agreements given credit in setting the Borrowing Base during such period, is greater than 5% of the Borrowing Base, then the Borrowing Base shall be automatically reduced by an amount equal to the aggregate Borrowing Base value of such oil and gas properties as determined by the Administrative Agent in the Administrative Agent's sole discretion, based upon the engineered value attributed to such properties in the most recent Reserve Report. |

If the Loan Parties and their subsidiaries incur any junior or unsecured indebtedness (subject to any baskets set forth herein and other baskets and exceptions to be mutually agreed between the

4

Borrower and the Administrative Agent), then the Borrowing Base shall be automatically reduced by 25% of the stated principal amount of such indebtedness.

| | |
|---|---|
| Closing Date: | The Plan Effective Date (the "<u>Closing Date</u>"). |

Use of Proceeds:

The proceeds of the Facilities shall be used to (a) repay all obligations under the Debtor-in-Possession Credit Agreement dated as of May 19, 2016 (as amended, the "<u>DIP Facility</u>") by and among Breitburn Operating LP, as borrower, Breitburn Energy Partners LP, as parent guarantor, Wells Fargo Bank, National Association, as administrative agent and certain lenders, (b) pay amounts required to be paid under the Plan, including any amounts owed to the Office of the United States Trustee, (c) pay fees and expenses in connection with emergence from the bankruptcy cases and (d) fund ongoing working capital requirements and other general corporate purposes.

Financing Documentation:

The Facilities will be documented in exit financing documents that are substantially consistent with the Prepetition Credit Agreement (and including EEA Bail-In provisions, customary sanctions provisions and definitions updates, including policies and procedures in respect thereof, and as otherwise mutually agreed with the Administrative Agent and the Borrower, and as otherwise set forth in this Term Sheet), including loan agreements, guarantees, promissory notes, borrowing base certificates, compliance and other customary certificates, commitment letter, fee letter, and collateral documents required to grant and perfect the Lenders' first priority security interest in the collateral, including without limitation, security agreements, pledge agreements, financing statements, mortgages, deposit account control agreements, security account control agreements, and intellectual property security agreements each of which shall be consistent with the foregoing principles; <u>provided</u> that such documentation shall (a) contain terms and conditions set forth in this term sheet and such other changes as may be mutually agreed by the Borrower and the Administrative Agent and (b) give due regard to (i) current market terms for restructured reserve-based revolving credit facilities for borrowers emerging from bankruptcy and (ii) the operational and strategic requirements of the Parent and its subsidiaries (collectively, the "<u>Financing Documentation</u>" and the principles described therein, the "<u>Documentation Principles</u>").

Collateral:

The Obligations will be secured by valid and perfected first priority (subject to certain exceptions set forth in the Financing Documentation) security interests in and liens on all of the following (collectively, the "<u>Collateral</u>"):

(a)    (i) 100% of the equity interests of all present and future domestic subsidiaries of any Loan Party (other than the equity interests of Breitburn GP LLC and the equity interests of any FSHCO) and (ii) 65% of the voting equity interests and 100% of the non-

AmericasActive:9418093.14

voting equity interests of all present and future first-tier Foreign Subsidiaries and FSHCOs of any Loan Party;

(b)  Substantially all of the tangible and intangible personal property and assets of the Loan Parties (including, without limitation, all equipment, inventory and other goods, accounts, licenses, contracts, intercompany loans, intellectual property and other general intangibles, deposit accounts, securities accounts and other investment property and cash, subject to any mutually agreed baskets);

(c)  Oil and gas properties representing not less than 95% of the NYMEX Strip PV-9 of the total proved reserves of the Loan Parties included in the most recent Reserve Report; and

(d)  All other oil and gas properties (including undeveloped acreage, but excluding proved reserves) upon which the Loan Parties have granted the Prepetition Agent for the benefit of the Prepetition Lenders a lien pursuant to mortgages granted under the Prepetition Facility or DIP Facility to the extent still owned by the Loan Parties;

in each case, subject to exceptions for Excluded Property (to be defined as mutually agreed).

"Foreign Subsidiary" shall mean any direct or indirect subsidiary of Parent organized under the laws of any jurisdiction other than the United States, any state thereof or the District of Columbia.

"FSHCO" shall mean any direct or indirect domestic subsidiary of Parent substantially all of the assets of which consist of the equity and/or securities of one or more Foreign Subsidiaries.

All such security interests in personal property and all liens on oil and gas properties and other real property will be created pursuant to the Financing Documentation.

| Interest Rates: | At the Borrower's option, loans (other than Swingline Loans) will bear interest based on the Base Rate or LIBOR, plus the applicable Interest Margin (as defined below).  Swingline Loans will bear interest at the Base Rate plus the applicable Interest Margin. |

The interest margin ("Interest Margin") shall be:

(a)  in the case of the Revolving Facility, based upon utilization of the Borrowing Base (expressed as a percentage of outstanding loans and Letters of Credit under the Revolving Facility divided by the Borrowing Base) an Interest Margin according to the following grid:

AmericasActive:9418093.14

| Utilization | LIBOR+ | ABR+ |
|---|---|---|
| < 30.0% | 2.50% | 1.50% |
| ≥ 30.0%; < 60.0% | 2.75% | 1.75% |
| ≥ 60.0%; < 90.0% | 3.00% | 2.00% |
| ≥ 90.0% | 3.50% | 2.50% |

(b)   and in the case of the Term Facility, an Interest Margin of 2.00% for LIBOR loans and 1.00% for Base Rate loans;

provided that in no event shall LIBOR be less than zero.

Fees:

(a)   Unused Line Fee. The Borrower shall pay to the Administrative Agent, for the account of the Revolving Lenders, an unused line fee (the "Unused Line Fee") in an amount according to the following grid:

| Commitment Utilization | Rate |
|---|---|
| ≤ 50.0% | 0.375% |
| <>50.0% | 0.50% |

"Commitment Utilization" shall mean an amount equal to the average daily difference between (a) the total commitment of the Revolving Facility and (b) the aggregate outstanding balance of the Revolving Facility.

All accrued Unused Line Fees will be fully earned and due and payable monthly in arrears for the account of the Lenders under the Revolving Facility and will accrue from the Closing Date.

(b)   Upfront Fees. The Borrower shall pay to Wells Fargo Securities, for the account of each of the Revolving Lenders, upfront fees which will be due and payable as follows: (i) an aggregate amount equal to 0.15% times the aggregate principal amount of the Revolving Facility, which shall be earned and payable in full in cash on the Closing Date; and (ii) an aggregate amount equal to 0.30% times the aggregate principal amount of the Revolving Facility on the Closing Date, which shall be earned and payable in full in cash on the one (1) year anniversary of the Closing Date.

(c)   Letter of Credit Fees. The Borrower shall pay to the Administrative Agent for the account of the Revolving Lenders a Letter of Credit fee (due quarterly) equal to the product of the

7

LIBOR Margin and the undrawn amount of each Letter of Credit. In addition, Borrower shall pay to the Administrative Agent for the account of any Issuing Bank a fronting fee equal to the product of 0.20% and the undrawn amount of each Letter of Credit.

(d)    Other Fees. The Borrower shall pay other fees set forth in a separate fee letter.

Maturity Date:

(a)    Revolving Facility. The final maturity of the Revolving Facility will occur on the 4-year anniversary of the Closing Date.

(b)    Term Facility. The final maturity of the Term Facility will occur on the 7-year anniversary of the Closing Date.

Amortization:    None.

Mandatory Prepayments:

(a)    Borrowing Base Redeterminations. The Revolving Facility will be required to be repaid in the amount of any Borrowing Base Deficiency arising or resulting from the circumstances described under the section "Borrowing Base and Borrowing Base Redetermination" above as set forth in such section.

(b)    Borrowing Base Reductions. The Revolving Facility will be required to be prepaid in connection with any Borrowing Base Deficiency arising or resulting from the circumstances described under the section "Mandatory Borrowing Base Reductions" above as set forth in such section.

(c)    Anti-Hoarding. If as of the last business day of any calendar week any of the Revolving Loans are outstanding and the Loan Parties have Excess Cash (other than the proceeds of a borrowing that are expected to be used within 3 business days of such borrowing), then the Borrower shall within 2 business days prepay the Revolving Loans in an amount equal to such Excess Cash. As used herein, "Excess Cash" means the amount of unrestricted cash and cash equivalents of Parent and the other Loan Parties in excess of $75,000,000 in the aggregate (excluding (i) cash earmarked to pay unaffiliated third party obligations or to affiliates on account of transactions not prohibited under the Financing Documentation for which checks have been issued or wires or ACH have been initiated, (ii) cash or cash equivalents of the Loan Parties constituting purchase price deposits held in escrow pursuant to a binding and enforceable purchase and sale agreement with a third party containing customary provisions regarding the payment and refunding of such deposits, (iii) cash and cash equivalents held in any of the following accounts in the ordinary course of business: (a) accounts designated and used solely for payroll or employee benefits; (b) cash collateral accounts with respect to Letters of Credit; (c) trust accounts held and used exclusively

8

for the payment of taxes of the Loan Parties, including for the payment of taxes by direct (and, in the case of holding through an entity that is fiscally transparent for U.S. federal income taxes, indirect) partners of the Loan Parties; and (d) suspense, escrow or trust accounts designated and used exclusively for property reclamation deposits in respect of abandonment and remediation obligations, royalty, net profit interest and/or working interest payments owing to third parties or in respect of any such amounts owed by third parties to any Loan Party and (iv) royalty obligations, working interest obligations, production payments, vendor payments, and severance and ad valorem taxes of the Loan Parties due and owing within 3 business days to unaffiliated third parties and for which the Loan Parties will issue checks or initiate wires or ACH transfers within such 3 business day period).  In the event net cash proceeds received by a Loan Party in connection with any asset sale, casualty event or swap termination that are required to be used to make payments under the Loan Agreement are swept as being Excess Cash, then the Borrower shall be deemed to have made any other mandatory prepayment required to be made in respect of such proceeds.

All such mandatory prepayments made under

(i)    clauses (a) and (b) above will be applied, *first*, to prepay outstanding loans under the Revolving Facility (without a permanent reduction in commitments thereunder), *second*, in the case of clauses (a) and (b) above, to cash collateralize Letters of Credit outstanding under the Revolving Facility for so long as a Borrowing Base Deficiency remains and *third*, to prepay outstanding loans under the Term Facility (with a corresponding permanent reduction in commitments thereunder); and

(ii)   clause (c) above will be applied to prepay outstanding loans under the Revolving Facility (without a permanent reduction in commitments thereunder).

**Optional Prepayments and Commitment Reductions:**    Loans under the Revolving Facility may be prepaid at any time, in whole or in part, at the option of the Borrower, upon notice to the Administrative Agent and in minimum principal amounts and in multiples to be mutually agreed upon with the Administrative Agent, without premium or penalty (except LIBOR breakage costs).  Any optional prepayment of the Revolving Facility will be applied to prepay outstanding loans (without a permanent reduction in commitments thereunder unless so elected by the Borrower).

The unutilized portion of the commitments under the Revolving Facility may be terminated, in whole or in part, at the option of the Borrower, upon notice to the Administrative Agent and in minimum

9

principal amounts and in multiples to be mutually agreed with the Administrative Agent.

After prepayment in full of the Revolving Loans and cash collateralization of Letters of Credit outstanding under the Revolving Facility and termination of the commitments under the Revolving Facility, the Term Loans may be prepaid, in whole or in part, at the option of the Borrower, upon notice and in minimum principal amounts and in multiples to be mutually agreed, without premium or penalty (except LIBOR breakage costs). Notwithstanding anything to the contrary herein, in no event shall any payments be made to satisfy any amounts outstanding under the Term Facility unless the amounts outstanding under the Revolving Facility are indefeasibly paid or satisfied (or are contemporaneously being indefeasibly repaid or satisfied) in full in cash on a final basis, the Letters of Credit outstanding under the Revolving Facility have been cash collateralized and the commitments thereunder are terminated.

Conditions to Closing:

In addition to the "Conditions to All Extensions of Credit" section below, the closing of the Facilities and, with regard to the Revolving Facility (if applicable), the making of the initial extensions of credit thereunder, will be subject to satisfaction of usual and customary conditions precedent, including but not limited to the following (collectively, the "Conditions to Closing"):

1. the Plan and any related order of the Bankruptcy Court, including, without limitation, the entry of the order confirming the Plan (the "Confirmation Order"), shall be in form and substance reasonably satisfactory to the Administrative Agent, including approval of the Facilities, and releases and exculpations, it being agreed that the Plan to which this Term Sheet is attached is satisfactory in form and substance to the Administrative Agent;

2. the Confirmation Order shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified in a manner material and adverse to interests of the Administrative Agent and the Revolving Lenders or otherwise contrary to this Term Sheet;

3. the Plan Effective Date shall have occurred, all conditions precedent to the effectiveness of the Plan shall have been (or shall be concurrently with the closing of the Facilities) fulfilled or waived as permitted therein, including, without limitation, all transactions contemplated in the Plan or in the Confirmation Order to occur on the Plan Effective Date shall have been (or shall be concurrently with the closing of the Facilities) substantially consummated in accordance with the terms thereof and in compliance with applicable law, Bankruptcy Court and regulatory approvals;

10

4. the Administrative Agent shall have received satisfactory evidence as to the payment in full on the Closing Date of all material administrative expense claims, priority claims and other claims required to be paid upon the Closing Date;

5. there shall have been no material adverse change in, or a material adverse effect upon, the operations, business, properties or financial condition of the Loan Parties taken as a whole (other than as a result of the events leading up to or arising from the commencement or continuance of the bankruptcy proceedings or the confirmation of the Plan) from the date of the Revolving Lenders providing their commitment to the Revolving Facility through the date of the closing of the Revolving Facility;

6. (a) execution and delivery of the Financing Documentation and (b) the Administrative Agent and the Term Lenders and Revolving Lenders will have received (i) customary legal opinions as to the Loan Parties and the Financing Documentation (including, without limitation, customary opinions of local counsel), (ii) customary resolutions or other evidence of authority and incumbency, customary officers' certificates, good standing certificates, in each case with respect to the Borrower and the Guarantors, and a solvency certificate for the Borrower and its subsidiaries on a consolidated basis after giving effect to the transactions contemplated by this Term Sheet on the Closing Date and (iii) flood hazard diligence and documentation as required by the federal Flood Disaster Protection Act of 1973 or otherwise in a manner satisfactory to the Term Lenders and Revolving Lenders;

7. all documents and filings required to perfect or evidence the Administrative Agent's first priority security interest in and liens on the Collateral (including, without limitation, all certificates evidencing pledged capital stock or membership or partnership interests, as applicable, with accompanying executed stock powers, all UCC financing statements to be filed in the applicable government UCC filing offices, all intellectual property security agreements to be filed with the United States Copyright Office or the United States Patent and Trademark Office, as applicable, all deposit account and securities account control agreements and all mortgages, deeds of trust and real property filings) shall have been executed and/or delivered and, to the extent applicable, be in proper form for filing; provided, however, to the extent the Borrower and the Guarantors cannot deliver any such items (other than UCC financing statements and certificates evidencing pledged capital stock or membership or partnership interests) after the use of commercially reasonable efforts to do so by the Closing Date, the Borrower and the Guarantors shall be afforded a post-closing period of 30

11

days (or such other period as the Administrative Agent may agree in its sole discretion) to deliver such documentation;

8. the Prepetition Obligations shall receive the treatment outlined in this Term Sheet and the Plan, the Prepetition Facility shall have been amended and restated pursuant to the Plan, and the DIP Facility shall have been repaid in full (or, in the case of outstanding letters of credit, rolled into the Revolving Facility on terms and conditions satisfactory to the issuing banks under the Revolving Facility and the Administrative Agent) and the commitments thereunder terminated, and all security interests related thereto shall have been terminated substantially concurrently with the Closing Date;

9. the Administrative Agent shall have received an ACORD evidence of insurance certificate evidencing coverage of the Loan Parties and their respective subsidiaries and naming the Administrative Agent in such capacity for the Lenders as additional insured on all liability policies (subject to customary exceptions) and loss payee on all property insurance policies;

10. all required governmental and third party consents and approvals shall have been obtained by the Loan Parties and shall be in full force and effect;

11. all fees and documented out-of-pocket expenses required to be paid on the Closing Date in connection with the Facilities, including the reasonable documented out-of-pocket fees and expenses of counsel and financial advisors to the Administrative Agent, shall have been paid in full in cash;

12. the Parent and its consolidated subsidiaries shall demonstrate liquidity of not less than $100,000,000 on the Closing Date, after giving effect to the transactions contemplated hereby and under the Plan;

13. prior to or concurrently with the initial borrowings under the Facilities, the Borrower shall have received no less than $765,000,000 in proceeds from the sale to PermianCo of certain of the Debtors' acreage and related assets (including producing wells, existing infrastructure and all other proved developing producing (PDP) assets), including all rights to develop such acreage and related business operations; and

14. the Administrative Agent shall have received an updated business plan for the Borrower and its subsidiaries after giving effect to the transactions contemplated hereby and under the Plan on the Closing Date (the "Business Plan") and such Business Plan shall be in form and substance reasonably acceptable to the Administrative Agent.

12

| | |
|---|---|
| Conditions to All Extensions of Credit: | Each extension of credit under the Facilities will be subject to satisfaction of the following: (a) all of the representations, warranties, and covenants (including compliance with anti-cash hoarding) in the Financing Documentation shall be true and correct in all material respects (or if qualified by materiality or material adverse effect, in all respects) as of the date of such extension of credit, or if such representation speaks as of an earlier date, as of such earlier date; (b) no default or event of default under the Facilities shall have occurred and be continuing or would result from such extension of credit; and (c) delivery of a customary borrowing notice. |
| Cash Management: | The Loan Parties and their subsidiaries shall maintain their cash management system as it existed prior to the Closing Date for the benefit of the Facilities, with such changes as may be mutually agreed by the Administrative Agent and the Borrower. |
| Representations and Warranties: | The Financing Documentation will contain representations and warranties subject to exceptions and materiality thresholds as are usual and customary for transactions of this type as mutually agreed (which will be applicable to the Loan Parties and their restricted subsidiaries). |
| Affirmative Covenants: | The Financing Documentation will contain affirmative covenants subject to limitations and modifications as are usual and customary for transactions of this type as mutually agreed (which will be applicable to the Loan Parties and their restricted subsidiaries). |
| Negative Covenants: | The Financing Documentation will contain negative covenants subject to limitations and modifications as are usual and customary for transactions of this type as mutually agreed (which will be applicable to the Loan Parties and their restricted subsidiaries): |

(a)    limitation on liens;

(b)    limitation on disposition of assets;

(c)    limitation on consolidations and mergers;

(d)    limitation on loans and investments;

(e)    limitation on indebtedness (including a prohibition on junior indebtedness until the first measurement date of (and compliance with) the Total Net Leverage Ratio referenced below);

(f)    limitation on transactions with affiliates;

(g)    limitations on margin stock;

(h)    limitations on contingent obligations;

AmericasActive:9418093.14

(i)  limitations on restricted payments (including, (i) restrictions on payments and prepayments of certain junior and unsecured debt and (ii) customary restrictions on dividends, distributions, redemptions and repurchases of equity), including an exception for customary tax distributions; <u>provided</u> that restricted payments shall be permitted as long as (i) no default or event of default exists before or after giving effect thereto, (ii) pro forma availability under the Revolving Facility is greater than 20%, (iii) the pro forma Total Net Leverage Ratio is less than 2.50 to 1.00 and (iv) the Administrative Agent shall have received a certificate as to compliance with such conditions (including calculations therefor);

(j)  limitations on derivative contracts (as set forth in greater detail below);

(k)  limitations on (A) changes to the nature of the Loan Parties' business and (B) amendments to (i) organization documents, (ii) material subordinated indebtedness and (iii) corporate structure;

(l)  limitations on accounting changes;

(m)  ERISA compliance;

(n)  limitations on restrictions affecting the ability of subsidiaries to guarantee the loans, grant liens securing the loans or make distributions to the Borrower;

(o)  limitations on transactions with Breitburn Collingwood Utica LLC ("<u>Breitburn Utica</u>"), for so long as Breitburn Utica is an unrestricted subsidiary; and

(p)  limitations on amendments to documents governing certain junior and unsecured debt.

Financial Covenants:     Limited to the following financial covenants:

(a)  <u>Total Net Leverage Ratio</u>.  As of the last day of any fiscal quarter, commencing with the first full fiscal quarter after the Closing Date, the ratio of Total Net Indebtedness (as defined below) to EBITDAX for the trailing twelve months then ending (the "<u>Total Net Leverage Ratio</u>") shall not exceed 4.00 to 1.00.

(b)  "<u>Current Ratio</u>" means, as of the last day of any fiscal quarter, commencing with the last day of the first full fiscal quarter ending after the Closing Date, the ratio of (a) consolidated current assets (including the unused amount of the commitments under the Revolving Facility, unless a default exists, but excluding non-cash assets under ASC 815 and excluding cash collateral) to (b) consolidated current liabilities (excluding

14

(i) non-cash obligations under ASC 815, (ii) current maturities of long term debt (including in respect of the Obligations) and (iii) non-cash liabilities recorded in connection with stock-based or similar incentive based compensation awards or arrangements), shall not be less than 1.00 to 1.00.

"Total Net Indebtedness" shall mean debt for borrowed money (including obligations evidenced by bonds, notes and similar instruments), direct obligations arising under letters of credit surety bonds and similar instruments, capital leases and purchase money debt, deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business), guarantees in respect of the foregoing types of debt, and all debt of the foregoing types of any partnership or joint venture in which the Borrower or a subsidiary is a general partner or joint venturer, unless such debt is expressly made non-recourse minus unrestricted cash and cash equivalents and cash and cash equivalents restricted in favor of the Administrative Agent or any Lender in an aggregate amount not to exceed $50,000,000.

"EBITDAX" shall be defined in a manner substantially consistent with the definition thereof in the Prepetition Credit Agreement (including an add-back for fees and transaction costs incurred by the Loan Parties in connection with the bankruptcy cases and the transactions contemplated hereby, and unusual, one-time or non-recurring restructuring charges incurred during the first two fiscal quarters following the Closing Date not to exceed 10% of EBITDAX for such quarter (calculated prior to giving effect to such adjustment)); provided that EBITDAX for each of the four fiscal quarters ending before the Closing Date shall be deemed to equal $32,500,000/quarter.

For purposes of determining compliance with the financial covenants, any cash equity contribution (which shall be common equity or otherwise in a form acceptable to the Administrative Agent) made to the Borrower after the last day of any fiscal quarter and on or prior to the day that is ten days after the day on which financial statements are required to be delivered for that fiscal quarter will, at the request of the Borrower, be included in the calculation of EBITDAX and/or current assets solely for the purposes of determining compliance with such financial covenant at the end of such fiscal quarter and applicable subsequent periods which include such fiscal quarter (any such equity contribution so included in the calculation of EBITDAX or current assets, a "Specified Equity Contribution"); provided (a) the Borrower will be permitted to request that a Specified Equity Contribution be included in the calculation of EBITDAX and/or current assets with respect to any fiscal quarter (i) no more than twice during any consecutive four fiscal quarter period, and (ii) no more than four times in the aggregate during the term of the Facilities; (b) each Specified Equity Contribution will be no greater than the amount required to cause the

AmericasActive:9418093.14

Borrower to be in compliance with the financial covenants; (c) all Specified Equity Contributions and the use of proceeds thereof will be disregarded for all other purposes under the Facilities; and (d) subject to other customary qualifications and limitations on Specified Equity Contributions.

Hedging Requirements:

<u>Minimum Hedging</u>.   The Borrower shall enter into hedging agreements with Lenders (or any of their respective affiliates; provided that no more than 10% of the aggregate notional volumes (with appropriate conversions for crude oil, natural gas and natural gas liquids units) under hedge agreements may come from hedge agreements with affiliates of Lenders) with a term of no more than thirty-three months to limit or reduce market price risk with respect to at least 50% of expected production of oil and gas from "proved developed producing" reserves and at least 20% of expected production of oil and gas from "proved developed non-producing" and "proved undeveloped" reserves for a term maturing 33-months immediately following the Closing Date, as determined by reference to the most recent Reserve Report within (a) in the case of "proved developed producing" reserves and "proved developed non-producing" reserves, 90 days following the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion) and (b) in the case of "proved undeveloped" reserves, 180 days following the Closing Date (or such later date as the Administrative Agent may agree in its sole discretion).

<u>Maximum Hedging</u>.   The Borrower may enter into hedging agreements with Lenders (or any of their respective affiliates; provided that no more than 10% of the aggregate notional volumes (with appropriate conversions for crude oil, natural gas and natural gas liquids units) under hedge agreements may come from hedge agreements with affiliates of Lenders) with a term of no more than sixty months to limit or reduce market price risk, subject to customary adjustments for asset sales and early termination options acceptable to hedge providers; <u>provided</u> that no such hedging agreement, at the time it is entered into, when aggregated with all permitted hedging agreements, requires the Loan Parties, collectively, to deliver volumes in excess of the sum of 90% of the "proved developed producing" reserves, 50% of "proved developed non-producing" and 50% of "proved undeveloped" reserves for each month in years 1, 2, 3, 4 and 5, each as determined by reference to the most recent Reserve Report.

Events of Default:

Substantially similar to the events of default in the Prepetition Credit Agreement, except as mutually agreed with the Administrative Agent and as otherwise set forth in this Term Sheet, each subject to limitations and modifications as are usual and customary for transactions of this type as mutually agreed (which will be applicable to the Loan Parties and their subsidiaries (other than (i) immaterial subsidiaries (which are not Loan Parties) for the bankruptcy defaults

16

and (ii) unrestricted subsidiaries (which are not Loan Parties) except to the extent provided in the Prepetition Credit Agreement)).

|  |  |
|---|---|
| Amendments and Waivers: | Amendments and waivers of the Financing Documentation will require the approval of the Revolving Lenders (that are non-defaulting Revolving Lenders) holding more than 50% of the aggregate amount of the commitments in respect of the Revolving Facility, except that the consent of (a) each Revolving Lender (that is a non-defaulting Revolving Lender) shall be required in connection with (i) any increase of the Borrowing Base and (ii) changing any provision specifying the number or percentage of Revolving Lenders required to amend or waive any Financing Documentation (other than a provision amendments or waivers with respect to the matters set forth in clauses (c) and (d) below which shall require the consent of each Lender (that is a non-defaulting Lender), (b) Revolving Lenders (that are non-defaulting Revolving Lenders) holding more than 66-2/3% of the aggregate amount of the commitments in respect of the Revolving Facility shall be required to decrease or maintain the Borrowing Base, (c) each Lender shall be required in connection with (i) changing any provision specifying the number or percentage of Lenders (that are non-defaulting Lenders) required to amend or waive any Financing Documentation in respect of the matters described in this clause (c) and clause (d) below and (ii) releasing any guarantor (except in connection with a permitted transaction) or all or substantially all of the Collateral, and (d) each affected Lender shall be required in connection with (i) any increase or extension of its commitment, (ii) the postponement of any scheduled date for payment of principal, interest, fees or other amount payable to such Lender, (iii) any reduction in the principal amount of any loan, interest rate (other than the waiver of default interest), fee or other amount payable to such Lender and (iv) altering the pro rata sharing of payments. |
| Expenses and Indemnification: | Usual and customary for facilities of this type as may be mutually agreed. |
| Governing Law: | State of New York. |

17

**GUARANTORS**

| Guarantor | Jurisdiction of Organization |
| --- | --- |
| Breitburn GP LLC | Delaware |
| Breitburn Operating GP LLC | Delaware |
| Breitburn Management Company LLC | Delaware |
| Breitburn Florida LLC | Delaware |
| Breitburn Oklahoma LLC | Delaware |
| Breitburn Sawtelle LLC (f/k/a Breitburn Fulton LLC) | Delaware |
| Breitburn Transpetco GP LLC | Delaware |
| Breitburn Transpetco LP LLC | Delaware |
| Transpetco Pipeline Company, L.P. | Delaware |
| Breitburn Finance Corporation | Delaware |
| Beaver Creek Pipeline, L.L.C. | Michigan |
| Alamitos Company | California |
| Phoenix Production Company | Wyoming |
| GTG Pipeline LLC | Virginia |
| Mercury Michigan Company, LLC | Michigan |
| Terra Energy Company LLC | Michigan |
| Terra Pipeline Company LLC | Michigan |
| QR Energy, LP | Delaware |
| QRE GP, LLC | Delaware |
| QRE Operating, LLC | Delaware |

18

**EXHIBIT II**

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| CHARLIE A. SMITH | CROWN OIL PARTNERS, LLC | 07/29/2008 | FEE | SEC 7, BLK 35, T-2-S, T&P RY. CO. SVY, GLASSCOCK CO, TX, S&E DEPTHS SHALLOWER THAN 100' BELOW DEEPEST PROD FORM IN 82.685 AC TR OUT OF POOLED UNIT 160 AC PATTERSON PETROLEUM, INC. NO. 1 SMITH UNIT, REC VOL 325, PG 621 GLASSCOCK CO, TX. | TX | Glasscock | 119 | 448 | 3338 |
| MARY ALICE ALLEN | PATTERSON PETROLEUM, INC | 05/24/1994 | FEE | T&P RY CO SVY, T-2-S, BLK 35, SEC. 07, S& E 82.865 ACS M/L WITHIN THE BOUNDARIES OF THE POOLED UNIT 160 ACRE PATTERSON PETROLEUM, INC. NO. 1 SMITH UNIT. | TX | Glasscock | 314 | 428 | 1184 |
| A K GUTHRIE 2006 REV TRUST, MARY G THOMPSON, ANDREA KAY NELSON'S GRANDCHILDREN'S TRUST, KIMBERLY PAIGE GUTHRIE GRANDCHILDREN'S TRUST, AND DORIS PIKE GUTHRIE TEXAS TRUST FOR MARY LYNN GUTHRIE PERRY. | BREITBURN | 05/02/2013 | FEE | T&P RY CO SURVEY☐ T2N, BLOCK 33☐ SEC 6: W/2 | TX | Howard | 1342 | 504 | |
| A K GUTHRIE, MARY G THOMPSON, DORIS PIKE GUTHRIE TEXAS TRUST FOR A K GUTHRIE, AND DORIS PIKE GUTHRIE TEXAS TRUST FOR MARY LYNNE GUTHRIE PERRY | SPRING ENERGY CO INC | 04/23/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | Howard | 1187 | 634 | |
| A.G. ROGERS, INDIVIDUALLY AND AS INDEPENDENT EXECUTOR FOR THE ESTATE OF LUCY MYRLENE ROGERS, DECEASED | SPRING ENERGY CO INC | 04/20/2012 | FEE | S/2, SEC 34, BLK 33, T2N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS. CONT 322 ACS M/L. | TX | Howard | 1272 | 12 | |
| A.O. LANG, JR. AND HIS WIFE, MARY D. LANG | JOHN P. BATES | 08/25/1977 | FEE | TWP 2N BLK 34 SEC 2 & 11; SEC 2: SW/4; SEC 11: SW/4; SE/4 | TX | Howard | 461 | 702 | 4860 |
| ADAM BROWN | BIG STAR OIL & GAS LLC | 02/22/2012 | FEE | THE SOUTH HALF (S/2) AND THE NORTHEAST QUARTER (NE/4) OF SECTION 28, BLOCK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 486 ACRES, MORE OR LESS | TX | Howard | 1263 | 665 | 2012-00002233 |
| ALEXANDER FRENCH BANKS, RICHARD ASWORTH BANKS, JAMES DURINGER BANKS C/O BANK ONE TRUST COMPANY, N.A., AGENT | OGX RESOURCES LLC | 07/24/2006 | FEE | SE/4 BELOW 7,134' AND SW/4 OF SEC 40, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1038 | 196 | 00000812 |
| ALICE ANN BROWN | OGX RESOURCES | 07/20/2006 | FEE | SW/4 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1016 | 104 | 00003765 |
| ALICE ANN BROWN, SSP | CLEAR WATER, INC. | 09/21/2009 | FEE | W/2 SEC 43, BLK 33, T-2-N, T&P & RY CO SURVEY | TX | Howard | 1153 | 542 | 200900004823 |
| ALICE ANN GRANTHAM | RBP LAND COMPANY | 12/04/2009 | FEE | E/2 SE/4 SECTION 33, BLOCK 33, T-2-N, T&P RR. CO. SURVEY | TX | Howard | 1171 | 760 | |
| AMY M BLEDSOE | BREITBURN OPERATING LP | 06/25/2015 | FEE | S/2 S/2 NE/4 OF SECTION 31, BLOCK 33, T-20N, T&P RY CO SURVEY, CONTAINING 40 ACRES | TX | Howard | 1466 | 783 | 2015-00004735 |
| ANDRES PERCHES | BREITBURN OPERATING LP | 07/21/2014 | FEE | SW/4 SW/4 OF SECTION 18, BLOCK 33, T-2-N, HOWARD COUNTY, TX | TX | Howard | 1409 | 77 | 2014-00005487 |
| ANN LAND ALEXANDER | CROWNROCK, LP | 05/15/2010 | FEE | THE E/80 ACRES OF THE W/215 ACRES OF THE S/2 OF SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1183 | 378 | |
| ANN LAND ALEXANDER | RBP LAND COMPANY | 10/30/2009 | FEE | SE/4 SECTION 33, BLOCK 33, T-2-N, T&P RR. CO. SURVEY | TX | Howard | 1171 | 754 | |
| ANN LAND ALEXANDER | STEVENS & TULL DEVELOPMENT LT | 03/28/2007 | FEE | W/2 N/66 2/3 N/200 W/2 SECTION 49, IN BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1056 | 210 | |
| ANN LAND ALEXANDER | CROWNROCK, LP | 04/23/2010 | FEE | TR 2 NE/4 AND TR 4 W/2, SEC 32, BLK 33, T-2-N, T&P RY CO SURVEY, HOWARD COUNTY, TX, CONT 104.20 ACS, M/L | TX | Howard | 1177 | 600 | |
| ANN PRICE | CROWNROCK, LP | 07/11/2011 | FEE | EAST 65AC OF SE/4, SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1237 | 672 | |
| Annie Elaine Potter, Trustee of the Annie Elaine Potter Living Trust | Brigham Oil & Gas, LP | 4/10/2001 | Fee | Northeast Quarter (NE/4), Sec 31, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 836 | 649 | |
| AUGUST PETERSON | CROWNROCK, LP | 11/14/2011 | FEE | T&P RR CO, T2N, BLK 33, SEC 32☐ TR1: E 85.286 ACS LOTS 8-9☐ TR2: W 19.62 ACS LOTS 8-9☐ HOWARD CO, TX | TX | Howard | 1265 | 651 | |
| AUSTIN TRUST COMPANY, LINDLEY COLE TURNER AND MATTHEW GARRETT TURNER, CO-TRUSTEES OF THE LINDLEY COLE TURNER TRUST UNDER THE WILL OF DOROTHY ANN TURNER, DECEASED. | PARTEE DRILLING, INC. | 09/09/2010 | FEE | T2N, BLK 33☐ SEC 38: E/2☐ T&P RY CO SURVEY☐ HOWARD COUNTY, TEXAS | TX | Howard | 1194 | 608 | |
| AUSTIN TRUST COMPANY, LINDLEY COLE TURNER AND MATTHEW GARRETT TURNER, CO-TRUSTEES OF THE MATTHEW GARRETT TURNER TRUST UNDER THE WILL OF DOROTHY ANN TURNER, DECEASED. | PARTEE DRILLING, INC. | 09/09/2010 | FEE | T2N, BLK 33☐ SEC 38: E/2☐ T&P RY CO SURVEY, HOWARD COUNTY, TEXAS | TX | Howard | 1194 | 594 | |
| BARBARA ANN WILLIAMS WRIGHT | CROWNROCK LP | 01/25/2013 | FEE | T2N BLK 33☐ SEC 33: E/2 SE/4☐ T&P RR CO SURVEY☐ HOWARD CO. TX☐ CONT 80 ACS M/L | TX | Howard | 1315 | 56 | |
| BARBARA CLARK | OGX RESOURCES LLC | 06/16/2006 | FEE | NE/4 OF SECTION 40, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1013 | 229 | 0000321 |
| BARBARA ELIZABETH WILLIAMS | CROWNROCK LP | 01/11/2013 | FEE | T2N, BLK 33☐ SEC 33: E/2 SE/4☐ T&P RR CO SURVEY☐ HOWARD CO, TX☐ CONT 80 ACS M/L | TX | Howard | 1315 | 52 | 2013-00000966 |
| BARBARA J BUNDY, TRUSTEE OF THE BARBARA J BUNDY TRUST UNDER TRUST AGREEMENT DATED MAY 23, 1996, AS AMENDED BY FIRST AMENDMENT DATED JUNE 4. 2004 | SPRING ENERGY CO INC | 05/17/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS CONTAINING 320 ACRES MORE OR LESS | TX | Howard | 1187 | 630 | |
| BARBARA JUNE SHORTES | RBP LAND COMPANY | 12/04/2009 | FEE | E/2 SE/4 SECTION 33, BLOCK 33, T-2-N, T&P RR. CO. SURVEY | TX | Howard | 1171 | 766 | |
| BARBARA L. RIGGS | RBP LAND COMPANY | 11/23/2009 | FEE | T&P RR CO, T2N, BLK 33, SEC 32☐ TR1: E 85.286 ACS LOTS 8-9☐ TR2: W 19.62 ACS LOTS 8-9☐ HOWARD CO, TX | TX | Howard | 1169 | 368 | |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| Barnes, Katherine Janeice, dealing in her separate property, and joined by her husband, Joe D. Barnes | DOUBLE EAGLE DEVELOPMENT, LLC | 12/29/2011 | FEE | SE/4 SEC 7, BLK 33, T-2-N, T&P RY CO SURVEY, HOWARD COUNTY, TX | TX | Howard | 1254 | 201 | 2012-00000717 |
| BAYTECH INC | CROWNROCK | 12/12/2012 | FEE | T2N BLK 34☐ SEC 22: E/2 NE/4☐ T&P RY CO SURVEY☐ HOWARD CO, TX☐ CONT 80 ACS M/L | TX | Howard | 1311 | 317 | |
| BEALL, DOUGLAS SEAN | JPM EOC OPAL, LLC | 7/19/2016 | FEE | E/2 SW/4 SECTION 27, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | HOWARD | 1561 | 471 | 2016-00007873 |
| BEALL, ROBERT E. | JPM EOC OPAL, LLC | 7/18/2016 | FEE | E/2 SW/4 SECTION 27, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | HOWARD | 1561 | 474 | 2016-00007874 |
| BEALL, ROBERT E. AND DOUGLAS SEAN | MPI ENERGY PARTNERS, LP | 12/17/2007 | FEE | SW/4 SECTION 27, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | Howard | 1098 | 762 | 2008-00003570 |
| BETTY RAE THOMAS AND KIRK THOMAS | J CLEO THOMPSON AND JR LP | 07/11/2003 | FEE | N/2 OF SEC 44 & NW/4 OF SECTION 45, BLOCK 33, T&P RR CO SURVEY | TX | Howard | 907 | 36 | 00004574 |
| BETTY RAE THOMAS, IND & TRUSTEE OF THE R.C. THOMAS FAMILY TRUST, KIRK THOMAS, ROBERT CLINE | OGX RESOURCES, LLC | 07/11/2006 | FEE | SE/4 AND S 80 AC OUT OF NE/4 SEC 46, BLOCK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1017 | 240 | 00003919 |
| BETTY SUE WILLIAMS LUCUS | CROWNROCK LP | 01/25/2013 | FEE | T2N BLK 33☐ SEC 33: E/2 SE/4☐ T&P RR CO SURVEY☐ HOWARD CO, TX☐ CONT 80 ACS M/L | TX | Howard | 1313 | 500 | |
| BETTY THOMAS FAMILY, LP, ET AL | DOUBLE EAGLE LONE STAR LLC | 5/12/2016 | Fee | E2 NE4, Sec 44, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 1551 | 694 | |
| BETTY THOMAS FAMILY, LP, ET AL | DOUBLE EAGLE LONE STAR LLC | 5/12/2016 | Fee | E2 NW4, Sec 45, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 1551 | 677 | |
| BILLY BOB BARKER | CROWNROCK, LP | 02/13/2012 | FEE | EAST 65AC OF SE/4, SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1258 | 310 | |
| BILLY BOB BARKER | CROWNROCK, LP | 02/13/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE SE/4 | TX | Howard | 1258 | 310 | 2012-00001454 |
| BILLY DALE MCNEW | OGX RESOURCES LLC | 06/16/2006 | FEE | NE/4 OF SECTION 40, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1013 | 100 | 00003190 |
| BILLY LEE HEARD | CROWNROCK, LP | 03/01/2013 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE SE/4 | TX | Howard | 1317 | 702 | 1387 |
| BILLY M LAMKIN, INDEPENDENT EXECUTOR OF THE ESTATE OF CECIL M LAMKIN, DECEASED | MACK T RESOURCES LP | 11/28/2011 | FEE | NE/4 OF SEC 12, BLOCK 35, T-1-S, T&P RR CO SURVEY | TX | Howard | 1252 | 280 | 2012-00000397 |
| Bob Parks | OGX Resources LLC | 10/10/2006 | FEE | NW/4 Section 33, Block 33, T2N | TX | HOWARD | 1028 | 649 | |
| BOBBIE LEE FRYAR | MPI ENERGY PARTNERS, LP | 05/27/2007 | FEE | THE NORTHEAST QUARTER (NE/4) OF SECTION 8, BLOCK 34, T-1-S, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 160 ACRES MORE OR LESS | TX | Howard | 1054 | 590 | |
| BOBBIE SUE BEALL, DEALING IN HER SOLE AND SEPARATE PROPERTY | R. C. SCHLAGAL | 08/15/2006 | FEE | NE/4 OF SEC 45, BLK 33, T-2-N, T&P RR CO SURVEY,  SAVE & EXCEPT 40 AC | TX | Howard | 1036 | 403 | 00000466 |
| BOBBY CARREL PEMBERTON | CROWNROCK LP | 02/15/2013 | FEE | T2N, BLK 33☐ SEC 33: E/2 SE/4☐ T&P RR CO SURVEY☐ HOWARD COUNTY, TX, CONT 80 ACS M/L | TX | Howard | 1319 | 357 | |
| BOBBY MCNEW | OGX RESOURCES LLC | 06/16/2006 | FEE | ☐ NE/4 OF SECTION 40, BLOCK 33, T-2-N, T&P RR CO SURVEY☐ | TX | Howard | 1012 | 433 | 0000310 |
| BOBBY WELDON WILLIAMS | RBP LAND COMPANY | 12/14/2009 | FEE | E/2 SE/4 SECTION 33, BLOCK 33, T-2-N, T&P | TX | Howard | 1171 | 745 | |
| BRYAN H PHILLIPS | CROWNQUEST OPERATING LLC | 05/18/2010 | FEE | BLK 33, T2N, T&P RY. CO. SURVEY; SEC 20: ALL SAVE AND EXCEPT 80 ACS OF 160 AC POOLING UNIT☐ SEC 21: SW/4☐ HOWARD COUNTY, TX | TX | Howard | 1178 | 264 | |
| BUCHANAN, TREVA LYNN | MPI ENERGY PARTNERS, LP | 2/20/2008 | FEE | SW/4 SECTION 27, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | HOWARD | 1090 | 165 | 00002138 |
| BURLINGTON RESOURCES OIL & GAS | CROWNROCK, LP | 10/01/2011 | FEE | THE EAST HALF (E/2) OF SECTION 22, BLOCK 34, T-2-N, T&P RY CO SURVEY, HOWARD COUNTY, TX, CONTAINING 321 ACRES, MORE OR LESS | TX | Howard | 1241 | 737 | |
| BURLINGTON RESOURCES OIL & GAS COMPANY LP | OGX RESOURCES LLC | 08/08/2006 | FEE | N/2 SEC 42, BLOCK 33, T2N, T&P RR CO SURVEY LESS 47.55 ACRES | TX | Howard | 1031 | 453 | 00006167 |
| C RAY RUSSELL & WIFE, SUE RUSSELL | MAGEE CLIFTON CHALFANT | 05/24/1979 | FEE | N/2 SE/4, SE/4 SE/4, SEC 11, BLOCK 34, T1N, HOWARD COUNTY, TX, BELOW 3,500 FEET SUBSURFACE. | TX | Howard | 483 | 179 | |
| CANDIS WOOD BRADSHAW | STEVENS & TULL DEVELOPMENT LT | 11/14/2011 | FEE | T&P RR CO, T2N, BLK 33, SEC 32☐ TR1: E 85.286 ACS LOTS 8-9☐ TR2: W 19.62 ACS LOTS 8-9☐ HOWARD CO, TX | TX | Howard | 1265 | 643 | |
| CARL J MAYER ET AL | RBP LAND COMPANY | 11/15/2011 | FEE | EAST HALF (E/2) SECTION 22, BLOCK 34, T-2-N, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1253 | 65 | |
| CARL M. POSEY, BY AND THROUGH HIS ATTORNEY-IN-FACT, REBECCA ELKIND | CROWNROCK, LP | 07/24/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1298 | 118 | 7292 |
| CAROLYN RODGERS | OGX RESOURCES LLC | 06/16/2006 | FEE | NE/4 OF SECTION 40, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1015 | 580 | 00003693 |
| CATHEY CARTER | W.B. ROBBINS, III | 06/17/2008 | FEE | TWP 2N BLK 33 SEC 42; N/2SE/4 | TX | Howard | 1113 | 545 | 2008-00005970 |
| Cecial Allred | CrownRock, L.P. | 4/24/2007 | FEE | The SE/4 of Section 6, Block 33, T-2-N, T&P Ry. CO. Survey | TX | HOWARD | 1048 | 8 | |
| CHARLES ROY WILLIAMS | RBP LAND COMPANY | 10/27/2009 | FEE | SE/4 SECTION 33, BLOCK 33, T-2-N, T&P RR. CO. SURVEY | TX | Howard | 1171 | 751 | |
| CHARLES WILLIAMS | STEVENS & TULL DEVELOPMENT LT | 05/04/2007 | FEE | THE E/80 ACRES OF THE E/160 ACRES OF THE W/215 ACRES OF THE S/2 OF SECTION 48 AND THE EAST 30 ACRES OF THE NE/4 SECTION 48; AND THE NORTH 66 2/3RDS ACRES OF THE NORTH 200 ACRES OF THE W/2 SECTION 49, ALL IN BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1056 | 186 | |
| CHARLES WILLIAMS | CROWNROCK, LP | 04/23/2010 | FEE | TRACT 2 OF THE NE/4 AND TRACT 4 OF THE W/2, EACH OF SECTION 32, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | Howard | 1177 | 606 | |
| CHRISTOPHER NEIL DUNAGAN | SPRING ENERGY CO INC | 08/09/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS CONTAINING 320 ACRES MORE OR LESS | TX | Howard | 1193 | 201 | |
| CLARENCE SCHAEFER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CLEAR WATER INC | 07/18/2009 | FEE | SE/4 OF SEC 41, BLK 33, T-2-N, T & P RY CO SURVEY | TX | Howard | 1148 | 12 | |

Historical Divisions, L
Oil and Gas Lease Schedule

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| CLARK, POLLY | MPI ENERGY PARTNERS, LP | 3/7/2008 | FEE | SW/4 SECTION 27, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | HOWARD | 1091 | 142 | 00002307 |
| CLAUDETTE MULLEN | CROWNROCK, LP | 07/11/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1298 | 127 | 7295 |
| CLAY INGRAM AND WIFE, MARY BETH INGRAM. | MPI ENERGY PARTNERS, LP | 08/09/2007 | FEE | SW/4 SEC 21, BLOCK 33, T2N, T&P RY. CO. SURVEY, CONT 160 ACS M/L. | TX | Howard | 1070 | 420 | |
| CLAY INGRAM AND WIFE, MARY BETH INGRAM. | MPI ENERGY PARTNERS, LP | 08/09/2007 | FEE | SEC 20, BLK 33, T2N, T&P RY. CO. SURVEY, SAVE & EXCEPT 80 ACS OUT OF A 160 ACRE POOLING UNIT AROUND THE PHILLIPS UNIT #1 WELL, CONT 575 ACS M/L. | TX | Howard | 1070 | 410 | |
| CLIFTON FRANCIS TALBOT | MPI ENERGY PARTNERS, LP | 11/17/2006 | FEE | T-2-N BLK 34⬜ SEC 26: S/2⬜ T&P RY CO SURVEY, CERT NO. 2181, HOWARD CO, TEXAS, CONT 328.8 ACS M/L | TX | Howard | 1034 | 685 | |
| CLINTON C DUNAGAN | SPRING ENERGY CO INC | 08/09/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1193 | 648 | |
| CLINTON F DUNAGAN | SPRING ENERGY CO INC | 08/02/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1194 | 659 | |
| CURTIS SNEAD | CROWNROCK, LP | 01/19/2012 | FEE | EAST 65AC OF SE/4, SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1257 | 161 | |
| CURTIS SNEAD | CROWNROCK, LP | 01/19/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE SE/4 | TX | Howard | 1257 | 161 | 2012-00001263 |
| DALE KERWIN BROWN | BIG STAR OIL & GAS LLC | 03/10/2012 | FEE | THE SOUTH HALF (S/2) AND THE NORTHEAST QUARTER (NE/4) OF SECTION 28, BLOCK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 486 ACRES, MORE OR LESS | TX | Howard | 1270 | 79 | 2012-00003122 |
| DANNY J MEEK | SPRING ENERGY CO INC | 08/25/2010 | FEE | NORTH HALF (N/2) OF SECTION 34, BLOCK 33, T-2-N, T&P RR SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 324.4 ACRES MORE OR LESS | TX | Howard | 1194 | 651 | |
| DAVID A. JACOBSON | CROWNROCK, LP | 03/05/2013 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1364 | 567 | 2013-00008452 |
| DAVID FREEL MORSE, AS HIS SOLE AND SEPARATE PROPERTY | CROWNROCK LP | 12/12/2008 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1128 | 777 | 2009-00000867 |
| DAVID HILLES III | DWR OIL COMPANY | 03/12/2004 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 928 | 269 | 00001610 |
| DAVID RAY WILLIAMS | CROWNROCK LP | 11/29/2012 | FEE | T2N, BLOCK 33:⬜ SEC 33: E/2 SE/4⬜ T&P RR CO SURVEY⬜ HOWARD CO, TX:⬜ CONT 80 ACS M/L | TX | Howard | 1313 | 489 | |
| DEER SIBLINGS 2005 MINERAL MANAGEMENT TRUST DATED 5/18/2005, COMERICA BANK TRUSTEE | BREITBURN OPERATING, LP | 01/12/2015 | FEE | SW/4 SECTION 17, BLOCK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1441 | 296 | 2015-00001214 |
| DENNIS JACOBSON | CROWNROCK, LP | 07/24/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1298 | 124 | 7294 |
| DEWEY DWAYNE HODNETT, SSP | CLEAR WATER, INC. | 09/21/2009 | FEE | W/2 SEC 43 | TX | Howard | 1153 | 530 | 2009-00004821 |
| DONALD SCOTT | SLB LAND SERVICES, LLC | 06/01/2009 | FEE | T&P RR CO SY, T-2-N, BLK 34, SEC. 11: S/2NE/4, HOWARD COUNTY, TEXAS | TX | Howard | 1153 | 728 | 2009-00004856 |
| Doris L. Smith and Donna L. King a/k/a Donna L. Smith, Successor Co-Trustees of the Sybil Smith Family Trust u/a/d July 19, 1993 | W.B. ROBBINS, III | 06/17/2008 | FEE | SE/4 SEC 42, BLK 33, T-2-N, T&P RY CO SURVEY, HOWARD COUNTY, TX | TX | Howard | 1113 | 534 | 2008-00005969 |
| Doris L. Smith and Donna L. King a/k/a Donna L. Smith, Successor Co-Trustees of the Sybil Smith Family Trust u/a/d July 19, 1993 | W. B. ROBBINS, III | 6/17/2008 | FEE | NE/4 SE/4 Section 42, Block 33 T2N | TX | HOWARD | 1113 | 523 | |
| DORIS L. SMITH AND DONNA L. KING AKA DONNA L. SMITH, SUCCESSOR CO-TRUSTEES OF THE SYBIL SMITH FAMILY TRUST UAD | W.B. ROBBINS, III | 06/17/2008 | FEE | TWP 2N BLK 33 SEC 42; N/2 SE/4; S/2 SE/4 | TX | Howard | 1113 | 523 | 2008-00005968 |
| DOROTHY CLINE MCKENZIE | CROWNROCK, LP | 12/09/2010 | FEE | T&P RR CO, T2N, BLK 33, SEC 32:⬜ TR1: E 85.286 ACS LOTS 8-9⬜ TR2: W 19.62 ACS LOTS 8-9⬜ HOWARD CO, TX | TX | Howard | 1204 | 723 | |
| DOROTHY GARRETT FAMILY PARTNERSHIP, LP & MELINDA SUE PARTEE | PARTEE DRILLING, INC. | 11/10/2010 | FEE | T2N, BLK 22:⬜ SEC 38: E/2:⬜ T&P RY CO SURVEY, HOWARD COUNTY, TX | TX | Howard | 1200 | 78 | |
| DOROTHY M. LITTLE (LIFE ESTATE), WHOSE ADDRESS IS C/O BOB AND SHERRY WALKER, 6 BUSH OAK LANE, WOODLANDS, TX 77380, AS LESSOR | MPI ENERGY PARTNERS, LP | 12/18/2007 | FEE | W/2 AND SE/4 SEC31 BLK 33, T2N, T&P RY. CO. SURVEY, CONT 480 ACS, M/L | TX | Howard | 1083 | 478 | |
| DOROTHY MEALMAN | CROWNROCK, LP | 07/11/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1298 | 130 | 7296 |
| DOUGLAS LLOYD | R. C. SCHLAGAL | 07/25/2006 | FEE | NE/4 OF SEC 45, BLK 33, T-2-N, T&P RR CO SURVEY, SAVE & EXCEPT 40 AC | TX | Howard | 1022 | 30 | 00004582 |
| EDWARD LYNN SNEAD | CROWNROCK, LP | 01/19/2012 | FEE | EAST 65AC OF SE/4, SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1257 | 165 | |
| EDWARD LYNN SNEAD | CROWNROCK, LP | 01/19/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE SE/4 | TX | Howard | 1257 | 165 | 2012-00001264 |
| ELIZABETH FELL OVEN ESTATE, ⬜ HAROLD F OVEN, INDEPENDENT EXECUTOR | BREITBURN OPERATING, LP | 09/24/2013 | FEE | T2N, BLOCK 33:⬜ SEC 6: W/2⬜ T&P RR CO. SURVEY⬜ HOWARD CO., TX | TX | Howard | 1357 | 105 | 2013-00007457 |
| ELLIOTT E RANSOM | MPI ENERGY PARTNERS, LP | 12/18/2007 | FEE | W/2 AND SE/4 OF SEC 31, BLK 33, T-2-N, T&P RY. CO. SURVEY, CONTAINING 480 ACRES, M/L. | TX | Howard | 1083 | 508 | |
| ELOY AND JUANA GARCIA | BREITBURN OPERATING LP | 08/05/2014 | FEE | SW/4 SW/4 OF SECTION 18, BLOCK 33, T-2-N, HOWARD COUNTY, TX | TX | Howard | 1411 | 33 | 2014-00005745 |
| ELYSHA RENEE DUNAGAN | SPRING ENERGY CO INC | 08/02/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1193 | 644 | |
| EMIL MOSBACHER, JR. AND ROBERT MOSBACHER | NORTH AMERICAN ROYALTIES, INC. | 07/23/1980 | FEE | TWP 2N BLK 34 SEC 2 & 11; SEC2: SW/4; SEC 11: SW/4; SE/4 | TX | Howard | 499 | 532 | 4810 |

Historical Divisions 6
Oil and Gas Lease Schedule

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| EP BIRKHEAD, JR AND RETA BURNETT BURKHEAD; CAMILLA BURKHEAD WALLACE AND LAWRENCE WALLACE | CLEAR WATER INC | 07/07/2009 | FEE | SW/4 OF SEC 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1148 | 1 | 2009-00003903 |
| ESTATE OF LUCY MYRLENE ROGERS | SPRING ENERGY CO INC | 12/04/2009 | FEE | THE WEST HALF (W/2) OF SECTION 38, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TX, CONTAINING 326 ACRES, MORE OR LESS | TX | Howard | 1165 | 98 | |
| ESTATE OF RUTH GRANTHAM | SPRING ENERGY CO INC | 02/25/2010 | FEE | ALL OF SECTION 34, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS CONTAINING 646.4 ACRES MORE OR LESS | TX | Howard | 1171 | 180 | |
| ESTATE OF RUTH GRANTHAM | SPRING ENERGY CO INC | 02/25/2010 | FEE | WEST HALF (W/2) OF SECTION 38, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, CONTAINING 326 ACRES, MORE OR LESS | TX | Howard | 1171 | 188 | |
| ESTATE OF ZULA MCCRARY | SPRING ENERGY CO INC | 02/25/2010 | FEE | ALL OF SECTION 34, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS CONTAINING 646.4 ACRES MORE OR LESS | TX | Howard | 1171 | 196 | |
| ESTATE OF ZULA MCCRARY | SPRING ENERGY CO INC | 02/25/2010 | FEE | WEST HALF (W/2) OF SECTION 38, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 326 ACRES, MORE OR LESS | TX | Howard | 1171 | 204 | |
| ESTATE OF ZULA MCCRARY | PARTEE DRILLING, INC. | 08/31/2010 | FEE | T2N, BLK 33☐ SEC 38: E/2☐ T&P RY CO SURVEY☐ HOWARD COUNTY, TEXAS | TX | Howard | 1191 | 660 | |
| ETHYLE SCHAAD | MAGEE CLIFTON CHALFANT | 06/13/1979 | FEE | N/2 SE/4, SE/4 SE/4, SEC 11, BLOCK 34, T1N, HOWARD COUNTY, TX, BELOW 3,500 FEET SUBSURFACE. | TX | Howard | 483 | 300 | |
| EULA MAE PALMER | RBP LAND COMPANY | 06/04/2010 | FEE | ALL OF THE E/56ACRES OF THE S/2 SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1185 | 452 | |
| EVALENA V FISHER | RBP LAND COMPANY | 09/15/2011 | FEE | EAST HALF (E/2) SECTION 22, BLOCK 34, T-2-N, CONTAINING 320 ACRES, T&P RY CO SURVEY | TX | Howard | 1244 | 590 | |
| EZEQUIEL TORRES | BREITBURN OPERATING LP | 11/06/2014 | FEE | SW/4 SW/4 SEC 18, BLK 33, T-2-N, HOWARD COUNTY, TX | TX | Howard | 1418 | 636 | 2014-00006874 |
| FLORENCE KLEIN IRREVOCABLE TRUST CREATED UNDER THE KLEIN FAMILY TRUST DATED 10/1/1971 MINERAL MANAGEMENT TRUST, COMERICA BANK TRUSTEE BY THROUGH, AND UNDER, FARMERS NATIONAL COMPANY, AGENT | BREITBURN OPERATING LP | 01/12/2015 | FEE | SW/4 SECTION 17, BLOCK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1441 | 290 | 2015-00001213 |
| FRANCES FELL MALONE ESTATE, HAROLD F. OVEN, INDEPENDENT EXECUTOR | SPRING ENERGY CO INC | 07/19/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1193 | 652 | |
| FRANCES FELL MALONE ESTATE, HAROLD F OVEN, INDEPENDENT EXECUTOR | BREITBURN OPERATING, LP | 09/16/2013 | FEE | T2N BLOCK 33☐ SEC 6: W/2☐ T&P RR CO. SURVEY☐ HOWARD CO., TX | TX | Howard | 1357 | 107 | 2013-0007458 |
| FRED MARCUS PHILLIPS, TRUSTEE OF THE FRED PHILLIPS REVOCABLE TRUST, EDGAR A. PHILLIPS, FRANCES RINGENER, SANDRA BEARD, DONA SINCLAIR | BREITBURN OPERATING L.P. | 06/20/2013 | FEE | T2N BLOCK 33☐ SEC 19: W/2 SW/4☐ T&P RR CO SURVEY☐ HOWARD CO., TX | TX | Howard | 1367 | 150 | 2013-0008768 |
| FRED MARTIN | J CLEO THOMPSON AND JR LP | 07/11/2003 | FEE | NE/4 OF SEC 44, BLK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 907 | 60 | 00004576 |
| FRED PHILLIPS ET AL | MPI ENERGY PARTNERS, LP | 01/04/2007 | FEE | SE/4 SECTION 18, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, CONTAINING 156 ACRES, MORE OR LESS | TX | Howard | 1037 | 755 | |
| FRED PHILLIPS ET AL | MPI ENERGY PARTNERS, LP | 01/04/2007 | FEE | T-2-N, BLK 33☐ SEC 19: E/2 SW/4, SE/4☐ T&P RY. CO. SURVEY, A-327, HOWARD CO, TX CONT 240 ACS M/L | TX | Howard | 1037 | 735 | |
| FRED PHILLIPS ET AL | MPI ENERGY PARTNERS, LP | 01/04/2007 | FEE | S/2 SECTION 19, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1037 | 735 | |
| FREEMAN, LAYTON | MPI ENERGY PARTNERS, LP | 1/16/2008 | FEE | NW/4 SECTION 27, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | HOWARD | 1090 | 168 | 00002139 |
| FREEMAN, LAYTON | Breitburn Operating LP | 12/31/2016 | FEE | NW/4 SECTION 27, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | HOWARD | 1605 | 354 | |
| FURQUERON-INGRAM LLC, A TEXAS LIMITED LIABILITY COMPANY | BREITBURN OPERATING LP | 12/24/2014 | FEE | E/2 NW/4 AND E/2 SW/4 SECTION 20, BLK 33, T-2-N; W/2 SW/4 SECTION 21☐ T&P RY CO SURVEY | TX | Howard | 1434 | 207 | 2015-00000161 |
| GARY DON NEWSOM | PARTEE DRILLING, INC. | 09/08/2011 | FEE | T2N, BLK 33☐ SEC 38: E/2☐ T&P RY CO SURVEY☐ HOWARD COUNTY, TEXAS, CONT 326 ACS M/L | TX | Howard | 1250 | 766 | |
| Gary W. Ware and Vicky L. Ware | Cobra Exploration Company, LLC | 7/30/2008 | FEE | SW/4, W/2 SE/4 Section 29, Block 33, T2N, T&P Ry. CO. Survey | TX | HOWARD | 1106 | 534 | 4822 |
| Gary W. Ware, et ux Vicky L. Ware | Cobra Oil & Gas Corporation | 5/14/2014 | Fee | South One-Half (S/2), but limited to the Southwest Quarter (SW/4), Sec 17, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 1397 | 718 | 2014-00003780 |
| GEODYNE NOMINEE CORP | CROWNROCK | 09/01/2012 | FEE | T2N BLK 34☐ SEC 22: E/2☐ T&P RY CO SURVEY☐ HOWARD CO., TX☐ CONT 320 ACS M/L | TX | Howard | 1293 | 200 | |
| Georiga M. Haden, Exectrix of the Estate of Nina Loudamy, Dec'd | Parallel Petroleum Corporation | 6/7/1993 | FEE | NE/4, N/2 NW/4 Section 29, Block 33, T2N, T&P Ry. CO. Survey | TX | HOWARD | 683 | 146 | 4434 |
| GERALD RIGGAN | OGX RESOURCES | 08/02/2006 | FEE | SE/4 OF SEC 43, BLK 33, T-2-N, T & P RR CO SURVEY, HOWARD COUNTY, | TX | Howard | 1020 | 169 | 00004291 |
| GERTRUDE MARCELLA MCCANN | VIERSEN & COCHRAN | 11/09/1987 | FEE | S/2 SEC 40, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 613 | 195 | |
| GERTRUDE OLINGER TYSON, A WIDOW | JOHN P. BATES | 07/26/1977 | FEE | TWP 2N BLK 34 SEC 2 & 11; SEC 2: SW/4; SEC 11: SW/4; SE/4 | TX | Howard | 461 | 701 | 4861 |
| GLADYS LAVERNE MORELAND | CROWNROCK LP | 02/15/2013 | FEE | T2N, BLK 33☐ SEC 33: E/2 SE/4☐ T&P RR CO SURVEY☐ HOWARD COUNTY, TX, CONT 80 ACS M/L | TX | Howard | 1317 | 692 | |
| Glen Darwin Grantham | Cobra Oil & Gas Corporation | 5/14/2014 | Fee | South One-Half (S/2), but limited to the Southwest Quarter (SW/4), Sec 17, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 1398 | 347 | 2014-00003823 |

Historical Division 6
Oil and Gas Lease Schedule

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| GLENN FILLINGIM, AS THE DULY APPOINTED RECEIVER, IN CAUSE NO. 44418, TRINITY PRODUCTION CO., V. EMILY MCCANN AND CODY MCCANN | CROWNROCK, LP | 11/19/2007 | FEE | NW/4 OF SEC 40, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1071 | 689 | 00007130 |
| GLORIA SPEAK | STEVENS & TULL DEVELOPMENT LT | 05/01/2007 | FEE | LOT 1 OF THE NE/4 OF SECTION 32, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | Howard | 1056 | 282 | |
| Grace S. Kretschmer, SSP | Choate Company, Inc. | 9/10/1992 | FEE | Insofar and only Insofar as the lease covers the NW/4 Section 28, Block 33, T2N, Howard County, TX | TX | HOWARD | 687 | 609 | |
| Grady L. Grantham, et ux Alice Ann Grantham | Cobra Oil & Gas Corporation | 5/15/2014 | Fee | South One-Half (S/2), but limited to the Southwest Quarter (SW/4), Sec 17, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 1398 | 359 | 2014-00003824 |
| GREGORY DON FISHER | CROWNROCK | 05/22/2012 | FEE | T2N BLK 34☐ SEC 22: E/2☐ T&P RY CO SURVEY☐ HOWARD CO, TEXAS☐ CONT 320 ACS M/L | TX | Howard | 1275 | 685 | |
| GWENDALINE ROGERS (INCLUDES HIS INTEREST AS LIFE TENANT AND ALL INTEREST OWNED BY LESSOR UDNER THE ESTATE OF M A COCKRELL AND ALLIE COCKRELL AND AS TRUSTEE FO THE M A COCKRELL AND ALLIE COCKRELL REVOCABLE LIVING TRUST DATED 7/25/1997) | OGX RESOURCES LLC | 09/27/2006 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1026 | 204 | 00005295 |
| H M MCMILLAN ROYALTY TRUST | SPRING ENERGY CO INC | 06/02/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1187 | 614 | |
| HARLOW ROYALTIES LTD | CROWNROCK, LP | 09/10/2010 | FEE | THE SOUTHEAST QUARTER (SE/4) OF SECTION 5, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 160 ACRES, MORE OR LESS | TX | Howard | 1200 | 375 | |
| HARLOW ROYALTIES, LTD☐ (H ROY TEX, INC. AS GENERAL PARTNER) | BREITBURN OPERATING, LP | 10/25/2013 | FEE | T2N BLOCK 33☐ SEC 5: SE/4☐ T&P RR CO SURVEY☐ HOWARD CO., TX | TX | Howard | 1379 | 434 | 2014-00001051 |
| HAROLD F OVEN, AGENT AND☐ ATTORNEY IN FACT FOR ELIZABETH FELL OVEN, SSP | SPRING ENERGY CO INC | 07/19/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1193 | 656 | |
| HAROLD GAIDA TALBOT | MPI ENERGY PARTNERS, LP | 11/17/2006 | FEE | T-2-N BLK 34☐ SEC 26: S/2☐ T&P RY CO SURVEY, CERT NO. 2181, HOWARD CO, TEXAS, CONT 328.8 ACS M/L | TX | Howard | 1034 | 687 | |
| HAROLD GAIDA TALBOT (AKA GUY TALBOT) | OGX RESOURCES LLC | 08/15/2006 | FEE | N/2 SEC 42, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1026 | 208 | 00005296 |
| HAROLD RIGGAN | OGX RESOURCES LLC | 08/02/2006 | FEE | SE/4 OF SEC 43, BLK 33, T-2-N, T&P RY CO SURVEY, HOWARD COUNTY, TX | TX | Howard | 1020 | 172 | 00004292 |
| HATTIE VEIGH MCELHANNON | STEVENS & TULL DEVELOPMENT LT | 05/01/2007 | FEE | E/65 ACS S/2 AND A 5 ACS TRACT OUT OF THE NW CORNER OF SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1056 | 238 | |
| HOLLY MORGAN AS ATTORNEY IN FACT FOR FLOYD E HEARD | CROWNROCK LP | 01/19/2012 | FEE | E 65 ACS SE/4, SEC 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1255 | 560 | 2012-00000999 |
| HOLLY MORGAN AS ATTORNEY-IN-FACT FOR FLOYD E. HEARD | CROWNROCK LP | 01/19/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE SE/4 | TX | Howard | 1255 | 560 | 2012-00000999 |
| IRVIN H WELCH | SPRING ENERGY CO INC | 08/25/2010 | FEE | NORTH HALF (N/2) OF SECTION 34, BLOCK 33, T-2-N, T&P RR SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 324.4 ACRES MORE OR LESS | TX | Howard | 1200 | 291 | |
| J B SACKETT | MPI ENERGY PARTNERS, LP | 01/02/2007 | FEE | INSOFAR AND ONLY INSOFAR AS SAID LEASE COVERS ALL OF SEC 5, SAVE AND EXCEPT THE NW/4, AND ALL OF SEC 9, SAVE AND EXCEPT THE SE/4, BLOCK 34, T1N, T&P RR CO SURVEY, CONT 960 ACS M/L, HOWARD COUNTY, TEXAS | TX | Howard | 1034 | 628 | 2010-00000136 |
| JACOB EDDIE BROWN, III, INDEPENDENT EXECUTOR UWO JACOB EDDIE BROWN JR | BIG STAR OIL & GAS LLC | 02/22/2012 | FEE | THE SOUTH HALF (S/2) AND THE NORTHEAST QUARTER (NE/4) OF SECTION 28, BLOCK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 486 ACRES, MORE OR LESS | TX | Howard | 1263 | 681 | 2012-00002237 |
| JAMES B SMITH | RBP LAND COMPANY | 11/23/2009 | FEE | TRACT 1: E 85.286 ACS OF LOT 8,9 SEC 32, BLK 33, T2N,T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, AND☐ TRACT 2: W 19.62 ACS OF LOT 8,9 SEC 32, BLK 33, T2N, T&P RY CO SURVEY, HOWARD COUNTY, TX | TX | Howard | 1169 | 374 | |
| JAMES BROOKS AYRES ROBERTSON IV | DWR OIL COMPANY | 03/12/2004 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 932 | 217 | 00002243 |
| JAMES C LEVY | OGX RESOURCES LLC | 06/16/2006 | FEE | 47.56 AC OUT OF THE NW PART OF THE NE/4 OF SEC 42, BLK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1016 | 751 | 00003871 |
| JAMES K MEEK | SPRING ENERGY CO INC | 08/25/2010 | FEE | NORTH HALF (N/2) OF SECTION 34, BLOCK 33, T-2-N, T&P RR SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 324.4 ACRES MORE OR LESS | TX | Howard | 1194 | 655 | |
| JAMES LITTLE ELLIOTT | MPI ENERGY PARTNERS, LP | 12/18/2007 | FEE | W/2 AND SE/4 OF SEC 31, BLK 33, T-2-N, T&P RY. CO. SURVEY, CONT 480 ACS, M/L | TX | Howard | 1083 | 538 | |
| JAMES LLOYD, DEALING IN HIS SOLE AND SEPARATE PROPERTY | R. C. SCHLAGAL | 08/15/2006 | FEE | NE/4 OF SEC 45, BLK 33, T-2-N, T&P RR CO SURVEY, SAVE AND EXCEPT 40 ACRES | TX | Howard | 1022 | 4 | 00004580 |
| JAMES T WOOD, CANDIS BRADSHAW, BRANDI PETERSON, JOSHUA WOOD | OGX RESOURCES, LLC | 07/11/2006 | FEE | SE/4 AND S 80 AC OUT OF NE/4 OF SEC 46, BLK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1019 | 804 | 00004244 |
| JAMES WILBUR LITTLE | MPI ENERGY PARTNERS, LP | 12/18/2007 | FEE | W/2 AND SE/4 OF SEC 31, BLK 33, T-2-N, T&P RY. CO. SURVEY, CONT 480 ACS, M/L. | TX | Howard | 1083 | 468 | |
| JAMES WOOD | RBP LAND COMPANY | 11/14/2011 | FEE | T&P RR CO, T2N, BLK 33, SEC 32☐ TR1: E 85.286 ACS LOTS 8-9☐ TR2: W 19.62 ACS LOTS 8-9☐ HOWARD CO, TX | TX | Howard | 1265 | 647 | |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| JANE R LANCASTER | SPRING ENERGY CO INC | 05/11/2010 | FEE | THE WEST HALF (W/2) OF SECTION 34, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TX, CONTAINING 323.2 ACRES, MORE OR LESS | TX | Howard | 1180 | 148 | |
| Jane R. Lancaster | Choate Company, Inc. | 10/21/1992 | FEE | NW/4 Section 28, Block 33, T2N, Howard County, TX | TX | HOWARD | 675 | 91 | |
| JANE RANSOM CREASY | MPI ENERGY PARTNERS, LP | 12/18/2007 | FEE | W/2 AND SE/4 OF SEC 31, BLK 33, T-2-N, T&P RY. CO. SURVEY, CONT 480 ACS, M/L | TX | Howard | 1083 | 498 | |
| Jean Harrell Hicks | OGX Resources LLC | 9/26/2006 | FEE | NW/4 Section 33, Block 33, T2N | TX | HOWARD | 1028 | 652 | |
| JEFFREY DANA SHERRILL | CROWNROCK LP | 09/24/2008 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1116 | 208 | 2008-00006438 |
| JERRY COCKRELL (INCLUDES HIS INTEREST AS LIFE TENANT AND ALL INTEREST OWNED BY LESSOR UDNER THE ESTATE OF M A COCKRELL AND ALLIE COCKRELL AND AS TRUSTEE FO THE M A COCKRELL AND ALLIE COCKRELL REVOCABLE LIVING TRUST DATED 7/25/1997) | OGX RESOURCES | 09/27/2006 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1026 | 745 | 00005402 |
| JERRY EUGENE PEMBERTON | CROWNROCK LP | 02/15/2013 | FEE | T2N, BLK 33☐ SEC 33: E/2 SE/4☐ T&P RR CO SURVEY☐ HOWARD COUNTY, TX, CONT 80 ACS | TX | Howard | 1319 | 379 | |
| JO ANNE GAY JORDAN | SPRING ENERGY CO INC | 03/25/2010 | FEE | THE NORTH HALF (N/2) OF SECTION 34, BLOCK 33, T-2-N, T&P RR SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 324.4 ACRES MORE OR LESS | TX | Howard | 1177 | 386 | |
| JOE PAUL BEALL AND LINDA RENE BEALL | BREITBURN OPERATING LP | 06/12/2015 | FEE | N/2 NW/4 AND E/2 NE/4 OF SECTION 41, BLOCK 33, T-2-N, T&P RY CO SURVEY, CONTAINING 160 ACRES, MORE OR LESS | TX | Howard | 1463 | 419 | 2015-00004295 |
| JOE PAUL BEALL AND WIFE, LINDA RENE BEALL | OGX RESOURCES LLC | 10/19/2006 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1027 | 407 | 00005512 |
| JOHN CASEY MORSE, AS HIS SOLE AND SEPARATE PROPERTY | CROWNROCK | 12/12/2008 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1128 | 783 | 2009-00000869 |
| JOHN CURRIE, INDEPENDENT EXECUTOR OF THE ESTATE OF RUTH GRANTHAM, DECEASED | PARTEE DRILLING, INC. | 08/25/2010 | FEE | T2N, BLK 33☐ SEC 38: E/2☐ T&P RR CO SURVEY☐ HOWARD COUNTY, TEXAS | TX | Howard | 1194 | 663 | |
| JOHN N (JACK) LITTLE | MPI ENERGY PARTNERS, LP | 12/18/2007 | FEE | W/2 AND SE/4 OF SEC 31, BLK 33, T-2-N, T&P RY. CO. SURVEY, CONT 480 ACS, M/L | TX | Howard | 1083 | 488 | |
| JOHN SALEH | SPRING ENERGY CO INC | 09/17/2010 | FEE | T2N, BLK 33☐ SEC 34: ALL, T&P RR SURVEY☐ SEC 38: ALL, T&P RY CO SURVEY☐ HOWARD COUNTY, TEXAS CONT 1298.4 ACS M/L | TX | Howard | 1193 | 209 | |
| JOHN STOKES INDIVIDUALLY, AND AS INDEPENDENT CO-EXECUTOR OF THE ESTATE OF ERMA N. HAMILTON, DECEASED | MACK T RESOURCES LP | 12/06/2011 | FEE | SW/4 OF SEC 17, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1252 | 298 | 2012-00000401 |
| JON ROBERT WILLIAMS | CROWNROCK LP | 01/11/2013 | FEE | T2N BLK 33☐ SEC 33: E/2 SE/4☐ T&P RR CO SURVEY☐ HOWARD CO, TX☐ CONT 80 ACS M/L | TX | Howard | 1315 | 48 | 2013-00000965 |
| JONI JACOBSON | CROWNROCK, LP | 07/24/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1298 | 121 | 7293 |
| JONT TYSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | JOHN P. BATES | 07/26/1977 | FEE | TWP 2N BLK 34 SEC 2 & 11; SEC 2: SW/4; SEC 11: SW/4; SE/4 | TX | Howard | 461 | 532 | 4215 |
| JOSEPHINE SHERRILL | CROWNROCK LP | 09/24/2008 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1116 | 211 | 2008-00006439 |
| JOSHUA WOOD | CROWNROCK, LP | 11/14/2011 | FEE | T&P RR CO, T2N, BLK 33, SEC 32:☐ TR1: E 85.286 ACS LOTS 8-9☐ TR2: W 19.62 ACS LOTS 8-9☐ HOWARD CO, TX | TX | Howard | 1265 | 639 | |
| JOY HOWLAND | OGX RESOURCES LLC | 06/16/2006 | FEE | NE/4 OF SECTION 40, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1012 | 707 | 00003145 |
| JUANITA M BATTENFIELD, INDIVIDUALLY AND AS TRUSTEE OF THE BATTENFIELD REVOCABLE FAMILY TRUST | BIG STAR OIL & GAS LLC | 02/22/2012 | FEE | THE SOUTH HALF (S/2) AND THE NORTHEAST QUARTER (NE/4) OF SECTION 28, BLOCK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 486 ACRES, MORE OR LESS | TX | Howard | 1263 | 673 | 2012-00002235 |
| JUDY BROWN | BIG STAR OIL & GAS LLC | 02/22/2012 | FEE | HE SOUTH HALF (S/2) AND THE NORTHEAST QUARTER (NE/4) OF SECTION 28, BLOCK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 486 ACRES, MORE OR LESS | TX | Howard | 1263 | 669 | 2012-00002234 |
| JUDY R MORGAN | EXXON CORPORATION | 03/24/1983 | FEE | N/2 SE/4, SE/4 SE/4, SEC 11, BLOCK 34, T1N, HOWARD COUNTY, TX, BELOW 3,500 FEET SUBSURFACE. | TX | Howard | 535 | 705 | |
| KAREN KAY WILLIAMS HACKNEY | CROWNROCK LP | 01/11/2013 | FEE | T2N, BLOCK 33☐ SEC 33: E/2 SE/4☐ T&P RR CO SURVEY☐ HOWARD CO, TX☐ CONT 80 ACS M/L | TX | Howard | 1313 | 493 | |
| KARL ROY JACOBSON | CROWNROCK, LP | 03/05/2013 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1334 | 33 | 3992 |
| KATHERINE A. JACOBSON | CROWNROCK, LP | 03/05/2013 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1326 | 768 | 2907 |
| KATHERINE L WEIMAN | OGX RESOURCES LLC | 06/16/2006 | FEE | 47.56 AC OUT OF THE NW PART OF THE NE/4 OF SEC 42, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1016 | 755 | 00003872 |
| KATHERINE S PARKER FORMERLY KNOWN AS KINGSTON | MACK T RESOURCES | 11/18/2011 | FEE | NE/4 OF SECTION 12, BLOCK 35, TOWNSHIP 1 SOUTH, ALL BEING T&P RR CO SURVEY | TX | Howard | 1252 | 276 | 2012-00000396 |
| KELLI FARR | CROWNROCK LP | 07/24/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1298 | 115 | 7291 |
| KENNETH RICHARD OLIVAS | CROWNROCK LP | 10/30/2008 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1118 | 508 | 2008-00006850 |
| Kenneth Schuelke et ux | Choate Company, Inc. | 8/5/1992 | FEE | NW/4 Section 28, Block 33, T2N, Howard County, TX | TX | HOWARD | 671 | 84 | |
| KENT NEWSOM | PARTEE DRILLING, INC. | 09/08/2011 | FEE | T2N, BLK 33☐ SEC 38: E/2☐ T&P RR CO SURVEY☐ HOWARD COUNTY, TEXAS, CONT 326 ACS M/L | TX | Howard | 1248 | 35 | |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| KEVIN COCKRELL, INDIVIDUALLY UNDER THE ESTATES OF M A COCKRELL AND ALLIE COCKRELL AND ALL THE REVISIONARY INTEREST UNDER THE LIFE ESTATES OF JERRY COCKRELL AND GWENDOLINE ROGERS) | OGX RESOURCES, LLC | 09/27/2006 | FEE | N/2 OF SEC 41, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1026 | 741 | 00005401 |
| KIRK THOMAS | CLEAR WATER INC. | 07/23/2009 | FEE | TWP 2N BLK 33 SEC 43; NE/4, SURFACE DOWN TO THE BASE OF THE MISSISSIPPIAN FORMATION; NE/4 , BELOW THE BASE OF THE MISSISSIPPIAN FORMATION | TX | Howard | 1151 | 292 | 2009-00004470 |
| KNOTT CHURCH OF CHRIST (FKA GARNER CHURCH OF CHRIST) | BREITBURN OPERATING LP | 07/29/2014 | FEE | 1.0 ACRE, MORE OR LESS, BEING LOCATED IN THE SW/4 SW/4 OF SECTION 18, BLOCK 33, T-2-N, HOWARD COUNTY, TX | TX | Howard | 1430 | 568 | 2014-00008618 |
| KNOTT VOLUNTEER FIRE DISTRICT (KNOTT COMMUNITY VOLUNTEER FIRE DEPARTMENT) | BREITBURN OPERATING LP | 12/11/2014 | FEE | SW/4 SW/4 OF SECTION 18, BLOCK 33, T-2-N, HOWARD COUNTY, TEXAS | TX | Howard | 1430 | 159 | 2014-00008535 |
| KRISTI HOWARD NEWTON | H. L. BROWN OPERATING LLC | 05/19/2004 | FEE | S/2 OF SECTION 40, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 936 | 301 | 00002977 |
| LANA L SALTER AND DAVID E SALTER, TRUSTEES UNDER THE LANA L SALTER LIVING TRUST, DATED APRIL 19, 2001 | R. C. SCHLAGAL | 07/25/2006 | FEE | NE/4 OF SEC 45, BLK 33, T-2-N, T&P RR CO SURVEY, SAVE & EXCEPT 40 AC | TX | Howard | 1022 | 42 | 00004583 |
| LARRY DON SHAW AND LINDA FAYE JOHNSON | MERITAGE ENERGY COMPANY, LLC | 01/01/1901 | FEE | TWP 2N BLK 33 SEC 32; TRACT 8 OF THE W/2 | TX | Howard | 1280 | 815 | 2012-00004800 |
| LAWRENCE W SCOTT | SLB LAND SERVICES, LLC | 06/01/2009 | FEE | T&P RR CO SY, T-2-N, BLK 34, SEC. 11: S/2NE/4, HOWARD COUNTY, TEXAS | TX | Howard | 1153 | 725 | 2009-00004585 |
| LEO BEN VOLLMER LIFE ESTATE | MPI ENERGY PARTNERS, LP | 02/28/2008 | FEE | THE NORTHEAST QUARTER (NE/4) OF SECTION 8, BLOCK 34, T-1-S, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 160 ACRES MORE OR LESS | TX | Howard | 1091 | 196 | |
| LEO WILLIAMS | CROWNROCK, LP | 05/01/2010 | FEE | THE E/80 ACRES OF THE E/160 ACRES OF THE W/215 ACRES OF THE S/2 OF SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1179 | 454 | |
| LEO WILLIAMS | RBP LAND COMPANY | 10/27/2009 | FEE | SE/4 SECTION 33, BLOCK 33, T-2-N, T&P RR. CO. SURVEY | TX | Howard | 1171 | 748 | |
| LEO WILLIAMS | STEVENS & TULL DEVELOPMENT LT | 05/01/2007 | FEE | W/2 N/66 2/3 N/200 W/2, W/2 S/66 2/3RDS N/200 W/2 SECTION 49, ALL IN BLOCK A, BAUER & COCKRELL SURVEY, HOWARD AND MARTIN COUNTIES, TEXAS | TX | Howard | 1056 | 196 | |
| LEO WILLIAMS | CROWNROCK, LP | 04/23/2010 | FEE | TR 2 NE/4 AND TR 4 W/2, SEC 32, BLK 33, T2N, T&P RY. CO. SURVEY | TX | Howard | 1179 | 461 | |
| LESLIE FAY GRANTHAM | SPRING ENERGY CO INC | 06/21/2010 | FEE | ALL OF SECTION 34, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS CONTAINING 646.4 ACRES MORE OR LESS | TX | Howard | 1187 | 631 | |
| LESLIE FAY GRANTHAM | SPRING ENERGY CO INC | 09/15/2010 | FEE | W/2 OF SECTION 38, BLOCK 33, ABSTRACT 1244, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 326 ACRES, MORE OR LESS | TX | Howard | 1193 | 219 | |
| LESLIE FAY GRANTHAM | PARTEE DRILLING, INC. | 09/15/2010 | FEE | T2N, BLK 33☐ SEC 38: E/2☐ T&P RY CO SURVEY☐ HOWARD COUNTY, TEXAS | TX | Howard | 1193 | 193 | |
| LIBBY TURNER SSP | SPRING ENERGY CO INC | 05/17/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1187 | 604 | |
| LINDA BEA CYPERT, SANDRA KAY MCNALLEN | CLEAR WATER | 08/11/2009 | FEE | SE/4 OF SECTION 33, BLOCK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1156 | 491 | 2009-00005162 |
| LINDA BEA CYPERT, SANDRA KAY MCNALLEN, MICHAEL LEE KING | CLEAR WATER, INC. | 08/11/2009 | FEE | NORTH 220 AC OF THE W/2, SEC 39, BLOCK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1151 | 273 | 2009-00004468 |
| LINDA BEA CYPERT, SANDRA KAY MCNALLEN. | CROWNROCK, LP | 05/20/2010 | FEE | TR 2 NE/4, TR4 W/2, TR 5 W/2, SEC 32, BLK 33, T2N, T&P RY. CO. SURVEY, CONT 156.6 ACS, M/L. | TX | Howard | 1182 | 795 | |
| LINDA CYPERT | STEVENS & TULL DEVELOPMENT LT | 05/10/2007 | FEE | W/65 ACS OF THE E/95 ACS OF THE NE/4 AND THE E/80 ACS OF THE E/160 ACS OF THE W/215 ACS OF THE S/2 OF SEC 48; THE N 66 2/3RDS ACS OF THE N 200 ACS OF THE W/2 AND THE MIDDLE 66 2/3RDS ACS OF THE N 200 ACS OF THE W/2 OF SEC 49, ALL IN BLOCK A, BAUER & COCKR | TX | Howard | 1056 | 271 | |
| LINDA GAYLE CADE, INDIVIDUALLY AND AS SUCCESSOR INDEPENDENT EXECUTRIX OF THE ESTATE OF NINA LOUDAMY, DEC'D | SPRING ENERGY CO INC | 01/12/2010 | FEE | W/2 SECTION 29, BLK 33, T2N, T&P RY CO SURVEY, SAVE & EXCEPT 80 AC TRACT OUT OF THE NW/4. | TX | Howard | 1170 | 760 | |
| LINDLEY COLE TURNER | PARTEE DRILLING, INC. | 09/09/2010 | FEE | T2N, BLK 33☐ SEC 38: E/2☐ T&P RY CO SURVEY☐ HOWARD COUNTY, TEXAS | TX | Howard | 1194 | 615 | |
| LISA JO FOWLKES | CROWNROCK, LP | 05/22/2012 | FEE | TRACT 7 OF THE W/2 OF SECTION 32, BLOCK 33, T-2-N, HOWARD COUNTY, TEXAS, CONTAINING 52.4 ACRES, MORE OR LESS. | TX | Howard | 1274 | 513 | 2012-00003847 |
| LORETTA GORDON OHLSON | CROWNROCK LP | 09/24/2008 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1116 | 214 | 2008-00006440 |
| LOU ANN LINDSAY | MPI ENERGY PARTNERS | 12/18/2006 | FEE | SECTION 6, SAVE AND EXCEPT THE NW/4, BLOCK 34, T-1-N, T&P RY CO SURVEY; AND SECTION 9, SAVE AND EXCEPT THE SE/4, BLOCK 34, T-1-N, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 960 ACRES, MORE OR LESS. | TX | Howard | 1037 | 478 | 2010-00000657 |
| LOUISE ELIZABETH SMITH, MORCIE LEE SMITH, JR. , AND SANDRA LOUISE EVANS | CROWNROCK, LP | 08/02/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48: E/65 AC OF THE S/2 | TX | Howard | 1298 | 133 | 7297 |
| Louise Schwennesen | Choate Company, Inc. | 9/10/1992 | FEE | Insofar and only Insofar as the lease covers the NW/4 Section 28, Block 33, T2N, Howard County, TX | TX | HOWARD | 687 | 718 | |
| LUCY BROWN BRANCH | BIG STAR OIL & GAS LLC | 02/22/2012 | FEE | THE SOUTH HALF (S/2) AND THE NORTHEAST QUARTER (NE/4) OF SECTION 28, BLOCK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 486 ACRES, MORE OR LESS | TX | Howard | 1263 | 661 | 2012-00002232 |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| LUPE GUERRA (GUADALUPE S. GUERRA) | BREITBURN OPERATING LP | 07/28/2014 | FEE | SW/4 SW/4 OF SECTION 18, BLOCK 33, T-2-N, HOWARD COUNTY, TEXAS | TX | Howard | 1408 | 675 | 2014-00005432 |
| M.H. BROWN AND D.L. BROWN TRUST, MARLIN H. & DOROTHY LOU BROWN, TRUSTEES | BIG STAR OIL & GAS LLC | 02/22/2012 | FEE | THE SOUTH HALF (S/2) AND THE NORTHEAST QUARTER (NE/4) OF SECTION 28, BLOCK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 486 ACRES, MORE OR LESS | TX | Howard | 1263 | 377 | 2012-00002236 |
| MARCIANNE WILLIAMS BILLS | CROWNROCK LP | 01/11/2013 | FEE | T2N BLK 33□ SEC 33: E/2 SE/4□ T&P RR CO SURVEY□ HOWARD CO. TX□ CONT 80 ACS ML | TX | Howard | 1315 | 44 | 2013-00000964 |
| MARGARET LUCILLE STEVENS | SLB LAND SERVICES, LLC | 06/01/2009 | FEE | T&P RR CO SVY, T-2-N, BLK 34, SEC. 11: S/2N/4, HOWARD COUNTY, TEXAS | TX | Howard | 1153 | 722 | 2009-00004854 |
| MARGY KEATON | SPRING ENERGY CO INC | 07/14/2010 | FEE | W/2 OF SECTION 38, BLOCK 33, ABSTRACT 1244, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 326 ACRES, MORE OR LESS | TX | Howard | 1197 | 783 | |
| MARGY KEATON | PARTEE DRILLING, INC. | 07/14/2010 | FEE | T2N BLK 33□ SEC. 38: E/2N 38 T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS CONT 326 ACS M/L | TX | Howard | 1196 | 200 | |
| MARIAN G POSEY | CROWNROCK, LP | 07/29/2011 | FEE | EAST 65AC OF SE/4, SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1237 | 675 | |
| MARILYN ANN DUNAGAN STUBBEMAN | SPRING ENERGY CO INC | 08/02/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1193 | 205 | |
| MARK HILLES | DWR OIL COMPANY | 03/12/2004 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 930 | 228 | 00001926 |
| MARK WAYNE COCKRELL, INDIVIDUALLY UNDER THE ESTATES OF M A COCKRELL AND ALLIE COCKRELL AND ALL THE REVISIONARY INTEREST UNDER THE LIFE ESTATES OF JERRY COCKRELL AND GWENDOLINE ROGERS) | OGX RESOURCES LLC | 09/27/2006 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1026 | 585 | 00005374 |
| MARSHALL & WINSTON INC | CROWNROCK | 11/29/2012 | FEE | T2N BLK 34□ SEC 22: E/2 NE/4□ T&P RY CO SURVEY□ HOWARD CO, TX□ CONT 80 ACS M/L | TX | Howard | 1306 | 427 | |
| MARTIN AND LENITA FRYAR REVOCABLE TRUST | ANTARES ENERGY COMPANY | 10/01/2014 | FEE | E/2 OF THE NE/4 OF SEC 44, BLK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TX | TX | Howard | 1421 | 236 | 2014-00007251 |
| MARTIN FRYAR | J CLEO THOMPSON AND JR LP | 07/11/2003 | FEE | N/2 OF SEC 44 & NW/4 OF SEC 45, BLK 33/34 OF SEC 44, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 907 | 48 | 00004575 |
| MARTIN FRYAR | CLEARWATER, INC | 02/20/2008 | FEE | NW/4 OF SEC 44, BLK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1088 | 557 | 00001832 |
| MARVIN ANTELL AND IRIS ANTELL | RBP LAND COMPANY | 11/15/2011 | FEE | EAST HALF (E/2) SECTION 22, BLOCK 34, T-2-N, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1253 | 68 | |
| MARVIN BATSON | MPI ENERGY PARTNERS, LP | 03/04/2008 | FEE | THE NORTHEAST QUARTER (NE/4) OF SECTION 8, BLOCK 34, T-1-S, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 160 ACRES | TX | Howard | 1091 | 187 | |
| MARY ANN HILLES SQUIRES | ENERQUEST OIL & GAS LTD | 08/27/2007 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1065 | 116 | 00005810 |
| MARY ANN POLLARD | SPRING ENERGY CO INC | 05/17/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1187 | 609 | |
| Mary Ann Shortes and husband Johnny Shortes | Petroleum Royalty Search, Inc | 12/20/2006 | FEE | The North 240 acres of the W/2 of Section 7, Block 33, T-2-N, T&P Ry. Co. Survey | TX | HOWARD | 1037 | 317 | |
| Mary Ann Shortes and husband Johnny Shortes | RBP Land Company | 12/12/2006 | FEE | The N/2 of Section 17, Block 33, T-2-N, T&P Ry. CO. Survey | TX | HOWARD | 1036 | 810 | |
| MARY BETH INGRAM ET AL | CROWNROCK, LP | 02/16/2012 | FEE | NE/4, SW/4 SEC 20, BLK 33, T2N, T&P RY CO SURVEY, SAVE AND EXCEPT 80 ACS OUT OF A 160 ACRE POOLING UNIT AROUND THE PHILLIPS UNIT #1 WELL, BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS IN DESIGNATION OF POOLING UNIT, DATED 4/5/199 | TX | Howard | 1268 | 109 | |
| MARY LANE REYNOLDS | MPI ENERGY PARTNERS, LP | 02/29/2008 | FEE | THE NORTHEAST QUARTER (NE/4) OF SECTION 8, BLOCK 34, T-1-S, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 160 ACRES MORE OR LESS | TX | Howard | 1096 | 393 | |
| MARY LOUISE SCHWENNESEN TRUST | SPRING ENERGY CO INC | 05/10/2010 | FEE | THE WEST HALF (W/2) OF SECTION 34, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TX, CONTAINING 323.2 ACRES, MORE OR LESS | TX | Howard | 1187 | 618 | |
| MARY O THOMAS | SPRING ENERGY CO INC | 05/24/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1187 | 628 | |
| Mary Pauline Sunday Estate | OGX Resources LLC | 10/13/2006 | FEE | NW/4 Section 33, Block 33, T2N | TX | HOWARD | 1028 | 669 | |
| MARY READ WITNERROWD INDIVIDUALLY, AND AS TRUSTEE OF THE TEDDYE J READ TRUST AND THE ANDREW DAVID READ TRUST | MACK T RESOURCES LP | 12/14/2011 | FEE | SW/4 OF SEC 17, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1252 | 290 | 2012-00000399 |
| MARY SUSAN FINCKE | CROWNROCK, L.P. | 07/15/2009 | FEE | T&P RR CO SVY, T-2-N, BLK 34, SEC. 11: N/2 NE/4, HOWARD COUNTY, TEXAS | TX | Howard | 1155 | 360 | 2009-00004981 |
| MATTHEW GARRETT TURNER | PARTEE DRILLING, INC. | 09/09/2010 | FEE | ALL OF SECTION 10, THE SE/4 OF SECTION 3, AND THE W/2 OF SECTION 11, BLOCK 32, T-1-N, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS (MORRIS FARM) | TX | Howard | 1194 | 601 | |
| MEGAN I. SCHROEDER | CROWNROCK, LP | 03/05/2013 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1326 | 765 | 2906 |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| MICHAEL LEE HODNETT | OGX RESOURCES LLC | 04/15/2007 | FEE | SW/4 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY☐ | TX | Howard | 1037 | 594 | 00000683 |
| MICHAEL LEE HODNETT, SSP | CLEAR WATER, INC. | 09/21/2009 | FEE | W/2 SEC 43 | TX | Howard | 1153 | 518 | 2009-00004819 |
| MICHAEL LEE KING | STEVENS & TULL DEVELOPMENT LT | 05/10/2007 | FEE | W/65 ACS OF THE E/95 ACS OF THE NE/4 AND THE E/80 ACS OF THE E/160 ACS OF THE W/215 ACS OF THE S/2 OF SEC 48; THE N 66 2/3RDS ACS OF THE N 200 ACS OF THE W/2 AND THE MIDDLE 66 2/3RDS ACS OF THE N 200 ACS OF THE W/2 OS SEC 49, ALL IN BLOCK A, BAUER & COCKR | TX | Howard | 1056 | 296 | |
| MICHAEL LEE KING | CROWNROCK, LP | 04/23/2010 | FEE | TRACT 2 OF THE NE/4, TRACT 4 OF THE W/2 AND TRACT 5 OF THE W/2, EACH OF SECTION 32, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | Howard | 1178 | 117 | |
| MICHAEL S GORMAN | STEVENS & TULL DEVELOPMENT LT | 05/01/2007 | FEE | ALL OF THE E/65 ACRES OF THE S/2 AND A 5 ACRE TRACT OUT OF THE NW CORNER OF SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1056 | 286 | |
| Michael Tate | OGX Resources LLC | 10/13/2006 | FEE | NW/4 Section 33, Block 33, T2N | TX | HOWARD | 1028 | 646 | |
| MICHELE BLESSNER | J CLEO THOMPSON AND JR LP | 08/11/2003 | FEE | NE/4 OF SEC 44, BLK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 908 | 267 | 00004714 |
| MICKEY H. E. SCHROEDER | CROWNROCK, LP | 10/16/2013 | FEE | BAUER & COCKERILL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1363 | 258 | 2013-00008260 |
| MILDRED BROWN CLARK | BIG STAR OIL & GAS LLC | 02/22/2012 | FEE | THE SOUTH HALF (S/2) AND THE NORTHEAST QUARTER (NE/4) OF SECTION 28, BLOCK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 486 ACRES, MORE OR LESS | TX | Howard | 1263 | 685 | 2012-00002238 |
| MKN INC | SPRING ENERGY CO INC | 06/28/2010 | FEE | SECTION 34, BLOCK 33, ABSTRACT 1244, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 646.4 ACRES, MORE OR LESS | TX | Howard | 1235 | 3 | |
| MKN INC | SPRING ENERGY CO INC | 06/28/2010 | FEE | W/2 OF SECTION 38, BLOCK 33, ABSTRACT 1244, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 326 ACRES, MORE OR LESS | TX | Howard | 1208 | 526 | |
| MKSEA LLC | SPRING ENERGY CO INC | 07/13/2010 | FEE | N/2 OF SECTION 34, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 324.4 ACRES, MORE OR LESS | TX | Howard | 1205 | 88 | |
| MKSEA LLC | SPRING ENERGY CO INC | 07/13/2010 | FEE | S/2 OF SECTION 34, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 322 ACRES, MORE OR LESS | TX | Howard | 1220 | 24 | |
| MONA SUE CORNING | SPRING ENERGY CO INC | 02/08/2010 | FEE | W/2 OF SEC 29, BLK 33, T2N, T&P RY CO SURVEY, SAVE & EXCEPT AN 80 ACRE TRACT OUT OF THE NW4 | TX | Howard | 1170 | 753 | |
| Mona Sue Corning, Individually and as Independent Executrix of the Estate of Lela R. Lumpkin, Dec'd | Parallel Petroleum Corporation | 6/7/1993 | FEE | NE/4, N/2 NW/4  Section 29, Block 33, T2N, T&P Ry. CO. Survey | TX | HOWARD | 687 | 168 | 6120 |
| N. L. RIGGAN | OGX RESOURCES LLC | 08/14/2006 | FEE | SE/4 OF SEC 43, BLK 33, T&P RY CO SURVEY, HOWARD COUNTY | TX | Howard | 1002 | 310 | 00004644 |
| NADINE L HODNETT LIFE ESTATE | SPRING ENERGY CO INC | 08/31/2007 | FEE | ALL OF THE SOUTHEAST QUARTER (SE/4) OF SECTION 23, BLOCK 34, T-2-N, T&P RR CO. SURVEY | TX | Howard | 1066 | 717 | |
| NEWELL W. TATE, INDIVIDUALLY AND AS AGENT AND ATTORNEY-IN-FACT FOR THE FOLLOWING INDIVIDUALS: GARY ALLISON TATE, BERWYN ELLIOTT TATE, MARY LARUE SHANKS, TRUMAN PHILIP TATE, ROGER LYNN TATE, ALAN CRAIG TATE, AND DORA JANELLE THOMAS | CHALFANT PROPERTIES, INC. | 12/01/2008 | FEE | TWP 2N BLK 33 SEC 43; SE/4 | TX | Howard | 1153 | 778 | 2009-00004865 |
| NICOLE COCKRELL CHANEY, INDIVIDUALLY UNDER THE ESTATES OF M A COCKRELL AND ALLIE COCKRELL AND ALL THE REVISIONARY INTEREST UNDER THE LIFE ESTATES OF JERRY COCKRELL AND GWENDOLINE ROGERS) | OGX RESOURCES LLC | 09/27/2006 | FEE | N/2 OF SECTION 41, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1026 | 589 | 00005375 |
| NORA ROSALEE DARNELL | SLB LAND SERVICES, LLC | 06/01/2009 | FEE | T&P RR CO SVY, T-2-N, BLK 34, SEC. 11: S/2NE/4, HOWARD COUNTY, TEXAS | TX | Howard | 1153 | 734 | 2009-00004858 |
| NORA TAYLOR | SLB LAND SERVICES, LLC | 06/01/2009 | FEE | T&P RR CO SVY, T-2-N, BLK 34, SEC. 11: S/2NE/4, HOWARD COUNTY, TEXAS | TX | Howard | 1153 | 731 | 2009-00004857 |
| NORMA J MECKEL | RBP LAND COMPANY | 11/23/2009 | FEE | T&P RR CO, T2N, BLK 33, SEC 32:☐ TR1: E 85.286 ACS LOTS 8-9☐ TR2: W 19.62 ACS LOTS 8-9☐ HOWARD CO, TX | TX | Howard | 1169 | 365 | |
| NORTH CENTRAL OIL CORP. | NORTH AMERICAN ROYALTIES, INC. | 08/09/1980 | FEE | TWP 2N BLK 34 SEC 2 & 11; SEC 2: SW/4; SEC 11: SW/4 | TX | Howard | 501 | 472 | 5595 |
| NOVA GEAN CAUBLE | RBP LAND COMPANY | 12/07/2009 | FEE | E/2 SE/4 SEC 33, BLOCK 33, T2N, T&P RR. CO. SURVEY, HOWARD COUNTY, TX CONT 80 ACS M/L | TX | Howard | 1171 | 769 | |
| O'BENCO III LP | CROWNROCK LP | 01/24/2013 | FEE | T2N BLK 34:☐ SEC 22: E/2 NE/4:☐ T&P RY CO SURVEY☐ HOWARD CO, TX☐ CONT 80 ACS M/L | TX | Howard | 1315 | 34 | |
| OGX RESOURCES LLC | CLEAR WATER INC | 02/15/2007 | FEE | N/2 SEC 42, BLK 33, T-2-N, T&P, SAVE AND EXCEPT 47.56 ACRES | TX | Howard | 1053 | 643 | 00003728 |
| OLA E. STEED, DEALING IN HER SOLE AND SEPARATE PROPERTY | JOHN P. BATES | 07/19/1977 | FEE | TWP 2N BLK 34 SEC 2 & 11; SEC 2: SW/4; SEC 11: SW/4; SE/4 | TX | Howard | 461 | 518 | 4206 |
| ONES A PLASTER | RBP LAND COMPANY | 03/22/2010 | FEE | SE/4 SECTION 33, BLOCK 33, T-2-N, T&P RR. CO. SURVEY | TX | Howard | 1175 | 634 | |
| OTIS NEAL WILLIAMS | RBP LAND COMPANY | 01/13/2010 | FEE | E/2 SE/4 SECTION 33, BLOCK 33, T-2-N, T&P RR. CO. SURVEY | TX | Howard | 1171 | 763 | |
| OWEN D BROWN | BIG STAR OIL & GAS LLC | 02/22/2012 | FEE | THE SOUTH HALF (S/2) AND THE NORTHEAST QUARTER (NE/4) OF SECTION 28, BLOCK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 486 ACRES, MORE OR LESS | TX | Howard | 1263 | 689 | 2012-00002238 |

Historical Division 6
Oil and Gas Lease Schedule

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| OWEN K CARTER | RBP LAND COMPANY | 04/29/2010 | FEE | SE/4 SECTION 33, BLOCK 33, T-2-N, T&P RR CO. SURVEY | TX | Howard | 1177 | 555 | |
| PAMELA DICKEY | DWR OIL COMPANY INC | 11/20/2004 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 955 | 761 | 00006246 |
| PARKER FAMILY FARMS LTD | H L BROWN OPERATING LLC | 06/01/2004 | FEE | SE/4 OF SEC 41, BLK 33, T-2-N, T & P SURVEY | TX | Howard | 940 | 56 | 00003618 |
| PATRICIA KIM STEPHENS | CROWNROCK LP | 11/29/2012 | FEE | T2N, BLOCK 33☐ SEC 33: E/2 SE/4☐ T&P RR CO SURVEY☐ HOWARD CO, TX, CONT 80 ACS M/L | TX | Howard | 1312 | 187 | |
| PATRICIA LYNN HALL, SSP | CLEAR WATER, INC. | 09/21/2009 | FEE | W/2 SEC 43 | TX | Howard | 1155 | 780 | 2009-00005050 |
| PATRICIA MORSE CURTIS AS ATTORNEY IN FACT FOR JOSEPHINE FREEL MORSE | CROWNROCK | 09/24/2008 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1117 | 442 | 2008-00006648 |
| PATRICIA MORSE CURTIS, AS HER SOLE AND SEPARATE PROPERTY | CROWNROCK LP | 12/12/2008 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1128 | 780 | 2009-00000863 |
| PATSY DIANE MASON | CROWNROCK, LP | 01/19/2012 | FEE | EAST 65AC OF SE/4, SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1257 | 157 | |
| PATSY DIANE MASON | CROWNROCK, LP | 01/19/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE SE/4 | TX | Howard | 1257 | 157 | 2012-00001262 |
| PATSY FAYE DOUGLASS | CROWNROCK, LP | 12/01/2011 | FEE | THE NORTHEAST QUARTER (NE/4) AND THE SOUTHWEST QUARTER (SW/4) OF SECTION 20, BLOCK 33, T-2-N, T&P RY. CO. SURVEY. SAVE AND EXCEPT 80 ACRES OUT OF A 160 ACRE POOLING UNIT AROUND THE PHILLIPS UNIT #1 WELL, BEING MORE PARTICULARLY DESCRIBED BY METES & BOUNDS | TX | Howard | 1249 | 172 | |
| PATSY FAYE DOUGLASS | MPI ENERGY PARTNERS, LP | 11/28/2007 | FEE | T2N, BLK 33, T&P RY CO SURVEY☐ SEC 20: NW/4, SE/4☐ SEC 21: SW/4☐ HOWARD COUNTY, TEXAS | TX | Howard | 1086 | 492 | |
| PATSY FAYE DOUGLASS, DEALING IN HER SOLE & SEPARATE PROPERTY | BREITBURN OPERATING, LP | 07/09/2014 | FEE | T2N, BLK 33, T&P RY CO SURVEY☐ SEC 20: NW/4, SE/4☐ SEC 21: SW/4☐ HOWARD CO., TX | TX | Howard | 1410 | 506 | 2014-0005695 |
| PAUL ALBERT FISHER | CROWNROCK | 05/22/2012 | FEE | T2N BLK 34☐ SEC 22: E/2☐ T&P RY CO SURVEY☐ HOWARD CO, TEXAS☐ CONT 320 ACS M/L | TX | Howard | 1275 | 682 | |
| PAULA KRETSCHMER SMITH | SPRING ENERGY CO INC | 09/07/2010 | FEE | WEST HALF (W/2) OF SECTION 34, BLOCK 33, T-2-N, T&P RR SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 323.2 ACRES MORE OR LESS | TX | Howard | 1197 | 787 | |
| Penny Peterson | Cobra Oil & Gas Corporation | 5/15/2014 | Fee | Southwest Quarter (SW/4), Sec 17, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 1428 | 611 | 2014-00008332 |
| PETER B. TYSON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | JOHN P. BATES | 07/26/1977 | FEE | TWP 2N BLK 34 SEC 2 & 11; SEC 2: SW/4; SEC 11: SW/4; SE/4 | TX | Howard | 461 | 531 | 4214 |
| R PATT LILLY | STEVENS & TULL DEVELOPMENT LT | 02/04/2008 | FEE | TRACT 6 OF THE NW/4 OF SECTION 32, BLOCK 33, T-2-N, T&P CO. SY. | TX | Howard | 1085 | 122 | |
| R V PEPPER AND WIFE, VICTORIA R PEPPER | ENERQUEST OIL & GAS LTD | 07/25/2007 | FEE | SE/4 OF SEC 41, BLK 33, T-2-N, T & P RY CO SURVEY | TX | Howard | 1037 | 801 | 00000734 |
| RANDALL MCGEHEE | CROWNROCK, LP | 07/24/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1298 | 106 | 7288 |
| RANDY H FRANCIS | MPI ENERGY PARTNERS, LP | 03/04/2008 | FEE | THE NORTHEAST QUARTER (NE/4) OF SECTION 8, BLOCK 34, T-1-S, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 160 ACRES MORE OR LESS | TX | Howard | 1091 | 199 | |
| RAYMOND STALLINGS | BREITBURN OPERATING LP | 04/01/2015 | FEE | 2 ACRES, MORE OR LESS, BEING THE WELL LOCATION OF BREITBURN'S RAYMOND EULA 30 #1 WELL, SECTION 30, BLK 33, T-2N, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS | TX | Howard | 1512 | 33 | 2016-00000531 |
| RAYMOND STALLINGS AND EULA FAYE STALLINGS (WIFE) | MPI ENERGY PARTNERS, LP | 04/03/2007 | FEE | THE N/2 OF SECTION 30, BLK 33, TOWNSHIP 2 NORTH, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320.0 ACRES, MORE OR LESS | TX | Howard | 1048 | 511 | |
| REBECCA ANN HUITT | CLEAR WATER INC | 08/11/2009 | FEE | E/2NW/4 AND NORTH 60 ACRES OF SW/4 SECTION 39, BLOCK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1149 | 160 | 2009-0004083 |
| RENAE FERGUSON, INDEPENDENT EXECUTRIX OF THE ESTATE OF A.K. GUTHRIE, DECEASED, THE DORIS PIKE GUTHRIE TEXAS TRUST FOR A.K. GUTHRIE, THE DORIS PIKE GUTHRIE TEXAS TRUST FOR MARY LYNNE GUTHRIE PERRY | MACK T RESOURCES, LP | 12/08/2011 | FEE | SW/4 OF SECTION 17, BLOCK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1252 | 284 | 2012-00000398 |
| REXIE R MCNEW | OGX RESOURCES LLC | 06/16/2006 | FEE | NE/4 OF SECTION 40, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1013 | 111 | 00003191 |
| RICHARD COLDIRON, ANNIE ELAINE POTTER. | PIEDRA ENERGY I, LLC | 11/04/2008 | FEE | ALL OF THE SW/4 EXCEPT THE N. 40 ACRES OF THE SW/4 OF SECTION 18, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, CONTAINING 120 ACRES, MORE OR LESS | TX | Howard | 1119 | 156 | |
| RICHARD L SMITH | RBP LAND COMPANY | 12/03/2009 | FEE | T&P RR CO, T2N, BLK 33, SEC 32☐ TR1: E 85.286 ACS LOTS 8-9☐ TR2: W 19.62 ACS LOTS 8-9 | TX | Howard | 1169 | 371 | |
| RICHARD LEE PEMBERTON | CROWNROCK LP | 02/15/2013 | FEE | T2N, BLK 33☐ SEC 33: E/2 SE/4☐ T&P RR CO SURVEY☐ HOWARD COUNTY, TX, CONT 80 ACS M/L | TX | Howard | 1319 | 387 | |
| RICHARD M COLDIRON | BREITBURN OPERATING LP | 06/12/2015 | FEE | S/2 S/2 NE/4 OF SECTION 31, BLOCK 33, T-2-N, T&P RY CO SURVEY, CONTAINING 40 AC, MORE OR LESS | TX | Howard | 1463 | 416 | 2015-00004294 |
| RICHARD MARK COLDIRON AND AMY MARIE BLEDSOE | REDWOOD EXPLORATION COMPANY, LLC | 3/22/2016 | Fee | NW/4 NE/4 & N/2 S/2 NE/4, Sec 31, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 1527 | 752 | 2016-00002872 |
| RICHARD MCGEHEE | CROWNROCK, LP | 07/11/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1298 | 109 | 7285 |
| ROBERT CLINE | RBP LAND COMPANY | 11/02/2009 | FEE | LOTS 8 AND 9, SECTION 32, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, CONTAINING 104.906 ACRES, MORE OR LESS | TX | Howard | 1166 | 602 | |

Historical Divisions 6
Oil and Gas Lease Schedule

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| ROBERT E BEALL, JOE E BEALL, RICHARD COLDIRON, ANNIE ELAINE POTTER. | PIEDRA ENERGY I, LLC | 11/04/2008 | FEE | THE NORTH 200 ACRES OF THE W/2 OF SECTION 18, BLOCK 33, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 200.00 ACRES, MORE OR LESS | TX | Howard | 1119 | 145 | |
| ROBERT E BEALL, JOE PAUL BEALL, LOIS RAE BEALL (INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF JOSEPH E BELL, DECEASED), JILL BEALL CLEMENTS, SHARI JO BEALL | BIG STAR OIL & GAS LLC | 07/12/2012 | FEE | THE SOUTH HALF (S/2) AND THE NORTHEAST QUARTER (NE/4) OF SECTION 28, BLOCK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 486 ACRES, MORE OR LESS | TX | Howard | 1283 | 35 | 2012-00005090 |
| ROBERT E BEALL, ROBERT LYNN BEALL, JOE PAUL BEALL, JILL BEALL CLEMENTS. | PIEDRA ENERGY I, LLC | 11/04/2008 | FEE | NE/4 SECTION 18, BLOCK 33, T-2-N, T&P RY CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 162.0 ACRES, MORE OR LESS | TX | Howard | 1119 | 134 | |
| ROBERT E. BEALL, AMY MARIE BLEDSOE; LOIS RAE BEALL, INDEPENDENT EXECUTRIX OF THE ESTATE OF JOSEPH E. BEALL, DECEASED; AND RICHARD MARK COLDIRON. | CROWNROCK, L.P. | 05/14/2012 | FEE | T&P RY CO SVY, T-2-N, BLK 33, SEC. 18: S/40 OF THE N/200 AC OF THE W/2, HOWARD COUNTY, TEXAS | TX | Howard | 1278 | 253 | 2012-00004406 |
| ROBERT EDWARD OLIVAS | CROWNROCK | 10/30/2008 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1122 | 82 | 2008-00007399 |
| ROBERT F DUKE AND WIFE JUDY ANN DUKE | ENERQUEST OIL & GAS LTD | 01/25/2007 | FEE | SE/4 OF SEC 41, BLK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1037 | 809 | 00000736 |
| ROBERT L. WOOD AND WIFE, MAE WOOD | NORTH AMERICAN ROYALTIES, INC. | 08/05/1980 | FEE | TWP 2N BLK 34 SEC 11; SW/4; SE/4 | TX | Howard | 499 | 635 | 4941 |
| ROBERT M. GAY REVOCABLE TRUST | SPRING ENERGY CO INC | 04/27/2010 | FEE | THE NORTH HALF (N/2) OF SECTION 34, BLOCK 33, T-2-N, T&P RR SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 324.4 ACRES MORE OR LESS | TX | Howard | 1177 | 391 | |
| ROBERT RAY WILLIAMS | ROBERT B. PORTER, JR., TRUSTEE OF T | 07/16/2012 | FEE | T&P RR CO SVY, T-2-N, BLK 33, SEC. 33: E/2SE/4, HOWARD COUNTY, TEXAS | TX | Howard | 1290 | 216 | 6202 |
| Robert W Harrell | OGX Resources LLC | 10/2/2006 | FEE | NW/4 Section 33, Block 33, T2N | TX | HOWARD | 1028 | 666 | |
| ROBERTA M REGAN TESTAMENTARY TRUST | SPRING ENERGY CO INC | 06/01/2010 | FEE | WEST 1/2 OF SECTION 34, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | Howard | 1187 | 597 | |
| ROBINSON FAMILY REVOCABLE TRUST | DOUBLE EAGLE DEVELOPMENT LLC | 11/23/2011 | FEE | NE/4 SEC 6 AND 143.60 AC TRACT OUT OF SEC 43 & 44, BLK 33, T-2-N, T&P RR CO SURVEY, HOWARD COUNTY, TX | TX | Howard | 1271 | 784 | 2012-00003400 |
| RONALD DEAN PEMBERTON | CROWNROCK LP | 02/15/2013 | FEE | T2N, BLK 33: SEC 33: E/2 SE/4 T&P RR CO SURVEY: HOWARD COUNTY, TX, CONT 80 ACS M/L | TX | Howard | 1319 | 353 | |
| ROOSEVELT SHAW | CROWNROCK, LP | 06/15/2010 | FEE | NW/4  AND W/2 NE/4 OF SECTION 19, BLOCK 33, T2N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 240 ACS M/L. | TX | Howard | 1181 | 317 | |
| ROOSEVELT SHAW | BREITBURN OPERATING LP | 02/01/2015 | FEE | 2 ACRES, MORE OR LESS, WELL LOCATION OF BREITBURN'S ROOSEVELT PATSY #15 WELL, SECT 19, BLK 33, T-2-N, T&P RY CO SURVEY, HOWARD COUNTY | TX | Howard | 1512 | 38 | 2016-00000532 |
| ROSETTA PETTY | CROWNROCK, LP | 05/04/2010 | FEE | EAST 80 ACRES PF THE EAST 160 ACRES OF THE WEST 215 ACRES OF THE SOUTH HALF OF SECTION 48, BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1179 | 468 | |
| ROSETTA PETTY | STEVENS & TULL DEVELOPMENT LT | 05/04/2007 | FEE | W/65 ACRES OF THE NE/4 OF SECTION 48 AND E/80 ACRES OF THE E/160 ACRES OF THE W/215 ACRES OF THE S/2 OF SECTION 48 AND THE NORTH 66 2/3RDS ACRES OF THE NORTH 200 ACRES OF THE W/2 OF SECTION 49, ALL IN BLOCK A, BAUER & COCKRELL SURVEY | TX | Howard | 1056 | 213 | |
| ROSETTA PETTY | RBP LAND COMPANY | 11/03/2009 | FEE | SE/4 SECTION 33, BLOCK 33, T-2-N, T&P RR. CO. SURVEY | TX | Howard | 1171 | 757 | |
| ROSETTA PETTY | CROWNROCK, LP | 05/18/2010 | FEE | TR 2 NE/4 AND TR 4 W/2, SEC 32, BLK 33, T2N, T&P RY. CO. SURVEY | TX | Howard | 1179 | 448 | |
| ROY LEE WILLIAMS | CROWNROCK LP | 01/25/2013 | FEE | T2N BLK 33: SEC 33: E/2 SE/4 T&P RR CO SURVEY: HOWARD CO, TX: CONT 80 ACS M/L | TX | Howard | 1313 | 497 | |
| Roy Phillips | Parallel Petroleum Corporation | 8/21/1992 | FEE | S/2 SW/4 Section 20, Block 33, T2N, T&P RR Co. Survey | TX | HOWARD | 685 | 643 | 5717 |
| RUSSELL LEDBETTER | SPRING ENERGY CO INC | 07/14/2010 | FEE | W/2 OF SECTION 38, BLOCK 33, ABSTRACT 1244, T-2-N, T&P RR CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 326 ACRES, MORE OR LESS | TX | Howard | 1200 | 295 | |
| RUSSELL LEDBETTER | PARTEE DRILLING, INC. | 07/14/2010 | FEE | T2N, BLK 33: SEC 38: E/2: T&P RR CO SURVEY: HOWARD COUNTY, TEXAS, CONT 326 ACS M/L | TX | Howard | 1200 | 287 | |
| SAM O WILLIAMS | STEVENS & TULL DEVELOPMENT LT | 05/01/2007 | FEE | THE S/2 OF SECTION 21, BLOCK 34, T-2-N, T&P RR. CO. SURVEY | TX | Howard | 1056 | 235 | |
| SAM SALEH | SPRING ENERGY CO INC | 09/17/2010 | FEE | T2N, BLK 33: SEC 34: ALL, T&P RR SURVEY: SEC 38: ALL, T&P RY CO SURVEY: HOWARD COUNTY, TEXAS CONT 1298.4 ACS M/L | TX | Howard | 1193 | 212 | |
| SAMMIE E WILLIAMS REV TRUST | SLB LAND SERVICES, LLC | 06/01/2009 | FEE | T&P RR CO SVY, T-2-N, BLK 34, SEC. 11: S/2NE/4, HOWARD COUNTY, TEXAS | TX | Howard | 1153 | 737 | 2009-00004859 |
| SANDI L DUNAGAN | SPRING ENERGY CO INC | 08/02/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES MORE OR LESS | TX | Howard | 1193 | 197 | |
| SANDRA KAY MCNALLEN | STEVENS & TULL DEVELOPMENT LT | 05/10/2007 | FEE | THE WEST 65 ACRES OF THE EAST 95 ACRES OF THE NE/4 AND THE E/80 ACRES OF THE E/160 ACRES OF THE W/215 ACRES OF THE S/2 OF SECTION 48; THE NORTH 66 2/3RDS ACRES OF THE NORTH 200 ACRES OF THE W/2 AND THE MIDDLE 66 2/3RDS ACRES OF THE NORTH 200 ACRES OF THE | TX | Howard | 1056 | 251 | |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| Senie Coldiron | Brigham Oil & Gas, LP | 4/10/2001 | Fee | Northeast Quarter (NE/4), Sec 31, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 836 | 660 | |
| SHANA RANEE PICKENS FIELDER | CROWNROCK LP | 02/18/2013 | FEE | T2N, BLOCK 33:□ SEC 33: E/2 SE/4□ T&P RR CO SURVEY□ HOWARD CO, TX:□ CONT 80 ACS M/L | TX | Howard | 1321 | 815 | |
| SHARON CHILDS, SSP | CLEAR WATER, INC | 09/21/2009 | FEE | W/2 SEC 43 | TX | Howard | 1153 | 524 | 2009-00004820 |
| SHARON CHILDS, SUZANNE HUITT, PATRICIA LYNN HALL, DEWEY DWAYNE HODNETT | OGX RESOURCES LLC | 04/15/2007 | FEE | SW/4 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1038 | 392 | 00000865 |
| SHARON MCGEHEE | CROWNROCK, LP | 07/24/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1298 | 112 | 7290 |
| SHARRON HUSSON | OGX RESOURCES LLC | 06/16/2006 | FEE | NE/4 OF SECTION 40, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1013 | 225 | 00003216 |
| STEPHEN ELLIOTT GAY | SPRING ENERGY CO INC | 03/18/2010 | FEE | THE NORTH HALF (N/2) OF SECTION 34, BLOCK 33, T-2-N, T&P RR SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 324.4 ACRES MORE OR LESS | TX | Howard | 1177 | 396 | |
| STOCK NGB LIMITED PARTNERS, LTD | BREITBURN OPERATING LP | 06/22/2015 | FEE | N/2 NW/4 AND E/2 NE/4 OF SECTION 41, BLOCK 33, T-2-N, T&P RY CO SURVEY, CONTAINING 160 ACRES | TX | Howard | 1478 | 362 | 2015-0006284 |
| STOCK NGB LIMITED PARTNERS, LTD AND JOE PAUL BEALL AND WIFE, LINDA RENE BEALL | OGX RESOURCES LLC | 08/18/2006 | FEE | N/2 OF SECTION 41, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1027 | 414 | 00005513 |
| SUE S WILLBANKS TRUST | SPRING ENERGY CO INC | 03/09/2006 | FEE | THE SOUTH HALF (S/2) OF SECTION 17, BLOCK 34, TOWNSHIP-1-NORTH, T&P RY CO SURVEY, HOWARD AND MARTIN COUNTIES, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1005 | 757 | |
| SUSAN ELLIOTT HARMON | MPI ENERGY PARTNERS, LP | 12/18/2007 | FEE | W/2 AND SE/4 OF SEC 31, BLK 33, T-2-N, T&P RY. CO. SURVEY, CONT 480 ACS, M/L. | TX | Howard | 1083 | 528 | |
| SUSAN SMITH | MPI ENERGY PARTNERS, LP | 03/04/2008 | FEE | THE NORTHEAST QUARTER (NE/4) OF SECTION 8, BLOCK 34, T-1-S, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 160 ACRES MORE OR LESS | TX | Howard | 1099 | 14 | |
| SUZAN K WILLIAMS COOPER | CROWNROCK LP | 01/11/2013 | FEE | T2N, BLK 33:□ SEC 33: E/2 SE/4□ T&P RR CO SURVEY□ HOWARD COUNTY, TX, CONT 80 ACS M/L | TX | Howard | 1319 | 375 | |
| SUZANNE HUITT, SSP | CLEAR WATER, INC. | 09/21/2009 | FEE | W/2 SEC 43 | TX | Howard | 1153 | 536 | 2009-00004822 |
| TEJON EXPLORATION CO | CROWNROCK LP | 01/23/2013 | FEE | T2N BLK 34□ SEC 22: E/2 NE/4□ T&P RR CO SURVEY□ HOWARD CO. TX:□ CONT 80 ACS M/L | TX | Howard | 1316 | 63 | |
| TEMPLE JO GRANTHAM | CROWNROCK LP | 12/17/2012 | FEE | T2N BLOCK 33:□ SEC 34: ALL:□ T&P RR CO SURVEY:□ HOWARD CO, TX | TX | Howard | 1326 | 759 | |
| Terry Grantham | Cobra Oil & Gas Corporation | 5/14/2014 | Fee | Southwest Quarter (SW/4), Sec 17, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 1428 | 599 | 2014-00008331 |
| TEXAS ENERGY STAR, LLC; ADAMS LEGACY GROUP; AND PAULA SUE ADAMS | PATRIOT ROYALTY & LAND, LLC | 09/10/2010 | FEE | T&P RY CO SVY, T-3-N, BLK 33, SEC. 29: NW/4, HOWARD COUNTY, TEXAS | TX | Howard | 1196 | 449 | 2010-00005398 |
| THE JEAN BROUGHTON TRUST AND THE G C BROUGHTON FOUNDATION | MPI ENERGY PARTNERS, LP | 12/11/2006 | FEE | INSOFAR AND ONLY INSOFAR AS SAID LEASE COVERS ALL OF SEC 5, SAVE AND EXCEPT THE NW/4, AND ALL OF SEC 9, SAVE AND EXCEPT THE SE/4, BLOCK 34, T1N, T&P RR CO SURVEY, CONT 960 ACS M/L, HOWARD COUNTY, TEXAS. | TX | Howard | 1034 | 637 | 2010-00000137 |
| THE LILLIAN SIMPSON TRUST | SPRING ENERGY CO INC | 06/29/2010 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P TY CO. SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 320 ACRES, MORE OR LESS | TX | Howard | 1190 | 210 | |
| THE LILLIAN SIMPSON TRUST,□ J LARRY NICHOLS TRUSTEE | BREITBURN OPERATING LP | 07/31/2015 | FEE | W/2 OF SECTION 6, BLOCK 33, T-2-N, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS | TX | Howard | 1492 | 353 | 2015-00008348 |
| THE SLK FAMILY TRUST | BREITBURN OPERATING LP | 09/29/2015 | FEE | MULTIPLE TRACTS WITHIN THE NE/4 OF SECT 6, BLOCK 33, T2N, T&P RR CO SURVEY AND SECTIONS 43 & 44, BLOCK 33, T3N, T&P RR CO SURVEY, HOWARD COUNTY, TX | TX | Howard | 1486 | 753 | 2015-00007481 |
| THOMAS D ELLIOTT | MPI ENERGY PARTNERS, LP | 12/18/2007 | FEE | W/2 AND SE/4 OF SEC 31, BLK 33, T-2-N, T&P RY. CO. SURVEY, CONT 480 ACS, M/L. | TX | Howard | 1083 | 518 | |
| THOMAS GRAVES, A SINGLE MAN | JOHN P. BATES | 08/24/1977 | FEE | TWP 2N BLK 34 SEC 2 & 11; SEC 2: SW/4; SEC 11: SW/4; SE/4 | TX | Howard | 461 | 612 | 4441 |
| THOMAS LEO VOLLMER | MPI ENERGY PARTNERS, LP | 02/28/2008 | FEE | THE NORTHEAST QUARTER (NE/4) OF SECTION 8, BLOCK 34, T-1-S, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 160 ACRES MORE OR LESS | TX | Howard | 1091 | 193 | |
| TOM STOKES INDIVIDUALLY, AND AS INDEPENDENT CO-EXECUTOR OF THE ESTATE OF ERMA N HAMILTON, DECEASED | MACK T RESOURCES LP | 12/06/2011 | FEE | SW/4 OF SEC 17, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1252 | 294 | 2012-0000400 |
| TRACY COCKRELL RIVERS (INDIVIDUALLY UNDER THE ESTATES OF M A COCKRELL AND ALLIE COCKRELL AND ALL THE REVISIONARY INTEREST UNDER THE LIFE ESTATES OF JERRY COCKRELL AND GWENDOLINE ROGERS) | OGX RESOURCES LLC | 09/27/2006 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1026 | 581 | 00005373 |
| VALDA GENE CROWDER, AKA JEAN CROWDER | OGX RESOURCES LLC | 06/16/2006 | FEE | NE/4 OF SECTION 40, BLOCK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1013 | 610 | 00003311 |
| VERL D SHAW & IOMA T SHAW TRUSTEES OF THE VERL D SHAW AND IOMA T SHAW REVOCABLE LIVING TRUST. | SPRING ENERGY CO INC | 04/21/2010 | FEE | NE/4 SE/4, SEC 30, BLK 33, ABSTRACT 1333, T2N, T&P RR CO SURVEY, HOWARD COUNTY, TEXAS, CONT 40.4125 ACS M/L | TX | Howard | 1178 | 643 | |
| VERL D SHAW AND IOMA T SHAW REVOCABLE LIVING TRUST | SPRING ENERGY COMPANY, INC. | 04/21/2010 | FEE | T&P RR CO SVY, T-2-N, A-1333, BLK 33, SEC. 30: NE/4SE/4, HOWARD COUNTY, TEXAS | TX | Howard | 1178 | 643 | 2010-00002523 |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| VERL D SHAW AND IOMA T SHAW REVOCABLE LIVING TRUST | MPI ENERGY PARTNERS, LP | 12/19/2007 | FEE | W 19.62 ACS LOTS 8 & 9, SEC 32; E 85.286 ACS LOTS 8 & 9, SEC 32; SE/4 SEC 32; ALL IN BLK 33, T2N, T&P RY CO SURVEY, HOWARD COUNTY, TX. | TX | Howard | 1082 | 137 | |
| Verl D Shaw and Ioma T Shaw Revocable Living Trust | MPI Energy Partners, L.P. | 12/19/2007 | FEE | N/2 SE/4 Section 32, Block 33, T2N | TX | HOWARD | 1082 | 137 | |
| VERL D SHAW AND IOMA T SHAW. | CROWNROCK, LP | 10/19/2009 | FEE | NE/4 OF SECTION 30, BLOCK 33, T-2-N, T&P RY. CO. SURVEY | TX | Howard | 1159 | 246 | |
| Verl D. Shaw and Ioma T. Shaw, Trustees of the Verl D. Shaw and Ioma T. Shaw Revocable Living Trust | Brigham Oil & Gas, LP | 4/24/2001 | Fee | Southeast Quarter of the Southeast Quarter (SE/4 SE/4), Sec 30, BLK 33, T2N, T&P RR Co Survey | TX | Howard | 833 | 317 | |
| VONCILLE MARIE ETHRIDGE | CROWNROCK, LP | 04/01/2010 | FEE | NORTHWEST QUARTER (NW/4) OF SECTION 8, BLOCK 34, T-1-S, T&P RY. CO. SURVEY, HOWARD COUNTY, TEXAS | TX | Howard | 1175 | 405 | |
| W WAYNE GILL AND WIFE MERLE GILL | ENERQUEST OIL & GAS LTD | 01/25/2007 | FEE | SE/4 OF SEC 41, BLK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 1037 | 804 | 00000735 |
| WALKER FARMS LTD | OGX RESOURCES LLC | 04/01/2006 | FEE | S 100 AC OF THE SW/4, SEC 39, BLK 33, T-2-N, HOWARD COUNTY, TX | TX | Howard | 1005 | 355 | 00001852 |
| WALKER FARMS LTD | J CLEO THOMPSON AND J C T JR LP | 07/10/2003 | FEE | W/2 OF SEC 46, BLK 33, T-2-N, T & P RY CO SURVEY | TX | Howard | 905 | 97 | 00004209 |
| WALKER FARMS, LTD | ANTARES ENERGY COMPANY | 05/18/2012 | FEE | S 100 AC OF THE SW/4 OF SEC 39, BLK 33, T-2-N, HOWARD COUNTY, TX | TX | Howard | 1272 | 39 | 2012-00003416 |
| WALTER WOODIE LONG AND WIFE ALICE LONG | STEVENS & TULL DEVELOPMENT LT | 05/01/2007 | FEE | SE/4 SEC 29 AND TRACT 3 OF THE NE/4 OF SEC 32, BLK 33, T2N, T&P RY. CO. SURVEY | TX | Howard | 1056 | 206 | |
| WANDA LEE ROMAN | CLEAR WATER, INC | 07/25/2009 | FEE | SE/4 OF SEC 41, BLK 33, T-2-N, T & P RY CO SURVEY | TX | Howard | 1151 | 284 | 2009-00004469 |
| WARD ACKERT HOWARD | H. L. BROWN OPERATING, LLC | 05/19/2004 | FEE | S/2 OF SEC 40, BLK 33, T-2-N, T & P & RY CO SURVEY | TX | Howard | 936 | 296 | 00002976 |
| WELLS FARGO BANK, N.A. TRUSTEE OF THE SOPHIE BARTLETT MOORE BECK REVOCABLE TRUST AND TRUSTEE OF THE STEPHEN E MOORE REVOCABLE TRUST | BREITBURN OPERATING LP | 04/10/2015 | FEE | N/2 SECTION 41, BLOCK 33, T2N, T&P SURVEY | TX | Howard | 1469 | 146 | 2015-0005004 |
| WELLS FARGO BANK, N.A.TRUSTEE OF THE SOPHIE BARTLETT MOORE BECK REVOCABLE TRUST AND TRUSTEE OF THE STEPHEN E MOORE REVOCABLE TRUST | BREITBURN OPERATING LP | 10/01/2010 | FEE | N/2 SECTION 41, BLOCK 33, T2N, T&P SURVEY | TX | Howard | 1469 | 146 | 2015-0005004 |
| WELLS FARGO BANK, NA TRUSTEE OF THE SOPHIE BARTLETT MOORE REVOCABLE TRUST AND TRUSTEE OF THE STEPHEN E MOORE REVOCABLE TRUST | BREITBURN OPERATING LP | 10/01/2010 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RY CO SURVEY, CONTAINING 320.00 ACRES, MORE OR LESS | TX | Howard | 1463 | 422 | 2015-00004296 |
| WELLS FARGO BANK, NA, TRUSTEE OF THE JEFF AND NADA MAE DAVIS CHARITABLE FOUNDATION | MACK T RESOURCES LP | 01/11/2012 | FEE | NE/4 SECTION 12, BLOCK 35, T-1-S, T&P SURVEY | TX | Howard | 1252 | 274 | 2012-00000395 |
| WELLS FARGO BANK, NA, TRUSTEE OF THE SOPHIE BARLETT MOORE TESTAMENTARY TRUST UWO BC MAN AND THE THE STEPHEN ELLIS MOORE TESTAMENTARY TRUST UWO BC MANN | DWR OIL COMPANY | 03/12/2004 | FEE | N/2 OF SECTION 41, BLOCK 33, T-2-N, T&P RY CO SURVEY | TX | Howard | 935 | 298 | 00002761 |
| WENDELL E SWANN | MACK TO RESOURCES LP | 01/02/2012 | FEE | SW/4 OF SEC 17, BLK 33, T-2-N, T&P RR CO SURVEY | TX | Howard | 1252 | 302 | 2012-00000402 |
| WESLEY JACOBSON | CROWNROCK, LP | 03/05/2013 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 48; E/65 AC OF THE S/2 | TX | Howard | 1334 | 36 | 3993 |
| WEST STAR ENERGY, LLC; ADAMS HERITAGE GROUP; AND CAROL ANN ADAMS. | PATRIOT ROYALTY & LAND, LLC | 09/10/2010 | FEE | T&P RY CO SVY, T-3-N, BLK 33, SEC. 29: NW/4, HOWARD COUNTY, TEXAS | TX | Howard | 1196 | 438 | 2010-00005397 |
| WILLIAM H SMITH | RBP LAND COMPANY | 10/19/2011 | FEE | NE/4 OF SECTION 8, BLOCK 34, T-1-S, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 160 ACRES, MORE OR LESS. | TX | Howard | 1242 | 447 | |
| WILLIAM LANE EDWARDS | MPI ENERGY PARTNERS, LP | 02/29/2008 | FEE | THE NORTHEAST QUARTER (NE/4) OF SECTION 8, BLOCK 34, T-1-S, T&P RY CO SURVEY, HOWARD COUNTY, TEXAS, CONTAINING 160 ACRES MORE OR LESS | TX | Howard | 1096 | 396 | |
| 77 OIL PROPERTIES, INC. | CROWNROCK, LP | 01/15/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 367 | 449 | 699 |
| ABILENE CHRISTIAN UNIVERSITY | PATRIOT ROYALTY & LAND, LLC | 02/05/2010 | FEE | T&P RY CO SVY, T-3-N, BLK 34, SEC. 29: S/2 SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 269 | 94 | 1053 |
| ACCOUNT NO. W00551200, FROST NATIONAL BANK, TRUSTEE | CROWNROCK, LP | 04/19/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 338 | 217 | 1879 |
| ADVENTURE EXPLORATION, LP ☐ ROCA RESOURCE COMPANY, INC. ☐ DAVID SLEDGE ☐ JOHN B. SYPTAK ☐ MARK T. DEHLINGER ☐ RICHARD H. COATS | PATRIOT ROYALTY & LAND, LLC | 05/19/2010 | FEE | T2N, BLK 37☐ SEC 8: SE/4☐ T&P RY CO SVY☐ MARTIN CO, TEXAS | TX | Martin | 273 | 419 | |
| ALICE DANIEL | CROWNROCK, LP | 09/23/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 325 | 127 | 106 |
| ALLEN W. HAMILL, JR. FAMILY PARTNERSHIP | CROWNROCK, LP | 01/24/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 367 | 439 | 696 |
| ALTA BELLE BRISTO, JAMES CULLEN BRISTO, DANIEL GENE BRISTO, AND BENJAMIN JUDD BRISTO | MACK T. RESOURCES, LP | 05/15/2009 | FEE | TWP 3N BLK 34 SEC 26; SE/4 | TX | Martin | 252 | 583 | |
| AMELIA BURCHETT, SSP | CROWNROCK, L.P. | 08/25/2009 | FEE | T&P RR CO SVY, T-1-N, BLK 37, SEC. 34: W/2SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 263 | 535 | 3608 |
| AMELIA ELAINE EILAND, AS HER SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 07/12/2012 | FEE | TWP 1N BLK 36 SEC 19; N/2NW/4 | TX | Martin | 348 | 639 | 2944 |
| American State Bank, Lubbock, Texas, as Trustee of the Loma June Hudgeons Trust | K. Brian Reeves | 9/6/2005 | FEE | SW/4 of Section 39,  Block 34, T-3-N, T&P Ry. CO. Survey | TX | MARTIN | 170 | 165 | |
| American State Bank, Lubbock, Texas, as Trustee of the Loma June Hudgeons Trust | Cobra Oil and Gas Corporation | 9/7/2008 | FEE | S/2 SW/4 of Section 39,  Block 34, T-3-N, T&P Ry. Co. Survey | TX | MARTIN | 237 | 232 | |
| ANGIE BRIDGES, A WIDOW | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 791 | 3812 |
| ANN TOWERS STONE | CROWNROCK, LP | 01/15/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 367 | 436 | 695 |
| ANNA LOUISE GRAVES | CROWNROCK, L.P. | 11/19/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 240 | 317 | 4125 |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| ANNETTE WEARNER, DEALING IN HER SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 09/10/2010 | FEE | TWP 1N BLK 37 SEC 38; NE/4 | TX | Martin | 291 | 137 | 4466 |
| AOG MINERAL PARTNERS, LTD., A TEXAS LIMITED PARTNERSHIP | CROWNROCK, LP | 04/01/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 | TX | Martin | 249 | 356 | 1346 |
| BALONEY FEATHERS, LIMITED | CROWNROCK, LP | 12/08/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 242 | 437 | 215 |
| BANK OF AMERICA, N.A., TRUSTEE OF THE FLORENCE MARIE HALL TRUST | CROWNROCK, L.P. | 06/01/2008 | FEE | T&P RY CO SVY, T-2-N, BLK 37, SEC. 20: SW/4, MARTIN COUNTY, TEXAS. | TX | Martin | 230 | 470 | 2399 |
| BANK OF AMERICA, N.A., TRUSTEE OF THE FLORENCE THELMA HALL TRUST AND AS TRUSTEE. | CROWNROCK, L.P. | 06/01/2008 | FEE | T&P RY CO SVY, T-2-N, BLK 37, SEC. 20: SW/4, MARTIN COUNTY, TEXAS. | TX | Martin | 235 | 670 | 3319 |
| BANK OF AMERICA, N.A., TRUSTEE□ OF THE FLORENCE MARIE HALL TRUST, TRUSTEE OF THE FLORENCE THELMA HALL TRUST AND AS TRUSTEE. | CROWNROCK, L.P. | 09/01/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 35, SEC. 09: E/2 E/2, MARTIN COUNTY, TEXAS. | TX | Martin | 235 | 676 | 3320 |
| BANK OF AMERICA, NA, FRANKLIN THOMPSON FAMILY AGENCY | S.E.S. ENERGY, LTD | 06/29/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 343 | 349 | 2413 |
| BANK OF AMERICA, NA, TRUSTEE OF THE SHELBY ELLIS TRUST | S.E.S. ENERGY, LTD | 03/23/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 335 | 422 | 1516 |
| BARBARA ANN LANE WALTHER | CROWNROCK, L.P. | 12/22/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 245 | 250 | 645 |
| BARBARA G. KIMBROUGH | CROWNROCK, LP | 09/23/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 325 | 144 | 112 |
| BARBARA GUINN | CROWNROCK, LP | 09/23/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 325 | 133 | 108 |
| BARBARA J. LOGGIE, DEALING HEREIN WITH HER SOLE AND SEPARATE PROPERTY, AND BEING THE SOLE HEIR IN AND TO THE EST. OF ROBERT G. LOGGIE, DECEASED | CROWNROCK, LP | 03/05/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 375 | 459 | 1699 |
| BARBARA MEEK HICKMAN, AS HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 06/17/2011 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 466 | 2720 |
| BARBARA SHAW ANDERSON | CROWNROCK, LP | 02/21/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 370 | 688 | 1172 |
| BARBARA SMITH | CROWNQUEST OPERATING, LLC | 04/04/2008 | FEE | T1S, BLK 37;□ SEC 1: NE/4□ T&P RR CO SVY, □ MARTIN COUNTY, TEXAS, CONT 160 ACS M/L | TX | Martin | 226 | 752 | 1746 |
| BAREFOOT MINERALS | CROWNROCK, L.P. | 11/21/2013 | FEE | SE/4, Sec 9, BLK 35, T2N, T&P RR Co. Survey | TX | Martin | 398 | 656 | 140260 |
| BDMC LP | Pioneer Natural Resources USA Inc. | 4/27/2005 | Fee | East 252.74 acres of S/2, Sec 10, BLK 35, T1N, T&P RR Co Survey | TX | Martin | 168 | 333 | 1460 |
| BDMC LP | Pioneer Natural Resources USA Inc. | 7/1/2010 | Fee | East 240 acres of the S/2, Sec 10, BLK 35, T1N, T&P RR Co Survey, SAVE & EXCEPT a 9.68 acre tract out of the SE/4 which is more particularly described by metes and bounds in Warranty Deed recorded in Volume 79, Page 499, of the Deed Records of Martin County, Texas, From a depth of 9,352 feet and below | TX | Martin | 280 | 322 | 2917 |
| BENJAMIN SMITH | CROWNROCK, LP | 02/21/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 370 | 679 | 1169 |
| BETTY JAN VALIQUETTE | PATRIOT ROYALTY & LAND, LLC | 12/22/2009 | FEE | T&P RY CO SVY, T-1-N, BLK 36, SEC. 47: N/2SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 263 | 662 | 3626 |
| BETTY JAN VALIQUETTE, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 11/10/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 240 | 331 | 4132 |
| BETTY JAN VALIQUETTE, DEALING IN HER SOLE AND SEPARATE PROPERTY | S.E.S. ENERGY, LTD | 02/17/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 335 | 406 | 1512 |
| BETTY JAN VALIQUETTE, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 01/07/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 AND THE N/30 ACRES OF THE SE/4 AND S/130ACRES OF THE SE/4 AND W/30 ACRES OF THE NE/4 | TX | Martin | 242 | 311 | 173 |
| BETTY SUE SAPP | CROWNROCK, LP | 05/27/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 320 | 2534 |
| BEVERLY HILBURN BOWMAN AND BERNARD HINES HILBURN, CO-TRUSTEES OF THE BEVERLY HILBURN BOWMAN TRUST AND THE BERNARD HINES HILBURN TRUST | CROWNROCK, LP | 09/06/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 319 | 498 | 3738 |
| BEVERLY J. DILLION, INDIVIDUALLY AND AS EXECUTRIX OF THE EST. OF CARROLL WILLIAM DILLON, DECEASED | CROWNROCK, LP | 03/19/2012 | FEE | TWP 2N BLK 35 SEC 27; S/2 SW/4 | TX | Martin | 344 | 399 | 2471 |
| Bill R. McMorries | Pioneer Natural Resources USA Inc. | 4/27/2015 | Fee | 3.39 acres out of the South Half (S/2) of Section 10, Block 35, Township-1-North, T&P RR Co Survey, being more particularly described by metes and bounds in a Right of Way Easement recorded in Volume 111, Page 50 of the Deed Records of Martin County, Texas, as amended | TX | Martin | 450 | 368 | 1683 |
| BILLIE MILES | PATRIOT ROYALTY & LAND, LLC | 03/31/2010 | FEE | TWP 1N BLK 35 SEC 25; S/2 NW/4 | TX | Martin | 270 | 413 | 1308 |
| BOB KENNEDY | PATRIOT ROYALTY & LAND, LLC | 12/17/2009 | FEE | T&P RY CO SVY, T-1-N, BLK 36, SEC. 47: N/2SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 263 | 666 | 3628 |
| BOB KENNEDY | CROWNROCK, LP | 11/06/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 240 | 337 | 4135 |
| BOB KENNEDY, DEALING JN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 01/05/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 AND THE N/30 ACRES OF THE SE/4 AND S/130ACRES OF THE SE/4 AND W/30 ACRES OF THE NE/4 | TX | Martin | 242 | 25 | 104 |
| BOB P. KENNEDY, DEALING IN HIS SOLE AND SEPARATE PROPERTY | S.E.S. ENERGY, LTD | 02/17/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 330 | 788 | 915 |
| BOBBY HENSON AND WIFE CAROL | CROWNROCK, L.P. | 02/07/2011 | FEE | NE/4 OF SECTION 17, BLOCK 36, T-1-S, T&P RY. CO. SURVEY:□ MARTIN COUNTY, TX | TX | Martin | 298 | 155 | 744 |
| BOLDRICK FAMILY PROPERTIES LP | CROWNQUEST OPERATING, LLC | 06/03/2008 | FEE | T1S, BLK 37;□ SEC 1: NE/4□ T&P RR CO SVY, □ MARTIN COUNTY, TEXAS, CONT 160 ACS M/L | TX | Martin | 234 | 538 | 3108 |
| BREITBURN ENERGY PARTNERS | BREITBURN OPERATING L P | 07/10/2012 | MIN | E/65 ACS SE/4 SEC 48, BLK A, B&C SURVEY, HOWARD AND MARTIN COUNTY, TX | TX | Martin | 366 | 375 | |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| BRENDA FAYE RUSH, DEALING IN HER SOLE AND SEPARATE PROPERTY | K. BRYAN REEVES | 04/27/2007 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 199 | 148 | 1520 |
| BRENT HATCH | PATRIOT ROYALTY & LAND, LLC | 03/31/2010 | FEE | TWP 1N BLK 35 SEC 25; S/2 NW/4 | TX | Martin | 270 | 417 | 1310 |
| BROUGHTON FARM COMPANY, THE JEAN BROUGHTON TRUST AND THE G.C.BROUGHTON FOUNDATION | MPI ENERGY PARTNERS, LP | 03/01/2007 | FEE | N/2 SECTION 10, BLOCK 35, T-1-N, T&P RY CO SURVEY, CONTAINING 331.3 ACRES, MORE OR LESS. | TX | Martin | 197 | 318 | |
| C.B. CHRISTIE | CROWNROCK, LP | 04/29/2010 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 276 | 210 | 2312 |
| CAL FARLEYS BOYS RANCH FOUNDATION WITH AMARILLO NATIONAL BANK AS AGENT | CROWNROCK, LP | 07/11/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 316 | 614 | 3392 |
| CANDACE L. KELLY | CROWNROCK, L.P. | 02/07/2011 | FEE | NE/4 OF SECTION 17, BLOCK 36, T-1-S, T&P RY. CO. SURVEY☐ MARTIN COUNTY, TX | TX | Martin | 299 | 732 | 1028 |
| CARL B. BAILEY, III | CROWNROCK, LP | 07/25/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 316 | 624 | 3394 |
| CAROL BEDWELL | CROWNROCK, L.P. | 02/19/2009 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 18: N/2SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 246 | 536 | 942 |
| CAROL M. MEEK, AS AIF FOR JAMES HOLLIS MEEK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | S.E.S. ENERGY, LTD | 02/17/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 333 | 31 | 1162 |
| CAROLE S. STRAATHOF, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 03/19/2012 | FEE | TWP 2N BLK 35 SEC 27; S/2 SW/4 | TX | Martin | 344 | 383 | 2467 |
| CAROLYN A. MCGUIRE, DEALING IN HER SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 11/03/2011 | FEE | TWP 2N BLK 37 SEC 34; SW/4 | TX | Martin | 328 | 533 | 598 |
| CAROLYN A. MCGUIRE, DEALING IN HER SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 731 | 3792 |
| CAROLYN JOHNSON | PATRIOT ROYALTY & LAND, LLC | 09/23/2010 | FEE | TWP 3N BLK 33 SEC 30; PART OF NW/4 | TX | Martin | 1197 | 41 | 2010-00005487 |
| CARROL D. YATER | CROWNQUEST OPERATING, LLC | 04/18/2008 | FEE | T&P RY CO SVY, T-1-S, BLK 36, SEC. 17: S/2NE/4, MARTIN COUNTY, TEXAS | TX | Martin | 226 | 747 | 1744 |
| CATHERINE GRACE HARRELL | CROWNROCK, LP | 04/11/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 350 | 81 | 3085 |
| CATHRYN CARTWRIGHT | CROWNROCK, LP | 09/23/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 325 | 135 | 109 |
| CECILIA STRAUS DELOACH | CROWNROCK, LP | 05/17/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 310 | 2529 |
| CENTRAL TRUST & INVESTMENT CO., AS TRUSTEE OF THE WILLIAM T. AND DOROTHY L. HENDERSON FAMILY TRUST | S.E.S. ENERGY, LTD | 04/02/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 339 | 449 | 1950 |
| CHARLES B. LOGGIE | CROWNROCK, LP | 08/03/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 317 | 773 | 3527 |
| CHARLES J. CONKLING | CROWNROCK, L.P. | 09/17/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 237 | 640 | 3690 |
| CHERYL TAYLOR, DEALING IN HER SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 740 | 3795 |
| CHRISTINA GAYDEN CARTER | CROWNROCK, LP | 05/03/2010 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 274 | 179 | 2085 |
| CLARENCE A. ROGERS, JR. | CROWNROCK, LP | 07/25/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 316 | 621 | 3393 |
| CLEAR CREEK ROYALTY & LAND, LTD | CROWNQUEST OPERATING, LLC | 05/15/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 35: S/2SW/4, FROM SURFACE DOWN TO BUT NOT INCLUDING 9,500 FT., MARTIN COUNTY, TEXAS | TX | Martin | 231 | 561 | 2622 |
| CLEAR CREEK ROYALTY & LAND, LTD | CROWNQUEST OPERATING, LLC | 05/15/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 35: S/2SW/4, FROM SURFACE DOWN TO BUT NOT INCLUDING 9,500 FT., MARTIN COUNTY, TEXAS | TX | Martin | 231 | 561 | 2622 |
| CLYDE P. VOLLMER | CROWNROCK, LP | 05/27/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 324 | 2536 |
| CONSTANCE BAILEY FALCO | CROWNROCK, LP | 09/07/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 317 | 761 | 3523 |
| CORA HENSON MANAGEMENT, LLC, A TEXAS LIMITED LIABILITY COMPANY, GENERAL PARTNER OF THE CORA HENSON FAMILY PARTNERSHIP, LP | STANDARD PERMIAN, LLC | 09/27/2012 | FEE | TWP 2N BLK 37 SEC 18; N/2 W160 N/2 | TX | Martin | 359 | 285 | 4104 |
| CORA HENSON MANAGEMENT, LLC, A TEXAS LIMITED LIABILITY COMPANY, GENERAL PARTNER OF THE CORA HENSON FAMILY PARTNERSHIP, LP | STANDARD PERMIAN, LLC | 09/27/2011 | FEE | TWP 2N BLK 37 SEC 18; S/2 OF THE W/100 OF THE N/2 | TX | Martin | 322 | 670 | 4035 |
| COURTNEY HOLT COWDEN, JR. | CROWNROCK, LP | 07/15/2011 | FEE | W/2 SEC 60, ABS 336, BLK A, B&C SURVEY, MARTIN CO, TX, S&E 80 AC UNIT CAVE #1060 IN S/2 S/2 NW/4 & N/2 N/2 SW/4 | TX | Martin | 314 | 119 | 3139 |
| COURTNEY HOLT COWDEN, JR. | MANHATTAN PETROLEUM INC | 5/3/2005 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 166 | 436 | |
| COURTNEY HOLT COWDEN, JR. | LEGACY RESERVES OPERATING LP | 11/12/2013 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 395 | 440 | |
| CYNTHIA STRAUS BELL, AKA CYNTHIA BELL, DEALING HEREIN WITH HER SOLE AND SEPARATE PROPERTY, AND BEING THE SOLE HEIR IN AND TO THE EST. OF FRANK STRAUS, DECEASED | CROWNROCK, LP | 05/27/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 318 | 2533 |
| DALE COCHRAN WIGLEY A/K/A DALE C. WIGLEY | CROWNROCK, LP | 04/05/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 338 | 222 | 1880 |
| DANIEL L. CAVE AND SPOUSE, ZADA CAVE | CROWNROCK, LP | 03/21/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 60; S/120 AC OF SW/4 | TX | Martin | 336 | 195 | 1619 |
| DANIEL L. CAVE AND SPOUSE, ZADA CAVE | CROWNROCK, LP | 04/13/2011 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 60: NORTH 120 AC OF THE NW/4, LESS 40 AC, SURFACE TO 11,000' | TX | Martin | 331 | 151 | 942 |
| DANIEL L. CAVE AND WIFE, ZADA CAVE | MANHATTAN PETROLEUM INC | 3/29/2005 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 166 | 428 | |
| DANIEL LEON CAVE | CROWNROCK, L.P. | 10/09/2008 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 07: NW/4, MARTIN COUNTY, TEXAS | TX | Martin | 238 | 471 | 3800 |
| DAVID DALE MAGNIN | CROWNROCK, LP | 10/03/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 359 | 273 | 4100 |
| DAVID SLEDGE | CROWNROCK, LP | 05/01/2011 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 60; S/120 AC OF SW/4 | TX | Martin | 304 | 339 | 1719 |
| DAVID W. SLEDGE AND WIFE, SANDRA L. SLEDGE | LEGACY RESERVES OPERATING LP | 11/12/2013 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 393 | 12 | |
| DENISE SHANK, A WIDOW | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 788 | 3811 |
| DIANE PERKINS, DEALING IN HER SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 746 | 3797 |
| DOLORES J. STOVALL, DEALING IN HER SOLE AND SEPARATE PROPERTY | S.E.S. ENERGY, LTD | 02/27/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 333 | 35 | 1163 |

| Lessor  Full  Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| DONALD E. POLLOCK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 01/06/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 | TX | Martin | 242 | 201 | 149 |
| DONALD L. GRANTHAM | STANDARD PERMIAN, LLC | 06/23/2011 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 433 | 2715 |
| DONALD R GRIMES, SSP | PATRIOT ROYALTY & LAND, LLC | 04/13/2010 | FEE | T1N, BLK 38; SEC 1: E/2 SE/4 T&P RY CO SURVEY, MARTIN COUNTY, TEXAS, CONT 80 ACS M/L | TX | Martin | 271 | 380 | 1518 |
| DONALD R. HORTON AND WIFE, MARTHA E. HORTON | CROWNROCK, LP | 06/27/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 386 | 239 | 3074 |
| DONALD YATES BOWLIN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 08/17/2008 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 46; E/220 AC | TX | Martin | 237 | 616 | 3679 |
| DONNA CRAM MOLER | CROWNROCK, LP | 10/14/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 325 | 141 | 111 |
| DONNA J. SAWYER, INDIVIDUALLY AND AS TRUSTEE OF THE FAMILY TRUST UNDER THE WILL OF JAMES G. SAWYER, DECEASED | CROWNROCK, LP | 12/31/2008 | FEE | TWP 2N BLK 36 SEC 36; NW/4 S&E N/80 AC | TX | Martin | 242 | 203 | 150 |
| DONNY WINSLOW, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 770 | 3805 |
| DONOHOO WYLY SLAUGHTER | CROWNROCK, L.P. | 08/07/2008 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 07: NW/4, MARTIN COUNTY, TEXAS | TX | Martin | 235 | 612 | 3310 |
| DORCHESTER MINERALS, LP | LEWIS B. BURLESON, INC. | 02/01/2010 | FEE | TWP 1N BLK 36 SEC 10; SE/4 | TX | Martin | 267 | 462 | 694 |
| DORIS HULL, ET VIR HOMER HULL | K. BRYAN REEVES | 04/01/2007 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 203 | 187 | 2061 |
| DORIS M HALLANAN REV TRUST | CROWNROCK, L.P. | 04/26/2010 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 276 | 672 | 2400 |
| DOROTHY DEAKINS CHANDLER, AKA DOROTHY D. CHANDLER | CROWNROCK, LP | 06/22/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 314 | 2531 |
| DOWIN O'NEAL, AKA DOWIN SINCLAIR O'NEAL | CROWNROCK, LP | 02/03/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 350 | 84 | 3086 |
| DRAGON SAGE LLC | CARL T. SPEIGHT | 06/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 SURFACE TO 100' BELOW THE MISSISSIPPIAN FORMATION; S/2 NW/4 100' BELOW THE MISSISSIPPIAN FORMATION | TX | Martin | 285 | 779 | 3808 |
| DUCAN H. STONE | CROWNROCK, LP | 01/15/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 369 | 304 | 941 |
| EDWARD G STEWART AND FRANCES A STEWART REVOCABLE TRUST OF 1/22/96 | CROWNQUEST OPERATING, LLC | 04/09/2008 | FEE | T1S, BLK 37 SEC 1: NE/4 T&P RR CO SVY, MARTIN COUNTY, TEXAS, CONT 160 ACS M/L | TX | Martin | 226 | 778 | 1756 |
| ELAINE EILAND, INDIVIDUALLY AND AS TRUSTEE OF THE PAIGE EILAND FAMILY TRUST | CARL T. SPEIGHT | 08/01/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 SURFACE TO 100' BELOW THE MISSISSIPPIAN FORMATION; S/2 NW/4 100' BELOW THE MISSISSIPPIAN FORMATION | TX | Martin | 285 | 722 | 3789 |
| ELAINE SEWELL | CROWNROCK, LP | 01/15/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 369 | 292 | 937 |
| ELIZABETH ANN TROTTER | CROWNROCK, L.P. | 10/23/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 239 | 374 | 3979 |
| ESTATE OF JAMES DAVID CAVE ET AL | CROWNROCK, L.P. | 10/09/2008 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 07: NW/4, MARTIN COUNTY, TEXAS | TX | Martin | 239 | 376 | 3980 |
| EUGENE COLEMAN, AS HIS SOLE AND SEPARATE PROPERTY, AND JOINED HEREIN BY HIS WIFE BRENDA J. COLEMAN | PATRIOT ROYALTY & LAND, LLC | 09/23/2010 | FEE | TWP 3N BLK 33 SEC 30; PART OF NW/4 | TX | Martin | 1197 | 44 | 2010-00005488 |
| EVELYN M. BARFIELD ELROD, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, L.P. | 01/04/2009 | FEE | TWP 1N BLK 35 SEC 15; E/2SE/4 | TX | Martin | 242 | 33 | 108 |
| F.A.E.E. ENTERPRISES | S.E.S. ENERGY, LTD | 02/21/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 333 | 22 | 1161 |
| FAEE ENTERPRISES | PATRIOT ROYALTY & LAND, LLC | 12/16/2009 | FEE | T&P RY CO SVY, T-1-N, BLK 36, SEC. 47: N/2SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 263 | 676 | 3633 |
| FAEE ENTERPRISES | CROWNROCK, LP | 01/12/2009 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 242 | 309 | 172 |
| FAEE ENTERPRISES | CROWNROCK, LP | 01/12/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 AND THE N/30 ACRES OF THE SE/4 AND S/130ACRES OF THE SE/4 AND W/30 ACRES OF THE NE/4 | TX | Martin | 242 | 439 | 216 |
| FIRST FINANCIAL TRUST & ASSET MANAGEMENT COMPANY, N.A. SUCCESSOR TRUSTEE FOR THE SIDNEY RANDALS TESTAMENTARY TRUST | STANDARD PERMIAN, LLC | 06/24/2011 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 472 | 2722 |
| FIRST NATIONAL BANK & TRUST COMPANY OF 12/1/1008 OKMULGEE, TRUSTEE PATRICIA BOYLE YOUNG MANAGEMENT TRUST | CROWNROCK, LP | 12/01/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 240 | 351 | 4139 |
| FLORENCE DANBY ROWE, A/K/A FLORENCE D. ROWE | CROWNROCK, LP | 12/20/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 330 | 354 | 842 |
| FLORENCE MARIE HALL TRUST | CROWNROCK, L.P. | 06/01/2008 | FEE | T&P RY CO SVY, T-2-N, BLK 37, SEC. 20: NW/4, MARTIN COUNTY, TEXAS | TX | Martin | 230 | 476 | 2400 |
| FLORENCE MARIE HALL TRUST | CROWNROCK, L.P. | 07/21/2009 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 232 | 214 | 2755 |
| FLORENCE MARIE HALL TRUST U/A BANK OF AMERICA, N.A., TRUSTEE | CROWNROCK, LP | 03/01/2013 | FEE | TWP 3N BLK 33 SEC 30; NE/4 | TX | Martin | 1327 | 767 | 3056 |
| FOREST E. MCKNIGHT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 725 | 3790 |
| FORREST E. MCKNIGHT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 11/03/2011 | FEE | TWP 1N BLK 37 SEC 34; SW/4 | TX | Martin | 328 | 526 | 597 |
| FRANKLIN STEPHENS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 10/01/2012 | FEE | TWP 2N BLK 37 SEC 18; N/2 W160 N/2 | TX | Martin | 359 | 290 | 4105 |
| FRANKLIN STEPHENS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 09/10/2011 | FEE | TWP 2N BLK 37 SEC 18; S/2 OF THE W/100 OF THE N/2 | TX | Martin | 322 | 674 | 4036 |

Historical Division 6
Oil and Gas Lease Schedule

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| FRED DENNIS CAVE | CROWNROCK, L.P. | 10/09/2008 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 07: NW/4, MARTIN COUNTY, TEXAS | TX | Martin | 238 | 476 | 3801 |
| FREDERICK M. GOLDING, AKA FREDERICK GOLDING, INDIVIDUAL AND AS TRUSTEE OF THE ALINE EILER GOLDING LIVING TRUST, DATED 9/29/1990 | CROWNROCK, LP | 10/03/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 359 | 276 | 4101 |
| G. P. Harrell and wife, Imogene Harrell | John Davis | 6/23/1957 | FEE | NE/4 Section 15 Block 35 T1N | TX | MARTIN | | | 597 |
| G.P. CROSSLEY, D/B/A NATURAL GAS SERVICES | BILL P HARRIS | 4/1/2005 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 166 | 426 | |
| G.P. CROSSLEY, D/B/A NATURAL GAS SERVICES | LEGACY RESERVES OPERATING LP | 10/29/2013 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 393 | 4 | |
| G.P. CROSSLEY, DBA NATURAL GAS SERVICES | CROWNROCK, L.P. | 09/09/2010 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 60; S/120 AC OF SW/4 | TX | Martin | 282 | 695 | 3369 |
| GARY LEE MAYFIELD, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, L.P. | 02/19/2009 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 18: N/2 SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 245 | 248 | 644 |
| GEORGE G. VAUGHT, JR. | CROWNROCK, LP | 02/03/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 338 | 208 | 1876 |
| GEORGE M O'BRIEN | LEGACY RESERVES OPERATING LP | 11/7/2013 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 393 | 15 | |
| GEORGE M. O'BRIEN | CROWNROCK, LP | 09/09/2010 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 60; S/120 AC OF SW/4 | TX | Martin | 282 | 698 | 3370 |
| GEORGE M. O'BRIEN | BILL P HARRIS | 4/1/2005 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 166 | 424 | |
| GEORGE M. SLAUGHTER III | CROWNROCK, L.P. | 08/07/2008 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 07: NW/4, MARTIN COUNTY, TEXAS | TX | Martin | 235 | 609 | 3309 |
| GEORGIA GRAHAM JONES | CROWNROCK, LP | 09/08/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 319 | 477 | 3731 |
| GINGER A. BECKSTEAD, GENERAL PARTNER OF THE ADAMS FAMILY PARTNERSHIP | STANDARD PERMIAN, LLC | 06/23/2011 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 450 | 2717 |
| GREG SADLER, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 09/21/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 SURFACE TO 100' BELOW THE MISSISSIPPIAN FORMATION; S/2 NW/4 100' BELOW THE MISSISSIPPIAN FORMATION | TX | Martin | 285 | 709 | 3785 |
| GRETCHEN BERLY, SSP | CROWNROCK, L.P. | 08/25/2009 | FEE | T&P RR CO SVY, T-1-N, BLK 37, SEC. 34: W/2SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 263 | 538 | 3609 |
| GUY C. HENSON | CROWNQUEST OPERATING, LLC | 05/02/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 35: S/2 SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 226 | 761 | 1749 |
| GUY C. HENSON | CROWNQUEST OPERATING, LLC | 05/02/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 35: S/2 SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 226 | 761 | 1749 |
| GUY MERWYN EILAND, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 08/01/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 SURFACE TO 100' BELOW THE MISSISSIPPIAN FORMATION; S/2 NW/4 100' BELOW THE MISSISSIPPIAN FORMATION | TX | Martin | 285 | 719 | 3788 |
| H.S. MINERALS AND REALTY, LTD. | CROWNROCK, L.P. | 09/16/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 237 | 589 | 3673 |
| HARRY L. GRAHAM | CROWNROCK, LP | 09/08/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 317 | 767 | 3525 |
| HELEN JOY SMITH COMPANY, TOMMY D. SMITH AS ASSISTANT MANAGER | S.E.S. ENERGY, LTD | 03/16/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 335 | 410 | 1513 |
| HILL INVESTMENTS, LTD | CROWNROCK, L.P. | 09/30/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 240 | 345 | 4138 |
| HOMER E. HENSON | CROWNQUEST OPERATING, LLC | 05/02/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 35: S/2 SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 226 | 763 | 1750 |
| HOMER E. HENSON | CROWNQUEST OPERATING, LLC | 05/02/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 35: S/2 SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 226 | 763 | 1750 |
| HUGHLYN TODD ET UX MARSHA JEAN TODD | CROWNQUEST OPERATING, LLC | 04/24/2008 | FEE | T&P RY CO SVY, T-1-S, BLK 36, SEC. 17: S/2NE/4, MARTIN COUNTY, TEXAS | TX | Martin | 226 | 741 | 1742 |
| HUGHLYN TODD, POWER OF ATTORNEY ON BEHALF OF TIM BRISTOW, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNQUEST OPERATING, LLC | 04/24/2008 | FEE | T&P RY CO SVY, T-1-S, BLK 36, SEC. 17: S/2NE/4, MARTIN COUNTY, TEXAS | TX | Martin | 226 | 739 | 1741 |
| IRMA LEE MOORE | CROWNROCK, L.P. | 07/10/2008 | FEE | T&P RR CO SVY, T-2-N, BLK 37, SEC. 21: N/2SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 232 | 779 | 2869 |
| J.B. BURNS, CLYDE BURNS & GEORGE BURNS, AS TRUSTEES FOR MINNIE ALMA ALBERT, A WIDOW, & LAUREL ALBERT, A SINGLE MAN | RAY R. BARRETT | 02/18/1958 | FEE | TWP 3N BLK 34 SEC 17; W/2SE/4, E/2SE/4 | TX | Martin | 29 | 99 | 350 |
| JACKPOT ROYALTY PARTNERSHIP | CROWNROCK, LP | 03/01/2011 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 60; NORTH 120 AC OF THE NW/4, LESS 40 AC, SURFACE TO 11,000' | TX | Martin | 303 | 10 | 1530 |
| JAMES HOLLIS MEEK | PATRIOT ROYALTY & LAND, LLC | 12/18/2009 | FEE | T&P RY CO SVY, T-1-N, BLK 36, SEC. 47: N/2SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 263 | 668 | 3629 |
| JAMES HOLLIS MEEK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 11/13/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 240 | 333 | 4133 |
| JAMES HOLLIS MEEK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 01/09/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 AND THE N/30 ACRES OF THE SE/4 AND S/130ACRES OF THE SE/4 AND W/30 ACRES OF THE NE/4 | TX | Martin | 242 | 207 | 152 |
| JAMES KELLY MEEK | PATRIOT ROYALTY & LAND, LLC | 12/16/2009 | FEE | T&P RY CO SVY, T-1-N, BLK 36, SEC. 47: N/2SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 263 | 672 | 3631 |
| JAMES KELLY MEEK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 11/24/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 240 | 325 | 4129 |
| JAMES KELLY MEEK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | S.E.S. ENERGY, LTD | 03/06/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 336 | 186 | 1616 |

Oil and Gas Lease Schedule

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| JAMES KELLY MEEK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 01/05/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 AND THE N/30 ACRES OF THE SE/4 AND S/130ACRES OF THE SE/4 AND W/30 ACRES OF THE NE/4 | TX | Martin | 242 | 27 | 105 |
| JAMES KENNETH SNODGRASS | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 782 | 3809 |
| JAMES LANCE HOPKINS, AS HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, L.P. | 02/07/2011 | FEE | NE/4 OF SECTION 17, BLOCK 36, T-1-S, T&P RY. CO. SURVEY □ MARTIN COUNTY, TX | TX | Martin | 298 | 420 | 791 |
| JAMES M. DAVIS, SR. AND WIFE, WANDA FAYE DAVIS | BAYTECH LLP | 05/15/2007 | FEE | TWP 3N BLK 35 SEC 25; SE/4 | TX | Martin | 209 | 541 | 3096 |
| JAMES MCKNIGHT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 728 | 3791 |
| JAMES MCKNIGHT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 11/03/2011 | FEE | TWP 2N BLK 37 SEC 34; SW/4 | TX | Martin | 328 | 519 | 596 |
| JAMES P. EDWARDS, AS AGENT AND ATTORNEY-IN-FACT FOR RUTH S. EDWARDS | BRECK OPERATING CORP. | 07/03/2008 | FEE | TWP 1N BLK 36 SEC 10; SE/4 | TX | Martin | 221 | 634 | 852 |
| JAMES PAUL MCHARGUE AS TRUSTEE OF THE MCHARGUE FAMILY TRUST | S.E.S. ENERGY, LTD | 04/12/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 335 | 429 | 1517 |
| JAMES R. DILLON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 03/19/2012 | FEE | TWP 2N BLK 35 SEC 27; S/2 SW/4 | TX | Martin | 344 | 395 | 2470 |
| JAMES R. SMALL | CROWNROCK, LP | 05/01/2011 | FEE | W/2 SEC 60, ABS 336, BLK A, B&C SURVEY, MARTIN CO, TX, S&E 80 AC UNIT CAVE #1060 IN S/2 S/2 NW/4 & N/2 N/2 SW/4 | TX | Martin | 308 | 367 | 2361 |
| JAMES R. SMALL | LEGACY RESERVES OPERATING LP | 11/14/2013 | Fee | N/2 SEC 60, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 394 | 100 | |
| JAMES S. PATTERSON | CROWNROCK, L.P. | 11/19/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS | TX | Martin | 240 | 321 | 4127 |
| JAMES W. LANE | CROWNROCK, L.P. | 12/22/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 245 | 252 | 646 |
| Jane C. Dillon | Pioneer Natural Resources USA Inc. | 2/1/2008 | Fee | S/2, Sec 10, BLK 35, T1N, T&P RR Co Survey | TX | Martin | 219 | 657 | 534 |
| JANE R. LANCASTER, C/O JOHN L. LANCASTER, III | BRECK OPERATING CORP. | 08/17/2007 | FEE | TWP 1N BLK 36 SEC 10; SE/4 | TX | Martin | 221 | 632 | 851 |
| JANET R. WOOLBERT, DEALING IN HER SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 03/19/2012 | FEE | TWP 2N BLK 35 SEC 27; S/2 SW/4 | TX | Martin | 344 | 387 | 2468 |
| JANICE ELROD GAITHER, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, L.P. | 12/10/2008 | FEE | TWP 1N BLK 35 SEC 15; E/2SE/4 | TX | Martin | 242 | 29 | 106 |
| JANICE LLOYD, A WIDOW | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 776 | 3807 |
| JANIE N MALLOY, SSP | PATRIOT ROYALTY & LAND, LLC | 04/13/2010 | FEE | T1N, BLK 38□ SEC 1: E/2 SE/4□ T&P RY CO SURVEY, □ MARTIN COUNTY, TEXAS, CONT 80 ACS M/L | TX | Martin | 271 | 374 | 1516 |
| JANUARY HARRELL FINLEY AKA JANUARY H. FINLEY | CROWNROCK, LP | 04/11/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 338 | 211 | 1877 |
| JEAN A. WILSON, A/K/A JEAN LOGGIE WILSON | CROWNROCK, LP | 08/03/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 319 | 480 | 3732 |
| JEAN EDNA HUNT TRUST, MARSHA HACHTEL, AS TRUSTEE | S.E.S. ENERGY, LTD | 03/16/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 339 | 453 | 1951 |
| JERRY WAYNE CAVE | CROWNROCK, L.P. | 10/09/2008 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 07: NW/4, MARTIN COUNTY, TEXAS | TX | Martin | 238 | 466 | 3799 |
| JESSE EDWARD HENSON | CROWNROCK, L.P. | 02/07/2011 | FEE | NE/4 OF SECTION 17, BLOCK 36, T-1-S, T&P RY. CO. SURVEY:□ MARTIN COUNTY, TX | TX | Martin | 298 | 149 | 741 |
| JIM BAILEY | CROWNROCK, LP | 09/07/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 325 | 124 | 105 |
| JIRI KLUBAL | CROWNROCK, LP | 05/01/2011 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 60; NORTH 120 AC OF THE NW/4, LESS 40 AC, SURFACE TO 11,000' | TX | Martin | 308 | 365 | 2360 |
| JIRI KLUBAL | LEGACY RESERVES OPERATING LP | 11/14/2013 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 394 | 97 | |
| JOE MARK LOGGIE | CROWNROCK, LP | 06/02/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 330 | 357 | 843 |
| JOHN CURRIE, INDEPENDENT EXECUTOR OF THE ESTATE OF RUTH GRANTHAM, DECEASED AND DIXIE SUE DAVES-GLEAVE WHO IS TH ESAME PERSON AS DIXIE GLEAUS IN THE WILL OF RUTH GRANTHAM AS A BENEFICIARY, BY AND THROUGH HER ATTORNEY-IN-FACT, DELLA MARIE AIKMAN (N/K/A DELL | STANDARD PERMIAN, LLC | 06/23/2011 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 441 | 2716 |
| JOHN DAVID POE, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 761 | 3802 |
| JOHN F. CRAM | CROWNROCK, LP | 10/14/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 325 | 138 | 110 |
| JOHN GRAMMER | S.E.S. ENERGY, LTD | 05/25/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 340 | 324 | 2042 |
| JOHN SALEH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 07/12/2012 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 345 | 532 | 2627 |
| JOHN SALEH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 08/19/2008 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 46; E/220 AC | TX | Martin | 235 | 578 | 3299 |
| JOLENE MEEK STARRACK FORMERLY KNOW AS JOLENE TROLINDER, DEALING IN HER SOLE AND SEPARATE PROPERTY | S.E.S. ENERGY, LTD | 02/17/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 330 | 796 | 917 |
| JOLENE TROLINDER | PATRIOT ROYALTY & LAND, LLC | 12/18/2009 | FEE | T&P RY CO SVY, T-1-N, BLK 36, SEC. 47: N/2SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 263 | 670 | 3630 |
| JOLENE TROLINDER STARRAK, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 11/14/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 240 | 327 | 4130 |
| JOLENE TROLINDER STARRAK, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 01/07/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 AND THE N/30 ACRES OF THE SE/4 AND S/130ACRES OF THE SE/4 AND W/30 ACRES OF THE NE/4 | TX | Martin | 242 | 205 | 151 |
| JOSEPH ELROD, DEALING IN HIS SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 01/02/2009 | FEE | TWP 1N BLK 35 SEC 15; E/2SE/4 | TX | Martin | 242 | 36 | 109 |
| JOSHUA WILLIAMS SHAW | CROWNROCK, L.P. | 7/26/2013 | FEE | SE/4, Sec 9, BLK 35, T2N, T&P RR Co. Survey | TX | Martin | 398 | 148 | 140151 |

Historical Division 6
Oil and Gas Lease Schedule

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| JOYCE CAUGHRON, DEALING IN HER SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 09/21/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 SURFACE TO 100' BELOW THE MISSISSIPPIAN FORMATION; S/2 NW/4 100' BELOW THE MISSISSIPPIAN FORMATION | TX | Martin | 285 | 785 | 3810 |
| JOYCE LYNN CARTER, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, L.P. | 02/25/2009 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 18: N/2 SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 245 | 246 | 643 |
| JUDITH GAIL ROWE CROWLEY | CROWNROCK, LP | 08/29/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 379 | 474 | 3730 |
| KATHLEEN A. YOUNG, DEALING IN HER SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 10/01/2012 | FEE | TWP 2N BLK 37 SEC 18; N/2 W160 N/2 | TX | Martin | 359 | 298 | 4107 |
| KATHLEEN A. YOUNG, DEALING IN HER SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 09/10/2011 | FEE | TWP 2N BLK 37 SEC 18; S/2 OF THE W/100 OF THE N/2 | TX | Martin | 322 | 677 | 4037 |
| KATHY MASE, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF DELMA WONDA GRAHAM, DECEASED | PATRIOT ROYALTY & LAND, LLC | 09/23/2010 | FEE | TWP 3N BLK 33 SEC 30; PART OF NW/4 | TX | Martin | 1197 | 31 | 2010-00005484 |
| Keith Nootbaar | Pioneer Natural Resources USA Inc. | 2/1/2008 | Fee | S/2, Sec 10, BLK 35, T1N, T&P RR Co Survey | TX | Martin | 219 | 661 | 536 |
| KEITH PETTY, RECEIVER FOR DEBORAH E ROSIN; STEPHEN WOODS; SERENA WOODS;□ AND TERRY WOODS; AND THEIR HEIRS, KNOWN OR UNKNOWN, IF ANY OF SAID PERSONS ARE DECEASED, CAUSE NO. 6298 IN THE 118TH DISTRICT COURT OF MARTIN COUNTY, TEXAS | CROWNQUEST OPERATING, LLC | 03/01/2010 | FEE | T1S, BLK 37:□ SEC 1: NE/4□ T&P RR CO SVY, □ MARTIN COUNTY, TEXAS, CONT 160 ACS M/L | TX | Martin | 267 | 510 | 709 |
| KELSAY R. MEEK | PATRIOT ROYALTY & LAND, LLC | 12/12/2009 | FEE | T&P RY CO SVY, T-1-N, BLK 36, SEC. 47: N/2SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 263 | 674 | 3632 |
| KELSAY R. MEEK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | K. BRYAN REEVES | 06/17/2007 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 343 | 349 | 656 |
| KELSAY RAY MEEK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 11/25/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 241 | 158 | 4269 |
| KELSAY RAY MEEK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 01/13/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 AND THE N/30 ACRES OF THE SE/4 AND S/130ACRES OF THE SE/4 AND W/30 ACRES OF THE NE/4 | TX | Martin | 242 | 667 | 265 |
| KENNETH HOUSTON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 764 | 3803 |
| KENNETH L. HENSON | CROWNQUEST OPERATING, LLC | 07/09/2008 | FEE | T&P RY CO SVY, T-1-S, BLK 36, SEC. 17: NE/4 NE/4, S/2 NE/4 MARTIN COUNTY, TEXAS | TX | Martin | 235 | 238 | 3233 |
| KENNETH W. WILLIAMS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 11/10/2008 | FEE | TWP 2N BLK 36 SEC 36; NW/4 S&E N/80 AC | TX | Martin | 240 | 329 | 4131 |
| KRISTIE KASPAR | CROWNROCK, LP | 09/23/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 325 | 130 | 107 |
| Kyle S. McMorries and wife Misty M. McMorries, Neil McMorries and wife Connie McMorries, individually and as partners of the McMorries Family Partnership | Pioneer Natural Resources USA Inc. | 4/27/2005 | Fee | NW/4, Sec 15, and the West 78.57 acres of the S/2, Sec 10, BLK 35, T1N, T&P RR Co Survey | TX | Martin | 168 | 343 | 1462 |
| LAMESA NATIONAL BANK, TRUSTEE OF THE GLENDA WOODWARD TRUST #59 | STANDARD PERMIAN, LLC | 02/10/2010 | FEE | TWP 2N BLK 36 SEC 6; E/120 ACRES OF THE SF2 | TX | Martin | 267 | 702 | 765 |
| LARRY RAY KARGL | CROWNROCK, L.P. | 12/15/2010 | FEE | T&P RY CO SVY, T-1-S, BLK 35, SEC. 17: 3.3 ACRES OUT OF THE N/2NW/4, MARTIN COUNTY, TEXAS | TX | Martin | 293 | 759 | 140 |
| LARRY RAY KARGL, AS HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, L.P. | 12/15/2010 | FEE | T&P RY CO SVY, T1S, BLK 35, SEC 17: 4.72 ACS OUT OF THE N/2 NE/4, 3.3 ACRES OUT OF THE N/2 NW/4, MARTIN COUNTY, TEXAS. | TX | Martin | 293 | 759 | 140 |
| LARY D. MAYFIELD, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, L.P. | 02/19/2009 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 18: N/2 SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 246 | 542 | 945 |
| LAURA M. ROCCHIO | CROWNROCK, LP | 05/18/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 350 | 78 | 3084 |
| LENSEY H. RANDALS, AS HER SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 06/17/2011 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 469 | 2721 |
| LESLIE DIANE PERKINS, TRUSTEE OF THE LESLIE DIANE PERKINS TRUST | CROWNROCK, LP | 01/22/2009 | FEE | TWP 2N BLK 36 SEC 20; NE/4 | TX | Martin | 242 | 791 | 292 |
| LESLIE FAY GRANTHAM, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 07/12/2012 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 345 | 518 | 2623 |
| LESLIE FAY GRANTHAM, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 10/09/2008 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 46; E/220 AC | TX | Martin | 237 | 618 | 3680 |
| LILLIAN DEAKINS CLARKE, A/K/A LILLIAN D. CLARKE | CROWNROCK, LP | 06/22/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 316 | 630 | 3396 |
| LISA M. MOZLEY, INDIVIDUALLY AND AS EXECUTRIX OF THE EST. OF PAULINE R. CROMMETT, AKA PAULINE RATHKE CROMMETT, DECEASED | CROWNROCK, LP | 10/12/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 367 | 453 | 700 |
| LISA MAYES, AS HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 06/17/2011 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 481 | 2723 |
| LOUISE SCHWENNESEN A/K/A MARY LOUISE SCHWENNESEN, TRUSTEE OF THE MARY LOUISE SCHWENNESEN TRUST | BRECK OPERATING CORP. | 10/01/2007 | FEE | TWP 1N BLK 36 SEC 10; SE/4 | TX | Martin | 221 | 629 | 850 |
| LUBBOCK CHRISTIAN UNIVERSITY | PATRIOT ROYALTY & LAND, LLC | 02/05/2010 | FEE | T&P RY CO SVY, T-3-N, BLK 34, SEC. 29: S/2 SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 269 | 84 | 651 |
| LUKE AARON SHAW | CROWNROCK, LP | 02/21/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 370 | 685 | 1171 |
| LYNNE W. TALBOT | CROWNROCK, LP | 09/08/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 319 | 495 | 3737 |
| M.D. ABEL COMPANY | CROWNROCK, LP | 09/15/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 235 | 605 | 3307 |
| MALLARD ROYALTY PARTNERS | CROWNROCK, LP | 04/13/2010 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 271 | 1 | 1400 |
| MARCY BROWN JACKSON, DEALING IN HER SOLE AND SEPARATE PROPERTY | PATRIOT ROYALTY & LAND, LLC | 04/24/2010 | FEE | TWP 2N BLK 36 SEC 21; NE/4 | TX | Martin | 272 | 65 | 1648 |
| MARGARET E. PAYTON | CROWNROCK, LP | 06/22/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 306 | 2527 |
| MARTHA DAY JOHNSON LOW, DEALING IN HER SOLE AND SEPARATE PROPERTY | PATRIOT ROYALTY & LAND, LLC | 11/18/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 240 | 733 | 4226 |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| MARTHA DAY JOHNSON LOW, DEALING IN HER SOLE, AND SEPARATE PROPERTY | PATRIOT RESOURCES PARTNERS LLC | 01/01/2009 | FEE | TWP 1N BLK 36 SEC 19; S/130 ACRES OF THE SE/4 & W/30 ACRES OF THE NE/4 | TX | Martin | 243 | 745 | |
| MARTY WAYNE GRAHAM AND STEPHEN MICHAEL GRAHAM | CJM RESOURCES, LP | 6/15/2016 | Fee | SW/4, Sec 15, BLK 35, T1N, T&P RR CO Survey | TX | Martin | 508 | 163 | |
| MARY CAROLYN ROWE BRUMBELOW | CROWNROCK, LP | 08/29/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 319 | 483 | 3733 |
| MARY H. ALLEVA | CROWNROCK, LP | 09/07/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 317 | 764 | 3524 |
| MARY JANE POWELL LOVELL | CROWNROCK, LP | 02/21/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 375 | 468 | 1702 |
| MARY LITTLETON | CROWNROCK, LP | 05/11/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 350 | 87 | 3087 |
| MARY LOUISE SHAW PITTMAN, ACTING BY AND THROUGH HER AGENT AND ATTORNEY-IN-FACT, NANCY L. YOUNG | CROWNROCK, LP | 03/27/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 375 | 465 | 1701 |
| MARY M. ELLIS | PATRIOT ROYALTY & LAND, LLC | 03/31/2010 | FEE | TWP 1N BLK 35 SEC 25; S/2 NW/4 | TX | Martin | 270 | 411 | 1307 |
| MARY MOONYEEN REYNOLDS | CROWNROCK, LP | 04/11/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 338 | 214 | 1878 |
| MARY RENFRO | CROWNROCK, LP | 08/03/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 317 | 770 | 3526 |
| MARYLEE ROSE MCKNIGHT, DEALING IN HER SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 734 | 3793 |
| McMorries Family Partnership | Pioneer Natural Resources USA Inc. | 11/1/2010 | Fee | INSOFAR & ONLY INSOFAR as the lease covers the West 78.56 acres of the South Half (S/2) of Section 10 & the Northwest Quarter (NW/4) of Section 15, Block 35, Township-1-North, T&P RR Co Survey, Martin County, Texas, containing 238.56 acres more or less, from a depth of 9,303 feet and below as it pertains to the McMorries "10" #1 Well, TRRC API #317-35013, located in the North Half of the Northeast (N/2NE/4) of Section 4, as amended | TX | Martin | 297 | 257 | 589 |
| MDJ MINERALS, LLP | CROWNROCK, L.P. | 09/01/2009 | FEE | T&P RR CO SVY, T-1-N, BLK 37, SEC. 34: W/2SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 257 | 720 | 2708 |
| MEDIA CUNNINGHAM | PATRIOT ROYALTY & LAND, LLC | 12/17/2009 | FEE | T&P RY CO SVY, T-1-N, BLK 36, SEC. 47: N/2SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 263 | 664 | 3627 |
| MEDIA CUNNINGHAM, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 11/06/2008 | FEE | TWP 2N BLK SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 240 | 335 | 4134 |
| MEDIA CUNNINGHAM, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 01/05/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 AND THE N/30 ACRES OF THE SE/4 AND S/130ACRES OF THE SE/4 AND W/30 ACRES OF THE NE/4 | TX | Martin | 242 | 23 | 103 |
| MEDIA MEEK CUNNINGHAM, DEALING IN HER SOLE AND SEPARATE PROPERTY | S.E.S. ENERGY, LTD | 02/17/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 330 | 792 | 916 |
| MELISSA R. STRINGER | CROWNROCK, LP | 08/15/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 359 | 279 | 4102 |
| MICHAEL ALLEN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 06/12/2012 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 345 | 522 | 2624 |
| MICHAEL DOUGHERTY | CROWNROCK, LP | 02/07/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 369 | 301 | 940 |
| MICHAEL KEVIN KEISLING, TRUSTEE OF THE MICHAEL KEVIN KEISLING TRUST | CROWNROCK, LP | 01/22/2009 | FEE | TWP 2N BLK 36 SEC 20; NE/4 | TX | Martin | 242 | 789 | 291 |
| MICHAEL LEWIS PARHAM, SR., PERSONAL REPRESENTATIVE AND INDEPENDENT EXECUTOR OF THE EST. OF MARGARET LOGGIE PARHAM, DECEASED | CROWNROCK, LP | 06/22/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 316 | 633 | 3397 |
| MICHAEL S. ELLIS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 10/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 SURFACE TO 100' BELOW THE MISSISSIPPIAN FORMATION; S/2 NW/4 100' BELOW THE MISSISSIPPIAN FORMATION | TX | Martin | 285 | 712 | 3786 |
| MIKE KEISLING, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 752 | 3799 |
| MIKEL. VARNADORE | CROWNROCK, LP | 09/01/2011 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 | TX | Martin | 314 | 131 | 3141 |
| MRS. ROBERT DIXIE KILGORE AKA ROBBIE LOUISE KILGORE DEALING IN HER SOLE & SEPARATE PROPERTY | PIONEER NATURAL RESOURCES USA, INC. | 02/15/2007 | FEE | TWP 3N BLK 35 SEC 25; SE/4 | TX | Martin | 264 | 188 | |
| MYRTLE BELLE STEWART ESTATE | CROWNQUEST OPERATING, LLC | 04/02/2008 | FEE | T1S, BLK 37□ SEC 1: NE/4□ T&P RR CO SVY, □ MARTIN COUNTY, TEXAS, CONT 160 ACS M/L | TX | Martin | 226 | 758 | 1748 |
| NANCY L. MAHAN | CROWNQUEST OPERATING, LLC | 07/30/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 35, SEC. 19: S/2SW/4, MARTIN COUNTY, TEXAS | TX | Martin | 235 | 236 | 3232 |
| NATIONAL ROYALTY COMPANY, LTD., A TEXAS LIMITED PARTNERSHIP | STANDARD PERMIAN, LLC | 11/03/2011 | FEE | TWP 2N BLK 37 SEC 34; SW/4 | TX | Martin | 328 | 548 | 600 |
| NELDA FAE HAZLEWOOD, A WIDOW | STANDARD PERMIAN, LLC | 07/12/2012 | FEE | TWP 1N BLK 36 SEC 19; N/2NW/4 | TX | Martin | 348 | 634 | 2943 |
| NINA MAHAN | CROWNROCK, L.P. | 10/16/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 238 | 481 | 3802 |
| O.K. "BOB" ROBINSON | CROWNROCK, L.P. | 09/26/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 237 | 637 | 3689 |
| OTTO G. PITZ | CROWNROCK, LP | 06/22/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 312 | 2530 |
| PAMELA J. BURKE , TRUSTEE OF THE P.I.P. 1990 TRUST ; J .I., JR. 1990 TRUST: W.W.I. 1990 TRUST | CROWNQUEST OPERATING, LLC | 05/02/2008 | FEE | T&P RY CO SVY, T-1-S, BLK 36, SEC. 17: NE/4, MARTIN COUNTY, TEXAS | TX | Martin | 226 | 744 | 1743 |
| PATRICIA C. SCHNEIDER FAMILY LIMITED PARTNERSHIP | CROWNROCK, L.P. | 10/09/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 237 | 643 | 3691 |
| PATRICIA STAPP PEDERSON, AKA PATRICIA S. PEDERSON | CROWNROCK, LP | 10/06/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 319 | 489 | 3735 |
| PATRICK K. DILLON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 03/19/2012 | FEE | TWP 2N BLK 35 SEC 27; S/2 SW/4 | TX | Martin | 344 | 391 | 2469 |
| PATRICK LYNN ARMSTRONG | PATRIOT ROYALTY & LAND, LLC | 09/23/2010 | FEE | TWP 3N BLK 33 SEC 30; PART OF NW/4 | TX | Martin | 1197 | 34 | 2010-00005485 |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| PATSY POLLOCK CASEY, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 01/06/2009 | FEE | TWP 1N BLK 36 SEC 19; E/100 ACRES OF THE NE/4 | TX | Martin | 242 | 31 | 107 |
| PAUL C BUNDY INTERESTS, LLC, AS LESSOR, WHOSE ADDRESS IS C/O CLARK G. THOMPSON JR, MANAGER | BREITBURN OPERATING, LP | 07/30/2014 | FEE | NW/4 NW/4 OF SEC 36, BLK 36, T2N, T&P RR CO SURVEY, A-757, MARTIN COUNTY, TEXAS | TX | Martin | 422 | 11 | 2894 |
| PAUL C. BUNDY INTEREST, LLC | CROWNROCK, LP | 12/15/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 242 | 662 | 264 |
| PAUL L. MCCULLISS | CROWNROCK, LP | 01/15/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 369 | 298 | 939 |
| PAULA GRACE SMITH A/K/A PAULA GRACE KRETSCHMER SMITH | BRECK OPERATING CORP. | 07/24/2007 | FEE | TWP 1N BLK 36 SEC 10; SE/4 | TX | Martin | 221 | 636 | 853 |
| PHILIP L. BRYANT AKA PHILIP LEE BRYANT, ET UX JAMIE B. BRYANT | K. BRYAN REEVES | 05/09/2007 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 200 | 565 | 1713 |
| RALPH W. WILLIAMS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 11/05/2008 | FEE | TWP 2N BLK 36 SEC 36; NW/4 S&E N/80 AC | TX | Martin | 240 | 323 | 4128 |
| RBP LAND COMPANY TRUST | LEGACY RESERVES OPERATING LP | 11/6/2013 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 393 | 1 | |
| RICHARD B. AHLVIN AND SUE S. AHLVIN, HUSBAND AND WIFE | CROWNROCK, LP | 10/06/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 319 | 486 | 3734 |
| RICHARD D. JONES, JR. DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 11/12/2008 | FEE | TWP 2N BLK 36 SEC 36; N/80 AC OF THE NW/4 | TX | Martin | 242 | 675 | 269 |
| RICHARD E. LEE | CROWNROCK, LP | 06/22/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 316 | 2532 |
| RITA JEAN ARMSTRONG | PATRIOT ROYALTY & LAND, LLC | 09/23/2010 | FEE | TWP 3N BLK 33 SEC 30; PART OF NW/4 | TX | Martin | 1197 | 37 | 2010-00005486 |
| RITA PAT HARRELL, INDIVIDUALLY AND AS TRUSTEE OF THE WILLIAM E. HARRELL TRUST; AND AS INDEPENDENT EXECUTRIX OF THE ESTATES OF WILLIAM E. HARRELL AND LARUE C. HARRELL | CROWNROCK, L.P. | 01/20/2009 | FEE | T&P RR CO SVY, T-1-N, BLK 37, SEC. 34: W/2SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 242 | 673 | 268 |
| ROBERT B. PORTER, JR. AS TRUSTEE OF THE RBP LAND COMPANY TRUST | CROWNROCK, LP | 05/01/2011 | FEE | W/2 SEC 60, ABS 336, BLK A, B&C SURVEY, MARTIN CO, TX,□ S&E 80 AC UNIT CAVE #1060 IN S/2 S/2 NW/4 & N/2 N/2 SW/4 | TX | Martin | 304 | 345 | 1721 |
| ROBERT C. THOMAS, TRUSTEE | CROWNROCK, LP | 09/01/2010 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 60; NORTH 120 AC OF THE NW/4, LESS 40 AC, SURFACE TO 11,000' | TX | Martin | 286 | 576 | 3926 |
| ROBERT E. LEE | CROWNROCK, LP | 06/22/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 308 | 2528 |
| ROBERT F. BROWN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | PATRIOT ROYALTY & LAND, LLC | 04/24/2010 | FEE | TWP 2N BLK 36 SEC 21; NE/4 | TX | Martin | 272 | 75 | 1650 |
| ROBERT GRAMMER | S.E.S. ENERGY, LTD | 05/25/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 340 | 467 | 2065 |
| ROBERT J. MCFARLAND | CROWNROCK, LP | 05/03/2010 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 274 | 177 | 2084 |
| ROBERT JEFFERY BROWN, DEALING IN HIS SOLE AND SEPARATE PROPERTY | PATRIOT ROYALTY & LAND, LLC | 04/24/2010 | FEE | TWP 2N BLK 36 SEC 21; NE/4 | TX | Martin | 272 | 70 | 1649 |
| ROBERT P. TURPIN, TRUSTEE OF THE ROBERT P. TURPIN TRUST CREATED UNDER THE WILLS OF ROBERT M. TURPIN, DECEASED, AND MINNIE MOORE TURPIN, DECEASED | S.E.S. ENERGY, LTD | 03/28/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 335 | 418 | 1515 |
| ROBERT R. PATTON | CROWNROCK, LP | 10/06/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 330 | 348 | 840 |
| ROCKHILL ROYALTY PARTNERS | CROWNROCK, LP | 05/15/2012 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 60; S/120 AC OF SW/4 | TX | Martin | 347 | 29 | 2757 |
| ROCKHILL ROYALTY PARTNERS | ROCA EXPLORATION LTD | 10/6/2005 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 179 | 135 | |
| RONALD H. HIGGINS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 10/01/2012 | FEE | TWP 2N BLK 37 SEC 18; N/2 W160 N/2 | TX | Martin | 359 | 302 | 4108 |
| RONALD H. HIGGINS, DEALING IN HIS SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 09/10/2011 | FEE | TWP 2N BLK 37 SEC 18; S/2 OF THE W/100 OF THE N/2 | TX | Martin | 322 | 680 | 4038 |
| RONNIE J. RINER, DEALING HEREIN WITH HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 05/17/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 322 | 2535 |
| ROY PATTON | CROWNROCK, LP | 10/06/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 319 | 492 | 3736 |
| ROYALTY CLEARINGHOUSE, LTD., A TEXAS LIMITED PARTNERSHIP | STANDARD PERMIAN, LLC | 09/26/2010 | FEE | TWP 1N BLK 37 SEC 38; NE/4 | TX | Martin | 294 | 372 | 234 |
| ROYCE SISK, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, L.P. | 02/19/2009 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 18: N/2 SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 246 | 538 | 943 |
| RUFUS CHARLES TOM, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 01/22/2009 | FEE | TWP 2N BLK 36 SEC 20; NE/4 | TX | Martin | 242 | 669 | 266 |
| RUFUS CHARLES TOM, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 755 | 3800 |
| SALLY GUITAR AND GEORGE D JONES, IND EXEC OF THE ESTATE OF JOHN GUITAR III, DECEASED, AND GEORGE D. JONES, TRUSTEE OF THE JOHN GUITAR III FARM TRUST | CROWNROCK, L.P. | 09/15/2009 | FEE | T1N, BLK 35□ SEC 5: W/2 □ T&P RR CO SVY□ MARTIN COUNTY, TEXAS, CONT 320 ACS M/L | TX | Martin | 258 | 718 | 2818 |
| SALLY KING SAVAGE, ET VIR | CROWNQUEST OPERATING, LLC | 03/27/2008 | FEE | TWP 2S BLK 35 SEC 16; N/2 | TX | Martin | 226 | 765 | 1751 |
| SAM E. HILBURN | CROWNROCK, L.P. | 09/10/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 235 | 602 | 3306 |
| SAM SALEH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 07/12/2012 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 345 | 528 | 2626 |
| SAM SALEH, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 08/19/2008 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 46; E/220 AC | TX | Martin | 235 | 580 | 3300 |
| SAMEDAN ROYALTY CORPORATION | CROWNROCK, LP | 08/23/2012 | FEE | TWP 1N BLK 35 & 36 SEC 19 & 13; SEC 19, BLK 35: NE/4; SEC 13, BLK 36: SW/4 | TX | Martin | 353 | 75 | 3418 |
| SAMUEL PAUL SMITH | CROWNROCK, LP | 02/21/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 370 | 682 | 1170 |
| SANDRA JANE SHAW | CROWNROCK, LP | 02/26/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 375 | 462 | 1700 |
| SANDRA L. HENSON | CROWNROCK, L.P. | 02/07/2011 | FEE | NE/4 OF SECTION 17, BLOCK 36, T-1-S, T&P RY. CO. SURVEY□ MARTIN COUNTY, TX | TX | Martin | 299 | 730 | 1027 |
| SCOT D. NORTHERN | CROWNROCK, LP | 05/01/2011 | FEE | W/2 SEC 60, ABS 336, BLK A, B&C SURVEY, MARTIN CO, TX,□ S&E 80 AC UNIT CAVE#060 IN S/2 S/2 NW/4 & N/2 N/2 SW/4. | TX | Martin | 304 | 342 | 1720 |
| SCOT D. NORTHERN AND WIFE, TANYA NORTHERN | LEGACY RESERVES OPERATING LP | 11/12/2013 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 393 | 22 | |
| SCOTT HOUSTON, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 767 | 3804 |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| SCOTT K. HENSON | CROWNROCK, L.P. | 02/07/2011 | FEE | NE/4 OF SECTION 17, BLOCK 36, T-1-S, T&P RY CO. SURVEY; MARTIN COUNTY, TX | TX | Martin | 302 | 617 | 1497 |
| SELF CHILDREN MANAGEMENT TRUST | CROWNROCK, L.P. | 01/01/2009 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 245 | 240 | 642 |
| SHARON W MCMILLAN, AKA SHARON L WASSON AS SUCCESSOR TRUSTEE OF THE LETA E WASSON FAMILY TRUST OF 1987. | CROWN ROCK LP | 02/27/2014 | FEE | E/100 NE/4 AND N/30 SE/4 OF SEC 19, BLK 36, T1N, T&P RY CO SURVEY, MARTIN CO, TX. | TX | Martin | 408 | 408 | 1355 |
| SHARON WASSON MCMILLAN SEPARATE PROPERTY TRUST | BREITBURN OPERATING LP | 09/17/2015 | FEE | NORTH 20 ACRES OF THE SE/4 OF SECTION 19, BLOCK 36, T-1-N, T&P RY CO SURVEY, MARTIN COUNTY, TEXAS | TX | Martin | 471 | 543 | 3971 |
| SHELIA LANGTON, DEALING IN HER SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 09/10/2011 | FEE | TWP 2N BLK 37 SEC 18; S/2 OF THE W/100 OF THE N/2 | TX | Martin | 322 | 683 | 4039 |
| SHELIA OBRIEN, DEALING IN HER SOLE AND SEPARATE PROPERTY | STANDARD PERMIAN, LLC | 10/01/2012 | FEE | TWP 2N BLK 37 SEC 18; N/2 W160 N/2 | TX | Martin | 359 | 294 | 4106 |
| SIDNEY HATCH | PATRIOT ROYALTY & LAND, LLC | 03/31/2010 | FEE | TWP 1N BLK 35 SEC 25; S/2 NW/4 | TX | Martin | 270 | 415 | 1309 |
| SLAUGHTER INVESTMENT CORP | CROWNROCK, L.P. | 08/07/2008 | FEE | T&P RR CO SVY, T-3-N, BLK 34, SEC. 07: NW/4, MARTIN COUNTY, TEXAS | TX | Martin | 235 | 615 | 3311 |
| STAJA MILLS, AS HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 06/17/2012 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 484 | 2724 |
| STANLEY E ADAMS JR, TRUSTEE U/W/0 SE ADAMS SR AND ELSIE ADAMS | CROWNROCK, LP | 09/14/2011 | FEE | TWP 1N BLK 35 SEC 19; E/100 ACRES OF THE NE/4 | TX | Martin | 315 | 796 | 3251 |
| STATE OF TEXAS, ACTING BY AND THROUGH ITS AGENT, COLORADO RIVER MUNICIPAL WATER DISTRICT | CROWNROCK, LP. | 03/03/2010 | ST | TWP 2N BLK 35 SEC 28; N/2 | TX | Martin | 270 | 98 | 1256 |
| STATE OF TEXAS, ACTING BY AND THROUGH ITS AGENT, SOUTHWEST ROYALTIES, INC A SUBSIDIARY OF CLAYTON WILLIAMS ENERGY, INC | STEPHEN C. COLE | 02/05/2013 | ST | TWP 2N BLK 35 SEC 28; E/2 SW/4; N/2 SE/4; N/2 SE/4 | TX | Martin | 365 | 674 | 465 |
| STEVEN MATTHEW LEGGITT | CROWNROCK, LP | 01/31/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 367 | 443 | 697 |
| STEVEN P. THOMPSON | S.E.S. ENERGY, LTD | 03/09/2012 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 335 | 414 | 1514 |
| STEVEN REED LOGGIE, A/K/A STEVEN R. LOGGIE | CROWNROCK, LP | 06/02/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 316 | 627 | 3395 |
| STEWART ROYALTY, INC. | MANHATTAN PETROLEUM INC | 4/12/2005 | Fee | S/2 S/2 NW/4, N/2 N/2 SW/4, Sec 60, BLK A, Bauer & Cockrell | TX | Martin | 166 | 461 | |
| STRAIN FAMILY LIMITED PARTNERSHIP; EDD HOMAN STRAIN, JERRY DELL HAGGERTON, LARRY WADDELL STRAIN, ALBERT THOMAS MORRIS, GARLAND KIRK MORRIS AND SCOTT DOUGLAS MORRIS, LEASING THEIR SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 04/16/2009 | FEE | TWP 2N BLK 35 SEC 19 & 13; SEC 19, BLK 35: NE/4; SEC 13, BLK 36: SW/4 | TX | Martin | 253 | 170 | 2010 |
| SUE HORTON CORSON CORPORATION | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 773 | 3806 |
| SUZANNA POE, DEALING IN HER SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 758 | 3801 |
| TAS ROYALTY COMPANY | CROWNROCK, LP | 12/20/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 350 | 90 | 3088 |
| TAS ROYALTY COMPANY, THOMAS SIKES, PARTNER | STANDARD PERMIAN, LLC | 06/17/2011 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 458 | 2718 |
| TED ROY STEWART JR | CROWNQUEST OPERATING, LLC | 04/02/2008 | FEE | T1S, BLK 37: SEC 1: NE/4; T&P RR CO SVY, MARTIN COUNTY, TEXAS, CONT 160 ACS M/L | TX | Martin | 226 | 755 | 1747 |
| TEMPLE JO GRANTHAM, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 06/17/2011 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 487 | 2725 |
| TEMPLE JO GRANTHAM, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 07/30/2008 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 46; E/220 AC | TX | Martin | 235 | 575 | 3298 |
| Terry Lynn McAdams | Pioneer Natural Resources USA Inc. | 9/12/2005 | Fee | S/2, Sec 10, BLK 35, T1N, T&P RR Co Survey | TX | Martin | 170 | 250 | 1795 |
| THE ALLAR COMPANY | CROWNROCK, L.P. | 10/21/2010 | FEE | T&P RR CO SVY, T-2-N, BLK 37, A-244, SEC. 17: W/2SE/4, MARTIN COUNTY, TEXAS | TX | Martin | 286 | 106 | 3839 |
| The Allar Company | Pioneer Natural Resources USA Inc. | 8/17/2010 | Fee | SE/4, Section 3, Block 35, Township-1-North, T&P RR Co Survey, limited to those depths below 9,018 feet | TX | Martin | 283 | 749 | 3495 |
| The Allar Company | Pioneer Natural Resources USA Inc. | 6/8/2006 | Fee | SE/4, Section 3, Block 35, Township-1-North, T&P RR Co Survey | TX | Martin | 180 | 553 | 1189 |
| THE ALLAR COMPANY, A TEXAS CORPORATION | CROWNROCK, LP. | 08/03/2011 | FEE | TWP 1N BLK 36 SEC 25; SW/4 | TX | Martin | 311 | 635 | 2843 |
| THE LAMAR FAMILY CLASS TRUST, MARY S. LAMAR, TRUSTEE | STANDARD PERMIAN, LLC | 01/12/2012 | FEE | TWP 2N BLK 37 SEC 34; SW/4 | TX | Martin | 328 | 555 | 601 |
| THEODORE A. FISCHER, JR. AND CHARLOTTE GLEE FISCHER, HUSBAND AND WIFE | CROWNROCK, LP | 12/09/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 330 | 351 | 841 |
| THOMAS ROCCHIO | CROWNROCK, LP | 05/18/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 359 | 282 | 4103 |
| THUNDERBOLT PETROLEUM, LLC | CROWNROCK, LP | 04/12/2011 | FEE | TWP 2N BLK 36 SEC 36; NW/4 S&E N/80 AC | TX | Martin | 304 | 756 | 1827 |
| THURMAN J GRIMES, SSP | PATRIOT ROYALTY & LAND, LLC | 04/13/2010 | FEE | T1N, BLK 38: SEC 1: E/2 SE/4; T&P RY CO SURVEY, MARTIN COUNTY, TEXAS, CONT 80 ACS M/L | TX | Martin | 271 | 383 | 1519 |
| TOM ALFRED KEISLING, TRUSTEE OF THE TOM ALFRED KEISLING TRUST | CROWNROCK, LP | 01/22/2009 | FEE | TWP 2N BLK 36 SEC 20; NE/4 | TX | Martin | 242 | 671 | 267 |
| TOM KEISLING, DEALING IN HIS SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 749 | 3798 |
| TRAVIS L. DAVIS, ROBERTA D. WRIGHT AND ADELE FLEMING, INDIVIDUALLY AND AS INDEPENDENT EXECUTORS OF THE EXT. OF ETHEL DAVIS, DECEASED | ROSEWOOD RESOURCES, INC | 01/13/1984 | FEE | TWP 3N BLK 34 SEC 46; S/2 SW/4 SURFACE TO 10,870'; N/2 SW/4; S/2 NW/4; S/2 SW/4 | TX | Martin | 239 | 59 | 1030 |
| VALERIA PAPPAS, INDIVIDUALLY AND AS EXECUTRIX OF THE EST. OF PATTY ELKIN, DECEASED | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 743 | 3796 |
| VALERIA TOM, A WIDOW | STANDARD PERMIAN, LLC | 11/03/2011 | FEE | TWP 2N BLK 37 SEC 34; SW/4 | TX | Martin | 328 | 541 | 599 |
| VALERIA TOM, A WIDOW | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 716 | 3787 |

Historical Divisions 6
Oil and Gas Lease Schedule

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| VIRGINIA ELLEN HOUSE, ET VIR JAY DEE HOUSE | K. BRYAN REEVES | 04/27/2007 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 199 | 146 | 1519 |
| VIRGINIA LEIGH COLLINS | CROWNQUEST OPERATING, LLC | 04/04/2008 | FEE | T1S, BLK 37☐ SEC 1: NE/4☐ T&P RR CO SVY, ☐ MARTIN COUNTY, TEXAS, CONT 160 ACS M/L | TX | Martin | 226 | 749 | 1745 |
| VIRGINIA M BURLESON, SSP | PATRIOT ROYALTY & LAND, LLC | 04/13/2010 | FEE | T1N, BLK 38☐ SEC. 01: E/2 SE/4☐ T&P RY CO SURVEY, ☐ MARTIN COUNTY, TEXAS, CONT 80 ACS M/L | TX | Martin | 271 | 377 | 1517 |
| VIRGINIA P. DABBS, DEALING IN HER SOLE AND SEPARATE PROPERTY | CARL T. SPEIGHT | 05/10/2010 | FEE | TWP 1N BLK 35 SEC 23; S/2 NW/4 | TX | Martin | 285 | 737 | 3794 |
| VIRGINIA P. JAMES, DEALING IN HER SOLE AND SEPARATE PROPERTY | CROWNROCK, L.P. | 02/07/2011 | FEE | NE/4 OF SECTION 17, BLOCK 36, T-1-S, T&P RY CO. SURVEY☐ MARTIN COUNTY, TX | TX | Martin | 298 | 151 | 742 |
| WANDA S. AUSTIN, AS HER SOLE AND SEPARATE PROPERTY, AND JOINED HEREIN BY HER HUSBAND BILL G. AUSTIN | PATRIOT ROYALTY & LAND, LLC | 09/23/2010 | FEE | TWP 3N BLK 33 SEC 30; PART OF NW/4 | TX | Martin | 1197 | 47 | 2010-00005489 |
| WELLS FARGO BANK, NA, TRUSTEE OF THE JEFF AND NADA MAE DAVIS CHARITABLE FOUNDATION | CROWNROCK, L.P. | 05/27/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 230 | 458 | 2397 |
| WELLS FARGO BANK, NA, TRUSTEE OF THE JEFF AND NADA MAE DAVIS CHARITABLE FOUNDATION | CROWNROCK, L.P. | 05/27/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 35, SEC. 17: N/2NW/4, MARTIN COUNTY, TEXAS | TX | Martin | 230 | 464 | 2398 |
| WELLS FARGO BANK, NA, TRUSTEE OF THE JEFF AND NADA MAE DAVIS CHARITABLE FOUNDATION | CROWNROCK, L.P. | 09/02/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 35, SEC 09: E/2 E/2, MARTIN COUNTY, TEXAS. | TX | Martin | 235 | 618 | 3312 |
| WILL C. BEECHERL ET UX | CROWNQUEST OPERATING, LLC | 05/15/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 35: S/2SW/4, FROM SURFACE DOWN TO BUT NOT INCLUDING 9,500 FT., MARTIN COUNTY, TEXAS | TX | Martin | 231 | 565 | 2623 |
| WILL C. BEECHERL ET UX | CROWNQUEST OPERATING, LLC | 05/15/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 35: S/2SW/4, FROM SURFACE DOWN TO BUT NOT INCLUDING 9,500 FT., MARTIN COUNTY, TEXAS | TX | Martin | 231 | 565 | 2623 |
| WILLARD WAYNE BRYANT, DEALING IN HIS SOLE AND SEPARATE PROPERTY | K. BRYAN REEVES | 04/27/2007 | FEE | TWP 1N BLK 35 SEC 33; E/2 SE/4 | TX | Martin | 199 | 144 | 1518 |
| WILLIAM A. CARTER, AS HIS SOLE AND SEPARATE PROPERTY | CROWNROCK, LP | 06/17/2011 | FEE | TWP 1N BLK 37 SEC 37; N/2 | TX | Martin | 310 | 463 | 2719 |
| WILLIAM C. LANE | CROWNROCK, L.P. | 08/27/2010 | FEE | T&P RY CO SVY, T-1-S, BLK 35, SEC 17: NE/4 (LESS 4.72 AC), S/2 NW/4,☐ BENG MORE FULLY DESCRIBED IN THE☐ WARRANTY DEED RECORDED IN THE☐ DEED RECORDS OF MARTIN CO., TEXAS V/J23. P/374☐ | TX | Martin | 282 | 232 | 3251 |
| WILLIAM D. LANE | CROWNROCK, L.P. | 01/12/2009 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 246 | 540 | 944 |
| WILLIAM DAVID LEGGITT | CROWNROCK, LP | 01/31/2013 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 369 | 295 | 938 |
| WILLIAM DAVID LOGGIE, JR | CROWNROCK, LP | 06/02/2011 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 309 | 326 | 2537 |
| WILLIAM E. ALEXANDER, TRUSTEE OF THE SCOTT II MINERAL TRUST | PATRIOT ROYALTY & LAND, LLC | 01/22/2010 | FEE | TWP 1N BLK 35 SEC 36; N/2 NE/4 | TX | Martin | 265 | 666 | 367 |
| WILLIAM E. PATTERSON | CROWNROCK, L.P. | 11/19/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 240 | 319 | 4126 |
| WILLIAM K. ROBINSON | CROWNROCK, L.P. | 10/03/2012 | FEE | TWP 2N BLK 35 SEC 9; SE/4 | TX | Martin | 367 | 446 | 698 |
| WINDOM ROYALTIES, LLC | CROWNROCK, L.P. | 06/09/2009 | FEE | T1S, BLK 37☐ SEC 1: NE/4☐ T&P RR CO SVY, ☐ MARTIN COUNTY, TEXAS, CONT 160 ACS M/L | TX | Martin | 257 | 19 | 2570 |
| WINIFRED JEANETTE BEACH | CROWNROCK, L.P. | 08/19/2008 | FEE | NE/4, S/2 NW/4 AND 20.05 ACRES IN THE SW/4 OF SECTION 17, BLOCK 35, TOWNSHIP 1 SOUTH, T&P RR CO. SY., IN THE COUNTY OF MARTIN, STATE OF TEXAS. | TX | Martin | 240 | 314 | 4124 |
| WYOK ROYALTY PARTNERSHIP | CROWNROCK, LP | 09/03/2010 | FEE | BAUER & COCKRELL SURVEY BLK A SEC 60; NORTH 120 AC OF THE NW/4, LESS 40 AC, SURFACE TO 11,000' | TX | Martin | 284 | 115 | 3520 |
| BANK OF AMERICA, NA AND JEFFERY W. FOLTZ AS CO-TRUSTEE FOR THE ALLIE GAYLE DAVISON TRUST #2 | CROWNROCK, LP | 11/05/2012 | FEE | TWP 1S BLK 36 SEC 32; S/120 OF NW/4 | TX | Midland | 399530 | | 2013-9598 |
| BANK OF AMERICA, NA. JEFFERY W. FOLTZ AND WILLIAM C. BYNUM, CO-TRUSTEES UNDER THE WILL OF LELAND DONALD DAVISON, DECEASED | CROWNROCK, LP | 11/05/2012 | FEE | TWP 1S BLK 36 SEC 32; S/120 OF NW/4 | TX | Midland | 399530 | | 2013-9599 |
| BOBBYE JEAN YATER | MACK T. RESOURCES L.P. | 09/12/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 32: S/2SW/4, MIDLAND COUNTY, TEXAS | TX | Midland | 3101 | 791 | |
| BRENDA STANDEFER DRIGGERS & JOYCE STANDEFER BULIN, CO-TRUSTEES OF THE BRENDA STANDEFER DRIGGERS AND JOYCE STANDEFER BULIN 2006 TRUST | CROWNQUEST OPERATING, LLC | 05/22/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 32: S/120 OF NW/4 | TX | Midland | 3088 | 194 | 2008-18834 |
| CLEAR CREEK ROYALTY & LAND, LTD. | CROWNROCK, L.P. | 09/22/2009 | FEE | T&P RR CO SVY, T-2-S, BLK 36, SEC. 29: NE/4, MIDLAND COUNTY, TEXAS | TX | Midland | | | 2009-20821 |
| CLEAR CREEK ROYALTY & LAND, LTD. | CROWNROCK, L.P. | 05/10/2011 | FEE | T&P RY CO SVY, T-1-S, BLK 36, SEC. 38: N/2NW/4 BELOW THE DEPTH OF 8700 FEET BENEATH THE SURFACE, MIDLAND COUNTY, TEXAS | TX | Midland | | | 2011-10415 |

| Lessor Full Name | Lessee | Lease Date | Lease Type | Lease Legal Description | State | County | Book | Page | Instrument No. |
|---|---|---|---|---|---|---|---|---|---|
| GUY C HENSON | SLB LAND SERVICES, LLC | 07/27/2009 | FEE | T&P RR CO SVY, T-2-S, BLK 36, SEC. 29: NE/4, MIDLAND COUNTY, TEXAS | TX | Midland | | | 2009-17205 |
| GUY C. HENSON | CROWNROCK, L.P. | 05/01/2011 | FEE | T&P RY CO SVY, T-1-S, BLK 36, SEC. 38: N/2NW/4 BELOW THE DEPTH OF 8700 FEET BENEATH THE SURFACE, MIDLAND COUNTY, TEXAS | TX | Midland | | | 2011-10414 |
| HOMER E HENSON | SLB LAND SERVICES, LLC | 07/27/2009 | FEE | T&P RR CO SVY, T-2-S, BLK 36, SEC. 29: NE/4, MIDLAND COUNTY, TEXAS | TX | Midland | | | 2009-17204 |
| HOMER E. HENSON | CROWNROCK, L.P. | 05/01/2011 | FEE | T&P RY CO SVY, T-1-S, BLK 36, SEC. 38: N/2NW/4 BELOW THE DEPTH OF 8700 FEET BENEATH THE SURFACE, MIDLAND COUNTY, TEXAS | TX | Midland | | | 2011-10416 |
| JUDY LYNN PIOTROWSKI ET AL | MACK T. RESOURCES L.P. | 09/16/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 32: S/2SW/4, MIDLAND COUNTY, TEXAS | TX | Midland | 3101 | 785 | 2008-21342 |
| NANCE FARMS LTD. I | MACK T. RESOURCES L.P. | 08/25/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 32: S/2SW/4, MIDLAND COUNTY, TEXAS | TX | Midland | 3101 | 794 | 2008-21345 |
| NATHAN HEIDELBERG, JR. | CROWNQUEST OPERATING, LLC | 05/21/2008 | FEE | TWP 1S BLK 36 SEC 32; S/120 OF NW/4 | TX | Midland | 3088 | 202 | 2008-18836 |
| PATRICIA E. HULL | MACK T. RESOURCES L.P. | 09/12/2008 | FEE | T&P RR CO SVY, T-1-S, BLK 36, SEC. 32: S/2SW/4, MIDLAND COUNTY, TEXAS | TX | Midland | 3101 | 788 | 2008-21344 |
| ROSS BUSH, DISTRICT CLERK OF MIDLAND COUNTY, TX, RECEIVER FOR THE UNKNOWN SHAREHOLDERS OF AGUILA OIL COMPANY, THEIR SUCCESSORS, ASSIGNS, AND/OR UNKNOWN HEIRS, DEFENDANT, CAUSE NO. CV 49087 IN THE 142ND JUDICIAL DISTRICT COURT OF MIDLAND COUNTY, TX | CROWNROCK, LP | 01/23/2013 | FEE | TWP 1S BLK 36 SEC 32; S/120 OF NW/4 | TX | Midland | 391028 | | 2013-1769 |
| RUBY HENSON HAGGARD | CROWNQUEST OPERATING, LLC | 05/22/2008 | FEE | TWP 1S BLK 36 SEC 32; S/120 OF NW/4 | TX | Midland | 3088 | 198 | 2008-18835 |
| WALLFAM, LP | CROWNROCK, LP | 01/11/2012 | FEE | TWP 1S BLK 36 SEC 32; S/120 OF NW/4 | TX | Midland | 182 | 47 | 2012-1848 |
| WILL C BEECHERL ET UX | CROWNROCK, L.P. | 09/22/2009 | FEE | T&P RR CO SVY, T-2-S, BLK 36, SEC. 29: NE/4, MIDLAND COUNTY, TEXAS | TX | Midland | | | 2009-22488 |
| WILL C. BEECHERL ET UX | CROWNROCK, L.P. | 05/10/2011 | FEE | T&P RY CO SVY, T-1-S, BLK 36, SEC. 38: N/2NW/4 BELOW THE DEPTH OF 8700 FEET BENEATH THE SURFACE, MIDLAND COUNTY, TEXAS | TX | Midland | | | 2011-10417 |

| County | Lease name | Lease WI | Gross Horizontal Development (All Rights) Acres | Net Horizontal Development (All Rights) Acres | Gross Vertical/Wellbore Only Acres | Net Vertical/Wellbore Only Acres |
|---|---|---|---|---|---|---|
| Howard | Adams West  29 | 1.000000 | 160.00 | 160.00 | | |
| Howard | Marie Hall 30 | 0.985000 | 172.30 | 169.71 | | |
| Howard | Mase 30 | 1.000000 | | | 167.40 | 167.40 |
| Martin | Tunnell 26 | 1.000000 | | | 161.90 | 161.90 |
| Martin | Hale 29 | 1.000000 | | | 80.10 | 80.10 |
| Martin | Harrell 2 | 1.000000 | 160.00 | 160.00 | | |
| Howard | Harrell 33 | 1.000000 | 160.00 | 160.00 | | |
| Martin | Albert 17 | 1.000000 | 80.00 | 80.00 | | |
| Martin | Tacor 17 | 1.000000 | 80.00 | 80.00 | | |
| Martin | Mayfield 18 | 1.000000 | 80.90 | 80.90 | | |
| Martin | Slaughter 7 | 1.000000 | 160.00 | 160.00 | | |
| Martin | Davis Farms 25 | 0.968800 | 161.00 | 40.97 | | 115.00 |
| Martin | Davis Lynx 46 | 0.761250 | 244.10 | 185.82 | | |
| Martin | Hudgeons | 1.000000 | 160.00 | 160.00 | | |
| Howard | Fincke/Taylor 11 | 0.500000 | 160.10 | 80.05 | | 80.05 |
| Howard | CFT /Talbot 26 | 1.000000 | | | 328.60 | 328.60 |
| Howard | Hodnett 23 | 1.000000 | 160.00 | 160.00 | | |
| Howard | SOW 21 | 1.000000 | | | 160.00 | 160.00 |
| Howard | SOW 21 | 1.000000 | 80.00 | 80.00 | | |
| Howard | Williams/Leo Un 48 | 1.000000 | 80.00 | 80.00 | | |
| Howard | Alexander/Gorman 49 | 1.000000 | 105.00 | 105.00 | | |
| Howard | Cypert/Cynallen/Petty 49 | 1.000000 | 120.00 | 120.00 | | |
| Martin | Dillon 27 | 1.000000 | 80.20 | 80.20 | | |
| Martin | CR State/SWR State 28 | 1.000000 | | | 240.00 | 240.00 |
| Martin | CR State/SWR State 28 | 1.000000 | 240.00 | 240.00 | | |
| Martin | Porter 60 | 1.000000 | 80.00 | 80.00 | | |
| Martin | RBP Trust 60 | 0.859270 | 120.00 | 103.11 | | |
| Martin | Cave | 0.598000 | 80.00 | 47.84 | | |
| Martin | Lohan 9 | 0.787313 | | | 160.00 | 125.97 |
| Martin | Jones N/Sawyer S 36 | 1.000000 | 161.90 | 161.90 | | |
| Martin | Judson 21 | 0.975000 | 160.80 | 156.78 | | |
| Martin | Rufus 20 | 1.000000 | 161.00 | 161.00 | | |
| Martin | SAM 17 | 1.000000 | 80.20 | 80.20 | | |
| Martin | Franklin/Cora 18 | 1.000000 | 166.70 | 166.70 | | |
| Martin | Tarzan Pivot 8 | 0.975000 | 166.50 | 162.34 | | |
| Martin | Moore 21 | 1.000000 | 80.00 | 80.00 | | |
| Martin | Valeria 34 | 1.000000 | 169.30 | 169.30 | | |
| Martin | Grimes 1 | 1.000000 | | | 80.00 | 80.00 |
| Martin | Harrell 34 | 0.979167 | 84.00 | 82.25 | | |
| Martin | Wearner 38 | 1.000000 | | | 167.90 | 167.90 |
| Martin | TAS 37 | 1.000000 | | | 80.00 | 80.00 |
| Martin | TAS 37 | 1.000000 | 241.20 | 241.20 | | |
| Martin | Amelia 19 | 1.000000 | 80.20 | 80.20 | | |
| Martin | Meek Un 19 | 0.500000 | | | 160.00 | 80.00 |
| Martin | Low Un 19 | 0.906250 | | | 160.00 | 145.00 |
| Martin | Dorchester 10 | 1.000000 | 160.20 | 160.20 | | |
| Martin | Strain 13 | 1.000000 | | | 162.00 | 162.00 |
| Martin | Crabtree 25 | 0.750000 | 160.70 | 41.24 | | 79.28 |
| Martin | Strain 19 | 1.000000 | | | 163.00 | 163.00 |
| Martin | Stovall 33 | 0.930000 | 80.50 | 74.87 | | |
| Martin | Eiland 23 | 1.000000 | 80.00 | 80.00 | | |
| Martin | Barfield 15 | 1.000000 | 83.10 | 83.10 | | |
| Martin | Guerin 15 | 1.000000 | 160.00 | 160.00 | | |
| Martin | McMorries 10 | 1.000000 | 78.26 | 78.26 | | |
| Martin | Broughton Farms A | 1.000000 | 240.00 | 240.00 | | |
| Martin | Graham | 1.000000 | 160.00 | 160.00 | | |
| Martin | McAdams 10 | 1.000000 | 172.74 | 172.74 | | |
| Martin | Broughton Farms 10 | 1.000000 | 80.00 | 80.00 | | |

Historical Division 6
Regulatory Lease Schedule

| County | Lease name | Lease WI | Gross Horizontal Development (All Rights) Acres | Net Horizontal Development (All Rights) Acres | Gross Vertical/Wellbore Only Acres | Net Vertical/Wellbore Only Acres |
|---|---|---|---|---|---|---|
| Martin | Allar 3 | 1.000000 | 161.30 | 161.30 | | |
| Martin | McAdams 10 A | 1.000000 | 80.00 | 80.00 | | |
| Martin | Ellis 25 | 1.000000 | 80.00 | 80.00 | | |
| Martin | Orphan 36 | 1.000000 | | | 81.40 | 81.40 |
| Martin | Parks 17 | 1.000000 | | | 320.00 | 320.00 |
| Martin | JD 9 | 1.000000 | 160.00 | 54.75 | | 105.25 |
| Martin | Kargl Unit | 1.000000 | 79.61 | 27.24 | | 52.37 |
| Martin | JNM Trust | 1.000000 | 79.81 | 27.31 | | 52.50 |
| Martin | Nada Mae | 1.000000 | 80.00 | 27.38 | | 52.62 |
| Martin | JNM Trust | 1.000000 | 79.81 | 27.31 | | 52.50 |
| Martin | Mahan 19 | 1.000000 | | | 80.30 | 80.30 |
| Martin | FAEE 47 | 1.000000 | 80.70 | 80.70 | | |
| Martin | Iverson 17 | 1.000000 | | | 161.50 | 161.50 |
| Martin | Roy 1 | 1.000000 | 161.70 | 161.70 | | |
| Martin | Nance 32 | 1.000000 | | | 80.00 | 80.00 |
| Martin | Heidelberg 32 | 1.000000 | 120.00 | 120.00 | | |
| Martin | Henson 35 | 1.000000 | | | 80.00 | 80.00 |
| Midland | Henson DR 38 | 1.000000 | | | 80.00 | 80.00 |
| Midland | Clearbee 29 | 1.000000 | 161.90 | 161.90 | | |
| Glasscock | Smith 7 | 0.597500 | 559.40 | 334.24 | | |
| Martin | Cole 6 | 1.000000 | 120.00 | 120.00 | | |
| Martin | FM Hall 20 | 1.000000 | | | 166.30 | 166.30 |
| Martin | Hall Trust 20 | 1.000000 | | | 166.30 | 166.30 |
| Martin | Guitar 5 | 1.000000 | | | 320.90 | 320.90 |
| Howard | Wells Fargo 12 | 0.750000 | 160.00 | 120.00 | | |
| Midland | Armstrong 36 | 1.000000 | 168.20 | 168.20 | | |
| Howard | Lindsay B | 1.000000 | | | 40.00 | 40.00 |
| Howard | Lindsay LA | 0.500000 | | | 221.65 | 221.65 |
| Howard | Lindsay A | 1.000000 | | | 120.00 | 120.00 |
| Howard | Lindsay CQ | 0.500000 | | | 181.05 | 181.05 |
| Howard | Cecil 6 | 0.937500 | 160.00 | 150.00 | | |
| Howard | Shortes 7 | 0.937500 | 240.00 | 225.00 | | |
| Howard | Shortes 17 | 0.937500 | 320.00 | 300.00 | | |
| Howard | Russell Limited | 0.500000 | 121.20 | 60.60 | | |
| Martin | Wilbanks 16 | 0.375000 | 243.60 | 91.35 | | |
| Howard | Sec 6 | 0.009400 | 320.00 | 3.00 | | |
| Howard | SLKT/Robinson | 1.000000 | 160.00 | 53.02 | | 106.67 |
| Howard | Sec 5 | 0.250000 | 160.00 | 40.00 | | |
| Howard | Fryar 2 | 0.150000 | | | 161.00 | 24.15 |
| Howard | Fryar 11 | 0.175000 | 160.00 | 28.00 | | |
| Howard | Shaw 11 | 0.105000 | 160.00 | 16.80 | | |
| Howard | BR 22 | 0.375000 | 240.30 | 90.11 | | |
| Howard | Marshall 22 | 0.500000 | 80.10 | 40.05 | | |
| Howard | Rogers 38 | 0.250000 | 320.00 | 80.00 | | |
| Howard | Redfish 38 | 0.100000 | 326.00 | 32.60 | | |
| Howard | Thomas | 0.970000 | | | 80.00 | 77.60 |
| Howard | DE Thomas | 1.000000 | | | 80.00 | 80.00 |
| Howard | Paloma | 0.970000 | | | 160.00 | 155.20 |
| Howard | Phillips Trust 19 | 1.000000 | 80.00 | 80.00 | | |
| Howard | Roosevelt Patsy 19B | 1.000000 | 160.10 | 160.10 | | |
| Howard | Beall Unit 18 | 1.000000 | 40.00 | 40.00 | | |
| Howard | RB Unit | 1.000000 | 81.60 | 81.60 | | |
| Howard | Beall 18 | 1.000000 | 161.80 | 161.80 | | |
| Howard | Fred Phillips 19 | 1.000000 | 80.00 | 80.00 | | |
| Howard | Beall SW | 1.000000 | 44.10 | 44.10 | | |
| Howard | Beard 18 | 1.000000 | 160.00 | 160.00 | | |
| Howard | Beall 18A | 1.000000 | 162.80 | 162.80 | | |
| Howard | Barnes 7 | 1.000000 | 160.00 | 160.00 | | |

Historical Division 6
Regulatory Lease Schedule

| County | Lease name | Lease WI | Gross Horizontal Development (All Rights) Acres | Net Horizontal Development (All Rights) Acres | Gross Vertical/Wellbore Only Acres | Net Vertical/Wellbore Only Acres |
|---|---|---|---|---|---|---|
| Howard | Corning Loudamy  29 | 1.000000 | 160.00 | 160.00 | | |
| Howard | B Phillips 20A | 1.000000 | 160.00 | 160.00 | | |
| Howard | Cassity 20 | 1.000000 | 163.60 | 163.60 | | |
| Howard | Cade 29 | 1.000000 | 80.00 | 80.00 | | |
| Howard | Phillips Unit | 1.000000 | 161.88 | 161.88 | | |
| Howard | Douglass 20 | 1.000000 | 82.00 | 82.00 | | |
| Howard | B Phillips 20 | 1.000000 | 160.00 | 160.00 | | |
| Howard | Thomas Stokes | 0.835938 | 160.00 | 133.75 | | |
| Howard | Knott Shaw 30 | 1.000000 | 162.90 | 162.90 | | |
| Howard | Ringener 19 | 1.000000 | 160.00 | 160.00 | | |
| Howard | Roosevelt Patsy 19 | 1.000000 | 80.00 | 80.00 | | |
| Howard | Raymond Eula 30 | 1.000000 | 160.00 | 160.00 | | |
| Howard | Ware 30 | 1.000000 | 242.64 | 242.64 | | |
| Howard | Little A/Elliott 31 | 1.000000 | 240.00 | 240.00 | | |
| Howard | Little 31 | 1.000000 | 238.00 | 238.00 | | |
| Howard | Coldiron/Bledsoe | 1.000000 | 40.00 | 40.00 | | |
| Howard | DE  Coldiron/Bledsoe | 1.000000 | 80.00 | 80.00 | | |
| Howard | Shasta | 1.000000 | 80.00 | 80.00 | | |
| Howard | Ioma 30 | 1.000000 | 40.40 | 40.40 | | |
| Howard | Corning  29 | 1.000000 | 160.50 | 160.50 | | |
| Howard | Knott Lilly 32 | 1.000000 | 157.20 | 157.20 | | |
| Howard | Cline 32 (A/B) | 0.500000 | 157.20 | 78.60 | | |
| Howard | Long 29 | 1.000000 | 160.10 | 160.10 | | |
| Howard | Wood Unit 32 | 1.000000 | 161.70 | 161.70 | | |
| Howard | Verl 32 | 1.000000 | 80.80 | 80.80 | | |
| Howard | Beall 28 | 1.000000 | 160.00 | 160.00 | | |
| Howard | Scheulke | 0.666667 | 160.00 | 106.67 | | |
| Howard | B Phillips 21 | 1.000000 | 160.00 | 160.00 | | |
| Howard | McCann | 0.500000 | 165.37 | 82.69 | | |
| Howard | Yucca | 1.000000 | 159.39 | 159.39 | | |
| Howard | Smith | 1.000000 | 160.00 | 160.00 | | |
| Howard | Billie Jo 33 | 1.000000 | 80.00 | 80.00 | | |
| Howard | McNew | 1.000000 | 162.15 | 162.15 | | |
| Howard | Nova 33 | 0.994154 | 80.00 | 79.53 | | |
| Howard | Super 34 | 1.000000 | 162.30 | 162.30 | | |
| Howard | Jordan 34 | 1.000000 | 162.40 | 162.40 | | |
| Howard | Clark 27 | 1.000000 | 160.00 | 160.00 | | |
| Howard | Freeman 27 | 1.000000 | 160.00 | 160.00 | | |
| Howard | Gay 34 | 1.000000 | 162.00 | 162.00 | | |
| Howard | Rogers 34 | 1.000000 | 162.40 | 162.40 | | |
| Howard | Coyote | 1.000000 | 143.95 | 143.95 | | |
| Howard | Ray/Ray A Unit | 0.970000 | 420.00 | 407.40 | | |
| Howard | Windmill | 1.000000 | 80.00 | 80.00 | | |
| Howard | Lone Star | 1.000000 | 320.00 | 320.00 | | |
| Howard | Pecan | 1.000000 | 160.00 | 160.00 | | |
| Howard | Texan | 1.000000 | 160.00 | 160.00 | | |
| Howard | Mesquite | 1.000000 | 163.59 | 163.59 | | |
| Howard | Texan A | 1.000000 | 160.00 | 160.00 | | |
| Howard | Levy | 0.970000 | 166.07 | 161.09 | | |
| Howard | Cottonwood | 0.500000 | 40.00 | 33.33 | | |
| Howard | Dagwood | 0.750000 | 83.12 | 62.34 | | |
| Howard | Alamo | 1.000000 | 164.66 | 164.66 | | |
| Howard | Live Oak | 1.000000 | 160.00 | 160.00 | | |
| Howard | Cottonwood A | 1.000000 | 41.54 | 41.54 | | |
| Howard | Aloe Vera | 1.000000 | | | 320.00 | 320.00 |
| Howard | CR 21 | 1.000000 | 240.00 | 240.00 | | |
| Martin | Grantham 46 | 0.312500 | | | 199.87 | 62.46 |
| Howard | Shaw 32 | 1.000000 | 80.00 | 80.00 | | |

**Regulatory Lease Schedule**

| County | Lease name | Lease WI | Gross Horizontal Development (All Rights) Acres | Net Horizontal Development (All Rights) Acres | Gross Vertical/Wellbore Only Acres | Net Vertical/Wellbore Only Acres |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |



HORIZANTAL RIGHTS
VERTICAL/WELLBORE RIGHTS ONLY
NON-OPERATED LEASES
Martin
Howard
Midland
Glasscock

**Exhibit B**

**Liquidation Analysis**

<u>**Liquidation Analysis**</u>

**1)        Introduction**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code[1] requires that the Bankruptcy Court find, as a condition to confirmation of the Plan, that each holder of a Claim or Interest in each Impaired Class: (a) has accepted the Plan or (b) will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.    To make these findings, the Bankruptcy Court must: (a) estimate the cash proceeds (the "**Liquidation Proceeds**") that a chapter 7 trustee (the "**Trustee**") would generate if each Debtors' chapter 11 cases were converted to chapter 7 cases on the Effective Date and the assets of the Debtors' estates were liquidated; (b) determine the distribution (the "**Liquidation Distribution**") that each holder of a Claim or Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each holder's Liquidation Distribution to the distribution under the Plan that such holder would receive if the Plan were confirmed and consummated.    Accordingly, asset values discussed herein may be different than amounts referred to in the Plan.    This analysis (the "**Liquidation Analysis**") is based on certain assumptions discussed herein and in the Disclosure Statement.

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.    The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code.    The Liquidation Analysis is not intended and should not be used for any other purpose.    The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.    NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY.

THE LIQUIDATION ANALYSIS DOES NOT CONTEMPLATE A SALE OR SALES OF THE DEBTORS' BUSINESS UNITS ON A GOING CONCERN BASIS.    ALTHOUGH THE DEBTORS MAKE NO ASSURANCES, IT IS POSSIBLE THAT (I) PROCEEDS RECEIVED FROM SUCH GOING CONCERN SALES WOULD BE MORE THAN PROCEEDS FROM A HYPOTHETICAL LIQUIDATION, (II) THE COSTS ASSOCIATED WITH THE SALES WOULD BE LESS, (III) FEWER CLAIMS WOULD BE ASSERTED AGAINST THE BANKRUPTCY ESTATES, OR (IV) CERTAIN ORDINARY COURSE CLAIMS WOULD BE ASSUMED BY THE BUYERS OF SUCH BUSINESS UNITS.

In preparing the Liquidation Analysis, the Debtors estimated Allowed Claims based upon a review of Claims listed on the Debtors' schedules of assets and liabilities and the Debtors' financial statements to account for other known liabilities, as necessary.    In addition, the Liquidation Analysis includes estimates for Claims not currently asserted in the chapter 11 cases, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 administrative claims, and chapter 7 administrative

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Disclosure Statement for the Debtors' Third Joint Chapter 11 Plan*, to which this exhibit is attached.

claims such as wind down costs, trustee fees, and tax liabilities. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing this Liquidation Analysis. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining distributions under the Plan. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION OR ADMISSION OF THE DEBTORS. THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

### 2)        Basis of Presentation

On May 15, 2016, the Debtors each filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.

The Liquidation Analysis assumes that the Debtors would be liquidated in a jointly administered and substantively consolidated proceeding.

The Liquidation Analysis has been prepared assuming that the Debtors converted their cases from chapter 11 cases to chapter 7 cases on or about December 31, 2017 (the "**Conversion Date**"). Except as otherwise noted, the Debtors' pro forma December 31, 2017 balance sheet is forecasted from actual book values of the Debtors' assets and liabilities as of July 31, 2017. The Liquidation Analysis was prepared on a consolidated basis.

It is assumed that, on the Conversion Date, the Bankruptcy Court would appoint the Trustee who would sell the Debtors' assets and distribute the cash proceeds, net of liquidation related costs, to creditors in accordance with relevant bankruptcy law.

The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation if the Trustee were appointed by the Bankruptcy Court to convert assets into cash. The determination of the hypothetical proceeds from the liquidation of assets is a highly uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by the Debtors' advisors and management, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors and their management.

The cessation of business in a liquidation is likely to trigger certain claims that otherwise would not exist under a Plan absent a liquidation. Some of these claims could be significant and will be entitled to priority in payment over general unsecured claims. Those priority claims would be paid before any liquidation proceeds would be made available to pay general unsecured claims.

As discussed herein, the claim amounts reflected in the Liquidation Analysis are estimates primarily based on the Debtors' best estimates and are subject to material revision.

No recovery or related litigation costs have been attributed to any potential avoidance actions under the Bankruptcy Code, including potential preferences or fraudulent transfer actions due to, among other issues, the cost of such litigation, the uncertainty of the outcome and anticipated disputes regarding these matters.

The Debtors have assumed that the liquidation would occur over an approximately seven-month time period to sell substantially all of the Debtors' assets, monetize and collect receivables and other assets on the pro forma balance sheet, and administer and wind-down the estates. During the seven-month period, producing assets would be sold over a four-month period and administration of proceeds and claims would require an additional three months.

In an actual liquidation, the process and length of wind-down could be materially longer and more expensive than the amounts assumed herein and thereby significantly reduce the actual recoveries relative to the estimated amounts shown herein. For example, the potential for priority, contingent, and other claims; litigation; rejection costs; and the final determination of allowed claims could substantially impact both the timing and amount of the distribution of the asset proceeds to the creditors. Also, in the context of a liquidation, there would likely be a myriad of potential offset claims, particularly with respect to joint interest billings that would take time to reconcile and resolve. Additionally, certain of the joint operating agreements appear to be non-assignable (absent consent from the other working interest owners) which could result in potential asset transfer issues in the context of a chapter 7 liquidation. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if Debtors were in fact, to undergo such a liquidation and the actual amounts received could be materially different (including materially less) than the amounts shown herein.

Professional fees, trustee fees, chapter 11 administrative expenses, priority claims and other such claims that may arise in a liquidation scenario would have to be paid in full from the liquidation proceeds before proceeds being made available to the General Unsecured Claims. Under the absolute priority rule, no junior creditor would receive any distributions until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. The assumed distributions to creditors as reflected in the Liquidation Analysis are estimated in accordance with the absolute priority rule.

The Liquidation Analysis does not include estimates for the tax consequences, either federal or state, that may be triggered upon the liquidation and sale of assets in the manner described above. Such tax consequences could be material (including the allocation of all items of income and loss and, upon completion of all distributions, the recognition and allocation of cancellation of debt income to equity holders).

3)    **Liquidation Process**

The Debtors' liquidation would be conducted in chapter 7 cases with the Trustee managing the bankruptcy estates to maximize recovery in an expedited process. The Trustee's initial step would be to develop a liquidation plan to generate proceeds from the sale of assets for distribution to creditors. The three major components of the liquidation are as follows:

- generation of cash proceeds from asset sales, marketed and sold in predetermined logical groupings (e.g., by production profile or region) in order to maximize value;

- costs related to the liquidation process, such as post-conversion date operating cash flows and estate wind-down costs including payroll and professional fees, trustee, and other administrative fees; and

- distribution of net proceeds generated from asset sales to claimants in accordance with the absolute priority rule under chapter 7 of the Bankruptcy Code.

4)    **Distribution of Net Proceeds to Claimants**

Any available net proceeds would be allocated to the applicable creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code:

- Certain Administrative Expense Claims: Fees and expenses of professionals retained in the Debtors' chapter 11 cases, fees payable to the United States Trustee for Region 2 pursuant to section 1920 of title 28 of the United States Code, and the Trustee's fees, in each case subject to

the terms of the final order approving the Debtors' postpetition revolving credit facility (the "**DIP Facility**").

- <u>Superpriority Secured Claims</u>:  Outstanding balances owed under the DIP Facility.

- <u>Secured Claims</u>:  Claims relating to the Debtors' prepetition secured indebtedness to the extent of the value of their collateral, including any adequate protection claims under the DIP Facility, in any case subject to the terms of the final order approving the DIP Facility.

- <u>Administrative and Priority Expense Claims</u>: Any remaining administrative or priority costs and expenses of the chapter 7 estates, including unpaid operating expenses incurred during the chapter 11 cases and any accrued and unpaid professional fees exceeding the "carve-out" under the DIP Facility.

- <u>Unsecured Claims</u>: Any non-secured, non-priority debt, including all outstanding Senior Unsecured Notes Claims, prepetition trade payables, and various other unsecured claims.

5)    **Conclusion**

As summarized in the below analysis, the Debtors have determined that upon the Effective Date the Plan will provide all creditors and equity security holders with a recovery (if any) that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and therefore believe that the Plan satisfies the requirement of section 1129(a)(7) of the Bankruptcy Code.

**Breitburn Energy Partners LP**
**Asset Liquidation Summary**

($ 000s)

| | Note | Forecasted Balance Sheet Dec-17 | Adj. to Pro Forma Values [1] | Adj. Pro Forma Value Dec-17 | Recovery Estimate (%) Low | Mid | High | Recovery Estimate ($) Low | Mid | High |
|---|---|---|---|---|---|---|---|---|---|---|
| **Gross Liquidation Proceeds:** | | | | | | | | | | |
| Cash and Equivalents | [ A. ] | $     1,864 | $    (1,864) | $       - | - | - | - | $       - | $       - | $       - |
| Trade Accounts Receivable | [ B. ] | 88,275 | (1,484) | 86,791 | 85% | 91% | 98% | 73,858 | 79,350 | 84,842 |
| Inventory | [ C. ] | 4,650 | - | 4,650 | 58% | 59% | 61% | 2,692 | 2,761 | 2,831 |
| Prepaid Expenses | [ D. ] | 7,834 | (356) | 7,477 | - | - | - | - | - | - |
| Investments | [ E. ] | 5,599 | 16,833 | 22,432 | 24% | 32% | 40% | 5,369 | 7,159 | 8,949 |
| Net PP&E | [ F. ][ G. ][ H. ] | 3,252,177 | (18,603) | 3,233,574 | 42% | 45% | 48% | 1,360,769 | 1,447,870 | 1,539,979 |
| Other Long-Term Assets | [ I. ] | 66,160 | (21,839) | 44,321 | 2% | 3% | 4% | 1,037 | 1,296 | 1,555 |
| **Total Gross Liquidation Proceeds** | | $  3,426,559 | $   (27,313) | $  3,399,246 | 42% | 45% | 48% | $1,443,725 | $1,538,437 | $1,638,156 |
| **(-) Less Total Liquidation Costs** | [ J. ][ K. ][ L. ] | | | | | | | $   (41,736) | $   (45,427) | $  (49,319) |
| **Total Net Liquidation Proceeds** | | | | | | | | 1,401,989 | 1,493,010 | 1,588,837 |

(1)  Adjustment to pro forma value deconsolidates East Texas Salt Water Disposal Company from the Company's consolidated balance sheet; book and liquidation values for East Texas Salt Water
     Disposal Company carried in Investments line item

**Breitburn Energy Partners LP**
**Claims Recovery Summary**

($ 000s)

| | Note | Estimated Claims | Recovery Estimate (%) | | | Recovery Estimate ($) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Low | Mid | High | Low | Mid | High | |
| **Total Net Liquidation Proceeds** | | | | | | 1,401,989 | 1,493,010 | 1,588,837 | |
| **Claims:** | | | | | | | | | |
| **Superpriority Claims:** | | | | | | | | | |
| DIP Facility Claims | [ N. ] | $ 105,990 | 100% | 100% | 100% | $ 105,990 | $ 105,990 | $ 105,990 | |
| Professional Fees Carve-Out | [ N. ] | 5,050 | 100% | 100% | 100% | 5,050 | 5,050 | 5,050 | |
| **Secured Claims:** | | | | | | | | | |
| Class 2 - Other Secured Claims | [ O. ] | 737 | 100% | 100% | 100% | 737 | 737 | 737 | |
| Class 3 - Revolving Credit Facility Claims | [ P. ] | 777,850 | 100% | 100% | 100% | 777,850 | 777,850 | 777,850 | |
| Class 3 - Interest Rate Hedge Payable Claims | [ P. ] | 1,210 | 100% | 100% | 100% | 1,210 | 1,210 | 1,210 | |
| Class 4 - Secured Notes Claims | [ Q. ] | 847,563 to 984,264 | 52% to 60% | 61% to 71% | 71% to 82% | 511,152 | 602,172 | 698,000 | |
| **Administrative Expenses and Priority Claims:** | | | | | | | | | |
| Class 1 - Priority Non-Tax Claims | [ R. ] | - | - | - | - | - | - | - | |
| Other Administrative Expenses and Priority Claims | [ R. ] | 86,875 | - | - | - | - | - | - | |
| **Unsecured Claims:** | | | | | | | | | |
| Class 5 - 8.625% Senior Unsecured Notes Claims | [ S. ] | 320,345 | - | - | - | - | - | - | |
| Class 5 - 7.875% Senior Unsecured Notes Claims | [ S. ] | 889,047 | - | - | - | - | - | - | |
| Class 6 - Other General Unsecured Claims | [ T. ] | 25,454 | - | - | - | - | - | - | |
| Class 6 - Secured Note Claims Deficiency Claim | [ T. ] | 149,563 to 473,112 | - | - | - | - | - | - | (1) |
| Class 7 - Ongoing Trade Claims | [ T. ] | 5,121 | - | - | - | - | - | - | |
| Class 8 - Intercompany Claims | [ T. ] | - | - | - | - | - | - | - | |
| **Other Claims:** | | | | | | | | | |
| Class 9 - Subordinated Claims | [ U. ] | - | - | - | - | - | - | - | |
| Class 10 - Intercompany Interests | [ V. ] | - | - | - | - | - | - | - | |
| Class 11 - Existing BBEP Equity Interests | [ W. ] | - | - | - | - | - | - | - | |
| **Total Estimated Claims:** | | $ 3,214,805 to $ 3,675,056 | | | | $ 1,401,989 | $ 1,493,010 | $ 1,588,837 | |

(1)  Secured Note Claims Deficiency Claim is calculated as the total Class 4 - Secured Notes Claims less the total Class 4. Secured Note Claims recovery

## Specific Notes to the Liquidation Analysis

## <u>Gross Liquidation Proceeds</u>

### A.  Cash and Equivalents

- Cash consists of cash in bank accounts and highly liquid investment securities that have original maturities of three months or less.

- The pro forma balance as of December 31, 2017 is based on the latest pro forma business plan projections prepared by the Debtors and their advisors.

- All post-Conversion Date receipts and disbursements are included in the "Assets" or "Total Liquidation Costs" line items, as applicable.

- The Debtors' pro forma cash balance at the Conversion Date is assumed to be zero. The Liquidation Analysis assumes cash on hand at the Conversion Date is applied to the outstanding DIP balance.

### B. Accounts Receivable

- Accounts receivable balances are based on the Debtors' estimated unaudited pro forma accounts receivable as of December 31, 2017.

- The analysis of accounts receivable assumes that the Trustee would retain certain existing staff to handle a collection effort for outstanding trade accounts receivable for the entities undergoing liquidation;

- Accounts receivable includes amounts due from purchasers of the Debtors' oil and gas production, joint interest partners, allowance for doubtful accounts, and a small amount of other receivables;

- For the purposes of the Liquidation Analysis, recoveries of trade receivables are estimated to be highly recoverable due to the short-term contractual obligations of the receivable counterparties and the low probability of contractual breaches.  An ultimate recovery range of 90% to 100% is estimated for trade receivables.

- Receivables from joint interest partners are contractual obligations, however an assumption is made that certain partners may offset their share of the unpaid joint interest payables back to the Debtors.  An ultimate recovery range of 65% - 90% is estimated for receivables from joint interest partners.

- The "Other Receivables" line item consists of amounts under reconciliation related to acquired and divested properties, a litigation settlement, select revenue accruals, and other legacy amounts under review.  The Debtors estimate that 25% to 50% of these amounts are potentially recoverable under a liquidation scenario.

- For purposes of the Liquidation Analysis, the ultimate blended recovery percentage for the Debtors' accounts receivable ranges from 85% to 98% of the pro forma balance.

### C. Inventory

- The Debtors' inventory consists of oil held in storage tanks related to their South Florida operations pending shipment by truck and barge to the point of sale. The Debtors inventory is assumed to be sold at market prices less marketing, handling, and other costs associated with transporting the inventory to its final point of sale.

- For purposes of the Liquidation Analysis, the ultimate blended recovery percentage of "Inventory" assets is estimated to be between 58% to 61% of the pro forma balance.

### D. Prepaid Expenses

- The "Prepaid Expenses" line item consists of prepaid insurance premiums, prepaid IT maintenance contracts, prepaid rent, and other prepayments to vendors.

- For purposes of the Liquidation Analysis, the ultimate recovery percentage on "Prepaid Expenses" assets is estimated to be 0%.

### E.    Investments

- Investments in East Texas Saltwater Disposal Company, Seal Beach Gas Processing Venture, Terra-Whiteside Processing Company, Wilderness-Chester LLC, and Wilderness Energy, L.C. are, for purposes of the Liquidation Analysis, included in the "Investments" line item of the pro forma Asset Liquidation Summary, and not consolidated.

- For purposes of the Liquidation Analysis, the ultimate recovery percentage on "Investments" assets is estimated to be 24% to 40% of the adjusted pro forma balance.

### F.    Oil and Gas Properties

- Given the daily production and depletion of the oil and gas assets, the Liquidation Analysis assumes the Trustee will pursue a prudent, prompt, and broad marketing of the assets over a four-month period, with the divestiture directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures.  It also assumes that the Trustee will not incur additional risk or have access to capital necessary to continue development, drilling, or completion of the oil and gas assets.

- Based on the methodology outlined above, a sale of the Debtors' oil and natural gas properties implies a liquidation value in the range of $1,357 million to $1,532 million.  This liquidation value provides for a blended recovery in the range of 42% to 47% of the December 31, 2017 pro forma net book value.

### G.    Land and Buildings

- Interests in real property and buildings consist of the Debtors' Gaylord, Michigan field office. The Liquidation Analysis assumes that the Debtors' recovery related to land and buildings is $1 million - $1.4 million.

### H.    Non-Oil and Gas Assets

- The "Non-Oil and Gas Assets" line item consists of $CO_2$-related assets at the Libby Ranch enhanced oil and gas recovery field, computer hardware, computer software, furniture and fixtures, office equipment, leasehold improvements, and automobiles.

- $CO_2$-related assets at the Libby Ranch field are critical to operations at Postle Field and are assumed to be included in the Postle Field oil and gas asset liquidation value.

- For purposes of the Liquidation Analysis, the ultimate blended recovery percentage on the "Non-Oil and Gas Assets" is estimated to be 1% to 4% of the gross pro forma balance.

### I.    Other Long-Term Assets

- The "Other Long-Term Assets" line item consists of property reclamation deposits related to the Jay Field, deposits for the Jay Field net interest obligation, tax payments paid in protest, deferred charges, security deposits, and gas imbalances.

- For purposes of the Liquidation Analysis, the ultimate recovery percentage of "Other Long-Term Assets" is estimated to be 2%-4% of the pro forma balance.

**Liquidation Costs**

The "Total Liquidation Costs" line item consists of the wind-down budget (includes post-conversion cash flow, payroll, other G&A expenses, and professional fees), chapter 7 Trustee fees, and royalty and working interest payments.

### J.  Wind-Down Budget

- The Debtors' wind-down budget includes post-conversion date operating cash flows and estates' wind-down costs including payroll and professional fees, and other administrative fees;

- Post-Conversion Cash Flow represents the Debtors' anticipated cash flow in a chapter 7 liquidation for a seven-month asset monetization and estate wind-down period post-Conversion Date.  As oil and gas assets are monetized, capital expenditures and all other operating expenses and cash flows associated with the specific monetized asset are excluded from the remainder of the wind-down budget.  Corporate payroll and operating costs during the liquidation are based on the assumption that certain limited functions would be required during the liquidation process for an orderly wind-down of the business and sale and transfer of oil and gas assets.

  *Payroll:*

- Field and District-level employees are assumed to be terminated/transferred to buyers in connection with their respective oil and gas asset divestiture over the asset monetization period.

- The Liquidation Analysis assumes that the Trustee would aggressively reduce corporate employee headcount to minimal staffing from the current levels over an estimated seven-month period, although the majority of any such employee-related reductions are assumed to be incurred following the initial period while the Trustee continues to operate the Debtors' businesses.

- No employee retention or severance costs are estimated as part of the wind-down budget.

  *Other G&A Expenses:*

- Other general and administrative expenses assumed as part of the wind-down budget consist primarily of the regularly occurring general and administrative costs (such as facilities rent, telephone, internet, office supplies, etc.) which will be required to operate the Debtors' businesses for the seven-month asset monetization and estate wind-down period.

  *Professional Fees:*

- Professional fees include estimates for outside legal counsel and investment bank professionals required and retained by the Trustee during the wind-down period.  Legal counsel professionals are assumed to charge on an hourly basis for assistance with asset monetization, estate wind-down, and administration of the claims reconciliation and related processes.  To maximize the value of the estates, it is assumed that the Trustee would retain an investment banking firm to lead the asset sale process.  The investment banking firm is assumed to charge a flat nominal monthly fee and a transaction fee equal to 1% of oil and gas asset sale value.

**K.  Chapter 7 Trustee Fees**

- Section 326 of the Bankruptcy Code provides for fees payable to the Trustee of 3.0% for liquidation proceeds exceeding $1 million.

**L.  Royalty and Working Interest Payments**

- Outstanding royalty and working interest payments are paid out of the liquidation proceeds since these funds are not technically property of the estate.  The estimated outstanding royalty and working interest amounts owed as of the Conversion Date is $15 million.

<u>Claims</u>

**N.  Superpriority Claims**

- The Liquidation Analysis assumes there will be approximately $106 million in outstanding DIP Facility Claims consisting of principal, plus accrued and unpaid pre- and post-Conversion Date interest.

- The Debtors estimate that there will be approximately $5.05 million in superpriority carve-out claims for chapter 11 professional fees and fees of the United States Trustee for Region 2.

- The Liquidation Analysis projects that all allowed and undisputed Superpriority Claims (including all claims for adequate protection in the order approving the DIP Facility) will be paid in full pursuant to the Liquidation Distribution.

**O.  Class 2 - Other Secured Claims**

- The Debtors estimate that there will be approximately $1 million in Other Secured Claims on the Conversion Date.  Other Secured Claims include equipment lease claims and certain trade claims.

- The Liquidation Analysis projects that all allowed and undisputed Other Secured Claims will be paid in full pursuant to the Liquidation Distribution.

**P.  Class 3 - Revolving Credit Facility Claims**

- The Debtors estimate that there will be approximately $779 million in Revolving Credit Facility claims, consisting of the principal amount of approximately $746 million, accrued and unpaid pre- and post-Conversion Date interest of approximately $32 million, and interest rate hedge payables of approximately $1.2 million. Post-Conversion Date interest is assumed to accrue until Revolving Credit Facility claims are paid at the end of the 4 month asset sale period.

- The Debtors have assumed that the liens securing the Revolving Credit Facility Claims are valid and perfected, and the Revolving Credit Facility Claims are fully secured.

- The Liquidation Analysis projects that all allowed and undisputed Revolving Credit Facility Claims will be paid in full pursuant to the Liquidation Distribution.

**Q.  Class 4 - Secured Notes Claims**

- The Debtors estimate that there will be approximately $848 million – $984 million in Secured Notes Claims on the Conversion Date, consisting of the principal amount of approximately $650 million, make whole of $135 million, and accrued and unpaid pre- and post-Conversion Date interest of $63 million - $199 million. The interest calculation range reflects competing views of the allowability of postpetition interest given the triggering of the make-whole claim as of the Petition Date. Post-Conversion Date interest is assumed to accrue until the Secured Notes Claims are paid at the end of the 4 month asset sale process.

- The Liquidation Analysis projects that the Secured Notes Claims will be paid approximately 52% to 82% pursuant to the Liquidation Distribution.

**R.  Administrative Expenses and Priority Claims**

- Chapter 11 administrative expenses include amounts necessary for the preservation of the Debtors' estates, incurred after the Petition Date but unpaid at the Conversion Date (including professional fees exceeding the superpriority carve-out; employee-related claims; certain lease rejection claims arising from leases assumed and entered into during the chapter 11 cases; and chapter 11 trade claims). The Debtors estimate there will be approximately $87 million in chapter 11 administrative expenses as of the Conversion Date.

- The Debtors estimate that there will be no Priority Non-Tax Claims on the Conversion Date.

- The Liquidation Analysis projects that all allowed and undisputed Administrative Expenses and Priority Claims will receive no recovery pursuant to the Liquidation Distribution.

**S.  Class 5A/5B - Unsecured Notes Claims**

- On the Conversion Date, the Debtors estimate there will be approximately $1,209 million in Unsecured Notes Claims.

- The Liquidation Analysis projects that Unsecured Notes Claims will receive no recovery pursuant to the Liquidation Distribution.

**T.  Class 6 - General Unsecured Claims,  Class 7 - Ongoing Trade Claims,  Class 8 - Intercompany Claims**

- On the Conversion Date, the Debtors estimate there will be approximately $180 million to $504 million in General Unsecured Claims. These claims include a deficiency claim relating to the Secured Notes Claims, Other General Unsecured Claims, Ongoing Trade Claims, and Intercompany Claims.

- The Liquidation Analysis projects that General Unsecured Claims will receive no recovery pursuant to the Liquidation Distribution.

**U.  Class 9 - Subordinated Claims**

- The Debtors estimate that there will be no Class 9 Claims on the Conversion Date.

- The Liquidation Analysis projects that the Class 9 Claims will receive no recovery pursuant to the Liquidation Distribution.

**V.  Class 10 - Intercompany Interests**

- The Liquidation Analysis projects that Intercompany Interests will be liquidated or settled pursuant to the asset dissolution process.

**W.  Class 11 - Existing BBEP Equity Interests**

- The Liquidation Analysis projects that Class 11 Claims will receive no recovery pursuant to the Liquidation Distribution.

## **Exhibit C**

**Financial Projections**

## **Financial Projections**

For purposes of demonstrating feasibility of the Plan, the Debtors have prepared the forecasted consolidated financial projections (the "**Financial Projections**") for the Reorganized Debtors[1] for the periods ending January 1, 2018 through December 31, 2021 (the "**Projection Period**").  The Financial Projections were prepared based on assumptions made by the Debtors' management as to the future performance of the Reorganized Debtors, and reflect management's judgment and expectations regarding their future operations and financial position.  The Financial Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond management's control, incident to the exploration for and development, production, and sale of oil, natural gas, and natural gas liquids.  Factors that may cause actual results to differ from expected results include:

1. fluctuations in oil and natural gas prices and the Reorganized Debtors' ability to hedge against movements in prices;
2. the uncertainty inherent in estimating reserves, future net revenues, and discounted future cash flows;
3. the timing and amount of future production of oil and natural gas;
4. changes in the availability and cost of capital;
5. environmental, drilling and other operating risks, including liability claims as a result of oil and natural gas operations;
6. proved and unproved drilling locations and future drilling plans; and
7. the effects of existing and future laws and governmental regulations, including environmental, hydraulic fracturing, and climate change regulation.

If one or more of the risks or uncertainties referenced above occur, or if underlying assumptions prove incorrect, actual results and plans could differ materially from those expressed in the Financial Projections. Furthermore, new factors could cause actual results to differ materially from those described in the Financial Projections, and it is not possible to predict all such factors, or to the extent to which any such factor or combination of factors may cause actual results to differ from those contained in the Financial Projections.  The Financial Projections herein are not, and must not be viewed as, a representation of fact, prediction, or guaranty of the Reorganized Debtors' future performance.

The Financial Projections have not been audited or reviewed by a registered independent accounting firm, and were not prepared with a view toward compliance with the guidelines of the Securities and Exchange Commission, the American Institute of Certified Public Accountants, or the Financial Accounting Standards Board ("**FASB**"), particularly for reorganization accounting.

The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the *Debtors' Third Amended Joint Chapter 11 Plan*.  Consistent therewith, the consolidated Financial Projections encompass those operations of the Reorganized Debtors after the Effective Date that will not include the Permian Assets.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR ADVISERS. EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE FINANCIAL PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH WILL BE BEYOND THE CONTROL OF THE REORGANIZED DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS AND REORGANIZED DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE FINANCIAL PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING AFTER THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE FINANCIAL PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE FINANCIAL PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISERS.

## I.    OVERVIEW

The Debtors and their subsidiaries are an independent oil and gas company focused on the exploitation and development of oil, natural gas liquids ("**NGL**"), and natural gas properties in the United States. The Financial Projections do not include any consideration of the Permian Assets.

## II.    ACCOUNTING AND PRESENTATION POLICIES

The Financial Projections have been prepared using accounting policies that are generally consistent with those applied in the Debtors' historical financial statements (GAAP consolidated basis). The Financial Projections have not been prepared under the intention of compliance with published guidelines of the SEC, the American Institute of Certified Public Accountants, the Financial Accounting Standards Board, or any other standard-setting body. The Financial Projections do not include adjustments or write-downs related to the predecessor Debtors' extinguishment of debt or other liabilities. The projected financial information does not reflect the impact of fresh start accounting, which could result in material changes to the projected values.

The Financial Projections do not reflect the formal implementation of reorganization accounting pursuant to FASB Accounting Standards Codification Topic 852, Reorganizations ("**ASC 852**"). Overall, the implementation of ASC 852 may or may not have a material impact on the underlying economics of the Plan.

The Debtors maintain a controlling interest in East Texas Saltwater Disposal Company. The Financial Projections, consistent with Debtors' consolidated historical financial statements, consolidate East Texas Saltwater Disposal Company at 100% of its value.

Adjusted EBITDA is a non-GAAP financial measure intended to provide useful information to evaluate the operations of the Debtors' business excluding certain items. Adjusted EBITDA should not be considered an alternative to net income, operating income, cash flow from operating activities or any other measure of financial performance presented in accordance with US GAAP. The Reorganized Debtors' projected adjusted EBITDA may not be comparable to similarly titled measures of another company because all companies may not calculate adjusted EBITDA in the same manner.

## III.    METHODOLOGY

The Financial Projections were prepared using a bottoms-up approach incorporating multiple sources of detailed information including region, area, and well-level analyses from each of the Debtors' operating divisions, other than those relating to the Permian Assets.

The projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

## IV.    ASSUMPTIONS

The Financial Projections include projected financial statements for 2018–2021 assuming that the Effective Date of the Plan is January 1, 2018 (the "**Emergence Date**"). The Financial Projections include consolidated financial statements inclusive of certain non-Debtor subsidiaries of the Debtors.

## V.    GENERAL ASSUMPTIONS

### A.  Restructuring

The Financial Projections include assumptions related to the Debtors' restructuring initiatives.

### B.  Exit Financing

The Financial Projections assume a post-emergence capital structure consisting of:

- First lien revolving credit facility with a borrowing base of $400 million and pricing of LIBOR plus grid of 250 - 350 bps
- $765 million of rights offering proceeds received on the Emergence Date

Management projects pro forma liquidity of approximately $220 million on the Emergence Date.

### C.  Total Revenue

Total revenue consists of production revenue and other revenue.

Production revenue is generated from the exploration for and development, production, gathering, and sale of oil, natural gas, and natural gas liquids.  Other revenue consists of salt water disposal revenue; revenue from sales of sulfur and $CO_2$ gas; pipeline-related revenue; and other operating revenue.

The Financial Projections make no assumption for hedge revenue.

### D.  Commodity Pricing

Commodity pricing is based on October 5, 2017 New York Mercantile Exchange ("**NYMEX**") strip pricing for crude oil and natural gas.  NGL prices are based on NYMEX strip pricing for crude oil.  Management estimates realized pricing based on forecasted oil and gas differentials for each producing area.

| *Reorganized Debtors' Financial Projections* | | FY 2018 Forecast | FY 2019 Forecast | FY 2020 Forecast | FY 2021 Forecast |
|---|---|---|---|---|---|
| *Realized Pricing (Excluding Hedges)* | ( D. ) | | | | |
| Oil ($/Bbl) | | $    48.01 | $    47.93 | $    47.63 | $    46.76 |
| NGL ($/Bbl) | | 19.11 | 18.83 | 18.48 | 18.38 |
| Gas ($/Mcf) | | 2.93 | 2.80 | 2.74 | 2.73 |

### E.  Operating Expenses

Operating expenses consist of lease operating expenses, transportation expenses, processing fees, oil and gas purchases, pre-drilling and other non-oil and gas operating expenses, district expenses, salt water disposal costs, and inventory change expense.

4

### F.  Production and Property Taxes

Production and property taxes includes severance and ad-valorem taxes, and the amounts are based on management's estimates of production volumes and mineral reserve values.

### G.  Cash General and Administrative Expenses

Cash general and administrative ("**G&A**") expenses primarily consists of personnel costs, rent, insurance, and other corporate overhead costs necessary to manage operations and comply with regulatory requirements.  The Reorganized Debtors' projected G&A expenses are based on the current development and operational plans, include management's targeted expense reductions, and exclude non-cash expenses.

### H.  Capital Expenditures

Capital expenditures include capital expenditures related to oil & gas properties, capitalized engineering expenses, and expenditures to acquire properties.

### I.  Changes in Net Working Capital & Other Cash Expenses

Changes in net working capital relates to changes in net working capital accounts.  Other cash expenses consists of cash expenses related to non-operating activities.

### J.  Cash Interest

Cash interest includes estimated interest disbursements payable on the Reorganized Debtors' outstanding debt.

### K.  Key Financial Metrics

- "Adjusted EBITDA" excludes non-cash compensation.
- "Net Debt" is calculated as total debt less balance sheet cash.
- "Borrowing Base Availability" includes availability on the post-emergence revolving credit facility after amounts drawn and outstanding letters of credit.
- "Net Debt/Adjusted EBITDA" is calculated using trailing twelve-month adjusted EBITDA and total debt less balance sheet cash.
- "Total Debt/Adjusted EBITDA" is calculated using trailing twelve-month adjusted EBITDA.
- "Interest Coverage" is calculated using trailing twelve-month adjusted EBITDA and trailing twelve-month cash interest disbursements.

### L.  Reconciliation of Net Income to Adjusted EBITDA

"Depletion, Depreciation, and Amortization" includes estimated depletion and depreciation of oil & gas properties and accretion expense related to abandonment and remediation of wells and facilities.  "Interest Expense, Net" may differ from "Cash Interest" due to the accrual nature of interest expense differing from the cash disbursement of interest. "Other Expenses, Net" includes non-cash compensation and restructuring expenses.

| *Reorganized Debtors' Financial Projections* | | **FY 2018** | | **FY 2019** | | **FY 2020** | | **FY 2021** |
|---|---|---|---|---|---|---|---|---|
| | | *Forecast* | | *Forecast* | | *Forecast* | | *Forecast* |
| *($ millions, unless otherwise indicated)* | Note | | | | | | | |
| Total Revenue | ( C. ) | $ | 526.0 | $ | 505.5 | $ | 497.8 | $ | 484.3 |
| (-) Lease Operating Expenses | ( E. ) | | (293.4) | | (284.4) | | (281.3) | | (266.3) |
| (-) Production Taxes | ( F. ) | | (30.9) | | (29.4) | | (28.8) | | (28.3) |
| (-) General and Administrative Expenses | ( G. ) | | (47.1) | | (47.4) | | (48.8) | | (50.3) |
| **Adjusted EBITDA** *(Excl. Non-Cash Comp.)* | | **$** | **154.6** | **$** | **144.3** | **$** | **138.9** | **$** | **139.4** |
| (-) Capital Expenditures | ( H. ) | $ | (72.6) | $ | (67.7) | $ | (114.9) | $ | (60.5) |
| (+/-) Changes in Net Working Capital & Other Cash Expenses | ( I. ) | | (9.7) | | (0.4) | | (2.4) | | (2.5) |
| **Unlevered Free Cash Flow** | | **$** | **72.2** | **$** | **76.1** | **$** | **21.6** | **$** | **76.4** |
| (-) Cash Interest | ( J. ) | $ | (7.9) | $ | (4.3) | $ | (3.2) | $ | (3.2) |
| **Levered Free Cash Flow** | | **$** | **64.4** | **$** | **71.8** | **$** | **18.4** | **$** | **73.1** |
| *Key Financial Metrics* | ( K. ) | | | | | | | |
| Adjusted EBITDA (Excl. Non-Cash Comp.) | | $ | 154.6 | $ | 144.3 | $ | 138.9 | $ | 139.4 |
| Total Debt | | | 69.5 | | - | | - | | - |
| Net Debt | | | 64.5 | | (7.3) | | (25.7) | | (98.8) |
| Borrowing Base Availability | | | 286.8 | | 356.3 | | 356.3 | | 356.3 |
| Total Liquidity | | | 291.8 | | 363.6 | | 382.0 | | 455.2 |
| Net Debt/Adjusted EBITDA | | | 0.42x | | -0.05x | | -0.18x | | -0.71x |
| Total Debt/Adjusted EBITDA | | | 0.45x | | 0.00x | | 0.00x | | 0.00x |
| Interest Coverage | | | 19.62x | | 33.56x | | 43.10x | | 43.27x |
| *Reconciliation of Net Income to Adjusted EBITDA* | ( L. ) | | | | | | | |
| Net Income/(Loss) | | $ | 35.1 | $ | 29.8 | $ | 16.5 | $ | 12.8 |
| (+) Depletion, Depreciation and Amortization | | | 88.1 | | 90.0 | | 98.4 | | 102.0 |
| (+) Interest Expense, Net | | | 8.0 | | 4.3 | | 3.2 | | 3.2 |
| (+) Other Expenses, Net | | | 23.3 | | 20.1 | | 20.7 | | 21.3 |
| **Adjusted EBITDA** *(Excl. Non-Cash Comp.)* | | **$** | **154.6** | **$** | **144.3** | **$** | **138.9** | **$** | **139.4** |

## **Exhibit D**

**Backstop Commitment Agreement**

**AMENDED AND RESTATED BACKSTOP COMMITMENT AGREEMENT**

**AMONG**

**THE SECOND LIEN NOTEHOLDER GROUP PARTIES PARTY HERETO,**

**THE COMMITMENT PARTIES PARTY HERETO**

**AND**

**BREITBURN ENERGY PARTNERS LP**

**AND**

**EACH OF THE DEBTORS IDENTIFIED AS SUCH HEREIN**

**Dated as of October 11, 2017**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND CONSTRUCTION ..................................................... 2
    Section 1.1    Definitions ............................................................................. 2
    Section 1.2    Construction .......................................................................17
    Section 1.3    Conflict ...............................................................................18
    Section 1.4    Debtors as Parties ..............................................................18

ARTICLE II BACKSTOP COMMITMENT ................................................................ 18
    Section 2.1    The Rights Offering; Subscription Rights; Minimum Allocation
                Rights...................................................................................18
    Section 2.2    The Backstop Commitment ..................................................20
    Section 2.3    Commitment Party Default ...................................................21
    Section 2.4    Subscription Escrow Account Funding .................................22
    Section 2.5    Closing................................................................................23
    Section 2.6    Designation and Assignment Rights .....................................24

ARTICLE III PUT OPTION PREMIUM AND EXPENSE REIMBURSEMENT ................... 26
    Section 3.1    Put Option Premium Payable by the Company .......................26
    Section 3.2    Payment of the Put Option Premium......................................26
    Section 3.3    Tax Treatment of the Put Option Premium .............................26
    Section 3.4    Expense Reimbursement .....................................................27

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT
PARTIES AND SECOND LIEN NOTEHOLDER GROUP PARTIES.................................... 28
    Section 4.1    Incorporation......................................................................28
    Section 4.2    Power and Authority.............................................................28
    Section 4.3    Execution and Delivery ........................................................28
    Section 4.4    No Conflict .........................................................................28
    Section 4.5    Consents and Approvals.......................................................29
    Section 4.6    No Registration....................................................................29
    Section 4.7    Purchasing Intent ................................................................29
    Section 4.8    Sophistication; Investigation ................................................29
    Section 4.9    No Broker's Fees .................................................................30
    Section 4.10   Legend................................................................................30
    Section 4.11   Agreements of the Commitment Parties..................................30
    Section 4.12   Access to Information...........................................................31
    Section 4.13   Sufficient Funds..................................................................31

ARTICLE V REPRESENTATIONS AND WARRANTIES OF THE DEBTORS..................... 31
    Section 5.1    Formation ...........................................................................31
    Section 5.2    Power and Authority.............................................................31
    Section 5.3    Execution and Delivery; Enforceability .................................31
    Section 5.4    No Conflict .........................................................................32
    Section 5.5    Consents and Approvals.......................................................32
    Section 5.6    SEC Documents and Disclosure Statement............................32

Section 5.7     Absence of Certain Changes ..................................................33
Section 5.8     No Violation; Compliance with Laws .................................33
Section 5.9     Legal Proceedings .................................................................33
Section 5.10    Labor Relations .....................................................................33
Section 5.11    Intellectual Property .............................................................34
Section 5.12    Title to Real and Personal Property .....................................34
Section 5.13    Hedging Contracts .................................................................36
Section 5.14    No Undisclosed Relationships...............................................36
Section 5.15    Licenses and Permits .............................................................36
Section 5.16    Environmental ........................................................................36
Section 5.17    Tax Returns ............................................................................38
Section 5.18    Employee Benefit Plans .........................................................38
Section 5.19    Internal Control Over Financial Reporting............................39
Section 5.20    Financial Condition. ..............................................................40
Section 5.21    Disclosure Controls and Procedures.....................................40
Section 5.22    Material Contracts .................................................................40
Section 5.23    No Unlawful Payments...........................................................41
Section 5.24    Compliance with Anti-Money Laundering Laws...................41
Section 5.25    Compliance with Sanctions Laws ..........................................41
Section 5.26    No Broker's Fees ...................................................................42
Section 5.27    Regulated Entities..................................................................42
Section 5.28    Insurance................................................................................42
Section 5.29    Alternative Transactions .......................................................42
Section 5.30    Issuance .................................................................................42
Section 5.31    No General Solicitation. .........................................................43
Section 5.32    Capitalization.........................................................................43

ARTICLE VI ADDITIONAL COVENANTS ................................................ 44
Section 6.1     Reasonable Best Efforts ........................................................44
Section 6.2     Antitrust Approval..................................................................45
Section 6.3     Conduct of Business ..............................................................46
Section 6.4     Confidentiality .......................................................................48
Section 6.5     Access to Information, Books and Records ...........................48
Section 6.6     Transition Services Agreement ..............................................49
Section 6.7     DTC Eligibility.......................................................................49
Section 6.8     Registration Rights Agreement; PermianCo Governance
                Documents and LegacyCo Organizational Documents...........49
Section 6.9     Blue Sky .................................................................................49
Section 6.10    No Integration; No General Solicitation................................50
Section 6.11    Use of Proceeds .....................................................................50
Section 6.12    Hedging ..................................................................................50
Section 6.13    Joinder of PermianCo ............................................................50

ARTICLE VII CONDITIONS TO THE OBLIGATIONS OF THE PARTIES............................ 50
Section 7.1     Conditions to the Obligations of the Commitment Parties and the
                Second Lien Noteholder Group Parties...................................50
Section 7.2     Conditions to the Obligations of the Debtors. ........................54

Section 7.3        Waiver of Conditions to Obligations......................................................54

ARTICLE VIII INDEMNIFICATION AND CONTRIBUTION ............................................... 54
Section 8.1        Indemnification Obligations.................................................................54
Section 8.2        Indemnification Procedure...................................................................55
Section 8.3        Settlement of Indemnified Claims.........................................................56
Section 8.4        Contribution........................................................................................56
Section 8.5        Treatment of Indemnification Payments ...............................................57
Section 8.6        No Survival...........................................................................................57

ARTICLE IX TERMINATION................................................................................................. 57
Section 9.1        Consensual Termination......................................................................57
Section 9.2        Automatic Termination .......................................................................57
Section 9.3        Termination by the Commitment Parties or the Second Lien
                   Noteholder Group Parties...................................................................57
Section 9.4        Termination by the Debtors.................................................................59
Section 9.5        Effect of Termination ..........................................................................60

ARTICLE X GENERAL PROVISIONS.................................................................................... 62
Section 10.1       Notices..................................................................................................62
Section 10.2       Assignment; Third Party Beneficiaries ...............................................64
Section 10.3       Prior Negotiations; Entire Agreement.................................................64
Section 10.4       Governing Law; Venue........................................................................64
Section 10.5       Waiver of Jury Trial .............................................................................65
Section 10.6       Execution of Agreement......................................................................65
Section 10.7       Waivers and Amendments; Consent ....................................................65
Section 10.8       Headings...............................................................................................66
Section 10.9       Specific Performance; Rights Cumulative ..........................................66
Section 10.10      Damages...............................................................................................66
Section 10.11      Several, Not Joint and Several, Obligations.........................................66
Section 10.12      No Reliance..........................................................................................66
Section 10.13      Settlement Discussions ........................................................................67
Section 10.14      Effectiveness........................................................................................67
Section 10.15      Severability..........................................................................................67
Section 10.16      Interpretation; Representation by Counsel ..........................................67
Section 10.17      No Recourse.........................................................................................67
Section 10.18      Publicity...............................................................................................68

## EXHIBITS

Exhibit A        Backstop Commitment Parties and Amounts
Exhibit B        Restructuring Support Agreement
Exhibit C        Rights Offering Procedures

**SCHEDULES**

Schedule 5.12(d)(iii)          Acreage Swaps
Schedule 5.13                 Hedging Contracts

<u>Schedule 5.12(d)(iii)</u>

**Acreage Swaps**

| Date of Agreement | Parties | Docket Numbers |
|---|---|---|
| 2017/04 | BREITBURN OPERATING LP<br>DIAMONDBACK O&G LLC | Motion: 989<br>Order: 1078 |
| 2017/05 | BREITBURN OPERATING LP<br>SM ENERGY COMPANY | Motion: 1116<br>Order: 1191 |
| 2017/06 | BREITBURN OPERATING LP<br>CROWNROCK OPERATING, LLC<br>CROWNROCK, L.P. | Motion: 1114<br>Order: 1192 |
| PENDING CLOSING | BREITBURN OPERATING LP<br>CONOCOPHILLIPS COMPANY | Motion: 760<br>Order: 869 |
| PENDING CLOSING | BREITBURN OPERATING LP<br>ENDEAVOR ENERGY RESOURCES, LP<br>GUIDON OPERATING LLC | Motion: 1008<br>Order: 1077 |

Schedule 5.13

**Hedging Contracts**

None.

### AMENDED AND RESTATED BACKSTOP COMMITMENT AGREEMENT

THIS AMENDED AND RESTATED BACKSTOP COMMITMENT AGREEMENT (this "**Agreement**"), dated as of October 11, 2017, is made by and among:

(1) the undersigned beneficial holders of, or investment managers, advisers, sub-advisers for holders of, Claims against the Debtors under the Second Lien Notes issued pursuant to the Second Lien Notes Indenture (such undersigned holders of Claims under the Second Lien Notes Indenture, collectively, the "**Second Lien Noteholder Group Parties**");

(2) the parties set forth on Exhibit A hereto (each referred to herein, individually, including any permitted transferee hereunder, as a "**Commitment Party**" and, collectively, as the "**Commitment Parties**"), each of which is a holder of Claims against the Debtors under (a) the 2020 Senior Notes issued pursuant to the 2020 Senior Notes Indenture and/or (b) the 2022 Senior Notes issued pursuant to the 2022 Senior Notes Indenture; and

(3) each of the Debtors, including Breitburn Energy Partners LP, a Delaware limited partnership (the "**Company**").

Each of the parties identified in the foregoing clauses (1) - (3) is referred to herein, individually, as a "**Party**" and, collectively, as the "**Parties**."

### RECITALS

WHEREAS, on May 15, 2016 (the "**Petition Date**"), the Debtors commenced voluntary cases under the Bankruptcy Code, which are being jointly administered under the caption *In re Breitburn Energy Partners LP, et al.*, Case No. 16-11390 (SMB) (the "**Chapter 11 Cases**") in the Bankruptcy Court;

WHEREAS, in connection with the Chapter 11 Cases, the Debtors, the Second Lien Noteholder Group Parties and the Commitment Parties have engaged in good faith, arm's length negotiations regarding the terms of the Approved Plan, and have entered into the RSA, attached as Exhibit B hereto, pursuant to which the parties thereto have agreed to support approval of the Approved Plan in accordance with the terms thereof;

WHEREAS, in connection with the implementation of the Rights Offering and pursuant to and on the terms and conditions of the Approved Plan, on or immediately prior to the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will effectuate the Restructuring Transactions, including the Reorganization Transactions;

WHEREAS, pursuant to this Agreement, the Approved Plan and the BCA Approval Order, the Company shall be required, on behalf of PermianCo, to implement the Rights Offering on behalf of PermianCo and will, for aggregate proceeds of $775,000,000, (x) issue Minimum Allocation Rights to each of the Commitment Parties for 40% of PermianCo Common Stock at a price per Share for aggregate proceeds of $310,000,000; and (y) in accordance with the Rights Offering Procedures, issue subscription rights to purchase PermianCo

Common Stock to holders of Senior Unsecured Notes (the "**Subscription Rights**") and conduct a rights offering representing an aggregate of 60% of PermianCo Common Stock at a price per Share for aggregate proceeds of $465,000,000;

WHEREAS, on the Effective Date, as provided by the Approved Plan, holders of General Unsecured Claims shall receive their pro rata share of either (x) the GUC Cash Pool payable from the proceeds from the Rights Offering or (y) an amount of PermianCo Common Stock equal in value to the GUC Cash Pool, as determined by the Debtors, the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors by no later than the date of the Disclosure Statement Hearing;

WHEREAS, subject to the terms and conditions contained in this Agreement, (A) each Commitment Party has agreed, severally and not jointly, to (x) fully exercise all Minimum Allocation Rights issued to it as a Commitment Party and duly purchase its Initial BCA Percentage of the underlying Minimum Allocation Rights Securities and (y) duly purchase, its Final BCA Percentage of the Unsubscribed Securities, if any, and (B) each Commitment Party shall receive PermianCo Common Stock in respect of the Put Option Premium based upon its respective Initial BCA Percentages at the time the payment is made;

WHEREAS, the Parties, other than the Debtors, entered into the Backstop Commitment Agreement, dated as of September 22, 2017 (the "**Original Agreement**"); and

WHEREAS, the Parties, other than the Debtors, have agreed pursuant to <u>Section 10.7</u> to amend and restate the Original Agreement as set forth herein to add the Debtors as Parties.

NOW, THEREFORE, in consideration of the mutual promises, agreements, representations, warranties and covenants contained herein, each of the Parties hereby severally and not jointly agrees as follows:

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION

Section 1.1    <u>Definitions</u>.    Capitalized terms that are used herein but not otherwise defined shall have the meanings ascribed to them in the RSA.  Except as otherwise expressly provided in this Agreement, whenever used in this Agreement (including any Exhibits and Schedules hereto), the following terms shall have the respective meanings specified therefor below:

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any Affiliated Funds of such Person); *provided*, that for purposes of this Agreement, no Commitment Party shall be deemed an Affiliate of the Company or any of its Subsidiaries.  For purposes of this definition, the term "control" (including the correlative meanings of the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the

direction of the management policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Affiliated Fund**" has the meaning set forth in <u>Section 2.6(b)</u>.

"**Agreement**" has the meaning set forth in the Preamble.

"**Alternative Transaction**" means any dissolution, winding up, liquidation, reorganization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of material assets, financing (debt or equity), refinancing, chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on one or more material asset sales under section 363 of the Bankruptcy Code or pursuant to a plan), of all or any of the Debtors, other than the transactions contemplated by the Approved Plan and this Agreement or as otherwise consented to by the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties.

"**Anti-Money Laundering Laws**" has the meaning set forth in <u>Section 5.24</u>.

"**Anticorruption Laws**" means all Laws of any jurisdiction applicable to the Company or its Subsidiaries from time to time concerning or relating to bribery or corruption.

"**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws, and "Antitrust Authority" means any of them.

"**Antitrust Laws**" mean the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law governing agreements in restraint of trade, monopolization, pre-merger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

"**Available Securities**" means the Unsubscribed Securities that any Commitment Party fails to purchase as a result of a Commitment Party Default by such Commitment Party as well as any Minimum Allocation Rights that a Commitment Party fails to exercise for the underlying Minimum Allocation Rights Securities.

"**Backstop Commitment**" has the meaning set forth in <u>Section 2.2(b)</u>.

"**Backstop Funding Date**" has the meaning set forth in <u>Section 2.4(b)</u>.

"**Ballots**" means the ballot forms distributed in connection with the solicitation of acceptances of the Approved Plan.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure and the local rules and general orders of the Bankruptcy Court, as in effect on the Petition Date, together with all amendments and modifications thereto subsequently made applicable to the Chapter 11 Cases.

"**Breakup Premium**" has the meaning set forth in Section 9.5(b).

"**Business Day**" means any day, other than a Saturday, Sunday or legal holiday, as defined in Bankruptcy Rule 9006(a).

"**Chapter 11 Cases**" has the meaning set forth in the Recitals.

"**Chosen Court**" has the meaning set forth in Section 10.4.

"**Claim**" means any "claim" against any Debtor as defined in sections 101(5) and 102(2) of the Bankruptcy Code, including, without limitation, any Claim arising after the Petition Date.

"**Closing**" has the meaning set forth in Section 2.5(a).

"**Closing Date**" has the meaning set forth in Section 2.5(a).

"**Code**" means the Internal Revenue Code of 1986, as amended, and regulations promulgated thereunder.

"**Commitment Party**" has the meaning set forth in the Preamble.

"**Commitment Party Default**" means the failure by any Commitment Party, by the Backstop Funding Date, in accordance with this Agreement and the Approved Plan, to (a) fully exercise all Minimum Allocation Rights that are issued to it and deliver and pay the aggregate per Share purchase price in respect of the Minimum Allocation Rights Securities issuable to it, (b) deliver and pay the aggregate per Share purchase price for such Commitment Party's Final BCA Percentage of any Unsubscribed Securities or (c) comply with Sections 2.1(a)(i) or 4.11.

"**Commitment Party Replacement**" has the meaning set forth in Section 2.3(a).

"**Commitment Party Replacement Period**" has the meaning set forth in Section 2.3(a).

"**Company**" has the meaning set forth in the Preamble.

"**Company Equity Interests**" means all common and preferred equity interests of the Company.

"**Company Plan**" means an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to ERISA, other than a Multiemployer Plan, which any of the Debtors sponsors, maintains, or to which it makes, is making, or is obligated to make contributions, or in the case of a multiple employer plan (as described in Section 4064(a) of ERISA) has made contributions at any time during the immediately preceding five plan years.

"**Confidential Information**" means any confidential or proprietary information pertaining to the Debtors or the transactions contemplated hereby that has been or will be

4

provided to certain of the Parties and their respective Representatives by the Company or its Representatives upon request; *provided*, that Confidential Information shall not include information that: (a) was or is received from a source independent of the Company and its Affiliates (*provided*, that such source is not known by the applicable Party to be subject to a written obligation of confidentiality owed to the Company), (b) was independently developed by a Party on its own behalf without use of any of the Confidential Information, (c) is or becomes generally available to the public (other than as a result of a disclosure by a Party that is prohibited pursuant to the terms of this Agreement), (d) is disclosed by a Party in connection with any proposed transfer of such Party's interests and/or obligations under this Agreement, (e) the Company has consented to disclosure of in writing or (f) becomes available to a Party or its Representatives through document production or discovery in connection with the Chapter 11 Cases or other judicial or administrative process, but subject to any confidentiality restrictions imposed by the Chapter 11 Cases or other such process.

"**Contract**" means any agreement, contract or instrument, including any loan, note, bond, mortgage, indenture, guarantee, deed of trust, license, franchise, commitment, lease, franchise agreement, letter of intent, memorandum of understanding or other obligation, and any amendments thereto, whether written or oral, but excluding the Approved Plan.

"**Defaulting Commitment Party**" means in respect of a Commitment Party Default that is continuing, the applicable defaulting Commitment Party.

"**Disclosure Statement Hearing**" means the hearing in front of the Bankruptcy Court related to the Disclosure Statement Motion.

"**Disclosure Statement Motion**" means the motion for an Order, in form and substance reasonably satisfactory to the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties that, among other things, seeks (a) approval of the Disclosure Statement; (b) establishment of a voting record date for the Approved Plan; (c) approval of solicitation packages and procedures for the distribution thereof; (d) approval of the forms of Ballots; (e) establishment of procedures for voting on the Approved Plan; (f) establishment of notice and objection procedures for the confirmation of the Approved Plan; and (g) establishment of procedures for the assumption and/or assignment of executory Contracts and unexpired leases under the Approved Plan.

"**Disclosure Statement Order**" means an Order entered by the Bankruptcy Court, substantially in the form attached to the Disclosure Statement Motion, which Order shall, among other things, approve the Disclosure Statement and the commencement of a solicitation of votes to accept or reject the Approved Plan, and which Order shall be in form and substance reasonably satisfactory to the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties.

"**Eligible Offeree**" means a holder of Senior Unsecured Notes that is (a) an accredited investor as defined in Rule 501(a) of Regulation D under the Securities Act or (b) a Non-U.S. Person.

"**Environmental Laws**" means all applicable Laws, Orders, decrees, treaties, directives, judgments or legally binding agreements promulgated or entered into by or with any Governmental Entity, relating in any way to the protection of the environment, the preservation or reclamation of natural resources, or the generation, management, Release or threatened Release of, or exposure to, any Hazardous Material.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with any of the Debtors, is, or at any relevant time during the past six years was, treated as a single employer under any provision of Section 414 of the Code.

"**ERISA Event**" means (a) any Reportable Event with respect to a Pension Plan; (b) any failure by any Pension Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Pension Plan, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Pension Plan, the failure to make by its due date a required installment under Section 430(j) of the Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by any of the Debtors or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Pension Plan, including the imposition of any Lien in favor of any Pension Plan or Multiemployer Plan; (e) a determination that any Pension Plan is, or is expected to be, in "at-risk" status (within the meaning of Section 303 of ERISA or Section 430 of the Code); (f) the receipt by any of the Debtors or any ERISA Affiliate from a plan administrator of any notice relating to an intention to terminate any Pension Plan or to appoint a trustee to administer any Pension Plan under Section 4042 of ERISA; (g) the incurrence by any of the Debtors or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Pension Plan or Multiemployer Plan; (h) the receipt by any of the Debtors or any ERISA Affiliate of any notice concerning the impending imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, "insolvent" (within the meaning of Section 4245 of ERISA), or in "endangered" or "critical status" (within the meaning of Section 305 of ERISA or Section 432 of the Code); (i) the conditions for imposition of a Lien under Section 303(k) of ERISA or Section 430(k) of the Code shall have been met with respect to any Pension Plan; (j) the adoption of an amendment to a Pension Plan requiring the provision of security to such Pension Plan pursuant to Section 307 of ERISA; (k) the assertion of a material claim (other than routine claims for benefits) against any Company Plan or the assets thereof, or against any of the Debtors in connection with any Company Plan; (l) receipt from the IRS of notice of the failure of any Company Plan (or any other employee benefit plan intended to be qualified under Section 401(a) of the Code) to qualify under Section 401(a) of the Code, or the failure of any trust forming part of any Company Plan to qualify for exemption from taxation under Section 501(a) of the Code; (m) a withdrawal by any of the Debtors or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations which is treated as such a withdrawal under Section 4062(e) of ERISA; or (n) the imposition of any liability under Title IV of ERISA,

6

other than PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any of the Debtors or any ERISA Affiliate.

"**Event**" means any event, development, occurrence, circumstance, effect, condition, result, state of facts or change.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Existing BBEP Equity Interests**" has the meaning set forth in Section 4.11.

"**Expense Reimbursement**" has the meaning set forth in Section 3.4(a).

"**Filing Party**" has the meaning set forth in Section 6.2(b).

"**Final Backstop Commitment**" means, with respect to any Commitment Party, the greater of zero and its (x) Remaining BCA Commitment *minus* (y) the Rights Offering Purchase Amount.

"**Final BCA Percentage**" means, with respect to any Commitment Party, the percentage obtained by dividing such Commitment Party's Final Backstop Commitment by the aggregate of the Final Backstop Commitments of all Commitment Parties. Any reference to "Final BCA Percentage" in this Agreement means the Final BCA Percentage in effect at the time of the relevant determination.

"**Final Order**" means, as applicable, an Order of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, reconsidered, readjudicated, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the Order could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such Order or has otherwise been dismissed with prejudice; *provided*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, as made applicable by Rule 9024 of the Bankruptcy Rules, may be filed relating to such Order shall not cause such Order to not be a Final Order.

"**Funding Notice**" has the meaning set forth in Section 2.4(a).

"**GAAP**" means generally accepted accounting principles in the United States.

"**General Unsecured Claims**" has the meaning set forth in the Approved Plan.

"**Governance Term Sheet**" means that certain term sheet setting forth the governance of PermianCo following the Effective Date attached as an exhibit to the Approved Plan.

"**Governmental Entity**" means any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory

authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof).

"**GUC Cash Pool**" means $500,000 in cash or any greater amount in cash as determined by the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors (with the consent of the Company) by no later than the date of the Disclosure Statement Hearing.

"**Hazardous Materials**" means all pollutants, contaminants, wastes, chemicals, materials, substances and constituents, including explosive or radioactive substances or petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls or radon gas, of any nature subject to regulation or which can give rise to liability under any Environmental Law other than naturally occurring radioactive material on or inside of equipment wells or Oil and Gas Property to the extent each of the foregoing is in service.

"**Hedging Contracts**" means: (a) interest rate swap agreements, interest rate cap agreements and interest rate collar agreements entered into with one or more financial institutions and designed to protect the Company or any of its Subsidiaries entering into the agreement against fluctuations in interest rates with respect to indebtedness incurred; (b) foreign exchange contracts and currency protection agreements entered into with one or more financial institutions and designed to protect the Company or any of its Subsidiaries entering into the agreement against fluctuations in currency exchanges rates with respect to indebtedness incurred; (c) any commodity futures contract, commodity option or other similar agreement or arrangement designed to protect against fluctuations in the price of hydrocarbons used, produced, processed or sold by the Company or any of its Subsidiaries at the time; and (d) other agreements or arrangements designed to protect the Company or any of its Subsidiaries against fluctuations in interest rates, commodity prices or currency exchange rates.

"**Hedging Order**" means the *Order Authorizing Application of Hedge Proceeds to Prepetition First Lien Indebtedness and to Hedge Termination Payments*, entered by the Bankruptcy Court on July 19, 2017.

"**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"**Hydrocarbon Interests**" means leasehold and other interests in or under oil, gas and other liquid or gaseous hydrocarbon leases wherever located, mineral fee interests, overriding royalty and royalty interests, net profit interests, and production payment interests relating to oil, gas or other liquid or gaseous hydrocarbons wherever located, including any reserved or residual interest of whatever nature.

"**Indemnified Claim**" has the meaning set forth in Section 8.2.

"**Indemnified Person**" has the meaning set forth in Section 8.1.

"**Indemnifying Party**" has the meaning set forth in Section 8.1.

"**Individual BCA Commitment**" means the total maximum dollar amount payable by each Commitment Party for PermianCo Common Stock as set forth on Exhibit A (as

it may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement).  The aggregate Individual BCA Commitment shall equal the Total BCA Commitment of $775,000,000.

"**Initial BCA Percentage**" means, with respect to any Commitment Party, such Commitment Party's percentage of the Total BCA Commitment as set forth opposite such Commitment Party's name under the column titled "Initial BCA Percentage" on Exhibit A (as it may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement), equal to such Commitment Party's Individual BCA Commitment *divided by* the Total BCA Commitment.  Any reference to "Initial BCA Percentage" in this Agreement means the Initial BCA Percentage in effect at the time of the relevant determination.

"**Intellectual Property Rights**" has the meaning set forth in Section 5.11.

"**Investment Company Act**" has the meaning set forth in Section 5.27.

"**Joinder Agreement**" has the meaning set forth in Section 2.6(c).

"**Joint Filing Party**" has the meaning set forth in Section 6.2(c).

"**Law**" means any law (statutory or common), statute, regulation, rule, code or ordinance enacted, adopted, issued or promulgated by any Governmental Entity.

"**LegacyCo**" means the newly formed Delaware corporation or limited liability company (treated as a partnership for Tax purposes), which formation as a corporation or limited liability company shall be in the sole discretion of the Requisite Consenting Second Lien Creditors.  LegacyCo will be, as of the Effective Date, the ultimate parent company of the Reorganized Debtors, and that, in accordance with the Restructuring Transactions, *inter alia*, will be the issuer of the LegacyCo Units to the Company pursuant to the Approved Plan and the transferee of the assets (other than the Permian Assets) of the Company (including equity interests of Subsidiaries).

"**LegacyCo LLC Agreement**" means the limited liability company agreement of LegacyCo, the form of which shall be included in the Plan Supplement and shall be in form and substance acceptable to the Requisite Consenting Second Lien Creditors and in accordance with the Approved Plan.

"**LegacyCo Organizational Documents**" means the LegacyCo LLC Agreement and the certificate of formation and/or other organizational documents of LegacyCo, which shall be in form and substance acceptable to the Requisite Consenting Second Lien Creditors.

"**LegacyCo Units**" means the common equity issued by LegacyCo.

"**Legal Proceedings**" means legal, governmental, administrative, judicial or regulatory investigations, audits, actions, suit, claims, arbitrations, demands, demand letters, claims, notices of noncompliance or violations, or proceedings.

"**Lien**" means any lien, adverse claim, charge, option, right of first refusal, servitude, security interest, mortgage, pledge, deed of trust, easement, encumbrance, restriction on transfer, conditional sale or other title retention agreement, defect in title, lien or judicial lien as defined in Sections 101(36) and (37) of the Bankruptcy Code or other restrictions of a similar kind.

"**Losses**" has the meaning set forth in <u>Section 8.1</u>.

"**Material Adverse Effect**" means any individual Event or series of Events that, individually or in the aggregate, (a) has, or would reasonably be expected to have, a material and adverse effect on the business, assets, properties, liabilities, finances, results of operations or condition (financial or otherwise) of the Debtors and their Subsidiaries, taken as a whole, or (b) prevents, materially delays or materially impairs or would be reasonably expected to prevent, materially delay or materially impair the consummation of the transactions contemplated by this Agreement or the RSA; *provided*, that, for the purposes of <u>clause (a)</u>, none of the following, either alone or in combination, will constitute a Material Adverse Effect: (i) of any change after the date hereof in the United States or foreign economies or securities or financial markets in general or that generally affects any industry in which the Debtors primarily operate; (ii) of any change after the date hereof arising in connection with earthquakes, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions; (iii) of any changes in applicable Laws or GAAP; (iv) resulting from the filing or pendency of the Chapter 11 Cases or actions taken in connection with the Chapter 11 Cases that are directed by the Bankruptcy Court and made in compliance with the Bankruptcy Code; (v) resulting from the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated hereby; (vi) resulting directly from any act of any of the Debtors and their Subsidiaries taken after the date hereof with the prior written consent of the Commitment Parties or (vii) any reduction in the accounting or carrying value of any of the assets of the Debtors or their Subsidiaries, as required by GAAP (it being understood that the foregoing shall not preclude any assertion that the facts or occurrences giving rise to or contributing to such reduction should be deemed to constitute, or be taken into account in determining whether there has been, or would reasonably be expected to be, a Material Adverse Effect); *provided*, that the exceptions set forth in <u>clauses (i)</u> through <u>(iii)</u> of this definition shall not apply to the extent that such described Event has a disproportionately adverse impact on the Debtors, taken as a whole, as compared to other companies in the industries in which the Debtors operate.

"**Material Contract**" means all "plans of acquisition, reorganization, arrangement, liquidation or succession" and "material contracts" (as such terms are defined in Items 601(b)(2) and 601(b)(10) of Regulation S-K under the Exchange Act) to which any Debtor is a party.

"**Minimum Allocation Rights**" means the rights issued to the Commitment Parties equal to 40% of the PermianCo Common Stock to be issued on the Closing Date to the Commitment Parties in connection with their exercise of the Minimum Allocation Rights (subject to the dilution for the Put Option Premium, any Shares issued after the Closing Date and on account of any Shares to be issued under any long-term management incentive plan in respect of PermianCo).

"**Minimum Allocation Rights Securities**" means the Shares underlying the Minimum Allocation Rights. In the aggregate, the Minimum Allocation Rights Securities shall represent Shares equal in value to $310,000,000.

"**Minimum Cash Balance**" has the meaning set forth in the Approved Plan.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA to which any of the Debtors or any ERISA Affiliate is making or accruing an obligation to make contributions, or each such plan with respect to which any such entity has any liability or obligation (including on account of an ERISA Affiliate).

"**New Exit Facility**" means a new senior secured amended and restated term loan facility and a new senior secured amended and restated revolving facility that shall become effective on the Effective Date of the Approved Plan.

"**Non-U.S. Person**" means a "non-U.S. person" as defined in Regulation S under the Securities Act.

"**OFAC**" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"**Oil and Gas**" means petroleum, natural gas and other related hydrocarbons or minerals or any of them and all other substances produced or extracted in association therewith.

"**Oil and Gas Properties**" means Hydrocarbon Interests and contracts executed in connection therewith and all tenements, hereditaments, appurtenances, and properties belonging, affixed or incidental to such Hydrocarbon Interests, including any and all property and situated upon or to be situated upon, and used, built for use, or useful in connection with the operating, working or developing of such Hydrocarbon Interests, including any and all petroleum and/or natural gas wells, buildings, structures, field separators, liquid extractors, plant compressors, pumps, pumping units, field gathering systems, pipelines, tank and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, liters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, taping, tubing and rods, surface leases, rights-of-way, easements and servitudes, and all additions, substitutions, replacements for, and fixtures and attachments thereto.

"**Order**" means any judgment, order, award, injunction, writ, permit, license or decree of any Governmental Entity or arbitrator of applicable jurisdiction.

"**Original Agreement**" has the meaning set forth in the Recitals.

"**Party**" has the meaning set forth in the Preamble.

"**PBGC**" means the Pension Benefit Guaranty Corporation, or any Governmental Entity succeeding to any of its principal functions under ERISA.

"**Pension Plan**" means any employee pension benefit plan, as such term is defined in Section 3(2) of ERISA (other than a Multiemployer Plan), subject to the provisions of

11

Title IV of ERISA or Section 412 or 430 of the Code or Section 302 of ERISA, and (i) sponsored or maintained (at the time of determination or at any time within the six years prior thereto) by any of the Debtors or any ERISA Affiliate, or with respect to which any such entity has any actual or contingent liability or obligation or (ii) in respect of which any of the Debtors or any ERISA Affiliate is (or, if such plan were terminated, could under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"**Permian Assets**" has the meaning set forth in the Approved Plan.

"**PermianCo**" means a newly formed Delaware corporation which will acquire all of the equity of a newly formed Delaware limited liability company to which the Permian Assets will be contributed pursuant to the Approved Plan and which will not be an Affiliate of the Company prior to the Effective Date.

"**PermianCo Common Stock**" means the common stock of PermianCo.

"**PermianCo Governance Documents**" means the certificate of incorporation, bylaws and Registration Rights Agreement of PermianCo, which shall be in form and substance reasonably satisfactory to the Requisite Commitment Parties and in accordance with the Approved Plan and the Governance Term Sheet.

"**Permitted Liens**" means (a) Liens for Taxes that (i) are not yet delinquent or (ii) are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (b) landlord's, operator's, vendors', carriers', warehousemen's, mechanics', materialmen's, repairmen's and other similar Liens for labor, materials or supplies or other like Liens arising by operation of law in the ordinary course of business or incident to the exploration, development, operation and maintenance of oil and gas properties provided with respect to any Real Property or personal property incurred in the ordinary course of business consistent with past practice and as otherwise not prohibited under this Agreement that have been filed on a schedule with the Bankruptcy Court in connection with the Chapter 11 Cases or, if not so filed, for amounts that are not more than 120 days delinquent and that do not materially detract from the value of, or materially impair the use of, any material Real Property or personal property of any of the Debtors for the operation of the Debtors' business, or, if for amounts that do materially detract from the value of, or materially impair the use of, any material Real Property or personal property of any of the Debtors, if such Lien is being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (c) zoning, building codes and other land use Laws regulating the use or occupancy of any Real Property or the activities conducted thereon that are imposed by any Governmental Entity having jurisdiction over such Real Property; *provided*, that no such zoning, building codes and other land use Laws prohibit the use or occupancy of such Real Property for the operation of the Debtors' business; (d) easements, covenants, conditions, minor encroachments, restrictions on transfer and other similar matters affecting title to any Real Property (including any title retention agreement) and other title defects and encumbrances that do not or would not materially impair the ownership, use or occupancy of such Real Property or the operation of the Debtors' business; (e) Liens granted under any Contracts (including joint operating agreements, oil and gas leases, unitization and pooling agreements, farmout agreements, joint development agreements, transportation agreements, marketing agreements,

seismic licenses and other similar operational oil and gas agreements), in each case, to the extent the same are ordinary and customary in the oil and gas business and do not or would not materially impair the ownership, use or occupancy of any Real Property for the operation of the Debtors' business or, if such claim does materially impair such ownership, use, occupancy or operation, are being contested in good faith by appropriate proceedings and for which adequate reserves have been made with respect thereto; (f) mortgages on a lessor's interest in a lease or sublease; *provided*, that no foreclosure proceedings have been duly filed (unless, in such case, such mortgage has been fully subordinated to all of the lessee's rights under the applicable lease by statute or otherwise); (g) Liens and Claims granted to the agents and the lenders to secure obligations outstanding under the New Exit Facility; (h) Liens granted to secure Hedging Contracts entered into prior to or on the Effective Date in the ordinary course of business and not for speculative purposes in accordance with the Hedging Order; (i) Liens arising solely from royalties, overriding royalties, revenue interests, net revenue interests, net profit interests, reversionary interests, production payments, preferential rights of purchase, working interests and other similar interests which exist pursuant to the terms of (x) the oil and gas leases of the Debtors as such leases existed as of March 1, 2017 or, if acquired or entered into after such date, as originally entered into by a Debtor or as of the date of such acquisition, as applicable, or (y) instruments otherwise filed of record (or for which a memorandum identifying or referencing such interest is filed of record) in the appropriate public records as of March 1, 2017; (j) Liens and Claims that, pursuant to the Approved Plan and the Confirmation Order, will be discharged and released on the Effective Date and (k) Liens described in the SEC Documents or the financial statements referred to in <u>Section 5.20</u> as disclosed to the Parties prior to the date of this Agreement.

"**Person**" means an individual, firm, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, associate, trust, Governmental Entity or other entity or organization.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Plan Supplement**" means the forms of certain documents effectuating the transactions contemplated in the Approved Plan and RSA, which documents shall be filed with the Clerk of the Bankruptcy Court prior to confirmation.

"**Put Option**" has the meaning set forth in <u>Section 2.2(a)</u>.

"**Put Option Premium**" has the meaning set forth in <u>Section 3.1(a)</u>.

"**Real Property**" means, collectively, all right, title and interest (including any leasehold estate) in and to any and all parcels of or interests in real property owned in fee or leased by any of the Debtors, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures incidental to the ownership or lease thereof.

"**Registration Rights Agreement**" has the meaning set forth in <u>Section 6.8(a)</u>.

"**Related Party**" means, with respect to any Person, (a) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager

or stockholder of such Person, (b) any former, current or future director, officer, agent, Affiliate, employee, general or limited partner, member, manager or stockholder of any of the foregoing or (c) any co-managed entity of such Person.

"**Related Transferee**" has the meaning set forth in <u>Section 2.6(b)</u>.

"**Release**" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating.

"**Remaining BCA Commitment**" means, with respect to any Commitment Party, the remaining dollar amount that such Commitment Party is committed to fund in respect of the Rights Offering and the Backstop Commitment after giving effect to the exercise by such Commitment Party of its Initial BCA Percentage of the Minimum Allocation Rights Securities, as set forth on <u>Exhibit A</u> (as it may be amended, supplemented or otherwise modified from time to time in accordance with this Agreement). The aggregate Remaining BCA Commitment shall equal $465,000,000.

"**Reorganization Transactions**" means the transactions, which shall be mutually acceptable to the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, to be undertaken in connection with the implementation of the Rights Offering, on the terms set forth in the Approved Plan, on or immediately prior to the Effective Date pursuant to which the Debtors, or the Reorganized Debtors, as applicable, will effectuate a corporate reorganization whereby the Debtors' assets and business operations will be segregated into PermianCo and LegacyCo. The Reorganization Transactions shall be as set forth in the Approved Plan and otherwise acceptable to the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties in all respects.

"**Reorganized Debtors**" means the Debtors as reorganized pursuant to the terms of the Approved Plan.

"**Replacing Commitment Parties**" has the meaning set forth in <u>Section 2.3(a)</u>.

"**Reportable Event**" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30 day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Pension Plan.

"**Representatives**" means, with respect to any Person, such Person's directors, officers, members, partners, managers, employees, agents, consultants, investment bankers, attorneys, accountants, advisors and other representatives.

"**Requirement of Law**" means, as to any Person, any Law or determination of a Governmental Entity, in each case applicable to or binding upon the Person or any of its property or to which the Person or any of its property is subject.

"**Requisite Commitment Parties**" means, at any relevant time, the Commitment Parties (and their Related Transferees and any other permitted transferee that acquires any portion of a Commitment Party's Backstop Commitment (including, for the avoidance of doubt,

14

any Minimum Allocation Rights) (but only to the extent of such acquired Backstop Commitment) and becomes bound to this Agreement as required hereunder pursuant to a Joinder Agreement) representing a minimum of 67% of the Total BCA Commitments as of the time that the relevant consent or approval is determined.

"**Restructuring Transactions**" has the meaning set forth in the Approved Plan.

"**Rights Offering**" means the rights offering that is backstopped by the Commitment Parties in respect of the Rights Offering Securities pursuant to and in accordance with this Agreement, the Approved Plan and the Rights Offering Procedures.

"**Rights Offering Expiration Time**" means the time and the date on which the subscription form or Ballots must be duly delivered to the Rights Offering Subscription Agent in accordance with the Rights Offering Procedures, together with the applicable per Share purchase price.

"**Rights Offering Participants**" means those Persons who duly subscribe for Rights Offering Securities in accordance with the Rights Offering Procedures, including any Commitment Parties.

"**Rights Offering Procedures**" means the procedures with respect to the Rights Offering attached hereto as <u>Exhibit C</u> that are approved by the Bankruptcy Court pursuant to the BCA Approval Order, which approved procedures, to the extent different from such attachment, shall be reasonably satisfactory to the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties.

"**Rights Offering Purchase Amount**" means, with respect to any Commitment Party, the aggregate purchase price in respect of the amount of Rights Offering Securities such Commitment Party (and its Related Transferees) has purchased in connection with their exercise of Subscription Rights in the Rights Offering, if any.

"**Rights Offering Securities**" means the Shares representing 60% of the aggregate Shares to be issued on the Closing Date (subject to dilution for the Put Option Premium, any shares of PermianCo Common Stock issued after the Effective Date and on account of any shares of PermianCo Common Stock to be issued under any long-term management incentive plan in respect of PermianCo), which amount shall be reduced to the extent that holders of General Unsecured Claims receive an amount of PermianCo Common Stock equal in value to the GUC Cash Pool.  For the avoidance of doubt, the Rights Offering Securities do not include the Minimum Allocation Rights Securities.

"**Rights Offering Subscription Agent**" means a subscription agent reasonably satisfactory to the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties.

"**RSA**" means that certain Amended and Restated Restructuring Support Agreement entered into by and among the Debtors, Consenting Second Lien Creditors (which Consenting Second Lien Creditors also constitute Second Lien Noteholder Group Parties) and the Consenting Senior Unsecured Creditors (which also constitute Commitment Parties

hereunder), dated as of the date hereof (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof).

"**Sanctioned Person**" has the meaning set forth in <u>Section 5.25</u>.

"**Sanctions**" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC, the U.S. Department of Commerce or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom.

"**SEC**" means the U.S. Securities and Exchange Commission.

"**SEC Documents**" has the meaning set forth in <u>Section 5.6</u>.

"**Second Lien Noteholder Group**" means the ad hoc group of holders of the Second Lien Notes.

"**Second Lien Noteholder Group Parties**" has the meaning set forth in the Preamble.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Shares**" means shares of PermianCo Common Stock.

"**Subscription Escrow Account**" has the meaning set forth in <u>Section 2.4(a)</u>.

"**Subscription Escrow Agreement**" has the meaning set forth in <u>Section 2.4(b)</u>.

"**Subscription Rights**" has the meaning set forth in the Recitals.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, joint venture or other legal entity as to which such Person (either alone or through or together with any other subsidiary), (a) owns, directly or indirectly, more than 50% of the stock or other equity interests, (b) has the power to elect a majority of the board of directors or similar governing body or (c) has the power to direct the business and policies.

"**Taxes**" means all taxes, assessments, duties, levies or other mandatory governmental charges paid to a Governmental Entity, including all federal, state, local, foreign and other income, franchise, profits, gross receipts, capital gains, capital stock, transfer, property, sales, use, value-added, occupation, excise, severance, windfall profits, stamp, payroll, social security, withholding and other taxes, assessments, duties, levies or other mandatory governmental charges of any kind whatsoever paid to a Governmental Entity (whether payable directly or by withholding and whether or not requiring the filing of a return), all estimated taxes, deficiency assessments, additions to tax, penalties and interest thereon and shall include any liability for such amounts as a result of being a member of a combined, consolidated, unitary or affiliated group.

"**Total BCA Commitment**" means the aggregate of the Individual BCA Commitments, amounting to $775,000,000.

"**Transfer**" means to sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions) in which any Person receives the right to own or acquire, or becomes obligated under this Agreement with respect to, any current or future interest in a Subscription Right, Minimum Allocation Right, a Claim in respect of the Senior Unsecured Notes, a Rights Offering Security, a Minimum Allocation Right Security, a Share of PermianCo Common Stock or a Transferred Backstop Commitment.

"**Transition Services Agreement**" means that certain transition services agreement, to be entered into between LegacyCo and PermianCo on the Effective Date, substantially in the form attached to the Plan Supplement, which Transition Services Agreement shall be consistent with the Approved Plan and otherwise reasonably acceptable to the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties.

"**Unsubscribed Securities**" means the Rights Offering Securities that have not been duly purchased by the Rights Offering Participants in accordance with the Rights Offering Procedures and the Approved Plan.

"**willful or intentional breach**" has the meaning set forth in <u>Section 9.5(a)</u>.

"**Withdrawal Liability**" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan.

Section 1.2    <u>Construction</u>.  In this Agreement, unless the context otherwise requires:

(a)    references to Articles, Sections, Exhibits and Schedules are references to the articles and sections or subsections of, and the exhibits and schedules attached to, this Agreement;

(b)    the division of this Agreement into Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement;

(c)    references in this Agreement to "writing" or comparable expressions include a reference to a written document transmitted by means of electronic mail in portable document format (pdf), facsimile transmission or comparable means of communication;

(d)    words expressed in the singular number shall include the plural and vice versa; words expressed in the masculine shall include the feminine and neuter gender and vice versa;

(e)    the words "hereof," "herein," "hereto," "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole, including all Exhibits and Schedules attached to this Agreement, and not to any provision of this Agreement unless the context otherwise requires;

(f)    the term "this Agreement" shall be construed as a reference to this Agreement as the same may have been, or may from time to time be, amended, modified, varied, novated or supplemented and all exhibits and schedules hereto;

(g)    "include," "includes" and "including" are deemed to be followed by "without limitation" whether or not they are in fact followed by such words and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it;

(h)    references to "day" or "days" are to calendar days;

(i)    when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and, if the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day;

(j)    references to "the date hereof" means the date of this Agreement;

(k)    unless otherwise specified, references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules or regulations promulgated thereunder in effect from time to time; and

(l)    references to "dollars" or "$" are to United States of America dollars.

Section 1.3    Conflict.  In the event of any inconsistencies between the terms of this Agreement (without reference to the Exhibits) and the Approved Plan or the RSA, the terms of this Agreement shall control.

Section 1.4    Debtors as Parties.  If there is a subsequent termination of this Agreement by the Debtors pursuant to Section 9.4, any and all provisions of the Agreement referencing "Weil," the "Debtor," or "Debtors" are, and shall continue to be, in full force and effect with respect to the other Parties as if such provisions were written without reference to "Weil," the "Debtor," or "Debtors," and this Agreement shall be in full force and effect with respect to each other Party.

**ARTICLE II**

**BACKSTOP COMMITMENT**

Section 2.1    The Rights Offering; Subscription Rights; Minimum Allocation Rights.

(a)    On and subject to the terms and conditions hereof, including entry of the BCA Approval Order:

(i)    after entry of the Confirmation Order but prior to the Effective Date, the Commitment Parties shall form PermianCo, which shall be taxable as a corporation for U.S. federal income tax purposes;

18

(ii)     prior to the Effective Date, the Company, on behalf of PermianCo, shall conduct the Rights Offering pursuant to and in accordance with the Rights Offering Procedures, this Agreement and the Approved Plan, and issue the Subscription Rights and the Minimum Allocation Rights;

(iii)     the Company, on behalf of PermianCo, will offer the Minimum Allocation Rights to the Commitment Parties that are Commitment Parties prior to the commencement of the Rights Offering in proportion to their Initial BCA Percentage. Each Commitment Party shall, on a several and neither joint nor joint and several basis, exercise the Minimum Allocation Rights issued to and held by such Commitment Party pursuant to and in accordance with this Agreement and the Approved Plan at the Closing; and

(iv)     the Company, on behalf of PermianCo, shall conduct the Rights Offering pursuant to and in accordance with the Rights Offering Procedures, this Agreement and the Approved Plan, and issue the Subscription Rights.

(b)     If reasonably requested by the Requisite Commitment Parties, from time to time prior to the Rights Offering Expiration Time (and any extensions thereto), the Rights Offering Subscription Agent shall notify, within two Business Days of receipt of such request by the Rights Offering Subscription Agent, the Commitment Parties of the aggregate number of Subscription Rights known by the Rights Offering Subscription Agent to have been exercised pursuant to the Rights Offering as of the most recent practicable time before such request.

(c)     The Rights Offering and Rights Offering Securities, the offer and sale of the Unsubscribed Securities purchased by the Commitment Parties pursuant to this Agreement and the issuance of the Minimum Allocation Rights Securities in respect of the exercise of the Minimum Allocation Rights will be made in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act and/or Regulation D thereunder or another available exemption from registration under the Securities Act, and the Disclosure Statement shall include a statement to such effect.  The issuance of PermianCo Common Stock in respect of the Put Option Premium will be made in reliance on the exemption from registration pursuant to section 1145 of the Bankruptcy Code and the Disclosure Statement shall include a statement to such effect.  The issuance of PermianCo Common Stock in respect of the Minimum Allocation Rights will be made in reliance on the exemption from registration provided by Section 4(a)(2) of the Securities Act and/or Regulation D thereunder or another available exemption from registration under the Securities Act.

(d)     Eligible Offerees (including the Commitment Parties) as of a record date to be reasonably acceptable to the Debtors, the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors will receive Subscription Rights from the Company to purchase, at a purchase price per Share, up to its pro rata share (measured as (i) the principal amount of Senior Unsecured Notes *divided by* (ii) the aggregate amount of all Senior Unsecured Notes) of the Rights Offering Securities.

(e)     The Ballots shall provide a place, or shall be accompanied by a subscription form, whereby each Eligible Offeree may exercise its Subscription Rights in whole

19

or in part.  The Subscription Rights may be exercised during the offering period specified in the Rights Offering Procedures, which offering period shall be reasonably acceptable to the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, and as may be extended one or more times as agreed to by the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties. The Approved Plan and the Rights Offering Procedures shall provide that in order to exercise its Subscription Rights, each Eligible Offeree (including the Commitment Parties) shall, prior to the Rights Offering Expiration Time, return a duly executed Ballot (or subscription form), to the Rights Offering Subscription Agent and pay an amount equal to the aggregate purchase price for the amount of Rights Offering Securities elected to be purchased by such Eligible Offeree by wire transfer of immediately available funds prior to the Rights Offering Expiration Time to the Subscription Escrow Account; provided, that the Commitment Parties shall not be required to deposit such funds until two Business Days prior to the Closing Date. The exercise of a Subscription Right by an Eligible Offeree is irrevocable unless the Rights Offering is not consummated. If the Rights Offering Subscription Agent for any reason does not receive from an Eligible Offeree a timely and duly completed Ballot (or subscription form, if applicable), and if the payment is not timely deposited in the Subscription Escrow Account for the Rights Offering Securities elected to be exercised by such Eligible Offeree, the Approved Plan shall provide that, unless otherwise approved by the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, such Eligible Offeree shall be deemed to have relinquished and waived its right to exercise Subscription Rights in the Rights Offering.  For the avoidance of doubt, notwithstanding the foregoing, the funding obligations, timing and procedures for the Commitment Parties are set forth in Section 2.4.

Section 2.2    The Backstop Commitment.

(a)    On and subject to the terms and conditions hereof, including entry of the BCA Approval Order, each Commitment Party hereby agrees to fund its Final Backstop Commitment and grants to the Company an option (collectively, the "**Put Option**") to require such Commitment Party to purchase Unsubscribed Securities on the Closing Date subject to the terms and conditions of this Agreement, and the Company shall have the right to enforce the Put Option on behalf of PermianCo.

(b)    Upon the exercise of the Put Option, each Commitment Party agrees, severally and not jointly, to purchase, and the Company shall sell on behalf of PermianCo to such Commitment Party, on the Closing Date, the number of Unsubscribed Securities equal to (x) such Commitment Party's Final BCA Percentage *multiplied by* (y) the aggregate number of Unsubscribed Securities, rounded among the Commitment Parties solely to avoid fractional shares as the Requisite Commitment Parties may determine.  The obligations of the Commitment Parties described in Section 2.1(a)(i) and Section 2.2(b) shall be referred to as the "**Backstop Commitment**."  The Company may exercise the Put Option by delivery to each Commitment Party of a written put election notice, *provided*, that the Put Option shall automatically and irrevocably be deemed to have been exercised by the Company without the need for delivery of written notice or the taking of any other further action by the Company or any other any Person, if the conditions set forth in Section 7.1(f) shall have been satisfied or waived in accordance with this Agreement.  The purchase price payable by each Commitment Party in respect of each Unsubscribed Security that such Commitment Party is obligated to purchase under its Backstop

Commitment shall be a per Share purchase price equivalent to the per Share purchase price for the Minimum Allocation Rights Securities and the Rights Offering Securities.

Section 2.3    Commitment Party Default.

(a)    Upon the occurrence of a Commitment Party Default, each Commitment Party (other than any Defaulting Commitment Party) shall have the right, but not the obligation, within five Business Days after receipt of written notice from the Company to all Commitment Parties of such Commitment Party Default, which notice shall be given promptly following the occurrence of such Commitment Party Default and to all Commitment Parties substantially concurrently (such five Business Day period, the "**Commitment Party Replacement Period**"), to make arrangements for one or more of the Commitment Parties (other than any Defaulting Commitment Party) to purchase all or any portion of the Available Securities (such purchase, a "**Commitment Party Replacement**") on the terms and subject to the conditions set forth in this Agreement and in such amounts as may be agreed upon by all of the Commitment Parties electing to purchase all or any portion of the Available Securities, or, if no such agreement is reached, based upon the relative applicable Initial BCA Percentages of any such Commitment Parties (such Commitment Parties, the "**Replacing Commitment Parties**"). Any such Available Securities purchased by a Replacing Commitment Party (and any commitment and applicable aggregate purchase price associated therewith) shall be included, among other things, in the determination of (w) Minimum Allocation Rights of such Replacing Commitment Party for all purposes hereunder, (x) the Unsubscribed Securities of such Replacing Commitment Party for all purposes hereunder, (y) the Initial BCA Percentage of such Replacing Commitment Party for purposes of Section 3.1(a) and (z) the Backstop Commitment of such Replacing Commitment Party for purposes of the definition of Requisite Commitment Parties. If a Commitment Party Default occurs, the Outside Date shall be delayed only to the extent necessary to allow for the Commitment Party Replacement to be completed within the Commitment Party Replacement Period.

(b)    No Commitment Party shall have any liability for the Backstop Commitment of any other Commitment Party. Nothing in this Agreement shall be deemed to require a Commitment Party to purchase more than its Initial BCA Percentage of the Minimum Allocation Rights Securities or Final BCA Percentage of the Unsubscribed Securities. If a Commitment Party is a Defaulting Commitment Party, it shall not be entitled to, and shall be deemed to have irrevocably forfeited its rights to receive, any of the Put Option Premium or Breakup Premium hereunder, as applicable, and the Replacing Commitment Parties shall instead be entitled to such Put Option Premium or Breakup Premium, as applicable, ratably in proportion to their respective Commitment Party Replacement.

(c)    For the avoidance of doubt, notwithstanding anything to the contrary set forth in Section 9.5 but subject to the limitations set forth in Section 10.9 and Section 10.10, no provision of this Agreement shall relieve any Defaulting Commitment Party from liability hereunder, or limit the availability of the remedies set forth in Section 10.9, in connection with any such Defaulting Commitment Party's Commitment Party Default.

Section 2.4    Subscription Escrow Account Funding.

(a)    Funding Notice.  No later than the fifth Business Day following the Rights Offering Expiration Time, the Rights Offering Subscription Agent shall, on behalf of the Company, deliver to each Commitment Party (and their respective counsels and financial advisors) a written notice (which may be provided by electronic mail) (the "**Funding Notice**") setting forth (i) a true and accurate calculation of (A) the number of Rights Offering Securities elected to be purchased by the Rights Offering Participants and the aggregate purchase price therefor (which shall additionally separately show the Rights Offering Purchase Amount); (B) the aggregate number of Unsubscribed Securities, if any, and the aggregate purchase price therefor; and (C) the aggregate number of Unsubscribed Securities to be issued and sold by the Company on behalf of PermianCo to such Commitment Party (based upon such Commitment Party's Final BCA Percentage) and the aggregate purchase price therefor; and (ii) the escrow account to which such Commitment Party shall deliver and pay the aggregate purchase price for such Commitment Party's Final BCA Percentage of the Unsubscribed Securities along with the aggregate purchase price for the Minimum Allocation Rights Securities and the Rights Offering Securities, if any (such escrow account, or other segregated account of the Rights Offering Subscription Agent, the "**Subscription Escrow Account**").  The Rights Offering Subscription Agent shall promptly provide any written backup, information and documentation relating to the information contained in the applicable Funding Notice as any Commitment Party may reasonably request.

(b)    Subscription Escrow Account Funding.  On the Business Day before the Closing Date (the "**Backstop Funding Date**"), each Commitment Party shall deliver and pay an amount equal to the sum of:

(i)    the aggregate purchase price for such Commitment Party's Initial BCA Percentage of the Minimum Allocation Rights Securities issued pursuant to the Minimum Allocation Rights; *plus*

(ii)    the aggregate purchase price for the PermianCo Common Stock issuable pursuant to such Commitment Party's exercise of Subscription Rights, if any, issued to it in the Rights Offering; *plus*

(iii)    the aggregate purchase price for such Commitment Party's Final BCA Percentage of the Unsubscribed Securities,

by wire transfer of immediately available funds in U.S. dollars into the Subscription Escrow Account in satisfaction of such Commitment Party's Backstop Commitment, including its obligations to fully exercise its Minimum Allocation Rights, and for the payment of the aggregate purchase price for Subscription Rights, if any, exercised by such Commitment Party. The Subscription Escrow Account shall be established with an escrow agent satisfactory to the Debtors, the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors pursuant to an escrow agreement in form and substance reasonably satisfactory to the Debtors, the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors (or, if the Subscription Escrow Account is a segregated account of the Rights Offering Subscription Agent, such account and related procedures shall be reasonably satisfactory to the Debtors, the Requisite

Consenting Second Lien Creditors and the Requisite Commitment Parties) (the "**Subscription Escrow Agreement**").  If this Agreement is terminated in accordance with its terms or the Rights Offering is terminated for any reason, the funds held in the Subscription Escrow Account shall be released, and each Commitment Party (and each other Rights Offering Participant) shall receive from the Subscription Escrow Account the cash amount actually funded to the Subscription Escrow Account by such Commitment Party (and each other Rights Offering Participant), without any interest, as soon as practicable following such termination.

Section 2.5    Closing.

(a)    Subject to Article IX, unless otherwise mutually agreed in writing among the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, the closing of the Backstop Commitments (the "**Closing**") shall take place at the offices of Akin Gump, One Bryant Park, New York, NY 10036, at 9:30 a.m., New York City time, on the date that is three Business Days after the date on which all of the conditions set forth in Article VII shall have been satisfied or waived in accordance with this Agreement (other than conditions that by their terms are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), which shall also be the Effective Date under the Approved Plan.  The date on which the Closing actually occurs shall be referred to herein as the "**Closing Date**."

(b)    At the Closing, the funds held in the Subscription Escrow Account shall be released and utilized as set forth in, and in accordance with, the Approved Plan and, if applicable, the Subscription Escrow Agreement.

(c)    At the Closing, issuance of the PermianCo Common Stock in connection with (x) the purchase of the Unsubscribed Securities, (y) the purchase of the Rights Offering Securities, if any, on account of the exercise of Subscription Rights and (z) the purchase of the Minimum Allocation Rights Securities will be made by PermianCo to each Commitment Party (or to the account of its designee in accordance with Section 2.6(a)) against payment therefor, in satisfaction of such Commitment Party's Backstop Commitment, including its obligations to fully exercise its Minimum Allocation Rights, and for the payment of the aggregate purchase price for Subscription Rights, if any, exercised by such Commitment Party.  In addition, the issuance of the PermianCo Common Stock in respect of the Put Option Premium shall also be issued to the Commitment Parties as set forth in Sections 3.1 and 3.2.  Unless a Commitment Party requests delivery of a physical stock certificate, the entry of any PermianCo Common Stock to be delivered pursuant to this Section 2.5(c) into the account of a Commitment Party pursuant to PermianCo's book entry procedures and delivery to such Commitment Party of an account statement reflecting the book entry of such Unsubscribed Securities shall be deemed delivery of such Unsubscribed Securities for purposes of this Agreement, it being understood that such book entry procedures may be those of a transfer agent acting on behalf of PermianCo in such capacity, satisfactory to the Requisite Commitment Parties.  Notwithstanding anything to the contrary in this Agreement, all PermianCo Common Stock to be delivered to the Commitment Parties will be delivered with all issue, stamp, transfer, sales and use, or similar transfer Taxes or duties that are due and payable (if any) in connection with such delivery duly paid by PermianCo.

Section 2.6    <u>Designation and Assignment Rights</u>.

(a)    Each Commitment Party shall have the right to designate by written notice to PermianCo (if formed) and the Company no later than two Business Days prior to the Closing Date that some or all of the Unsubscribed Securities that such Commitment Party is required to purchase in accordance with <u>Section 2.2</u>, Rights Offering Securities delivered in connection with the exercise of Subscription Rights (if any), the Minimum Allocation Rights Securities that it is obligated to purchase hereunder and the PermianCo Common Stock in respect of the Put Option Premium be issued in the name of, and delivered to, one or more of its Related Transferees (other than any portfolio company of such Commitment Party or its Affiliates) upon receipt by the Company on behalf of PermianCo of payment therefor in accordance with the terms hereof, which notice of designation shall (i) be addressed to PermianCo and the Company and signed by such Commitment Party and each such Related Transferee, (ii) specify the number of Unsubscribed Securities delivered in connection with the exercise of Subscription Rights (if any) and/or the Minimum Allocation Rights Securities that it is obligated to purchase hereunder and the PermianCo Common Stock in respect of the Put Option Premium to be delivered to or issued in the name of such Related Transferee and (iii) contain a confirmation by each such Related Transferee of the accuracy of the representations set forth in <u>Sections 4.6</u> through <u>4.12</u> as applied to such Related Transferee in respect of the Unsubscribed Securities (or any other PermianCo Common Stock not issued in reliance on section 1145 of the Bankruptcy Code); *provided*, that no such designation pursuant to this <u>Section 2.6(a)</u> shall relieve such Commitment Party from its obligations under this Agreement.

(b)    Each Commitment Party shall have the right to Transfer all or any portion of its Individual BCA Commitment (together with a pro rata amount of its Minimum Allocation Rights) to (i) one or more of its Affiliates or any investment fund the primary investment advisor to which is such Commitment Party, the investment advisor of such Commitment Party or an Affiliate thereof (an "**Affiliated Fund**") or (ii) one or more special purpose vehicles that are wholly-owned by such Commitment Party and for one or more of its Affiliated Funds, created for the purpose of holding such Backstop Commitment or holding debt or equity of the Debtors, and with respect to which such Commitment Party under this <u>clause (ii)</u> either (A) has provided an adequate equity support letter or a guarantee of such special purpose vehicle's Backstop Commitment in form and substance reasonably acceptable to the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties or (B) otherwise remains obligated to fund the Backstop Commitment to be Transferred until the consummation of the Approved Plan; *provided*, that the equity of such special purpose vehicle shall not be transferable other than to such Persons described in <u>clause (i)</u> or <u>(ii)</u> of this <u>Section 2.6(b)</u>, and in such manner, as such Commitment Party's Backstop Commitment is transferable pursuant to this <u>Section 2.6(b)</u> (each of the Persons referred to in <u>clauses (i)</u> and <u>(ii)</u>, a "**Related Transferee**").

(c)    With respect to any transferee that is not a Related Transferee of a Commitment Party, each Commitment Party may Transfer, on one or more occasions, any amount of its Individual BCA Commitment (together with a pro rata amount of its Minimum Allocation Rights), to any Person so long as such transferee agrees, pursuant to a joinder agreement in form and substance satisfactory to the Debtors, the Requisite Consenting Second Lien Creditors, and Requisite Commitment Parties (a "**Joinder Agreement**") (including, for the avoidance of doubt, the agreements and commitments set forth in <u>Section 4.11</u>), to be bound by

24

the obligations of such Commitment Party under this Agreement, and each of such Commitment Party, and such transferee shall have duly executed and delivered a copy of such Joinder Agreement to counsel for the Debtors, the Commitment Parties, and the Second Lien Noteholder Group Parties.  Except with respect to a Transfer to a Commitment Party or Related Transferee, (i) the Debtors and the Requisite Consenting Second Lien Creditors, acting in good faith, shall have determined, in their reasonable discretion after due inquiry and investigation, that the proposed transferee is reasonably capable of fulfilling such obligations, or (ii) absent such a determination, the proposed transferee shall have deposited into an escrow account under arrangements satisfactory to the Debtors and the Requisite Consenting Second Lien Creditors funds sufficient, in the reasonable determination of the Debtors and the Requisite Consenting Second Lien Creditors, to satisfy such proposed transferee's Backstop Commitment.  Upon compliance with this Section 2.6(c), the transferring Commitment Party shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations, and the transferee shall be fully bound as a Commitment Party hereunder for all purposes of this Agreement.  Any Transfer under this Section 2.6(c) shall be in an amount not less than the lesser of Individual BCA Commitments (including Minimum Allocation Rights) evidencing $5.0 million (on each such occasion) and such transferring Commitment Party's full Individual BCA Commitment.

(d)     Each Commitment Party, severally and not jointly, agrees that it will not Transfer, at any time prior to the Closing Date or the earlier termination of this Agreement in accordance with Article IX, any of its rights and obligations under this Agreement, including all or any portion of its Individual BCA Commitment (or Minimum Allocation Rights), to any Person other than in accordance with Sections 2.3, 2.6(a), 2.6(b) and 2.6(c), and in all cases, in compliance with applicable securities Laws, and any Transfer in contravention hereof shall be null and void *ab initio*.  After the Closing Date, nothing in this Agreement or the certificate of incorporation of PermianCo or bylaws of PermianCo shall limit or restrict in any way the ability of any Commitment Party (or any permitted transferee thereof) to Transfer any of the shares of PermianCo Common Stock or any interest therein; *provided*, that any such Transfer shall be made pursuant to applicable securities Laws.  For the avoidance of doubt, notwithstanding anything to the contrary in this Agreement, nothing contained in this Agreement shall prohibit or restrict the ability of any Commitment Party to Transfer its Senior Unsecured Notes at any time to any Person; *provided*, *however*, any Transfer of Senior Unsecured Notes by a Commitment Party shall be in accordance with the terms of the RSA.

(e)     Any transferee of a Commitment Party's Individual BCA Commitment (together with a pro rata amount of its Minimum Allocation Rights) in compliance with this Section 2.6 shall become a Commitment Party, and Exhibit A shall be amended to reflect such Transfer.  Any Person that becomes a Commitment Party as permitted under this Agreement after the date hereof shall be required to become a party to the RSA at the same time as such Person becomes a Commitment Party, by executing a joinder thereto in the form attached as Exhibit C to the RSA.

# ARTICLE III

## PUT OPTION PREMIUM AND EXPENSE REIMBURSEMENT

Section 3.1    <u>Put Option Premium Payable by the Company</u>.

(a)    Subject to <u>Section 3.2</u>, as consideration for the Put Option, the Backstop Commitment and the other agreements of the Commitment Parties in this Agreement, including the obligation of each of the Commitment Parties to exercise the Minimum Allocation Rights issued to and held by such Commitment Party, the Company shall cause to be paid at the Closing in shares of PermianCo Common Stock a nonrefundable premium in an amount equal to 10.0% of the aggregate outstanding number of shares of PermianCo Common Stock issued on the Closing Date, payable in accordance with <u>Section 3.2</u>, to the Commitment Parties (including any Replacing Commitment Party, but excluding any Defaulting Commitment Party) or their designees based upon their respective Initial BCA Percentage at the time the payment is made (the "**Put Option Premium**").

(b)    The provisions for the payment of the Put Option Premium, Breakup Premium, the Expense Reimbursement, the granting of the Minimum Allocation Rights (and the underlying securities) and the indemnification provisions under <u>Article VIII</u>, are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement.  The Put Option Premium, the Breakup Premium, the granting of the Minimum Allocation Rights (and the underlying securities), the indemnification provisions and the Expense Reimbursement shall constitute allowed administrative expense claims of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code under (i) the BCA Approval Order, if the Debtors are parties to the RSA and this Agreement as of the date of the entry of the BCA Approval Order, or (ii) the Confirmation Order, if the Debtors are not parties to the RSA and this Agreement as of the date of the entry of the BCA Approval Order.

Section 3.2    <u>Payment of the Put Option Premium</u>.  The Put Option Premium shall be fully earned and nonrefundable by no later than entry of (a) the BCA Approval Order, if the Debtors are parties to the RSA and this Agreement as of the date of the entry of the BCA Approval Order or (b) the Confirmation Order, if the Debtors are not parties to the RSA and this Agreement as of the date of the entry of the BCA Approval Order.  The Put Option Premium shall be paid at the Closing by PermianCo to satisfy the obligation of the Debtors, free and clear of any deduction for any applicable Taxes, on the Closing Date as set forth above, unless the Breakup Premium under <u>Section 9.5(b)</u> becomes payable by the Debtors to the Commitment Parties.  For the avoidance of doubt, the Put Option Premium will be payable as provided herein in partial consideration for the exercise by each of the Commitment Parties of the Subscription Rights and Minimum Allocation Rights issued to and held by such Commitment Party, irrespective of the amount of Unsubscribed Securities that are to be issued and actually required to be purchased by the Commitment Parties as set forth in the Funding Notice, if any.

Section 3.3    <u>Tax Treatment of the Put Option Premium</u>.  The Parties agree to treat the Put Option Premium as "option premium" for U.S. federal income Tax purposes and to not take

any action inconsistent therewith unless otherwise required by a final determination to the contrary within the meaning of section 1313(a) of the Tax Code.

Section 3.4    Expense Reimbursement.

(a)    Subject to entry of (x) the BCA Approval Order, if the Debtors are parties the RSA and this Agreement as of the date of the entry of the BCA Approval Order, or (y) the Confirmation Order, if the Debtors are not parties to the RSA and this Agreement as of the date of the entry of the BCA Approval Order, the Debtors shall pay in accordance with Section 3.4(b) (such payment obligations set forth in clauses (i) through (iii) below, collectively, the "**Expense Reimbursement**"):

(i)    all reasonable and documented fees, costs and expenses of the Commitment Parties and the Second Lien Noteholder Group (including the reasonable and documented fees, costs, expenses and disbursements of (v) Akin Gump Strauss Hauer & Feld LLP, counsel to certain Commitment Parties, and Perella Weinberg Partners LP, financial advisor to certain Commitment Parties, (w) White & Case LLP, counsel to a group of certain Commitment Parties, and Miller Buckfire & Co., LLC, financial advisor to a group of certain Commitment Parties, (x) Kirkland & Ellis LLP, counsel to the Second Lien Noteholder Group, and Moelis & Company, financial advisor to the Second Lien Noteholder Group, (y) any other advisors for oil and gas, title, environmental, operational, accounting, insurance, human resource/board selection, transfer and transition/integration matters retained by the Commitment Parties or the Second Lien Noteholder Group Parties and (z) any other advisors retained by the Commitment Parties or the Second Lien Noteholder Group Parties;

(ii)    without duplication of the reimbursable expenses described under clause (i), all reasonable and documented fees, costs and expenses of any and all other of the professionals, advisors and consultants retained by the Commitment Parties or the Second Lien Noteholder Group Parties; and

(iii)    all filing fees, if any, required by the HSR Act or any other Antitrust Law and all reasonable documented expenses related thereto, in each case, that have been paid or are payable by the Commitment Parties in connection with the Restructuring Transactions.

(b)    The Expense Reimbursement described in this Section 3.4 accrued through the date on which the BCA Approval Order shall be paid in cash in full within one Business Day of such date.  The Expense Reimbursement shall thereafter be payable on a regular and continuing basis by the Debtors promptly after receipt of monthly invoices therefor in cash in full; *provided*, that the Debtors' final payment, including estimated amounts through the Closing, shall be made contemporaneously with the Closing or the termination of this Agreement pursuant to Article IX.  The Commitment Parties shall promptly provide copies of all invoices (redacted as necessary to protect privileges) to the Debtors and to the United States Trustee if requested.  Unless otherwise ordered by the Bankruptcy Court, no recipient of any payment hereunder shall be required to file with respect thereto any interim or final fee application with

the Bankruptcy Court. The Expense Reimbursement described in this <u>Section 3.4</u> is in addition to, and not in replacement of, any expense reimbursement under the RSA or the Approved Plan.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE COMMITMENT PARTIES AND SECOND LIEN NOTEHOLDER GROUP PARTIES

Each Second Lien Noteholder Group Party and each Commitment Party severally, and not jointly, represents and warrants as to itself only (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 4.1    <u>Incorporation</u>. Such Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) under the Laws of its jurisdiction of incorporation or organization.

Section 4.2    <u>Power and Authority</u>. Such Party has the requisite power and authority (corporate or otherwise) to enter into, execute and deliver this Agreement and each other Restructuring Documents to which such Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Restructuring Documents.

Section 4.3    <u>Execution and Delivery</u>. This Agreement and each other Restructuring Document to which such Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Party and (b) assuming due and valid execution and delivery hereof and thereof by the other Parties, will constitute valid and legally binding obligations of such Party, enforceable against such Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar Laws limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 4.4    <u>No Conflict</u>. Assuming that the consents referred to in <u>clauses (a)</u> and <u>(b)</u> of <u>Section 4.5</u> are obtained, the execution and delivery by such Party of this Agreement and each other Restructuring Document to which such Party is a party, the compliance by such Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Party is a party or by which such Party is bound or to which any of the properties or assets of such Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Party and (c) will not result in any material violation of any Law or Order applicable to such Party or any of its properties, except in each of the cases described in <u>clauses (a)</u> or <u>(c)</u>, for any conflict, breach, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Party's performance of its obligations under this Agreement.

Section 4.5    <u>Consents and Approvals</u>.    No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over such Party or any of its properties is required for the execution and delivery by such Party of this Agreement and each other Restructuring Document to which such Party is a party, the compliance by such Party with the provisions hereof and thereof and the consummation of the transactions (including, if such Party is a Commitment Party, the purchase by such Party of its Initial BCA Percentage of the Minimum Allocation Rights Securities and Final BCA Percentage of the Unsubscribed Securities) contemplated herein and therein, except (a) any consent, approval, authorization, order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Party's performance of its obligations under this Agreement and each other Restructuring Document to which such Party is a party and (b) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement.

Section 4.6    <u>No Registration</u>.    If such Party is a Commitment Party, such Commitment Party understands that (a) the Unsubscribed Securities, the Rights Offering Securities subject to the Subscription Rights and the Minimum Allocation Rights Securities have not been registered under the Securities Act by reason of a specific exemption from the registration provisions of the Securities Act, the availability of which depends on, among other things, the bona fide nature of the investment intent and the accuracy of such Commitment Party's representations as expressed herein or otherwise made pursuant hereto and (b) the foregoing securities cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available.

Section 4.7    <u>Purchasing Intent</u>.    If such Party is a Commitment Party, such Commitment Party is acquiring the Unsubscribed Securities, the Rights Offering Securities subject to the Subscription Rights and the Minimum Allocation Rights Securities for its own account, not as a nominee or agent, and not with the view to, or for resale in connection with, any distribution thereof not in compliance with applicable securities Laws, and such Commitment Party has no present intention of selling, granting any participation in, or otherwise distributing the same, except in compliance with applicable securities Laws.

Section 4.8    <u>Sophistication; Investigation</u>.    If such Party is a Commitment Party, such Commitment Party has such knowledge and experience in financial and business matters such that it is capable of evaluating the merits and risks of its investment in the Unsubscribed Securities, the Rights Offering Securities subject to the Subscription Rights and the Minimum Allocation Rights Securities.    Such Commitment Party is an "accredited investor" within the meaning of Rule 501(a) of the Securities Act or a "qualified institutional buyer" within the meaning of Rule 144A of the Securities Act.    Such Commitment Party understands and is able to bear any economic risks associated with such investment (including the necessity of holding such shares for an indefinite period of time).    Except for the representations and warranties expressly set forth in this Agreement or any other Restructuring Document, such Commitment Party has independently evaluated the merits and risks of its decision to enter into this Agreement and disclaims reliance on any representations or warranties, either express or implied, by or on behalf of any of the Debtors.

Section 4.9   <u>No Broker's Fees</u>.   If such Party is a Commitment Party, such Commitment Party is not a party to any Contract with any Person (other than this Agreement and any Contract giving rise to the Expense Reimbursement hereunder, including, for the avoidance of doubt, the financial advisors listed in <u>Section 3.4(a)(i)</u>) that would give rise to a valid claim against any of the Debtors or the Reorganized Debtors for a brokerage commission, finder's fee or like payment in connection with the Rights Offering, the sale of the Unsubscribed Securities, the sale of the Rights Offering Securities subject to the Subscription Rights or the sale of the Minimum Allocation Rights Securities.

Section 4.10   <u>Legend</u>.   If such Party is a Commitment Party, such Commitment Party understands that any "restricted securities" acquired by it pursuant to the Approved Plan, if certificated, shall bear, or if uncertificated, shall be deemed to include, a customary Securities Act legend.

Section 4.11   <u>Agreements of the Commitment Parties</u>.   For purposes of this <u>Section 4.11</u>, the terms "own" and "acquire" and any variation thereon shall as used herein mean as determined for U.S. federal income tax purposes, and the term "**Existing BBEP Equity Interests**" shall be limited to outstanding Series A Cumulative Redeemable Preferred Units, Series B Preferred Units and common units of BBEP.

(a)   Each Commitment Party represents and warrants, to its actual knowledge, that it (or in the event it is a disregarded entity for U.S. federal income tax purposes, its tax-regarded owner) does not own any Existing BBEP Equity Interests, except as set forth on the signature page for such Commitment Party.

(b)   Each Commitment Party shall promptly notify the Debtors if, as of the date hereof (or the date such Commitment Party becomes a party hereto) or anytime on or prior to the Effective Date, to its actual knowledge, any of the following persons or entities owns or becomes the owner of Existing BBEP Equity Interests:

(i)   any entity wholly owned (directly or indirectly) by such Commitment Party, and

(ii)   any person that wholly owns (directly or indirectly) such Commitment Party.

Such notification shall include the amount and type of Existing BBEP Equity Interests that such person or entity owns.  To its actual knowledge, each Commitment Party shall set forth on its signature page to this Agreement any ownership of Existing BBEP Equity Interests as of the date of this Agreement by any entity wholly owned or wholly owning such Commitment Party.

For the avoidance of doubt, where the phrase "to its actual knowledge" is used in this <u>Section 4.11</u>, such phrase means the actual knowledge of the individual signing this Agreement on behalf of a Commitment Party.

The representations and warranties made above are only made as of the date of this Agreement.

(a)      Such Commitment Party shall cooperate with the Debtors and with LegacyCo and make available such information, records or other documents as are within the possession or control of such Commitment Party and are reasonably requested by the Debtors or LegacyCo in respect of the preparation of any tax filing, any audit or other proceeding, in each case as relates to the income tax treatment of the Restructuring Transactions effectuated pursuant to the Approved Plan; *provided*, *however*, for the avoidance of doubt, that such information, records or other documents shall not include any information that is confidential or proprietary in any respect (as determined in such Commitment Party's sole discretion).

Section 4.12   <u>Access to Information</u>.  If such Party is a Commitment Party, such Commitment Party acknowledges that it has been afforded the opportunity to ask questions and receive answers concerning the Debtors and to obtain additional information that it has requested to verify the accuracy of the information contained herein.

Section 4.13   <u>Sufficient Funds</u>.  If such Party is a Commitment Party, such Commitment Party will have as of the Closing sufficient assets and the financial capacity to perform all of its obligations under this Agreement, including the ability to fully exercise all Minimum Allocation Rights that are issued to it and fund such Commitment Party's aggregate purchase price for the Unsubscribed Securities, if any.

## REPRESENTATIONS AND WARRANTIES OF THE DEBTORS

Each Debtor, jointly severally, represents and warrants (unless otherwise set forth herein, as of the date of this Agreement and as of the Closing Date) as set forth below.

Section 5.1   <u>Formation</u>.  Such Party is a legal entity duly organized, validly existing and, if applicable, in good standing (or the equivalent thereof) (a) under the Laws of its jurisdiction of incorporation or organization and (b) except where the failure to have any such authority or qualification would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, in each jurisdiction where the conduct of its business as currently conducted requires such qualifications.

Section 5.2   <u>Power and Authority</u>.  Such Party has the requisite power and authority (corporate or otherwise) to (a) subject to the entry of the BCA Approval Order, enter into, execute and deliver this Agreement and, subject to the entry of the BCA Approval Order, Disclosure Statement Order and the Confirmation Order, each other Restructuring Documents to which such Party is a party and to perform its obligations hereunder and thereunder and has taken all necessary action (corporate or otherwise) required for the due authorization, execution, delivery and performance by it of this Agreement and the other Restructuring Documents and the consummation of the transactions contemplated hereby and thereby and (b) to own its property and assets and to transact the business in which it is currently engaged and presently proposes to engage.  Each of the Debtors is in compliance in all material respects with all Requirements of Law, except to the extent that the failure to be in compliance could not reasonably be expected to have a Material Adverse Effect.

Section 5.3   <u>Execution and Delivery; Enforceability</u>.   Subject to entry of the BCA Approval Order, this Agreement and, subject to the entry of the BCA Approval Order,

Disclosure Statement Order and the Confirmation Order, each other Restructuring Document to which such Party is a party (a) has been, or prior to its execution and delivery will be, duly and validly executed and delivered by such Party and (b) assuming due and valid execution and delivery hereof and thereof by the other Parties, will constitute valid and legally binding obligations of such Party, enforceable against such Party in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar Laws now or hereafter in effect limiting creditors' rights generally or by equitable principles relating to enforceability.

Section 5.4    No Conflict.  Assuming that the consents referred to in clauses (a) and (b) of Section 5.5 are obtained, the execution and delivery and performance by such Party of this Agreement, the Approved Plan and each other Restructuring Document to which such Party is a party, the compliance by such Party with all of the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein (a) will not conflict with, or result in a breach or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the acceleration of, or the creation of any Lien under, any Contract to which such Party is a party or by which such Party is bound or to which any of the properties or assets of such Party are subject, (b) will not result in any violation of the provisions of the certificate of incorporation or bylaws (or comparable constituent documents) of such Party and (c) will not result in any material violation of any Law or Order applicable to such Party or any of its properties, except in each of the cases described in clauses (a) or (c), for any conflict, breach, violation, default, acceleration or Lien which would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Party's performance of its obligations under this Agreement.

Section 5.5    Consents and Approvals.  No consent, approval, authorization, Order, registration or qualification of or with any Governmental Entity having jurisdiction over such Party or any of its properties is required for the execution and delivery by such Party of this Agreement, the Approved Plan and each other Restructuring Document to which such Party is a party, the compliance by such Party with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein, except (a) any consent, approval, authorization, order, registration or qualification which, if not made or obtained, would not reasonably be expected, individually or in the aggregate, to prohibit, materially delay or materially and adversely impact such Party's performance of its obligations under this Agreement and the BCA Approval Order and each other Restructuring Document to which such Party is a party (including the Disclosure Statement Order and the Confirmation Order, if applicable), (b) filings, notifications, authorizations, approvals, consents, clearances or termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement, and (c) such consents, approvals, authorizations, registrations or qualifications as may be required under state securities or "Blue Sky" Laws in connection with the issuance of the securities in the Rights Offering or as contemplated by the Approved Plan.

Section 5.6    SEC Documents and Disclosure Statement.  Since May 16, 2016, the Company has filed all documents required to be filed with the SEC ("**SEC Documents**").  No SEC Document that has been filed prior to the date this representation has been made, after

giving effect to any amendments or supplements thereto and to any subsequently filed SEC Documents, in each case filed prior to the date this representation is made, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading.  The Disclosure Statement as approved by the Bankruptcy Court will contain "adequate information," as such term in defined in section 1125 of the Bankruptcy Code, and will otherwise comply in all material respects with section 1125 of the Bankruptcy Code.

Section 5.7    Absence of Certain Changes.  Since December 31, 2016 to the date of this Agreement and except for the filing and pending Chapter 11 Cases, no Event has occurred or exists that constitutes, individually or in the aggregate, a Material Adverse Effect.

Section 5.8    No Violation; Compliance with Laws.    (a) The Company is not in violation of its governing documents, and (b) no other Debtor is in violation of its respective charter or bylaws, certificate of formation or limited liability company operating agreement or similar organizational document in any material respect.  None of the Debtors is or has been at any time since January 1, 2014 in violation of any Law or Order, except for any such violations that have not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.9    Legal Proceedings.  Other than the Chapter 11 Cases and any adversary proceedings or contested motions commenced in connection therewith or any matters referenced in any proof of claim filed therein, or otherwise disclosed in the SEC Documents, there are no Legal Proceedings pending or, to the knowledge of the Debtors, threatened to which any of the Debtors or any of their Subsidiaries is a party or to which any property of any of the Debtors is the subject, in each case that in any manner draws into question the validity or enforceability of this Agreement, the Approved Plan or the other Restructuring Documents or that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  No injunction, writ, temporary restraining order or any order of any nature has been issued by any court or other Governmental Entity purporting to enjoin or restrain the execution, delivery or performance of this Agreement, the Approved Plan or any other Restructuring Document, or directing that the transactions provided for herein or therein not be consummated as herein or therein provided.

Section 5.10    Labor Relations.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) there are no strikes or other labor disputes pending or threatened against any of the Debtors; (b) the hours worked and payments made to employees of any of the Debtors have not been in violation of the Fair Labor Standards Act or any other applicable Law dealing with such matters; and (c) all payments due from any of the Debtors or for which any claim may be made against any of the Debtors on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of any of the Debtors to the extent required by GAAP.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the consummation of the transactions contemplated by the Restructuring Documents will not give rise to a right of termination or right of renegotiation on the part of any union under any material collective bargaining agreement to which any of the Debtors (or any predecessor) is a

party or by which any of the Debtors (or any predecessor) is bound.  The Debtors are not parties to or bound by a collective bargaining agreement or similar labor agreement.

Section 5.11    Intellectual Property.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (a) each of the Debtors owns or is licensed or otherwise possesses the right to use, all of the patents, patent rights, trademarks, service marks, trade names, copyrights, mask works, contractual franchises, authorizations, domain names, or other rights and any and all applications or registrations for any of the foregoing (collectively, "**Intellectual Property Rights**") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person; (b) to the knowledge of the Debtors, none of the Debtors nor any Intellectual Property Right, proprietary right, slogan or other advertising devices, product, process, method, substance, part, or other material now employed, sold or offered by or contemplated to be employed, sold or offered by such Person, is interfering with, infringing upon, misappropriating or otherwise violating any valid Intellectual Property Rights of any Person; (c) no claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Debtors, threatened; and (d) no patent, invention, device, application, principle or any Law is pending or, to the knowledge of any Debtor, proposed, which, in either case, could reasonably be expected to have a Material Adverse Effect.

Section 5.12    Title to Real and Personal Property.

(a)    Real Property.  Each of the Debtors has good and defensible title to its respective Real Properties (other than Oil and Gas Properties), in each case, except for Permitted Liens and except for defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes, and except where the failure (or failures) to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; *provided*, *however*, the enforceability of such leased Real Properties (other than Oil and Gas Properties) may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other laws affecting creditor's rights generally or general principles of equity, including the Chapter 11 Cases.  All such properties and assets are free and clear of Liens, except for Permitted Liens and except for such Liens as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Leased Real Property.  Each of the Debtors is in compliance with all obligations under all leases (*provided*, that, as used in this Section 5.12(b), "leases" shall not include oil, gas and mineral leases and any other agreements comprising the Debtors' Oil and Gas Properties, which are addressed in Section 5.12(d)) to which it is a party that have not been rejected in the Chapter 11 Cases, except where the failure to comply would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and none of the Debtors has received written notice of any good faith claim asserting that such leases are not in full force and effect, except leases in respect of which the failure to be in full force and effect would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Each of the Debtors enjoys peaceful and undisturbed possession under all such leases, other than leases in respect of which the failure to enjoy peaceful and undisturbed possession

would not reasonably be expected to materially interfere with its ability to conduct its business as currently conducted or have, individually or in the aggregate, a Material Adverse Effect.

        (c)     <u>Intellectual Property Rights</u>.  Each of the Debtors owns or possesses the right to use all Intellectual Property Rights and all licenses and rights with respect to any of the foregoing used in the conduct of their businesses, without any conflict (of which any of the Debtors has been notified in writing) with the rights of others, and free from any burdensome restrictions on the present conduct of the Debtors, as the case may be, except where such conflicts and restrictions would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

        (d)     <u>Oil and Gas Properties</u>.  Each of the Debtors has good and defensible title to its respective Oil and Gas Properties, in each case free and clear of all Liens, encumbrances and defects, except for (i) Permitted Liens and (ii) such other Liens, encumbrances and defects as would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the material Permian Assets (individually or in the aggregate) or the material Oil and Gas Properties to be transferred to LegacyCo (individually or in the aggregate), and, except for any claim asserted, any proof of claim filed or as set forth on any schedule filed with the Bankruptcy Court in connection with the Chapter 11 Cases, none of the Debtors has received any written notice or otherwise has knowledge of any material claim of any sort that has been or may be asserted by anyone adverse to the rights of the Debtors under any of the Oil and Gas Properties of the Debtors to the continued ownership of such Oil and Gas Properties; *provided*, *however*, that the enforceability of the Oil and Gas Properties of the Debtors may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other Laws affecting creditors' rights generally and general principles of equity, including the Chapter 11 Cases. This <u>Section 5.12(d)</u> is not a representation as to any specific amount of working interest, net revenue interest or net acre position of or represented by any Oil and Gas Property held by any Debtor; *provided*, that, notwithstanding anything to the contrary in this Agreement, other than (i) sales of hydrocarbons in the ordinary course of business, (ii) sales of equipment that is no longer necessary in the operation of the Oil and Gas Properties or for which replacement equipment has been obtained and (iii) those acreage swaps set forth on <u>Schedule 5.12(d)(iii)</u>, no Debtor has conveyed any Oil and Gas Property to any Person which is not a Debtor, or otherwise encumbered any Oil and Gas Property, from and after March 1, 2017 up to the date of this Agreement.

        (e)     <u>Oil and Gas Reserves.</u>  Each Debtor and each of its Subsidiaries is in all material respects, the owner of the Oil and Gas that it purports to own from time to time in and under its Oil and Gas Properties, together with the right to produce the same.  The Oil and Gas Properties are not subject to any Lien other than Permitted Liens.  All Oil and Gas has been produced, sold and delivered in accordance in all material respects with all applicable Laws; each of the Debtors and its Subsidiaries has complied in all material respects with all material terms of each oil, gas and mineral lease and any other agreement comprising its Oil and Gas Properties; and all such oil, gas and mineral leases and other agreements have been maintained in full force and effect; *provided*, *however*, that nothing in this <u>Section 5.12(e)</u> shall prevent any Debtor or its Subsidiaries from (i) abandoning any well or forfeiting, surrendering, releasing or defaulting under any lease in the ordinary course of business which is not disadvantageous in any material respect to the Commitment Parties or the Second Lien Noteholder Group Parties and

which, in the opinion of such Debtor, is in its best interest and (ii) making any disposition permitted hereunder.  All of the Debtors' and their Subsidiaries' operating agreements and operating leases (determined in accordance with GAAP) with respect to their Oil and Gas Properties are enforceable in all material respects in accordance with their terms except as such may be modified by applicable bankruptcy Law or an Order of a court in equity.

(f)    Gas Imbalances.    There are no gas imbalances, take or pay or other prepayments with respect to any of the Oil and Gas Properties which would require the Debtors or their Subsidiaries to deliver Oil and Gas produced from any of the Oil and Gas Properties at some future time exceeding 5,000,000 Mcf of gas (on an Mcf equivalent basis) in the aggregate without then or thereafter receiving full payment therefor.

Section 5.13    Hedging Contracts.  As of the date hereof, Schedule 5.13 sets forth, a true and complete list of all Hedging Contracts of the Debtors and their Subsidiaries in effect as of the Closing, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof, all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

Section 5.14    No Undisclosed Relationships.    Other than Contracts or other direct or indirect relationships between or among any of the Debtors, there are no Contracts or other direct or indirect relationships existing as of the date hereof between or among any of the Debtors, on the one hand, and any director, officer or greater than five percent stockholder of any of the Debtors, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC and that is not so described, except for the transactions contemplated by this Agreement.  Any Contract existing as of the date hereof between or among any of the Debtors, on the one hand, and any director, officer or greater than five percent stockholder of any of the Debtors, on the other hand, that is required by the Exchange Act to be described in the Company's filings with the SEC is filed as an exhibit to, or incorporated by reference as indicated in, the Annual Report on Form 10-K for the year ended December 31, 2015 that the Company filed on February 29, 2016 or any other SEC Document filed thereafter until the date hereof.

Section 5.15    Licenses and Permits.    The Debtors possess all licenses, certificates, permits and other authorizations issued by, have made all declarations and filings with and have maintained all financial assurances required by, the appropriate Governmental Entities that are necessary for the ownership or lease of their respective properties and the conduct of the business, except where the failure to possess, make or give the same would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  None of the Debtors (a) has received written notice of any revocation or modification of any such license, certificate, permit or authorization or (b) has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except to the extent that any of the foregoing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.16    Environmental.    Except as to matters that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect (or with respect to

clauses (c) and (e) below, where the failure, either individually or in the aggregate, to take such actions could not be reasonably expected to have a Material Adverse Effect): (a) the Debtors, their Subsidiaries, their Real Properties and Oil and Gas Properties and the operations conducted thereon, comply and have complied with Environmental Laws and, to the knowledge of Debtors, any operations conducted thereon by any prior owner or operator of such property complied with Environmental Laws, (b) no written notice, claim, demand, request for information, Order, complaint or penalty has been received by any of the Debtors, and there are no Legal Proceedings pending or, to the knowledge of the Debtors, threatened which allege a violation of or liability under any Environmental Laws, in each case relating to any of the Debtors, (c) each Debtor has received (including timely application for renewal of the same), and maintained in full force and effect, all environmental permits, licenses and other approvals, and has maintained all financial assurances, in each case to the extent necessary for its operations to comply with all applicable Environmental Laws and is, and since January 1, 2014, has been, in compliance with the terms of such permits, licenses and other approvals and with all applicable Environmental Laws, (d) to the knowledge of the Company, no Hazardous Material is located at, on or under any property currently or formerly owned, operated or leased by any of the Debtors that would reasonably be expected to give rise to any cost, liability or obligation of any of the Debtors under any Environmental Laws other than future costs, liabilities and obligations associated with remediation at the end of the productive life of a well, facility or pipeline that has produced, stored or transported hydrocarbons, (e) no Hazardous Material has been Released, generated, treated, stored or handled by any of the Debtors or their Subsidiaries in a manner that could give rise to any liabilities, including liabilities for response costs, corrective action costs, personal injury, property damage or natural resources damages, pursuant to Environmental Laws, (f) none of the Debtors or any of their Subsidiaries has owned or operated any Real Property, Oil and Gas Property, or facility (and no such property or facility is contaminated by any such Hazardous Material) in a manner that has given or would give rise to any liabilities, including liabilities for response costs, corrective action costs, personal injury, property damage or natural resources damages, pursuant to Environmental Laws, (g) Hazardous Materials, if any, generated by the Debtors or any of their Subsidiaries at any and all Real Property and Oil and Gas Property of any such Subsidiary have in the past been transported, treated and disposed of in compliance with Environmental Laws then in effect, and, to the knowledge of such Debtor, transport carriers and treatment and disposal facilities known by such Debtor to have been used by it are not the subject of any existing action, investigation or inquiry by any Governmental Entity under any Environmental Laws, (h) no Hazardous Material has been transported to or Released at any location in a manner that would reasonably be expected to give rise to any cost, liability or obligation of any of the Debtors under any Environmental Laws other than future costs, liabilities and obligations associated with remediation at the end of the productive life of a well, facility or pipeline that has produced, stored or transported hydrocarbons, (i) no Debtor has any known pending investigation, monitoring, removal or remedial obligations under applicable Environmental Laws in connection with any Release or threatened Release of any Hazardous Materials into the environment by any Debtor or any Subsidiary thereof and (j) there are no agreements in which any of the Debtors has expressly assumed responsibility for any known obligation of any other Person arising under or relating to Environmental Laws that remains unresolved other than future costs, liabilities and obligations associated with remediation at the end of the productive life of a well, facility or pipeline that has produced, stored or transported

hydrocarbons, which has not been made available to the Commitment Parties prior to the date hereof.

Section 5.17    Tax Returns.

(a)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each of the Debtors has filed or caused to be filed all U.S. federal, state, provincial, local and non-U.S. Tax returns required to have been filed by it, including any filing extensions together with payments for any estimated Taxes due thereon on or before the time the extension is due and (ii) taken as a whole, each such Tax return is true and correct.

(b)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, each of the Debtors has timely paid or caused to be timely paid all Taxes shown to be due and payable by it on the returns referred to in Section 5.17(a) and all other Taxes or assessments (or made adequate provision (in accordance with GAAP) for the payment of all Taxes due) with respect to all periods or portions thereof ending on or before the date hereof (except (i) Taxes or assessments that are being contested in good faith by appropriate proceedings and for which the Debtors (as the case may be) have set aside on its books adequate reserves in accordance with GAAP or (ii) to the extent the non-payment thereof is permitted by the Bankruptcy Code), which Taxes, if not paid or adequately provided for, would reasonably be expected to be material to the Debtors taken as a whole. To the knowledge of the Debtors, there is no proposed Tax assessment against any Debtor or any of its Subsidiaries that would, if made, reasonably be expected to have a Material Adverse Effect.

(c)    Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, as of the date hereof, with respect to the Debtors, other than in connection with the Chapter 11 Cases and other than Taxes or assessments that are being contested in good faith and are not expected to result in significant negative adjustments that would be material to the Debtors taken as a whole, (i) no claims have been asserted in writing with respect to any Taxes, (ii) no presently effective waivers or extensions of statutes of limitation with respect to Taxes have been given or requested and (iii) no Tax returns are being examined by, and no written notification of intention to examine has been received from any Governmental Entity.

Section 5.18    Employee Benefit Plans.

(a)    Except as would not reasonably be expected to result in material liability to the Company taken as a whole: (i) each Company Plan is in compliance with the applicable provisions of ERISA and the Code and other federal or state Law; (ii) no Reportable Event has occurred during the past six years (or is reasonably likely to occur); (iii) no ERISA Event has occurred or is reasonably expected to occur; (iv) none of the Debtors has engaged in a "prohibited transaction" (as defined in Section 406 of ERISA and Section 4975 of the Code) in connection with any Company Plan that would subject any of the Debtors to Tax or other liability; and (v) no Company Plan maintained or contributed to by any of the Debtors provides welfare coverage or benefits to retired employees or independent contractors or other former employees or independent contractors (other than as required by Section 601 of ERISA). During

the past six years, neither the Debtors nor any of its ERISA Affiliates, sponsored, maintained, contributed to or had any obligation to sponsor, main or contribute to any Pension Plan or Multiemployer Plan.  None of the Debtors or any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

(b)     Except as would not reasonably be expected to result in material liability to the Company taken as a whole, or except as required by applicable Law, none of the Debtors has established, sponsored or maintained, or has any liability with respect to, any employee pension benefit plan or other employee benefit plan, program, policy, agreement or arrangement governed by or subject to the Laws of a jurisdiction other than the United States of America.

(c)     Except as would not reasonably be expected to result in material liability to the Company taken as a whole, there are no pending, or to the knowledge of the Debtors, threatened Legal Proceedings, asserted or instituted against any Company Plan or any Person as fiduciary or sponsor of any Company Plan, in each case other than claims for benefits in the normal course.

(d)     Within the last six years, no Pension Plan has been terminated, whether or not in a "standard termination" as that term is used in Section 4041(b)(1) of ERISA, except as would not reasonably be expected to result in material liability to the Company taken as a whole.

(e)     Except as would not reasonably be expected to result in material liability to the Company taken as a whole, all compensation and benefit arrangements of the Debtors comply and have complied in both form and operation with their terms and all applicable Laws and legal requirements, and none of the Debtors has any obligation to provide any individual with a "gross up" or similar payment in respect of any Taxes that may become payable under Sections 409A or 4999 of the Code.

(f)     Except as would not reasonably be expected to result in material liability to the Company taken as a whole, all liabilities (including all employer contributions and payments required to have been made by any of the Debtors) under or with respect to any compensation or benefit arrangement of any of the Debtors have been properly accounted for in the Company's financial statements in accordance with GAAP.

(g)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each of the Debtors is currently in compliance with all Laws in respect of personnel, employment and employment practices; (ii) all service providers of each of the Debtors are correctly classified as employees, independent contractors, or otherwise for all purposes (including any applicable Tax and employment policies or Law); and (iii) the Debtors have not and are not engaged in any unfair labor practice.

Section 5.19   Internal Control Over Financial Reporting.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company has established and maintains a system of internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) promulgated under the Exchange Act) that complies with the requirements of the Exchange Act and has been designed to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial

statements for external purposes in accordance with GAAP and to the knowledge of the Company, there are no material weaknesses in the Company's internal control over financial reporting as of the date hereof.

Section 5.20    Financial Condition.

(a)    The audited consolidated balance sheet of the Company and its consolidated Subsidiaries as of December 31, 2016, the related consolidated statement of income, partners' equity and cash flow of the Company and its consolidated Subsidiaries for the fiscal year ended on said date, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) present fairly in all material respects the financial position of the Company and its consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Company and its consolidated Subsidiaries as of the date thereof, including liabilities for Taxes, material commitments and indebtedness of the type required to be disclosed on a balance sheet prepared in accordance with GAAP.

(b)    The unaudited consolidated balance sheets of the Company and its consolidated Subsidiaries dated as of June 30, 2017, and the related consolidated statements of income or operations, partners' equity and cash flow for the fiscal quarter ended on that date (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) present fairly in all material respects the financial position of the Company and its consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject to the absence of footnotes and to normal year-end audit adjustment.

Section 5.21    Disclosure Controls and Procedures.  Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, the Company maintains disclosure controls and procedures (within the meaning of Rules 13a-15(e) and 15d-15(e) promulgated under the Exchange Act) designed to ensure that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, including that information required to be disclosed by the Company in the reports that it files and submits under the Exchange Act is accumulated and communicated to management of the Company as appropriate to allow timely decisions regarding required disclosure.

Section 5.22    Material Contracts.  Other than as a result of a rejection motion filed by any of the Debtors in the Chapter 11 Cases, all Material Contracts are valid, binding and enforceable by and against the Debtor party thereto and, to the knowledge of the Debtors, each other party thereto (except where the failure to be valid, binding or enforceable does not constitute a Material Adverse Effect), and no written notice to terminate, in whole or part, any Material Contract has been delivered to any of the Debtors (except where such termination would not reasonably be expected to have, individually or in the aggregate, a Material Adverse

Effect).  Other than as a result of the filing of the Chapter 11 Cases, none of the Debtors nor, to the knowledge of the Debtors, any other party to any Material Contract, is in material default or breach under the terms thereof, in each case, except for such instances of material default or breach that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Other than as a result of the Chapter 11 Cases, no Debtor or any of its Subsidiaries is a party to or bound by any Contract, or subject to any restriction in any organizational document, or any Requirement of Law, which would reasonably be expected to have a Material Adverse Effect.

Section 5.23    No Unlawful Payments.  Since January 1, 2014, none of the Debtors nor, to the knowledge of the Debtors, any of their respective directors, officers, employees or agents has in any material respect: (a) used any funds of any of the Debtors for any unlawful contribution, gift, entertainment or other unlawful expense, in each case relating to political activity; (b) made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; (c) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977; or (d) made any foreign bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.

Section 5.24    Compliance with Anti-Money Laundering Laws.  The operations of the Debtors are and, since January 1, 2014, have been at all times, conducted in compliance in all material respects with applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transactions Reporting Act of 1970, the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2011) and the anti-money laundering statutes of any jurisdictions applicable to the Company or its Subsidiaries (and the rules and regulations promulgated thereunder) (collectively, the "**Anti-Money Laundering Laws**"), and no material Legal Proceeding by or before any Governmental Entity or any arbitrator involving any of the Debtors with respect to Anti-Money Laundering Laws is pending or, to the knowledge of the Debtors, threatened.

Section 5.25    Compliance with Sanctions Laws.  None of the Debtors nor, to the knowledge of the Company, any of their respective directors, officers, employees or other Persons acting on their behalf with express authority to so act is currently subject to any U.S. Sanctions administered by OFAC (a "**Sanctioned Person**").  The Company will not directly or indirectly use the proceeds of the Rights Offerings, or lend, contribute or otherwise make available such proceeds to any other Debtor, joint venture partner or other Person in a manner that would result in violation of any Sanctions or Anti-Corruption Laws.  The Company has implemented and maintains in effect policies and procedures designed to ensure compliance by the Company, its Subsidiaries and their respective directors, officers, employees and agents with Anticorruption Laws and applicable Sanctions.  The Company, its Subsidiaries and their respective officers and employees and, to the knowledge of the Company, its directors and agents, are in compliance with Anticorruption Laws and applicable Sanctions in all material respects.  None of (a) the Company, any of its Subsidiaries or, to the knowledge of the Company, any of their respective directors, officers or employees, is a Sanctioned Person, and (b) to the knowledge of the Company, neither any agent of the Company nor any Subsidiary thereof that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.

Section 5.26   <u>No Broker's Fees</u>.   Neither the Company nor any of its Subsidiaries is a party to any Contract with any Person (other than this Agreement) that would give rise to a valid claim against the Commitment Parties or the Second Lien Noteholder Group Parties for a brokerage commission, finder's fee or like payment in connection with the Rights Offering or the sale of the PermianCo Common Stock pursuant to the Rights Offering or in connection with the Approved Plan, including the sale of the Unsubscribed Securities, the sale of the Rights Offering Securities, the Minimum Allocation Rights Securities and the Put Option Premium.

Section 5.27   <u>Regulated Entities</u>.   None of the Debtors is an "investment company" or is a company "controlled by" an "investment company" within the meaning of the Investment Company Act of 1940, as amended (the "**Investment Company Act**").   None of the Debtors, or any Person controlling the Company, Subsidiaries of the Company, or Breitburn Operating GP LLC, a Delaware limited liability company, is subject to regulation under the Federal Power Act, the Interstate Commerce Act, any state public utilities code, or any other federal or state statute or regulation limiting its ability to perform its obligations under this Agreement or the Approved Plan.

Section 5.28   <u>Insurance</u>.   Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect: (a) the Debtors have insured their properties and assets against such risks and in such amounts as are customary for companies engaged in similar businesses; (b) all premiums due and payable in respect of insurance policies maintained by the Debtors have been paid; (c) the Company reasonably believes that the insurance maintained by or on behalf of the Debtors is financially sound, reputable, and adequate in all respects, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where such Debtor or Subsidiary operates; and (d) as of the date hereof, none of the Debtors has received notice from any insurer or agent of such insurer with respect to any insurance policies of the Debtors of cancellation or termination of such policies, other than such notices which are received in the ordinary course of business or for policies that have expired in accordance with their terms.

Section 5.29   <u>Alternative Transactions</u>.   As of the date hereof, the Company is not pursuing, or in discussions or negotiations regarding, any solicitation, offer, or proposal from any Person concerning any actual or proposed Alternative Transaction and, as applicable, has terminated any existing discussions or negotiations regarding any actual or proposed Alternative Transaction.

Section 5.30   <u>Issuance</u>.

(a)   The PermianCo Common Stock to be issued pursuant to the Approved Plan, including the PermianCo Common Stock to be issued in connection with the consummation of the Rights Offering and pursuant to the terms of this Agreement, including in connection with the Minimum Allocation Rights Securities and the Put Option Premium, will, when issued and delivered on the Closing Date and any time thereafter, be duly and validly authorized, issued and delivered and shall be fully paid and non-assessable, and such PermianCo Common Stock will be free and clear of all Taxes, Liens (other than transfer restrictions imposed hereunder or by applicable Law), preemptive rights, subscription and similar rights, other than

any rights set forth in the Approved Plan, the Plan Supplement, the PermianCo Governance Documents or Restructuring Documents.The LegacyCo Units to be issued pursuant to the Approved Plan, will, when issued and delivered on the Closing Date and any time thereafter, be duly and validly authorized, issued and delivered, and such LegacyCo Units will be free and clear of all Taxes, Liens (other than transfer restrictions imposed hereunder or by applicable Law), preemptive rights, subscription and similar rights, other than any rights set forth in the Approved Plan, the Plan Supplement, the New Organizational Documents (as defined in the Approved Plan) or Restructuring Documents.

(c)    Except as set forth in this Agreement or the PermianCo Governance Documents or New Organizational Documents (as defined in the Approved Plan), as applicable, as of the Closing Date, none of PermianCo or LegacyCo will be party to or otherwise bound by or subject to any outstanding option, warrant, call, right, security, commitment, Contract, arrangement or undertaking (including any preemptive right) that (i) obligates any of PermianCo or LegacyCo to issue, deliver, sell or transfer, or repurchase, redeem or otherwise acquire, or cause to be issued, delivered, sold or transferred, or repurchased, redeemed or otherwise acquired, any units or shares of capital stock of, or other equity or voting interests in, any of the Reorganized Debtors or any security convertible or exercisable for or exchangeable into any units or shares of capital stock of, or other equity or voting interests in, any of the Reorganized Debtors, (ii) obligates any of PermianCo or LegacyCo to issue, grant, extend or enter into any such option, warrant, call, right, security, commitment, Contract, arrangement or undertaking, (iii) restricts the Transfer of any units or shares of capital stock of, or other equity interests in, any of PermianCo or LegacyCo or (iv) relates to the voting of any units or other equity interests in any of PermianCo or LegacyCo.

Section 5.31    No General Solicitation.

(a)    No Debtor, Affiliate thereof or any Person acting on its or any of their behalf has engaged, or will engage, in any form of general solicitation or general advertising (within the meaning of Rule 502(c) under the Securities Act) in connection with the offering of the sale of the Unsubscribed Securities or the sale of the Rights Offering Securities subject to the Subscription Rights.

(b)    Other than this Agreement and the Restructuring Documents expressly contemplated under the Approved Plan, none of the Debtors or any Affiliate thereof has entered into any agreement or arrangement with any Person in relation to the sale of the Unsubscribed Securities or the sale of the Rights Offering Securities subject to the Subscription Rights.

(c)    None of the Debtors, any of their respective Affiliates or any Person acting on its or their behalf, directly or indirectly, has made or will make any offers or sales of any security, or has solicited or will solicit offers to buy, or otherwise has negotiated or will negotiate in respect of, any security, under circumstances that would require the registration of any of the securities offered or sold in connection with the Rights Offering or under this Agreement under the Securities Act.

Section 5.32    Capitalization.  All issued and outstanding shares of capital stock or other equity interests of the Debtors and each of their respective Subsidiaries, as applicable, have been

duly authorized and duly and validly authorized and issued, and are fully paid and nonassessable, and are not subject to any preemptive rights. None of the Debtors or any of their respective Subsidiaries is a party to any outstanding option, warrant, call, subscription or other right (including any preemptive right), agreement or commitment which obligates any of them to issue, sell or transfer, or repurchase, redeem or otherwise acquire, any shares of the capital stock or other equity interest in the Debtors or any of their Subsidiaries.

## ARTICLE VI

## ADDITIONAL COVENANTS

Section 6.1    <u>Reasonable Best Efforts</u>.

(a)    Without in any way limiting any other respective obligation of any Party in this Agreement, each Party shall use reasonable best efforts to take or cause to be taken all actions, and do or cause to be done all things, reasonably necessary, proper or advisable in order to consummate and make effective the transactions contemplated by this Agreement and the Approved Plan, including using reasonable best efforts in:

(i)    timely preparing and filing all documentation reasonably necessary to effect all necessary notices, reports and other filings of such Person and to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any third party or Governmental Entity;

(ii)    defending any Legal Proceedings in any way challenging (A) this Agreement, the Approved Plan or any other Restructuring Document, (B) the BCA Approval Order, Disclosure Statement Order or Confirmation Order or (C) the consummation of the transactions contemplated hereby and thereby, including seeking to have any stay or temporary restraining Order entered by any Governmental Entity vacated or reversed; and

(iii)    working together in good faith to finalize any documents or agreements in connection with the Reorganization Transactions and related to the governance of the Reorganized Debtors, Restructuring Documents and all other documents relating thereto for timely inclusion in the Approved Plan and filing with the Bankruptcy Court in accordance with the RSA and the Approved Plan.

(b)    Subject to applicable Laws relating to the exchange of information, the Second Lien Noteholder Group Parties and the Commitment Parties shall have the right to review in advance, and to the extent practicable each will consult with the other on all of the information relating to Second Lien Noteholder Group Parties or the Commitment Parties, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the transactions contemplated by this Agreement or the Approved Plan; *provided*, *however*, that neither of the Second Lien Noteholder Group Parties or the Commitment Parties are required to provide for review in advance declarations or other evidence submitted in connection with any filing with the Bankruptcy

Court.  In exercising the foregoing rights, the Parties shall act reasonably and as promptly as practicable.

(c)    To the extent exigencies permit, the Debtors, the Second Lien Noteholder Group Parties and the Commitment Parties shall provide or cause to be provided to each other drafts of all motions, applications, pleadings, schedules, Orders, reports or other material papers (including all material memoranda, exhibits, supporting affidavits and evidence and other supporting documentation) in the Chapter 11 Cases relating to or affecting the Restructuring Documents in advance of filing the same with the Bankruptcy Court.  All such motions, applications, pleadings, schedules, Orders, reports and other material papers shall be in form and substance mutually satisfactory to the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties; *provided*, that the foregoing shall not modify any consent rights of the Requisite Consenting Second Lien Creditors or the Requisite Commitment Parties to any documents as explicitly set forth in this Agreement or in the Approved Plan.

(d)    Nothing contained in this <u>Section 6.1</u> shall limit the ability of any Second Lien Noteholder Group Party or Commitment Party to consult with the Debtors, to appear and be heard, or to file objections, concerning any matter arising in the Chapter 11 Cases to the extent not inconsistent with the RSA.

Section 6.2    <u>Antitrust Approval</u>.

(a)    Each Party agrees to use reasonable best efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or appropriate to consummate and make effective the transactions contemplated by this Agreement, the Approved Plan and the other Restructuring Documents, including (i) if applicable, filing, or causing to be filed, the Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated by this Agreement with the Antitrust Division of the United States Department of Justice and the United States Federal Trade Commission and any filings (or, if required by any Antitrust Authority, any drafts thereof) under any other Antitrust Laws that are necessary to consummate and make effective the transactions contemplated by this Agreement as soon as reasonably practicable and no later than 20 Business Days following the date hereof and (ii) promptly furnishing documents or information reasonably requested by any Antitrust Authority.

(b)    Each Party subject to an obligation pursuant to the Antitrust Laws to notify any transaction contemplated by this Agreement, the Approved Plan or the other Restructuring Documents that has notified any of the other Parties in writing of such obligation (each such Party, a "**Filing Party**") agree to reasonably cooperate with each other as to the appropriate time of filing such notification and its content.  Each Filing Party shall, to the extent permitted by applicable Law: (i) promptly notify each other Filing Party and each Second Lien Noteholder Group Party and each Commitment Party, and if in writing, furnish to each other Filing Party and each Second Lien Noteholder Group Party and each Commitment Party with copies of (or, in the case of material oral communications, advise each other orally of) any communications from or with an Antitrust Authority; (ii) not participate in any meeting with an Antitrust Authority unless it consults with each other Filing Party, as applicable, in advance and, to the extent permitted by the Antitrust Authority and applicable Law, give each other Filing

45

Party, as applicable, a reasonable opportunity to attend and participate thereat; (iii) furnish each other Filing Party, as applicable, with copies of all correspondence and communications between such Filing Party and the Antitrust Authority; (iv) furnish each other Filing Party with such necessary information and reasonable assistance as may be reasonably necessary in connection with the preparation of necessary filings or submission of information to the Antitrust Authority; and (v) not withdraw its filing, if any, under the HSR Act without the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties.

(c)  Should a Filing Party be subject to an obligation under the Antitrust Laws to jointly notify with one or more other Filing Parties (each, a "**Joint Filing Party**") any transaction contemplated by this Agreement, the Approved Plan or the other Restructuring Documents, such Joint Filing Party shall promptly notify each other Joint Filing Party, the Debtors and each Second Lien Noteholder Group Party and each Commitment Party of, and if in writing, furnish each other Joint Filing Party and each Second Lien Noteholder Group Party and each Commitment Party with copies of (or, in the case of material oral communications, advise each other Joint Filing Party orally of) any communications from or with an Antitrust Authority.

(d)  Each Filing Party and the other Parties shall use (and, to the extent that the Company becomes subject to an obligation pursuant to the Antitrust Laws to notify any transaction contemplated by this Agreement, the Approved Plan or the other Restructuring Documents, each of the Parties shall cooperate with the Company and use) their reasonable best efforts to (i) obtain all authorizations, approvals, consents, waivers or clearances under any applicable Antitrust Laws or to cause the termination or expiration of all applicable waiting periods under any Antitrust Laws in connection with the transactions contemplated by this Agreement at the earliest date practicable after the date of filing; and (ii) avoid any Legal Proceeding, whether brought by any Antitrust Authority or any third party. The communications contemplated by this Section 6.2 may be made by a Filing Party on an outside counsel-only basis or subject to other agreed upon confidentiality safeguards. The obligations in this Section 6.2 shall not apply to filings, correspondence, communications or meetings with Antitrust Authorities unrelated to the transactions contemplated by this Agreement, the Approved Plan or the other Restructuring Documents.

(e)  The Parties' obligations under this Section 6.2 shall include the obligation to avoid the entry of, or to have vacated, lifted, reversed or overturned any decree, judgment, injunction or other order, whether temporary, preliminary or permanent, and whether by administrative or judicial action or otherwise, that would restrain, prevent or delay the Closing on or before the Outside Date.

Section 6.3    Conduct of Business.

(a)  Except as set forth in this Agreement or the Approved Plan or with the prior written consent of the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors, during the period from the date of this Agreement to the earlier of the Effective Date and the date on which this Agreement is terminated in accordance with its terms, each of the Debtors shall use reasonable best efforts to:

      (i)     carry on its business in the ordinary course and maintain and operate its assets as a reasonably prudent operator;

      (ii)     preserve intact its material business operations and organizations, including retaining key members, officers and employees;

      (iii)     preserve its material relationships with customers, suppliers, licensors, licensees, distributors and others having material business dealings with the Company or its Subsidiaries in connection with their business;

      (iv)     maintain books, accounts and records in accordance with past custom and practice; and

      (v)     comply with applicable Law in all material respects.

      (b)     For the avoidance of doubt, the following shall be deemed to occur outside of the ordinary course of business of the Debtors and shall require the prior written consent of the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors: (i) any amendment, modification, termination, waiver, supplement, restatement or other change to any Material Contract or Hedging Contract, any assumption of any Material Contract or Hedging Contract, or any entry into any Material Contract or Hedging Contract, (ii) entry into, or any amendment, modification, waiver, supplement or other change to, any employment or severance agreement or incentive plan for employees and insiders of the Debtors to which any of the Debtors is a party or any assumption of any such employment agreements in connection with the Chapter 11 Cases, (iii) the adoption or amendment of any management incentive or equity plan by any of the Debtors, (iv) any (A) termination by a Debtor without cause or (B) reduction in title or responsibilities, in each case, of any insider (as defined in section 101(31)(B) of the Bankruptcy Code) of the Debtors, (v) the entry into of any contract or agreement relating to (or the consummation of) any acquisition or divestiture (or group of related acquisitions or divestitures) of Oil and Gas Properties or assets or (vi) the encumbrance or entry into any lease on all or any portion of the Debtors' assets other than in the ordinary course of business that are consistent with the prior business practices of the Debtors.  Except as otherwise provided in this Agreement, nothing in this Agreement shall give the Commitment Parties or the Second Lien Noteholder Group Parties, directly or indirectly, any right to control or direct the operations of the Debtors.

      (c)     Except as contemplated by this Agreement and the RSA, prior to the Effective Date, LegacyCo and PermianCo shall not: (i) hold any assets other than (A) their respective minute books and other corporate books and records and (B) other miscellaneous non-material assets incidental to the ownership of their respective equity interests or to the maintenance of their respective corporate existences; (ii) have any indebtedness, obligations or other liabilities other than (A) Tax liabilities arising in the ordinary course of business, (B) corporate, administrative and operating expenses in the ordinary course of business and (C) liabilities under this Agreement, the RSA and the Approved Plan; or (iii) engage in any activities or business other than (A) issuing shares of its own equity interests and (B) holding the assets and incurring the liabilities described in <u>clause (i)</u> above and activities incidental and related thereto.

Section 6.4    <u>Confidentiality</u>.    Notwithstanding any other agreement, from the date hereof until the Closing, each of the Second Lien Noteholder Group Parties and the Debtors agrees to maintain the confidentiality of the Confidential Information and not to disclose such Confidential Information to third parties, except that Confidential Information may be disclosed (a) to each of the Second Lien Noteholder Group Parties' and the Debtors' Representatives and Affiliates (and its Affiliates' Representatives) (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential) or (b) if disclosure is required or requested pursuant to judicial or administrative process or pursuant to applicable Law or applicable securities exchange rules or by any Governmental Entity; *provided*, that such disclosing party shall provide the other Parties with prompt written notice of such legal compulsion and cooperate with the Company and the other Parties to obtain a protective Order or similar remedy to cause such information or documents not to be disclosed, including interposing all available objections thereto; *provided*, *further*, that, in the event that such protective Order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of such information or documents that is legally required to be disclosed and shall exercise its commercially reasonable efforts to obtain assurance that confidential treatment will be accorded such disclosed information or documents.    Each of the Second Lien Noteholder Group Parties and Debtors agrees not use any Confidential Information for any purpose other than in connection with this Agreement or the other Restructuring Documents or the transactions contemplated hereby or thereby.

Section 6.5    <u>Access to Information, Books and Records</u>.    Subject to applicable Law, upon reasonable notice during the period from the date hereof until Closing, the Debtors, on behalf of the Company and its Subsidiaries, shall afford the Commitment Parties and Second Lien Noteholder Group Parties and their respective Representatives reasonable access, during normal business hours and without unreasonable disruption or interference with the Company's and its Subsidiaries' conduct of business, to the Company's and its Subsidiaries' employees, advisors and representatives, properties, books, Contracts and records (including financial information, information in respect of the Company's and its Subsidiaries' Hydrocarbon Interests, Oil and Gas Properties, Real Properties and compliance with Environmental Laws and other environmental matters) and, during the period from the date hereof until Closing, the Company shall (and shall cause its Subsidiaries to) furnish promptly to such Commitment Parties all reasonable information concerning the Company's and its Subsidiaries' business, properties and personnel as may reasonably be requested by any such party; *provided*, that the foregoing shall not require the Company (a) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Debtors would cause the Company or any of its Subsidiaries to violate any of their respective obligations with respect to confidentiality to a third party if the Company shall have used its reasonable best efforts to obtain, but failed to obtain, the consent of such third party to such inspection or disclosure, (b) to disclose any legally privileged information of the Company or any of its Subsidiaries or (c) to violate any applicable Laws or Orders. All requests for information and access made in accordance with this <u>Section 6.5</u> shall be directed to an executive officer of the Company or such Person as may be designated by the Company's executive officers. Each Commitment Party and Second Lien Noteholder Group Party hereby agrees that any information acquired by such Commitment Party, Second Lien Noteholder Group Party or its respective Representatives solely pursuant to a request made under this <u>Section 6.5</u> may be subject to the terms of a confidentiality agreement (and may constitute

"confidential information" (as such term will be defined in such confidentiality agreement)) to be entered into between each Commitment Party or Second Lien Noteholder Group Party, as applicable, and the Debtors in form and substance and on terms mutually acceptable to each Commitment Party or Second Lien Noteholder Group Party, as applicable, and the Debtors.

Section 6.6    <u>Transition Services Agreement</u>.  The Commitment Parties and the Second Lien Noteholder Group Parties shall enter into the Transition Services Agreement in accordance with the Approved Plan pursuant to which LegacyCo shall provide PermianCo with specified administrative, managerial and other services.

Section 6.7    <u>DTC Eligibility</u>.  Upon the written request of the Requisite Commitment Parties, the Debtors shall use reasonable best efforts to assist the Commitment Parties with making eligible PermianCo Common Stock to be issued pursuant to the Rights Offering and the Approved Plan eligible for deposit with The Depository Trust Company or able to be transferred through a transfer agent.

Section 6.8    <u>Registration Rights Agreement; PermianCo Governance Documents and LegacyCo Organizational Documents</u>.

(a)    The Approved Plan will provide that from and after an initial public offering of PermianCo, each holder of PermianCo Common Stock receiving "control" or "restricted" securities shall be entitled to registration rights pursuant to a registration rights agreement, which agreement shall be in form and substance consistent with the terms set forth in the Approved Plan and reasonably satisfactory to the Requisite Commitment Parties (the "**Registration Rights Agreement**").  A form of the Registration Rights Agreement shall be filed with the Bankruptcy Court as part of the Plan Supplement.

(b)    The Approved Plan will provide that on the Effective Date the PermianCo Governance Documents and the LegacyCo Organizational Documents will be duly authorized, approved, adopted and effective, in each case, reflecting the governance provisions of the Reorganized Debtors as set forth in the Approved Plan.  Forms of the PermianCo Governance Documents and the LegacyCo Organizational Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement.

Section 6.9    <u>Blue Sky</u>.  The Debtors shall, on or before the Closing Date, take such action as the Debtors and the Requisite Commitment Parties shall reasonably determine is necessary in order to qualify, or to obtain an exemption from such qualification, for any securities issued pursuant to the Approved Plan for sale to the Commitment Parties at the Closing Date under applicable securities and "Blue Sky" Laws of the states of the United States and any applicable foreign jurisdictions, and shall provide evidence of any such action so taken to the Commitment Parties on or prior to the Closing Date.  The Debtors shall timely make all filings and reports relating to the offer and sale of the securities issued pursuant to the Approved Plan required under applicable securities and "Blue Sky" Laws of the states of the United States. The Debtors shall pay all fees and expenses in connection with satisfying the obligations under this <u>Section 6.9</u>.

Section 6.10    No Integration; No General Solicitation.    Neither the Company nor any of its affiliates (as defined in Rule 501(b) of Regulation D promulgated under the Securities Act) will, directly or through any agent, sell, offer for sale, solicit offers to buy or otherwise negotiate in respect of, any security (as defined in the Securities Act), that is or will be integrated with the sale of any of the Rights Offering Securities, Unsubscribed Securities or any other PermianCo Common Stock to be issued under the Approved Plan and this Agreement in a manner that would require registration of any securities to be issued by the Reorganized Debtors on the Effective Date under the Securities Act.    None of the Company or any of its Affiliates or any other Person acting on its or their behalf will solicit offers for, or offer or sell, any such securities by means of any form of general solicitation or general advertising within the meaning of Rule 502(c) of Regulation D promulgated under the Securities Act or in any manner involving a public offering within the meaning of Section 4(a)(2) of the Securities Act.

Section 6.11    Use of Proceeds.    The Debtors will apply the proceeds from the Rights Offering for the purposes identified in the Disclosure Statement and the Approved Plan.

Section 6.12    Hedging.    The Debtors shall use reasonable best efforts to implement a plan to enter into Hedging Contracts that is reasonably acceptable to (a) the Requisite Consenting Second Lien Creditors and (b) to the extent that such hedging covers the Permian Assets, the Requisite Commitment Parties.

Section 6.13    Joinder of PermianCo.    Following the formation of PermianCo, PermianCo shall execute a Joinder Agreement pursuant to which PermianCo shall become a party hereto.

## ARTICLE VII

## CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

Section 7.1    Conditions to the Obligations of the Commitment Parties and the Second Lien Noteholder Group Parties.    The obligations of each Commitment Party and each Second Lien Noteholder Group Party (except with respect to Sections 7.1(g), (h), (i), (p), (q), (s)(i) and (u)(ii), which are conditions to the obligations of each Commitment Party only, and Sections 7.1(s)(ii) and (u)(iii), which are conditions to the obligations of each Second Lien Noteholder Group Party only) to consummate the transactions contemplated hereby shall be subject to (unless waived in accordance with Section 7.3) the satisfaction of the following conditions prior to or at the Closing:

(a)    BCA Approval Order.    The Bankruptcy Court shall have entered the BCA Approval Order, such Order shall be in form and substance reasonably satisfactory to the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties in their sole discretion and such Order shall be a Final Order.

(b)    RSA.    The RSA shall not have been terminated and shall be in full force and effect.

(c)    Disclosure Statement Order.    The Bankruptcy Court shall have entered the Disclosure Statement Order, such Order shall be in form and substance reasonably satisfactory to

the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties and such Order shall be in full force and effect.

(d)    <u>Confirmation Order</u>.    The Bankruptcy Court shall have entered the Confirmation Order, such Order shall be in form and substance acceptable to the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties and such Order shall not be subject to any stay.

(e)    <u>Approved Plan</u>.    The Company and all of the other Debtors shall have complied, in all material respects, with the terms of the Approved Plan that are to be performed by the Company and the other Debtors on or prior to the Effective Date and the conditions to the occurrence of the Effective Date set forth in the Approved Plan shall have been satisfied or, with the prior consent of the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties, waived in accordance with the terms thereof.

(f)    <u>Rights Offering</u>.    The Rights Offering shall have been conducted, in all material respects, in accordance with the BCA Approval Order, the Rights Offering Procedures and this Agreement, and the Rights Offering Expiration Time shall have occurred.

(g)    <u>Funding Notice</u>.    The Commitment Parties shall have received a Funding Notice in accordance with <u>Section 2.4(a)</u>.

(h)    <u>Valid Issuance</u>.

(i)    All PermianCo Common Stock subject to the Rights Offering (including the PermianCo Common Stock to be issued in respect of the Put Option Premium), shall be, upon (A) payment of the aggregate purchase price as provided herein and the Rights Offering Procedures and (B) the Effective Date, validly issued, fully paid and non-assessable, and free and clear of all Taxes, Liens, pre-emptive rights, rights of first refusal, subscription and similar rights except as set forth in the PermianCo Governance Documents.    Other than the PermianCo Common Stock to be issued pursuant to this Agreement and the Rights Offering, no PermianCo Common Stock shall be issued or outstanding.

(ii)    All LegacyCo Units to be issued to PermianCo shall be, upon the Effective Date, duly and validly authorized, issued and delivered, and free and clear of all Taxes, Liens, pre-emptive rights, rights of first refusal, subscription and similar rights except as set forth in the LegacyCo Organizational Documents.

(i)    <u>LegacyCo Units Issuance to PermianCo</u>.    LegacyCo Units amounting to 7.50% of the total outstanding LegacyCo Units on the Closing Date (subject to dilution for any LegacyCo Units to be issued after the Effective Date, including under any long-term management incentive plan in respect of LegacyCo) shall have been issued to PermianCo.

(j)    <u>Effective Date</u>.    The Effective Date shall have occurred, or shall be deemed to have occurred concurrently with the Closing, as applicable, in accordance with the terms and conditions in the Approved Plan and in the Confirmation Order.

       (k)    <u>Reorganization Transactions</u>.  The Reorganization Transactions shall have occurred and the PermianCo Governance Documents and LegacyCo Organizational Documents shall have been duly approved and adopted and shall be in full force and effect.

       (l)    <u>Expense Reimbursement</u>.  The Debtors shall have paid all Expense Reimbursement projected to be accrued through the Closing Date pursuant to <u>Section 3.4</u>.

       (m)    <u>Consents</u>.  All Governmental Entity and third-party notifications, filings, consents, waivers and approvals required for the consummation of the transactions contemplated by this Agreement and the Approved Plan shall have been made or received.

       (n)    <u>Antitrust Approvals</u>.  All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement and the Approved Plan shall have terminated or expired and all applicable authorizations, approvals, consents or clearances under any Antitrust Laws in connection with the transactions contemplated by this Agreement and the Approved Plan shall have been obtained.

       (o)    <u>No Legal Impediment</u>.  No Law or Order enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Approved Plan or the Rights Offering or the transactions contemplated by this Agreement shall be in effect.

       (p)    <u>Put Option</u>.  The Put Option shall have been exercised or be deemed to have been exercised in accordance with <u>Section 2.2(b)</u>.

       (q)    <u>Minimum Liquidity of PermianCo</u>.  PermianCo will have cash on hand of no less than the Minimum Cash Balance after giving effect to the consummation of the Reorganization Transactions and the transactions contemplated hereby.

       (r)    <u>Transition Services Agreement</u>.  LegacyCo and PermianCo shall have entered into the Transition Services Agreement.

       (s)    <u>No Material Adverse Effect</u>.

       (i)    No Material Adverse Effect shall have occurred and be continuing (replacing, for purposes of such definition, any references to Debtors or Debtors and their Subsidiaries with "the assets and liabilities to be transferred to PermianCo").

       (ii)

       (A)    No Material Adverse Effect shall have occurred and be continuing (replacing, for purposes of such definition, any references to Debtors or Debtors and their Subsidiaries with "the assets and liabilities to be transferred to LegacyCo").

       (B)    No Material Adverse Effect shall have occurred and be continuing.

       (t)    <u>Closing Deliverables</u>.  On or before the Effective Date, the Parties shall each deliver to the other, executed counterparts of the Restructuring Documents to be entered into at the Closing.

(u)    <u>Representations and Warranties.</u>

(i)    The representations and warranties of the Debtors contained in (A) <u>Sections 5.2</u>, <u>5.3</u>, <u>5.4</u> and <u>5.30</u> shall be true and correct in all respects other than *de minimis* inaccuracies on and as of the Closing Date, and (B) <u>Section 5.20</u> shall be true and correct in all material respects, in each case, after giving effect to the Approved Plan, with the same effect as if made on and as of the Closing Date after giving effect to the Approved Plan (except for such representations and warranties made as of a specified date, which shall be true and correct in all material respects only as of the specified date).

(ii)    The other representations and warranties of the Debtors contained in this Agreement shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing Date after giving effect to the Approved Plan with the same effect as if made on and as of the Closing Date after giving effect to the Approved Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct would not reasonably be expected to constitute, individually or in the aggregate, a Material Adverse Effect (replacing, for purposes of such definition, any references to Debtors or Debtors and their Subsidiaries with "the assets and liabilities to be transferred to PermianCo").

(iii)

(A)    The other representations and warranties of the Debtors contained in this Agreement shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing Date after giving effect to the Approved Plan with the same effect as if made on and as of the Closing Date after giving effect to the Approved Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct would not reasonably be expected to constitute, individually or in the aggregate, a Material Adverse Effect (replacing, for purposes of such definition, any references to Debtors or Debtors and their Subsidiaries with "the assets and liabilities to be transferred to LegacyCo").

(B)    The other representations and warranties of the Debtors contained in this Agreement shall be true and correct (disregarding all materiality or Material Adverse Effect qualifiers) on and as of the Closing Date after giving effect to the Approved Plan with the same effect as if made on and as of the Closing Date after giving effect to the Approved Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct would not reasonably be expected to constitute, individually or in the aggregate, a Material Adverse Effect.

(v)    <u>Covenants</u>. The Debtors shall have performed and complied, in all material respects, with all of their respective covenants and agreements contained in this Agreement that contemplate, by their terms, performance or compliance prior to the Closing Date.

Section 7.2    <u>Conditions to the Obligations of the Debtors</u>.    The obligations of the Debtors to consummate the transactions contemplated hereby shall be subject to (unless waived by the Debtors) the satisfaction of the following conditions prior to or at the Closing:

(a)    <u>Confirmation Order</u>.    The Bankruptcy Court shall have entered the Confirmation Order and such Order shall be a Final Order.

(b)    <u>Antitrust Approvals</u>.    All waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by this Agreement and the Approved Plan shall have terminated or expired and all applicable authorizations, approvals, consents or clearances under any Antitrust Laws in connection with the transactions contemplated by this Agreement and the Approved Plan shall have been obtained.

(c)    <u>No Legal Impediment</u>.    No Law or Order enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Approved Plan or the Rights Offering or the transactions contemplated by this Agreement shall be in effect.

(d)    <u>Representations and Warranties</u>.    The representations and warranties of the Commitment Parties and the Second Lien Noteholder Group Parties contained in this Agreement which contain materiality or Material Adverse Effect qualifiers shall be true and correct, and those without such qualifiers shall be true and correct in all material respects, on and as of the Closing Date after giving effect to the Approved Plan with the same effect as if made on and as of the Closing Date after giving effect to the Approved Plan (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

Section 7.3    <u>Waiver of Conditions to Obligations</u>.    All or any of the conditions set forth in <u>Section 7.1</u> may only be waived in whole or in part with respect to (a) all Commitment Parties by a written instrument delivered by the Requisite Commitment Parties and (b) all Second Lien Noteholder Group Parties, by a written instrument delivered by the Requisite Consenting Second Lien Creditors and if so waived, all Second Lien Noteholder Group Parties shall be bound by such waiver; *provided*, that the conditions in <u>Sections 7.1(g)</u>, <u>(h)</u>, <u>(i)</u>, <u>(p)</u> and <u>(q)</u> need only be waived by the Requisite Commitment Parties.

# ARTICLE VIII

# INDEMNIFICATION AND CONTRIBUTION

Section 8.1    <u>Indemnification Obligations</u>.    Following the entry of the BCA Approval Order, the Company and the other Debtors (the "**Indemnifying Parties**" and each, an "**Indemnifying Party**") shall, jointly and severally, indemnify and hold harmless each Commitment Party and Second Lien Noteholder Group Party and their respective Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling Persons (each, an "**Indemnified Person**") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Commitment Parties except to the extent otherwise provided for in this Agreement) (collectively, "**Losses**") that any such Indemnified Person may incur or to which any such Indemnified Person

may become subject arising out of or in connection with this Agreement, the Approved Plan and the transactions contemplated hereby and thereby, including the Backstop Commitments, the Rights Offering, the payment of the Put Option Premium (and Breakup Premium, if applicable) or the use of the proceeds of the Rights Offering, or any claim, challenge, litigation, investigation or proceeding relating to any of the foregoing, regardless of whether any Indemnified Person is a party thereto, whether or not such proceedings are brought by the Company, the other Debtors, their respective equity holders, Affiliates, creditors or any other Person, and reimburse each Indemnified Person upon demand for reasonable documented (with such documentation subject to redaction to preserve attorney client and work product privileges) legal or other third-party expenses incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth herein), irrespective of whether or not the transactions contemplated by this Agreement or the Approved Plan are consummated or whether or not this Agreement is terminated; *provided*, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (a) as to a Defaulting Commitment Party, its Related Parties or any Indemnified Person related thereto, caused by a Commitment Party Default by such Commitment Party or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of such Indemnified Person.  For the avoidance of doubt and notwithstanding anything to the contrary in this Agreement, no Indemnified Claim may be made against LegacyCo, and LegacyCo will have no obligation to indemnify any Person under this Agreement.

      Section 8.2    <u>Indemnification Procedure</u>.  Promptly after receipt by an Indemnified Person of notice of the commencement of any claim, challenge, litigation, investigation or proceeding (an "**Indemnified Claim**"), such Indemnified Person will, if a claim is to be made hereunder against the Indemnifying Party in respect thereof, notify the Indemnifying Party in writing of the commencement thereof; *provided*, that (a) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have hereunder except to the extent it has been materially prejudiced by such failure and (b) the omission to so notify the Indemnifying Party will not relieve the Indemnifying Party from any liability that it may have to such Indemnified Person otherwise than on account of this <u>Article VIII</u>.  In case any such Indemnified Claims are brought against any Indemnified Person and it notifies the Indemnifying Party of the commencement thereof, the Indemnifying Party will be entitled to participate therein, and, at its election by providing written notice to such Indemnified Person, the Indemnifying Party will be entitled to assume the defense thereof, with counsel reasonably acceptable to such Indemnified Person; *provided*, that if the parties (including any impleaded parties) to any such Indemnified Claims include both such Indemnified Person and the Indemnifying Party and based on advice of such Indemnified Person's counsel there are legal defenses available to such Indemnified Person that are different from or additional to those available to the Indemnifying Party, such Indemnified Person shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such Indemnified Claims.  Upon receipt of notice from the Indemnifying Party to such Indemnified Person of its election to so assume the defense of such Indemnified Claims with counsel reasonably acceptable to the Indemnified Person, the Indemnifying Party shall not be liable to such Indemnified Person for expenses incurred by such Indemnified Person in connection with

the defense thereof or participation therein (other than reasonable costs of investigation) unless (i) such Indemnified Person shall have employed separate counsel (in addition to any local counsel) in connection with the assertion of legal defenses in accordance with the proviso to the immediately preceding sentence (it being understood, however, that the Indemnifying Party shall not be liable for the expenses of more than one separate counsel representing the Indemnified Persons who are parties to such Indemnified Claims (in addition to one local counsel in each jurisdiction in which local counsel is required)), (ii) the Indemnifying Party shall not have employed counsel reasonably acceptable to such Indemnified Person to represent such Indemnified Person within a reasonable time after the Indemnifying Party has received notice of commencement of the Indemnified Claims from, or delivered on behalf of, the Indemnified Person, (iii) after the Indemnifying Party assumes the defense of the Indemnified Claims, the Indemnified Person determines in good faith that the Indemnifying Party has failed or is failing to defend such claim and provides written notice of such determination and the basis for such determination, and such failure is not reasonably cured within 10 Business Days of receipt of such notice, or (iv) the Indemnifying Party shall have authorized in writing the employment of counsel for such Indemnified Person.   Notwithstanding anything herein to the contrary, the Company and its Subsidiaries shall have sole control over any Tax controversy or Tax audit and shall be permitted to settle any liability for Taxes of the Company and its Subsidiaries.

    Section 8.3    Settlement of Indemnified Claims.   In connection with any Indemnified Claim for which an Indemnified Person is assuming the defense in accordance with this Article VIII, the Indemnifying Party shall not be liable for any settlement of any Indemnified Claims effected by such Indemnified Person without the written consent of the Indemnifying Party (which consent shall not be unreasonably withheld, conditioned or delayed).  If any settlement of any Indemnified Claims is consummated with the written consent of the Indemnifying Party or if there is a final judgment for the plaintiff in any such Indemnified Claims, the Indemnifying Party agrees to indemnify and hold harmless each Indemnified Person from and against any and all Losses by reason of such settlement or judgment to the extent such Losses are otherwise subject to indemnification by the Indemnifying Party hereunder in accordance with, and subject to the limitations of, this Article VIII.  The Indemnifying Party shall not, without the prior written consent of an Indemnified Person (which consent shall be granted or withheld, conditioned or delayed in the Indemnified Person's sole discretion), effect any settlement of any pending or threatened Indemnified Claims in respect of which indemnity or contribution has been sought hereunder by such Indemnified Person unless (a) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Indemnified Person from all liability on the claims that are the subject matter of such Indemnified Claims, and (b) such settlement does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

    Section 8.4    Contribution.    If for any reason the foregoing indemnification is unavailable to any Indemnified Person or insufficient to hold it harmless from Losses that are subject to indemnification pursuant to Section 8.1, then the Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Person as a result of such Loss in such proportion as is appropriate to reflect not only the relative benefits received by the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, but also the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Person, on the other hand, as well as any relevant equitable considerations.   It is hereby agreed that the relative

benefits to the Indemnifying Party, on the one hand, and all Indemnified Persons, on the other hand, shall be deemed to be in the same proportion as (a) the total value received or proposed to be received by the Company pursuant to the issuance and sale of the Unsubscribed Securities in the Rights Offering contemplated by this Agreement and the Approved Plan bears to (b) the Put Option Premium paid or proposed to be paid to the Commitment Parties. The Indemnifying Parties also agree that no Indemnified Person shall have any liability based on their comparative or contributory negligence or otherwise to the Indemnifying Parties, any Person asserting claims on behalf of or in right of any of the Indemnifying Parties, or any other Person in connection with an Indemnified Claim.

Section 8.5    Treatment of Indemnification Payments.    All amounts paid by an Indemnifying Party to an Indemnified Person under this Article VIII shall, to the extent permitted by applicable Law, be treated as adjustments to the applicable purchase price for all Tax purposes. The provisions of this Article VIII are an integral part of the transactions contemplated by this Agreement and without these provisions the Commitment Parties would not have entered into this Agreement. The BCA Approval Order shall provide that the obligations of the Company and the Reorganized Debtors under this Article VIII shall constitute allowed administrative expenses of the Debtors' estate under sections 503(b) and 507 of the Bankruptcy Code and are payable without further Order of the Bankruptcy Court, and that the Company and the Reorganized Debtors may comply with the requirements of this Article VIII without further Order of the Bankruptcy Court.

Section 8.6    No Survival.    All representations, warranties, covenants and agreements made in this Agreement shall not survive the Closing Date except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.

## ARTICLE IX

## TERMINATION

Section 9.1    Consensual Termination.    This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date by mutual written consent of the Company, acting on behalf of the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties.

Section 9.2    Automatic Termination.    This Agreement shall terminate automatically, without any further action required by any Party, upon:

(a)    the termination of the RSA with respect to all Parties in accordance with its terms; or

(b)    the consummation by the Company of an Alternative Transaction.

Section 9.3    Termination by the Commitment Parties or the Second Lien Noteholder Group Parties.    Upon three Business Days' written notice from the Requisite Consenting Second Lien Creditors or the Requisite Commitment Parties delivered in accordance with Section 10.1 to all of the Parties, at any time upon the occurrence of any the following events, in each case,

unless waived in writing by the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, either of the Requisite Consenting Second Lien Creditors or the Requisite Commitment Parties, may terminate this Agreement as to all Parties. No failure or delay by any of the Requisite Consenting Second Lien Creditors or the Requisite Commitment Parties in exercising any of their respective rights to terminate this Agreement shall operate as a waiver thereof or limit in any way such termination right:

(a)    any of the Milestones under the RSA have not been satisfied;

(b)    the Effective Date has not occurred by the Outside Date, subject to extension pursuant to Section 2.3(a); *provided*, that the Outside Date may be waived or extended in accordance with the RSA;

(c)    any of the BCA Approval Order, Disclosure Statement Order or Confirmation Order is reversed, stayed, dismissed, vacated, reconsidered or is modified or amended after entry in any material respect without the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties; *provided*, *however*, that the Requisite Commitment Parties may not terminate this Agreement as to all Parties under this Section 9.3(c) if such reversal, stay, dismissal, vacation, reconsideration or modification or amendment is reasonably expected to only relate to or affect LegacyCo or the Consenting Second Lien Creditors from and after the Closing (unless such reversal, stay, dismissal, vacation, reconsideration or modification or amendment affects PermianCo's rights with respect to LegacyCo as set forth in the Approved Plan);

(d)    any of this Agreement, the RSA, Rights Offering Procedures, Disclosure Statement, Approved Plan or any documents related to the Approved Plan, including notices, exhibits or appendices, or any of the Restructuring Documents is amended or modified in any material respect without the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties; *provided*, *however*, that the Requisite Commitment Parties may only terminate this Agreement as to all Parties under this Section 9.3(d) if such amendment or modification is reasonably expected to only relate to or affect LegacyCo or the Consenting Second Lien Creditors from and after the Closing (unless such reversal, stay, dismissal, vacation, reconsideration or modification or amendment affects PermianCo's rights with respect to LegacyCo as set forth in the Approved Plan);

(e)    an Order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Approved Plan or denying approval of the Disclosure Statement;

(f)    subject to the right of the Commitment Parties to arrange a Commitment Party Replacement in accordance with Section 2.3(a), the breach in any material respect by any Party of any of the representations, warranties, covenants, obligations or commitments set forth in this Agreement or the failure of any Party to act in a manner materially consistent with this Agreement, which breach or failure to act (i) would materially and adversely impede or interfere with the acceptance, implementation or consummation of the Restructuring Transactions by the Outside Date on the terms and conditions set forth in Approved Plan and (ii) is uncured for a period of seven Business Days after the receipt of written notice in accordance with Section 10.1

of such breach from any non-breaching Party, other than, in the case of clause (ii), with respect to any breach that is uncurable, for which no notice or cure period shall be required or apply (it being understood and agreed that any actions required to be taken by such Parties that are included in the Approved Plan but not in this Agreement are to be considered "covenants" of such Parties, and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in the Approved Plan to be re-copied in this Agreement). Notwithstanding the foregoing, under this Section 9.3(f), (x) the Requisite Consenting Second Lien Creditors may only exercise a right to terminate this Agreement if the breaching Party or Parties is one of the Commitment Parties or the Debtors and (y) the Requisite Commitment Parties may only exercise a right to terminate this Agreement if the breaching Party or Parties is one of the Second Lien Noteholder Group Parties or the Debtors. Notwithstanding the termination as to any individual Commitment Party, the remaining Commitment Parties shall be entitled to their pro rata portion of the Put Option Premium or Breakup Premium, as applicable, pursuant to the terms of this Agreement; for the avoidance of doubt, to the extent there has been a Commitment Party Default but there are Replacing Commitment Parties for the full amount of the Commitment Party Default, the Second Lien Noteholder Group Parties shall not have any rights to terminate this Agreement;

(g)    any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Approved Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Restructuring Documents; *provided*, *however*, that the termination right in this Section 9.3(g) shall not be available if the Party seeking to terminate this Agreement pursuant to this Section 9.3(g) shall not have used its reasonable best efforts to contest such Order prior to its becoming permanent if such party had the right to contest such Order; or

(h)    the Debtors fail to timely pay the fees and expenses as set forth in this Agreement, including the Expense Reimbursement, and such failure shall not have been cured by the fifth Business Day after notice is given of such failure, or in the case of the Expense Reimbursement, after such payment is due under Section 3.4(b);

*provided*, that any termination or breach of this Agreement that is caused by or is as a result of an action or inaction by the Debtors that gives rise to a termination event under this Section 9.3 shall only, in and of itself, result in the termination of this Agreement with respect to the Debtors.

Section 9.4    Termination by the Debtors.  Upon three Business Days' written notice from the Company delivered in accordance with Section 10.1 to the Commitment Parties and the Second Lien Noteholder Group Parties, at any time upon the occurrence of any the following events, in each case, the Company, on behalf of the Debtors, may terminate this Agreement as to the Debtors only:

(a)    the breach in any material respect by one or more of the Commitment Parties or Second Lien Noteholder Group Parties of any of the representations, warranties, covenants, obligations or commitments set forth in this Agreement or the failure of any Party to act in a manner materially consistent with this Agreement, which breach or failure to act (i) would materially and adversely impede or interfere with the acceptance, implementation or

59

consummation of the Restructuring Transactions by the Outside Date on the terms and conditions set forth in Approved Plan and (ii) is uncured for a period of seven Business Days after the receipt of written notice in accordance with <u>Section 10.1</u> of such breach from any non-breaching Party, other than with respect to any breach that is uncurable, for which no notice or cure period shall be required or apply (it being understood and agreed that any actions required to be taken by such Parties that are included in the Approved Plan but not in this Agreement are to be considered "covenants" of such Parties, and therefore covenants of this Agreement, notwithstanding the failure of any specific provision in the Approved Plan to be re-copied in this Agreement);

(b)     the board of directors, board of managers, or such similar governing body of any Debtor reasonably determines in good faith after consultation with outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided*, that the Company or another Debtor provides notice of such determination to counsel for the Consenting Creditors within three Business Days after the date thereof; or

(c)     any Law or final and non-appealable Order shall have been enacted, adopted or issued by any Governmental Entity that prohibits the implementation of the Approved Plan or the Rights Offering or the transactions contemplated by this Agreement or the other Restructuring Documents;

*provided*, that, in the event of termination pursuant to this <u>Section 9.4</u>, (i) only the Debtors shall be removed as Parties to this Agreement, and such termination shall not have the effect of terminating this Agreement with respect to the other Parties, and (ii) provisions of this Agreement that apply to, require the consent of or otherwise involve the Debtors, including the representations and warranties set forth in <u>Article V</u> and certain of the covenants in <u>Article VI</u> to which the Debtors are subject, but excluding the provisions of <u>Article VIII</u> and <u>Article X</u>, shall have no further force and effect, and the remainder of the Agreement shall continue to be binding on the Parties.

Section 9.5     <u>Effect of Termination</u>.

(a)     Upon termination of this Agreement pursuant to this <u>Article IX</u>, this Agreement shall forthwith become void and there shall be no further obligations or liabilities on the part of the Parties; *provided*, that (i) the Second Lien Noteholder Group Parties shall remain obligated not to take any action that in any way would directly or indirectly frustrate the ability of the Debtors to pay the Expense Reimbursement pursuant to <u>Article III</u> or to pay the Breakup Premium pursuant to <u>Section 9.5(b)</u> (in each case, pursuant to the BCA Approval Order), (ii) the provisions set forth in this <u>Section 9.5</u>, <u>Article VIII</u> and <u>Article X</u> shall survive the termination of this Agreement in accordance with their terms and (iii) subject to <u>Section 10.10</u>, nothing in this <u>Section 9.5</u> shall relieve any Party from liability for its gross negligence or any willful or intentional breach of this Agreement. For purposes of this Agreement, "willful or intentional breach" shall mean a breach of this Agreement that is a consequence of an act undertaken by the breaching party with the knowledge that the taking of such act would, or would reasonably be expected to, cause a breach of this Agreement.

(b)    Upon consummation of an Alternative Transaction, if (i)(A) this Agreement was terminated under Section 9.3(f) due to a breach by the Debtors, (B) the Debtors exercise their termination right under Section 9.4(b) or (C) this Agreement was terminated by the Debtors or the Requisite Consenting Second Lien Creditors for any other reason other than (w) on account of a denial of confirmation of the Approved Plan by the Bankruptcy Court on the basis that section 1129(b) of the Bankruptcy Code is not satisfied by the class of Senior Unsecured Notes, (x) under Section 9.2(a) due to a breach by one or more of the Commitment Parties that causes the termination of the RSA, (y) under Section 9.4(a) due to a breach by one or more of the Commitment Parties or (z) under the circumstances referred to in Section 9.3(g) or Section 9.4(c), and (ii) the Commitment Parties have not breached their obligations under this Agreement, which breach resulted in any of the conditions set forth in Article VII not to be satisfied, the Commitment Parties shall receive in accordance herewith a termination premium of 5.0% of the Total BCA Commitment, which premium shall be paid in cash (the "**Breakup Premium**") on or prior to the second Business Day following such consummation and subject to any applicable withholding Tax; *provided*, *however*, if (i) the Alternative Transaction does not result in the payment in full in cash of all claims arising under or related to the Second Lien Notes, including for principal, make-whole, interest thereupon, costs, fees and indemnities and all other obligations related thereto, to the extent such claims are allowed by the Bankruptcy Court, and (ii) the Requisite Consenting Second Lien Creditors were not in breach of the RSA at the time this Agreement was terminated, the Commitment Parties shall not seek or receive payment of the Breakup Premium in connection with such Alternative Transaction in full in cash but reserve all rights to assert and recover such Breakup Premium solely from the distributions under such Alternative Transaction, if any, to unsecured creditors and interest holders junior in priority to the Second Lien Notes.  The Debtors, subject to the BCA Approval Order, shall make the payment of the Breakup Premium to the Commitment Parties or their designees based upon their respective Initial BCA Percentages on the date of payment, by wire transfer of immediately available funds to such accounts as each of the Commitment Parties may designate.  The Breakup Premium shall be non-avoidable upon the entry of (x) the BCA Approval Order, if the Debtors are parties to the RSA and this Agreement as of the date of the entry of the BCA Approval Order, or (y) the Confirmation Order, if the Debtors are not parties to the RSA and this Agreement as of the date of the entry of the BCA Approval Order.

(c)    To the extent that all amounts due in respect of the Breakup Premium pursuant to Section 9.5(b) have actually been paid by the Debtors to the Commitment Parties in connection with a termination of this Agreement, the Commitment Parties shall not have any additional recourse against the Debtors for any obligations or liabilities relating to or arising from this Agreement.  Except as set forth in Section 9.5(b), the Breakup Premium shall not be payable upon the termination of this Agreement.  The Breakup Premium shall constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code, pursuant to (i) the BCA Approval Order, if the Debtors are parties to the RSA and this Agreement as of the date of the entry of the BCA Approval Order, or (ii) the Confirmation Order, if the Debtors are not parties to the RSA and this Agreement as of the date of the entry of the BCA Approval Order.

## ARTICLE X

## GENERAL PROVISIONS

Section 10.1    Notices.    All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to any of the Debtors, to:

Breitburn Energy Partners LP
707 Wilshire Boulevard, Suite 4600
Los Angeles, CA 90017
Attention: James G. Jackson, Chief Financial Officer
Email: jjackson@breitburn.com

with copies (which shall not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Ray C. Schrock, P.C.; Stephen Karotkin, Esq.
Email: ray.schrock@weil.com; stephen.karotkin@weil.com

(b)    if to a Second Lien Noteholder Group Party, to:

EIG Redwood Debt Aggregator, LP
c/o EIG Management Company, LLC
333 Clay Street, Suite 3500
Houston, TX 77002
Attention: Amy Springs; Clayton Taylor
Email: amy.springs@eigpartners.com; clay.taylor@eigpartners.com

and

Anchorage Capital Partners, L.P.
ACMO BBEP, L.P.
c/o Anchorage Capital Group, L.L.C.
610 Broadway, 6th Floor
New York, New York, 10012
Attention:  Legal
Email: legal@anchoragecap.com

and

Guggenheim Funds Trust – Guggenheim Macro Opportunities Fund
Hamilton Finance LLC

Maverick Enterprises, Inc.
NZC Guggenheim Master Fund Limited
NZC Guggenheim Fund LLC
SEI Institutional Managed Trust-Multi Asset Income Fund
c/o Guggenheim Partners Investment Management, LLC
330 Madison Avenue, 10th Floor
New York, New York 10017
Attention: GI Legal
Email: Justin.carroll@guggenheimpartners.com

with copies (which shall not constitute notice) to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attention: Christopher J. Marcus, P.C.; Steven N. Serajeddini
Email: christopher.marcus@kirkland.com; steven.serajeddini@kirkland.com

and

Kirkland & Ellis LLP
609 Main Street
Houston, TX 77002
Attention: John D. Pitts, P.C.; Matthew R. Pacey, P.C.
Email: john.pitts@kirkland.com; matt.pacey@kirkland.com

(c)    if to a Commitment Party, to the electronic mail addresses set forth on
Exhibit A with copies (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY 10036
Attention: Ira Dizengoff
Email: idizengoff@akingump.com

and

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Attention: Scott Alberino; Daniel Fisher
Email: salberino@akingump.com; dfisher@akingump.com

and

White & Case LLP
1221 Avenue of the Americas

New York, NY 10020
Attention: Harrison Denman
Email: hdenman@whitecase.com

and

Milbank, Tweed, Hadley & McCloy LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Attention:  Gregory Bray
Email: gbray@milbank.com

Section 10.2    Assignment; Third Party Beneficiaries.  Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by any Party (whether by operation of Law or otherwise) without the prior written consent of the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties, other than an assignment by (a) a Commitment Party expressly permitted by Section 2.3 or Section 2.6 and (b) a Second Lien Noteholder Group Party to an Affiliate; *provided*, that any such assignment shall not relieve any Party of its obligations under this Agreement.  Any purported assignment in violation of this Section 10.2 shall be void *ab initio*.  Subject to the foregoing provisions of this Section 10.2, there are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person.

Section 10.3    Prior Negotiations; Entire Agreement.

(a)    This Agreement (including the Exhibits, the Schedules and the other documents and instruments referred to in this Agreement) constitutes the entire agreement among the Parties and supersedes all prior agreements, arrangements or understandings, oral or written, among the Parties with respect to the subject matter of this Agreement (including the Original Agreement), except that the Parties acknowledge that the RSA continues in full force and effect.

(b)    Notwithstanding anything to the contrary in the Approved Plan (including any amendments, supplements or modifications thereto) or the Confirmation Order (and any amendments, supplements or modifications thereto) or an affirmative vote to accept the Approved Plan submitted by any Second Lien Noteholder Group Party or Commitment Party, nothing contained in the Approved Plan (including any amendments, supplements or modifications thereto) or Confirmation Order (including any amendments, supplements or modifications thereto) shall alter, amend or modify the rights of the Second Lien Noteholder Group Parties or the Commitment Parties under this Agreement unless such alteration, amendment or modification has been made in accordance with Section 10.7.

Section 10.4    Governing Law; Venue.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES

THEREOF.  Each Party agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement in the Bankruptcy Court (or court of proper appellate jurisdiction) (the "**Chosen Court**"), and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party or constitutional authority to finally adjudicate the matter.

Section 10.5   Waiver of Jury Trial.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.6   Execution of Agreement.   This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

Section 10.7   Waivers and Amendments; Consent.   This Agreement may be amended, restated, modified or changed only by a written instrument signed by the Company, the Second Lien Noteholder Group Parties and the Requisite Commitment Parties; *provided*, that (a) any Commitment Party's prior written consent shall be required for any amendment, restatement, modification, supplement or other changes that would, directly or indirectly: (i) modify the conditions to Closing set forth in Article VII, (ii) modify the specific economic terms or conditions of the Approved Plan, the Rights Offering or this Agreement (including the size of the Rights Offering, the amount of the Minimum Allocation Rights, the amount of the Put Option Premium and the amount of the Breakup Premium), (iii) modify such Commitment Party's Individual BCA Commitment, Initial BCA Percentage, Remaining BCA Commitment, Final Backstop Commitment or Final BCA Percentage, (iv) change this Section 10.7 or (v) have a materially adverse and disproportionate effect on a Commitment Party and (b) the prior written consent of each Commitment Party that was an original signatory hereto that is still a Commitment Party as of such date of amendment shall be required for any amendment to the definition of "Requisite Commitment Parties."  Notwithstanding the foregoing, Exhibit A shall be revised as necessary without requiring a written instrument signed by the Second Lien Noteholder Group Parties and the Requisite Commitment Parties to reflect changes in the composition of the Commitment Parties, Individual BCA Commitments, Initial BCA Percentages, Minimum Allocation Rights obligations and Remaining BCA Commitments as a result of transfers permitted in accordance with the terms and conditions of this Agreement.  The terms and conditions of this Agreement (other than the conditions set forth in Section 7.1, the waiver of which shall be governed solely by Article VII, and the termination events set forth in Section 9.3(b), the waiver of which shall be governed by their respective terms) may be waived (A) by the Requisite Consenting Second Lien Creditors only by a written instrument executed by the Requisite Consenting Second Lien Creditors and (B) by the Requisite Commitment Parties only by a written instrument executed by the Requisite Commitment Parties.  No delay on the part of any Party in exercising any right, power or privilege pursuant to this Agreement will

operate as a waiver thereof, nor will any waiver on the part of any Party of any right, power or privilege pursuant to this Agreement, nor will any single or partial exercise of any right, power or privilege pursuant to this Agreement, preclude any other or further exercise thereof or the exercise of any other right, power or privilege pursuant to this Agreement.

Section 10.8    <u>Headings</u>.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

Section 10.9    <u>Specific Performance; Rights Cumulative</u>.    The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to obtain an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, in addition to any other remedy to which they are entitled at Law or in equity.  Notwithstanding the foregoing, only the Debtors, the Second Lien Noteholder Group Parties, and the Requisite Commitment Parties may exercise any specific performance rights under this Agreement against one or more Commitment Parties, and only the Requisite Commitment Parties and the Second Lien Noteholder Group Parties may exercise any specific performance rights against the Debtors to cause the consummation of the Rights Offering.  Except as otherwise provided in this Agreement, the rights and remedies provided pursuant to this Agreement are cumulative and are not exclusive of any rights or remedies which any Party otherwise may have under this Agreement or at Law or in equity.

Section 10.10  <u>Damages</u>.  Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect or consequential damages or damages for lost profits.  Under no circumstance shall any Commitment Party be liable under this Agreement for an amount in excess of its unfunded Individual BCA Commitment.

Section 10.11  <u>Several, Not Joint and Several, Obligations</u>.    Except as otherwise expressly set forth herein, the agreements, representations, warranties, liabilities and obligations of the Parties under this Agreement are, in all respects, several and not joint and several.

Section 10.12  <u>No Reliance</u>.  No Commitment Party or any of its Related Parties shall have any duties or obligations to the other Commitment Parties in respect of this Agreement, the Approved Plan or the transactions contemplated hereby or thereby, except those expressly set forth herein.  Without limiting the generality of the foregoing, (a) no Commitment Party or any of its Related Parties shall be subject to any fiduciary or other implied duties to the other Commitment Parties, to the Debtors or to any other Person, (b) no Commitment Party or any of its Related Parties shall have any duty to take any discretionary action or exercise any discretionary powers on behalf of any other Commitment Party, (c) no Commitment Party or any of its Related Parties shall have any duty to the other Commitment Parties to obtain, through the exercise of diligence or otherwise, to investigate, confirm, or disclose to the other Commitment Parties any information relating to the Company or any of its Related Parties that may have been communicated to or obtained by such Commitment Party or any of its Affiliates in any capacity, (d) no Commitment Party may rely, and confirms that it has not relied, on any due diligence

investigation that any other Commitment Party or any Person acting on behalf of such other Commitment Party may have conducted with respect to the Company or any of its Affiliates or any of their respective securities, (e) the Parties acknowledge that this Agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of the Debtors and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended, (f) no action taken by any Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group" and (g) each Commitment Party acknowledges that no other Commitment Party is acting as a placement agent, initial purchaser, underwriter, broker or finder with respect to its Minimum Allocation Rights Securities or Unsubscribed Securities.   The decision to commit to purchase PermianCo Common Stock pursuant to Agreement has been made independently of any other purchaser.

Section 10.13    Settlement Discussions.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions or the payment of damages to which a Party may be entitled under this Agreement.

Section 10.14    Effectiveness.  This Agreement shall become effective and binding upon each Party when counterpart signatures to this Agreement have been executed and delivered to each other Party.

Section 10.15    Severability.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 10.16    Interpretation; Representation by Counsel.   This Agreement is the product of negotiations among the Parties and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  Each of the Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel and, therefore, waive the application of any Law (a) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (b) any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel.

Section 10.17    No Recourse.  Notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the Parties may be

partnerships or limited liability companies, each Party covenants, agrees and acknowledges that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any Party's Affiliates, or any of such Party's Affiliates' or respective Related Parties in each case other than the Parties to this Agreement and each of their respective successors and permitted assignees under this Agreement, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of any Party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; *provided*, *however*, nothing in this Section 10.17 shall relieve or otherwise limit the liability of any Party or any of their respective successors or permitted assigns for any breach or violation of its obligations under this Agreement or such other documents or instruments.  For the avoidance of doubt, prior to the Effective Date, none of the Parties will have any recourse, be entitled to commence any proceeding or make any claim under this Agreement or in connection with the transactions contemplated hereby except against any of the Parties or their respective successors and permitted assigns, as applicable.

Section 10.18  Publicity.

(a)    At all times prior to the Closing Date or the earlier termination of this Agreement in accordance with its terms, the Parties shall obtain the prior written consent (which consent shall not be unreasonably withheld) of the Commitment Parties and the Second Lien Noteholder Group Parties prior to issuing any press releases (and provide each other a reasonable opportunity to review and comment upon such release) or otherwise making public announcements with respect to the transactions contemplated by this Agreement, it being understood that nothing in this Section 10.18 shall prohibit any Party from filing any motions or other pleadings or documents with the Bankruptcy Court in connection with the Chapter 11 Cases.

(b)    Notwithstanding anything herein to the contrary, Exhibit A to this Agreement shall be redacted and/or its contents shall be treated as confidential to the extent that this Agreement or its contents are shared with any third party.

*[Signature Pages Follow]*

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**SECOND LIEN NOTEHOLDER GROUP PARTIES:**

**EIG Redwood Debt Aggregator, LP**

By: **EIG Redwood Aggregator GP, LLC**, its general partner and Attorney-in-Fact

By: **EIG Asset Management, LLC**, its sole member

By: _____
Name:  Clayton R. Taylor
Title:  Managing Director

By: _____
Name: Richard K. Punches, II
Title: Managing Director

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

**Anchorage Capital Partners, L.P.**

By:  Anchorage Capital Group, L.L.C., its
      investment manager

By:
    Name:
    Title:     Sean Gallalue
           Authorized Signatory

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

**ACMO BBEP, L.P.**

By:  Anchorage Capital Group, L.L.C., its
investment manager

By:
Name:
Title:          Sean Gallahue
                Authorized Signatory

[*Signature Page to Amended and Restated Backstop Commitment Agreement*]

**Guggenheim Funds Trust - Guggenheim Macro Opportunities Fund**

By: **Guggenheim Partners Investment Management, LLC,** as Investment Adviser

By: _____

Name: Kevin M. Robinson

Title: Attorney-in-Fact

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

**Hamilton Finance LLC**

By:  **Guggenheim Partners Investment**
     **Management, LLC,** as Sub-Advisor

By:_____
    Name: Kevin M. Robinson
    Title: Attorney-in-Fact

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

**Maverick Enterprises, Inc.**

By:  **Guggenheim Partners Investment**
    **Management, LLC,** as Investment Manager

By:_____
    Name: Kevin M. Robinson
    Title: Attorney-in-Fact

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

**NZC Guggenheim Master Fund Limited**

By:  **Guggenheim Partners Investment
Management, LLC,** as Manager

By:_____

    Name: Kevin M. Robinson
    Title: Attorney-in-Fact

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

NZC Guggenheim Fund LLC

By:  **Guggenheim Partners Investment
Management, LLC,** as Manager

By: _____
Name: Kevin M. Robinson
Title: Attorney-in-Fact

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

**SEI Institutional Managed Trust - Multi Asset Income Fund**

By:  **Guggenheim Partners Investment Management, LLC,** as Sub-Adviser

By: _____

Name: Kevin M. Robinson
Title: Attorney-in-Fact

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

**AKANTHOS CAPITAL MANAGEMENT, LLC**

By: _____
    Name: _Michael Feo_
    Title: _CEO_

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| ███████ | ███████ | ███████ | ███████ |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**FRANKLIN ADVISERS, Inc., as investment manager on behalf of certain funds and accounts**


By: _____

Name: Glenn Voyles

Title: SVP


In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**1992 MSF INTERNATIONAL LTD, by Highbridge Capital Management, LLC as Trading Manager**


By: _____

Name: Jonathan Segal
Title: Managing Director


In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**1992 TACTICAL CREDIT MASTER FUND, L.P., by Highbridge Capital Management, LLC as Trading Manager**

By: _____

Name: Jonathan Segal
Title: Managing Director

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**PACIFIC CAPITAL MANAGEMENT LLC**

By: _____

Name: Jonathan Glaser
Title: Managing Member

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**NEWBERG FAMILY TRUST UTD 12/18/90**

By: _____

Name: Bruce Newberg

Title: Trustee

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**BARCLAYS BANK PLC ("BARCLAYS"), solely in respect of its Distressed Trading Desk (the "Distressed Desk") and not any other unit, group, division, or affiliate of Barclays and solely in respect of the Distressed Desk's Senior Unsecured Note Claims**

By: _____
Name: Adam Yarnold
Title: Managing Director

For the avoidance of doubt, and notwithstanding anything to the contrary contained in this Agreement, nothing in this Agreement shall bind Barclays, to take or not take any action (including any action contemplated by the provisions of the Agreement referenced above), or otherwise in any respect, other than with respect to its Distressed Desk and its Senior Unsecured Claims.

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**SONOMA CAPITAL MANAGEMENT**

By: _____

Name: Jeffrey Thorp
Title: Member

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED ("MLPFS"), solely in respect of its Global Credit and Special Situations Group and not any other group, unit, division or affiliate of MLPFS**

By: _____

Name: Vincenzo Ruocco
Title: Vice President, US Corporate Actions

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**BlackRock Multi-Manager Alternative Strategies Fund**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____

Name: Vijay Srinivasan
Title: Head of Research

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**BSF MULTI-MANAGER ALTERNATIVE
STRATEGIES FUND**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
Name: Vijay Srinivasan
Title: Head of Research

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**KTRS Credit Fund, LP**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
Name: Vijay Srinivasan
Title: Head of Research

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Marathon Blue Grass Credit Fund, L.P.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
Name: Vijay Srinivasan
Title: Head of Research

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**Marathon Centre Street Partnership, L.P.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
Name: Vijay Srinivasan
Title: Head of Research

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Marathon Credit Dislocation Fund LP**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
Name: Vijay Srinivasan
Title: Head of Research

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Marathon Special Opportunity Master Fund Ltd.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory


By: _____
　　　Name: Vijay Srinivasan
　　　Title: Head of Research

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Master SIF SICAV-SIF**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory


By: _____
        Name: Vijay Srinivasan
        Title: Head of Research


In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**ASCENSION ALPHA FUND LLC, by WL Ross & Co. LLC, as Investment Manager**

By: _____

Name: Benjamin Gruder
Title: Managing Director

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**ASCENSION HEALTH MASTER PENSION TRUST,**
**by WL Ross & Co. LLC, as Investment Manager**

By: _____
    Name: Benjamin Gruder
    Title: Managing Director

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**CARILION CLINIC, by WL Ross & Co. LLC, as Investment Manager**

By: _____
        Name: Benjamin Gruder
        Title: Managing Director

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**CATALINA HOLDINGS (BERMUDA) LTD., by WL Ross & Co. LLC, as Investment Manager**

By: _____
      Name: Benjamin Gruder
      Title: Managing Director

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

MARQUETTE COMPANIES, LLC, by WL Ross &
Co. LLC, as Investment Manager

By: _____

Name: Benjamin Gruder
Title: Managing Director

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**PEPPERDINE UNIVERSITY, by WL Ross & Co.
LLC, as Investment Manager**

By: _____
        Name: Benjamin Gruder
        Title: Managing Director

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

RETIREMENT PLAN OF CARILION CLINIC, by
WL Ross & Co. LLC, as Investment Manager

By: _____
       Name: Benjamin Gruder
       Title: Managing Director

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**UNIVERSITY OF MINNESOTA FOUNDATION, by
WL Ross & Co. LLC, as Investment Manager**

By: _____
      Name: Benjamin Gruder
      Title: Managing Director

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**WLR PARALLEL ESC, L.P., by WL Ross & Co. LLC, as Investment Manager**

By: _____
    Name: Benjamin Gruder
    Title: Managing Director

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**WLR RECOVERY FUND V, L.P., by WL Ross & Co. LLC, as Investment Manager**

By: _____

     Name: Benjamin Gruder
     Title: Managing Director

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**WLR-SC FINANCING CONDUIT LLC, by WL Ross & Co. LLC, as Investment Manager**

By: _____
   Name: Benjamin Gruder
   Title: Managing Director

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party. If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BEACH POINT SELECT FUND LP**
By: Beach Point Capital Management LP
Its Investment Manager

By:_____
    Name: Carl Goldsmith
    Title: Co-Chief Investment Officer

*Signature Page to Amended and Restated Backstop Commitment Agreement*

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BPC UKI, L.P.**
By: BPC AS LLC
Its General Partner
By: Beach Point Capital Management LP
Its Managing Member


By: _____
　　　Name: Carl Goldsmith
　　　Title: Co-Chief Investment Officer

*Signature Page to Amended and Restated Backstop Commitment Agreement*

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BEACH POINT MULTI-ASSET CREDIT FUND LTD.**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
    Name: Carl Goldsmith
    Title: Co-Chief Investment Officer

*Signature Page to Amended and Restated Backstop Commitment Agreement*

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BEACH POINT MULTI-STRATEGY CREDIT MASTER FUND, L.P.**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
      Name: Carl Goldsmith
      Title: Co-Chief Investment Officer

*Signature Page to Amended and Restated Backstop Commitment Agreement*

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BEACH POINT TOTAL RETURN MASTER FUND, L.P.**
**By: Beach Point Capital Management LP**
**Its Investment Manager**


By: _____
     Name: Carl Goldsmith
     Title: Co-Chief Investment Officer

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**Elliott Associates, L.P.**
By: Elliott Capital Advisors, L.P., as general partner
By: Braxton Associates, Inc., as general partner

By: _____
Name: Elliot Greenberg
Title: Vice President

In accordance with Section 4.11, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| ████████████████████████████████ | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**Elliott International, L.P.**
By: Elliott International Capital Advisors Inc., as
attorney-in-fact

By: _____
Name: Elliot Greenberg
Title: Vice President

In accordance with <u>Section 4.11</u>, set forth below is any ownership of Company Equity Interests as of the date of this Agreement by the Commitment Party and any entity wholly owned by and any person wholly owning such Commitment Party.  If none is shown, none is owned.

| Name of Owner | Relationship to Commitment Party | Amount and Type of Company Equity Interests Owned (as of the Date of this Agreement) | |
|---|---|---|---|
| | | Amount | Type |
| ███████████████████████████████████ | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Signature Page to Amended and Restated Backstop Commitment Agreement*

**DEBTORS:**

**BREITBURN ENERGY PARTNERS LP**

By:    Breitburn GP LLC,
        its general partner

By: _____
      Name: James G. Jackson
      Title:  Executive Vice President and
             Chief Financial Officer

**BREITBURN OPERATING LP**

By:    Breitburn Operating GP LLC,
        its general partner

By: _____
      Name: James G. Jackson
      Title:  Executive Vice President and
             Chief Financial Officer

**BREITBURN FINANCE CORPORATION**

By: _____
      Name: James G. Jackson
      Title:  Chief Financial Officer

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

**ALAMITOS COMPANY**
**BEAVER CREEK PIPELINE, L.L.C.**
**GTG PIPELINE LLC**
**MERCURY MICHIGAN COMPANY, LLC**
**PHOENIX PRODUCTION COMPANY**
**QRE GP, LLC**
**TERRA ENERGY COMPANY LLC**
**TERRA PIPELINE COMPANY LLC**

By: _____
Name: James G. Jackson
Title: Chief Financial Officer

**BREITBURN OPERATING GP LLC**
**BREITBURN GP LLC**
**BREITBURN MANAGEMENT COMPANY LLC**

By: _____
Name: James G. Jackson
Title: Executive Vice President and
Chief Financial Officer

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

**BREITBURN FLORIDA LLC**
**BREITBURN OKLAHOMA LLC**
**BREITBURN SAWTELLE**
**BREITBURN TRANSPETCO GP LLC**
**BREITBURN TRANSPETCO LP LLC**

By:     Breitburn Operating LP,
        its sole member

By:     Breitburn Operating GP LLC,
        its general partner

By: _____
Name: James G. Jackson
Title:   Executive Vice President and
         Chief Financial Officer

**QR ENERGY, LP**

By:     QRE GP, LLC,
        its general partner

By: _____
Name: James G. Jackson
Title:  Chief Financial Officer

**QRE OPERATING, LLC**

By:     QR Energy, LP,
        its sole member

By:     QRE GP, LLC,
        its general partner

By: _____
Name: James G. Jackson
Title:  Chief Financial Officer

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

**TRANSPETCO PIPELINE COMPANY, L.P.**

By:   Breitburn Operating LP,
      on behalf of itself and as the sole member of
      Breitburn Transpetco GP LLC, a
      general partner

By:   Breitburn Operating GP LLC,
      its general partner


By: _____
    Name: James G. Jackson
    Title: Executive Vice President and
           Chief Financial Officer

*[Signature Page to Amended and Restated Backstop Commitment Agreement]*

Exhibit A

**Commitments**

| | Commitment Party | Individual BCA Commitment | Initial BCA Percentage | Obligation in Respect of the Minimum Allocation Rights | Remaining BCA Commitment |
|---|---|---|---|---|---|
| 1. | Akanthos Capital Management, LLC, on behalf of:<br><br>Akanthos Opportunity Master Fund, L.P.<br>Star V Partners, LLC<br>Akanthos SPV1, LLC<br>TD Ameritrade/Kao Family Trust date 1999<br><br>Notice details:<br><br>21700 Oxnard St. Suite 1730<br>Woodland Hills, CA 91367<br>Attention: Akanthos Capital Management, LLC<br>/ Rob Chambers<br>Email: mkao@akanthoscapital.com /<br>rchambers@akanthoscapital.com /<br>AkanthosTrading@akanthoscapital.com | ███ | ███ | ███ | ███ |
| 2. | Barclays Bank PLC ("**Barclays**"), solely in respect of its Distressed Trading Desk (the "**Distressed Desk**") and not any other unit, group, division or affiliate of Barclays and solely in respect of the Distressed Desk's Senior Unsecured Notes Claims<br><br>Notice details:<br><br>745 Seventh Avenue<br>New York, NY 10019<br>Attention: Brian Hook<br>Email: brian.hook@barclays.com | ███ | ███ | ███ | ███ |

Exhibit A-1

| | | | | | |
|---|---|---|---|---|---|
| 3. | BPC UKI, L.P.<br><br>Notice details:<br><br>c/o Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention:  Joseph  Fabiana<br>Email:  jfabiani@beachpointcapital.com | ■ | ■ | ■ | ■ |
| 4. | Beach Point Multi-Asset Credit Fund Ltd.<br><br>Notice details:<br><br>c/o Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention:  Joseph  Fabiana<br>Email:  jfabiani@beachpointcapital.com | ■ | ■ | ■ | ■ |
| 5. | Beach Point Total Return Master Fund, L.P.<br><br>Notice details:<br><br>c/o Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention:  Joseph  Fabiana<br>Email:  jfabiani@beachpointcapital.com | ■ | ■ | ■ | ■ |
| 6. | Beach Point Select Fund LP<br><br>Notice details:<br><br>c/o Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention:  Joseph  Fabiana<br>Email:  jfabiani@beachpointcapital.com | ■ | ■ | ■ | ■ |

Exhibit A-2

| | | | | | |
|---|---|---|---|---|---|
| 7. | Beach Point Multi-Strategy Credit Master Fund, L.P.<br><br>Notice details:<br><br>c/o Beach Point Capital Management LP<br>1620 26th Street, Suite 6000N<br>Santa Monica, CA 90404<br>Attention:  Joseph  Fabiana<br>Email:  jfabiani@beachpointcapital.com | ■ | ■ | ■ | ■ |
| 8. | Elliott Associates, L.P.<br><br>Notice details:<br><br>c/o Elliott Management Corporation<br>40 West 57th Street<br>New York, NY 10019<br>Attention: Michael Stephan<br>Email: mstephan@elliottmgmt.com | ■ | ■ | ■ | ■ |
| 9. | Elliott International, L.P.<br><br>Notice details:<br><br>c/o Elliott Management Corporation<br>40 West 57th Street<br>New York, NY 10019<br>Attention: Michael Stephan<br>Email: mstephan@elliottmgmt.com | ■ | ■ | ■ | ■ |

Exhibit A-3

| 10. | Franklin Advisers, Inc., as investment manager on behalf of certain funds and accounts<br><br>Notice details:<br><br>Franklin Templeton Investments<br>1 Franklin Pkwy<br>San Mateo, CA 94403<br>Attention:  Bryant Dieffenbacher / Chris Chen<br>Email: Bryant.dieffenbacher@franklintempleton.com / chris.chen@franklintempleton.com | ■ | ■ | ■ | ■ |
| 11. | 1992 MSF International Ltd.<br><br>Notice details:<br><br>c/o Highbridge Capital Management, LLC<br>40 West 57th Street, 32nd Floor<br>New York, NY 10019<br>Attention:  Damon Meyer<br>Email:  Damon.Meyer@highbridge.com | ■ | ■ | ■ | ■ |
| 12. | 1992 Tactical Credit Master Fund, L.P.<br><br>Notice details:<br><br>c/o Highbridge Capital Management, LLC<br>40 West 57th Street, 32nd Floor<br>New York, NY 10019<br>Attention:  Damon Meyer<br>Email:  Damon.Meyer@highbridge.com | ■ | ■ | ■ | ■ |

Exhibit A-4

| | | | | | | |
|---|---|---|---|---|---|---|
| 13. | Newberg Family Trust UTD 12/18/90<br><br>Notice Details:<br><br>11601 Wilshire Blvd<br>Suite 1925<br>Los Angeles, CA 90025<br>Attention:  Bruce Newberg<br>Email:  bruce@newbergfamily.net | | ▮ | | ▮ | | ▮ | | ▮ |
| 14. | Pacific Capital Management LLC<br><br>Notice Details:<br><br>11601 Wilshire Blvd<br>Suite 1925<br>Los Angeles, CA 90025<br>Attention:  Jonathan Glaser<br>Email:  jglaser@jmgcapital.com | | ▮ | | ▮ | | ▮ | | ▮ |
| 15. | Sonoma Capital Management LLC, for its advisees:  Sonoma Capital LP and Jeffrey Thorp Roth IRA<br><br>Notice details:<br><br>437 Madison Ave.<br>34th Floor<br>New York, NY 10022<br>Attention: Jeffrey Thorp<br>Email:  jthorp@sonomacm.com | | ▮ | | ▮ | | ▮ | | ▮ |

| 16. | Marathon Special Opportunity Master Fund Ltd.<br><br>Notice details:<br><br>c/o Marathon Asset Management, LP<br>One Bryant Park, 38th Floor<br>New York, NY 10036<br>Attention: Michael Alexander<br>Email: malexander@marathonfund.com | ██████ | ████ | ██████ | ██████ |
| 17. | Marathon Centre Street Partnership, L.P.<br><br>Notice details:<br><br>c/o Marathon Asset Management, LP<br>One Bryant Park, 38th Floor<br>New York, NY 10036<br>Attention: Michael Alexander<br>Email: malexander@marathonfund.com | ██████ | ████ | ██████ | ██████ |
| 18. | KTRS Credit Fund, LP<br><br>Notice details:<br><br>c/o Marathon Asset Management, LP<br>One Bryant Park, 38th Floor<br>New York, NY 10036<br>Attention: Michael Alexander<br>Email: malexander@marathonfund.com | ██████ | ████ | ██████ | ██████ |

| | | | | | |
|---|---|---|---|---|---|
| 19. | Marathon Credit Dislocation Fund LP<br><br>Notice details:<br><br>c/o Marathon Asset Management, LP<br>One Bryant Park, 38th Floor<br>New York, NY 10036<br>Attention: Michael Alexander<br>Email: malexander@marathonfund.com | ■■■■ | ■■■ | ■■■■ | ■■■■ |
| 20. | Marathon Blue Grass Credit Fund, LP<br><br>Notice details:<br><br>c/o Marathon Asset Management, LP<br>One Bryant Park, 38th Floor<br>New York, NY 10036<br>Attention: Michael Alexander<br>Email: malexander@marathonfund.com | ■■■■ | ■■■ | ■■■■ | ■■■■ |
| 21. | Master SIF SICAV-SIF<br><br>Notice details:<br><br>c/o Marathon Asset Management, LP<br>One Bryant Park, 38th Floor<br>New York, NY 10036<br>Attention: Michael Alexander<br>Email: malexander@marathonfund.com | ■■■■ | ■■■ | ■■■■ | ■■■■ |

| 22. | BSF Multi-Manager Alternative Strategies Fund<br><br>Notice details:<br><br>c/o Marathon Asset Management, LP<br>One Bryant Park, 38th Floor<br>New York, NY 10036<br>Attention: Michael Alexander<br>Email: malexander@marathonfund.com | ████ | ████ | ████ | ████ |
|---|---|---|---|---|---|
| 23. | BlackRock Multi-Manager Alternative Strategies Fund<br><br>Notice details:<br><br>c/o Marathon Asset Management, LP<br>One Bryant Park, 38th Floor<br>New York, NY 10036<br>Attention: Michael Alexander<br>Email: malexander@marathonfund.com | ████ | ████ | ████ | ████ |
| 24. | Merrill Lynch, Pierce, Fenner & Smith Incorporated ("**MLPFS**"), solely in respect of its Global Credit and Special Situations Group and not any other group, unit, division or affiliate of MLPFS<br><br>Notice details:<br><br>222 Broadway, 11th Floor<br>New York, NY 10038<br>Attention: Corporate Actions/Vincenzo Ruocco<br>Email: BAScorporateactions@bofasecurities.com | ████ | ████ | ████ | ████ |

| | | | | | |
|---|---|---|---|---|---|
| 25. | Ascension Alpha Fund LLC<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ▉ | ▉ | ▉ | ▉ |
| 26. | Ascension Health Master Pension Trust<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ▉ | ▉ | ▉ | ▉ |
| 27. | Carilion Clinic<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ▉ | ▉ | ▉ | ▉ |

Exhibit A-9

| 28. | Catalina Holdings (Bermuda) Ltd.<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ██████ | ████ | ██████ | ██████ |
| 29. | Marquette Companies, LLC<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ██████ | ████ | ██████ | ██████ |
| 30. | Pepperdine University<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ██████ | ████ | ██████ | ██████ |

| 31. | Retirement Plan of Carilion Clinic<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ▮ | ▮ | ▮ | ▮ |
|---|---|---|---|---|---|
| 32. | University of Minnesota Foundation<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ▮ | ▮ | ▮ | ▮ |
| 33. | WLR Recovery Fund V., L.P.<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ▮ | ▮ | ▮ | ▮ |

| | | | | | |
|---|---|---|---|---|---|
| 34. | WLR-SC Financing Conduit LLC<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ■■■■ | ■■■ | ■■■ | ■■■ |
| 35. | WLR V Parallel ESC, L.P.<br><br>Notice details:<br><br>c/o W.L. Ross & Co. LLC<br>1166 Avenue of the Americas<br>25th Floor<br>New York NY, 10036<br>Attention:  Stephen Swanson<br>Email:  stephen.swanson@invesco.com | ■■■ | ■■■ | ■■■ | ■■■ |
| | **Total** | **$775,000,000** | **100.00%** | **$310,000,000** | **$465,000,000** |

## **Exhibit B**

**Restructuring Support Agreement**

[Attached to Disclosure Statement as Exhibit E.]

<u>Exhibit C</u>

**Rights Offering Procedures**

[Intentionally omitted.  Available upon written
request to breitburninfo@primeclerk.com]

Exhibit C

Schedule 5.12(d)(iii)

**Acreage Swaps**

| Date of Agreement | Parties | Docket Numbers |
|---|---|---|
| 2017/04 | BREITBURN OPERATING LP<br>DIAMONDBACK O&G LLC | Motion: 989<br>Order: 1078 |
| 2017/05 | BREITBURN OPERATING LP<br>SM ENERGY COMPANY | Motion: 1116<br>Order: 1191 |
| 2017/06 | BREITBURN OPERATING LP<br>CROWNROCK OPERATING, LLC<br>CROWNROCK, L.P. | Motion: 1114<br>Order: 1192 |
| PENDING CLOSING | BREITBURN OPERATING LP<br>CONOCOPHILLIPS COMPANY | Motion: 760<br>Order: 869 |
| PENDING CLOSING | BREITBURN OPERATING LP<br>ENDEAVOR ENERGY RESOURCES, LP<br>GUIDON OPERATING LLC | Motion: 1008<br>Order: 1077 |

Schedule 5.13

**Hedging Contracts**

None.

Execution Version

## FIRST AMENDMENT TO
## AMENDED AND RESTATED
## BACKSTOP COMMITMENT AGREEMENT

This FIRST AMENDMENT TO AMENDED AND RESTATED BACKSTOP COMMITMENT AGREEMENT (this "**BCA Amendment**") dated November 28, 2017 is entered into between:

(a)    each of the debtors and debtors in possession in the jointly administered chapter 11 bankruptcy cases under the lead case *In re Breitburn Energy Partners LP*, Case No. 16-11390 (SMB), including, but not limited to, Breitburn Energy Partners LP, Breitburn GP LLC, Breitburn Operating LP, Breitburn Operating GP LLC, Breitburn Management Company LLC, Breitburn Finance Corporation, Alamitos Company, Beaver Creek Pipeline, L.L.C., Breitburn Florida LLC, Breitburn Oklahoma LLC, Breitburn Sawtelle LLC, Breitburn Transpetco GP LLC, Breitburn Transpetco LP LLC, GTG Pipeline LLC, Mercury Michigan Company, LLC, Phoenix Production Company, QR Energy, LP, QRE GP, LLC, QRE Operating, LLC, Terra Energy Company LLC, Terra Pipeline Company LLC, and Transpetco Pipeline Company, L.P. (collectively, the "**Debtors**"); and

(b)    the undersigned parties hereto (other than the Debtors) (the "**BCA Parties**"), collectively constituting the Second Lien Noteholder Group Parties and the Commitment Parties.

The Debtors and the BCA Parties are referred to herein together as the "**Amendment Parties**". Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the A&R Backstop Commitment Agreement (as defined below).

**WHEREAS**, on September 22, 2017, the BCA Parties and certain other parties entered into a backstop commitment agreement (the "**Initial BCA**");

**WHEREAS**, on October 11, 2017, the Debtors and the BCA Parties amended and restated the Initial BCA, pursuant to an Amended and Restated Backstop Commitment Agreement (as amended, supplemented, or otherwise modified from time to time, the "**A&R Backstop Commitment Agreement**");

**WHEREAS**, the Debtors intend to amend the Debtors' First Amended Joint Chapter 11 Plan (the "**Plan**") and related disclosure statement (including the rights offering procedures included therein) (the "**Disclosure Statement**"), each previously filed with the Bankruptcy Court (as defined in the Plan) on November 13, 2017;

**WHEREAS**, on the date hereof, the Debtors and certain of the Amendment Parties, intend to execute an amendment (the "**RSA Amendment**") to the Amended and Restated Restructuring Support Agreement, dated October 11, 2017 (the "**A&R Restructuring Support Agreement**"), to give effect to such amendments to the Plan.

**WHEREAS**, the Amendment Parties wish to consent to such amendments to the Plan and the Disclosure Statement and to amend the A&R Backstop Commitment Agreement, including the rights offering procedures attached as Exhibit C thereto, to the extent necessary to conform the A&R Backstop Commitment Agreement to such amendments and to take such other actions as are necessary to give effect to such amendments.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein and in the A&R Backstop Commitment Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Amendment Parties agree as follows:

1.  **Amendments.**

    (a)    Rights Offering Procedures (A&R Backstop Commitment Agreement Exhibit C).  Exhibit C of the A&R Backstop Commitment Agreement is hereby deleted and replaced in its entirety with the Rights Offering Procedures attached hereto as Exhibit A (the "**Amended Rights Offering Procedures**").

    (b)    Conforming Amendments.   To the extent anything in the Amended Rights Offering Procedures or the Amended Plan (as defined in the RSA Amendment) is inconsistent with the terms or provisions of the A&R Backstop Commitment Agreement, the A&R Backstop Commitment Agreement is hereby amended to conform with the provisions of the Amended Rights Offering Procedures and the Amended Plan (as defined in the RSA Amendment).

2.  **Consents**.

    Each of the Debtors and the BCA Parties hereby acknowledge consent to (a) the amendments set forth in the Amended Rights Offering Procedures, (b) to the amendments set forth in the RSA Amendment, including the Amended Plan (as defined in the RSA Amendment) and (c) subject to Sections 3 and 5.02(v) of the A&R Restructuring Support Agreement, the filing with the Bankruptcy Court of the Amended Plan (as defined in the RSA Amendment) and an amended Disclosure Statement that includes the Amended Rights Offering Procedures.

3. **<u>Effectiveness.</u>**

This BCA Amendment shall become effective and binding on the Debtors and the BCA Parties in accordance with the terms of the A&R Backstop Commitment Agreement upon the execution and delivery by each of the Debtors and the BCA Parties of executed signature pages hereto.

4. **<u>Miscellaneous.</u>**

(a)    Except as specifically set forth herein, the terms of the A&R Backstop Commitment Agreement shall remain in full force and effect and are hereby ratified and confirmed.

(b)    This BCA Amendment may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this BCA Amendment delivered by facsimile, PDF or otherwise shall be deemed to be an original for the purposes of this paragraph.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the Amendment Parties have caused this BCA Amendment to be executed and delivered as of the date first set forth above.

**DEBTORS:**

**BREITBURN ENERGY PARTNERS LP**

By:     Breitburn GP LLC,
       its general partner

By:
       Name: Halbert S. Washburn
       Title:  Chief Executive Officer

**BREITBURN OPERATING LP**

By:     Breitburn Operating GP LLC,
       its general partner

By:
       Name: Halbert S. Washburn
       Title:  Chief Executive Officer

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**ALAMITOS COMPANY**
**PHOENIX PRODUCTION COMPANY**

By: _____
     Name: Halbert S. Washburn
     Title:  President


**BEAVER CREEK PIPELINE, L.L.C.**
**BREITBURN FINANCE CORPORATION**
**BREITBURN GP LLC**
**BREITBURN MANAGEMENT COMPANY LLC**
**BREITBURN OPERATING GP LLC**
**GTG PIPELINE LLC**
**MERCURY MICHIGAN COMPANY, LLC**
**QRE GP, LLC**
**TERRA ENERGY COMPANY LLC**
**TERRA PIPELINE COMPANY LLC**

By: _____
     Name: Halbert S. Washburn
     Title:  Chief Executive Officer


**BREITBURN FLORIDA LLC**
**BREITBURN OKLAHOMA LLC**
**BREITBURN SAWTELLE LLC**
**BREITBURN TRANSPETCO GP LLC**
**BREITBURN TRANSPETCO LP LLC**

By:     Breitburn Operating LP,
        its sole member

By:     Breitburn Operating GP LLC,
        its general partner

By: _____
     Name:  Halbert S. Washburn
     Title:   Chief Executive Officer


*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**QR ENERGY, LP**

By:     QRE GP, LLC,
          its general partner

By:

          Name: Halbert S. Washburn
          Title:  Chief Executive Officer

**QRE OPERATING, LLC**

By:     QR Energy, LP,
          its sole member

By:     QRE GP, LLC,
          its general partner

By:

          Name: Halbert S. Washburn
          Title:  Chief Executive Officer

**TRANSPETCO PIPELINE COMPANY, L.P.**

By:     Breitburn Operating LP,
          on behalf of itself and as the sole member of
          Breitburn Transpetco GP LLC,
          a general partner

By:     Breitburn Operating GP LLC,
          its general partner

By:

          Name: Halbert S. Washburn
          Title:  Chief Executive Officer

SECOND LIEN NOTEHOLDER GROUP
PARTIES:

**EIG Redwood Debt Aggregator, LP**

By: **EIG Redwood Aggregator GP, LLC**, its
general partner and Attorney-in-Fact

By: **EIG Asset Management, LLC**, its sole
member

By: _____
Name:  Clayton R. Taylor
Title:  Managing Director

By: _____
Name: Richard K. Punches, II
Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**Anchorage Capital Partners, L.P.**

By: **Anchorage Capital Group, L.L.C.,** its
     investment manager

By: _____
    Name:
    Title:

**ACMO BBEP, L.P.**

By: **Anchorage Capital Group, L.L.C.,** its
     investment manager

By: _____
Name:
Title:

Melissa Griffiths
Authorized Signatory

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**Guggenheim Funds Trust - Guggenheim Macro
Opportunities Fund**

By:  **Guggenheim Partners Investment
        Management, LLC,** as Investment Adviser

By:_____

        Name: Kevin M. Robinson
        Title: Attorney-in-Fact

**Hamilton Finance LLC**

By: **Guggenheim Partners Investment
Management, LLC,** as Sub-Advisor

By: _____

Name: Kevin M. Robinson
Title: Attorney-in-Fact

Maverick Enterprises, Inc.

By: **Guggenheim Partners Investment**
**Management, LLC,** as Investment Manager

By: _____
Name: Kevin M. Robinson
Title: Attorney-in-Fact

**NZC Guggenheim Master Fund Limited**

By:  **Guggenheim Partners Investment
Management, LLC,** as Manager

By: _____
   Name: Kevin M. Robinson
   Title: Attorney-in-Fact

NZC Guggenheim Fund LLC

By:  **Guggenheim Partners Investment
Management, LLC,** as Manager

By: _____
Name: Kevin M. Robinson
Title: Attorney-in-Fact

**SEI Institutional Managed Trust - Multi Asset
Income Fund**

By:  **Guggenheim Partners Investment
     Management, LLC,** as Sub-Adviser

By: _____

Name: Kevin M. Robinson
Title: Attorney-in-Fact

COMMITMENT PARTIES

**MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED ("MLPFS"), solely
in respect of its Global Credit and Special
Situations Group and not any other group, unit,
division or affiliate of MLPFS**

By:_____

    Name: Vincenzo Ruocco
    Title: Vice President, US Corporate Actions

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**Elliott Associates, L.P.**
By: Elliott Capital Advisors, L.P., as general partner
By: Braxton Associates, Inc., as general partner

By: _____
    Name: Elliot Greenberg
    Title: Vice President

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**Elliott International, L.P.**
By: Elliott International Capital Advisors Inc., as
attorney-in-fact

By:_____
   Name: Elliot Greenberg
   Title: Vice President

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**BlackRock Multi-Manager Alternative Strategies Fund**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
   Name: Vijay Srinivasan
   Title: Head of Research

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**Marathon Blue Grass Credit Fund, L.P.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
      Name: Vijay Srinivasan
      Title: Head of Research

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**BSF MULTI-MANAGER ALTERNATIVE
STRATEGIES FUND**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
     Name: Vijay Srinivasan
     Title: Head of Research

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**Marathon Centre Street Partnership, L.P.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
Name: Vijay Srinivasan
Title: Head of Research

**Marathon Credit Dislocation Fund LP**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
     Name: Vijay Srinivasan
     Title: Head of Research

**KTRS Credit Fund, LP**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____

Name: Vijay Srinivasan
Title: Head of Research

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**Master SIF SICAV-SIF**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
  Name: Vijay Srinivasan
  Title: Head of Research

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**Marathon Special Opportunity Master Fund Ltd.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____

Name: Vijay Srinivasan
Title: Head of Research

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**ASCENSION ALPHA FUND LLC, by WL Ross & Co. LLC, as Investment Manager**

By: _____
    Name: Benjamin Gruder
    Title: Managing Director

**ASCENSION HEALTH MASTER PENSION
TRUST, by WL Ross & Co. LLC, as Investment
Manager**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**CARILION CLINIC, by WL Ross & Co. LLC,
as Investment Manager**

By:_____

    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**CATALINA HOLDINGS (BERMUDA) LTD.,
by WL Ross & Co. LLC, as Investment Manager**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**MARQUETTE COMPANIES, LLC, by WL Ross & Co. LLC, as Investment Manager**

By:_____

    Name: Benjamin Gruder

    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**PEPPERDINE UNIVERSITY, by WL Ross & Co. LLC, as Investment Manager**

By:_____
Name: Benjamin Gruder
Title: Managing Director

**RETIREMENT PLAN OF CARILION CLINIC,**
**by WL Ross & Co. LLC, as Investment Manager**


By:_____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**UNIVERSITY OF MINNESOTA**
**FOUNDATION, by WL Ross & Co. LLC, as**
**Investment Manager**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

**WLR PARALLEL ESC, L.P., by WL Ross & Co. LLC, as Investment Manager**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**WLR RECOVERY FUND V, L.P., by WL Ross & Co. LLC, as Investment Manager**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**WLR-SC FINANCING CONDUIT LLC, by WL Ross & Co. LLC, as Investment Manager**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

**BPC UKI, L.P.**
By: BPC AS LLC
Its General Partner
By: Beach Point Capital Management LP
Its Managing Member

By:_____
    Name: Carl Goldsmith
    Title: Co-Chief Investment Officer

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**BEACH POINT MULTI-ASSET CREDIT FUND LTD.**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
      Name: Carl Goldsmith
      Title: Co-Chief Investment Officer

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**BEACH POINT MULTI-STRATEGY CREDIT
MASTER FUND, L.P.**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
     Name: Carl Goldsmith
     Title: Co-Chief Investment Officer

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**BEACH POINT SELECT FUND LP**
By: Beach Point Capital Management LP
Is Investment Manager

By:_____

          Name: Carl Goldsmith
          Title: Co-Chief Investment Officer

**BEACH POINT TOTAL RETURN MASTER**
**FUND, L.P.**
By: Beach Point Capital Management LP
Its Investment Manager

By:_____

Name: Carl Goldsmith
Title: Co-Chief Investment Officer

**AKANTHOS CAPITAL MANAGEMENT, LLC**

By:_____

Name:  Michael Kao

Title:    CEO

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**FRANKLIN ADVISERS, Inc.,** as investment
manager on behalf of certain funds and accounts

By: _____

    Name: Glenn Voyles
    Title: SVP

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**1992 MSF INTERNATIONAL LTD**, by
Highbridge Capital Management, LLC as Trading
Manager

By: _____
    Name: Jonathan Segal
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**1992 TACTICAL CREDIT MASTER FUND,**
L.P., by Highbridge Capital Management, LLC as
Trading Manager

By:

Name: Jonathan Segal
Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

PACIFIC CAPITAL MANAGEMENT LLC

By: _____

    Name: Jonathan Glaser
    Title: Managing Member

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**NEWBERG FAMILY TRUST UTD 12/18/90**

By: _____
  Name: Bruce Newberg
  Title: Trustee

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**BARCLAYS BANK PLC** ("BARCLAYS"), solely in respect of its Distressed Trading Desk (the "Distressed Trading Desk") and not any other unit, group, division or affiliate of Barclays and solely in respect of the Distressed Desk's Senior Unsecured Note Claims

By: _____
    Name: Adam Yarnold
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

**SONOMA CAPITAL MANAGEMENT**

By:_____

Name: Jeffrey Thorp

Title: Member

*[Signature Page to Amendment No. 1 to A&R Backstop Commitment Agreement]*

EXHIBIT A

AMENDED RIGHTS OFFERING PROCEDURES

[Attached to Disclosure Statement as Exhibit F]

**<u>Exhibit E</u>**

**Restructuring Support Agreement**

**EXECUTION VERSION**

**THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AMENDED AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

### AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT

This Amended and Restated Restructuring Support Agreement (including all exhibits and schedules attached hereto and in accordance with <u>Section 2</u>, this "**Amended Agreement**") is made and entered into as of October 11, 2017, by and among the following parties (each of the foregoing described in <u>sub-clauses (1)</u> through <u>(4)</u>, and any person or entity that becomes a party hereto in accordance with the terms hereof, a "**Party**" and, collectively, the "**Parties**"):

1. each of the debtors and debtors in possession in the jointly administered chapter 11 bankruptcy cases under the lead case *In re Breitburn Energy Partners LP*, Case No. 16-11390 (SMB), including, but not limited to, BBEP, Breitburn GP LLC, Breitburn Operating LP ("**BOLP**"), Breitburn Operating GP LLC, Breitburn Management Company LLC, Breitburn Finance Corporation ("**Breitburn Finance**"), Alamitos Company, Beaver Creek Pipeline, L.L.C., Breitburn Florida LLC, Breitburn Oklahoma LLC, Breitburn Sawtelle LLC, Breitburn Transpetco GP LLC, Breitburn Transpetco LP LLC, GTG Pipeline LLC, Mercury Michigan Company, LLC, Phoenix Production Company, QR Energy, LP, QRE GP, LLC, QRE Operating, LLC, Terra Energy Company LLC, Terra Pipeline Company LLC, and Transpetco Pipeline Company, L.P. (collectively, the "**Debtors**");

2. the undersigned beneficial holders of, or investment managers, advisers or sub-advisers for holders of, claims against the Debtors under the outstanding 9.25% Senior Secured Second Lien Notes due 2020 (the "**Second Lien Notes**") issued pursuant to that certain Indenture, dated as of April 8, 2015 (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**Second Lien Notes Indenture**"), by and among BBEP, BOLP, and Breitburn Finance, as issuers, the guarantors party thereto, Delaware Trust Company, as successor trustee and collateral agent, and Permitted Transferees (defined below) of such claims in accordance with <u>Section 6</u> of this Amended Agreement (such claims, the "**Second Lien Note Claims**," and such undersigned holders of Second Lien Note Claims, collectively, the "**Consenting Second Lien Creditors**");

3. the undersigned beneficial holders of, or investment managers, advisers or sub-advisers for holders of, claims against the Debtors under (a) the outstanding 8.625% Senior Notes due 2020 (the "**2020 Senior Notes**") issued pursuant to that certain

Indenture, dated as of October 6, 2010 (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**2020 Senior Notes Indenture**"), by and among BBEP and Breitburn Finance, as issuers, the guarantors party thereto, and U.S. Bank National Association, as trustee, and (b) the outstanding 7.875% Senior Notes due 2022 (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "**2022 Senior Notes**", and together with the 2020 Senior Notes the "**Senior Unsecured Notes**", and together with the Second Lien Notes, the "**Notes**") issued pursuant to that certain Indenture, dated as of January 13, 2012 (the "**2022 Senior Notes Indenture**", and together with the Second Lien Notes Indenture and the 2020 Senior Notes Indenture, the "**Indentures**"), by and among BBEP and Breitburn Finance, as issuers, the guarantors party thereto, U.S. Bank National Association, as trustee, and, in each case, Permitted Transferees of such claims in accordance with Section 6 of this Amended Agreement (such claims, the "**Senior Unsecured Note Claims**" and such undersigned holders of Senior Unsecured Note Claims, collectively, the "**Consenting Senior Unsecured Creditors**"), who may also constitute Commitment Parties

4.  if the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (defined below) (the "**UCC**") becomes a Party hereto, the UCC; and

5.  if the lenders under the Debtors' prepetition revolving credit facility become a Party hereto, (the "**RBL Lenders**" and, together with the UCC, the Consenting Second Lien Creditors, and the Consenting Senior Unsecured Creditors, the "**Consenting Creditors**"), the RBL Lenders.

Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Amended BCA (defined below) or the Approved Plan (defined below), as applicable, subject to Section 2 hereof.

## RECITALS

**WHEREAS**, on May 15, 2016, the Debtors commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), which are being jointly administered under the caption *In re Breitburn Energy Partners LP, et al.*, Case No. 16-11390 (SMB) (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

**WHEREAS**, on September 22, 2017, the Consenting Second Lien Creditors and the Consenting Senior Unsecured Creditors entered into a restructuring support agreement (the "**Initial RSA**") and a backstop commitment agreement (the "**Initial BCA**");

**WHEREAS**, in connection with the Chapter 11 Cases, and following the execution of the Initial RSA and Initial BCA, the Debtors, the Consenting Second Lien Creditors, and the Consenting Senior Unsecured Creditors have engaged in further good faith, arm's length negotiations regarding the terms of a chapter 11 plan of reorganization, substantially in the form attached as **Exhibit A** hereto (together with any amendments thereto consistent with this

Amended Agreement, the "**Approved Plan**"), and the terms and provisions thereof, including the Restructuring Transactions

WHEREAS, such Approved Plan shall contain the terms and conditions set forth in, and be consistent in all respects with, the term sheet attached as **Exhibit D** hereto (the "**Term Sheet**");

WHEREAS, upon the consent of the Requisite Commitment Parties, and the Requisite Consenting Second Lien Creditors (each defined below), the UCC and the RBL Lenders may become Parties;

WHEREAS, as of the date hereof, the Consenting Second Lien Creditors collectively represent or hold, in the aggregate, more than fifty percent (50%) in number of holders and more than 66 2/3% of the aggregate principal amount of the Second Lien Notes;

WHEREAS, as of the date hereof, the Consenting Senior Unsecured Creditors collectively represent or hold, in the aggregate, more than 68% (subject to the closing of certain pending trades) of the aggregate principal amount of the Senior Unsecured Notes;

WHEREAS, to provide assurance that the Rights Offering will be fully subscribed, certain of the Consenting Senior Unsecured Creditors that are Commitment Parties will backstop the Rights Offering and exercise the Minimum Allocation Rights, each in accordance with the terms and conditions set forth in an amendment to the Initial BCA (the "**Amended BCA**"), to be entered into contemporaneously herewith;

WHEREAS, the Parties desire to express to each other their mutual support and commitment with respect to the matters provided in the Approved Plan, the Amended BCA, and hereunder;

WHEREAS, in expressing such support and commitment, the Parties do not desire and do not intend in any way to derogate from or diminish the solicitation requirements of applicable law, including chapter 11 of the Bankruptcy Code;

WHEREAS, notwithstanding any proposed deadlines in relation to the Restructuring Transactions, the Parties intend to complete the Restructuring Transactions with all speed in as timely a manner as practicable and to negotiate in good faith with each other Party to consummate the Restructuring Transactions; and

WHEREAS, subject to the execution of definitive documentation and appropriate approvals by the Bankruptcy Court, the terms of this Amended Agreement set forth the Parties' entire agreement concerning their respective obligations.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

**Section 1.**    *Agreement Effective Date.*  This Amended Agreement shall become effective and binding upon each Party immediately following the occurrence of the following conditions (the "**Amended Agreement Effective Date**"):

> (a)    the Amended BCA has been executed;

> (b)    the Debtors shall have executed and delivered counterpart signatures to this Amended Agreement to each other Party;

> (c)    holders of 66 2/3% of the aggregate principal amount of the Second Lien Notes have executed and delivered counterpart signatures to this Amended Agreement to each other Party; and

> (d)    holders of more than 68% (subject to the closing of certain pending trades) of the aggregate principal amount of the Senior Unsecured Notes have executed and delivered counterpart signatures to this Amended Agreement to each other Party

Notwithstanding the occurrence of the Agreement Effective Date, this Agreement contemplates, and the Consenting Creditors and the Debtors acknowledge, that the UCC or the RBL Lenders may become Parties upon execution and delivery of counterpart signature pages of this Agreement to counsel to each other Party and at such time the UCC and/or RBL Lenders shall become obligated under this Agreement.

To the extent the the UCC or the RBL Lenders become a Party, their legal counsel may be provided signature pages of the Consenting Creditors in unredacted form; provided, that the UCC and the RBL Lenders and their legal counsel shall not be permitted to disclose any of the holdings of Debtor Claims (defined below) or Backstop Commitments (defined in the Backstop Commitment Agreement) of any Consenting Second Lien Creditor or Consenting Senior Unsecured Creditor set forth on such unredacted signature pages.

For the avoidance of doubt, if there is a Termination Date (defined in Section 9.05) pursuant to Section 9.02, any and all provisions referencing "Weil," the "Debtor," or the "Debtors" are, and shall continue to be, in full force and effect with respect to the Consenting Creditors as if such provisions were written without reference to "Weil," the "Debtor," or the "Debtors," and this Amended Agreement shall be in full force and effect with respect to each other Party hereto. Further, for the avoidance of doubt, if the UCC or the RBL Lenders never become a Party, any and all provisions of the Agreement referencing Milbank, the UCC, W&S, or the RBL Lenders are, and shall continue to be, in full force and effect with respect to the other Consenting Creditors as if such provisions were written without reference to Milbank, the UCC, W&S, or the RBL Lenders and this Agreement shall be in full force and effect with respect to each other Party hereto.

Signature pages executed by the Consenting Second Lien Creditors and the Consenting Senior Unsecured Creditors shall be delivered to Kirkland & Ellis LLP ("**K&E**"), legal counsel to the

Consenting Second Lien Creditors; Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**"), legal counsel to the Ad Hoc Unsecured Noteholder Group; White & Case LLP ("**W&C**"), legal counsel to a group of certain of the other Consenting Senior Unsecured Creditors; Weil Gotshal & Manges LLP ("**Weil**"), legal counsel to the Debtors; if applicable, Milbank, Tweed, Hadley & McCloy LLP ("**Milbank**"), legal counsel to the UCC; and, if applicable, Winston & Stawn, ("**W&S**") LLP, legal counsel to the RBL Lenders. Each Consenting Creditor intends to be and is bound under this Amended Agreement with respect to any and all claims against, or interests in, any of the Debtors, whether currently held or hereafter acquired by such Consenting Creditor.

**Section 2.**      *Exhibits Incorporated by Reference.*  Each of the exhibits and schedules attached hereto is expressly incorporated herein and made a part of this Amended Agreement, and all references to this Amended Agreement shall include the exhibits.  In the event of any inconsistency between this Amended Agreement (without reference to the exhibits) and the exhibits, the terms of the exhibits shall govern.  This Amended Agreement (without reference to the exhibits) may be interpreted with reference to the definitions set forth in the exhibits, to the extent such terms are used herein.

**Section 3.**      *Definitive Documentation*.

(a)    The definitive documents and agreements (collectively, the "**Restructuring Documents**") related to or otherwise utilized to implement, effectuate or govern the Restructuring Transactions shall consist of every order entered by the Bankruptcy Court and every pleading, motion, proposed order or document (but not including any notices, except as otherwise set forth in this section) filed by the Parties, to the extent, in each case, such orders, pleadings, motions, proposed orders or documents relate to the Restructuring Transactions or the implementation or consummation of the transactions contemplated by this Amended Agreement (including the Approved Plan and the Amended BCA).  The Restructuring Documents that remain subject to negotiation and completion, shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent in all respects with, and containing the terms and conditions set forth in, this Amended Agreement (including the Approved Plan), the Amended BCA, and the Term Sheet (unless such discrepancy between the Term Sheet and the Restructuring Documents is agreed to by the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, as applicable), and shall otherwise be in form and substance acceptable to the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties, except as otherwise set forth herein or in the Approved Plan.  As used herein, the term "**Requisite Consenting Second Lien Creditors**" means, at any relevant time, Consenting Second Lien Creditors (i) holding at least a majority of the sum of the outstanding Second Lien Note Claims held by all Consenting Second Lien Creditors and (ii) at least fifty percent (50%) in number calculated by providing one vote to each of (x) EIG Redwood Debt Aggregator, LP and its affiliates ("**EIG**"), (y) Anchorage Capital Partners, LP and its affiliates ("**Anchorage**"), and (z) Guggenheim Partners Investment Management, LLC and its affiliates ("**Guggenheim**") (provided, that if, at any time prior to the Effective Date, EIG, Anchorage or Guggenheim sell all of their Second Lien Note Claims, the applicable holder shall no longer have voting rights under the immediately preceding clause (ii)), and the term "**Requisite Commitment Parties**" shall have the meaning ascribed to such term in the Amended BCA.  The Restructuring Documents include:

(i)      the Approved Plan;

(ii)     the Disclosure Statement (and all exhibits and other documents and instruments related thereto) with respect to the Approved Plan, the other solicitation materials in respect of the Approved Plan (such materials, collectively, the "**Solicitation Materials**"), the motion to approve the Disclosure Statement and the order approving the Disclosure Statement (the "**Disclosure Statement Order**");

(iii)    the Amended BCA, the Rights Offering procedures and any offering document or other document to effectuate the Rights Offering, the BCA Motion (defined below), and the BCA Approval Order (defined below);

(iv)    any documents or agreements for exit financing for LegacyCo, including, any related credit agreement or required intercreditor agreement;

(v)     any documents or agreements in connection with the Restructuring Transactions and related to the governance of Reorganized Debtors following the conclusion of the Chapter 11 Cases, including any certificates of incorporation, certificates of formation, bylaws, limited liability company agreements (or equivalent governing documents), shareholders' agreements and registration rights agreements;

(vi)    all other documents that will comprise the Plan Supplement; and

(vii)   the Confirmation Order and pleadings in support of entry of the Confirmation Order.

(b)     Notwithstanding anything set forth in this Amended Agreement, the definitive terms and conditions of the Rights Offering shall be subject to the consent and approval of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties; provided, however, that notwithstanding the foregoing or anything to the contrary herein, any amendment or modification (i) to the conditions to closing as set forth in the Amended BCA, (ii) of the specific economic treatment of the Senior Unsecured Notes under the Approved Plan or the Commitment Parties pursuant to the Rights Offering or the Amended BCA (including, but not limited to, the amount of the Rights Offering, the size of the Minimum Allocation Rights, the amount of the Put Option Premium, and the amount of the Breakup Premium), as set forth in the Approved Plan or the Amended BCA, as applicable, or (iii) that has a materially adverse and disproportionate effect on a Commitment Party, shall be subject to the consent and approval of each Commitment Party.

(c)     Further, notwithstanding anything set forth in this Amended Agreement to the contrary, (i) the definitive documents or agreements for the post-Effective Date governance of New Permian Corp. shall be consistent in all material respects with the Approved Plan and Term Sheet and shall be otherwise acceptable the Requisite Commitment Parties and (ii) the definitive documents or agreements for exit financing for LegacyCo and the post-Effective Date governance of LegacyCo shall be consistent in all material respects with the

WEIL:\96309033\2\29979.0003

Approved Plan and Term Sheet and shall be otherwise acceptable to the Requisite Consenting Second Lien Creditors.

**Section 4.**    *Milestones***.** The following milestones (the "**Milestones**") shall apply to this Amended Agreement, unless extended or agreed to in writing by counsel to the Debtors, counsel to the Requisite Consenting Second Lien Creditors, and counsel to the Requisite Commitment Parties:

(a)    by no later than October 11, 2017, the Debtors shall file the (i) the Approved Plan, (ii) the Disclosure Statement, (iii) the motion seeking entry of the Disclosure Statement Order, and (iv) (x) the motion seeking approval of the Amended BCA (including payment of the Put Option Premium), (y) Rights Offering procedures, and (z) payment of related premiums, fees and expenses and related forms (the "**BCA Motion**");

(b) by no later than the forty-fifth (45th) day after the date the Disclosure Statement and BCA Motion are filed, the Bankruptcy Court shall have entered (i) the Disclosure Statement Order and (ii) an order approving (A) the Amended BCA (including payment of the Put Option Premium), (B) Rights Offering procedures, and (C) payment of related premiums, fees and expenses (such order containing all such approvals, the "**BCA Approval Order**");

(c) by no later than the sixtieth (60th) day after the date that the Bankruptcy Court enters the Disclosure Statement Order and the BCA Approval Order, the Bankruptcy Court shall have entered the Confirmation Order;

(d) by no later than the twenty-fifth (25th) day (subject to Section 2.3(a) of the Amended BCA) after the entry of the Confirmation Order (the "**Outside Date**"), the Effective Date shall have occurred.

**Section 5.**    *Commitments Regarding the Restructuring Transactions*.

    5.01.    Commitment of the Consenting Creditors.

(a)    During the period beginning on the Amended Agreement Effective Date and ending on a Termination Date (defined in Section 9.05) (such period, the "**Amended Effective Period**"), subject to the terms and conditions hereof, each of the Consenting Creditors agrees, severally and not jointly, that:

(i)    it shall cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the other Parties and will use commercially reasonable efforts to pursue, support, solicit, implement, confirm, and consummate the Restructuring Transactions contemplated by the Approved Plan, as applicable, and to execute any document and give any notice, order, instruction, or direction reasonably necessary to support, facilitate, implement, consummate, or otherwise give effect to the Restructuring Transactions contemplated by the Approved Plan, as applicable, and to act in good faith and take all commercially reasonable actions to negotiate the Restructuring Documents with the other Consenting Creditors

7

and the Debtors and consummate the Restructuring Transactions in a manner consistent with this Amended Agreement and the Approved Plan;

(ii)      it shall cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the other Parties;

(iii)      it shall not, directly or indirectly:

(A)      object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions;

(B)      propose, support, vote for, encourage, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with, any entity regarding any Alternative Transaction or any arrangement, understanding or agreements related to any Alternative Transaction or any other financing of or investment in any of the Debtors other than the Restructuring Transactions;

(C)      direct the trustee under any of the Second Lien Notes, 2020 Senior Notes and/or 2022 Senior Notes (as applicable) to take any action contemplated in (A) or (B) above;

(iv)      it shall, subject to the receipt by such Consenting Creditor of the Disclosure Statement and the Solicitation Materials, (in each case, solely in respect of the Approved Plan), approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code:

(A)      timely vote each of its claims against the Debtors (including each of its Second Lien Note Claims, which includes the Allowed Second Lien Note Claims described below, and Senior Unsecured Note Claims, and any other claims against the Debtors) (such claims, collectively, the "**Debtor Claims**") to accept the Approved Plan by delivering its duly executed and completed ballot(s) accepting the Approved Plan on a timely basis following the commencement of the solicitation and its actual receipt of the Solicitation Materials and ballot; and

(B)      not change or withdraw (or cause to be changed or withdrawn) such vote, provided, however, that such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Consenting Creditor at any time if this Amended Agreement is terminated with respect to such Consenting Creditor (it being understood by the Parties that any modification of the Approved Plan that results in a termination of this Amended Agreement pursuant to Section 9 hereof shall entitle such Consenting Creditor to an opportunity to change its vote in accordance with section 1127(d) of

8

the Bankruptcy Code, and the Solicitation Materials with respect to the Approved Plan shall be consistent with this proviso);

(v)     except to the extent expressly contemplated under the Approved Plan or this Amended Agreement, it will not, and will not direct the trustee under any of the Second Lien Notes, 2020 Senior Notes and/or 2022 Senior Notes (as applicable) to exercise any right or remedy for the enforcement, collection, or recovery of any of the Debtor Claims, and any other claims against any direct or indirect subsidiaries of the Debtors that are not Debtors; provided, however, that nothing in this Amended Agreement shall limit the right of any Party to exercise any right or remedy provided under the Confirmation Order or any other Restructuring Document;

(vi)     at least three (3) business days (or such shorter review period as necessary in light of exigent circumstances) prior to the date when any Consenting Creditor intends to file, such Consenting Creditor shall provide draft copies of all material motions, proposed orders, amended versions of the Approved Plan or Disclosure Statement to K&E, Akin Gump, W&C, W&S, and Milbank, as applicable, that it intends to file with the Bankruptcy Court and, at least five (5) business days prior to the date when the applicable Consenting Creditor intends to file, provide draft copies of any Restructuring Documents and related motions, the Confirmation Order and any supplements to the Approved Plan to K&E, Akin Gump, W&C, W&S, and Milbank, as applicable.  The applicable Consenting Creditor shall consult in good faith with K&E, Akin Gump, W&C, W&S, and Milbank, as applicable, regarding the form and substance of all material proposed filings with the Bankruptcy Court; provided, that the consent requirements set forth in this Agreement or Approved Plan shall apply with respect to any motions, declarations, proposed orders or other filings with the Bankruptcy Court that constitute Restructuring Documents; and

(vii)     if such Consenting Creditor is the UCC, support the confirmation and consummation of the Approved Plan and submit a letter, which will be included in the Solicitation Materials, recommending that the unsecured creditors of the Debtors vote in favor of the Approved Plan, which letter and recommendation shall not be subsequently withdrawn.

provided, however, that nothing in this Section 5.01(a) shall require any Consenting Creditor to incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements, that could result in expenses, liabilities or other obligations to any such Party, other than as specifically stated in this Amended Agreement, the Approved Plan, or the Amended BCA and commercially reasonable expenses incurred in furtherance of its obligations under this Amended Agreement.

(b)     The foregoing sub-clause (a) of this Section 5 will not limit any of the following Consenting Creditor rights:

9

(i)       under any applicable bankruptcy, insolvency, foreclosure or similar proceeding, including, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case provided that such appearance and the positions advocated in connection therewith are not inconsistent with this Amended Agreement and do not hinder, delay or prevent consummation of the Restructuring Transactions;

(ii)      under the Indentures and any applicable credit agreement, indenture, other loan document or applicable law, or constitute a waiver or amendment of any provision thereof provided that such rights are not inconsistent with the terms of this Amended Agreement solely during the time in which this Amended Agreement is in effect and do not hinder, delay or prevent consummation of the Restructuring Transactions;

(iii)     to take or direct any action relating to maintenance, protection, or preservation of any collateral provided that such action is not inconsistent with this Amended Agreement and does not hinder, delay or prevent consummation of the Restructuring Transactions;

(iv)      to purchase, sell or enter into any transactions in connection with the Second Lien Note Claims, Senior Unsecured Note Claims or any other Debtor Claims, subject to the terms of this Amended Agreement;

(v)       to consult with other Consenting Creditors, the Debtors or any other party in interest in the Chapter 11 Cases, provided, that such action is not inconsistent with this Amended Agreement and does not hinder, delay or prevent consummation of the Restructuring Transactions; or

(vi)      to enforce any right, remedy, condition, consent or approval requirement under this Amended Agreement or any of the Restructuring Documents.

5.02.   **Commitments of Debtor**.

(a)      During the Amended Effective Period, the Debtors agree to:

(i)       pursue the Restructuring Transactions on the terms set forth in this Amended Agreement, the Term Sheet, and the Approved Plan, and not sign any agreement to pursue any auction, sale process or other restructuring transaction for the Debtors or substantially all of its assets;

(ii)      use good faith efforts to implement this Amended Agreement and the Approved Plan in accordance with the Term Sheet, the transactions and other actions contemplated hereby and thereby;

(iii)     (A) support and complete the Restructuring Transactions set forth in this Amended Agreement and the Approved Plan; (B) negotiate in

10

good faith all Restructuring Documents that are subject to negotiation as of the Amended Agreement Effective Date; (C) execute and deliver any other required agreements to effectuate and consummate the Restructuring Transactions; (D) make commercially reasonable efforts to obtain required regulatory and/or third-party approvals for the Restructuring Transactions, if any; (E) complete the Restructuring Transactions in a timely and expeditious manner, and as otherwise required by this Amended Agreement and the Restructuring Documents; (F) not undertake any actions materially inconsistent with the Restructuring Transactions or the adoption and implementation of the Approved Plan and confirmation thereof and not take any action directly or indirectly that is inconsistent with, or that would reasonably be expected to prevent, interfere with, delay or impede the approval of the Disclosure Statement, the solicitation of votes on the Approved Plan, and the confirmation and consummation of the Approved Plan and the Restructuring Transactions, including soliciting or causing or allowing any of its agents or representatives to solicit any agreements or commence or continue negotiations with any party in interest in these Chapter 11 Cases relating to any chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) other supporting, pursuing, or otherwise facilitating the consummation of an Alternative Transaction; (G) not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with this Amended Agreement or delay, impede, appeal, or take any other negative action, directly or indirectly, to interfere with the acceptance or implementation of the Restructuring Transactions; and (H) use commercially reasonable efforts to support and obtain Bankruptcy Court approval of the release, exculpation, and indemnification provisions set forth in the Restructuring Documents;

(iv)      do all things reasonably necessary and appropriate in furtherance of confirming the Approved Plan and consummating the Restructuring Transactions in accordance with, and within the time frames contemplated by, this Amended Agreement (including compliance with each Milestone);

(v)      at least three (3) business days (or such shorter review period as necessary in light of exigent circumstances) prior to the date when the Debtors intend to file, provide draft copies of all material motions, proposed orders, amended versions of the Approved Plan or Disclosure Statement to K&E, Akin Gump, W&C, W&S, and Milbank, that any Debtor intends to file with the Bankruptcy Court and, at least five (5) business days prior to the date when the applicable Debtor intends to file, provide draft copies of any Restructuring Documents and related motions, the Confirmation Order and any supplements to the Approved Plan to K&E, Akin Gump, W&C W&S, and Milbank.  The Debtors shall consult in good faith with K&E, Akin Gump, W&C, W&S, and Milbank regarding the form and substance of all material proposed filings with the Bankruptcy Court; provided, that the

WEIL:\96309033\2\29979.0003

consent requirements set forth in this Amended Agreement or Approved Plan shall apply with respect to any motions, declarations, proposed orders or other filings with the Bankruptcy Court that constitute Restructuring Documents;

(vi)    use commercially reasonable efforts to comply with each Milestone set forth in <u>Section 4</u> hereof;

(vii)    timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order (A) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (B) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Chapter 11 Cases;

(viii)    timely oppose any objections filed with the Bankruptcy Court to (A) the Disclosure Statement, (B) the Approved Plan or (C) confirmation of the Approved Plan;

(ix)    timely object to any motion filed with the Bankruptcy Court by a party seeking the entry of an order modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(x)    comply in all material respects with applicable laws (including making or seeking to obtain all required material consents and/or appropriate filings or registrations with, notifications to, or authorizations, consents or approvals of any regulatory or governmental authority, and paying all material taxes as they become due and payable except to the extent nonpayment thereof is permitted by the Bankruptcy Code);

(xi)    maintain the good standing (or equivalent status under the laws of its incorporation or organization) under the laws of the state or other jurisdiction in which each of the Debtors are incorporated or organized;

(xii)    (A) operate the business of each of the Debtors in the ordinary course and consistent with past practice and in a manner that is consistent with this Amended Agreement and the business plan of the Debtors and confer with the Consenting Creditors and their respective representatives, as reasonably requested, on operational matters and the general status of ongoing operations, and (B) provide the Consenting Creditors with any information reasonably requested regarding the Debtors and reasonable access to management and advisors of the Debtors for the purposes of evaluating the Debtors' assets, liabilities, operations, businesses, finances, strategies, prospects and affairs. Notwithstanding the generality of the foregoing, the Debtors shall, except as expressly contemplated by this Amended Agreement or with the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, and, subject to applicable

12

bankruptcy law, use commercially reasonable efforts consistent with the Restructuring Transactions to (1) maintain their physical assets, properties and facilities in their current working order, condition and repair as of the date hereof, ordinary wear and tear excepted, (2) perform all obligations required to be performed by the Debtors under any executory contracts or unexpired leases that have not been rejected by order of the Bankruptcy Court, (3) maintain their books and records on a basis consistent with prior practice, (4) bill for products sold or services rendered and pay accounts payable in a manner generally consistent with past practice, but taking into account the Restructuring Transactions, (5) maintain all insurance policies, or suitable replacements therefor, in full force and effect through the close of business on the Effective Date, (6) neither encumber nor enter into any material new leases, licenses or other use or occupancy agreements for real property or any part thereof, and (7) not enter into or amend any executive employment agreements or any executive management compensation, severance or incentive plans, including any equity arrangements, except as contemplated by the Approved Plan;

(xiii)    to the extent that any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Amended Agreement or the Approved Plan, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, in consultation with the Requisite Consenting Second Lien Creditors and Requisite Commitment Parties; provided, however, that the economic outcome for the Consenting Creditors, the anticipated timing of confirmation and the Effective Date, and other material terms as contemplated in this Amended Agreement and in the Approved Plan must be preserved;

(xiv)    provide prompt written notice to the Consenting Creditors between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which the Debtors have actual knowledge and which such occurrence or failure would likely cause (1) any representation of the Debtors contained in this Amended Agreement to be untrue or inaccurate in any material respect, (2) any covenant of the Debtors contained in this Amended Agreement not to be satisfied in any material respect or (3) any condition precedent contained in the Approved Plan or this Amended Agreement not to occur or become impossible to satisfy, (B) receipt of any written notice from any third party alleging that the consent of such party is or may be required in connection with the Restructuring Transactions, (C) receipt of any written notice from any governmental body in connection with this Amended Agreement or the Restructuring Transactions, (D) receipt of any written notice of any proceeding commenced, or, to the actual knowledge of the Debtors, threatened against the Debtors, relating to or involving or otherwise affecting in any material respect the Restructuring Transactions, and (E) any failure of the Debtors to comply, in any material

WEIL:\96309033\2\29979.0003

respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder;

(xv)     promptly notify the Consenting Creditors in writing of any governmental or third party complaints, litigations, investigations, or hearings (or communications indicating that the same may be contemplated or threatened);

(xvi)     cause the Confirmation Order to become effective and enforceable immediately upon its entry and to have the period in which an appeal thereto must be filed commence immediately upon its entry;

(xvii)     comply in all material respects with the terms and conditions of the DIP Facility (defined in the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, and 364 and Fed. R. Bankr. P. 4001, and Local Rules 4001-1 and 4001-2 For Authority to (A) Obtain Postpetition Financing, (B) Use Cash Collateral, (C) Grant Certain Protections to Prepetition Secured Parties, and (D) Related Relief* (ECF No. 5)), and the final orders and amendments related thereto (collectively, the "**Final DIP Order**");

(xviii)     not object to, delay, impede or take any other action that is materially inconsistent with, or is intended or is likely to interfere with, acceptance or implementation of the Restructuring Transactions;

(xix)     not enter into, adopt or materially amend any employment agreements or any insider compensation or incentive plans, or increase in any manner the compensation or benefits (including severance), in each case, of any insider of the Debtors, without the prior consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties;

(xx)     not seek to amend or modify, or file a pleading seeking authority to amend or modify, the Restructuring Documents in a manner that is materially inconsistent with this Amended Agreement or the Approved Plan;

(xxi)     not file any pleading materially inconsistent with the Restructuring Transactions or the terms of this Amended Agreement or the Approved Plan;

(xxii)     not seek, solicit, or support any Alternative Transaction, except with the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties; and

(xxiii)     shall notify the Consenting Creditors promptly (but in any event within two (2) business days) of any bona fide, written proposals or offers received after the date of this Amended Agreement by any of the Debtors, any of their subsidiaries or any of their respective Representatives,

14

relating to any Alternative Transaction, which such notice shall indicate the identity of such person and contain a summary of the material terms of such proposal or offer for an Alternative Transaction. The Debtors shall keep the Consenting Creditors informed, on a reasonably prompt basis, of the status and material terms of any such proposals or offers and the status of any material developments in respect of any such discussions or negotiations.

5.03.   <u>Additional Commitment of the UCC</u>.  If the UCC is a Party, the UCC agrees that, upon the occurrence of the Agreement Effective Date, the prosecution of its standing motion and claim objection filed on December 19, 2016 (ECF No. 867) entitled (I) Objection to Proof of Claim filed by Delaware Trust Company as Indenture Trustee for the 9.25% Senior Secured Second Lien Notes Due 2020 and (II) Motion of the Official Committee of Unsecured Creditors for Entry of an Order Conditionally Authorizing the Committee to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates and Granting Related Relief (the "**<u>Standing Motion and Claim Objection</u>**") shall be stayed, and the Standing Motion and Claim Objection shall be held in abeyance until the earlier of the occurrence of the Effective Date or the Termination Date and the UCC shall take any and all steps necessary to stay or hold in abeyance the Standing Motion and Claim Objection.  Upon the occurrence of the Effective Date, the Standing Motion and Claim Objection shall be deemed dismissed or otherwise withdrawn with prejudice.  For the avoidance of doubt, in the event that this Agreement is terminated pursuant to Section 9 for any reason, nothing contained herein shall impair the rights of the UCC to resume prosecution of the Standing Motion and Claim Objection following the Termination Date.

5.04.   <u>Additional Commitment of all Parties</u>.  The Consenting Second Lien Creditors' Second Lien Note Claims shall be allowed in the amount of $793,300,000 (which includes principal and makewhole), plus accrued unpaid pre- and post-petition default interest on all outstanding obligations, costs, fees, indemnities, and all other obligations payable under the Second Lien Notes Indenture (the "**<u>Allowed Second Lien Note Claims</u>**"); <u>provided</u>, <u>that</u>, in the event this Amended Agreement is terminated pursuant to <u>Section 9</u> for any reason, any and all rights of (i) the Debtors, with respect to the assertion, allowance and estimation (for any purpose) of any Second Lien Note Claims, in any amount, (ii) the Consenting Second Lien Creditors with respect to the assertion, allowance and estimation (for any purpose) of any Second Lien Note Claims, in any amount, it may have against the Debtors, (iii) the RBL Lenders with respect to the assertion, allowance and estimation (for any purpose) of any Second Lien Note Claims, in any amount, and (iv) the Consenting Senior Unsecured Creditors and the UCC with respect to any objections to the assertion, allowance and estimation (for any purpose) of any Second Lien Note Claims, in any amount, against the Debtors, shall be preserved, it being understood and agreed by the Debtors and the Consenting Creditors that nothing contained herein is intended or should be construed as a waiver of the Debtors', the Consenting Second Lien Creditors', the Consenting Senior Unsecured Creditors', the RBL Lenders', or the UCC's rights with respect to any Second Lien Note Claims against the Debtors in the event that this Amended Agreement is terminated with respect to the Debtors, the Consenting Second Lien Creditors, Consenting Senior Unsecured Creditors, the RBL Lenders, or the UCC; <u>provided</u>, <u>further</u>, that the Parties agree that Allowed Second Lien Note Claims amount referenced in this Section was determined as a result of compromise and settlement by and among the Parties in relation to this Amended Agreement.

**Section 6.**    *Transfer of Claims and Interests*.

   (a)  During the Amended Effective Period, no Consenting Creditor shall sell, use, pledge, assign, transfer, permit the participation in, or otherwise dispose of any ownership (including any beneficial ownership)[1] in the Second Lien Note Claims or Senior Unsecured Note Claims in whole or in part (each, a "**Transfer**") to any party, unless it satisfies all of the following requirements (a transferee that satisfies such requirements, a "**Permitted Transferee**," and such Transfer, a "**Permitted Transfer**"):

     (i)  the intended transferee (x) is another Consenting Creditor, (y) as of the date of such Transfer, the Consenting Creditor controls, is controlled by or is under common control with such Consenting Creditor an affiliate, affiliated fund or affiliated entity with a common investment advisor, or (z) executes a transfer agreement in the form attached hereto as **Exhibit B** (a "**Transfer Agreement**") prior to or concurrently with the closing of such Transfer; and

     (ii)  notice of any Transfer, including the amount transferred and, in the case of (i)(z) above, the fully executed Transfer Agreement, shall be provided to Weil, K&E, Akin Gump, W&C, W&S, and Milbank within three (3) business days following the closing of such Transfer.

   (b)  Upon satisfaction of the requirements in <u>Section 6(a)</u>, (i) the Permitted Transferee shall be deemed to be a Consenting Creditor hereunder and shall be deemed to be a Consenting Second Lien Creditor or Consenting Senior Unsecured Creditor, or both, as applicable, and, for the avoidance of doubt, a Permitted Transferee is bound as a Consenting Creditor under this Amended Agreement with respect to any and all claims against, or interests in, any of the Debtors, whether held at the time such Permitted Transferee becomes a Party or later acquired by such Permitted Transferee, and (ii) the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Amended Agreement to the extent of such transferred rights and obligations.

   (c)  Notwithstanding <u>Section 6(a)</u>, a Qualified Marketmaker[2] that acquires any Second Lien Note Claims or Senior Unsecured Note Claims with the purpose and intent of acting as a Qualified Marketmaker for such Debtor Claims, shall not be required to execute and deliver to any of Weil, K&E, Akin Gump, W&C, W&S, or Milbank a Transfer Agreement in respect of such Second Lien Note Claims or Senior Unsecured Note Claims if (A) such Qualified Marketmaker subsequently transfers such Second Lien Note Claims or Senior Unsecured Note Claims (by purchase, sale, assignment, participation, or otherwise) within three (3) business days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund or affiliated

---

[1] As used herein, the term "beneficial ownership" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Debtor Claims or the right to acquire such claims or interests.

[2] As used herein, the term "**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers claims of the Debtors (or enter with customers into long and short positions in claims against the Debtors), in its capacity as a dealer or market maker in claims against the Debtors, (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt), and (c) in the case of a Qualified Marketmaker with respect to Second Lien Notes, that such entity does not and will not own any Existing BBEP Equity Interests.

entity with a common investment advisor, (B) the transferee otherwise is a Permitted Transferee (including, for the avoidance of doubt, the requirement that such transferee execute a Transfer Agreement) and (C) the Transfer otherwise is a Permitted Transfer.  To the extent that a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may transfer (by purchase, sale, assignment, participation or otherwise) any right, title or interest in Second Lien Note Claims or Senior Unsecured Note Claims that such Consenting Creditor acquires in its capacity as a Qualified Marketmaker from a holder of the Second Lien Note Claims or Senior Unsecured Note Claims who is not a Consenting Creditor without regard to the requirements set forth in Section 6(a) hereof.

(d)     This Amended Agreement shall in no way be construed to preclude the Consenting Creditors from acquiring additional Debtor Claims; provided, however, that (i) any Consenting Creditor that acquires additional Debtor Claims, as applicable, after the Agreement Effective Date shall notify Weil, K&E, Akin Gump, W&C, W&S, and Milbank of such acquisition, within five business days following such acquisition, including the amount of such acquisition, which notice may be deemed to be provided by the filing of a statement with the Bankruptcy Court as required by Rule 2019 of the Federal Rules of Bankruptcy Procedure, including revised holdings information for such Consenting Creditor and (ii) such additional Debtor Claims shall automatically and immediately upon acquisition by a Consenting Creditor, as applicable, be deemed subject to the terms of this Amended Agreement (regardless of when or whether notice of such acquisition is given to the respective counsels to the Consenting Creditors).

(e)     In addition, other than pursuant to a Permitted Transfer, any holder of Second Lien Note Claims or Senior Unsecured Note Claims shall become a Party, and become obligated as a Consenting Creditor and as a Consenting Second Lien Creditor or Consenting Senior Unsecured Creditor, or both, as applicable, solely to the extent (i) the ascension of such holder to this Amended Agreement is consented to by the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties and (ii) (x) such holder executes a joinder agreement in the form attached hereto as **Exhibit C** (a "**Joinder Agreement**"), and shall be deemed a Consenting Creditor and a Consenting Second Lien Creditor or Consenting Senior Unsecured Creditor hereunder, or both, as applicable, and (y) such joinder is delivered to Weil, K&E, Akin Gump, W&C, W&S, and Milbank within three (3) business days following the execution thereof.

(f)     Any Transfer made in violation of this Section 6 shall be void ab initio.  Each other Consenting Creditor shall have the right to enforce the voiding of such Transfer.  Any Consenting Creditor that effectuates a Permitted Transfer to a Permitted Transferee shall have no liability under this Amended Agreement arising from or related to the failure of the Permitted Transferee to comply with the terms of this Amended Agreement.

(g)     Notwithstanding anything to the contrary in this Section 6, the restrictions on Transfer set forth in this Section 6 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker dealer or prime broker holding such claims and interests in custody or prime brokerage in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests in accordance with the terms of the custody or prime brokerage agreement(s), as

17

applicable.  For the avoidance of doubt, a bank, broker-dealer or prime broker holding custody of the claims and interests shall not be subject to the terms of this Amended Agreement solely when acting in such capacity.

(h)    Any transfers of any Backstop Commitments shall be subject to the terms and conditions set forth in the Amended BCA.

(i)    Any lender under the RBL Facility and the agent thereunder may become a Party, and become obligated as a Consenting Creditor, solely to the extent (i) the ascension of such holder to this Agreement is consented to by the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties and (ii) (x) any such person or entity executes documentation in form and substance acceptable to the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties evidencing its agreement to be bound by the terms and conditions of this Agreement and make all representations and warranties contained herein as of the date thereof, and shall be deemed a Consenting Creditor and (y) such documentation is delivered to Weil, K&E, Akin Gump, W&C, W&S, and Milbank within three (3) business days following the execution thereof.

(j)    Any holder of Senior Unsecured Notes Claims that is not otherwise a Commitment Party but which becomes a Commitment Party pursuant to the Amended BCA must in advance of becoming a Commitment Party become a Party by executing a joinder in form and substance acceptable to the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties evidencing its agreement to be bound by the terms and conditions of this Amended Agreement and make all representations and warranties contained herein as of the date of its becoming a Commitment Party or otherwise participating in the Rights Offering, and shall be deemed a Consenting Creditor and Consenting Senior Unsecured Creditor hereunder.  Any holder of Senior Unsecured Notes Claims that is not a Commitment Party and otherwise participates in the Rights Offering shall be required to timely vote all of its Debtor Claims in favor of the Approved Plan.

**Section 7.    *Representations and Warranties.***

7.01.  <u>Representations and Warranties</u>. Each Consenting Creditor represents and warrants, severally, and not jointly, and, upon the Debtors becoming a Party, the Debtors also represent and warrant, to each other Party, as of the date hereof (or as of the date a Permitted Transferee of Debtor becomes a Party) that:

(a)    other than the UCC and the Debtors, it is the beneficial owner of the amount of the Debtor Claims identified below its name on its signature page hereof and in the amounts set forth therein, or is the nominee, investment manager, adviser, or sub-adviser for beneficial holders of the Debtor Claims, as reflected in such Consenting Creditor's signature block to this Amended Agreement (such Debtor Claims, the "**<u>Owned Debtor Claims</u>**");

(b)    other than the UCC and the Debtors, it has the full power and authority to act on behalf of, vote and consent to matters concerning the Owned Debtor Claims;

(c)    other than the UCC and the Debtors, the Owned Debtor Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting

restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Creditor's ability to perform any of its obligations under this Amended Agreement at the time such obligations are required to be performed;

(d)     other than the UCC and the Debtors, (i) it is either an accredited investor (defined in Rule 501(a) under the Securities Act of 1933, as amended (the "**Securities Act**") or (B) non-U.S. person as defined in Regulation S under the Securities Act, and (ii) any securities of New Permian Corp. or LegacyCo acquired by the applicable Consenting Creditor in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act;

(e)     as of the date hereof, it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other person or entity, would prevent it from taking any action required of it under this Amended Agreement;

(f)     it is validly existing and in good standing (or equivalent) under the laws of its jurisdiction of organization, and this Amended Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(g)     except as expressly provided in this Amended Agreement, the Approved Plan, the Term Sheet, or the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Amended Agreement and the Approved Plan;

(h)     except as expressly provided in this Amended Agreement, it has all requisite corporate or other power and authority to enter into, execute, and deliver this Amended Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Amended Agreement and the Approved Plan;

(i)     except as expressly set forth herein (and subject to necessary Bankruptcy Court approval and/or regulatory approvals associated with the Restructuring Transactions), the execution, delivery, and performance by it of this Amended Agreement does not, and shall not, require any registration or filing with consent or approval of, or notice to, or other action to, with or by, any federal, state, or other governmental authority or regulatory body;

(j)     no Consenting Creditor or Debtor is party to any contract, agreement, commitment, understanding or other obligation (written or oral) with any other person or entity with respect to any proposal inconsistent with the Restructuring Transactions, or with respect to an Alternative Transaction; and

(k)     the execution, delivery, and performance of this Amended Agreement does not and shall not: (a) violate any provision of law, rules or regulations applicable to it or any of its subsidiaries in any material respect; or (b) other than the UCC, violate its certificate of incorporation, bylaws, or other organizational documents or those of any of its subsidiaries.

WEIL:\96309033\2\29979.0003

**Section 8.**    *Acknowledgement*.    Notwithstanding any other provision herein, this Amended Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.

**Section 9.**    *Termination Events*.

9.01.    Consenting Creditor Termination Events.    Upon written notice from the Consenting Second Lien Creditors holding in the aggregate, more than fifty percent (50%) in number of holders and more than 66 2/3% of the aggregate principal amount of the Second Lien Notes (the "**Specified Consenting Second Lien Creditors**") or the Requisite Commitment Parties delivered in accordance with Section 13.10 to all of the Parties, at any time upon the occurrence and during the continuance of any the following events, in each case, unless waived in writing by the Specified Consenting Second Lien Creditors and the Requisite Commitment Parties, either of the Specified Consenting Second Lien Creditors or the Requisite Commitment Parties may terminate this Amended Agreement as to all Parties.  The UCC and RBL Lenders may terminate this Agreement as to itself and to no other Party upon written notice from the UCC and RBL Lenders delivered in accordance with Section 13.10 to all of the Parties, at any time upon the occurrence of any the following events, unless waived in writing by the UCC or RBL Lenders.  No failure or delay by any of the Specified Consenting Second Lien Creditors, the Requisite Commitment Parties, the RBL Lenders, or the UCC in exercising any of their respective rights to terminate this Amended Agreement shall operate as a waiver thereof or limit in any way such termination right:

(a)    upon the failure to meet any of the Milestones;

(b)    the breach in any material respect by any Party of any of the representations, warranties, covenants, obligations or commitments set forth in this Amended Agreement, or the failure of any Party to act in a manner materially consistent with this Amended Agreement, which breach or failure to act (i) would materially and adversely impede or interfere with the acceptance, implementation or consummation of the Restructuring Transactions by the Outside Date on the terms and conditions set forth in this Amended Agreement (including the Approved Plan) and (ii) is uncured for a period of three (3) business days after the receipt of written notice in accordance with Section 13.10 of such breach from any non-breaching Party, other than with respect to any breach that is uncurable, for which no notice or cure period shall be required or apply (it being understood and agreed that any actions required to be taken by such Parties that are included in the Approved Plan but not in this Amended Agreement are to be considered "covenants" of such Parties, and therefore covenants of this Amended Agreement, notwithstanding the failure of any specific provision in the Approved Plan to be re-copied in this Amended Agreement).  Notwithstanding the foregoing, under this Section 9.01(b), (w) the Specified Consenting Second Lien Creditors may only exercise a right to terminate this Amended Agreement as to all Parties if the breaching Party or Parties is one of the Consenting Senior Unsecured Creditors, (x) the Requisite Commitment Parties may only exercise a right to terminate this Amended Agreement as to all Parties if the breaching Party or Parties is one of the Consenting Second Lien Creditors and such breach is not reasonably expected to only relate to or affect LegacyCo or the Consenting Second Lien

20

Creditors from and after the Closing, (y) the Specified Consenting Second Lien Creditors and the Requisite Commitment Parties may only terminate this Agreement as to the UCC or RBL Lenders if the UCC or RBL Lenders are the breaching Party, and not as to all Parties, and (z) the Specified Consenting Second Lien Creditors and the Requisite Commitment Parties may only terminate this Amended Agreement as to the Debtors if the Debtor is a breaching Party, and not as to all Parties;

(c)    the issuance by any governmental authority, including any regulatory authority, the Bankruptcy Court, or another court of competent jurisdiction, of any injunction, judgment, decree, charge, ruling or order that, in each case, would have an adverse effect on a material provision of this Amended Agreement or a material portion of the Restructuring Transactions or the Approved Plan or a material adverse effect on the Debtors' businesses, unless the Debtors, the Requisite Consenting Second Lien Creditors or the Requisite Commitment Parties have sought a stay of such injunction, judgment, decree, charge, ruling, or order within fifteen (15) business days after the date of such issuance, and such injunction, judgment, decree, charge, ruling, or order is reversed or vacated within twenty (20) business days after the date of such issuance; provided, however, that the Requisite Commitment Parties may not terminate this Amended Agreement with respect to all Parties if the issuance by a governmental authority is reasonably expected to only relate to or affect LegacyCo or the Consenting Second Lien Creditors from and after the Closing;

(d)    an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code, a trustee, or a receiver shall have been appointed in the Chapter 11 Cases;

(e)    the (i) conversion of one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code or (ii) dismissal of one or more of the Chapter 11 Cases of the Debtors, unless such conversion or dismissal, as applicable, is made with the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties;

(f)    any of the Restructuring Documents after completion, (i) contain terms, conditions, representations, warranties or covenants that are not materially consistent with the terms of this Amended Agreement, (ii) shall have been materially and adversely amended or modified or (iii) shall have been withdrawn, in each case, without the consent of the applicable Party in accordance with its approval rights under this Amended Agreement (including the Term Sheet), and in the case of a Restructuring Document that is also an order, including the Confirmation Order, such order shall have been materially stayed, reversed, vacated or adversely modified, without the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, unless the Debtors have sought a stay of such order within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance; provided, however, that the Requisite Commitment Parties may not terminate this Amended Agreement with respect to all Parties if the breach on account of this Section 9.01(f) is reasonably expected to only relate to or affect LegacyCo or the Consenting Second Lien Creditors from and after the Closing;

WEIL:\96309033\2\29979.0003

(g)    (i) any of the Parties file a pleading seeking authority to amend, modify or withdraw any of the Restructuring Documents without the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, or (ii) the Approved Plan or Disclosure Statement is amended or modified in any manner that is materially adverse to either the Consenting Second Lien Creditors or the Consenting Senior Unsecured Creditors and is otherwise not reasonably acceptable to the Requisite Consenting Second Lien Creditors or the Requisite Commitment Parties; provided, however, that (y) Specified Consenting Second Lien Creditors shall not have a right to terminate this Amended Agreement on account of a breach of this Section 9.01(g) by any Consenting Second Lien Creditor and (z) the Requisite Commitment Parties shall not have a right to terminate this Amended Agreement on account of a breach of this Section 9.01(g) by any Consenting Senior Unsecured Creditor; provided, further, that the Requisite Commitment Parties may not terminate this Amended Agreement with respect to all Parties if the breach on account of this Section 9.01(g) is reasonably expected to only relate to or affect LegacyCo or the Consenting Second Lien Creditors from and after the Closing;

(h)    any of the Parties directly or indirectly propose, support, assist, solicit or file a pleading seeking approval of any Alternative Transaction (or any approval of any sales, voting or other procedures in connection with an Alternative Transaction) without the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties that results in a material adverse effect for the consummation of the Restructuring Transactions; provided, however, that (y) Specified Consenting Second Lien Creditors shall not have a right to terminate this Amended Agreement on account of a breach of this Section 9.01(h) by any Consenting Second Lien Creditor and (z) the Requisite Commitment Parties shall not have a right to terminate this Amended Agreement on account of a breach of this Section 9.01(h) by any Consenting Senior Unsecured Creditor;

(i)    the Debtors file a motion or application seeking authority to sell all or a material portion of its assets without the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties; provided, however, that the Requisite Commitment Parties may not terminate this Amended Agreement with respect to all Parties if the breach on account of this Section 9.01(i) is reasonably expected to only relate to or affect LegacyCo or the Consenting Second Lien Creditors from and after the Closing;

(j)    the Debtors file a motion seeking authority to enter into post-petition secured financing, without the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties; provided, however, that the Requisite Commitment Parties may not terminate this Amended Agreement with respect to all Parties if the breach on account of this Section 9.01(j) is reasonably expected to only relate to or affect LegacyCo or the Consenting Second Lien Creditors from and after the Closing;

(k)    the Bankruptcy Court enters an order avoiding, disallowing, subordinating or recharacterizing any claim, lien or interest held by any Consenting Creditor arising under or related to the Indentures or the Final DIP Order, unless any Party sought a stay of such order within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance; provided, however, that the Requisite Commitment Parties may not terminate this Amended

WEIL:\96309033\2\29979.0003

Agreement with respect to all Parties if the breach on account of this <u>Section 9.01(k)</u> is reasonably expected to only relate to or affect LegacyCo or the Consenting Second Lien Creditors from and after the Closing;

(l)   the occurrence of an event of default under the Final DIP Order unless waived by all parties entitled to waive such event of default; <u>provided</u>, <u>however</u>, that the Requisite Commitment Parties may only terminate this Amended Agreement with respect to all Parties if this <u>Section 9.01(l)</u> results in an order that results a foreclosure on the assets to be owned by New Permian Corp. upon the Effective Date;

(m)   the UCC is a Party, the UCC refuses or otherwise does not obtain an order staying or holding in abeyance the Standing Motion and Claim Objection within five (5) business days after becoming a Party, subject to Section 5.03 of this Agreement; or

(n)   the Bankruptcy Court grants relief that (i) is inconsistent with this Amended Agreement in any material respect or (ii) would, or would reasonably be expected to, materially frustrate the purposes of this Amended Agreement, including by preventing the consummation of the Restructuring Transactions, unless the Debtors or the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties have sought a stay of such relief within five (5) business days after the date of such issuance, and such order is stayed, reversed or vacated within ten (10) business days after the date of such issuance; <u>provided</u>, <u>however</u>, that the Requisite Commitment Parties may not terminate this Amended Agreement with respect to all Parties if the breach on account of this <u>Section 9.01(n)</u> is reasonably expected to only relate to or affect LegacyCo or the Consenting Second Lien Creditors from and after the Closing.

9.02.   <u>Debtor Termination Events</u>.   This Amended Agreement shall terminate, solely with respect to the Debtors, immediately upon delivery of written notice from BBEP to all of the Parties (in accordance with <u>Section 13.10</u>) at any time after the occurrence and during the continuance of any Debtor Termination Event, as defined in this <u>Section 9</u>.

(a) The breach in any material respect by one or more of the Consenting Creditors of any of the undertakings, representations, warranties or covenants of the Consenting Creditors set forth herein which remains uncured for a period of ten (10) business days after the receipt of written notice of such breach;

(b) The board of directors, board of managers, or such similar governing body of any Debtor reasonably determines in good faith after consultation with outside counsel that continued performance under this Amended Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; <u>provided</u>, <u>that</u> BBEP or another Debtor provides notice of such determination to the Consenting Creditors within two days after the date thereof;

(c) The Amended BCA and the rights and obligations of all parties thereunder is terminated in accordance with its terms;

(d) The Requisite Commitment Parties or the Specified Consenting Second Lien Creditors give a notice of termination of this Amended Agreement;

23

(e) On the date that an order is entered by the Bankruptcy Court or a court of competent jurisdiction denying confirmation of the Approved Plan (unless caused by a default by the Debtors of its obligations hereunder, in which event the Debtors shall not have the right to terminate under this subsection) or declining to approve the Disclosure Statement; provided, that the Debtors shall not have the right to terminate this Amended Agreement pursuant to this Section if the Bankruptcy Court declines to approve the Disclosure Statement or denies confirmation of the Approved Plan subject only to the making of ministerial or administrative modifications to the Approved Plan or Disclosure Statement;

(f)     The acquisition of Existing BBEP Equity Interests by Consenting Second Lien Creditors or by any persons controlled by or persons controlling such Consenting Second Lien Creditors; provided, however, that a Consenting Second Lien Creditor as of the date hereof or any person controlled by or controlling such Second Lien Creditor as of the date hereof may acquire Existing BBEP Equity Interests from any person that is a Consenting Second Lien Creditor as of the date hereof or a person controlled by or persons controlling such Consenting Second Lien Creditor as of the date hereof, if such acquisition does not cause (i) EIG Equity Aggregator or any person controlled by or controlling EIG Equity Aggregator to own more Existing BEPP Equity Interests than is owned by EIG Equity Aggregator as of the date hereof, or (ii) any Consenting Second Lien Creditor or any person controlled by or person controlling such Consenting Second Lien Creditor to own Existing BBEP Equity Interests constituting (A) 30 percent or more of the aggregate preference amount (including accrued but unpaid yield) or aggregate capital accounts of the combined Series A Cumulative Redeemable Preferred Units and the Series B Preferred Units or (B) thirty percent (30%) or more of the common units of BBEP (in the case of both clause (i) and clause (ii), to the knowledge of the acquiring Consenting Second Lien Creditor and its controlling and controlled persons, after reasonable inquiry among the Consenting Second Lien Creditor and its controlled and controlling persons but for avoidance of doubt not requiring inquiry outside such persons, and separately to the knowledge of the selling Consenting Second Lien Creditor and its controlling and controlled persons, also after reasonable inquiry among the Consenting Second Lien Creditor and its controlled and controlling persons but for avoidance of doubt not requiring inquiry outside such persons, with "own" being determined for purposes of this proviso taking into account the constructive ownership rules applicable for purposes of Section 707(b)(1) of the Tax Code and the Treasury Regulations thereunder); provided, further, that for purposes of this Section 9.02(f), the terms "controlled" and "controlling" shall have the meaning described in Section 11(b); and

(g) The issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order enjoining the consummation of a material portion of the Restructuring Transactions, which ruling, judgment or order has not been stayed, reversed or vacated within twenty (20) business days after such issuance.

9.03.   Mutual Termination.  This Amended Agreement, and the obligations of all Parties hereunder, may be terminated by mutual agreement among the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties.

9.04.   Automatic Termination.  This Amended Agreement shall terminate automatically without any further required action or notice on the earlier of (i) the Effective Date, (ii) the

Outside Date (as such date may be extended subject to <u>Section 10(a)</u> of this Amended Agreement), and (iii) the termination of the Amended BCA with respect to all parties in accordance with its terms.

9.05.   <u>Effect of Termination</u>.

(a)   No Party may terminate this Amended Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Amended Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein.   The date on which termination of this Amended Agreement is effective shall be referred to as a "**<u>Termination Date</u>**."

(b)   Upon the occurrence of a Termination Date by either the Specified Consenting Second Lien Creditors or the Requisite Commitment Parties in accordance with <u>Section 9.01</u> above, (i) this Amended Agreement shall be of no further force and effect and each Party subject to such termination consistent with <u>Section 9.01</u> above shall be released from its commitments, undertakings and agreements under or related to this Amended Agreement and shall have the rights and remedies that it would have had, had it not entered into this Amended Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Amended Agreement, including with respect to any and all claims or causes of action, <u>provided</u>, <u>that</u> in no event shall any termination relieve any Party from liability for its material breach or material non-performance of its obligations hereunder prior to the date of such termination and (ii) any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Amended Agreement or otherwise.   Notwithstanding anything to the contrary in this Amended Agreement, any termination under <u>Section 9.01</u> that is based directly on the actions or inactions of the Debtor shall only, in and of itself, result in the termination of this Amended Agreement with respect to the Debtors only and no other Party shall be relieved from its obligations hereunder.

(c)   Upon the occurrence of a Termination Date by either the UCC or RBL Lenders in accordance with <u>Section 9.01</u> above, this Agreement shall be of no further force and effect with respect to the UCC and the RBL Lenders and the UCC and the RBL Lenders subject to such termination consistent with <u>Section 9.01</u> above shall be released from their commitments, undertakings and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all claims or causes of action, provided, that in no event shall any termination relieve the UCC and the RBL Lenders from liability for its material breach or material non-performance of its obligations hereunder prior to the date of such termination.

(d)   Upon the occurrence of a Termination Date in accordance with <u>Section 9.02</u> above, this Amended Agreement shall be of no further force and effect with respect to the Debtors and the Debtors subject to such termination consistent with <u>Section 9.02</u> above shall be

WEIL:\96309033\2\29979.0003

released from its commitments, undertakings and agreements under or related to this Amended Agreement and shall have the rights and remedies that it would have had, had it not entered into this Amended Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Amended Agreement, including with respect to any and all claims or causes of action, provided, that in no event shall any termination relieve the Debtors from liability for its material breach or material non-performance of its obligations hereunder prior to the date of such termination.  Upon the occurrence of a Termination Date in accordance with Section 9.02 above, any and all provisions of the Agreement referencing "Weil," the "Debtor," or "Debtors" shall continue to be in full force and effect with respect to the Consenting Creditors as if such provision were written without reference to "Weil," the "Debtor," or "Debtors."

(e)    Notwithstanding anything to the contrary in this Amended Agreement, this Section 9.05 shall not be construed to prohibit any of the Debtors or the Consenting Creditors from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Amended Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Amended Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict any right of any Debtor or Consenting Creditor, or the ability of any Debtor or Consenting Creditor, to protect and preserve its rights (including rights under this Amended Agreement), remedies and interests, including its claims against any Debtor or Consenting Creditor.

9.06.    Automatic Stay.    The Debtors acknowledge that the giving of notice of termination by any Party pursuant to this Amended Agreement nor compliance with any provision hereto shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code; provided, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of termination was not proper under the terms of this Amended Agreement.

**Section 10.    *Amendments*.**  This Amended Agreement, including the Term Sheet, may not be modified, amended, or supplemented in any manner except as consented to (in writing) signed by the Debtors, the Requisite Consenting Second Lien Creditors, and the Requisite Commitment Parties; provided, however, that if the proposed modification, amendment, or supplement has a material, disproportionate (as compared to other Consenting Creditors holding Second Lien Note Claims or Senior Unsecured Note Claims) and adverse effect on any of the Consenting Creditors or the Debtor Claims held by such Consenting Creditors, then the consent of each such affected Consenting Creditor shall also be required to effectuate such modification, amendment, or supplement; and provided, further, that any extension of the Outside Date beyond 180 days after the Amended Agreement Effective Date shall require the written consent of each of the Commitment Parties and the Consenting Second Lien Creditors.

**Section 11.    *Additional Agreements of the Consenting Second Lien Creditors*.**  For purposes of this Section 11, the terms "own" and "acquire" and any variation thereon shall as used herein mean as determined for U.S. federal income tax purposes, and the term "Existing BBEP Equity Interests" shall be limited to outstanding Series A Cumulative Redeemable Preferred Units, Series B Preferred Units, and common units of BBEP.

26

(a)     Each Consenting Second Lien Creditor represents and warrants that it (or in the event it is a disregarded entity for U.S. federal income tax purposes, its tax-regarded owner):

(i)   does not own any Existing BBEP Equity Interests, except as set forth on the signature page for such Consenting Second Lien Creditor;

(ii)  shall dispose of any Existing BBEP Equity Interests that it owns, or in lieu thereof, any Second Lien Note Claims that it owns, prior to the confirmation date of the Approved Plan (provided that, for the avoidance of doubt, any such disposition may be to a related or affiliated person that is not treated as the same person for tax purposes) or otherwise undertake transactions such that any Existing BBEP Equity Interests are not treated for tax purposes as owned by the same person that owns any Second Lien Note Claims; and

(iii)  shall be, as of the Distribution Record Date and as of Effective Date, or shall cause the second lien debt to be held as of the Distribution Record Date and as of Effective Date by, a "United States person" within the meaning of Section 7701(a)(30) of the Tax Code and the regulations promulgated thereunder.

(b)     Each Consenting Second Lien Creditor represents and warrants that the following persons do not own any Existing BBEP Equity Interests, except as set forth on the signature page[3] for such Consenting Second Lien Creditor:

(i)   any entity controlled by (through direct or indirect equity ownership) such Consenting Second Lien Creditor, and

(ii)  any person controlling (directly or indirectly through equity ownership) such Consenting Second Lien Creditor, including (A) such Consenting Second Lien Creditor's general partner (if such Consenting Second Lien Creditor is a limited partnership), such Consenting Second Lien Creditor's managing member (if such Consenting Second Lien Creditor is a limited liability company), any other equityholder in a similar managing capacity or owning controlling voting equity interests with respect to the Consenting Second Lien Creditor owns Existing BBEP Equity Interests, (B) any entity directly owning more than fifty percent (50%) of the equity interests in such Consenting Second Lien Creditor, and (C) in the case of a controlling entity, any person that controls such controlling entity.

(c)     Each Consenting Second Lien Creditor shall promptly notify the Debtors if such Consenting Second Lien Creditor (or in the event it is a disregarded entity for U.S. federal income tax purposes, its tax-regarded owner) or any entities controlled by or persons controlling (as described in Section 11(b)) such Consenting Second Lien Creditor acquire any Existing BBEP Equity Interests hereafter or dispose of any Existing BBEP Equity Interests to an

---

[3]     Each Consenting Second Lien Creditor shall set forth on its signature page to this Amended Agreement any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by any entity controlled by and any person controlling such Consenting Second Lien Creditor.

unrelated party.  Such notification shall include the amount and type of Existing BBEP Equity Interests that such person or entity owns.

(d)    Such Consenting Second Lien Creditor shall cooperate with the Debtors and with LegacyCo and make available such information, records or other documents as are within the possession or control of such Consenting Second Lien Creditor and are reasonably requested by the Debtors or LegacyCo in respect of the preparation of any tax filing, any audit or other proceeding, in each case, as relates to the income tax treatment of the Restructuring Transactions effectuated pursuant to the Approved Plan (including such information, records or other documents that support compliance with the provisions of this Section 11 by any entity controlled by and any person controlling such Consenting Second Lien Creditor); provided, however, for the avoidance of doubt, that such information, records or other documents shall not include any information that is confidential or proprietary in any respect (as determined in such Consenting Second Lien Creditor's reasonable discretion).

**Section 12.    *Agreements of the Consenting Senior Unsecured Creditors.*[4]**  For purposes of this Section 12, the terms "own" and "acquire" and any variation thereon shall as used herein mean as determined for U.S. federal income tax purposes, and the term "Existing BBEP Equity Interests" shall be limited to outstanding Series A Cumulative Redeemable Preferred Units, Series B Preferred Units and common units of BBEP.

(a)    Each Consenting Senior Unsecured Creditor represents and warrants, to its actual knowledge, that it (or in the event it is a disregarded entity for U.S. federal income tax purposes, its tax-regarded owner) does not own any Existing BBEP Equity Interests, except as set forth on the signature page for such Consenting Senior Unsecured Creditor.

(b)    Each Consenting Senior Unsecured Creditor shall promptly notify the Debtors if, as of the date hereof (or the date such Consenting Senior Unsecured Creditor becomes a party hereto) or anytime on or prior to the Effective Date, to its actual knowledge, any of the following persons or entities owns or becomes the owner of Existing BBEP Equity Interests:

(i)  any entity wholly owned (directly or indirectly) by such Consenting Senior Unsecured Creditor, and

(ii)  any person that wholly owns (directly or indirectly) such Consenting Senior Unsecured Creditor.

Such notification shall include the amount and type of Existing BBEP Equity Interests that such person or entity owns.  To its actual knowledge,[5] each Consenting Senior Unsecured Creditor shall set forth on its signature page to this Agreement any ownership of Existing BBEP Equity Interests as of the date of this Agreement by any entity wholly owned or wholly owning such Consenting Senior Unsecured Creditor.

---

[4]    The representations and warranties made in this Section 12 are only made as of the date of this Amended Agreement.

[5]    For the avoidance of doubt, where the phrase "to its actual knowledge" is used in this Section 12, such phrase means the actual knowledge of the individual signing this Agreement on behalf of a Consenting

WEIL:\96309033\2\29979.0003

(c)    Such Consenting Senior Unsecured Creditor shall cooperate with the Debtors and with LegacyCo and make available such information, records or other documents as are within the possession or control of such Consenting Senior Unsecured Creditor and are reasonably requested by the Debtors or LegacyCo in respect of the preparation of any tax filing, any audit or other proceeding, in each case as relates to the income tax treatment of the Restructuring Transactions effectuated pursuant to the Approved Plan; provided, however, for the avoidance of doubt, that such information, records or other documents shall not include any information that is confidential or proprietary in any respect (as determined in such Consenting Senior Unsecured Creditor's sole discretion).

**Section 13.    *Miscellaneous*.**

13.01.    Further Assurances.    Subject to the other terms of this Amended Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court in connection with the Approved Plan, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.02.    Entire Agreement.    This Amended Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral, or written, among the Parties with respect thereto.

13.03.    Headings.    The headings of all sections of this Amended Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

13.04.    GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM; WAIVER OF TRIAL BY JURY.    THIS AMENDED AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.    Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Amended Agreement in the Bankruptcy Court (or court of proper appellate jurisdiction) (the "**Chosen Court**"), and solely in connection with claims arising under this Amended Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (b) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (c) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto or constitutional authority to finally adjudicate the matter.

13.05.    Trial by Jury Waiver.    EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDED AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

---

Senior Unsecured Creditor.

WEIL:\96309033\2\29979.0003

13.06.  <u>Execution of Agreement</u>.   This Amended Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Amended Agreement, each individual executing this Amended Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Amended Agreement on behalf of said Party.

13.07.  <u>Rules of Construction</u>. Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Amended Agreement be interpreted to include votes or voting on a chapter 11 plan under the Bankruptcy Code. When a reference is made in this Amended Agreement to a section or exhibit, such reference shall be to a section or exhibit, respectively, of or attached to this Amended Agreement unless otherwise indicated. Unless the context of this Amended Agreement otherwise requires, (a) words using the singular or plural number also include the plural or singular number, respectively, (b) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement, (c) the words "include," "includes" and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (d) the word "or" shall not be exclusive and shall be read to mean "and/or." "Writing," "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form, and any requirement that any notice, consent or other information shall be provided "in writing" shall include email. Any reference to "business day" means any day, other than a Saturday, a Sunday or any other day on which banks located in New York, New York are closed for business as a result of federal, state or local holiday and any other reference to day means a calendar day.

13.08.  <u>Interpretation; Representation by Counsel</u>. This Amended Agreement is the product of negotiations among the Consenting Second Lien Creditors and the Consenting Senior Unsecured Creditors and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Amended Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Consenting Second Lien Creditors and the Consenting Senior Unsecured Creditors were each represented by counsel during the negotiations and drafting of this Amended Agreement and continue to be represented by counsel and, therefore, waive the application of any law, regulation, holding or rule of construction (i) providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document or (ii) any Party with a defense to the enforcement of the terms of this Amended Agreement against such Party based upon lack of legal counsel.

13.09.  <u>Successors and Assigns; No Third Party Beneficiaries</u>.  This Amended Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Amended Agreement, and the rights or obligations of any Party under this Amended Agreement may not be assigned, delegated, or transferred to any other person or entity.

WEIL:\96309033\2\29979.0003

13.10.  Notices.  All notices hereunder shall be deemed given if in writing and delivered by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to the Debtors, to the electronic mail addresses set forth below such Party's signature, as the case may be, with copies to:

> Breitburn Energy Partners LP
> 707 Wilshire Boulevard, Suite 4600
> Los Angeles, CA 90017
> Fax:  (213) 225-5917
> Attention:  Gregory Brown, General Counsel
> Email: gbrown@breitburn.com
>
> With a copy (which shall not constitute notice) to:
>
> Weil, Gotshal & Manges LLP (as counsel to the Debtors)
> 767 Fifth Avenue
> New York, NY 10153
> Facsimile: (212) 310-8007
> Attention: Ray C. Schrock, P.C. and Stephen Karotkin, Esq.
> Email: ray.schrock@weil.com and stephen.karotkin@weil.com

(b)    if to a Consenting Second Lien Creditor, to the electronic mail addresses set forth below such Party's signature (or as directed by any Permitted Transferee thereof), as the case may be, with copies to:

> Kirkland & Ellis LLP
> 601 Lexington Avenue
> New York, NY 10022
> Attention: Christopher Marcus
> Email address: christopher.marcus@kirkland.com
>
> -and-
>
> Kirkland & Ellis LLP
> 300 North LaSalle
> Chicago, IL 60654
> Attention:  Steven N. Serajeddini
> E-mail address: steven.serajeddini@kirkland.com

(c)    if to a Consenting Senior Unsecured Creditor, to the electronic mail addresses set forth below such Party's signature (or as directed by any Permitted Transferee thereof), as the case may be, with copies to:

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, NY 10036

31

Attention: Ira Dizengoff
Email address: idizengoff@akingump.com

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Attention: Scott Alberino; Daniel Fisher
Email address: salberino@akingump.com; dfisher@akingump.com

and

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attention: Harrison Denman
Email address: hdenman@whitecase.com

(d)    if to the UCC, to:

Milbank, Tweed, Hadley & McCloy LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Attention: Gregory Bray
Email address: gbray@mailbank.com

(e)    if to the RBL Lenders, to:

Winston & Strawn LLP
333 S. Grand Avenue, 38th Floor
Los Angeles, CA 90071
Attn: Eric E. Sagerman, Justin E. Rawlins,
Telephone: (213) 615-1700
Telecopier: (213) 615-1750
Email: esagerman@winston.com, jrawlins@winston.com

or such other address as may have been furnished by a Party to each of the other Parties by notice given in accordance with the requirements set forth above.  Any notice given by delivery, mail (electronic or otherwise), or courier shall be effective when received.

13.11.  Survival.  Notwithstanding the termination of this Amended Agreement pursuant to Section 9, the agreements and obligations of the Parties in this Section 13.11 and Sections 9.05, 10, 13.02, 13.04, 13.05, 13.06, 13.07, 13.08, 13.09, 13.10, 13.12, 13.13, 13.14, 13.15, 13.16, 13.17 and 13.18.

13.12.  Independent Analysis.  Each Party hereby confirms that its decision to execute this Amended Agreement has been based upon its independent assessment of documents and information available to it, as it has deemed appropriate.

WEIL:\96309033\2\29979.0003

13.13.  Waiver.  If the Restructuring Transactions are not consummated, or if this Amended Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Amended Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms, pursue the consummation of the Restructuring Transactions or the payment of damages to which a Party may be entitled under this Amended Agreement.

13.14.  Relationship Among Parties.

(a)  Notwithstanding anything herein to the contrary, (i) the duties and obligations of the Parties under this Amended Agreement shall be several, not joint, (ii) no Party shall have any responsibility by virtue of this Amended Agreement for any trading by any other entity; (iii) no prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Amended Agreement; (iv) the Parties hereto acknowledge that this Amended Agreement does not constitute an agreement, arrangement or understanding with respect to acting together for the purpose of acquiring, holding, voting or disposing of any equity securities of the Debtors and the Parties do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"); (v) none of the Parties shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities in any kind or form to each other, including as a result of this Amended Agreement or the transactions contemplated herein or in the Approved Plan; and (vi) no action taken by any Party pursuant to this Amended Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Parties are in any way acting in concert or as such a "group."

(b)  Notwithstanding anything to the contrary herein, this Amended Agreement (including the Approved Plan) and the transactions contemplated hereby shall not create any fiduciary duties between and among the Consenting Senior Unsecured Creditors (in their capacity as holders of Senior Unsecured Notes Claims) or the Consenting Second Lien Creditors, or other duties or responsibilities to each other, the Debtors, or any Debtor's creditors or other stakeholders.

13.15.  Specific Performance.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Amended Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of a court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  All rights, powers, and remedies provided under this Amended Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

13.16.  Several, Not Joint and Several, Obligations.  Except as otherwise expressly set forth herein, the agreements, representations, warranties, liabilities and obligations of the Parties under this Amended Agreement are, in all respects, several and not joint and several.

WEIL:\96309033\2\29979.0003

13.17.  <u>Severability and Construction</u>.  If any provision of this Amended Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Amended Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

13.18.  <u>Reporting of Debtor Claims</u>.  The Parties agree and acknowledge that the reported amount of the Debtor Claims reflected in each Consenting Creditor signature block does not necessarily reflect the full amount of such Consenting Creditor Debtor Claims (including, without limitation, principal, accrued and unpaid interest, makewhole, fees and expenses) and any disclosure made on any Consenting Creditor signature block shall be without prejudice to any subsequent assertion by or on behalf of such Consenting Creditor of the full amount of its Debtor Claims.

13.19.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Amended Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.20.  <u>Claim Resolution Matters</u>. Prior to the Effective Date, the Debtors shall not enter into any agreements with holders of claims (as defined in the Bankruptcy Code) other than as contemplated in this Amended Agreement, relating to the allowance, estimation, validity, extent, or priority of such claims, or the treatment and classification of such claims under the Approved Plan without the prior written consent of the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, except with respect to (a) claims which the Debtors are authorized to resolve or pay pursuant to any applicable first day orders or (b) claims as otherwise contemplated herein.

13.21.  <u>Settlement Discussions</u>.  This Amended Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Amended Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

13.22.  <u>FIRPTA Certification</u>.  On or before the Effective Date, each of BBEP and LegacyCo shall have received a certification from each Consenting Second Lien Creditor or any related or affiliated transferee thereof (or, in the event such creditor is a disregarded entity for U.S. federal income tax purposes, its tax-regarded owner) and New Permian Corp. satisfying the requirements of U.S. Treasury Regulations Section 1.1445-2(b)(2) stating that such creditor is not a foreign person for purposes of Section 1445 of the Code and the regulations promulgated thereunder.

*[Remainder of page intentionally left blank.]*

34

**IN WITNESS WHEREOF**, the Parties have executed this Amended Agreement on the day and year first above written.

<u>**DEBTORS:**</u>

**BREITBURN ENERGY PARTNERS LP**

By: Breitburn GP LLC,
   its general partner

By: _____
   Name: Halbert S. Washburn
   Title: Chief Executive Officer

**BREITBURN OPERATING LP**

By: Breitburn Operating GP LLC,
   its general partner

By: _____
   Name: Halbert S. Washburn
   Title: Chief Executive Officer

**BREITBURN FINANCE CORPORATION**

By: _____
   Name: Halbert S. Washburn
   Title: Chief Executive Officer

[Signature Page to Amended and Restated Restructuring Support Agreement]

**ALAMITOS COMPANY**
**BEAVER CREEK PIPELINE, L.L.C.**
**GTG PIPELINE LLC**
**MERCURY MICHIGAN COMPANY, LLC**
**PHOENIX PRODUCTION COMPANY**
**QRE GP, LLC**
**TERRA ENERGY COMPANY LLC**
**TERRA PIPELINE COMPANY LLC**


By: _____
    Name: James G. Jackson
    Title: Chief Financial Officer


**BREITBURN OPERATING GP LLC**
**BREITBURN GP LLC**
**BREITBURN MANAGEMENT COMPANY LLC**


By: _____
    Name: James G. Jackson
    Title: Chief Financial Officer


[Signature Page to Amended and Restated Restructuring Support Agreement]

**BREITBURN FLORIDA LLC**
**BREITBURN OKLAHOMA LLC**
**BREITBURN SAWTELLE**
**BREITBURN TRANSPETCO GP LLC**
**BREITBURN TRANSPETCO LP LLC**

By:     Breitburn Operating LP,
        its sole member

By:     Breitburn Operating GP LLC,
        its general partner

By: _____
        Name:  Halbert S. Washburn
        Title:   Chief Executive Officer

**QR ENERGY, LP**

By:     QRE GP, LLC,
        its general partner

By: _____
        Name:  Halbert S. Washburn
        Title:   Chief Executive Officer

**QRE OPERATING, LLC**

By:     QR Energy, LP,
        its sole member

By:     QRE GP, LLC,
        its general partner

By: _____
        Name:  Halbert S. Washburn
        Title:   Chief Executive Officer

[Signature Page to Amended and Restated Restructuring Support Agreement]

**TRANSPETCO PIPELINE COMPANY, L.P.**

By:    Breitburn Operating LP,
       on behalf of itself and as the sole member of
       Breitburn Transpetco GP LLC, a
       general partner

By:    Breitburn Operating GP LLC,
       its general partner

By: _____
       Name: Halbert S. Washburn
       Title:  Chief Executive Officer

[Signature Page to Amended and Restated Restructuring Support Agreement]

**MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED ("MLPFS"), solely in respect of its Global Credit and Special Situations Group and not any other group, unit, division or affiliate of MLPFS**

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: 

Name: Vincenzo Ruocco
Title: Vice President, US Corporate Actions

Aggregate Principal Amount of 2020 Notes:



Aggregate Principal Amount of 2022 Notes:

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):



Notice Address:

222 Broadway, 11th Floor

New York, NY 10038

Attention: Corporate Actions/Vincenzo Ruocco
Email: BASCorporateActions@bofasecurities.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BEACH POINT SELECT FUND LP**
By: Beach Point Capital Management LP
Its Investment Manager

By: 
    Name: Carl Goldsmith
    Title: Co-Chief Investment Officer

Aggregate Principal Amount of 2020 Notes:

█

Aggregate Principal Amount of 2022 Notes:

███████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

███████████ _

Type:

██████████ __

Notice Address:

c/o Beach Point Capital Management LP
1620 26th Street, Suite 6000N
Santa Monica, CA 90404
Attention: Joseph Fabiani
Email: jfabiani@beachpointcapital.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BEACH POINT TOTAL RETURN MASTER FUND, L.P.**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
    Name: Carl Goldsmith
    Title: Co-Chief Investment Officer


Aggregate Principal Amount of 2020 Notes:

$

Aggregate Principal Amount of 2022 Notes:

██████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the
RBL Facility or DIP credit facility):

Type:

████████████ _

Type:

████████████ ___

Notice Address:

c/o Beach Point Capital Management LP

1620 26th Street, Suite 6000N

Santa Monica, CA 90404

Attention: Joseph Fabiani

Email: jfabiani@beachpointcapital.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BPC UKI, L.P.**
By: BPC AS LLC
Its General Partner
By: Beach Point Capital Management LP
Its Managing Member

By: _____
        Name: Carl Goldsmith
        Title: Co-Chief Investment Officer

Aggregate Principal Amount of 2020 Notes:

█████████

Aggregate Principal Amount of 2022 Notes:

█████████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the
RBL Facility or DIP credit facility):

Type:

██████████ _____

Type:

██████████ _____

Notice Address:

c/o Beach Point Capital Management LP_____
1620 26th Street, Suite 6000N_____
Santa Monica, CA 90404_____
Attention: Joseph Fabiani_____
Email: jfabiani@beachpointcapital.com_____

*Signature Page to Amended and Restated Restructuring Support Agreement*

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**LUMX BEACH POINT TOTAL RETURN FUND LIMITED**
By: Beach Point Capital Management LP
Its Trading Adviser

By: _____
        Name: Carl Goldsmith
        Title: Co-Chief Investment Officer

Aggregate Principal Amount of 2020 Notes:

$

Aggregate Principal Amount of 2022 Notes:

███████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

██████████ _____

Type:

████████ _____

Notice Address:

c/o Beach Point Capital Management LP_____
1620 26th Street, Suite 6000N_____
Santa Monica, CA 90404_____
Attention: Joseph Fabiani_____
Email: jfabiani@beachpointcapital.com_____

*Signature Page to Amended and Restated Restructuring Support Agreement*

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __ / __ / __ ) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BEACH POINT MULTI-ASSET CREDIT FUND LTD.**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
        Name: Carl Goldsmith
        Title: Co-Chief Investment Officer

Aggregate Principal Amount of 2020 Notes:

███████

Aggregate Principal Amount of 2022 Notes:

███████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

████████ _____

Type:

██████ _____

Notice Address:

c/o Beach Point Capital Management LP_____

1620 26th Street, Suite 6000N_____

Santa Monica, CA 90404_____

Attention: Joseph Fabiani_____

Email: jfabiani@beachpointcapital.com_____

*Signature Page to Amended and Restated Restructuring Support Agreement*

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**BEACH POINT MULTI-STRATEGY CREDIT MASTER FUND, L.P.**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
        Name: Carl Goldsmith
        Title: Co-Chief Investment Officer

Aggregate Principal Amount of 2020 Notes:

$

Aggregate Principal Amount of 2022 Notes:

███████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

████████ _____

Type:

███████ _____

Notice Address:

c/o Beach Point Capital Management LP_____
1620 26th Street, Suite 6000N_____
Santa Monica, CA 90404_____
Attention: Joseph Fabiani_____
Email: jfabiani@beachpointcapital.com_____

*Signature Page to Amended and Restated Restructuring Support Agreement*

**ELLIOTT ASSOCIATES, L.P.**
By: Elliott Capital Advisors, L.P., as general partner
By: Braxton Associates, Inc., as general Partner

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of 6/16/17) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| Elliott Associates, L.P. | | ██████████ | ██████████ |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Elliot Greenberg
Title: Vice President

Aggregate Principal Amount of 2020 Notes:

███████████████████

Aggregate Principal Amount of 2022 Notes:

███████████████████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:



Type:

Notice Address:

c/o Elliott Management Corporation
40 West 57th Street
New York, N.Y. 10019
Attention: Michael Stephan
Email: mstephan@elliottmgmt.com

**ELLIOTT INTERNATIONAL, L.P.**
By: Elliott International Capital Advisors Inc., as
attorney-in-fact

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of _10/16/17_) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| Elliott International, L.P. | | ████████ | ████████ |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Elliot Greenberg
Title: Vice President

Aggregate Principal Amount of 2020 Notes:

████████████████

Aggregate Principal Amount of 2022 Notes:

████████████████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the
RBL Facility or DIP credit facility):

Type:

███████████████

Type:

███████████████

Notice Address:

c/o Elliott Management Corporation
40 West 57th Street
New York, N.Y. 10019
Attention: Michael Stephan
Email: mstephan@elliottmgmt.com

**BLACKROCK MULTI-MANAGER
ALTERNATIVE STRATEGIES FUND**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Vijay Srinivasan
Title: Head of Research

Aggregate Principal Amount of 2020 Notes:

█████████████████████████

Aggregate Principal Amount of 2022 Notes:

█████████████████████████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

███████████████

Type:

███████████████

Notice Address:

c/o Marathon Asset Management L.P.
One Bryant Park, 38th Floor
New York, N.Y. 10036
Attention: Michael Alexander
Email: malexander@marathonfund.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

**BSF MULTI-MANAGER ALTERNATIVE STRATEGIES FUND**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of   /   /   ) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Vijay Srinivasan
Title: Head of Research

Aggregate Principal Amount of 2020 Notes:

██████████████████

Aggregate Principal Amount of 2022 Notes:

██████████████████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

███████████ ___

Type:

███████████ ___

Notice Address:

c/o Marathon Asset Management L.P.
One Bryant Park, 38th Floor
New York, N.Y. 10036
Attention: Michael Alexander
Email: malexander@marathonfund.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

**KTRS CREDIT FUND**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of _/_/_) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Vijay Srinivasan
Title: Head of Research

Aggregate Principal Amount of 2020 Notes:

█████████████████████████

Aggregate Principal Amount of 2022 Notes:

█████████████████████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

████████████ ___

Type:

████████████ ___

Notice Address:

c/o Marathon Asset Management L.P.
One Bryant Park, 38th Floor
New York, N.Y. 10036
Attention: Michael Alexander
Email: malexander@marathonfund.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

**MARATHON BLUE GRASS CREDIT FUND, L.P.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of ___/___/___) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Vijay Srinivasan
Title: Head of Research

Aggregate Principal Amount of 2020 Notes:

$ ████████████████████

Aggregate Principal Amount of 2022 Notes:

$ ████████████████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the
RBL Facility or DIP credit facility):

Type:

███████████ ____

Type:

$███████████ ____

Notice Address:

c/o Marathon Asset Management L.P.
One Bryant Park, 38th Floor
New York, N.Y. 10036
Attention: Michael Alexander
Email: malexander@marathonfund.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

**MARATHON CENTRE STREET
PARTNERSHIP, L.P.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of ___/___/___) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By:_____
Name: Vijay Srinivasan
Title: Head of Research

Aggregate Principal Amount of 2020 Notes:

████████████████████

Aggregate Principal Amount of 2022 Notes:

████████████████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

████████████

Type:

$████████████ __

Notice Address:

c/o Marathon Asset Management L.P.
One Bryant Park, 38th Floor
New York, N.Y. 10036
Attention: Michael Alexander
Email: malexander@marathonfund.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

**MARATHON CREDIT DISLOCATION FUND, L.P.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Vijay Srinivasan
Title: Head of Research

Aggregate Principal Amount of 2020 Notes:

███████████████

Aggregate Principal Amount of 2022 Notes:

███████████████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

$██████████ ____

Type:

██████████ ____

Notice Address:

c/o Marathon Asset Management L.P.
One Bryant Park, 38th Floor
New York, N.Y. 10036
Attention: Michael Alexander
Email: malexander@marathonfund.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

**MARATHON SPECIAL OPPORTUNITY
MASTER FUND, LTD.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity
Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor
and any entity wholly owned by and any person wholly owning such Consenting Senior
Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Vijay Srinivasan
Title: Head of Research

Aggregate Principal Amount of 2020 Notes:

███████████████████

Aggregate Principal Amount of 2022 Notes:

███████████████████

*Signature Page to Amended and Restated Restructuring Support Agreement*

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

████████████ ___

Type:

$████████████ ___

Notice Address:

c/o Marathon Asset Management L.P.
One Bryant Park, 38th Floor
New York, N.Y. 10036
Attention: Michael Alexander
Email: malexander@marathonfund.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

**MASTER SIF SICAV-SIF**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of  /  /  ) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Vijay Srinivasan
Title: Head of Research

Aggregate Principal Amount of 2020 Notes:
■■■■■■■■■■■■■■■■■■■■■■■■

Aggregate Principal Amount of 2022 Notes:
■■■■■■■■■■■■■■■■■■■■■■■■

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

$██████████ __

Type:

$██████████ ___

Notice Address:

c/o Marathon Asset Management L.P.
One Bryant Park, 38th Floor
New York, N.Y. 10036
Attention: Michael Alexander
Email: malexander@marathonfund.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

**ASCENSION ALPHA FUND LLC, by WL Ross & Co. LLC**

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By:_____
   Name: Benjamin Gruder
   Title: Managing Director

Aggregate Principal Amount of 2020 Notes:

█████████████

Aggregate Principal Amount of 2022 Notes:

█████████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

███████████

Type:

███████████

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036
Attention:_____
Email:

**ASCENSION HEALTH MASTER PENSION
TRUST, by WL Ross & Co. LLC**

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity
Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor
and any entity wholly owned by and any person wholly owning such Consenting Senior
Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of   /   /   ) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
  Name: Benjamin Gruder
  Title: Managing Director

Aggregate Principal Amount of 2020 Notes:

███████████

Aggregate Principal Amount of 2022 Notes:

███████████

Any other Debtor Claims (e.g., claims under the
RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

███████████

Type:

███████████

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036
Attention:
Email:

**CARILION CLINIC, by WL Ross & Co. LLC**

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Benjamin Gruder
Title: Managing Director

Aggregate Principal Amount of 2020 Notes:



Aggregate Principal Amount of 2022 Notes:



Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

*Signature Page to Amended and Restated Restructuring Support Agreement*

$ █████████

Type:

$ ██████

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036
Attention:_____
Email:

**CATALINA HOLDINGS (BERMUDA) LTD., by
WL Ross & Co. LLC**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of  /  / ) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |



By: _____
    Name: Benjamin Gruder
    Title: Managing Director

Aggregate Principal Amount of 2020 Notes:

$ ███████████

Aggregate Principal Amount of 2022 Notes:

███████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

███████████████ —

Type:

$ ██████████ —

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036_____
Attention:_____
Email:

**MARQUETTE COMPANIES, LLC, by WL Ross & Co. LLC**

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
    Name: Benjamin Gruder
    Title: Managing Director

Aggregate Principal Amount of 2020 Notes:



Aggregate Principal Amount of 2022 Notes:

$ 

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

$ ████████████

Type:

$ ████████████

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036
Attention:_____
Email:

**PEPPERDINE UNIVERSITY, by WL Ross & Co. LLC**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of _/ /_ ) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____

Name: Benjamin Gruder
Title: Managing Director

Aggregate Principal Amount of 2020 Notes:

$ ███████

Aggregate Principal Amount of 2022 Notes:

$ ███████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

$ ███████████ —

Type:

$ ███████████ —

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036
Attention:_____
Email:

**RETIREMENT PLAN OF CARILION CLINIC,**
**by WL Ross & Co. LLC**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of  /  /  ) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____

Name: Benjamin Gruder
Title: Managing Director

Aggregate Principal Amount of 2020 Notes:

$ ████████

Aggregate Principal Amount of 2022 Notes:

$ ████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

$ ███████████ —

Type:

$ ███████████ —

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036 _____
Attention:_____
Email:

**UNIVERSITY OF MINNESOTA FOUNDATION,**
**by WL Ross & Co. LLC**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __ / __ / __) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
    Name: Benjamin Gruder
    Title: Managing Director

Aggregate Principal Amount of 2020 Notes:

$ ████████████

Aggregate Principal Amount of 2022 Notes:

$ ████████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

$ ██████████████

Type:

$ ██████████████

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036
Attention:
Email:

**WLR RECOVERY FUND V, L.P., by WL Ross & Co. LLC**

In accordance with <u>Section 12</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

Aggregate Principal Amount of 2020 Notes:

$██████████

Aggregate Principal Amount of 2022 Notes:

$██████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

$ ██████████ —

Type:

$ ██████████ —

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036
Attention:_____
Email:

*Signature Page to Amended and Restated Restructuring Support Agreement*

**WLR V PARALLEL ESC, L.P., by WL Ross & Co. LLC**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __ / __ / __ ) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Benjamin Gruder
Title: Managing Director

Aggregate Principal Amount of 2020 Notes:

$ ▮▮▮▮▮▮

Aggregate Principal Amount of 2022 Notes:

$ ▮▮▮▮▮▮

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

$ ███████████

Type:

$ ██████████

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036
Attention:_____
Email:

**WLR-SC FINANCING CONDUIT LLC, by WL Ross & Co. LLC**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __ / __ / __ ) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
    Name: Benjamin Gruder
    Title: Managing Director

Aggregate Principal Amount of 2020 Notes:

$ ███████████

Aggregate Principal Amount of 2022 Notes:

$ ███████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

$ ███████████ —

Type:

$ ███████████ —

Notice Address:

c/o WL Ross & Co. LLC
1166 Avenue of the Americas, 25th Floor
New York, NY 10036
Attention:
Email:

**EIG Redwood Debt Aggregator, LP**

In accordance with <u>Section 11</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Second Lien Creditor and any entity controlled by and any person controlling such Consenting Second Lien Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Second Lien Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of ███████) | |
| --- | --- | --- | --- |
| | | **Amount** | **Type** |
| ██████████ ████████ | ██████ | ████████ | ██████████ ████ |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**EIG Redwood Debt Aggregator, LP**

By: **EIG Redwood Aggregator GP, LLC**, its
    general partner and Attorney-in-Fact

By: **EIG Asset Management, LLC**, its sole
    member

By: _____
    Name:  Clayton R. Taylor
    Title:  Managing Director

By: _____
    Name: Richard K. Punches, II
    Title: Managing Director

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Aggregate Principal Amount of Second Lien Notes:

██████████████

Any other Debtor Claims:

Type:

$_____

Type:

$_____

Notice Address:

c/o EIG Management Company, LLC
333 Clay Street, Suite 3500
Houston, TX 77002
Attention: Amy Springs; Clayton Taylor
Email: amy.springs@eigpartners.com;
clay.taylor@eigpartners.com

Anchorage Capital Partners, L.P.

In accordance with <u>Section 11</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Second Lien Creditor and any entity controlled by and any person controlling such Consenting Second Lien Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Second Lien Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of ████) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| ████████████████████████████████████████████ | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Anchorage Capital Partners, L.P.

By:  Anchorage Capital Group, L.L.C., its
     investment manager

By: _____
     Name:
     Title:    Sean Gallahue
               Authorized Signatory

Aggregate Principal Amount of Second Lien Notes:
████████████████

Any other Debtor Claims:
Type:

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

$_____


Type:

$_____


Notice Address:

c/o Anchorage Capital Group, L.L.C
610 Broadway, 6th Floor
New York, New York, 10012
Attention:  Legal
Email: legal@anchoragecap.com

[*Signature Page to Amended and Restated Restructuring Support Agreement*]

**ACMO BBEP, L.P.**

In accordance with Section 11, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Second Lien Creditor and any entity controlled by and any person controlling such Consenting Second Lien Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Second Lien Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of ███) | |
|---|---|---|---|
| | | Amount | Type |
| ███████████████████████████████ | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**ACMO BBEP, L.P.**

By: Anchorage Capital Group, L.L.C., its
    investment manager

By: _____

    Name:
    Title:   Sean Gallahue
               Authorized Signatory

Aggregate Principal Amount of Second Lien Notes:

███████████████

Any other Debtor Claims:
Type:

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

$_____

Type:

$_____

Notice Address:

c/o Anchorage Capital Group, L.L.C
610 Broadway, 6th Floor
New York, New York, 10012
Attention:  Legal
Email: legal@anchoragecap.com

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

**Guggenheim Funds Trust -
Guggenheim Macro Opportunities Fund**

In accordance with <u>Section 11</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Second Lien Creditor and any entity controlled by and any person controlling such Consenting Second Lien Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Second Lien Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of █████) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| ████████████████████████████████████████████████████ | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Guggenheim Funds Trust - Guggenheim Macro Opportunities Fund**

By: **Guggenheim Partners Investment Management, LLC**, as Investment Adviser

By: _____

Name: Kevin M. Robinson

Title: Attorney-in-Fact

Aggregate Principal Amount of Second Lien Notes:

$ _████████_

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Any other Debtor Claims:

Type:


$_____


Type:


$_____


Notice Address:

c/o Guggenheim Partners Investment Management,
LLC
330 Madison Avenue, 10th Floor
New York, New York 10017
<u>Attention</u>: GI Legal
<u>Email</u>: Justin.carroll@guggenheimpartners.com

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

**Hamilton Finance LLC**

In accordance with <u>Section 11</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Second Lien Creditor and any entity controlled by and any person controlling such Consenting Second Lien Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Second Lien Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of ███) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| ███████████████████████████████████████ | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Hamilton Finance LLC**

By: **Guggenheim Partners Investment Management, LLC,** as Sub-Advisor

By: _____
   Name: Kevin M. Robinson
   Title: Attorney-in-Fact

Aggregate Principal Amount of Second Lien Notes:
$___███████████

Any other Debtor Claims:
Type:

$_____

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Type:

$_____

Notice Address:

c/o Guggenheim Partners Investment Management,
LLC
330 Madison Avenue, 10th Floor
New York, New York 10017
<u>Attention</u>: GI Legal
<u>Email</u>: Justin.carroll@guggenheimpartners.com

**Maverick Enterprises, Inc.**

In accordance with <u>Section 11</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Second Lien Creditor and any entity controlled by and any person controlling such Consenting Second Lien Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Second Lien Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of ███) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| ████████████████████████████████████████████ | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Maverick Enterprises, Inc.**

By:  **Guggenheim Partners Investment Management, LLC,** as Investment Manager

By:_____

Name: Kevin M. Robinson

Title: Attorney-in-Fact

Aggregate Principal Amount of Second Lien Notes:

$___████████____

Any other Debtor Claims:

Type:

$_____

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Type:

$_____

Notice Address:

c/o Guggenheim Partners Investment Management,
LLC
330 Madison Avenue, 10th Floor
New York, New York 10017
Attention: GI Legal
Email: Justin.carroll@guggenheimpartners.com

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

**NZC Guggenheim Master Fund Limited**

In accordance with <u>Section 11</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Second Lien Creditor and any entity controlled by and any person controlling such Consenting Second Lien Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Second Lien Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of   /   / ) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**NZC Guggenheim Master Fund Limited**

By: **Guggenheim Partners Investment Management, LLC,** as Manager

By: _____
Name: Kevin M. Robinson
Title: Attorney-in-Fact


Aggregate Principal Amount of Second Lien Notes:
$_____████████_____

Any other Debtor Claims:
Type:

$_____

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Type:

$_____


Notice Address:

c/o Guggenheim Partners Investment Management, LLC
330 Madison Avenue, 10th Floor
New York, New York 10017
<u>Attention</u>: GI Legal
<u>Email</u>: Justin.carroll@guggenheimpartners.com

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

**NZC Guggenheim Fund LLC**

In accordance with <u>Section 11</u>, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Second Lien Creditor and any entity controlled by and any person controlling such Consenting Second Lien Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Second Lien Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of ███) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| ████████████████████████████ | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**NZC Guggenheim Fund LLC**

By:  **Guggenheim Partners Investment Management, LLC,** as Manager

By: _____
    Name: Kevin M. Robinson
    Title: Attorney-in-Fact

Aggregate Principal Amount of Second Lien Notes:
$ ████████████

Any other Debtor Claims:
Type:

$ _____

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Type:

$_____


Notice Address:

c/o Guggenheim Partners Investment Management,
LLC
330 Madison Avenue, 10th Floor
New York, New York 10017
<u>Attention</u>: GI Legal
<u>Email</u>: Justin.carroll@guggenheimpartners.com

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

**SEI Institutional Managed Trust -**
**Multi Asset Income Fund**

In accordance with <u>Section 11</u>, set forth below is any ownership of Existing BBEP Equity Interests
as of the date of this Amended Agreement by the Consenting Second Lien Creditor and any entity
controlled by and any person controlling such Consenting Second Lien Creditor. If none is shown,
none is owned.

| Name of Owner | Relationship to Consenting Second Lien Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of ████) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| ████████████████████████████████ | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**SEI Institutional Managed Trust - Multi Asset**
**Income Fund**

By: **Guggenheim Partners Investment**
**Management, LLC,** as Sub-Adviser

By: _____
Name: Kevin M. Robinson
Title: Attorney-in-Fact


Aggregate Principal Amount of Second Lien Notes:
$ ___████████____

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Any other Debtor Claims:

Type:

$_____

Type:

$_____

Notice Address:

c/o Guggenheim Partners Investment Management, LLC
330 Madison Avenue, 10th Floor
New York, New York 10017
<u>Attention</u>: GI Legal
<u>Email</u>: Justin.carroll@guggenheimpartners.com

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

### AKANTHOS CAPITAL MANAGEMENT, LLC

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor.  If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of  /  /  ) | |
|---|---|---|---|
| | | Amount | Type |
| ███████ | ███████ | ███████ | ███████ |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
    Name: *Michael Kao*
    Title: *CEO*

Aggregate Principal Amount of 2020 Notes:

███████

Aggregate Principal Amount of 2022 Notes:

███████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Type:

█████████████████████

Type:

████████████████

Notice Address:

21700 Oxnard Street, Suite 1730
Woodland Hills, CA 91367

Attention: Akanthos Capital Management, LLC
Email:mkao@akanthoscapital.com; Akanthos
Trading@akanthoscapital.com

**FRANKLIN ADVISERS, INC., as investment
manager on behalf of certain funds and accounts**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of 10/10/2017) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _Se Vn/l_

Name: Glenn Voyles
Title: SVP

Aggregate Principal Amount of 2020 Notes:

██████████

Aggregate Principal Amount of 2022 Notes:

██████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

████████████████

Type:

████████████████

Notice Address:

Franklin Templeton Investments
1 Franklin Pkwy
San Mateo, CA 94403
Attention: Bryant Dieffenbacher, Chris Chen
Email:
bryant.dieffenbacher@franklintempleton.com,
chris.chen@franklintempleton.com

**1992 MSF INTERNATIONAL LTD., Highbridge Capital Management, LLC, as Trading Manager**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____

    Name: Jonathan Segal
    Title: Managing Director

Aggregate Principal Amount of 2020 Notes:

▮▮▮▮▮

Aggregate Principal Amount of 2022 Notes:

▮▮▮▮▮

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Type:

████████████████████

Type:

██████████████████

Notice Address:

40 West 57th Street, 32nd Floor

New York, NY 10019

Attention: Damon Meyer
Email: damon.meyer@highbridge.com

**1992 TACTICAL CREDIT MASTER FUND.,**
**Highbridge Capital Management, LLC, as Trading**
**Manager**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of   /   /   ) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
    Name: Jonathan Segal
    Title: Managing Director


Aggregate Principal Amount of 2020 Notes:

█████████

Aggregate Principal Amount of 2022 Notes:

█████████


Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Type:

███████████████████

Type:

███████████████████

Notice Address:

40 West 57th Street, 32nd Floor

New York, NY 10019

Attention: Damon Meyer

Email: damon.meyer@highbridge.com

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

**PACIFIC CAPITAL MANAGEMENT LLC**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of  /  / ) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Jonathan Glaser
Title: Managing Member

Aggregate Principal Amount of 2020 Notes:

███████████████████████

Aggregate Principal Amount of 2022 Notes:

████████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Type:

███████████████

Type:

███████████████

Notice Address:

11601 Wilshire Blvd, Ste. 1925
Los Angeles, CA 90025

Attention:_____

Email: jmg@jmgcapital.com

## NEWBERG FAMILY TRUST UTD 12/18/90

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of  /  / ) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____
Name: Bruce Newberg
Title: Trustee

Aggregate Principal Amount of 2020 Notes:

████████████████████

Aggregate Principal Amount of 2022 Notes:

██████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

Type:

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

███████████████

Type:

███████████████

Notice Address:

Bruce Newberg
11601 Wilshire Blvd, Suite 1925
Los Angeles, CA 90025
Attention:_____
Email: bruce@newbergfamily.net

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

**BARCLAYS BANK PLC ("Barclays"), solely in respect of its Distressed Trading Desk (the "Distressed Desk") and not any other unit, group, division, or affiliate of Barclays and solely in respect of the Distressed Desk's Senior Unsecured Note Claims**

For the avoidance of doubt, and notwithstanding anything to the contrary contained in this Agreement, the last sentence of Section 1 and Section 6(d) shall not apply to Barclays and nothing in this Agreement shall bind Barclays, to take or not take any action (including any action contemplated by the provisions of the Agreement referenced above), or otherwise in any respect, with respect to Barclays' first lien RBL holdings.

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of 10/11/2017) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____

Name: Adam Yarnold
Title: Managing Director

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

Aggregate Principal Amount of 2020 Notes:

███████████████████

Aggregate Principal Amount of 2022 Notes:

████████████

Any other Debtor Claims (e.g., claims under the
RBL Facility or DIP credit facility):

Type:

███████████████████

Type:

███████████████████

Notice Address:

745 Seventh Avenue
New York, NY 10019

Attention: Brian Hook
Email: brian.hook@barclays.com

*[Signature Page to Amended and Restated Restructuring Support Agreement]*

**SONOMA CAPITAL MANAGEMENT**

In accordance with Section 12, set forth below is any ownership of Existing BBEP Equity Interests as of the date of this Amended Agreement by the Consenting Senior Unsecured Creditor and any entity wholly owned by and any person wholly owning such Consenting Senior Unsecured Creditor. If none is shown, none is owned.

| Name of Owner | Relationship to Consenting Senior Unsecured Creditor | Amount and Type of Existing BBEP Equity Interests Owned (as of  /  /  ) | |
| --- | --- | --- | --- |
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

By: _____

Name: Jeffrey Thorp

Title: Member

Aggregate Principal Amount of 2020 Notes:

████████████████

Aggregate Principal Amount of 2022 Notes:

██████████

Any other Debtor Claims (e.g., claims under the RBL Facility or DIP credit facility):

*Signature Page to Amended and Restated Restructuring Support Agreement*

Type:

████████████████

Type:

████████████████

Notice Address:

Sonoma Capital Management
437 Madison Ave, 34th Floor
New York, NY 10022
Attention: Jeffrey Thorp
Email: jthorp@sonomacm.com

*Signature Page to Amended and Restated Restructuring Support Agreement*

## EXHIBIT A

**APPROVED PLAN**

[Attached to the Disclosure Statement as Exhibit A]

WEIL:96304251229979.0003
WEIL:\96309033\2\29979.0003

## EXHIBIT B

### PROVISION FOR TRANSFER AGREEMENT

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Amended and Restated Restructuring Support Agreement, dated as of October 11, 2017 (the "**Amended Agreement**"),[1] by and among the Debtors and the Consenting Creditors, including the transferor to the Transferee of any Second Lien Note Claims or Senior Unsecured Note Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "**Consenting Creditor**" as well as a "**Consenting Second Lien Creditor**" or "**Consenting Senior Unsecured Creditor**," as applicable, under the terms of the Amended Agreement, based on the Debtor Claim that is Transferred.  This Transfer Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.

The Transferee specifically agrees to be bound by the terms and conditions of the Amended Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.  The Transferee intends to be and is bound under the Amended Agreement with respect to any and all claims against, or interests in, any of the Debtors, whether currently held or hereafter acquired by such Transferee.

Date Executed:  _____

**TRANSFEREE**


Name of Institution:  _____


By:         _____
Name:      _____
Its:          _____
Telephone:  _____
Facsimile:  _____

---

[1]    Capitalized terms not used but not otherwise defined herein shall have the meanings ascribed to such terms in the Amended Agreement.

In accordance with commitments in the Amended Agreement, set forth below is any ownership of Existing BBEP Equity Interests as of the date of the Amended Agreement by the Transferee and any entity wholly owned by and any person wholly owning such Transferee. If none is shown, none is owned. As of the date hereof, the Transferee does not own any additional Existing BBEP Equity Interests.

| Name of Owner | Relationship to the Transferor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
|---|---|---|---|
| | | **Amount** | **Type** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

*Aggregate Amounts Beneficially Owned or Managed on Account of*

**Second Lien Note Claims**

$ _____

**Senior Unsecured Note Claims: 2020 Senior Notes**

$ _____

**Senior Unsecured Note Claims: 2022 Senior Notes**

$ _____

**RBL Claims**

$ _____

**DIP Claims**

$ _____

**Any other Debtor Claims:**

Type:

$ _____

Type:

$ _____

NOTICE ADDRESS:

      [_____]
      [_____]
      [_____]
Attention:  [_____]
E-mail: [_____]

with a copy to:

      [_____]
      [_____]
      [_____]
Attention:  [_____]
E-mail: [_____]

## EXHIBIT C

## JOINDER AGREEMENT


[Attached.]

## Joinder Agreement

[_____], 2017

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Amended and Restated Restructuring Support Agreement, dated as of October 11, 2017, a copy of which is attached hereto as Annex I (as it may be amended, supplemented, or otherwise modified from time to time, the "**Amended Agreement**"),[1] by and among the Debtors and the Consenting Creditors.

1.      Agreement to be Bound.  The Transferee hereby agrees to be bound by all of the terms of the Amended Agreement.  The Transferee shall hereafter be deemed to be a "Consenting Creditor" and a "Party" for all purposes under the Amended Agreement.

2.      Representations and Warranties.  With respect to the aggregate Debtor Claims set forth below its name on the signature page hereof, the Transferee hereby makes the representations and warranties of the Consenting Creditors set forth in Section 7 of the Amended Agreement to each other Party.

3.      Governing Law.  This joinder agreement (the "**Joinder Agreement**") to the Amended Agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.      Ownership of Existing BBEP Equity Interests.  In accordance with commitments in the Amended Agreement, set forth below is any ownership of Existing BBEP Equity Interests as of the date of the Amended Agreement by the Transferee and any entity wholly owned by and any person wholly owning such Transferee.  If none is shown, none is owned.  As of the date hereof, the Transferee does not own any additional Existing BBEP Equity Interests.

| Name of Owner | Relationship to the Transferor | Amount and Type of Existing BBEP Equity Interests Owned (as of __/__/__) | |
|---|---|---|---|
| | | Amount | Type |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

* * * * *

---

[1]      Capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Amended Agreement.

IN WITNESS WHEREOF, the Transferee has caused this Joinder Agreement to be executed as of the date first written above.

Name of Transferor: _____

Name of Transferee: _____

By: _____

Name: _____

Title: _____

Amount of Second Lien Note Claims (if any):  $_____
Amount of Senior Unsecured Note Claims under the 2020 Senior Notes (if any):  $_____
Amount of Senior Unsecured Note Claims under the 2022 Senior Notes (if any):  $_____
Amount of RBL Claims (if any):  $_____
Amount of DIP Claims (if any):  $_____
Amount of any other Debtor Claims (if any):  $_____

<u>Notice Address</u>:

_____
_____
_____
Fax: _____
Attention: _____

With a copy to:

_____
_____
_____
Fax: _____
Attention:_____
_____

## EXHIBIT D

## TERM SHEET

**IN RE BREITBURN ENERGY PARTNERS, L.P.,** *et al.*
**Case No. 16-11390 (SMB) (Bankr. S.D.N.Y.)**

<u>**Restructuring Term Sheet**</u>

This preliminary term sheet (the "***Term Sheet***")[1], in conjunction with the Approved Plan and that certain Amended and Stated Restructuring Support Agreement dated October 11, 2017 (the "***Amended Agreement***"), summarizes certain material terms and conditions of a new money rights offering, the proceeds of which would be used to fund a plan of reorganization for Breitburn Energy Partners L.P. ("***BBEP***") and its various affiliated debtor entities (collectively, the "***Debtors***"). The transactions contemplated in this Term Sheet are subject in all respects to the negotiation, execution, and delivery of definitive documentation.

Until publicly disclosed with the prior written consent of (i) the ad hoc group of holders of the Debtors' Senior Unsecured Notes comprised of Beach Point Capital Management LP, Elliott Management Corporation, Marathon Asset Management, LP, and W.L. Ross & Co. LLC (the "***Ad Hoc Unsecured Noteholder Group***"), (ii) the ad hoc group of holders of the Debtors' Senior Unsecured Notes represented by White & Case LLP (the "***W&C Group***"), (iii) the ad hoc group of second lien noteholders (the "***Second Lien Noteholder Group***"), and (iv) the Debtors, this Term Sheet and the information contained herein is strictly confidential and may not be shared with any person other than the Ad Hoc Unsecured Noteholder Group, the W&C Group, the Second Lien Noteholder Group, the Commitment Parties (defined below) and their respective professional advisors.

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF ALL APPLICABLE LAW. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH ANY POTENTIAL TRANSACTIONS REFERENCED HEREIN AND THE ENTRY INTO OR THE CREATION OF ANY BINDING AGREEMENT IS SUBJECT TO THE EXECUTION OF DEFINITIVE DOCUMENTATION IN FORM AND SUBSTANCE CONSISTENT WITH THIS TERM SHEET AND OTHERWISE ACCEPTABLE TO THE AD HOC UNSECURED NOTEHOLDER GROUP, THE DEBTORS, THE W&C GROUP, AND THE SECOND LIEN NOTEHOLDER GROUP. THIS TERM SHEET HAS BEEN PRODUCED FOR DISCUSSION AND SETTLEMENT PURPOSES ONLY AND IS SUBJECT TO THE PROVISIONS OF RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND OTHER SIMILAR APPLICABLE STATE AND FEDERAL RULES PROTECTING THE USE OR DISCLOSURE OF INFORMATION EXCHANGED IN THE CONTEXT OF SETTLEMENT DISCUSSIONS.

| | |
|---|---|
| **Management Incentive Plan** | The Approved Plan may provide for the creation of one or more long-term management incentive plans for the management of each of LegacyCo and New Permian Corp. on terms to be determined by the board of directors of each of LegacyCo and New Permian Corp. following the Effective Date. |
| **Transition Services Agreement** | By no later than the Effective Date, LegacyCo and New Permian Corp. shall enter into a transition services agreement (the "***Transition Services Agreement***") pursuant to which LegacyCo shall, upon request, provide New Permian Corp. with specified administrative, managerial and other services |

---

[1]    Capitalized terms used but not otherwise defined herein have the meaning ascribed to such terms in the Approved Plan, the Amended Agreement, or that certain Amended and Restated Backstop Commitment Agreement, dated October, 11 2017, as applicable.

| | |
|---|---|
| | related to, among other things, (i) the operation and development of the Permian Assets and (ii) listing of New Permian Corp. Common Stock (defined below) on any of the OTCBB, OTCQX, OTCQB, or OTC Pink markets, in each case from and after the Closing.  The Transition Services Agreement shall contain commercially reasonable terms for a transaction of this type and shall be in form and substance reasonably acceptable to the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors, including:<br><br>1.  a term of eight months;<br>2.  reimbursement of all actual and reasonable costs and expenses incurred by LegacyCo (and not, for the avoidance of doubt, including any element of mark-up, profit or 'cost plus' for the benefit of LegacyCo) under the Transition Services Agreement pursuant to a cost allocation methodology to be agreed upon by the Requisite Commitment Parties and the Requisite Consenting Second Lien Creditors, including costs of the LegacyCo management team during the term of the Transition Services Agreement to the extent such members of the management team provide services to New Permian Corp. under the Transition Services Agreement; and<br>3.  indemnification for LegacyCo and any other service provider for any losses arising under the Transition Services Agreement (except for losses or damages due to LegacyCo's gross negligence and willful misconduct), including third party claims and any claims arising from the registration and listing of New Permian Corp. Common Stock. |
| **Board of Directors of LegacyCo / Transfers** | The board of directors and governance of LegacyCo shall be determined by the Requisite Consenting Second Lien Creditors in their sole discretion; *provided*, that (a)  New Permian Corp. shall have the right to appoint an observer to the board of directors of LegacyCo, which observer shall be subject to customary confidentiality and privilege and conflict of interest exclusion provisions to be mutually agreed; (b) the Legacyco Organizational Documents shall require the consent of New Permian Corp. for any affiliate transactions that are not on arms' length terms and are not approved by the LegacyCo board members appointed by non-conflicted equity holders; and (c) New Permian Corp., in its capacity as a holder of LegacyCo Units, shall have reasonable and customary preemptive rights, tag-along rights, and information rights (including access to quarterly and annual financial statements); *provided*, *further*, that New Permian Corp., in its capacity as a holder of LegacyCo Units, shall only retain the right to appoint an observer and receive information so long as it holds at least 5.0% of LegacyCo Units (*provided*, that, New Permian Corp. shall not be deemed to own less than 5.0% of the LegacyCo Units solely due to dilution by virtue of equity issuances exempted from New Permian Corp.'s preemptive rights).<br><br>New Permian Corp.'s LegacyCo Units shall be subject to reasonable and customary transfer restrictions, including no transfers to LegacyCo competitors and customary drag rights; *provided*, that New Permian Corp. shall not be prevented from encumbering its LegacyCo Units in connection with obtaining any financing. |
| **Post-Effective Date New Permian Corp.** | The post-Effective Date equity, shareholder and governance rights for New Permian Corp. shall be on the terms and conditions set forth on **Exhibit A** |

| | |
|---|---|
| **Equity, Shareholder and Governance Rights** | attached hereto and otherwise acceptable to the Requisite Commitment Parties. |
| **Fiduciary Duties** | Notwithstanding anything to the contrary herein, this Term Sheet and the transactions contemplated hereby shall not create any fiduciary duties between and among the Commitment Parties (in their capacity as Senior Unsecured Noteholders), the Second Lien Noteholder Group or its members, or other duties or responsibilities to each other, the Debtors, or any Debtor's creditors or other stakeholders. |

**<u>Exhibit A</u>**

**<u>Post-Effective Date New Permian Corp. Equity, Shareholder and Governance Rights</u>**

[Attached]

| | **New Permian Corp.** |
|---|---|
| **Company Status** | Subject to the completion of additional diligence and the determination of the Requisite Commitment Parties, it is anticipated that New Permian Corp. shall be a Delaware corporation. New Permian Corp. shall not be a public company and shall not be required to file reports under the Exchange Act. |
| | To the maximum extent possible, the governance arrangements of New Permian Corp. shall not cause the holders of New Permian Corp. Common Stock (defined below) to become a group pursuant to Section 13 of the Exchange Act. |
| | New Permian Corp. shall use its reasonable best efforts to be listed on the Pink Sheets market by 12/31/18. |
| **Classes of Equity** | Upon consummation of Approved Plan, there shall be one class of common stock (the "***New Permian Corp. Common Stock***"). |
| **Transferability** | Subject to the requirements of the Securities Act and applicable state securities' laws, as amended, the New Permian Corp. Common Stock shall not be subject to contractual restrictions on transfer. |
| **Preemptive Rights** | Until New Permian Corp. Common Stock is listed on one of the NYSE or Nasdaq markets (the "***New Permian Corp. Listing Condition***"), each holder of more than 1% (together with affiliates) of the New Permian Corp. Common Stock shall be entitled to customary preemptive participation rights, including, without limitation, with respect to (i) any equity capital raises, (ii) any debt capital raises (or series of debt capital raises) (a) pursuant to which any affiliates of New Permian Corp. collectively are providing greater than 45% of the new capital or any one affiliate of New Permian Corp. is providing greater than 25% of the new capital, and/or (b) if the debt capital raise includes the issuance of any warrants, instruments convertible to equity, or other equity-type features or components; *provided* that in all cases such preemptive rights shall be subject to customary exceptions. |
| **Information Rights** | New Permian Corp. shall hold quarterly conference calls for shareholders, with dates and dial-in information announced at least three (3) days prior to such quarterly calls. |
| | New Permian Corp. shall make quarterly and annual financial information available on a website for its equity holders. |
| **Affiliate Transactions** | Until the New Permian Corp. Listing Condition is satisfied, New Permian Corp. shall not enter into a transaction with (a) affiliates of |

| | **New Permian Corp.** |
|---|---|
| | New Permian Corp. holding more than 2% of New Permian Corp.'s outstanding equity or (b) the officers, managers, directors, or lenders of the New Permian Corp. or their Subsidiaries (in each case, an "***Affiliate Transaction***") on terms less favorable than those that would have been obtainable from a third party on an arms-length basis for such transaction and any Affiliate Transaction shall be approved by a majority of the disinterested/non-conflicted directors of New Permian Corp.. <br><br> For purposes hereof, Affiliate Transactions shall exclude (i) transactions (or series of related transactions) with a value less than $5 million entered into in the ordinary course of business with entities that are affiliates solely as a result of being a portfolio company of an equity holder or lender of New Permian Corp., (ii) indemnification, expense advancement and expense reimbursement of employees, officers and managers, (iii) transactions subject to preemptive rights, (iv) employee compensation and benefits, and (v) intercompany transactions (other than transactions with LegacyCo). |
| **Governance Rights** | Except as otherwise set forth below for the election of directors, each share of stock issued by New Permian Corp. shall be entitled to one vote and shall be entitled to vote for all such matters that are put to the stockholders for approval under New Permian Corp.'s governing documents and applicable law. Notwithstanding the foregoing, management and governance of New Permian Corp. shall be determined by the New Permian Corp. Board (defined below) for all matters except those that require shareholder approval under applicable law. <br><br> The number of directors on the board of directors of New Permian Corp. (the "***New Permian Corp. Board***") shall be established with five (5) directors, which number may be increased following the Effective Date upon a determination of the New Permian Corp. Board, and any vacancies resulting from such an increase shall be filled by a majority vote of the New Permian Corp. Board. <br><br> The New Permian Corp. Board shall be as follows: <br><br> (i)    One (1) director shall be the Chief Executive Officer of New Permian Corp. (the "***CEO***"); and <br><br> (ii)    Four (4) of the directors shall be appointed by the Commitment Parties identified below (each, a "***Nominating Holder***") as follows: |

| | **New Permian Corp.** |
|---|---|
| | (a) WL Ross, shall be entitled to nominate and have elected one (1) director on the New Permian Corp. Board; |
| | (b) Elliott shall be shall be entitled to nominate and have elected three (3) directors on the New Permian Corp. Board. |
| | The Commitment Parties (other than WL Ross and Elliott) shall be entitled to appoint one non-voting observer to the New Permian Corp. Board (by majority vote of all Backstop Commitments not held by Elliott or WL Ross) for an initial two-year term. The observer shall have full access to New Permian Corp. Board materials and meetings, except where such access would jeopardize attorney-client privilege. |
| | The governance documents for New Permian Corp. shall provide for a re-allocation of Board seats following a material change in share ownership. |
| | Unless the New Permian Corp. Listing Condition is satisfied, the Commitment Parties shall have customary tag-along rights on non-open market sales of (x) 35% or more of New Permian Corp. Common Stock in the first year following closing, (y) 40% or more of New Permian Corp. Common Stock in the second year following closing and (z) 45% or more of New Permian Corp. Common Stock in the third year following closing. |
| **Shareholder Voting** | Until the New Permian Corp. Listing Condition is satisfied, the following transactions shall require prior approval from a 2/3 vote of New Permian Corp. Common Stock (which may be provided by written consent): |
| | (i)  amending New Permian Corp.'s or any of its Subsidiaries' organizational documents that would materially and disproportionately affect the shareholder rights to be granted hereunder; |
| | (ii)  any decrease in the number of directors serving on the New Permian Corp. Board; |
| | (iii)  during the one-year period following the Effective Date, any equity capital raises or equity offerings having a value in excess of $350 million; and |
| | (iv)  any sale of all or substantially all the assets of New Permian Corp. or any other transaction (whether by merger, consolidation or otherwise) which result in a |

| | **New Permian Corp.** |
|---|---|
| | change of control of New Permian Corp. (this item shall be subject to a majority vote after the one-year anniversary of closing). |
| **Equity Incentives** | Any equity incentives granted or issued to management or employees of New Permian Corp. or its Subsidiaries, or to any providers of services to New Permian Corp. or its Subsidiaries, shall dilute each holder of stock of New Permian Corp. equally and ratably, regardless of the time of issue of such incentive or approval of any plan for such issuance. |
| **Registration Rights** | Once New Permian Corp. is public, holders of New Permian Corp. Common Stock shall have customary piggyback registration rights for a public company, subject to customary cutbacks and limitations. |

Execution Version

# FIRST AMENDMENT TO
# AMENDED AND RESTATED
# RESTRUCTURING SUPPORT AGREEMENT

This FIRST AMENDMENT TO AMENDED AND RESTATED RESTRUCTURING SUPPORT AGREEMENT (this "**RSA Amendment**") dated November 28, 2017 is entered into among:

(a)    each of the debtors and debtors in possession in the jointly administered chapter 11 bankruptcy cases under the lead case *In re Breitburn Energy Partners LP*, Case No. 16-11390 (SMB), including, but not limited to, Breitburn Energy Partners LP, Breitburn GP LLC, Breitburn Operating LP, Breitburn Operating GP LLC, Breitburn Management Company LLC, Breitburn Finance Corporation, Alamitos Company, Beaver Creek Pipeline, L.L.C., Breitburn Florida LLC, Breitburn Oklahoma LLC, Breitburn Sawtelle LLC, Breitburn Transpetco GP LLC, Breitburn Transpetco LP LLC, GTG Pipeline LLC, Mercury Michigan Company, LLC, Phoenix Production Company, QR Energy, LP, QRE GP, LLC, QRE Operating, LLC, Terra Energy Company LLC, Terra Pipeline Company LLC, and Transpetco Pipeline Company, L.P. (collectively, the "**Debtors**");

(b)    the undersigned beneficial holders of, or investment managers, advisers or sub-advisers for holders of, claims against the Debtors under the Second Lien Notes (as defined in the A&R Restructuring Support Agreement (defined below)) constituting the Requisite Consenting Second Lien Creditors (as defined in the A&R Restructuring Support Agreement) (collectively, the "**Requisite Consenting Second Lien Creditors**"); and

(c)    the undersigned beneficial holders of, or investment managers, advisers or sub-advisers for holders of, claims against the Debtors under (a) the outstanding 2020 Senior Notes and (b) the 2022 Senior Notes (in each case, as defined in the A&R Restructuring Support Agreement) constituting the Requisite Commitment Parties (as defined in the A&R Restructuring Support Agreement) (collectively, the "**Commitment Parties**").

The Debtors, the Requisite Consenting Second Lien Creditors and the Commitment Parties are referred to herein together as the "**Amendment Parties**." Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the A&R Restructuring Support Agreement (as defined below).

**WHEREAS**, on September 22, 2017, the Consenting Second Lien Creditors and the Consenting Senior Unsecured Creditors entered into a restructuring support agreement (the "**Initial RSA**");

**WHEREAS**, on October 11, 2017, the Debtors, the Consenting Second Lien Creditors and the Consenting Senior Unsecured Creditors amended and restated the Initial RSA, pursuant

to an amended and restated restructuring support agreement (as amended, supplemented, or otherwise modified from time to time, the "**A&R Restructuring Support Agreement**");

**WHEREAS**, the Debtors intend to amend the Debtors' First Amended Joint Chapter 11 Plan (the "**Plan**") and related disclosure statement (including the rights offering procedures included therein) (the "**Disclosure Statement**"), each previously filed with the Bankruptcy Court on November 13, 2017;

**WHEREAS**, the Amendment Parties wish to consent to such amendments and to amend the A&R Restructuring Support Agreement to the extent necessary to conform the A&R Restructuring Support Agreement to such amendments and take such other actions as are necessary to give effect to such amendments; and

**WHEREAS**, concurrently with the execution of this RSA Amendment, certain of the Amendment Parties intend to execute an amendment (the "**BCA Amendment**") to the Amended and Restated Backstop Commitment Agreement (the "**A&R Backstop Commitment Agreement**"), dated October 11, 2017, including the rights offering procedures attached as Exhibit C thereto.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein and in the A&R Restructuring Support Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Amendment Parties agree as follows:

1.    **Amendments.**

(a)    Section 4(b).  Reference to "the forty-fifth (45th) day after the date the Disclosure Statement and BCA Motion are filed" in Section 4(b) of the A&R Restructuring Support Agreement is hereby amended and replaced with "December 1, 2017".

(b)    Exhibit A.  Exhibit A of the A&R Restructuring Support Agreement is hereby deleted and replaced in its entirety with the Debtors' Second Amended Joint Chapter 11 Plan of Reorganization attached hereto as Exhibit A (the "**Amended Plan**").

(c)    Conforming Amendments.

i.    Each reference to the "Approved Plan" in the A&R Restructuring Support Agreement are hereby deleted and replaced with a reference to the "Amended Plan".

ii.    Each reference to the "Rights Offering Procedures" or Rights Offering procedures" in the A&R Restructuring Support Agreement shall be deemed to refer to the Rights Offering Procedures substantially in the form attached as Exhibit A to the BCA Amendment.

2

iii.    To the extent anything in the Amended Plan is inconsistent with the terms or provisions of the A&R Restructuring Support Agreement, the A&R Restructuring Support Agreement is hereby amended to conform with the provisions of the Amended Plan.

2.    **Consents**.  Each of the Debtors, the Requisite Consenting Second Lien Creditors and the Commitment Parties hereby consent to (a) the amendments set forth in the Amended Plan, (b) the amendments set forth in the BCA Amendment, including those amendments set forth in the Amended Rights Offering Procedures (as defined therein) and (c) subject to the terms of the A&R Restructuring Support Agreement, including Sections 3 and 5.02(v) thereof, the filing with the Bankruptcy Court of the Amended Plan and an amended Disclosure Statement that includes the Amended Rights Offering Procedures (as defined in the BCA Amendment).

3.    **Effectiveness.**

This RSA Amendment shall become effective and binding on the Debtors, the Consenting Second Lien Creditors and the Consenting Senior Unsecured Creditors in accordance with the terms of the A&R Restructuring Support Agreement upon the execution and delivery by each of the Debtors, the Requisite Consenting Second Lien Creditors and the Commitment Parties of executed signature pages hereto.

4.    **Miscellaneous.**

(a)    Except as specifically set forth herein, the terms of the A&R Restructuring Support Agreement shall remain in full force and effect and are hereby ratified and confirmed.

(b)    This RSA Amendment may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this RSA Amendment delivered by facsimile, PDF or otherwise shall be deemed to be an original for the purposes of this paragraph.

*[Signature pages follow.]*

3

IN WITNESS WHEREOF, the Amendment Parties have caused this RSA Amendment to be executed and delivered as of the date first set forth above.

**DEBTORS:**

**BREITBURN ENERGY PARTNERS LP**

By:             Breitburn GP LLC,
                its general partner

By:             _____
                Name: Halbert S. Washburn
                Title:   Chief Executive Officer

**BREITBURN OPERATING LP**

By:             Breitburn Operating GP LLC,
                its general partner

By:             _____
                Name: Halbert S. Washburn
                Title:   Chief Executive Officer

**ALAMITOS COMPANY**
**PHOENIX PRODUCTION COMPANY**

By: _____
　　　Name: Halbert S. Washburn
　　　Title:　President


**BEAVER CREEK PIPELINE, L.L.C.**
**BREITBURN FINANCE CORPORATION**
**BREITBURN GP LLC**
**BREITBURN MANAGEMENT COMPANY LLC**
**BREITBURN OPERATING GP LLC**
**GTG PIPELINE LLC**
**MERCURY MICHIGAN COMPANY, LLC**
**QRE GP, LLC**
**TERRA ENERGY COMPANY LLC**
**TERRA PIPELINE COMPANY LLC**

By: _____
　　　Name: Halbert S. Washburn
　　　Title:　Chief Executive Officer


**BREITBURN FLORIDA LLC**
**BREITBURN OKLAHOMA LLC**
**BREITBURN SAWTELLE LLC**
**BREITBURN TRANSPETCO GP LLC**
**BREITBURN TRANSPETCO LP LLC**

By:　　　Breitburn Operating LP,
　　　　　its sole member

By:　　　Breitburn Operating GP LLC,
　　　　　its general partner

By: _____
　　　Name:　Halbert S. Washburn
　　　Title:　Chief Executive Officer


*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**QR ENERGY, LP**

By:      QRE GP, LLC,
           its general partner

By:

Name: Halbert S. Washburn
Title:  Chief Executive Officer


**QRE OPERATING, LLC**

By:      QR Energy, LP,
           its sole member

By:      QRE GP, LLC,
           its general partner

By:

Name: Halbert S. Washburn
Title:  Chief Executive Officer


**TRANSPETCO PIPELINE COMPANY, L.P.**

By:      Breitburn Operating LP,
           on behalf of itself and as the sole member of
           Breitburn Transpetco GP LLC,
           a general partner

By:      Breitburn Operating GP LLC,
           its general partner

By:

Name: Halbert S. Washburn
Title:  Chief Executive Officer


*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**EIG Redwood Debt Aggregator, LP**

By: **EIG Redwood Aggregator GP, LLC**, its
general partner and Attorney-in-Fact

By: **EIG Asset Management, LLC**, its sole
member

By: _____
Name:  Clayton R. Taylor
Title:  Managing Director

By: _____
Name: Richard K. Punches, II
Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**Anchorage Capital Partners, L.P.**

By: **Anchorage Capital Group, L.L.C.,** its
investment manager

By: _____
Name:
Title:       Melissa Griffiths
             Authorized Signatory

**ACMO BBEP, L.P.**

By: **Anchorage Capital Group, L.L.C.,** its
investment manager

By: _____
Name:
Title:

Melissa Griffiths
Authorized Signatory

**Guggenheim Funds Trust - Guggenheim Macro
Opportunities Fund**

By:  **Guggenheim Partners Investment
Management, LLC,** as Investment Adviser

By: _____

Name: Kevin M. Robinson
Title: Attorney-in-Fact

**Hamilton Finance LLC**

By: **Guggenheim Partners Investment
Management, LLC,** as Sub-Advisor

By: _____
    Name: Kevin M. Robinson
    Title: Attorney-in-Fact

Maverick Enterprises, Inc.

By:  **Guggenheim Partners Investment
Management, LLC,** as Investment Manager

By: _____

Name: Kevin M. Robinson
Title: Attorney-in-Fact

NZC Guggenheim Master Fund Limited

By:  **Guggenheim Partners Investment
Management, LLC,** as Manager

By: _____
Name: Kevin M. Robinson
Title: Attorney-in-Fact

NZC Guggenheim Fund LLC

By:  **Guggenheim Partners Investment
Management, LLC,** as Manager

By: _____
Name: Kevin M. Robinson
Title: Attorney-in-Fact

**SEI Institutional Managed Trust - Multi Asset Income Fund**

By: **Guggenheim Partners Investment Management, LLC,** as Sub-Adviser

By: _____

Name: Kevin M. Robinson

Title: Attorney-in-Fact

COMMITMENT PARTIES

**MERRILL LYNCH, PIERCE, FENNER &
SMITH INCORPORATED ("MLPFS"), solely
in respect of its Global Credit and Special
Situations Group and not any other group, unit,
division or affiliate of MLPFS**

By: _____

    Name: Vincenzo Ruocco
    Title: Vice President, US Corporate Actions

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**ELLIOTT ASSOCIATES, L.P.**
By: Elliott Capital Advisors, L.P., as general partner
By: Braxton Associates, Inc., as general Partner

By: _____
     Name: Elliot Greenberg
     Title: Vice President

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**ELLIOTT INTERNATIONAL, L.P.**
By: Elliott International Capital Advisors Inc., as
attorney-in-fact

By: _____
    Name: Elliot Greenberg
    Title: Vice President

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**BLACKROCK MULTI-MANAGER
ALTERNATIVE STRATEGIES FUND**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
        Name: Vijay Srinivasan
        Title: Head of Research

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**MARATHON BLUE GRASS CREDIT FUND, L.P.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
    Name: Vijay Srinivasan
    Title: Head of Research

**BSF MULTI-MANAGER ALTERNATIVE
STRATEGIES FUND**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____

      Name: Vijay Srinivasan
      Title: Head of Research

**MARATHON CENTRE STREET
PARTNERSHIP, L.P.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
    Name: Vijay Srinivasan
    Title: Head of Research

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**MARATHON CREDIT DISLOCATION FUND, L.P.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____
    Name: Vijay Srinivasan
    Title: Head of Research

**KTRS CREDIT FUND**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____

Name: Vijay Srinivasan
Title: Head of Research

**MASTER SIF SICAV-SIF**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By: _____

Name: Vijay Srinivasan
Title: Head of Research

**MARATHON SPECIAL OPPORTUNITY
MASTER FUND, LTD.**
By: Marathon Asset Management L.P.
Its Investment Manager and Authorized Signatory

By:_____
　　Name: Vijay Srinivasan
　　Title: Head of Research

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**ASCENSION ALPHA FUND LLC, by WL Ross & Co. LLC**

By:_____

    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**ASCENSION HEALTH MASTER PENSION TRUST, by WL Ross & Co. LLC**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**CARILION CLINIC, by WL Ross & Co. LLC**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

**CATALINA HOLDINGS (BERMUDA) LTD.,**
**by WL Ross & Co. LLC**


By:_____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**MARQUETTE COMPANIES, LLC, by WL Ross & Co. LLC**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**PEPPERDINE UNIVERSITY, by WL Ross & Co. LLC**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**RETIREMENT PLAN OF CARILION CLINIC,**
**by WL Ross & Co. LLC**

By:_____
     Name: Benjamin Gruder
     Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**UNIVERSITY OF MINNESOTA
FOUNDATION, by WL Ross & Co. LLC**

By:_____
　　　Name: Benjamin Gruder
　　　Title: Managing Director

**WLR RECOVERY FUND V, L.P., by WL Ross
& Co. LLC**

By: _____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**WLR V PARALLEL ESC, L.P., by WL Ross & Co. LLC**

By:_____
    Name: Benjamin Gruder
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**WLR-SC FINANCING CONDUIT LLC, by WL Ross & Co. LLC**

By:_____
     Name: Benjamin Gruder
     Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**BEACH POINT TOTAL RETURN MASTER FUND, L.P.**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
     Name: Carl Goldsmith
     Title: Co-Chief Investment Officer

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**BEACH POINT SELECT FUND LP**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
      Name: Carl Goldsmith
      Title: Co-Chief Investment Officer

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**BPC UKI, L.P.**
By: BPC AS LLC
Its General Partner
By: Beach Point Capital Management LP
Its Managing Member

By: _____
    Name: Carl Goldsmith
    Title: Co-Chief Investment Officer

**LumX Beach Point Total Return Fund Ltd.**
By: Beach Point Capital Management LP
Its Trading Adviser

By:_____
Name: Carl Goldsmith
Title: Co-Chief Investment Officer

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**BEACH POINT MULTI-ASSET CREDIT FUND LTD.**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
    Name: Carl Goldsmith
    Title: Co-Chief Investment Officer

**BEACH POINT MULTI-STRATEGY CREDIT MASTER FUND, L.P.**
By: Beach Point Capital Management LP
Its Investment Manager

By: _____
    Name: Carl Goldsmith
    Title: Co-Chief Investment Officer

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**AKANTHOS CAPITAL MANAGEMENT, LLC**

By:_____

Name:  Michael Kao

Title:   CEO

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**FRANKLIN ADVISERS, Inc.**, as investment
manager on behalf of certain funds and accounts

By: _____
    Name: Glenn Voyles
    Title: SVP

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**1992 MSF INTERNATIONAL LTD,** by
Highbridge Capital Management, LLC as Trading
Manager

By: _____
       Name: Jonathan Segal
       Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**1992 TACTICAL CREDIT MASTER FUND,**
**L.P.,** by Highbridge Capital Management, LLC as
Trading Manager

By: _____

Name: Jonathan Segal

Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**PACIFIC CAPITAL MANAGEMENT LLC**

By:_____

    Name: Jonathan Glaser
    Title: Managing Member

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**NEWBERG FAMILY TRUST UTD 12/18/90**

By: _____

Name: Bruce Newberg
Title: Trustee

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**BARCLAYS BANK PLC** ("BARCLAYS"), solely
in respect of its Distressed Trading Desk (the
"Distressed Trading Desk") and not any other unit,
group, division or affiliate of Barclays and solely in
respect of the Distressed Desk's Senior Unsecured
Note Claims

By:_____

    Name: Adam Yarnold
    Title: Managing Director

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

**SONOMA CAPITAL MANAGEMENT**

By:_____

Name: Jeffrey Thorp
Title: Member

*[Signature Page to Amendment No. 1 to A&R Restructuring Support Agreement]*

EXHIBIT A AMENDED PLAN

[Intentionally omitted.  Available upon written
request to breitburninfo@primeclerk.com]

## **Exhibit F**

**Rights Offering Procedures**

# RIGHTS OFFERING PROCEDURES

## I.    Introduction

Breitburn Energy Partners LP (the "***Debtor***") and certain of its subsidiaries (collectively, the "***Debtors***")[1] are pursuing a proposed financial restructuring of their existing debt and other obligations to be effectuated pursuant to a plan of reorganization (the "***Plan***") and related disclosure statement (the "***Disclosure Statement***") in connection with a chapter 11 bankruptcy case, in accordance with the terms and conditions set forth in the Amended and Restated Backstop Commitment Agreement, dated as of October 11, 2017, and the First Amendment to the Backstop Commitment Agreement, dated as of November 28, 2017 (together, the "***Backstop Commitment Agreement***"), by and among the Debtors and other parties thereto.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth for such terms in the Plan or the Backstop Commitment Agreement.

On December 1, 2017, the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") entered an order (the "***Rights Offering Approval***") that approved, among other things, the form and manner of the rights offering.  In connection with the Plan, and in accordance with these procedures (the "***Rights Offering Procedures***"), the Debtor shall be required to implement the rights offering on behalf of New Permian Corp. (as defined in the Plan), and will, for aggregate proceeds of $775,000,000, (x) distribute to each of the Commitment Parties (as defined in the Backstop Commitment Agreement) Minimum Allocation Rights (as defined in the Backstop Commitment Agreement) enabling those parties to acquire an aggregate of 40% of the common stock of New Permian Corp. (subject to dilution) for aggregate proceeds of $310,000,000; and (y) distribute subscription rights to holders of Allowed Unsecured Notes Claims (as defined in the Plan) who are Eligible Offerees (defined below) enabling those parties to purchase an aggregate of 60% (subject to dilution) of the common stock of New Permian Corp. for aggregate proceeds of $465,000,000 (the "***Rights Offering***").

An "***Eligible Offeree***" is a holder of an Allowed Unsecured Notes Claim, that is, as of the Rights Offering Record  Date (as defined below), either (a) an "***accredited investor***" within the meaning of Rule 501(a)  of Regulation D under the Securities Act (as defined below) (an "***Accredited Investor***") or an entity in which all of the equity investors are Accredited Investors, or (b) a non-U.S. Person, as defined in Regulation S of the Securities Act of 1933, as amended (the "***Securities Act***").

Only Eligible Offerees may exercise Subscription Rights in the Rights Offering.  As provided in the Plan, each Non-Eligible Offeree that certifies to the reasonable satisfaction of the Debtors, in consultation with the Requisite Commitment Parties and the Creditors' Committee, that it is not an Eligible Offeree, will instead receive, at its election, either (i) Trust Units (as defined below)

---

[1] The entities included in the definition of "Debtors" are as follows: Breitburn Energy Partners LP; Breitburn GP LLC; Breitburn Operating LP; Breitburn Operating GP LLC; Breitburn Management Company LLC; Breitburn Finance Corporation; Alamitos Company; Beaver Creek Pipeline, L.L.C.; Breitburn Florida LLC; Breitburn Oklahoma LLC; Breitburn Sawtelle LLC; Breitburn Transpetco GP LLC; Breitburn Transpetco LP LLC; GTG Pipeline LLC; Mercury Michigan Company, LLC; Phoenix Production Company; QR Energy, LP; QRE GP, LLC; QRE Operating, LLC; Terra Energy Company LLC; Terra Pipeline Company LLC; and Transpetco Pipeline Company, L.P.

which represent the Shares of New Permian Stock, equal to 4.5% of such Non-Eligible Offeree's Allowed Unsecured Notes Claim (the "*Trust Substitute Distribution*") or (ii) the cash value of such Shares of New Permian Stock, as of the Effective Date (the "*Cash Substitute Distribution*", and together with the Cash Substitute Distribution, each a form of "*Substitute Distribution*"), provided that the aggregate amount of the distribution to such holders will not exceed New Permian Corp. Shares having a value equal to $5,422,265, and to the extent that the value of New Permian Corp. Shares that would otherwise be issued to such holders exceeds $5,422,265, the distribution of such shares will be reduced ratably to eliminate the excess.

Non-Eligible Offerees who elect to participate in the Trust Substitute Distribution, will have their Shares of New Permian Corp. held in a Trust (the "*Trust*"), and such Non-Eligible Offerees will receive units in the Trust (the "*Trust Units*"). The Trust Units are totally passive and may not be transferred at any time. Non-Eligible Offerees holding Trust Units will only receive a distribution from the Trust in accordance with the documentation governing the Trust or, in any event, if the Trust is still in existence at such time, upon the expiration of the Trust, which is expected to be seven (7) years after the Effective Date.

Eligible Offerees that are not Commitment Parties who elect to irrevocably participate in the Rights Offering on, or prior to, December 13, 2017 (the "*Early Election Date*") and that certify on the Rights Exercise Form that they voted, on behalf of all their Unsecured Notes Claims, to accept, and not object to the Plan, will receive, on the Plan Effective Date, their pro rata share (based on the respective backstop commitment amounts (which includes the amounts committed in the Minimum Allocation Rights, as defined in the Plan, and the Rights Offering) of the Commitment Parties and the respective subscription amounts as to the rights exercised by Eligible Offerees by the Early Election Date) of 10% of the New Permian Corp. Shares (the "*Early Election Premium*"), which will dilute the New Permian Corp. Shares issued pursuant to the Rights Offering and pursuant to the Minimum Allocation Rights (as defined in the Plan).

The Rights Offering Procedures will govern the ability of Eligible Offerees to participate in the Rights Offering and Non-Eligible Offerees to receive the Substitute Distribution.

All questions relating to these Rights Offering Procedures, other documents associated with the Rights Offering, or the requirements to participate in the Rights Offering should be directed to Prime Clerk, the subscription agent (the "*Subscription Agent*") retained by the Debtors at:

<div align="center">

**Prime Clerk**
**830 Third Avenue, 9th Floor**
**New York, New York 10022**
**Attention: Breitburn Energy Processing**
**Tel: (855) 851-7887**

**Questions (but not documents) may be directed to breitburnballots@primeclerk.com**
**(please reference "Breitburn Energy" in the subject line)**

</div>

WEIL:\95964727\37\29979.0003

*THE DISCLOSURE STATEMENT DISTRIBUTED IN CONNECTION WITH THE DEBTORS' SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN SETS FORTH IMPORTANT INFORMATION THAT SHOULD BE CAREFULLY READ AND CONSIDERED BY EACH ELIGIBLE OFFEREE PRIOR TO MAKING A DECISION TO PARTICIPATE IN THE RIGHTS OFFERING, INCLUDING THE SECTIONS ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED," "VALUATION ANALYSIS," "RIGHTS OFFERING PROCEDURES" AND "FINANCIAL INFORMATION AND PROJECTIONS." THE DISCLOSURE STATEMENT IS AVAILABLE ON THE DEBTOR'S RESTRUCTURING WEBSITE AT CASES.PRIMECLERK.COM/BREITBURN AND COPIES ARE ALSO AVAILABLE UPON REQUEST FROM THE SUBSCRIPTION AGENT.*

## II.    Rights Offering and Substitute Distribution

To fully exercise its right to participate in the Rights Offering (the "***Subscription Rights***"), an Eligible Offeree must (i) complete the rights offering subscription exercise form (the "***Rights Exercise Form***"), which has been distributed with these Rights Offering Procedures to Eligible Offerees and (ii) pay the purchase price (the "***Rights Exercise Price***"), which is an amount equal to its pro rata share of the $465,000,000 aggregate exercise price for the Rights Offering Securities (as defined in the Backstop Commitment Agreement), such pro rata share measured as the principal amount of Unsecured Notes Claims (as defined in the Plan) held by such Eligible Offeree, as compared to the aggregate amount of Unsecured Notes Claims as of November 27, 2017 (the "***Rights Offering Record Date***"), rounded down to the nearest dollar. Eligible Offerees electing to participate in the Rights Offering on, or prior to, the Early Election Date, that certify on the Rights Exercise Form that they voted, on behalf of all the Unsecured Notes Claims, to accept, and not object to the Plan, will also receive the Early Election Premium.

Each Eligible Offeree may exercise (in whole dollar increments) all, some, or none of its pro rata share, and the Rights Exercise Price for such Eligible Offeree will be adjusted accordingly (in whole dollar increments). Any fraction of a Rights Offering Security to be issued to an Eligible Offeree who elects to acquire such Rights Offering Securities shall be rounded down to the nearest whole Rights Offering Security. The total amount of Rights Offering Securities that may be purchased pursuant to the Rights Offering shall be adjusted as necessary to account for the rounding described in this section. No compensation shall be paid, whether in cash or otherwise, in respect of any rounded-down amounts.

For the avoidance of doubt, subsequent to the Rights Offering Record Date, the Subscription Rights may not be transferrable, assignable or detachable to any party, other than as permitted in Section VI.D. below.

Furthermore, the right to receive a Substitute Distribution, shall not be transferrable, assignable or detachable to any party, other than as permitted in Section VII.C below.

There will be no over-subscription privilege in the Rights Offering. If the aggregate proceeds of the Rights Offering are less than $465,000,000, the unsubscribed securities will not be offered to other Eligible Offerees but will be purchased by the Commitment Parties in accordance with the Backstop Commitment Agreement.

3

Although it is expected that all distributions of Rights Offering Securities, if in the form of New Permian Corp. common stock, will occur through The Depository Trust Company ("*DTC*"), there is no guarantee that this will occur.

## III.    The Backstop

The Rights Offering will be backstopped by the Commitment Parties pursuant to the Backstop Commitment Agreement. The Commitment Parties will be provided with a special form (the "*Backstop Addendum*") to attach to their Rights Exercise Form(s).

If the aggregate proceeds of the Rights Offering are less than $465,000,000, the unsubscribed securities will not be offered to other Eligible Offerees but will be purchased by the Commitment Parties in accordance with the Backstop Commitment Agreement.

## IV.    Commencement/Expiration of the Rights Offering

The Rights Offering shall commence on the day upon which the Rights Exercise Form is first mailed or made available to Eligible Offerees, which is expected to be within five (5) Business Days after receipt of the Rights Offering Approval and on or around the Rights Offering Record Date.  The Rights Offering shall expire at 4:00 p.m. New York City time January 4, 2018 (such time and date, as may be amended, the "*Rights Expiration Time*"), unless, if permitted by the Rights Offering Approval, extended by the Debtor with the consent of the Requisite Consenting Second Lien Creditors and Requisite Commitment Parties (each as defined in the Backstop Commitment Agreement).   The Debtor shall promptly notify the Eligible Offerees of any extension and of the new Rights Expiration Time by press release or otherwise. The Debtor shall, if reasonably requested by the Requisite Commitment Parties, from time to time prior to the Rights Expiration Time (and any extensions thereto), notify, or cause the Subscription Agent to notify, within two business days of receipt of such request by the Debtor, the investors of the aggregate number of Subscription Rights known by the Subscription Agent to have been exercised pursuant to the Rights Offering as of the most recent practicable time before such request.

The Debtor, on behalf of New Permian Corp., shall furnish Rights Exercise Forms to the Eligible Offerees and/or, to the extent applicable, their brokers, dealers, commercial banks, trust companies, or other agents or nominees (the "*Subscription Nominees*").   Each Subscription Nominee is entitled to receive sufficient copies of these Rights Offering Procedures and the Rights Exercise Form for distribution to the beneficial owners of the Unsecured Notes for whom such Subscription Nominee holds such Unsecured Notes.

## V.    Commencement/Expiration of the Form of Substitute Distribution Election

The ability for Non-Eligible Offerees to elect the form of Substitute Distribution shall commence on the day upon which the Rights Exercise Form is first mailed or made available to Non-Eligible Offerees, which is expected to be within five (5) Business Days after receipt of the Rights Offering Approval and on or around the Rights Offering Record Date. Non-Eligible Offerees may submit their election for the form of Substitute Distribution until 10:00 a.m. New

WEIL:\95964727\37\29979.0003

York City time January 11, 2018, which is the anticipated Confirmation Date (as defined in the Plan).

## VI.    Exercise of Subscription Rights by Eligible Offerees

Each Eligible Offeree that elects to participate in the Rights Offering must affirmatively make a binding, irrevocable election to exercise its Subscription Rights (the "***Binding Rights Election***") before the Rights Expiration Time.

<div style="border:1px solid black; padding:10px; text-align:center;">

**<u>The Binding Rights Election, upon receipt by the Subscription Agent, cannot be withdrawn</u>.**

</div>

Each Eligible Offeree will be entitled to participate in the Rights Offering solely to the extent provided in these Rights Offering Procedures, except in the case of Eligible Offerees who are Commitment Parties, who are entitled to participate in the Rights Offering to the extent also provided in the Backstop Commitment Agreement.

### A.    Exercise by Eligible Offerees

To exercise the Subscription Rights, each Eligible Offeree must (i) return a duly completed Rights Exercise Form to the Subscription Agent so that the duly completed Rights Exercise Form is *actually received* by the Subscription Agent on or before the Rights Expiration Time and (ii) pay to the Subscription Escrow Account (as defined in the Backstop Commitment Agreement), by wire transfer of immediately available funds, the Rights Exercise Price so that payment of the Rights Exercise Price is *actually received* by the Subscription Escrow Account on or before the Rights Expiration Time; <u>provided</u>, that the Commitment Parties (in their capacities as Eligible Offerees) shall not be required to pay their respective Rights Exercise Prices until not less than two business days prior to the effective date of the Plan (the "***Effective Date***"), in accordance with these Rights Offering Procedures, and the Backstop Commitment Agreement.

In order to exercise its Subscription Rights, any Eligible Offeree who holds Allowed Unsecured Notes Claims through a Subscription Nominee must return a duly completed Rights Exercise Form to its Subscription Nominee or otherwise instruct its Subscription Nominee as to its instructions for the Subscription Rights (in each case in sufficient time to allow such Subscription Nominee to deliver the Rights Exercise Form to the Subscription Agent prior to the Rights Expiration Time) in accordance with procedures established by its Subscription Nominee, which, in turn, must comply with clauses (i) and (ii) of the immediately preceding paragraph.

For purposes of this Rights Offering, Wilmington Trust, National Association, in its capacity as Indenture Trustee for the each of the series of Unsecured Notes, shall not constitute a Subscription Nominee and shall not have any responsibility with respect to sending any Rights Offering information or collecting any Rights Exercise Forms.

B.    Deemed Representations and Acknowledgements

Any Eligible Offeree that participates in the Rights Offering is deemed to have made the following representations and acknowledgements:

(i)    Such Eligible Offeree recognizes and understands that the Subscription Rights are not transferable, other than as provided in Section VI.D below; and

(ii)    Such creditor represents and warrants that it is an Eligible Offeree.

C.    Failure to Exercise Subscription Rights

**Unexercised Subscription Rights will be relinquished at the Rights Expiration Time.**  If, on or prior to the Rights Expiration Time, the Subscription Agent for any reason does not receive from an Eligible Offeree or its Subscription Nominee a duly completed Rights Exercise Form or payment of the Rights Exercise Price is  not made into the Subscription Escrow Account, then unless otherwise approved by the Debtors, the Requisite Consenting Second Lien Creditors and the Requisite Commitment Parties, such Eligible Offeree shall be deemed to have irrevocably relinquished and waived its right to exercises the Subscription Rights in the Rights Offering.

Any attempt to exercise Subscription Rights after the Rights Expiration Time shall be null and void and nether New Permian Corp. nor the Debtor shall be obligated to honor any such purported exercise received by the Subscription Agent after the Rights Expiration Time regardless of when the documents relating thereto were sent.

**The method of delivery of the Rights Exercise Form and any other required documents is at each Eligible Offeree's option and sole risk, and delivery will be considered made only when actually received by the Subscription Agent.  Delivery by reputable overnight courier is encouraged and strongly recommended.  In all cases, you should allow sufficient time to ensure timely delivery prior to the Rights Expiration Time.**

**The risk of non-delivery of the Rights Exercise Form and any other required documents sent to the Subscription Agent in connection with the exercise of the Subscription Rights lies solely with the holders of the Allowed Unsecured Notes Claims, and none of the Debtors, the reorganized Debtors, New Permian Corp., the Commitment Parties, or any of their respective officers, directors, employees, agents or advisers, including the Subscription Agent, assumes the risk of non-delivery under any circumstance whatsoever.**

D.    Transfer Restrictions for Eligible Offerees

After the Rights Offering Record Date, an Eligible Offeree that is a holder of an Allowed Unsecured Notes Claim shall not transfer or assign its Subscription Rights unless such holder also transfers or assigns with such Subscription Rights the corresponding Allowed Unsecured Notes Claims.  Any such transfer will be subject to compliance with applicable securities laws relating to the transfer of restricted securities, and such transfers may be made only to other Eligible Offerees who held Unsecured Notes Claims as of the Rights Offering Record Date. Such transfer shall be evidenced by the delivery of the Eligible Offeree Transfer Notice (defined

6

below) to the Subscription Agent or other procedures acceptable to the Reorganized Debtors and the Subscription Agent.

After the Subscription Rights have been exercised, the person exercising such Subscription Rights shall have the right to designate the receipt of the Rights Offering Securities to another person that is an Accredited Investor or a "**QIB**" that completes and submits the Rights Exercise Form together with all necessary tax forms required thereunder. A "**QIB**" means a "**qualified institutional buyer**" within the meaning of Rule 144A under the Securities Act. Any such transfer shall be subject to compliance with applicable securities laws relating to the transfer of restricted securities.

The "**Eligible Offeree Transfer Notice**" is a notice delivered to the Subscription Agent notifying the Subscription Agent of the transfer of a Claim by the holder of the corresponding Subscription Rights through the Rights Expiration Time, which (i) indicates the name of the transferor, the name of the transferee, the type of Claim being transferred and the principal amount of such Claims; (ii) certifies that such transferee is a QIB or an Accredited Investor; and (iii) certifies that such transferee has completed and submitted the Rights Exercise Form together with all necessary tax forms required thereunder.

Notwithstanding the foregoing, each Eligible Offeree as of the Rights Offering Record Date must complete and submit the Rights Exercise Form to the Subscription Agent, whether or not it decides to transfer its Unsecured Notes Claim and the right to receive Rights Offering Securities to another party, as described above.

For transfer restrictions applicable to Non-Eligible Offerees, see Section VII.C. below.

E.    Payment for Subscription Rights

If, on or prior to the Rights Expiration Time, immediately available funds have not been deposited into the Subscription Escrow Account on behalf of an Eligible Offeree by wire transfer in an amount equal to the total Rights Exercise Price for such Eligible Offeree's Subscription Rights, such Eligible Offeree shall be deemed to have relinquished and waived its Subscription Rights, subject to the next paragraph; *provided*, that the Commitment Parties (in their capacities as Eligible Offerees) shall not be required to pay their respective Rights Exercise Prices until the two business days immediately prior to the Effective Date.

F.    Disputes, Waivers, and Extensions

Any and all disputes concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights shall be addressed in good faith by the Debtor, on behalf of New Permian Corp., in consultation with the Requisite Commitment Parties, the determinations of which shall be final and binding.  The Debtor, with the approval of the Requisite Commitment Parties, may (i) waive any defect or irregularity, or permit a defect or irregularity to be corrected, within such times as it may determine in good faith to be appropriate or (ii) reject the purported exercise of any Subscription Rights for which the Rights Exercise Form and/or payment includes defects or irregularities.  Rights Exercise Forms shall be deemed not to have been properly completed until all irregularities have been waived or cured.  The Debtor reserves the right on behalf of New Permian Corp., and with the approval of the Requisite Commitment Parties, to give notice to any

Eligible Offeree regarding any defect or irregularity in connection with any purported exercise of Subscription Rights by such Eligible Offeree or right to receive a Substitute Distribution by any Non-Eligible Offeree and the Debtor may, with the approval of the Requisite Commitment Parties, permit such defect or irregularity to be cured; it being understood, that none of the Debtor, New Permian Corp., the Subscription Agent, or the Commitment Parties (or any of their respective officers, directors, employees, agents or advisors) shall incur any liability for failure to give such notification.

The Debtor, on behalf of New Permian Corp., and with the approval of the Bankruptcy Court (if applicable) and the Requisite Commitment Parties, may (i) extend the duration of the Rights Offering or adopt additional detailed procedures to more efficiently administer the distribution and exercise of the Subscription Rights; and (ii) make such other changes to the Rights Offering, including changes that affect which parties constitute Eligible Offerees and/or Non-Eligible Offerees.

G.    Funds

The payments made to acquire Rights Offering Securities pursuant to the Rights Offering (the "***Rights Offering Funds***") shall be deposited into the Subscription Escrow Account pending the Effective Date in a segregated account or accounts (i) which shall be separate and apart from the Subscription Agent's general operating funds and any other funds subject to any lien, encumbrance, or cash collateral arrangements and (ii) which will be maintained for the purpose of holding the money for administration of the Rights Offering until the Effective Date.  The Subscription Agent shall not use the Rights Offering Funds for any purpose other than to release the funds as directed by New Permian Corp., or the Debtor on behalf of New Permian Corp., on the Effective Date or as otherwise set forth in these Rights Offering Procedures or in the Plan, and, until released in accordance with the foregoing, the Rights Offering Funds will not be deemed part of the Debtors' bankruptcy estate.  The Subscription Agent shall not permit the Rights Offering Funds to be encumbered by any lien, encumbrance, or cash collateral obligation. No interest will be paid to participating Eligible Offerees on account of any amounts paid in connection with their exercise of Subscription Rights under any circumstances.

Notwithstanding anything to the contrary herein, each Commitment Party shall make all payments in connection with the Rights Offering directly to the Subscription Escrow Account at least two business days prior to the Effective Date.

H.    Participating Eligible Offeree Release

See Section 10.9 of the Plan for important information regarding releases.

VII.    **Non-Eligible Offerees**

A.    Conditions to Receipt of a Substitute Distribution

In order to be treated as a Non-Eligible Offeree and receive its Substitute Distribution under the Plan, a Non-Eligible Offeree must complete, or cause its Subscription Nominee to complete, the Rights Exercise Form certifying that it is not an Accredited Investor and is a U.S. Person, and cause such Rights Exercise Form to be delivered to the Subscription Agent on or before the

8

Rights Offering Expiration Time. The Offering Form for each Non-Eligible Offeree must also specify if such Non-Eligible Offeree is a holder of an Allowed Unsecured Notes Claim to be eligible to receive the Substitute Distribution available to holders of each of these Claims, as described in the paragraphs below. Additionally, such Non-Eligible Offeree will elect the form of Substitute Distribution on the Rights Exercise Form. If a Non-Eligible Offeree does not satisfy these requirements, such Non-Eligible Offeree shall be deemed to have forever and irrevocably relinquished and waived the right to receive the Substitute Distribution pursuant to the Plan and these Rights Offering Procedures. Prior to making a Substitute Distribution to a Non-Eligible Offeree, the Reorganized Debtors may require such additional information as they deem necessary to confirm that such Non-Eligible Offeree qualifies as such in accordance with these Rights Offering Procedures.

Non-Eligible Offerees that satisfy the conditions set forth herein will receive, in lieu of the opportunity to participate in the Rights Offering, the Substitute Distribution. The Substitute Distribution shall also be distributed to certain holders of General Unsecured Claims (as defined in the Plan) and Non-Eligible Offerees on a pro rata basis on the Initial Distribution Date and Final Distribution Date (each as defined in the Plan).

B.    Deemed Representations and Acknowledgements

Any Non-Eligible Offeree that elects to receive a Substitute Distribution is deemed to have made the following representations and acknowledgements:

(i)    Such Non-Eligible Offeree recognizes and understands that the right to receive a Substitute Distribution is not transferable, other than as provided in Section VII.C. below; and

(ii)    Such creditor represents and warrants that it is a Non-Eligible Offeree.

C.    Transfer Restrictions for Non-Eligible Offerees

After the Rights Offering Record Date, the holder of the corresponding Unsecured Notes Claim that is a Non-Eligible Offeree shall not transfer or assign such Unsecured Notes Claim unless such holder transfers or assigns with such Claim(s) the right to receive the proceeds of the Substitute Distribution, subject to compliance with applicable securities laws relating to the transfer of restricted securities, as evidenced by the delivery of the Non-Eligible Offeree Transfer Notice (defined below) to the Subscription Agent or other procedures acceptable to the Reorganized Debtors and the Subscription Agent.

The right to receive the Substitute Distribution pursuant to these Rights Offering Procedures, which right is subject to the qualification challenge described under Section VII.D., shall not be transferrable other than to a party that is not an Accredited Investor and is not a QIB, and also completes and submits the Rights Exercise Form, which form includes certifications to such status, together with all necessary tax forms required thereunder.

The "**Non-Eligible Offeree Transfer Notice**" is a notice delivered to the Subscription Agent notifying the Subscription Agent of the transfer of a Claim by a Non-Eligible as of the Rights Offering Record Date, which (i) indicates the name of the transferor, the name of the transferee,

WEIL:\95964727\37\29979.0003

the type of Claim being transferred and the principal amount of such Claims; (ii) certifies that such transferee is neither a QIB nor an Accredited Investor; and (iii) certifies that such transferee has completed and submitted the Rights Exercise Form together with all necessary tax forms required thereunder.

Notwithstanding the foregoing, the Non-Eligible Offeree as of the Rights Offering Record Date must complete and submit the Rights Exercise Form to the Subscription Agent, whether or not it decides to transfer its Unsecured Notes Claim and the right to the Substitute Distribution to another party, as described above.

> D.    Disputes, Waivers, and Extensions

Any and all disputes concerning the timeliness, viability, form, and eligibility of any election of the Substitute Distribution (including the qualification of any Non-Eligible Offeree) shall be addressed in good faith by the Debtor, on behalf of New Permian Corp., in consultation with the Requisite Commitment Parties, the determinations of which shall be final and binding, subject to the right of the Requisite Commitment Parties to independently challenge the qualification determination on any purported Non-Eligible Offeree in Bankruptcy Court.  The Debtor, with the approval of the Requisite Commitment Parties, may (i) waive any defect or irregularity, or permit a defect or irregularity to be corrected, within such times as it may determine in good faith to be appropriate or (ii) reject the purported election of any Substitute Distribution for which the Rights Exercise Form includes defects or irregularities.  Rights Exercise Forms shall be deemed not to have been properly completed until all irregularities have been waived or cured.  The Debtor reserves the right on behalf of New Permian Corp., and with the approval of the Requisite Commitment Parties, to give notice to any Non-Eligible Offeree regarding any defect or irregularity in connection with any purported election of a Substitute Distribution by such Non-Eligible Offeree may, with the approval of the Requisite Commitment Parties, permit such defect or irregularity to be cured; it being understood, that none of the Debtor, New Permian Corp., the Subscription Agent, or the Commitment Parties (or any of their respective officers, directors, employees, agents or advisors) shall incur any liability for failure to give such notification.

The Debtor, on behalf of New Permian Corp., and with the approval of the Bankruptcy Court (if applicable) and the Requisite Commitment Parties, may (i) extend the duration of the time to elect to receive a Substitute Distribution or adopt additional detailed procedures to more efficiently administer the distribution and election of a Substitute Distribution; and (ii) make such other changes to the Rights Offering, including changes that affect which parties constitute Eligible Offerees and/or Non-Eligible Offerees.

10

## VIII.  Miscellaneous

A.    <u>Issuance</u>

The Rights Offering Securities to be issued pursuant to the Rights Offering are expected to be delivered to Eligible Offerees that have properly exercised their Subscription Rights on or as soon as practicable following the Effective Date.  The Rights Offering Securities will be issued in book-entry form or other form approved by the Requisite Commitment Parties.

Although it is expected that all distributions of Rights Offering Securities and Substitute Distributions, if in the form of New Permian Corp. common stock, will occur through DTC, there is no guarantee that this will occur.

B.    <u>Securities Law and Related Matters</u>

The Rights Offering Securities issued to the Eligible Offerees participating in the Rights Offering will be exempt from registration under the Securities Act, and any other applicable federal and state securities laws pursuant to Section 4(a)(2) of the Securities Act and/or Regulation D thereunder or another available exemption from registration under the Securities Act, and may not be resold or otherwise transferred, without registration under the Securities Act or an exemption therefrom, or any other applicable federal and state securities laws. Therefore, to the extent a certificate is issued in conjunction with the issuance of the Rights Offering Securities, such certificate may contain (or each book-entry position shall be deemed to contain) a restricted securities legend in form and substance substantially similar to the following:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS, AND ACCORDINGLY THE SECURITIES REPRESENTED BY THIS CERTIFICATE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM.

There is not and there may not be a public market for shares of New Permian Corp. There can be no assurance that a listing of New Permian Corp. shares will be achieved or that an active trading market for New Permian Corp. shares will ever develop or, if such a market does develop that it will be maintained.

The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code.  In accordance with section 1125(e) of the Bankruptcy Code, a debtor or any of its agents that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale or purchase of a security, offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or a newly organized successor to the debtor under the plan, is not liable, on account of participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.

11

IX.    **Rights Offering Conditioned Upon Effectiveness of the Plan; Reservation of Subscription Rights; Return of Rights Offering Amount**

All exercises of Subscription Rights are subject to and conditioned upon the confirmation and effectiveness of the Plan. Notwithstanding anything contained herein, in the Disclosure Statement or in the Plan to the contrary, the Debtor reserves the right, with the approval of the Requisite Commitment Parties, not to be unreasonably withheld, to modify these Rights Offering Procedures or adopt additional detailed procedures if necessary in the Debtor's business judgment to more efficiently administer the distribution and exercise of the Subscription Rights or comply with applicable law.

In the event that (i) the Rights Offering is terminated, (ii) the Debtor revokes or withdraws the Plan, or (iii) the Backstop Commitment Agreement is terminated, the Subscription Agent shall, within five (5) Business Days of such event, return all amounts received from Eligible Offerees, without any interest, and, in the case of clauses (ii) and (iii) above, the Rights Offering shall automatically be terminated.

WEIL:\95964727\37\29979.0003