UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------X
In re:                              :
                                    :          Chapter 11
BREITBURN ENERGY                    :
PARTNERS LP, *et al.*,[1]           :          Case No.: 16-11390 (SMB)
                                    :
                        Debtors.    :
---------------------------------------------X

## CORRECTED MEMORANDUM DECISION AND ORDER DENYING CONFIRMATION OF THE DEBTORS' THIRD AMENDED PLAN

**A P P E A R A N C E S :**

WEIL, GOTSHAL & MANGES LLP
*Attorneys for Debtors*
767 Fifth Avenue
New York, New York 10153

> Ray C. Schrock, P.C. Esq.
> Stephen Karotkin, Esq.
> Edward Soto, Esq.
> Richard W. Slack, Esq.
> Yehudah Buchweitz, Esq.
> Of Counsel

PROSKAUER ROSE LLP
*Attorneys for the Official Committee of
  Equity Securities Holders*
Eleven Times Square
New York, New York 10036

> Martin J. Bienenstock, Esq.
> Vincent Indelicato, Esq.
> Michael T. Mervis, Esq.
> Scott A. Eggers, Esq.
> Of Counsel

---

[1]    The debtors in these chapter 11 cases (collectively, the "Debtors") are as follows: Breitburn Energy Partners LP; Breitburn GP LLC; Breitburn Operating LP; Breitburn Operating GP LLC; Breitburn Management Company LLC; Breitburn Finance Corporation; Alamitos Company; Beaver Creek Pipeline, L.L.C.; Breitburn Florida LLC; Breitburn Oklahoma LLC; Breitburn Sawtelle LLC; Breitburn Transpetco GP LLC; Breitburn Transpetco LP LLC; GTG Pipeline LLC; Mercury Michigan Company, LLC; Phoenix Production Company; QR Energy, LP; QRE GP, LLC; QRE Operating, LLC; Terra Energy Company LLC; Terra Pipeline Company LLC; and Transpetco Pipeline Company, L.P.

MILBANK, TWEED, HADLEY & MCCLOY LLP
*Attorneys for the Official Committee of*
  *Unsecured Creditors*
International Square Building
1850 K Street, NW
Washington, DC 20006

> Andrew M. LeBlanc, Esq.,
>     Of Counsel

KIRKLAND & ELLIS LLP
*Attorneys for Second Lien Group*
601 Lexington Avenue
New York, NY 10022

> Mark McKane, Esq.
>     Of Counsel

JACK N. MAYER
532 East 8th Street
Brooklyn, NY 11218

DOUGLAS B. MAY
687 Long Rifle Road
Grand Junction, CO 81507

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

Breitburn Energy Partners LP ("BBEP") and its debtor affiliates (with BBEP, the "Debtors" or "Breitburn") seek confirmation of their Third Amended Joint Chapter 11 Plan, dated Dec. 1, 2017 ("Plan"). The Plan was rejected by Class 5B, the unaccredited bondholders and deemed rejected by Classes 9, the subordinated creditors, and 11, BBEP's preferred and common unitholders ("Equity"). The Court conducted a four day evidentiary hearing largely focused on the Debtors' valuation.

The credible valuation evidence demonstrated that the Debtor is hopelessly insolvent and Equity is out of the money. However, based on the valuation of the Debtors' assets as found by the Court, the Court concludes that the Debtors have failed

to sustain their burden of proving that the Plan does not unfairly discriminate against Class 5B.  Accordingly, the application to confirm the Plan is denied.

## BACKGROUND[2]

Breitburn consists of a group of affiliated independent oil and gas exploration and production ("E & P") companies.  Their portfolio consists of largely undeveloped, unconventional acreage located in the Permian Midland Basin primarily in Howard and Martin counties in West Texas (the "Permian Assets"), and mature, developed assets spread across multiple onshore basins within the United States (the "Legacy Assets"). (*Declaration of Douglas A. Fordyce in Support of Confirmation of Debtors' Third Amended Joint Chapter 11 Plan*, dated Jan. 8, 2018 ("*Fordyce*"), ¶¶ 13, 14 (ECF Doc. # 2071).)[3]  The Legacy Assets include thousands of individual wells, mostly with long-life production from proved developed oil and gas reserves.  These assets are situated in Texas, New Mexico, Ark-La-Tex (situated in portions of Arkansas, Louisiana, and eastern Texas), a mid-continent area in Oklahoma, Kansas, and Northern Texas, California, Wyoming, the Southeast, including Florida and parts of the Midwest, including Michigan, Indiana, and Kentucky.  The Legacy Assets also include certain assets in the Permian Midland Basin, but references to the Permian Assets in this opinion do not include these Legacy Assets.  (*Fordyce* ¶¶ 13, 15.)

---

[2]    The following citation conventions are used in this decision: BX refers to Breitburn's exhibits received in evidence, OEX refers to the exhibits of the Official Committee of Equity Securities Holders (the "Equity Committee") received in evidence and the four days of trial transcripts are referred to as Tr. Day 1, Tr. Day 2, *etc.*  Finally, citations to ECF refer to the electronic docket in bankruptcy case no. 16-11390 (SMB).

[3]    The Court received the direct testimony of the witnesses through written declarations.

Like many of its peers, Breitburn was battered by declining oil and gas prices and filed these chapter 11 cases on May 15, 2016 (the "Petition Date"). As of the Petition Date, Breitburn had several tranches of secured and unsecured funded debt aggregating approximately $3 billion. (*See* BX 90 ("Disclosure Statement") at 18).) The secured debt included a Revolving Credit Facility ("First Lien Debt"), 9.25% Senior Secured Second Lien Notes due 2020 ("Second Lien Debt," and with the "First Lien Debt," the "Prepetition Secured Debt") and two tranches of unsecured notes ("Bond Debt"). (*Id.*) In addition, BBEP had outstanding equity held by preferred and common unitholders.

## A.    Plan Negotiations

The Debtors faced several obstacles to confirmation from the start of the cases, and plan negotiations had to address several moving parts often headed in opposite directions. According to the unrefuted testimony of Timothy R. Pohl of Lazard Frères & Co., Breitburn's financial advisor, (*see Declaration of Timothy R. Pohl in Support of Confirmation of Debtors' Third Amended Joint Chapter 11 Plan,* dated Jan. 8, 2018 ("*Pohl*") (ECF Doc. # 2070)), the Debtors required approximately $1 billion in new capital to (a) repay or refinance the approximately $750 million of the First Lien Debt (net of hedge proceeds), (b) repay estimated debtor in possession ("DIP") loans and administrative costs, and (c) provide working capital for the reorganized Debtors upon emergence. (*Pohl* ¶ 9.) In addition, the Debtors needed to provide for the payment or confirmable treatment of the claims of the holders of the Second Lien Debt (the "Second Lien Group") which totaled approximately $792 million as of the Petition Date (inclusive of contractual make-whole payments and prior to any post-petition interest accruals) before unsecured creditors would be entitled to any recovery. (*Pohl* ¶ 9.)

4

During the ensuing eighteen months, the Debtors and Pohl negotiated various potential plans with holders of the First Lien Debt (the "First Lien Group"), the Second Lien Group and the Official Committee of Unsecured Creditors (the "UCC"), whose constituency included the holders of the Bond Debt (the "Bondholders"), some of whom formed into *ad hoc* groups represented by separate counsel.  The initial negotiations focused on obtaining the Second Lien Group's willingness to convert its prepetition secured debt to equity and provide $150 million in new equity and the First Lien Group's agreement to provide a new secured exit facility in an amount of approximately $850 million.  (*Pohl* ¶ 10.)  The Debtors' unsecured creditors, including the Bondholders, would receive a small minority equity interest in the reorganized Debtors.  (*Pohl* ¶ 10.)  These negotiations did not succeed because, among other things, the Debtors could not reach an agreement with the holders of their Prepetition Secured Debt.  (*Pohl* ¶ 12.)

During late 2016 and early 2017, the Debtors received competing proposals from two groups: an *ad hoc* group of Bondholders represented by Akin Gump Strauss Hauer & Feld LLP (the "Akin Group"), which held approximately one-third of the principal amount of the Bond Debt, and an *ad hoc* group of Bondholders represented by White & Case LLP (the "White & Case Group") who were partnering with members of the UCC.  (*Pohl* ¶¶ 13-15.)  Each proposal had the following characteristics:  a backstopped rights offering[4] of $800 million or more available to eligible Bondholders in exchange for the

---

[4]    In simplest terms, a rights offering is a source of exit financing.  Creditors (or a subgroup of creditors) are offered the opportunity under the plan to subscribe for an equity interest in the surviving entity or a new entity formed under the plan.  The parties to a backstop or equity commitment agreement agree to subscribe for any equity interests that are not purchased through the rights offering.

majority of the equity of the reorganized Debtors, a new first lien exit facility provided by the First Lien Group, reinstated or new second lien debt distributed to the Second Lien Group and a minority equity interest in the reorganized Debtors distributed to unsecured creditors (including Bondholders) outside of the rights offering. (*Pohl* ¶¶ 14-16.)  The Debtors continued negotiations with each group to improve the terms, including increasing the size of the equity rights offering up to $1 billion and agreement on a consensual treatment of the Second Lien Debt, (*Pohl* ¶ 16), but the parties could not agree on that treatment. (*Pohl* ¶ 17.)

At the same time that the Debtors were negotiating with the White & Case Group and the UCC, the White & Case Group and the UCC began discussions with the Akin Group in an attempt to gain its participation in and support for the plan proposal.  In June 2017, the Debtors were presented with a materially revised proposal that had the support of the UCC and both the White & Case and Akin Groups premised on a $1 billion rights offering (the "Revised Bondholder Proposal").  The Revised Bondholder Proposal called for, among other things, a substantially altered proposed treatment of the Second Lien Debt, which the Debtors believed was not confirmable. (*Pohl* ¶ 18.)

During this same period, the Debtors also sought to raise capital from third-parties.  Among other things, the Debtors explored the possibility of issuing new second lien or unsecured bond debt in the capital markets to refinance the Second Lien Debt.  While two institutions potentially interested in underwriting the issue of new debt believed this might be viable, they advised the Debtors that their ability to raise sufficient new capital to pay off the Second Lien Debt was predicated on a material new equity infusion by the Bondholders and a lien securing the new debt on the Debtors'

6

assets, including the Permian Assets.  (*Pohl* ¶¶ 19-20.)  This last requirement conflicted with the Revised Bondholder Proposal under which the Permian Assets had to remain free of liens.  Hence, the third party financing proposal was not a feasible alternative. (*Pohl* ¶ 21.)

In June and July 2017, the Debtors renewed negotiations with the Second Lien Group even while they continued to negotiate potential modifications to the Revised Bondholder Plan, but the two groups were at an impasse.  The Second Lien Group would not accept debt under a plan that was satisfactory to the proponents of the Revised Bondholder Proposal or less than 100% in cash of their (disputed) claims.  (*Pohl* ¶ 22.) Further, the Second Lien Group would not agree to and could not be forced to equitize their debt.  (*Pohl* ¶ 22.)  The *ad hoc* Bondholder Groups, on the other hand, would not accept the terms necessary to raise the funds through third party financing.  (*Pohl* ¶ 22.) Furthermore, certain members of the Bondholder Groups were unwilling to invest sufficient amounts unless coupled with a cram down structure for the Second Lien Debt that the Debtors did not consider confirmable.  (*Pohl* ¶ 22.)  In short, the Debtors had not been able to procure the approximate $1 billion needed to emerge from chapter 11 before even addressing the treatment of the Second Lien Debt, (*Pohl* ¶ 22), and despite renewed discussions, the Second Lien Group would not agree to invest new equity junior to the equity provided by market-placed debt.  (*Pohl* ¶¶ 23-24.)  Furthermore, the plan would have provided little or no recovery to the unsecured creditors, and it was clear that the UCC and the Bondholder Groups would vigorously oppose such a plan.  (*Pohl* ¶ 25.)

By early August 2017, the Second Lien Group and the Akin and White & Case Groups began negotiations with the Debtors' encouragement designed to achieve a consensual plan.  (*Pohl* ¶ 26.)  The structure that emerged was ultimately incorporated into the plan before the Court.  The Debtors' assets would be split between New Permian Corp. ("New Permian") and LegacyCo.  The Bondholders would own the equity in New Permian, the entity that would own the Permian Assets plus a minority interest in LegacyCo, through their participation in a rights offering backstopped by members of the Bondholder Groups.  The Second Lien Debt would be converted into a majority interest in the equity of LegacyCo, the entity that would own the Legacy Assets.  The First Lien Group would provide exit financing to LegacyCo, leaving New Permian free of debt, and the proceeds of the exit facility and the rights offering would supply the $1 billion needed to emerge from chapter 11 and provide additional working capital for LegacyCo.  (*Pohl* ¶ 26.)

As the consensus was gelling, the Debtors received unsolicited offers for some of their assets.  In particular, on August 29, 2017, Diamondback Energy, Inc. ("Diamondback") offered $675 million for the Permian Assets, and on October 3, 2017, raised its offer to $725 million subject to certain conditions, including bidder protections and possible adjustment based on the results of due diligence.  (Disclosure Statement at 29.)  The Debtors did not pursue the Diamondback offer because even at a higher price, the outcome to the stakeholders would be inferior to the proposed treatment under the plan then under discussion.  (*Pohl* ¶ 27.)

In October 2017, the Debtors successfully concluded plan negotiations with the Second Lien Group and the majority of Bondholders, (*Pohl* ¶ 29), and the Breitburn

Board unanimously approved the plan on October 10, 2017. (*Pohl* ¶ 33.) However, opposition remained. The UCC, whose membership was in the process of changing,[5] did not support the plan, (*Pohl* ¶ 30), and filed lengthy objections to the Disclosure Statement, (*see Objection of Official Committee of Unsecured Creditors to Debtors' Motion to Approve Disclosure Statement*, dated Nov. 9, 2017 (ECF Doc. # 1787)), and to the Debtors' motion to approve the backstop agreement. (*See Objection of Official Committee of Unsecured Creditors to Debtors' Motion Authorizing Entry Into the Backstop Commitment Agreement*, dated Nov. 13, 2017 (ECF Doc. 1802).)

Given the UCC's opposition, the Court adjourned the hearings on the motions to approve the Disclosure Statement and the backstop agreement, and following a telephone conference with the parties, ordered mediation before Bankruptcy Judge Robert D. Drain. (*Order Selecting Mediator and Governing Mediation Procedures*, dated Nov. 16, 2017 (ECF Doc. # 1830).) The mediation order authorized the participation of the Equity Committee (which alone continued to argue that the Debtors were solvent) but withdrew from the mediation Equity's issue regarding cancellation of debt income ("CODI"), discussed in more detail below. The mediation proved successful as it garnered the support to a modified plan from all of the parties save the Equity Committee.

---

[5]    On October 30, 2017, the United States Trustee appointed three members to the UCC: Transpetco Transport Co., a trade creditor, Wilmington Trust Company, the indenture trustee for the Bond Debt, and Ronald J. Lichtman, a Bondholder. (*Second Amended Notice of Appointment of Official Committee of Unsecured Creditors*, dated Oct. 30, 2017 (ECF Doc. # 1735).)

### B.    The Plan

The resulting Plan is a complex document,[6] and I summarize it here only to the extent necessary for this opinion.  The Plan creates two new corporations, New Permian and LegacyCo.  New Permian will own all of the Permian Assets, and a 7.5% interest in the equity of LegacyCo, and LegacyCo will own the Legacy Assets.  To the extent relevant, the Plan divides the creditors into Class 3 (First Lien Debt), Class 4 (Second Lien Debt), Classes 5A/5B (Bond Debt), Class 6 (non-Bondholder unsecured debt), Class 7 (ongoing trade debt), Class 9 (subordinated debt) and Class 11 (Equity).  The Plan treats each class in the following manner:[7]

1.    The First Lien Debt aggregates $747,316,435.62.  Class 3 will receive 100% of its claim on the Effective Date minus the $400 million exit facility that it is providing.

2.    The Second Lien Debt aggregates between $838 million and $949 million, depending on the outcome of a dispute regarding the right to certain post-petition interest.  The Plan will distribute 92.5% of the equity in LegacyCo to Class 4, and projects a recovery between 84% and 75%, subject, however, to dilution by an anticipated management incentive plan, or MIP.  The MIP is discussed in more detail later in this opinion.

3.    The Bond Debt aggregates $1,209,392,187.50, and the treatment depends on whether the Bondholder is an accredited investor.  Class 5A consists of "Accredited Investors" as defined in Rule 501(a) of Regulation D of the Securities Act of 1933 or a

---

[6]    A copy of the Plan is attached to the Disclosure Statement.

[7]    The descriptions that follow are taken from the Disclosure Statement.

non-U.S. Person (collectively, "Eligible Offerees").  Members of Class 5A are eligible to participate in a rights offering through which they may acquire a *pro rata* interest in the equity of New Permian by investing up to $775 million through the rights offering.  The rights offering is backstopped by a group of Bondholders, so that if an insufficient number of Class 5A Bondholders subscribe pursuant to the rights offering, the backstop parties will make up the difference needed to reach $775 million.  The treatment is limited to Eligible Offerees to maintain an exemption from the registration requirements under the federal securities laws for certain transactions that do not involve a "public offering."  15 U.S.C. § 77d(a)(2).  A Class 5A creditor that does not subscribe under the rights offering receives no distribution under the plan.

Class 5B consists of the Bondholders that are not Eligible Offerees.  The Plan creates a trust (the "AUNC Trust") that will be an Eligible Offeree and receive some of the New Permian equity.  A Class 5B creditor will have the option to receive AUNC Trust shares having a value of approximately 4.5% of its allowed claim or receive a cash distribution in the same percentage amount subject to an overall cap of $5,422,265.00.  The Class 5B creditor must certify that it is not an Eligible Offeree (an Eligible Offeree would have to make a cash investment through the rights offering to receive any distribution.)  The certification is made in the ballot.  (*See* ECF Doc. # 1885-1, at 23 of 111.)  Consequently, a Class 5B creditor that fails to return the ballot (or returns it without the certification) does not receive any distribution.

4.    The Class 6 debt totals $21.5 million.  Its members will receive cash, but certain members can choose instead to receive New Permian stock.  The cash distribution is estimated to be 6.98% of the allowed amount of the Class 6 claim.  The

distribution of the New Permian shares will be equal in value to 4.5% of the allowed amount of the Class 6 claim.

5.      The ongoing trade debt totals $5.2 million.  Class 7 members, who are unidentified, will receive 100% of their claims.

6.      Class 9 consists of claims subordinated under 11 U.S.C. § 510, and will not receive or retain any property under the Plan.

7.      Finally, all existing equity interests in BBEP will be cancelled, and Class 11 will not receive or retain any property under the Plan.

### C.      The Valuation Evidence

#### 1.      Introduction

The market value of the Debtors' assets is the central issue in this proceeding. There are three primary methods used to determine the total enterprise value, or TEV, of an oil and gas E & P company: (a) a net asset value ("NAV") analysis, (b) a precedent transaction analysis and (c) a comparable company analysis.  (*Fordyce* ¶ 17.)  Not all three approaches will be appropriate in every case.  (*Fordyce* ¶ 17.)

The NAV is essentially a forward looking, discounted cash flow analysis that estimates the TEV by calculating the sum of the present value of net cash flows generated by the assets.  (*Fordyce* ¶ 18.)  After computing the value of the cash flows, the NAV is derived based on three further adjustments.  First, the cash flows are discounted back to the present value, typically at the industry standard rate of 10% ("PV-10").  (*Fordyce* ¶ 18.)  Second, the discounted cash flows are further adjusted by applying reserve adjustment factors ("RAFs") to each of the Company's categories of oil

12

and gas reserve categories.  (*Fordyce* ¶ 18.)  This deduction accounts for the likelihood (or unlikelihood) that the estimated oil and gas reserves still in the ground will be recovered in the future.  The less likely their recovery, the less value is attributed to those reserves in the NAV analysis.  Third, future corporate general and administration ("G&A") expenses and District G&A expenses are estimated and deducted.  (*Fordyce* ¶ 18.)

The precedent transaction analysis is a second, accepted valuation methodology. Under this methodology, transaction values are commonly expressed as multiples of various measures of financial and operating statistics such as acreage, daily production and proved reserves.  (*Fordyce* ¶ 29.)  Unlike the NAV, it is backward looking because it looks at earlier transactions.  Among the factors typically used to select precedent transactions are geographic location, commodity weighting, reserve life, asset type, commodity price environment, transaction date, developmental level and relative size. (*Fordyce* ¶ 30.)  The object is to determine a price per acre based on two components: the amount of the acreage involved in the transaction and the barrels of oil equivalent[8] ("BOE") that are produced daily on the acreage ("BOED").  The BOED must be considered because an acre that produces more oil is worth more than an acre that produces less oil.

The third generally accepted valuation methodology is the comparable company analysis.  This methodology determines the value of a company by comparing it with

---

[8]    A barrel of oil equivalent is an industry term used to summarize the amount of energy that is equivalent to the amount of energy found in one barrel of crude oil.  (*Direct Testimony of John F. Reader*, dated Jan. 8, 2018 ("*Reader*"), at ¶ 21 n. 6 (ECF Doc. # 2082).)

other, public companies with similar assets, as well as similar operating and financial

characteristics. (*Fordyce* ¶ 32.) The expert determines the TEV for each selected public

company by examining the trading prices for its equity securities as reflected in the

public markets and adding to that amount the outstanding amounts of preferred

securities, minority interests and debt net of cash for the selected company. (*Fordyce* ¶

32.) This analysis produces multiples or ratios which are then applied to the relevant

metrics for the company being valued. (*Fordyce* ¶ 32.) The selection of comparable

companies is typically based upon the type of assets, geographic location, size and scale

of operations, mix of developed and undeveloped reserves, production growth, financial

health, reserve life and hydrocarbon mix, among other characteristics. (*Fordyce* ¶ 33.)

Opining on value involves a degree of subjectivity regardless of which method is

used. The backward-looking precedent transaction and comparable company analyses

require the expert to select comparable transactions or companies, but in truth, no two

transactions or companies are exactly alike. The expert necessarily exercises discretion

in his determination of comparability. The forward-looking discounted cash flow

analysis or NAV is even more subjective. It involves predicting future revenues and

expenses, and therefore requires assumptions regarding future prices and future costs,

in this case going out fifty years, that are no more than guesses. The competing expert

opinions in these cases show how two people can look at the same assets but reach

wildly disparate conclusions regarding their worth.

In addition to the experts who testified, the Court received numerous emails and

letters from unitholders and unsecured creditors expressing their personal views of

value often accompanied by articles or reports that they implicitly if not explicitly want

the Court to consider.  It is important, at the outset, to remember that the confirmation hearing was a trial at which valuation (as well as other) witnesses were subject to cross-examination, and their opinions were exposed to rigorous scrutiny.  Consistent with the rules of evidence, the Court cannot consider the proof of value submitted outside of the confirmation hearing through the aforementioned emails and letters because the proof was not tested by the time-honored methods of determining the reliability of the evidence.  Accordingly, the Court will begin with the valuation evidence adduced through the expert testimony based on the accepted methods of valuation, and then consider the other evidence of value referred to at the trial.

### 2.    LegacyCo

Both experts relied primarily on an NAV analysis to value the Debtors' Legacy Assets.  (*See Fordyce* ¶ 41; *Reader* ¶ 14.)  Fordyce, the Debtors' expert, concluded that the market value of the Legacy Assets fell between $780 million and $990 million, with a midpoint value of $895 million.  He confirmed this value using a precedent transaction analysis.  (*Fordyce* ¶ 41.)  Reader, the Equity Committee's expert, opined that the Legacy Assets were worth between $2.013 billion and $2.551 billion, and assumed an intermediate value of $2.285.  (*Reader* ¶ 60.)

Generally, four differing assumptions explained the substantial difference in the experts' opinions: (i) initial pricing (strip vs. consensus), (ii) forecasting prices out fifty years, (iii) risk-adjustments and (iv) G&A expenses.

### a.    Pricing

The most significant valuation factor was the assumptions relating to the price of oil and gas.  Fordyce used strip pricing.  (*See Fordyce* ¶¶ 22, 42.)  The strip price reflects the price at which future contracts for the sale of oil and gas are traded on the New York Mercantile Exchange ("NYMEX").  (*Fordyce* ¶ 22.)  In contrast, Reader used a consensus price that he developed just for this case.  (Tr. Day 2, 125:11–21.)  Reader chose ten price sources, added their forecast prices together and divided the result by ten to calculate the average commodity price for each year.  (*See* Tr. Day 2, 126:2–10.)

The parties spent a great deal of time debating the relative merits of strip *versus* consensus pricing.  In truth, strip pricing is a form of consensus pricing, and the one used by valuation experts and businesses alike.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 209 (Bankr. S.D.N.Y. 2016) (Strip prices do not necessarily project future prices, but "are considered an appropriate source of information as to future movement in the commodity price because they are based on the pricing of commodity future contracts.").  Strip prices reflect the views of where prices are headed by willing buyers and sellers, each with access to all available information who, proverbially, "puts his money where his mouth is."  (*See Fordyce* ¶¶ 24–28; *see Declaration of James G. Jackson in Support of Confirmation of Debtors' Third Amended Joint Chapter 11 Plan*, dated Jan. 8, 2018 ("*Jackson*"), ¶ 47 ("Strip pricing refers to a market aggregation of actual prices at which buyers and sellers transact for future deliveries of oil and gas volumes.") (ECF Doc. # 2068).)  The Debtors use strip pricing in their day-to-day business to determine whether to pursue particular oil and gas acquisition opportunities and as part of the GAAP impairment process discussed below.  (*See Jackson* ¶ 46.)  The

16

Debtors' founder and Chief Executive Officer, Halbert S. Washburn, testified that in his thirty years in the oil and gas business, "all transactions that I have been involved in have been based on strip pricing." (*Declaration of Halbert S. Washburn in Support of Confirmation of Debtors' Third Amended Joint Chapter 11 Plan,* dated Jan. 8, 2018 ("*Washburn*"), ¶ 14 (ECF Doc. # 2067).)

The general acceptance of strip pricing is also confirmed by various third party sources. For example, the Society of Petroleum Evaluation Engineers ("SPEE") is a respected professional society that conducts surveys of its members as well as non-members on matters relating to the oil and gas industry. Its June 1, 2017 report ("SPEE Report) (BX 38) summarizes responses to questionnaires distributed to 269 members and certain invited guests. (SPEE Report at 1.) One of the questions asked about the sources used in future price projections. The overwhelming majority, 2o6 of the 239 who responded to this question, or 86%, answered that they used strip pricing in making future commodity price projections. (*Id.* at 9.) The respondents used additional sources as well, and in fact, the average respondent used 2.52 sources.[9] (*Id.*) Nevertheless, strip pricing was the overwhelming choice, and Reader admitted that it was "not uncommon to see strip pricing in fair market valuations," (Tr. Day 3, 24:9–12), and strip prices are used in every day transactional assessments like bank lending and business planning. (Tr. Day 3, 24:13–21.) In addition, an article by Rhett Campbell, entitled "Valuing Oil & Gas Assets in the Courtroom," which Reader described as a "very helpful resource," (Tr. Day 2, 181:5-12), stated that "if one believes in the invisible hand

---

[9]    The second category most often used (by 50% of the respondents) was "internal company forecasts." (SPEE Report at 9.) This may include some form of consensus pricing.

theory of markets then the NYMEX strip is the best estimate of future prices." (Tr. Day 3, 29:6–12.) Finally, strip pricing has been used to value assets in every large, confirmed chapter 11 E & P case since 2015. (*Rebuttal Report of Douglas A. Fordyce in Response to the Expert Report of the Statutory Committee of Equity Security Holders*, dated Dec. 13, 2017 ¶ 9 (BX 28).)

Even if one could make a case for using consensus pricing rather than strip pricing, Reader's cross-examination revealed the unreliability of his consensus price deck. As noted, he gave equal weight to each of his sources when he computed his consensus price deck. But two of his sources, *investing.com* and the *Wall Street Journal*, already reflected the consensus of numerous individual price forecasts. *Investing.com* included thirty-three individual forecasts, (BX 72), and the *Wall Street Journal* contained over forty individual forecasts. (*See* BX 70.) On average, both sources forecasted lower prices than Reader's consensus, (*see Fordyce* ¶ 86), and Reader admitted that if he had used the average *investing.com* and *Wall Street Journal* prices and kept them flat for the remainder of the fifty years in his NAV analysis (as Fordyce had done), his valuation of LegacyCo would have been lower than Fordyce's valuation. (*See* Tr. Day 2, 172:14–25.) Reader nevertheless counted each as a single source in his overall weighting to create his consensus price deck, and thereby inflated his consensus price.

Reader's consensus price deck suffered from other shortcomings that led to an inflated value. For example, the highest single price forecast Reader used came from an email, dated July 12, 2017, sent by TPH Canada in response to a contact initiated by Reader. (BX 73.) TPH Canada forecasted an oil price of $65.00 per barrel in 2018 and

18

$75.00 per barrel in 2019 through 2021, the last year covered by its forecast.  The email acknowledged that its forecast was "very optimistic on oil," hoped that it was right, but added that its own research models were run on a price deck of $55 per barrel.  (BX 73.) Reader testified that he did not recall reading the reference to a $55 flat price when he received the email, (Tr. Day 2, 165:10-16), and admitted that had he used the $55 flat price in his own models, his price would be lower than the strip price used by Fordyce. (Tr. Day 2, 165:17–166:20.)

Reader's consensus price deck also included forecasts from three Canadian reserve engineering companies: Sproule, McDaniel and GLJ.  Sproule and McDaniel were among the highest price forecasts in Reader's consensus price deck.  Reader testified that reserve engineering companies perform reserve evaluations that are not the same as financial valuations.  (Tr. Day 2, 180:14–24.)  Reader's decision to include reserve engineering forecasts was inconsistent with the aforementioned Campbell article which stated that being a reserve engineer did not equate to being an expert on fair market value.[10]  (Tr. Day 2, 181:25–182:23.)

Reader's cross-examination demonstrated that his selection of consensus price sources was unreliable, and perhaps, designed to reach a pre-conceived conclusion that the Debtors are solvent rather than to determine whether the Debtors are solvent. Accordingly, I conclude that Reader's consensus price deck is not reliable.

---

[10]    When confronted with the article, Reader said it was "a little bit dated" with respect to the definitions of reserve categories and "maybe other changes that I would be less familiar with."  (Tr. Day 2, 181:13-24.)  Reader nonetheless listed the Campbell article in his expert report as one of the references he used.  (BX 65 at 43.)

### b.    Forecasting Future Prices

Strip pricing goes only so far.  The experts based their NAV analyses on a fifty year forecast, but NYMEX trading thins as we go further into the future, and the strip pricing (as well as consensus pricing) becomes less reliable.  Fordyce testified that there were tens of thousands of reported trades through year seven, (Tr. Day 1, 275:10-19), and although trading tailed off, there were still "lots of trades" in years eight and nine. (Tr. Day 1, 276:12-277:6.)[11]  Fordyce used strip prices for the longest duration available, eight years for oil and ten years for gas.  (*Fordyce* ¶ 42.)  Using strip prices this far into the future was consistent with Breitburn's practice in projecting prices for purposes of its internal accounting and the GAAP impairment analysis (discussed below).  (*See* BX 23 at 17 n. 5.)

After strip prices were no longer reliable, Fordyce used the last reliable strip price and held prices flat for the remainder of his NAV analysis.  Reader, on the other hand, escalated prices starting in 2028 at the annual rate of 2% for the remaining forty years of his forecast.  He did not, however, escalate costs.

While Fordyce criticized Reader's 2% annual price increase, he took special aim at Reader's failure to also increase his cost projections.  An expert cannot escalate prices and ignore escalating costs; if prices rise, the costs of drilling, lease operating expenses and labor also rise.  It becomes more economical to drill, demand for drilling services

---

[11]    Fordyce also testified about substantial trading off exchange in the separate over-the-counter and option markets, but people who make the off exchange trades reference the strip price.  (Tr. Day 1, 277:6-279:5.)  This makes sense.  The NYMEX is transparent.  A seller would not sell for less than the price of the strip (otherwise, it can sell on the NYMEX) and a buyer would not pay more than the strip price (otherwise, it can buy on the NYMEX).

and employees increases, and the laws of supply and demand will cause the price of those services, labor costs and other expenses to rise.[12]  (Tr. Day 3, 169:2–171:24.)  Moreover, it takes energy to make energy.  (*See* Tr. Day 3, 171:25-172:2.)  Energy is needed to run drilling rigs and illuminate work areas, and this energy comes from hydrocarbons – diesel oil and gas.  (Tr. Day 3, 172:5-173:7.)  Thus, if the price of oil or gas rises, the Debtors' operating costs will also rise.  Based on his analysis of Breitburn's costs, Fordyce concluded that Breitburn's oil and gas expenses represent 31% of Breitburn's lease operating expenses.  (Tr. Day 3, 174:2-14.)  In essence, Reader's forecast of forty years of 2% annual price increases mistakenly assumes that every dollar of increased revenue resulting from future price rises will drop down to the bottom line.

Fordyce performed two additional sensitivity analyses mid-trial.[13]  Using Reader's consensus price deck and the G&A from Breitburn's Business Plan 4.3, (BX 19), Fordyce escalated costs at the same rate as oil prices through 2028 (Reader's last date), and then escalated prices and costs at the rate of 2% for the remaining approximate forty years.  Under this scenario, the implied value for LegacyCo ranged between $1.288 billion and $1.614 billion, with a midpoint of $1.451 billion.  (*See* BX 93 at 4.)

Given the issues with Reader's consensus price deck, the Court asked Fordyce to run the same analysis, but this time, using Breitburn's price assumptions.  (*See* BX 94.)

---

[12]    When asked how he could justify not paying a single salary increase throughout this fifty-year period, Reader responded, "you can't put the emotions of your employees over generating profits to your bottom line."  (Tr. Day 2, 151:14–16.)

[13]    A sensitivity analysis is another name for a "what if" analysis.  The analyst makes certain assumptions, such as price or costs, and plugs the numbers into a computer program to see what outcome is produced by those assumptions.

Fordyce started with the January 6, 2018 strip price for both oil and gas,[14] escalated lease operating expenses, the district (but not the corporate) G&A and capital costs at the same rate that the strip prices increased, and for the balance of the fifty years, increased prices and expenses at 2% *per annum*.  Finally, Fordyce factored in the net hedge liability of $27 million triggered by the higher prices assumed in this analysis.  This analysis did not calculate a low point value, but the value of LegacyCo ranged between $904 million and $1.147 billion with a midpoint of $1.025 billion.[15]  (BX 94 at 2; Tr. Day 4, 19:21-20:5.)

Although Fordyce prepared these analyses, he disagreed that prices should be escalated at the end of the strip price year, and offered three reasons for keeping prices (and costs) flat.  First, prices and costs fluctuate dramatically due to external events rather than inflation, and it is difficult to forecast oil and gas prices and costs.  (Tr. Day 4, 12:6-13:4.)  Second, selecting the appropriate escalation rate is subjective;  prices don't go up forever, and it might be appropriate to cap the price at some point.  (Tr. Day 4, 13:5-13:13.)  Third, escalating prices and costs at the same rate is belied by experience.  As the profit margin grows over time, more participants will enter the industry, costs will rise, and ultimately, profit margins will decline.

---

[14]    Notably, although the prices were higher in the immediate years, the future prices as of January 6, 2018 were actually lower than the same prices forecasted on October 27, 2017.  For example, the 2025 price for oil was $59.20 as of October 27 but only $54.67 as of January 6.  The 2024 price had also declined by $4.60 between the later and earlier dates.  The price declines suggest that buyers and sellers think the price of oil will decline in those years.  Nevertheless, the NAV remained relatively constant under the Lazard model used in its expert report regardless of which strip prices were used.  (Tr. Day 4, 20:17-20:24.)

[15]    LegacyCo would emerge from confirmation with a net debt of $130 million.  This debt would decrease the value of the equity in LegacyCo that will be distributed under the plan.  (Tr. Day 4, 20:25-21:19.)

Initially, I reject Reader's forecast.  He escalated prices but not costs, and instead, relied on Breitburn's own cost assumptions.  (Tr. Day 3, 9:16-24.)  But Breitburn assumed flat rather than escalating prices after year ten and its own projections would not reflect costs escalating in conjunction with a 2% annual price rise over forty years.  As explained above and conceded by Reader, rising prices result in rising costs if for no other reason than it takes energy to get energy out of the ground.  (Tr. Day 3, 9:8-15.)  Thus, by adopting Breitburn's own cost assumptions during forty years of flat prices, Reader underestimated Breitburn's costs and overestimated LegacyCo's NAV.  In fact, Fordyce testified that using his price assumptions (consensus plus 2% annual escalation) but also escalating lease operating expenses and capital expenditures at the same 2% annual rate reduced Breitburn's TEV (inclusive of the Permian Assets) by $1.1 billion.  (Tr. Day 3, 166:1-168:15.)

On the other hand, the assumption of flat pricing and costs defies logic as well as experience.  The parties forecasted prices for a total of fifty years, and it seems reasonable to assume there will be some increase.  While Fordyce testified credibly that commodity prices are cyclical, forty-five years ago a gallon of gas cost thirty cents.  (*See* Tr. Day 4, 121:12-16.)  In addition, Breitburn escalates prices and costs at the annual rate of 2% at the end of the strip price period when performing the impairment test under GAAP.  (BX 23 at 17 n. 5; OEX 40 at 2.)  While holding prices and costs flat starting in year ten may be methodologically sound, the result is unduly conservative and inconsistent with the practice that Breitburn follows, at least for accounting purposes.  Accordingly I conclude that modifications depicted in BX 94 better reflect the value of LegacyCo, and subject to the discussion of risking and G&A, raise the midpoint

23

value under the NAV from $875 million to $1.025 billion.  (*See* BX 94 at 2; Tr. Day 4, 19:21–20:12.)

### c.    Risking Reserves

The third area of difference concerned risking.  As noted earlier, after computing the discounted cash flow in accordance with PV-10, the projected cash flows must be further reduced because not all oil reserves are equally likely to produce the reserve amounts.  The risks include, among other things, subsurface risks, cost and expense uncertainties and mechanical problems that ultimately may influence development of the forecasted reserves.  (*Fordyce* ¶ 20.)

For purposes of the RAFs, the reserves are placed into three general categories, Proved, Probable and Possible.  (*Fordyce* ¶ 19.)  Each category reflects a descending likelihood that oil and gas will be available in the anticipated volumes and that they can be extracted economically.  (*Fordyce* ¶ 44.)  Proved reserves, which are the most likely to be recovered, are further subdivided into three categories based on the time and expense necessary to their recovery.  Proved Developed Producing reserves are reserves expected to be recovered (i) through existing wells with existing equipment or operating methods or in which the cost of the required equipment is relatively minor compared to the cost of a new well, and (ii) through installed extraction equipment and infrastructure operational at the time of the reserves estimate if the extraction is by means not involving a well.  (*Fordyce* ¶ 19.)  Proved Developed Non-Producing reserves are reserves expected to be recovered from completion intervals that are either open but not producing at the time of the estimate, or that are behind existing wells but not yet open.  (*Fordyce* ¶ 19.)  Proved Undeveloped reserves are reserves expected to be recovered

24

from new wells on undrilled acreage or from existing wells where a relatively major expenditure is required for completion.  (*Fordyce* ¶ 19.)  Next, Probable reserves are undeveloped reserves where the reserve value has an equal chance of being accurate or inaccurate.  (*Fordyce* ¶ 19.)  Finally, Possible reserves are undeveloped reserves where the reserve is not precluded but chances are lower than probable, *i.e.*, less than 50%. (*Fordyce* ¶ 19.)

Breitburn's management had created its own risking factors in developing its business plan, but Fordyce substituted the RAFs published by SPEE.  He gave three reasons.  First, Breitburn's internal risking only considered volumetric risk - whether the predicted reserves are in the ground.  Management did not consider the economic risk, particularly with respect to the Potential and Possible reserves, which will cost time and money to extract if extracted at all.  (*See Fordyce* ¶ 44; Tr. Day 2, 16:23-17:17, 106:9-107:9).)  Second, the SPEE RAFs, which are based on a broad survey of industry participants, were the RAFs used in the majority of recent E & P chapter 11 cases, and Lazard was not able to locate any valuations that used management risk factors. (*Fordyce* ¶¶ 43, 47.)  Third, 75% of SPEE respondents used the SPEE RAFs for fair market valuations.  (*See* BX 38 at 31.)  In addition, the Campbell article noted that "it is common for valuation experts to use the results in the SPEE survey as a source of risk factors." (Tr. Day 3, 42:13–14.)

In applying the SPEE RAFs, Fordyce rejected the greatest risk factor (P90) because it did not give any value to Probable and Possible reserves and signified that LegacyCo would be operating in a "runoff" state.  (*Fordyce* ¶ 46.)  The Legacy Assets include significant remaining undeveloped resources and the business plan includes

costs and expenditures necessary for the development of those resources.  (*Fordyce* ¶ 46.)  If the business plan assumes the costs associated with the development of undeveloped resources, it would be appropriate to value LegacyCo in a "runoff" state. (*Fordyce* ¶ 46.)

The SPEE report also sets out different risking percentages for different types of assets: conventional, unconventional, on/offshore and recovery methods, including primary and secondary/enhanced recovery, known as enhanced oil recovery ("EOR"). As most of the Legacy Assets are conventional, Lazard used the conventional RAFs in its analysis.  (*See Fordyce* ¶ 49.)  Had Fordyce broken down the Debtors' assets further and applied SPEE's primary recovery percentages to the Debtors' conventional assets under primary recovery and those under secondary/EOR recoveries, respectively, and SPEE's unconventional percentages to the unconventional assets, it would not have materially changed the analysis or conclusions because the percentage differences between these different RAF categories in the SPEE report are relatively small.  (*See Fordyce* ¶ 49.) Some of the percentages would have been lower (using unconventional RAFs) and some higher (using primary and secondary recovery RAFs) and thus using the conventional RAFs approximated a middle ground.  (*See Fordyce* ¶ 49.)

Reader criticized Fordyce's reliance on the SPEE RAFs, and relied on management's internal risking which added between $100 million and $300 million to the value of the LegacyCo assets using all of Fordyce's other assumptions.  (Tr. Day 2, 27:13-21.)  However, his criticism of the SPEE survey respondents' preference for the SPEE RAFs was unconvincing.  Reader conceded that "[SPEE] risk adjustment factors are at times used for fair market valuation purposes" but added he "just cannot agree"

with their use.  (Tr. Day 3, 46:4–9.)  And when confronted with the SPEE survey results, Reader volunteered that the respondents did not understand what was being asked.  (Tr. Day 3, 45:12-19.)  Unless he is a mind reader, I don't know how he could divine the understanding (or lack of understanding) of the survey respondents.  Like the Campbell article, his expert report listed the SPEE Report as a reference, (BX 65 at 43), and his criticism of his own references when shown that they contradicted his opinions further undercut his credibility.

The Equity Committee also speculated that management's internal risking incorporated the economic as well as the volumetric risks described by Fordyce. However, Fordyce participated in numerous internal discussions regarding the company's business plan which forms the basis of the NAV, (*Fordyce* ¶ 53), and testified without objection that a Breitburn executive informed him that the internal risking looks only to whether the oil is in the ground.  (Tr. Day 2, 28:17-29:4.)  Accordingly, the Court concludes that the SPEE RAFs rather than management's risking should be used in preparing an NAV analysis of the Legacy Assets.

### d.    Projecting G&A

The final factor that divided the experts related to the assumptions concerning G&A.  G&A falls into two categories: District and Corporate.  District, or asset level G&A, refers to the portion of the total G&A expense that is directly allocable to asset level activities.  (*Fordyce* ¶ 56; Tr. Day 2, 34:9–18; *see also Reader* ¶ 50 ("District G&A represents overhead expenses related to the Debtors' regional offices").)  Corporate G&A includes the remaining unallocated total G&A expenses, such as legal, corporate, accounting, human resources, recruitment and other administrative costs that are not

27

allocable to specific assets, but which are still necessary to generate the cash flows supporting the business (and its value) as an ongoing enterprise. (*Fordyce* ¶ 56.)

According to Fordyce, industry practitioners typically estimate the G&A impact on NAV value (*i.e.* the deduction) either by capitalizing total G&A based on a 4.0x to 5.0x multiple (to approximate the G&A burden over time) or by capitalizing Corporate G&A and discounting District G&A for the full life of the assets at a 10% rate. (*Fordyce* ¶ 55.) Fordyce opined that the latter approach better reflects the business reality that some amount of G&A expenses are associated with the assets as long as the assets generate positive cash flows. (*Fordyce* ¶ 55.)

In preparing their business plan, the Debtors separately projected Corporate and District G&A for the period from 2018 to 2022. (*Fordyce* ¶ 56.) The projections were developed pursuant to a comprehensive study during which the Debtors' advisors, Alvarez & Marsal, interviewed various key management and employees. (*Declaration of William Kosturos in Support of Confirmation of Debtors' Third Amended Joint Chapter 11 Plan*, dated Jan. 8, 2018 ("*Kosturos*"), ¶¶ 17,18 (ECF Doc. 2069).) The business plan reduces LegacyCo's G&A and District Expense costs by 45%, and headcount by approximately 56% relative to year-end 2014 levels. (*See Jackson* ¶ 60.) Lazard also conducted extensive due diligence on the Debtors' business plans, including the G&A expense assumptions, and concluded that the G&A assumptions in Business Plan 4.3 were reasonable. (*Fordyce* ¶ 53.)

Lazard estimated the Corporate G&A deduction to NAV by applying a 4.5x multiple to the 2018–2022 average Corporate G&A projections. It estimated the

District G&A expense using the present value of the District G&A expenses for the life of the assets, discounted at a 10% discount rate, and projected District G&A beyond 2022 using the run-rate unit cost of a produced BOE for 2022 ($2.43 per BOE), thereby tying District G&A costs to production levels.  (*Fordyce* ¶ 57.)  Using this methodology, Lazard estimated the District and Corporate G&A deduction of $295 million and $221 million, respectively, and $516 million in the aggregate.  (*Fordyce* ¶ 57.)

Reader used the G&A assumptions from the Debtors' own forecasts, but reduced the Debtors' projected G&A costs by over 40% because he had "serious concerns" with the "character" of the LegacyCo business plan.  (*Reader* ¶ 52.)  Instead, based on his own experience, he opined that the projected LegacyCo G&A was unreasonably high and did not capture the anticipated savings that a potential buyer would consider in determining the amount of its offer.  (*Reader* ¶ 52.)  Taking the potential buyer's mind set into account, Reader dropped Breitburn's total G&A from $5.27/BOE to $3.00/BOE.  (*Reader* ¶ 53.)  He bolstered his opinion by reference to an earlier valuation performed by the UCC's investment banker, but that valuation was excluded from evidence.

Assuming that Breitburn's G&A is higher than its peers, Reader's G&A conclusions and their effect on value are nonetheless arbitrary and speculative.  He assumes that any willing buyer operating with a lower G&A would pass the savings on to Breitburn through a higher purchase price rather than retain the added value for itself.  Fordyce testified that "[i]n my experience, buyers seek to retain as much potential 'synergy' value for themselves and not pay the seller for cost reductions or other benefits it may have."  (*Fordyce* ¶ 97.)  But even if a buyer with lower G&A costs might bid more for the Legacy Assets, Reader's reduction of the G&A costs from $5.27/BOE to

$3.00/BOE was arbitrary.  In contrast, Lazard's G&A assumptions are based on a top to bottom assessment of its G&A costs under a comprehensive business plan that resulted in annual cost reductions of $21 million.[16]  (*Kosturos* ¶ 18.)  Under the circumstances, I find that Breitburn's G&A assumptions and Lazard's methodology are more reliable, and give Reader's G&A assumptions no weight.

### e.    Business Plan 4.3

In formulating the LegacyCo NAV, Lazard relied on Breitburn's Business Plan 4.3, dated Oct. 10, 2017 (BX 19).  (*Fordyce* ¶¶ 16, 42.)  Business Plan 4.3 included projections for the years 2018 through 2022.  It assumed that LegacyCo's debt would be paid off by 2019.  (Tr. Day 1, 68:15-69:8.)  During the same five-year period, cash on hand at the end of the year increased from $5 million to $162.75 million, (BX 19, at 12; Tr. Day 1, 69:13-16), while daily oil production declined from 40,221 BOED to 33,586 BOED.  (BX 19 at 7; Tr. Day 1, 69:17-70:4.)  Capital expenditures fluctuated.  After rising through year three ($110.43 million), they fell significantly in years four ($59.9 million) and five ($28.9) million.  (BX 19 at 10; Tr. Day 1, 70:7-71:17.)  Finally, G&A increased slightly over the five-year period from $47.1 million to $51.8 million.  (BX 19 at 11; Tr. Day 1, 73:17-25.)

The Equity Committee argues that Business Plan 4.3 paints a picture of a company hoarding cash (after 2019) and not making capital expenditures while production is declining and G&A is rising.  Reader characterized Business Plan 4.3 as unrealistic, damaging to assets and making no sense.  (Tr. Day 3, 103:12-15.)  In

---

[16]    Breitburn incorporated 80% of the projected reduction, or $17 million per year, into its Business Plan to account for implementation risks.  (*Kosturos* ¶ 18.)

addition, Jackson testified that Breitburn put together Business Plan 4.3 because it needed a viable plan that the secured creditors would support.  (Tr. Day 1, at 130:25-140:9.)

Juxtaposed against Business Plan 4.3 is a document entitled Legacy Business Expansion Projects (the "Expansion Plan") sent by Mark Pease, Breitburn's president and chief operating officer, to Washburn.  (ECX 38.)  The Expansion Plan suggests that at the September 8, 2017 strip price, LegacyCo could develop an additional 200.2 million BOE reserves.  The Equity Committee argued that the Expansion Plan represents the real business plan and Business Plan 4.3 was designed to "low ball" the ostensible value of LegacyCo for the benefit of the Second Lien Group and the Debtors' management under the MIP discussed below.  The Equity Committee contends that instead of repaying debt, hoarding excess cash and allowing production to decline, the Debtors should be spending cash to increase production as envisioned by the Expansion Plan.

Neither Business Plan 4.3 nor the Expansion Plan provides insight into the value of the Debtors' assets.  Reading them together, the Equity Committee assumes that the Debtors are foregoing the opportunity to develop valuable reserves.  As Fordyce explained, Business Plan 4.3 is a five-year projection whereas the NAV analysis of LegacyCo is based on a fifty-year projection.  Attempting to develop  all of the projects immediately, as the Equity Committee implies Breitburn should do, risks outspending Breitburn's limited capital.  Instead, Breitburn ranked the order of the various projects and intends to first develop those that are likely to produce the highest return.  (Tr. Day 3, 154:17-156:10.)  In this regard, Reader had not compared Business Plan 4.3 to the

31

Expansion Plan, and did not know whether any of the Expansion Plan projects were included in Business Plan 4.3. (Tr. Day 3, 133:5-8.)

In addition, the Expansion Plan depicted an unrealistic development scenario. As Reader noted on cross-examination, the development of the additional reserves was unrisked and was based on undiscounted cash flows. This means that some of the projects might not produce any profits, and moreover, the Expansion Plan does not incorporate any lease operating or capital expenditures. (Tr. Day 3, 130:24-132:24.)

### f.    Reader's Comparable Company Analysis

Reader also performed a comparable company analysis for LegacyCo, but placed far less emphasis on its results. (*Reader* ¶ 63.) The comparable company analysis is backward-looking, and Reader believed that the recent rise in oil prices and the 20% decline in Breitburn's production while in chapter 11 would yield results that lowered LegacyCo's valuation. (*Reader* ¶ 63.) Furthermore, no two companies or operations will ever be the same, although experts find comparable company analyses useful provided they are done well. (*Reader* ¶ 66.) Thus, he relied on his comparable company analysis to anchor the low end of his valuation. (*Reader* ¶ 63.)

The results of his analysis were depicted in a chart but never clearly spelled out.[17] (*See Reader* ¶ 73.) It appears that Reader computed a midpoint TEV for all of Breitburn's assets, including the Permian Assets, as ranging between $3.9 billion and

---

[17]    The parties' proposed findings of fact, submitted after the trial, largely ignored Reader's comparable company analysis, and the Equity Committee did not propose a finding of value based on Reader's comparable company analysis.

$5.431 billion depending on certain assumptions.[18]  As I read his chart, he valued the Legacy Assets under three assumptions at midpoints ranging from $2.01 billion to $4.029 billion.

Lazard did not perform a comparable company analysis for several reasons including a lack of public companies that have a similar portfolio of geographically diverse, developed, mature mostly conventional assets as LegacyCo.  (*Fordyce* ¶ 41.) Fordyce also criticized several aspects of Reader's comparable company analysis on the same basis; the Debtors' assets are not reasonably comparable in size, scale and operations to other publicly traded E & P companies, and Reader ignored the regional differences relating to the hydrocarbon mix, economic returns and the attractiveness of opportunities as reflected by the drilling activities in the various regions.  (*Fordyce* ¶¶ 98, 112-14.)

In addition, Reader's calculations contain obvious errors that inflated the results. TEV is computed under comparable company methodology by examining the public trading prices for the equity securities of each selected company and adding the company's aggregate outstanding amounts of preferred securities, minority interests and debt,[19] net of cash.  (*Fordyce* ¶ 32.)  Multiples are then derived from the comparable companies and applied to the relevant metrics (*e.g.*, reserves, daily production and EBIDTA) for the company being valued.  (*See Fordyce* ¶ 32.)  Reader used the single

---

[18]    Reader's highpoint valuation for all of Breitburn's assets appears to be $9.968 billion.  (*Reader* ¶ 73.)

[19]    According to Fordyce, a valuation expert uses the market value of the distressed debt instead of the book value.  (*Fordyce* ¶ 119.)

highest multiple from his data to estimate value. (*Fordyce* ¶ 117.) In addition, he did not deduct cash in his net debt calculations, and included all long-term liabilities, not just debt, in calculating TEV. (*Fordyce* ¶ 118.) Finally, Reader did not deduct other claims senior to common stock, including preferred stock and minority interests. (*Fordyce* ¶ 119.)

In light of the minimal weight that Reader accorded to his comparable company analysis and Fordyce's criticisms, the Court does not find it helpful.

### g.    Lazard's Precedent Transaction Analysis

Lazard also used a precedent transaction analysis in valuing LegacyCo. The analysis acknowledged that two of the regions in which LegacyCo would operate lacked specific comparable transactions, and accordingly, Lazard used a broader set of weighted multiples to estimate the values for these regions. (*Fordyce* ¶ 60.) Lazard concluded that the valuation under the precedent transaction method yielded a range of values between $720 million and $1.125 billion, with a midpoint value of $922 billion. (*See Fordyce* ¶¶ 59, 62.)

Based on the testimony of the experts, and crediting the analysis in BX 94 which used the January 6, 2018 strip price and assumed escalating prices and costs, I find that the midpoint value of the Legacy Assets is $1.025 billion. LegacyCo will carry a net $130 million debt burden on the Effective Date, and accordingly, the value of LegacyCo's equity will be $895 million rounded to $900 million.

### 3.    Permian Assets

The Permian Assets consist of 17,660 acres of largely undeveloped, unconventional acreage located primarily in Howard and Martin counties in West Texas.  As of January 2018, the Permian Assets produced 5,334 BOED.  Both experts analyzed the value of the Permian Assets using the precedent transactions methodology.

### a.    Fordyce

Fordyce selected nine transactions in Howard and Martin counties that took place between March 31, 2016 and July 28, 2017.  The price per acre based upon the analysis of total acreage and BOED of the precedent transactions ranged between $12,976 and $63,830.  (*Fordyce* ¶ 36 (referring to *Lazard Expert Report*, dated Nov. 2017, at 9 (BX 27).)[20]  Backing out the BOED from the value,[21] the implied precedent transaction values for the acreage alone ranged between $57,872 and $10,049 per acre, with a midpoint value of $33,276.  Based on this result, the midpoint value of the Debtors' 17,660 acres (at $33,276 per acre) is $587,654,160.00.  Adding the Permian Assets' existing production of 5,334 BOED (at $40,000 per BOED) increases the midpoint value of the Permian Assets by $213.26 million for a total midpoint value of $800,914,160, rounded to $800 million.

Fordyce actually computed a lower midpoint value of $740 million as a result of his own rounding.  First, he assumed that the Permian Assets produced 5,300 BOED

---

[20]    The various expert reports were marked for identification but were not received in evidence. Nevertheless, both experts referred to their reports in their testimony, and the reports reflect a summary of the testimony.

[21]    Fordyce assumed that each BOED added $40,000 of value to the precedent transaction.  (BX 27 at 9 n. 1.)

(rather than 5,334 BOED), and rounded the resulting value, $212 million (5,300 BOED x $40,000 per BOE), down to $210 million.  Had he used 5,334 BOED, the value of the daily production would have been $213.26 million, or $3.26 million more.  Second, he assumed a midpoint acreage value of $30,000, or $3,276 per acre less than the midpoint acreage value reflected in his precedent transactions.  This accounts for an additional difference in value of $57,854,160.

Fordyce concluded that he would not apply a NAV methodology to determine the value of the Permian Assets for three reasons.  First, Breitburn has not prepared a plan for the development of the Permian Assets, and hence, the Plan before the Court does not consider the capital needs for such development.  Second, during the pendency of these cases, there have been hypothetical business plans and financial projections created by the Debtors that included assumptions regarding capital deployment in the Permian basin, and constructing hypothetical NAVs utilizing these assumptions resulted in a lower value than the precedent transactions analysis.  Third, the number of relevant, precedent transactions in Howard and Martin counties was robust, implying that they provided the most reliable measure of value.  (*Fordyce* ¶ 38.)  Finally, Fordyce did not utilize a comparable company analysis due to the lack of a business plan and the lack of publically-traded Permian focused companies that were reasonably similar to Breitburn in operational and financial size and stage of development.  (*Fordyce* ¶ 40.)

### b.    Reader

Reader's precedent transaction analysis, corrected for internal errors, actually resulted in a lower value for the Permian Assets.  Reader selected seventeen comparable

transactions in the area that encompasses the Permian Assets.[22]  (BX 65 at 50.)  These included five of the same comparables as Fordyce (sellers RK Petroleum (6/21/16), Rock Oil (8/8/16), Plymouth (9/6/16), Pioneer (3/15/17) and a transaction involving QEP as the purchaser (7/26/17).)  Reader's precedent transactions yielded an average value per acre of $29,320, or roughly $4,000 less than Fordyce.  Reader also assumed that the Permian Assets consisted of 17,500 acres (160 acres less than Fordyce) (*see* OEX 65 ("*Barchan Expert Report*"), at 37), and produced 5,315 BOED at a value of $38,895.00 per BOE.[23]

Using the same methodology as Fordyce, the combined acreage value ($29,320 per acre multiplied by 17,500 acres) and production value (5,315 BOED x $38,895 per BOE) should have resulted in an average or midpoint value of $719,826,925.00 for the Permian Assets.  Without explanation, Reader raised this average value by approximately $44 million to $764 million, and treated it as the *low* point instead of the average or midpoint value in his analysis.  (*See Barchan Expert Report* at 37; Tr. Day 3, 70:6-10.)  He then created a new midpoint value for the Permian Assets of $1.030 billion by averaging his "low" value of $764 million and his high value of $1.296 billion. (*Barchan Expert Report* at 37.)  Under his methodology, and subtracting the value of the existing daily production, the average midpoint price per acre is $47,044.18, and at the high value, the average price per acre is $62,244.18.

---

[22]    Reader listed two other transactions but omitted the transaction price.  I have ignored these two transactions because Reader did not include the necessary information.

[23]    There were two exceptions.  Reader utilized $33,000 per BOE for an October 18, 2016 sale by Qstar and $40,000 per BOE for a September 6, 2016 sale by Plymouth.  The discrepancies remain unexplained.  Furthermore, Reader used $38,895 in computing the midpoint value of the Permian Assets under his methodology.

Reader made further adjustments during his testimony. He dropped the two lowest values from his precedent transactions because one of them was a scattered, non-operated interest, and the other was so far out of the basin that it was not comparable. (Tr. Day 3, 70:10-19.) Reader did not eliminate any high value transactions. He then recomputed the new "low" point (actually the midpoint) at $31,825, which he treated as a "low" point (instead of as a midpoint) based on his opinion that the Debtors' acreage is in the "sweet spot" of the Permian Midland basin. (*Reader* ¶ 90 n. 23.) For some reason, he did not amend his overall value analysis of the Permian Assets, and still attributed a midpoint value of $1.030 billion and a high point value of $1.296 billion. (*See Reader* ¶ 91.)

If Reader had treated his "low" point as his midpoint, which it was, his valuation would be the lowest. Before he dropped the two lowest transactions, his midpoint value was $29,320 per acre. This was less than the midpoint value of $30,000 per acre that Fordyce used. After he dropped the two transactions, his midpoint rose to $31,825 per acre. This was still lower than the midpoint value derived from Fordyce's precedent transactions that the Court used in determining the value of the Permian Assets.

Reader also performed an NAV analysis which he derived from the earlier Business Plan 4.0, (BX 17), that the Debtors had abandoned.[24] The NAV analysis resulted in values for the Permian Assets ranging between $1.526 billion and $2.743

---

[24]    The Debtors abandoned Business Plan 4.0 because it was not viable. It assumed: (1) $1 billion in rights offering proceeds from unsecured creditors which never materialized; (2) the Second Lien Debt being paid in full with $824 million in cash (to which the holders of the First Lien Debt would not agree); (3) a post-emergence revolving credit facility in the amount of $900 million; and (4) the LegacyCo Assets and the Permian Assets remaining together in one company. (*See Jackson* ¶ 57.)

billion.  (*Reader* ¶ 60.)  This translates to an implied value per acre between $88,108.72 and $155,322.76, inclusive of daily production.  The NAV valuation is based on the same consensus pricing and other valuation and expense assumptions that were discussed in connection with Reader's NAV analysis of the Legacy Assets, and are unsupportable for the same reasons.  Furthermore, no one will pay $88,108.72 per acre, much less $155,322.76 per acre, where the highest price commanded in a precedent Permian basin transaction relied on by the experts was $63,830.00 per acre.  (*See Lazard Expert Report* at 9; *Barchan Expert Report* at 50.)[25]  In fact, Reader's midpoint value derived through his precedent transaction analysis of $1.030 billion (which was actually much lower) is about two-thirds of the lower value he computed using his NAV methodology.  Such disparate results between two value methodologies indicate that something is wrong with at least one of them.

In addition, Reader's "sweet spot" value enhancement was contradicted by his own testimony.  A map depicting the location of the Permian Assets is included in the *Lazard Expert Report* at 8.  Although the acreage in Howard County appears to be fairly contiguous, the acreage in Martin County is scattered.  (Tr. Day 3, 151:12-152:8; *see Lazard Expert Report* at 8.)  Both experts agreed that contiguous blocks are more valuable because operators can drill longer lateral wells.  (Tr. Day 3, 73:9-17 (Reader); 152:9-11 (Fordyce).)  Conversely, non-contiguous blocks, which characterize the Permian Assets located in Martin County, are less valuable.

---

[25]    This price was received in the sale by RK Petroleum Corp. to QEP Resources Inc. on June 21, 2016.

In addition, 7,500 acres of Breitburn's 17,660 acres in the Permian Basin, or over 42%, are non-operated assets, meaning someone other than Breitburn operates them. (Tr. Day 3, 152:21-22.)  A non-operated asset is less valuable because the operator decides, among other things, when to drill the well, what type of well to drill, how long to complete the drilling, how deep to drill the well and what kind of completion techniques are best.  (Tr. Day 3, 153:8-24.)  Reader dropped one of his lowest precedent transactions because it was a "scattered non-operated interest."  Yet so are portions of the Permian Assets, but Reader did not reduce the value of the Permian Assets for this reason.

Accordingly, I reject Reader's precedent transactions and NAV analyses for the Permian Assets, and conclude for the reasons stated that the value of the Permian Assets is $800 million at the midpoint.

### 4.    Other Value Data Points

The value of the Debtors' assets must be determined in accordance with the valuation methodologies described above.  During the course of these cases, other indications of value emerged.  The Court discusses them briefly to explain why they are not substitutes for a methodologically acceptable valuation analysis.

### a.    Book Value

As of December 31, 2016, the book value of Breitburn's equity was approximately $600 million, but by September 30, 2017, it was negative $200 million, rendering Breitburn insolvent on a book value basis.  (BX 23 at 5.)  Many unitholders and

40

unsecured creditors questioned why the book value of total equity declined while oil and gas prices rose.[26]

Book value does not necessarily reflect the market value of an asset.  (*Jackson* ¶ 51.)  Generally, a company initially books the value of an asset at the price it paid to acquire it.  However, the value of oil and gas assets is subject to being written down through a process known as impairment.  An impairment charge is a GAAP accounting term that refers generally to the process by which a company is required to reduce the carrying value of an asset on its balance sheet when the company determines that the carrying value may no longer be recoverable.  (*Jackson* ¶ 52.)  Breitburn's oil and gas properties, divided into 130 "buckets" of property, are reviewed on a property-by-property basis for impairment at least quarterly.  (*Jackson* ¶ 52; Tr. Day 1, 125:19-126:1.)  Breitburn must first determine whether the expected *undiscounted* future cash flows generated by the asset are less than the current net book value of that asset.  (*Jackson* ¶ 52.)  This is known as the recoverability test.  If the current net book value is less than the undiscounted cash flow, Breitburn does not take an impairment charge.  (*Jackson* ¶ 52.)  If the current net book value exceeds the undiscounted cash flows, Breitburn must take an impairment charge, and write down the value of the asset on its books and records to the amount generally determined by a discounted cash flow calculation.  (*Jackson* ¶ 52.)

---

[26]      The total book value of the oil and gas assets actually increased from $7.907 billion to $7.984 billion between those dates, (BX 23 at 5), notwithstanding that Breitburn took a $419.9 million non-cash impairment charge against those assets during that same nine month period.  (BX 23 at 17 n.5.)

Prior to the Plan now before the Court, Breitburn carried the Permian Assets at $881 million, (OEX 40 at 4), and the assets did not have to be written down based on the recoverability test. (*See* Tr. Day 1, 108:20-109:2.) However, because Breitburn would not recover more than $775 million for the Permian Assets under the Plan, Breitburn reduced the book value of the Permian Assets to $775 million, (OEX 40 at 4), to reflect the amount of the cash flow the Permian Assets would generate through the backstopped rights offering.

The GAAP recoverability test can obviously overestimate the actual market value of an asset. It relies on undiscounted cash flows, but the market value of oil and gas reserves is determined by discounting the future cash flows by 10% and then reducing the discounted cash flows by the RAFs. On the other hand, there is no unimpairment test. If the undiscounted cash flows exceed the book value of an oil and gas asset, because the strip price rises or for any other reason, the book value is not increased. In other words, the book value of an oil and gas asset is an accounting concept that does not reflect the market value of that asset.

### b.    The KEIP Motion

On July 27, 2016, the Debtors filed a motion to approve certain key employee retention and/or incentive programs. (*See Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 363(b), and 503(c)(3) for Entry of an Order Approving Debtors' Retention and Incentive Programs for Certain Key Employees*, dated July 27, 2016 (ECF Doc. # 309).) One of the programs (the "KEIP") included Breitburn's four key executives (hereinafter, the "Management"): Halbert S. Washburn (Chief Executive Officer), Mark Pease (President and Chief Operating Officer), James G. Jackson (Executive Vice President

42

and Chief Financial Officer), and Gregory Brown (Executive Vice President, General

Counsel, and Chief Administrative Officer), (*id.* at ¶ 29(a)), and provided for maximum

aggregate payments ("Total Stretch Award") of $10,730,200.  (*Id.* at ¶ 29(e).)  Arguing

in favor of the KEIP, the Debtors asserted that Management was responsible for

operating Breitburn's approximate $4 billion business.  (*Id.* at ¶ 18 ("[W]ith respect to

the KEIP, it is imperative that the Debtors' executives, who are responsible for operating

the Debtors' approximately $4 billion business on a day-to-day basis, and who now have

additional responsibilities attendant to the chapter 11 process, are appropriately

incentivized to drive performance for the overall enterprise for the benefit of all of the

Debtors' stakeholders.")  The Equity Committee argues that I should take judicial notice

of this admission.

Although the statement may be an admission, neither the Equity Committee nor

anyone else contends that the Debtors are judicially estopped from arguing that

Breitburn is worth less than $4 billion.  Moreover, the KEIP moved in lockstep with the

motion, brought on by the Court's order to show cause, to appoint an official equity

committee.  The Debtors opposed that motion arguing that the "incontrovertible facts"

showed that the Debtors were insolvent and equity would not receive any recovery.

(*Debtors' Preliminary Omnibus Response to Order to Show Cause Why an Official

Committee of Equity Security Holders Should Not Be Appointed*, dated Aug. 16, 2016,

at ¶ 21 (ECF Doc. # 392).)  The Debtors supported their opposition with an opinion by a

Lazard managing director who valued the Breitburn assets at between $1.35 billion and

$1.9 billion.  (*Declaration and Expert Report of David Cecil (I) in Support of Debtors'

Preliminary Omnibus Response to Order to Show Cause Why an Official Committee of*

43

*Equity Security Holders Should Not Be Appointed and (II) in Response to Declaration of Martin Lewis And The Dillon Valuation Report*, dated Sept. 19, 2016, at ¶ 12 (ECF Doc. # 555).)  It was clear, therefore, that the Debtors were contemporaneously challenging the contention that they were solvent – they were arguing that they were hopelessly insolvent - during this entire period in opposing the appointment of an official equity committee.  Whatever can be said about these inconsistencies, the parties in interest, including the representatives of Equity, understood that the Debtors were not conceding a $4 billion value, and ultimately, the market value of the Debtors' assets must be determined in accordance with the methodologies described above and the evidence adduced at trial.

### c.    Cook Sensitivity Analysis

In November 2016, Kevin Cook, Breitburn's Vice President of Corporate Development and Strategy, generated a document entitled Post-Emergence Strategy Considerations (the "Strategy").  (BX 25.)  The Strategy was a sensitivity analysis, a series of "what if" scenarios relating to the value of Breitburn's assets assuming certain variables relating to future prices and development.  It was never finalized, is incomplete on its face, (*see* Tr. Day 1, 205:21-23), and was never shared with Management or Lazard.  (Tr. Day 1, 213:5-10.)

The results of Cook's analysis are summarized on page 33 of the Strategy. Depending on various pricing assumptions, including strip pricing, consensus pricing and a "modest recovery," the Debtors could be worth between $1.82 billion and $3.746 billion.  However, the then-present sale value of the Permian Assets was $700 million,

(BX 25 at 7), a figure Cook reached based on precedent transactions and discussions with potential buyers of the Debtors' assets.  (Tr. Day 1, 215:14-23.)

The Strategy was not a valuation, the price assumptions were not forecasts of what future prices would be, and Cook did not select prices he thought likely.  (Tr. Day 1, 211:19-25.)  Furthermore, Cook testified that he was not a valuation expert, (*Declaration of Kevin Cook in Support of Confirmation of Debtors' Third Amended Joint Chapter 11 Plan*, dated Jan. 8, 2018 ("*Cook*") ¶ 6 (ECF Doc. # 2065)), and had never performed a formal valuation of oil and gas assets.  (Tr. Day 1, 209:23-25.)  In addition, he computed the value of discounted cash flows by plugging in various pricing assumptions, presumably on a computer program.  (*Cook* ¶¶ 6, 7, 10, 13, 14.)  He did not, however, reduce the value of the cash flows by any risk factors, counted Proved and Possible reserves the same, (Tr. Day 1, 210:23-211:9), and did not test his assumed prices against data available in the industry.  (Tr. Day 1, 212:21-23.)  For example, his strip pricing assumptions after 2020 appeared as whole numbers divisible by ten and increased by exactly $10.00 every year.  (BX 25 at 33.)  Finally, the development depicted in the Strategy failed to consider where the money would come from to pay for that development.  (Tr. Day 1, 205:13-14.)  Accordingly, the Strategy is not probative of value.

### d.    Liquidation Value

The Debtors presented evidence at the confirmation hearing that the liquidation value of its oil and gas assets ranged between $1.357 billion and $1.532 billion.  (*Kosturos* ¶ 10.)  Fordyce had testified that the TEV of Breitburn was between $1.44 billion and $1.83 billion.  (*Fordyce* ¶ 125.)  Thus, the liquidation value was approximately 94% of the TEV at the low point approximately 84% at the high point.

45

The high correlation between the liquidation value and the TEV struck the Court as unusual; it implied that the Debtors might be worth almost the same in liquidation and as a going concern.

However, the values are not quite as close as a percentage comparison suggests. The Permian Assets were valued for liquidation purposes at the same amount that Lazard ascribed to those assets in its precedent transaction analysis.  (Tr. Day 1, 228:24-229:8.)  In other words, Kosturos and Lazard valued the Permian Assets the same, respectively, on a liquidation and going concern basis.  Backing out the low and high values ascribed by Lazard to the Permian Assets from the liquidation analysis yields a liquidation value of LegacyCo's oil and gas assets within the range between $702 billion and $707 million.[27]  Once the value of the Permian Assets is backed out, the $1.025 billion midpoint NAV of the Legacy Assets computed by the Court on a going concern basis is much greater than the approximate $700 million liquidation value.

### e.    Lime Rock Offer

On February 2, 2018, the Debtors advised the Court that Lime Rock Resources IV-A, L.P. ("Lime Rock") had submitted an unsolicited expression of interest and proposed term sheet (collectively, the "Expression of Interest") to purchase all of the Debtors' assets for $1.8 billion subject to adjustment following a four week due diligence period.  (ECF Doc. # 2202.)  By its terms, the Expression of Interest was not an offer.  In addition to due diligence, it included several conditions and milestones, and required

---

[27]    The liquidation high value actually becomes the low value when the Permian Assets are excluded. This reversal results from the fact that the difference between the high and low liquidation values computed by Kosturos was $175 million ($1.532 billion minus $1.357 billion) while the difference between the high and low values of the Permian Assets was $180 million ($830 million minus $650 million).

the Court to defer ruling on confirmation until March, by which time Lime Rock would have completed its due diligence and signed a purchase agreement.  The purchase agreement would include a 2% breakup fee plus "other customary buyer protections," and for five weeks after signing, give Lime Rock an adverse market condition termination right, presumably meaning that Lime Rock could terminate the purchase agreement if the price of oil or gas dropped.  After the execution of the purchase agreement, the Debtors' assets would be sold at a § 363 sale, and a closing on the sale would occur by June 15, 2018.  The Debtors advised the Court that the Board considered and declined to pursue the Expression of Interest for the reasons set forth in the letter to the Court.  (*See id.* at 2.)

The Equity Committee moved to reopen the confirmation trial record to admit the Expression of Interest into evidence, and argued that the Expression of Interest was a floor price that necessitated an auction.  (*Motion of Statutory Committee of Equity Security Holders to Reopen the Record of the Confirmation Hearing to Include Limited, New Evidence*, dated Feb. 2, 2018 (ECF Doc. # 2208).)  The Debtors, the Second Lien Group and two *ad hoc* unsecured noteholder groups objected to the motion but ultimately agreed that the record could be reopened to admit the Expression of Interest into evidence. (*Debtors' Response to the Motion of the Statutory Committee of Equity Security Holders to Reopen the Record of the Confirmation Hearing to Include Limited, New Evidence*, dated Feb 9, 2018 ("*Debtors' Response*") (ECF Doc. # 2233)); *The Second Lien Group's Objection to the Motion of the Statutory Committee of Equity Holders to Reopen the Record of the Confirmation Hearing to Include Limited, New Evidence*, dated Feb. 9, 2018 ("*Second Lien Objection*") (ECF Doc. # 2234)); *Joinder of*

*the Ad Hoc Unsecured Noteholder Groups to the Debtors' Response to the Motion of the*

*Statutory Committee of Equity Security Holders to Reopen the Record of the*

*Confirmation Hearing to Include Limited, New Evidence*, dated Feb. 9, 2018 (ECF Doc.

# 2235).)  Based on this consent, the Court reopened the record to the extent of

receiving the Expression of Interest into the record.[28]

The significance, if any, of the Expression of Interest, has been rendered moot by

its terms.  Among other things, the Debtors and the UCC had to advise Lime Rock by

February 14, 2018 that they would support the transaction.  At the February 13, 2018

hearing on the Equity Committee's motion, the UCC advised the Court in no uncertain

terms that it would not support Lime Rock's proposal.  It contemplates a liquidation

sale, and the unsecured creditors are sitting behind approximately $1.8 billion in

secured, administrative and priority debt.  As the attorney for the UCC explained, the

Expression of Interest provides no recovery for any unsecured creditors.  The Plan, on

the other hand, provides a recovery to each unsecured creditor class which would be lost

under the Lime Rock Expression of Interest.  Moreover, Lime Rock's timetable would

further delay the confirmation of the Plan and add additional administrative debt that

must be satisfied before the unsecured creditors would receive anything.  While it is

always possible that the delay and increased administrative expenses would ultimately

yield a price high enough to cover the increased costs, there is no guarantee.  Thus,

while Equity, which is out of the money, is willing to take that chance, the UCC's

attorney succinctly observed, "a bird in the hand is worth two in the bush."  Since the

---

[28]    The Equity Committee's motion included additional argument based on the Expression of
Interest and two articles regarding the rising price of oil.  To be clear, the only additional evidence that the
Court received was the Expression of Interest.

UCC will never agree to the transaction proposed by Lime Rock, the condition requiring its support cannot be met.

Furthermore, the Expression of Interest undercuts the Reader valuation.[29]  The Debtors' oil and gas assets and their value have been fully vetted.  All of the expert reports and the direct examinations have been on the docket for weeks, and the Court conducted a four day trial that dealt for the most part with the valuation evidence.  At that trial, the Debtors' expert fixed the value of their assets at around $1.6 billion and Reader opined that they were worth $3.8 billion.  As the Expression of Interest attests, Lime Rock is a fund, formed in 2005, that acquires, operates and improves U.S. oil and gas assets, manages partnerships that have proved reserves of 240 million BOE and interests in 4,800 wells producing over 39,000 BOED.  In addition, Lime Rock forecasts a $360 capital expenditure program for 2018.

In short, Lime Rock is a very sophisticated oil and gas investor.  Neither Lime Rock (nor anyone else) needs due diligence to bid $1.8 billion for assets worth $3.8 billion.  Lime Rock's $1.8 billion Expression of Interest, with a possible adjustment after due diligence, implies that it views $1.8 billion at or near the cap in value rather than the minimum the Equity Committee supposes.[30]

---

[29]    The Court has received several emails from unitholders and Bondholders speculating that the Expression of Interest was the product of a conspiracy involving the Debtors' counsel, Weil, Gotshal & Manges, Lime Rock and possibly EIG Global Energy ("EIG"), a significant holder of Second Lien Debt, to undercut Reader's value opinion and support the Debtors' valuation.  It must be remembered that it was the Equity Committee that insisted that the Expression of Interest be made part of the record.  But for that, the Expression of Interest would not be part of the record or considered by the Court.

[30]    I assume that any adjustment would more likely be downward than upward.  Lime Rock would have no incentive to bid against its own Expression of Interest by offering to purchase the Debtors' assets for more than $1.8 billion after completing due diligence.

In conclusion, the Court finds that the Permian Assets are worth $800 million at the midpoint value and the Legacy Assets are worth $1.025 billion at the midpoint value.

## DISCUSSION

The proponent of the confirmation of a plan must prove by a preponderance of the evidence that it satisfies the relevant requirements of 11 U.S.C. § 1129(a), and if the plan is not fully consensual, 11 U.S.C. § 1129(b).  *See In re Quigley Co.*, 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010).  Here, the majority of the elements are not in dispute, and the evidence adduced at the hearing supports the conclusion that the Debtors have satisfied the elements of confirmation except as specifically noted.  Accordingly, the Court limits the discussion to those issues raised by the parties as well as some other issues relevant to confirmation.

### A.    Cram Down

Bankruptcy Code §§ 1129(a)(10) and 1129(b), read together, permit the plan proponent to confirm a plan that has not been accepted by all classes provided that at least one class of impaired creditors affirmatively accepts the plan, not counting the votes of insiders, and the plan satisfies the requirements of section 1129(b).  Five impaired classes (Classes 3, 4, 5A, 5B and 6) were entitled to vote, (*see Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Debtors' Third Amended Joint Chapter 11 Plan*, dated Jan. 8, 2018, at ¶ 5 (ECF Doc. # 2066)), and Classes 3, 4, 5A and 6 voted to accept.  (*Id.*, Ex. A.) Accordingly, at least one impaired class affirmatively voted to accept the Plan.

Class 5B rejected the Plan, and Class 9 (subordinated claims) and Class 11 (Breitburn equity interests) were deemed to reject the Plan because they do not receive or retain any property under the Plan.[31] (*Plan* at § 3.2(c).) Section 1129(b) allows the bankruptcy court to confirm a plan over the rejection by a class of claims or interests if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). The process of confirming a plan over a dissenting class is known as a "cram down." *Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 (1999). I assume that the subordinated claims included in Class 9 are claims subordinated under 11 U.S.C. § 510(b) to the level of Equity[32] – the preferred and common unitholders - which comprise Class 11, and hence, Classes 9 and 11 will have the same rights and will be considered as one for the purposes of section 1129(b).

A plan is "fair and equitable" with respect to a class of dissenting equity interest holders if

> (i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed

---

[31]    Bankruptcy Code § 1126(g) states:

> Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.

[32]    Bankruptcy Code § 510(b) states:

> For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

> liquidation preference to which such holder is entitled, any fixed
> redemption price to which such holder is entitled, or the value of such
> interest; or
>
> (ii) the holder of any interest that is junior to the interests of such class
> will not receive or retain under the plan on account of such junior interest
> any property.

11 U.S.C. § 1129(b)(2)(C).  Subsection (ii) sets forth the absolute priority rule under which junior classes, absent consent, may not receive property unless all senior classes are paid in full.  *DISH Network Corp. v. DBSD N. Am., Inc.* (*In re DBSD N. Am., Inc.*), 634 F.3d 79, 88 (2d Cir. 2011).  An unwritten corollary to the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.  *In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) (quoting *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 612 (Bankr. D. Del. 2001)).  Because the estates are insolvent, no creditor class is receiving more than 100% of its claims[33] and no class below Equity (there is no such class) will receive or retain property under the Plan, the Plan is fair and equitable with respect to Equity.  Furthermore, because Classes 9 and 11 are receiving the same treatment, the Plan does not unfairly discriminate against either class.

The Plan is also fair and equitable to Class 5B.  A plan is fair and equitable with respect to a class of unsecured claims if

> (i) the plan provides that each holder of a claim of such class receive or
> retain on account of such claim property of a value, as of the effective date
> of the plan, equal to the allowed amount of such claim; or
>
> (ii) the holder of any claim or interest that is junior to the claims of such
> class will not receive or retain under the plan on account of such junior
> claim or interest any property. . . .

---

[33]    The value of the distribution of 92.5% of the equity in LegacyCo to Class 4 is $832.5 million ($900 million x 92.5%).  This amount is less than the lowest estimate of the Second Lien Debt.

11 U.S.C. § 1129(b)(2)(B).  The classes below the unsecured creditors – the subordinated creditors and Equity – are not receiving or retaining any property on account of their junior claims or interests, and accordingly, the Plan satisfies subparagraph (ii).

However, the Plan unfairly discriminates against Class 5B.  "The Bankruptcy Code does not define unfair discrimination, but it is designed to protect against horizontal discrimination in the same way that the absolute priority rule prevents against nonconsensual vertical discrimination."  *In re SunEdison, Inc.*, 575 B.R. 220, 226 (Bankr. S.D.N.Y. 2017).  "In other words, the unfair discrimination test assures fair treatment among classes of the same priority level while the fair and equitable requirement ensures fair treatment among classes of different priority levels."  *SunEdison*, 575 B.R. at 226; *accord In re ICL Holding Co.*, 802 F.3d 547, 552 n. 4 (3d Cir. 2015) (Ambro, J.); Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 AM. BANKR. L.J. 227, 227-28 (Spring 1998).

The "unfair discrimination" test does not require absolute parity in the treatment of classes with the same legal rights, and courts have adopted various tests to determine when discrimination crosses the threshold and becomes unfair.  *See* 7 ALAN N. RESNICK & HENRY J. SOMMER, COLLIER ON BANKRUPTCY ¶ 1129.03[3][a], at 1129-65 to 1129-66 (16th ed. 2017) ("COLLIER").  In *In re Buttonwood Partners, Ltd.*, 111 B.R. 57 (Bankr. S.D.N.Y. 1990), Judge Lifland adapted a four part test under which the plan proponent must consider whether "(i) there is a reasonable basis for discriminating, (ii) the debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale."  *Id.* at 63.  That test has been applied by other judges in this and other

districts.  *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 242-43 (Bankr. S.D.N.Y. 2014) (collecting cases).

The leading bankruptcy treatise has criticized this and other multi-part tests, primarily because their elements are redundant.  For example, whether a reasonable basis for discrimination exists appears to be subsumed within the factor that the discrimination is necessary to consummate the plan as well the more general requirement under 11 U.S.C. § 1129(a)(3) that the plan must be proposed in good faith. 7 COLLIER ¶ 1129.03[3][a], at 1129-66.  In addition, the rationale for discrimination is part of the consideration of the second factor – whether the debtor can consummate the plan without the discrimination.  *Id.*  Collier concludes that "[t]he test boils down to whether the proposed discrimination has a reasonable basis and is necessary for reorganization."  *Id.*

Here, the Plan discriminates with respect to the recoveries provided to the four classes of unsecured claims.  Based on the value found by the Court, Class 5A, the Eligible Offerees that participate in the rights offering, will receive property with an approximate, midpoint value of $867,500,000[34] in exchange for a contribution of $775 million, or an approximate 11.94% dividend.  Class 5B will receive an approximate 4.5% dividend.  Class 6, the other general unsecured creditors, will receive approximately 7%.

---

[34]    Class 5A  will receive a debt-free New Permian worth $800 million in addition to 7.5% of the equity of LegacyCo.  As noted earlier the net value of the equity in LegacyCo is $900 million.  Hence, 7.5% of LegacyCo's equity is worth $67,500,000.00 ($900 million x 7.5%).  Class 5A's New Permian equity may be subject to some dilution because a portion of the New Permian equity is assigned to the AUNC Trust, and members of Classes 5B and 6 can opt to receive, directly or indirectly, shares in New Permian.  The Debtors did not provide evidence of whether any creditors have exercised that option or the amount, if any, of the dilution.

Finally, Classes 7A and 7B, the unidentified ongoing creditors of LegacyCo and New Permian, will receive 100% of their allowed claims.

The Debtors have not demonstrated why it is reasonable or necessary to pay Class 5B so much less percentagewise than Class 5A or Class 7, and less than Class 6. The Debtors have compared the treatment of Classes 5A and 5B in their unfair discrimination argument, but have not addressed the treatment of Class 5B compared to the treatment of Classes 6 and 7. In addition, the comparison between the treatment of Classes 5A and 5B is based on assumed values that are lower than the values found by the Court, and hence, the conclusion that Classes 5A and 5B are both receiving the same approximate 4.5% distribution is incorrect; Class 5A is receiving over two times greater value than Class 5B.

Accordingly, the Court concludes that the Debtors have failed to sustain their burden under 11 U.S.C. § 1129(b) to prove that the Plan does not unfairly discriminate against Class 5B.

### B.    Good Faith

The party seeking confirmation must show that "[t]he plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). "Good faith," as used in section 1129(a)(3), is not defined in the Bankruptcy Code, but the term is generally interpreted to mean that the plan "was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected." *Argo Fund Ltd. v. Bd. of Directors of Telecom Argentina, S.A* (*In re Bd. of Directors of Telecom Argentina, S.A*), 528 F.3d 162, 174 (2d Cir. 2008) (quoting *Koelbl v. Glessing*

(*In re Koelbl*), 751 F.2d 137, 139 (2d Cir.1984) (internal quotations omitted); *accord Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988) ("The good-faith test means that the plan was proposed with honesty and good intentions and with a basis for expecting that a reorganization can be effected."). Section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan." *In re Chemtura Corp.*, 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010); *accord Quigley, Inc.*, 437 B.R. at 125. It must be viewed in light of the totality of the circumstances surrounding the establishment of a chapter 11 plan. *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir. 1984); *Chemtura*, 439 B.R. at 608; *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *51 (S.D.N.Y. Oct. 31, 2003); *In re Leslie Fay Cos.*, 207 B.R. 764, 781 (Bankr. S.D.N.Y. 1997).

The Equity Committee as well as numerous unitholders and Bondholders contend that the Debtors did not propose the Plan in good faith. The common complaint is that Washburn ran these cases for the personal benefits he would receive under a proposed MIP, and acquiesced in the demands of the Second Lien Group for that reason. The Equity Committee and individual unitholders also argue that the Debtors have failed to address the CODI problem in good faith and the Plan was proposed in a manner that violated Delaware law.

### 1.   MIP

The MIP was a topic of several face to face, email and telephonic discussions primarily between Washburn and Clay Taylor, a managing director of EIG beginning in the summer of 2017, and was still under discussion at the time of the confirmation hearing. (*Washburn* ¶¶ 11-12.) Although it went through several iterations, by the time

of the confirmation hearing the concept of the MIP centered on a participation in LegacyCo's equity for the benefit of the Debtors' four key executives - Washburn, Jackson, Pease and Brown, *i.e.* Management.  In the latest version, the Second Lien Group will first recover an amount equal to $800 million plus any additional capital contributions and an 8% internal rate of return.  Thereafter, Management will begin to receive equity in accordance with a formula.  (BX 15 at 2.)  In addition, Management will receive employment agreements with LegacyCo on terms substantially similar to their existing employment agreements with Breitburn.  (BX 15 at 2.)

The Debtors emphasize that the MIP has not been approved and is still under consideration, but the argument misses the point.  Although the Second Lien Group has not committed to a MIP thus far, Management has an expectation that it will do so, and that the MIP may confer a substantial economic benefit as well as the promise of continued employment.  The Equity Committee further alleges that Management created Business Plan 4.3 for the purpose of hoarding cash and paying off the Second Lien Group as quickly as possible so that its members can begin to receive their equity in LegacyCo under the proposed MIP.  The possibility of the MIP plainly gives Management an interest in the Plan.

Management's interest does not, however, sound the death knell of the Plan. BBEP's Board of Directors (the "Board") unanimously approved the Plan at its October 10, 2017 meeting.  Although two members of Management, including Washburn, sat on the Board and voted for the Plan, five independent directors also voted in favor of the Plan.  Thus, even if the Management directors should have abstained from voting, and their votes are ignored, the Plan was unanimously approved by the remaining

independent, disinterested directors.  The Equity Committee nevertheless contends that the Plan was proposed in a manner forbidden by Delaware law, and hence, does not satisfy 11 U.S.C. § 1129(a)(3).

### 2.    Delaware Law

BBEP is a Delaware limited partnership governed by the Delaware Revised Limited Partnership Act of 1976, 6 DEL. CODE §§ 17-101, *et seq*.  The Equity Committee contends that the Plan was proposed in violation of Delaware corporate law, and ignores Delaware limited partnership law and BBEP's *Third Amended and Restated Agreement of Limited Partnership of Breitburn Energy Partners LP*, dated as of Apr. 8, 2015 ("*Partnership Agreement*").  (OEX 55).  The latter sets forth a procedure to deal with potential conflicts of interest between the General Partner or its affiliates on the one hand, and the Partnership, any Group Member, any Partner or its assignee on the other:

> [A]ny resolution or course of action by the General Partner or its Affiliates in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement . . . or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).

(*Partnership Agreement* § 7.9(a).)  "'Special Approval' means approval by a majority of the members of the Conflicts Committee acting in good faith."  (*Id*. at p. 21.)

Assuming that § 7.9(a) is applicable, the *Partnership Agreement* does not require an "express finding" as the Equity Committee argues; it grants a safe harbor if the

procedures are followed or the transaction satisfies one of the final two subparagraphs. As noted, the Board approved the Plan at its October 10, 2017 meeting. The materials distributed to the Board at the meeting informed the directors about the MIP, (BX 11 at 6, 9; Tr. Day 1, 172:12-18), and the five independent directors unanimously voted to approve the Plan. (*Pohl* ¶ 33 & n. 1; *see also Washburn* ¶ 10).) Although the Board was informed about the MIP, the Equity Committee questions how much the independent directors actually knew. However, the Equity Committee did not offer any evidence, such as the testimony of the independent directors, suggesting that the Board failed to act in good faith or make an informed judgment regarding the merits of the Plan, and I do not presume that the independent directors failed to perform their fiduciary duties as directors based on nothing more than the Equity Committee's speculation.

Admittedly, neither a Conflicts Committee nor a vote of common unitholders approved the Plan. Hence, the Debtors did not satisfy subparagraphs (i) or (ii) of section 7.9(a). As a result, the Court must determine whether the transactions contemplated by the Plan, specifically the transfer of the Permian Assets to New Permian and the Legacy Assets to LegacyCo, are on terms no less favorable than those offered by an unrelated third party and whether the Plan is fair and reasonable to BBEP taking into account the totality of the relationships between the parties involved. In the end, the question of compliance with Delaware law and good faith under Bankruptcy Code § 1129(a)(3) are essentially the same.

In judging good faith, it is necessary to consider the circumstances of these cases. At the outset, to say that the Prepetition Secured Lenders drove the plan process is to state the obvious. Using the middle value of the range of the Second Lien Debt, the

Debtors owed their Prepetition Secured Creditors $1.64 billion as of December 31, 2017,
(*Kosturos* ¶ 19), and interest and other charges continue to accrue as secured claims up
to the value of their collateral. *See* 11 U.S.C. § 506(b). Absent the consent of the two
classes of the Prepetition Secured Debt, the Debtors would have to cram them down
under 11 U.S.C. § 1129(b)(2)(A).

A cram down would not be easy. Basically, the Debtors would have to cash out
the Prepetition Secured Debt on the Effective Date or pay the present value of the
Prepetition Secured Debt over time, sell their collateral subject to Prepetition Secured
Creditors' rights to credit bid their claims, *RADLAD Gateway Hotel, LLC v.
Amalgamated Bank*, 566 U.S. 639, 647 (2012), or give the Prepetition Secured Creditors
the indubitable equivalent of their claims. *See* 11 U.S.C. § 1129(b)(2)(A). The Equity
Committee suggests that I could limit the Prepetition Secured Creditors' right to credit
bid in a sale, citing *In re Fisker Auto. Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del.
2014). Assuming I could or would do this, it would not help. The Prepetition Secured
Creditors would either retain their unsatisfied liens on the transferred property, 11
U.S.C. § 1129(b)(2)(A)(i)(I), which a buyer is not likely to accept (buyers generally want
the assets "free and clear" of liens, claims and interests), or the liens would attach to the
sale proceeds, 11 U.S.C. § 1129 (b)(2)(A)(ii), as collateral for the Prepetition Secured
Debt, and could not be used for other purposes. Furthermore, aside from the assets that
the Equity Committee and others argue should be sold, the Debtors have no other
property to distribute to the Prepetition Secured Creditors as the "indubitable
equivalent" of their secured claims. Finally, the Debtors owe an additional, approximate
$100 million in administrative debt, including professional fees and debtor in

60

possession financing claims.  (*Kosturos* ¶ 19.)  The administrative debt will continue to

grow as the case lingers, and unless the administrative creditors consent to less

favorable treatment, the administrative debt must be paid on the Effective Date.  *See* 11

U.S.C. § 1129(a)(9)(A).  Finally, unless the Debtors liquidated, they would need money

to continue to operate.

All of the difficult plan negotiations described by Pohl were aimed at continuing

Breitburn to the extent possible as a going concern, and ultimately succeeded.  The

Second Lien Group consented to take equity instead of cash in satisfaction of their

secured claims, the First Lien Group agreed to provide exit financing from its

distribution, the Class 5A creditors, by accepting the Plan, agreed to forego any

distribution except through participation in the rights offering, and the UCC agreed to

support the Plan because it provided for a distribution to the other unsecured creditors.

In this manner, the Plan reorganized $3 billion in debt, and Breitburn, through

LegacyCo, continued in business and saved jobs.

The alternative, advocated by the Equity Committee, unitholders and certain

Bondholders, is a liquidation sale of the Debtors' assets.  A debtor in possession is not

under a statutory duty to liquidate the estate's assets.  *See* 11 U.S.C. § 1106 (a)(1)

(omitting from the duties imposed on a chapter 11 trustee the chapter 7 trustee's duty

under Bankruptcy Code § 701(a)(1) to reduce to money property of the estate); 11 U.S.C.

§ 1107(a) (with exceptions, imposing on a debtor in possession the duties of a chapter 11

trustee).  While the debtor in possession nonetheless has a fiduciary duty to maximize

the value of the estate for the benefit of its stakeholders, *Smart World Techs., LLC v.*

*Juno Online Servs., Inc.* (*In re Smart World Techs., LLC*), 423 F.3d 166, 175 (2d Cir.

2005) ("[T]he Code not only authorizes the chapter 11 debtor to manage the estate's legal claims, but in fact requires the debtor to do so in a way that maximizes the estate's value."), and that duty may trigger an duty to sell when the debtor in possession is worth more dead than alive, *see In re Spa Chakra*, No. 09–17260 (SMB), 2010 WL 779270, at *3 (Bankr. S.D.N.Y. Mar. 5, 2010) ("[T]he sale of a going concern often fulfills the 'fundamental purpose of reorganization' by allowing the new owners to continue to operate the debtor's business and employ the debtor's former employees"), a prospective bidder does not prompt a duty to sell by making an offer inferior to the deal that is already on the table.

The Plan, in this regard, is superior to any unsolicited offers that the Debtors have received during these cases. The offer from Diamondback, which garnered the most attention, involved a contingent bid of $725 million for the Permian Assets. But those same assets will bring in $775 million under the Plan, and together with the 7.5% interest in LegacyCo's equity, discharge all of the Class 5A Bond Debt. Moreover, an auction sale of only the Permian Assets (or less than all of the Debtors' assets) would not provide the cash needed to emerge from bankruptcy because the Prepetition Secured Creditors would either credit bid or a third party would prevail at the auction and the liens securing the Prepetition Secured Debt would attach to the proceeds of the sale. In addition, the Lime Rock $1.8 billion Expression of Interest was inferior to the Plan for the reasons succinctly articulated by counsel to the UCC.

This is not to say that a higher and better offer can be ignored by the Debtors should one come in. At the hearing to consider the Lime Rock Expression of Interest, the Court asked the Debtors' counsel what price would be high enough to induce the

Debtors to entertain a third party bid. He responded "none." This was the wrong answer. Instead, the UCC gave the right answer. In substance, the UCC would consider a higher and better offer, it could not say what would make an offer higher and better but the Lime Rock Expression of Interest was not higher or better because it would leave nothing for the unsecured creditors. Should such an offer come in, the Debtors will doubtless consider it in consultation with the Prepetition Secured Lenders and UCC before rejecting it out of hand.[35]

### 3.    CODI

Another hotly contested good faith issue concerned the Debtors' approach to dealing with CODI. Breitburn is structured as a master limited partnership, and income and losses pass through directly to the common unitholders. If the Court confirms a chapter 11 plan that results in the cancellation of debt, the U. S. tax laws may require Breitburn's common unitholders to incur CODI that exceeds the value of their principal investment at the time they purchased their partnership units. *See* 26 U.S.C. § 108(d)(6). In that event, the common unitholders will not only lose their investments, they will be hit with a tax bill for the CODI.

To mitigate the likelihood of CODI, the Plan structured the transactions involving LegacyCo and New Permian as a taxable sale of their assets that will generate sufficient ordinary loss to offset any CODI. The Equity Committee acknowledged that this was a

---

[35]    On a going forward basis, the United States Trustee, whose duties include the appointment of official committees and their members, 11 U.S.C. § 1102, may wish to change the membership of the UCC to include a member of Class 5B. The current members of the UCC include an ongoing creditor who will be paid in full, the indenture trustee who represents all Bondholders and an individual accredited investor and member of Class 5A who subscribed to the rights offering. Class 5B, the unaccredited Bondholders, rejected the Plan and there are no Class 5B creditors that are members of the UCC.

usual approach used in other bankruptcy cases to mitigate the threat of CODI.  (*See Proposed Findings of Fact and Conclusions of Law of the Statutory Committee of Equity Security Holders in Opposition to Confirmation of Debtors' Third Amended Joint Chapter 11 Plan*, dated Jan. 31, 2018, at ¶ 142 (ECF Doc. # 2194).)  However, the Plan granted the Second Lien Group (or some subset) the right to make an election prior to the Effective Date to treat LegacyCo as a "C" corporation for tax purposes, (Plan at § 6.9(a)(iii)), and the effect of that election would cause the IRS to disallow the loss under, *inter alia*, the related party rules.  (Disclosure Statement at 78.)  The Second Lien Group never stated that it intended to exercise the election, but he Equity Committee contends that grant of this right means the Plan was proposed in bad faith.

Subsequent to the confirmation hearing, the Second Lien Group agreed not to make the election, if ever, until at least two days after the Effective Date.  (*Second Lien Objection* ¶ 6.)  Counsel to the Equity Committee acknowledged at the hearing on the Equity Committee's motion to reopen the record that the Second Lien Group's concession resolved the CODI issue.  Still, there are no guarantees that the IRS will not disallow the loss based on the related party loss disallowance provisions under the Internal Revenue Code.  (*Id.*)

I find that the Debtors have addressed and attempted to resolve the CODI issue in good faith.  Although there may be other methods of addressing the issue that will provide a greater degree of certainty to Equity, such as the outright sale of the assets to an unrelated third party, the Equity Committee has not cited any authority requiring the Debtors to adopt the alternative that is the least risky to Equity.  The Debtors and the other stakeholders structured the transactions as a taxable sale for the purpose of

64

generating taxable losses to offset CODI, and the approach, typical in chapter 11 cases, is reasonable under the circumstances. That the Second Lien Group obtained an option for its benefit that might increase the value of its distribution at the expense of Equity does not mean that the Debtors proposed their Plan in bad faith.

Accordingly, the Court concludes that the Debtors proposed the Plan in good faith and not by any means forbidden by law.

### C.    Other Confirmation Issues

Jack N. Mayer raised several confirmation issues *pro se*. (*See Objection of Jack N. Mayer to Confirmation of Debtors' Third Amended Joint Chapter 11 Plan*, signed Jan. 4, 2018 (ECF Doc. # 2087).) Mayer is a Class 5A creditor. He is unwilling or unable to subscribe to the rights offering, and consequently, will receive nothing under the Plan. He contends that the Plan violates the best interest of creditors test under 11 U.S.C. § 1127(a)(7), (*id.* ¶¶ 4-6), the Plan unfairly discriminates against and is not fair and equitable with respect to Class 5A, (*id.* ¶¶ 8-12), and implicitly, the Plan is proposed in bad faith because the Debtors' valuation of their assets is too low and they have refused to market their assets. (*Id.* ¶¶ 6(iii), 6(iv), 13-14.)

Mayer cannot raise an unfair discrimination/fair and equitable objection to his treatment because Class 5A accepted the Plan, and the cram down provisions under 11 U.S.C. § 1129(b) do not apply to his class. In addition, while the Debtors' valuations were lower than those found by the Court, the Debtors did not breach a duty to maximize the assets by refusing to entertain inferior, unsolicited offers or the

Expression of Interest, especially where the latter included the condition of UCC approval which could not be met.

The Debtors have also satisfied the best interest test. Section 1129(a)(7) of the Bankruptcy Code provides, in relevant part, that the Court "shall confirm a plan only if" each creditor in an impaired class "(i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." Section 1129(a)(7) is designed to protect individual rejecting and non-voting members of an impaired class by establishing the minimum that they must receive or retain under the plan. *Kane v. Johns-Manville Corp.*, 843 F.2d at 649 ("Subsection 1129(a)(7) incorporates the former 'best interest of creditors' test and requires a finding that each holder of a claim or interest either has accepted the plan or has received no less under the plan than what he would have received in a Chapter 7 liquidation."). The Liquidation Analysis supplied by the Debtors shows that the unsecured creditors, including the Bondholders, would not receive any distribution in a hypothetical chapter 7 case. (*Kosturos* Ex. A, at 10.) Because Mayer is not receiving *less* under the Plan than he would receive in the hypothetical chapter 7, his treatment satisfies the best interest of creditors test.[36]

Although not expressly raised by Mayer, his objection implicates the requirement for equal treatment because he will receive nothing under the Plan while members of his

---

[36]    In fact, the Liquidation Analysis demonstrates that the Plan meets the requirements of the best interest test as to all classes.

class that subscribe to the rights offering will receive equity in New Permian.  Section

1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of

a particular class, unless the holder of a particular claim or interest agrees to a less

favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).

Equality of treatment requires that all class members receive equal value and pay the

same consideration in exchange for their distributions.  *Ahuja v. LightSquared, Inc.* (*In

re LightSquared, Inc.*)*,* 534 B.R. 522, 537 (S.D.N.Y. 2015), *aff'd*, 644 F. App'x 24 (2d

Cir.), *cert. denied*, 137 S. Ct. 335 (2016); *In re Quigley Co. Inc.*, 377 B.R. 110, 116 (Bankr.

S.D.N.Y. 2007); *see In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986); *In re

W.R. Grace & Co.*, 475 B.R. 34, 121 (D. Del. 2012).

Section 1123(a)(4) requires equality of treatment, not equality of result.  It is

satisfied if claimants in the same class have the same opportunity for recovery.  *In re

W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("[C]ourts have interpreted the 'same

treatment' requirement to mean that all claimants in a class must have 'the same

opportunity' for recovery."); *Ad Hoc Committee of Personal Injury Asbestos Claimants

v. Dana Corp.*, (*In re Dana Corp.*), 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry

under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing,

but whether they have the same opportunity."); *In re Republic Airways Holdings, Inc.*,

565 B.R. 710, 728 n. 13 (Bankr. S.D.N.Y. 2017) (same); *see In re Central Med. Ctr., Inc.*,

122 B.R. 568, 574 (Bankr. E.D. Mo. 1990) (lottery system that paid certain bondholders

before others and at different interest rates did not violate section 1123(a)(4) because all

members were subject to the same process for the satisfaction of their claims).  Although

the subscribers and non-subscribers will receive different value on account of their

67

allowed claims, all Class 5A members had the same opportunity to subscribe or not subscribe to the rights offering on the same terms.  Accordingly, the Plan satisfies section 1123(a)(4) even though the non-subscribers in Class 5A will not receive or retain any property under the Plan.

Based on the foregoing, the Court denies the Debtors' application to confirm the Plan.  The Court further concludes that the remaining arguments raised by the parties lack merit or are rendered moot by virtue of the Court's disposition of the application. The foregoing constitutes the Court's findings of facts and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure, made applicable to this contested matter by Rule 9014(c) of the Federal Rules of Bankruptcy Procedure.

So ordered.

Dated:   New York, New York
         March 9, 2018

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
United States Bankruptcy Judge